# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**CONFIDENTIAL – FILED UNDER SEAL** |

## EXHIBIT 1
## STATEMENT OF ADMITTED FACTS

# **TABLE OF CONTENTS**

I.      PARTIES ......................................................................................1

II.     PATENT-IN-SUIT ........................................................................1

III.    PLAINTIFF'S BELRAPZO® PRODUCT ......................................4

IV.     PLAINTIFF'S BENDEKA® PRODUCT ........................................6

V.      ███████████████████ ................................................8

VI.     ███████████████████ .............................................9

VII.    PRIORITY DATE OF THE '483 PATENT ..................................10

VIII.   ALLEGED INFRINGEMENT BY SLAYBACK ........................11

IX.     ALLEGED INFRINGEMENT BY APOTEX ............................12

i

Exhibit 1
Statement of Admitted Facts

## STATEMENT OF ADMITTED FACTS

The following facts are undisputed or have been agreed to or stipulated to by the parties.

## I.   PARTIES

1.   Eagle Pharmaceuticals, Inc. ("Eagle") is a corporation organized and existing under the laws of Delaware, having its corporate offices and principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, NJ 07677.

2.   Slayback Pharma LLC ("Slayback") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 301 Carnegie Center, #303, Princeton, New Jersey 08540.

3.   Apotex Inc. is a corporation organized and existing under the laws of Canada, having its principal place of business at 150 Signet Drive, Toronto, Ontario, M9L 1T9, Canada.

4.   Apotex Corp. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.

## II.   PATENT-IN-SUIT

5.   U.S. Patent No. 11,103,483 (the "'483 patent"), entitled "Formulations of Bendamustine," issued on August 31, 2021.

6.   U.S. Patent Application No. 16/509,920 (the "'920 application"), the

Exhibit 1
Statement of Admitted Facts

patent application that issued as the '483 patent, was filed with the U.S. Patent and

Trademark Office ("USPTO") on July 12, 2019.

7.      The '920 application claims priority to U.S. Provisional Application

No. 61/299,100, filed on January 28, 2010.

8.      The '920 application is a continuation of U.S. Patent Application No.

16/015,656 (the "'656 application"), which was filed with the USPTO on June 22,

2018, but was later abandoned.

9.      The '656 application is a continuation of U.S. Patent Application No.

15/432,335 (the "'335 application"), the patent application that issued as U.S.

Patent No. 10,010,533, and was filed with the USPTO on February 14, 2017.

10.     The '335 application is a continuation of U.S. Patent Application No.

15/013,436 (the "'436 application"), the patent application that issued as U.S.

Patent No. 9,572,797, and was filed with the USPTO on February 2, 2016.

11.     The '436 application is a continuation of U.S. Patent Application No.

14/031,879 (the "'879 application"), the patent application that issued as U.S.

Patent No. 9,265,831, and was filed with the USPTO on September 19, 2013.

12.     The '879 application is a continuation of U.S. Patent Application No.

13/016,473 (the "'473 application"), the patent application that issued as U.S.

Patent No. 8,609,707, and was filed with the USPTO on January 28, 2011.

13.     Eagle Pharmaceuticals, Inc. is the assignee of the '483 patent.

Exhibit 1
Statement of Admitted Facts

14.    The expiration date of the '483 patent is January 28, 2031.

15.    The named inventors of the '483 patent are Nagesh R. Palepu and

Philip Christopher Buxton.

16.    Plaintiff is asserting claims 2, 4, and 12 of the '483 patent against

Defendants.

17.    Claim 1 of the '483 patent recites: "A ready to use liquid

bendamustine-containing composition comprising: bendamustine, or a

pharmaceutically acceptable salt thereof, wherein the bendamustine concentration

in the composition is from about 10 mg/mL to about 100 mg/mL; polyethylene

glycol; and a stabilizing amount of an antioxidant; the composition having less

than about 5% peak area response of total impurities resulting from the degradation

of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at

least 15 months at a temperature of from about 5° C. to about 25° C."

18.    Claim 2 of the '483 patent recites: "The ready to use liquid

bendamustine-containing composition of claim **1**, wherein the antioxidant is lipoic

acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium

formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-

containing aliphatic compound, dihydrolipoic acid, or a mixture thereof."

19.    Claim 4 of the '483 patent recites: "The ready to use liquid

bendamustine-containing composition of claim **1**, having less than about 5% peak

Exhibit 1
Statement of Admitted Facts

area response of total impurities resulting from the degradation of the

bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15

months at a temperature of about 25° C."

20.     Claim 8 of the '483 patent recites: "A method of treating cancer in a

mammal, comprising administering an effective amount of the ready to use liquid

bendamustine-containing composition of claim **1** to the mammal."

21.     Claim 12 of the '483 patent recites: "The method of claim **8**, wherein

the ready to use liquid bendamustine-containing composition has less than about

5% peak area response of total impurities resulting from the degradation of the

bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15

months at a temperature of about 5° C."

22.     Defendants contend that the asserted claims 2, 4, and 12 of the '483

patent are invalid.

23.     Defendants contend that the asserted claims 2, 4, and 12 of the '483

patent are not infringed.

## III.   PLAINTIFF'S BELRAPZO® PRODUCT

24.     BELRAPZO® Highlights of Prescribing Information states,

"BELRAPZO is an alkylating drug indicated for treatment of patients with: (1)

Chronic lymphocytic leukemia (CLL) and (2) Indolent B-cell non-Hodgkin

lymphoma (NHL) that has progressed during or within six months of treatment

Exhibit 1
Statement of Admitted Facts

with rituximab or a rituximab-containing regimen."

25.     The active ingredient in BELRAPZO® is bendamustine hydrochloride.

26.     The BELRAPZO® Full Prescribing Information states: "Each

milliliter of the injection contains 25 mg of bendamustine hydrochloride, USP, 0.1

mL of propylene glycol, USP, 5 mg of monothioglycerol, NF and q.s. to 1 mL

polyethylene glycol 400, NF."

27.     Plaintiff sells BELRAPZO® in the United States pursuant to New

Drug Application ("NDA") No. 205580.

28.     The U.S. Food & Drug Administration ("FDA") Approval Date for

BELRAPZO® is May 15, 2018.

29.     BELRAPZO® comprises bendamustine, or a pharmaceutically

acceptable salt thereof, wherein the bendamustine concentration in the composition

is from about 10 mg/mL to about 100 mg/mL.

30.     BELRAPZO® comprises polyethylene glycol.

31.     BELRAPZO® comprises a stabilizing amount of an antioxidant.

32.     BELRAPZO® has less than about 5% peak area response of total

impurities resulting from the degradation of the bendamustine, as determined by

HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from

about 5° C. to about 25° C.

33.     BELRAPZO® meets the claim limitation "wherein the antioxidant is

5

Exhibit 1
Statement of Admitted Facts

lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite,

sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a

phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof."

34.     BELRAPZO® has less than about 5% peak area response of total

impurities resulting from the degradation of the bendamustine, as determined by

HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from

about 5° C. to about 25° C.

35.     BELRAPZO® has less than about 5% peak area response of total

impurities resulting from the degradation of the bendamustine, as determined by

HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about

25° C.

36.     BELRAPZO® has less than about 5% peak area response of total

impurities resulting from the degradation of the bendamustine, as determined by

HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about

5° C.

37.     The use of BELRAPZO® in accordance with its FDA-approved

labeling is a method of treating cancer in a mammal.

## IV.   PLAINTIFF'S BENDEKA® PRODUCT

38.     BENDEKA®'s active ingredient is an alkylating drug indicated for

treatment of patients with: (1) Chronic lymphocytic leukemia (CLL) and (2)

Exhibit 1

Statement of Admitted Facts

Indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or

within six months of treatment with rituximab or a rituximab-containing regimen.

39.   The active ingredient in BENDEKA® is bendamustine hydrochloride.

40.   The BENDEKA® Full Prescribing Information states: "Each milliliter

contains 25 mg of bendamustine hydrochloride, 0.1 mL of Propylene Glycol, USP,

5 mg of Monothioglycerol, NF, in Polyethylene Glycol 400, NF. Sodium

hydroxide may have been used to adjust the acidity of polyethylene glycol 400."

41.   BENDEKA® is sold in the United States pursuant to New Drug

Application ("NDA") No. 208194.

42.   The U.S. Food & Drug Administration ("FDA") Approval Date for

BENDEKA® is December 7, 2015.

43.   BENDEKA® comprises bendamustine, or a pharmaceutically

acceptable salt thereof, wherein the bendamustine concentration in the composition

is from about 10 mg/mL to about 100 mg/mL.

44.   BENDEKA® comprises polyethylene glycol.

45.   BENDEKA® comprises a stabilizing amount of an antioxidant.

46.   BENDEKA® has less than about 5% peak area response of total

impurities resulting from the degradation of the bendamustine, as determined by

HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from

about 5° C. to about 25° C.

Exhibit 1
Statement of Admitted Facts

47.    BENDEKA® meets the claim limitation "wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof."

48.    BENDEKA® has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5° C. to about 25° C.

49.    BENDEKA® has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25° C.

50.    BENDEKA® has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5° C.

51.    The use of BENDEKA® in accordance with its FDA-approved labeling is a method of treating cancer in a mammal.

**V.**    ████████████████████████

52.    By letter dated October 31, 2018 (the "Slayback Notice Letter"),

Exhibit 1

Statement of Admitted Facts

Slayback notified Eagle pursuant to 21 C.F.R. § 314.52(c)(2) that Slayback was

seeking FDA approval of New Drug Application No. 212209 to market in the

United States the bendamustine hydrochloride injection product described therein

("Slayback's NDA Product").

53.



54.

VI. 

55.    By letter dated August 16, 2021 (the "Apotex Notice Letter"), Apotex

Inc. notified Eagle pursuant to 21 C.F.R. § 314.52(c)(2) that Apotex Inc. was

seeking FDA approval of New Drug Application No. 215033 to market in the

Exhibit 1
Statement of Admitted Facts

United States the bendamustine hydrochloride injection product described therein

("Apotex's Proposed NDA Product").

56.     Apotex Inc. submitted NDA No. 215033 to the FDA seeking approval

to market in the United States Apotex's Proposed NDA Product, and appointed

Apotex Corp. as the U.S. agent for NDA No. 215033.

57.     

58.

## VII.   PRIORITY DATE OF THE '483 PATENT

59.     Asserted claims 2, 4, and 12 of the '483 patent are entitled to a

Exhibit 1
Statement of Admitted Facts

priority date of January 28, 2010.

## VIII.  ALLEGED INFRINGEMENT BY SLAYBACK

60.     Plaintiff is asserting that Slayback's NDA Product infringes claims 2, 4, and 12 of the '483 patent.



Exhibit 1
Statement of Admitted Facts



70.    Slayback contends the Asserted Claims of the '483 patent are invalid.

71.    Slayback contends the Asserted Claims of the '483 patent are not

infringed.

## IX.    ALLEGED INFRINGEMENT BY APOTEX

72.    Plaintiff is asserting that Apotex's Proposed NDA Product infringes

claims 2, 4, and 12 of the '483 patent.

73.

Exhibit 1
Statement of Admitted Facts



74.

75.

76.

77.

78.

79.

Exhibit 1
Statement of Admitted Facts



80.

81.

82.     Apotex contends the Asserted Claims of the '483 patent are invalid.

83.     Apotex contends the Asserted Claims of the '483 patent are not infringed.

# EXHIBIT 2A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

Plaintiff,

v.

SLAYBACK PHARMA LLC,
APOTEX INC., and APOTEX CORP.,

Defendants.

C.A. No. 21-1256-CFC-JLH

## EXHIBIT 2A
## PLAINTIFF'S STATEMENT OF ISSUES OF FACT
## THAT REMAIN TO BE LITIGATED

Exhibit 2A
Plaintiff's Statement of Issues of Fact

## TABLE OF CONTENTS

I.    INFRINGEMENT BY SLAYBACK ................................................................2

II.   INFRINGEMENT BY APOTEX ....................................................................3

III.  VALIDITY ....................................................................................................5

     A.    Anticipation ........................................................................................5
     B.    *Prima Facie* Obviousness ..................................................................10
     C.    Objective Indicia of Non-Obviousness ...............................................14
     D.    Indefiniteness .....................................................................................15

IV.  REMEDIES ..................................................................................................16

Exhibit 2A
Plaintiff's Statement of Issues of Fact

## PLAINTIFF'S STATEMENT OF ISSUES OF FACT
## THAT REMAIN TO BE LITIGATED

Pursuant to Local Rule 16.3(c)(5), the Court's Scheduling Order (D.I. 27), and the Court's June 9, 2022 Oral Order, Plaintiff Eagle Pharmaceuticals, Inc. ("Plaintiff") hereby submits the following Statement of Issues of Fact that Remain to be Litigated ("Statement"). Plaintiff incorporates by reference any issues of fact set forth in its responsive papers to any comparable material filed by Defendants.

By including an issue of fact in this Statement, Plaintiff does not assume the burdens of proof that govern that issue.  Further, by identifying a fact issue in this Statement, Plaintiff does not concede that Defendants have provided sufficient evidence to survive judgment as a matter of law. Plaintiff reserves the right to contend that it is entitled to judgment as a matter of law on any and all issues.

Plaintiff reserves the right to modify or supplement this Statement to the extent necessary to reflect any future rulings by the Court, or to fairly respond to any new issues that Defendants may raise. By submitting this Statement, Plaintiff does not waive its right to amend or supplement this submission after they consider Defendants' submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, trial, or post-trial briefing.

If any of these issues of fact is deemed to be an issue of law rather than an issue of fact, Plaintiff incorporates the issues by reference into Plaintiff's Statement of Issues of Law that Remain to be Litigated (Exhibit 3A). Conversely,

Exhibit 2A
Plaintiff's Statement of Issues of Fact

if any issue in Plaintiff's Statement of Issues of Law that Remain to be Litigated is

deemed to be an issue of fact, Plaintiff incorporates the issues by reference into this

Statement.

## I.    INFRINGEMENT BY SLAYBACK

1.    Whether Plaintiff has proven by a preponderance of the evidence that

Defendant Slayback Pharma LLC's ("Slayback's) submission of New Drug

Application No. 212209 ("Slayback's NDA") constitutes an act of infringement of

the asserted claims of the '483 patent, either literally or under the doctrine of

equivalents.

2.    Whether Plaintiff has proven by a preponderance of the evidence that

Slayback's commercial use, manufacture, sale, offer for sale, or importation of

Slayback's NDA Product would infringe, actively induce and/or contribute to the

infringement by others of the asserted claims under any of 35 U.S.C. § 271(a), (b),

or (c), either literally or under the doctrine of equivalents.

3.    Whether Plaintiff has proven by a preponderance of the evidence that

Slayback's NDA Product is "ready to use."

4.    Whether Plaintiff has proven by a preponderance of the evidence that

Slayback's NDA Product is "[a]ble to be dispensed with minimal if any effort or

preparation; prepackaged."

Exhibit 2A
Plaintiff's Statement of Issues of Fact

5. Whether Plaintiff has proven by a preponderance of the evidence that Slayback represented in a certified submission to the FDA that Slayback's NDA Product is "ready to use."

6. Whether Slayback should be bound by its multiple representations to the FDA, under oath and potential criminal penalty, that its proposed formulation/composition is "ready to use."

7. Whether Plaintiff has proven by a preponderance of the evidence that prosecution history estoppel does not apply to limit the application of the doctrine of equivalents to Slayback's NDA Product.

8. Whether Plaintiff has proven by a preponderance of the evidence that the a POSA reading the '483 patent as a whole would not identify a disclosure of liquid bendamustine formulations that are to be administered through infusion with a suitable diluent as an alternative to claimed "ready to use" liquid bendamustine formulations and thus the disclosure dedication rule does not limit the application of the doctrine of equivalents.

## II. INFRINGEMENT BY APOTEX

9. Whether Plaintiff has proven by a preponderance of the evidence that Defendants Apotex Inc.'s and Apotex Corp.'s (together, "Apotex's") submission of New Drug Application No. 215033 ("Apotex's NDA") constitutes an act of

Exhibit 2A
Plaintiff's Statement of Issues of Fact

infringement of the asserted claims of the '483 patent, either literally or under the doctrine of equivalents.

10.     Whether Plaintiff has proven by a preponderance of the evidence that Apotex's commercial use, manufacture, sale, offer for sale, or importation of Apotex's NDA Product would infringe, actively induce and/or contribute to the infringement by others of the asserted claims under any of 35 U.S.C. § 271(a), (b), or (c), either literally or under the doctrine of equivalents.

11.     Whether Plaintiff has proven by a preponderance of the evidence that Apotex's NDA Product is "ready to use."

12.     Whether Plaintiff has proven by a preponderance of the evidence that Apotex's NDA Product is "[a]ble to be dispensed with minimal if any effort or preparation; prepackaged."

13.     Whether Plaintiff has proven by a preponderance of the evidence that Apotex represented in a certified submission to the FDA that Apotex's NDA Product is "ready to use."

14.     Whether Apotex should be bound by its representation to the FDA, under oath and potential criminal penalty, that its proposed formulation/composition is "ready to use."

Exhibit 2A
Plaintiff's Statement of Issues of Fact

15.     Whether Plaintiff has proven by a preponderance of the evidence that prosecution history estoppel does not apply to limit the application of the doctrine of equivalents to Apotex's NDA Product.

16.     Whether Plaintiff has proven by a preponderance of the evidence that the a POSA reading the '483 patent as a whole would not identify a disclosure of liquid bendamustine formulations that are to be administered through infusion with a suitable diluent as an alternative to claimed "ready to use" liquid bendamustine formulations and thus the disclosure dedication rule does not limit the application of the doctrine of equivalents.

## III.    VALIDITY

### A.    Anticipation

17.     Whether Defendants have failed to prove by clear and convincing evidence that the asserted claims are anticipated, either expressly or inherently, by International Patent Publication No. WO 2010/036702 A1 (filed September 23, 2009) to Drager et al. ("Drager").

18.     Whether Defendants have failed to prove by clear and convincing evidence that Drager discloses a ready to use liquid bendamustine-containing composition comprising all of the claimed elements as arranged or combined in the same way as in the claims of the '483 patent.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

19.     Whether Defendants have failed to prove that a POSA would at once envisage each member of the definite and limited class of potential formulations disclosed in Drager, including the specific claims identified by Defendants, which generally describe laundry lists of ingredients that would lead to innumerable combinations of potential formulations.

20.     Whether Defendants have failed to prove that Drager directs those skilled in the art to the claimed subject matter without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of Drager.

21.     Whether Defendants have established by clear and convincing evidence that a POSA reading Drager would have been led by its specific teachings concerning stability to utilize PEG as a solvent in a liquid formulation comprising a polar aprotic solvent.

22.     Whether Defendants have failed to prove by clear and convincing evidence that Drager provides any reason or motivation to utilize PEG in a bendamustine formulation.

23.     Whether a POSA would understand that Drager disclosed the use of uncommon or disfavored polar aprotic solvents for use in pharmaceutical formulations, compared to more common polar protic solvents, such as water, ethanol or propylene glycol.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

24.     Whether Defendants have failed to prove by clear and convincing evidence that Drager disclosed a liquid bendamustine formulation comprising a stabilizing amount of an antioxidant.

25.     Whether Defendants have failed to prove by clear and convincing evidence that Drager provided guidance as to why a POSA would include PEG combined with a stabilizing amount of an antioxidant in a liquid bendamustine formulation.

26.     Whether Defendants have failed to prove by clear and convincing evidence that Drager disclosed that a bendamustine formulation containing PEG would be susceptible to oxidation or require a stabilizing amount of an antioxidant.

27.     Whether, as of the priority date of the '483 patent, there were commercially available pharmaceutical formulations for human use comprising PEG and a stabilizing amount of an antioxidant.

28.     Whether, as of the priority date of the '483 patent, the prior art taught that bendamustine degraded via oxidation.

29.     Whether Defendants have failed to prove by clear and convincing evidence that a POSA would understand that Drager disclosed ready to use liquid bendamustine-containing compositions containing PEG and a stabilizing amount of an antioxidant that inherently meets the stability limitation of the '483 patent.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

30.     Whether Defendants have failed to prove by clear and convincing

evidence that a POSA would understand that Drager disclosed ready to use liquid

bendamustine-containing compositions containing PEG and a stabilizing amount

of an antioxidant that necessarily results in the claimed stability limitation of the

'483 patent.

31.     Whether Defendants have failed to prove by clear and convincing

evidence that the claim limitation "less than about 5% peak area response of total

impurities resulting from the degradation of the bendamustine, as determined by

HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from

about 5ºC. to about 25º C." is an inherent property of the formulations disclosed by

Drager.

32.     Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses all elements of claim 2 including the claim

limitation "wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate,

methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-

containing aromatic compound, a phenol-containing aliphatic compound,

dihydrolipoic acid, or a mixture thereof" as arranged or combined in the same way

as in claim 2 of the '483 patent.

33.     Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses all elements of claim 3 including the claim

Exhibit 2A
Plaintiff's Statement of Issues of Fact

limitation "wherein the ready to use liquid bendamustine-containing composition

has less than about 5% peak area response of total impurities resulting from the

degradation of the bendamustine, as determined by HPLC as a wavelength of 223

nm after at least 15 months at a temperature of about 5º C" as arranged or

combined in the same way as in claim 3 of the '483 patent.

34.   Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses all elements of claim 4 including the claim

limitation "having less than about 5% peak area response of total impurities

resulting from the degradation of the bendamustine, as determined by HPLC as a

wavelength of 223 nm after at least 15 months at a temperature of about 25º C" as

arranged or combined in the same way as in claim 4 of the '483 patent.

35.   Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses a formulation that would have all elements of claim

4 including the stability profile recited in claim 4 of the '483 patent.

36.   Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses all elements of claim 6 including the claim

limitation "wherein the bendamustine concentration is about 25 mg/mL" as

arranged or combined in the same way as in claim 6 of the '483 patent.

37.   Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses all elements of claim 12 including the claim

Exhibit 2A
Plaintiff's Statement of Issues of Fact

limitation "having less than about 5% peak area response of total impurities

resulting from the degradation of the bendamustine, as determined by HPLC as a

wavelength of 223 nm after at least 15 months at a temperature of about 25º C" as

arranged or combined in the same way as in claim 12 of the '483 patent.

38.    Whether Defendants have failed to prove by clear and convincing

evidence that Drager discloses a formulation that would have all elements of claim

12 including the stability profile recited in claim 12 of the '483 patent.

39.    Whether Defendants have failed to prove by clear and convincing

evidence that claim 5 of U.S. Patent No. 8,344,006 (the "'006 Patent") claims

priority to U.S. Provisional Application No. 61/100,074 (the "'074 application"),

filed September 25, 2008.

40.    Whether Defendants have failed to prove by clear and convincing

evidence that claim 5 of the '006 Patent disclosed all elements of the asserted

claims of the '483 patent, as arranged in the claims.

**B.    *Prima Facie* Obviousness**

41.    Whether Defendants have failed to prove by clear and convincing

evidence that the asserted claims (claims 2, 4, and 12) would have been obvious

over Drager or the '006 Patent[1].

---

[1] Defendants have improperly raised for the first time in their Pre-Trial Order
submissions new obviousness combinations that were never previously disclosed

Exhibit 2A
Plaintiff's Statement of Issues of Fact

42.　　Whether Defendants' contentions that the asserted claims would have been obvious impermissibly rely on hindsight.

43.　　Whether Defendants have failed to prove by clear and convincing evidence that each and every element of the asserted claims was disclosed in Drager or the '006 Patent.

44.　　Whether Defendants have failed to prove by clear and convincing evidence that the POSA would have been motivated to or had reason to modify or combine Drager in the precise manner required to use the inventions recited in the asserted claims.

45.　　Whether Defendants have failed to prove by clear and convincing evidence that the POSA would have been motivated to or had reason to modify or combine the '006 Patent in the precise manner required to use the inventions recited in the asserted claims.

46.　　Whether Defendants have failed to prove by clear and convincing evidence that the POSA would have had a reasonable expectation of success in making or using the inventions recited in the asserted claims.

---

during discovery, that the '483 patent is obvious over Drager combined with the '006 patent and the general knowledge in the art. *See* PTO Ex. 2B at Section VIII; ¶ 239. These belated combinations should be stricken and Defendants should not be allowed to present any such undisclosed combinations at trial.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

47.    Whether Defendants have failed to prove by clear and convincing evidence that the POSA, on the basis of the prior art as a whole, would have been motivated and would have had a reasonable expectation of success starting with Drager over any of the other available bendamustine formulations, such as Treanda or Ribomustin.

48.    Whether Defendants have failed to prove by clear and convincing evidence that the POSA, on the basis of the prior art as a whole, would have been motivated to select PEG as an excipient in a liquid bendamustine formulation, or would have had a reasonable expectation of success in formulating a liquid bendamustine composition with PEG as claimed.

49.    Whether a POSA, as of the priority date of the '483 patent, would not have included PEG in a liquid bendamustine formulation because the POSA would have expected PEG to exacerbate the bendamustine degradation due to PEG's high polarity and high nucleophilic reactivity.

50.    Whether, as of the priority date of the '483 patent, the prior art taught that bendamustine was subject to oxidative degradation.

51.    Whether, as of the priority date of the '483 patent, the prior art taught that polar aprotic solvents were disfavored for use in pharmaceutical formulations, particularly as compared to more common polar protic solvents.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

52.     Whether a POSA would be motivated to pursue a formulation comprising PEG based on Drager's disclosure of stability and solubility data for a bendamustine formulation comprising DMA and PG.

53.     Whether Drager teaches away from the use of PEG in bendamustine formulations.

54.     Whether Defendants have failed to prove by clear and convincing evidence that the POSA, on the basis of the prior art as a whole, would have been motivated to use a stabilizing amount of an antioxidant in the claimed liquid bendamustine formulation, or would have had a reasonable expectation of success in formulating the claimed liquid bendamustine composition with a stabilizing amount of antioxidant.

55.     Whether Defendants have failed to prove by clear and convincing evidence that the POSA, on the basis of the prior art as a whole, would have been motivated to include a stabilizing amount of an antioxidant with PEG to reduce any alleged esterification caused by PEG.

56.     Whether Defendants have failed to prove by clear and convincing evidence that the POSA, on the basis of the prior art as a whole, would have had a reasonable expectation of success in using a stabilizing amount of an antioxidant to reduce any alleged esterification caused by PEG.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

57.     Whether Defendants have failed to prove by clear and convincing evidence that the POSA, on the basis of the prior art as a whole, would have a reasonable expectation of successfully achieving the claimed stability profile.

58.     Whether Defendants have failed to prove by clear and convincing evidence that the claimed stability profile in the '483 patent is inherent in Drager's or the '006 Patent's formulations.

59.     Whether Defendants have failed to prove by clear and convincing evidence that the POSA, based on Drager's disclosure of an undifferentiated list of excipients, would have been motivated to select propyl gallate, tocopherol, BHA, or BHT in lieu of niacinamide as an antioxidant.

**C.     Objective Indicia of Non-Obviousness**

60.     Whether objective indicia of non-obviousness, including unexpected results, teaching away, long-felt need, and failure of others, support the validity of the asserted claims of the '483 patent.

61.     Whether the prior art as a whole taught away from the use of polar, protic solvents by presenting them as optional or inferior to formulations containing only polar aprotic solvents.

62.     Whether, as of the priority date of the '483 patent, the prior art taught that bendamustine was subject to oxidative degradation.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

63.     Whether the use of both PEG and a stabilizing amount of an antioxidant resulted in the claimed stability both at room temperature and under refrigeration was an unexpected result compared to the expectations of a POSA before the priority date of the asserted patent.

64.     Whether the claimed inventions of the '483 patent satisfied a long felt need for a stable, tolerable liquid bendamustine drug product that was commercially viable.

65.     Whether the prior art as a whole evidenced the failure of others to develop a stable, liquid, commercially viable bendamustine formulation until the inventions of the '483 patent.

**D.    Indefiniteness**

66.     Whether Defendants have proven by clear and convincing evidence that the claim term "ready to use" is indefinite.

67.     Whether Defendants have proven by clear and convincing evidence that '483 patent claims, specification, and prosecution history would not inform the POSA with reasonable certainty of the scope of the inventions claimed by the asserted claims with respect to the claim term "ready to use."

68.     Whether a POSA would have understood the scope of the claim term "ready to use" as "able to be dispensed with minimal effort or preparation."

Exhibit 2A
Plaintiff's Statement of Issues of Fact

69.     Whether a POSA would have understood that the ready to use liquid bendamustine-containing compositions of the '483 patent decreased the number of steps for dispensing, as compared to lyophilized compositions.

70.     Whether a POSA would have understood that lyophilized bendamustine compositions required reconstitution and were not able to be dispensed with minimal if any effort or preparation.

## IV.    REMEDIES

71.     Whether Plaintiff is entitled to a judgment that Slayback has infringed, will infringe, will actively induce infringement of, and/or will contribute to the infringement by others of the '483 patent.

72.     Whether Plaintiff is entitled to a judgment that Apotex has infringed, will infringe, will actively induce infringement of, and/or will contribute to the infringement by others of the '483 patent.

73.     Whether Plaintiff is entitled to an order pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval for Slayback's NDA Product be not earlier than the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

74.     Whether Plaintiff is entitled to an order pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval for Apotex's

Exhibit 2A
Plaintiff's Statement of Issues of Fact

NDA Product be not earlier than the expiration date of the '483 patent, inclusive of

any extension(s) and additional period(s) of exclusivity.

75.    Whether Plaintiff is entitled to a preliminary and permanent injunction

pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283 enjoining

Slayback, its officers, agents, servants, employees and attorneys, and all persons

acting in concert with them, from making, using, selling, offering for sale,

marketing, distributing, or importing Slayback's NDA Product, or the inducement

of or the contribution to any of the foregoing, prior to the expiration date of the

'483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

76.    Whether Plaintiff is entitled to a preliminary and permanent injunction

pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283 enjoining

Apotex, its officers, agents, servants, employees and attorneys, and all persons

acting in concert with them, from making, using, selling, offering for sale,

marketing, distributing, or importing Apotex's NDA Product, or the inducement of

or the contribution to any of the foregoing, prior to the expiration date of the '483

patent, inclusive of any extension(s) and additional period(s) of exclusivity.

77.    Whether Plaintiff is entitled to a judgment that making, using, selling,

offering for sale, marketing, distributing, or importing Slayback's NDA Product,

prior to the expiration date of the '483 patent, will infringe, actively induce

infringement of, and/or contribute to the infringement by others of the '483 patent.

Exhibit 2A
Plaintiff's Statement of Issues of Fact

78.     Whether Plaintiff is entitled to a judgment that making, using, selling, offering for sale, marketing, distributing, or importing Apotex's NDA Product, prior to the expiration date of the '483 patent, will infringe, actively induce infringement of, and/or contribute to the infringement by others of the '483 patent.

79.     Whether Plaintiff is entitled to a judgment that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285.

80.     Whether Plaintiff is entitled to costs and expenses in this action.

81.     Whether Plaintiff is entitled to further and other relief the Court may deem just and proper.

# EXHIBIT 2B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**CONFIDENTIAL – FILED UNDER SEAL** |

## <u>EXHIBIT 2B</u>
## <u>DEFENDANTS' STATEMENT OF ISSUES OF FACT</u>
## <u>THAT REMAIN TO BE LITIGATED</u>

## TABLE OF CONTENTS

I.    CLAIM CONSTRUCTION ........................................................3

II.   PERSON OF ORDINARY SKILL IN THE ART ("POSA").......................4

III.  THE '483 PATENT.............................................................6

    A.   The Specification............................................................6

    B.   The Claims ...................................................................6

    C.   The Prosecution History....................................................8

IV.   TECHNICAL BACKGROUND ...............................................10

    A.   Formulations for Parenteral Administration .........................11

    B.   Excipient Selection for Parenteral Formulations ..................12

        1.   API-Bendamustine ...................................................15

        2.   Polyethylene Glycol ("PEG")....................................20

        3.   Antioxidants ........................................................22

    C.   Parental Products Containing Cytotoxic Agents................38

    D.   Dispensing Bendamustine Hydrochloride Parenteral
        Products ...................................................................43

V.    SCOPE AND CONTENT OF THE PRIOR ART........................48

    A.   Drager ......................................................................48

        1.   Drager discloses liquid bendamustine formulations
            within the claimed concentration ranges .................49

        2.   Drager discloses PEG as an excipient in bendamustine
            liquid formulations....................................................51

        3.   Drager discloses antioxidants as an excipient that
            reduced oxidation and thereby increases stability of
            bendamustine liquid formulations..............................54

        4.   Drager discloses bendamustine liquid formulations
            that are stable over typical commercial storage
            periods, including 15 months....................................56

        5.   Drager discloses specific bendamustine liquid
            formulations that include each of the limitations of the
            '483 patent............................................................60

Exhibit 2B
Defendants' Statement of Issues of Fact

VI.   DEFENDANTS' PROPOSED NDA PRODUCTS DO NOT INFRINGE THE '483 PATENT ....................................................65

    A.   ████████████████████ ........................................65

    B.   The Apotex Proposed NDA Product Is Not "Ready to Use"..............71

    C.   ████████████████████ ........................................73

    D.   The Slayback Proposed NDA Product Is Not "Ready to Use"....................................................................................78

    E.   Apotex's and Slayback's NDA Products Do Not Infringe the '483 Patent Under the Doctrine of Equivalents .................................79

VII.  THE ASSERTED CLAIMS OF THE '483 PATENT ARE INVALID AS ANTICIPATED BY THE '006 PATENT AND AS ANTICIPATED BY DRAGER ....................................................81

    A.   Claim 1 of the '483 Patent is Anticipated by Drager .........................81

        1.   Claim 1 of the '483 Patent is Anticipated by Claim 5 of the '006 Patent .....................................................83

        2.   Claim 1 of the '483 Patent is Anticipated by Drager...............92

    B.   Claim 2 of the '483 Patent is Anticipated by Either of the ''006 Patent or Drager....................................................103

    C.   Claim 4 of the '483 Patent is Anticipated by Either of the ''006 Patent or Drager....................................................104

    D.   Claim 8 of the '483 Patent is Anticipated by Either of the ''006 Patent or Drager....................................................105

    E.   Claim 12 of the '483 Patent Is Anticipated by Either of the ''006 Patent or Drager....................................................106

VIII. THE ASSERTED CLAIMS OF THE '483 PATENT ARE INVALID AS OBVIOUS TO A POSA OVER DRAGER, THE '006 PATENT, AND THE GENERAL KNOWLEDGE IN THE ART ........................................................................107

    A.   Claim 1 of the '483 Patent is Obvious Over Drager .........................107

        1.   A POSA would be motivated to use PEG in stable liquid bendamustine formulations.............................................108

Exhibit 2B
Defendants' Statement of Issues of Fact

2.  A POSA would be motivated to use a stabilizing amount of antioxidant in stable liquid bendamustine formulations ..............................................................111

3.  A POSA would have had a reasonable expectation of success in arriving at the liquid bendamustine formulations of the asserted claims .........................................116

B.  Claim 1 of the '483 Patent is Obvious Over Drager .........................120

C.  Claim 2 of the '483 Patent is Obvious Over Drager .........................132

D.  Claim 4 of the '483 Patent is Obvious Over Drager .........................133

E.  Claim 8 of the '483 Patent is Obvious Over Drager .........................134

F.  Claim 12 of the '483 Patent Is Obvious Over Drager .......................135

G.  SECONDARY CONSIDERATIONS ................................................136

1.  No Evidence of Unexpected Results ......................................136

IX.  THE ASSERTED CLAIMS OF THE ''483 PATENT ARE INVALID UNDER 35 U.S.C. § 112 ..........................................................141

Exhibit 2B
Defendants' Statement of Issues of Fact

## **DEFENDANTS' STATEMENT OF ISSUES OF FACT**
## **THAT REMAIN TO BE LITIGATED**

Pursuant to Local Rule 16.3(c)(4), the Court's Scheduling Order (D.I. 27), and the Court's June 9, 2022 Oral Order, Defendants Slayback Pharma Limited LLC ("Slayback"), Apotex, Inc. and Apotex Corp. (together "Apotex") (collectively, "Defendants") hereby submit this Statement of Issues of Fact that Remain to be Litigated ("Statement"). Defendants incorporate by reference any issues of fact set forth in its responsive papers to any comparable material filed by Plaintiff Eagle Pharmaceuticals, Inc. ("Plaintiff"). In this action, Plaintiff is currently asserting U.S. Patent No. 11,103,483 ("the '483 patent" or "Patent-in-Suit").

Defendants reserve all rights with respect to these disclosures, including the right to amend, supplement, or otherwise modify these disclosures without prejudice according to the schedule set forth by the Parties for pre-trial exchanges, the local rules, the Federal Rules of Civil Procedure, and any other basis in fact or law. Defendants reserve the right to affirmatively use, elaborate upon, or dispute any fact cited by Plaintiff, including the scientific bases for such fact or Plaintiff's application of such fact in this case, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, trial, or post-trial briefing..

By including a fact herein, Defendants do not assume the burden of proof or production with regard to that fact. As such, Defendants reserve the right to object

Exhibit 2B
Defendants' Statement of Issues of Fact

and/or contest those alleged facts and present any and all rebuttal evidence in

response to those alleged facts when identified by Plaintiff.  Any fact not

specifically admitted in the parties' Statement of Uncontested Facts should be

considered contested, even if not specifically enumerated herein.  Defendants'

following statement is based, in relevant part, on their current understanding of

Plaintiff's positions.

If any of these issues of fact is deemed to be an issue of law rather than an

issue of fact, Defendants incorporate the issues by reference into Defendants'

Statement of Issues of Law that Remain to be Litigated (Exhibit 3B).  Conversely,

if any issue in Defendants' Statement of Issues of Law that Remain to be Litigated

is deemed to be an issue of fact, Defendant incorporates the issues by reference

into this Statement.  Defendants incorporate by reference their expert reports in

support of any proof to be presented by expert testimony.  To the extent that a fact

or an issue of fact in one section applies to another section, claim or theory, it is

incorporated therein as well without separate repetition.  Defendants incorporate by

reference the Statement of Admitted Facts.

To the extent Defendants set forth a statement of contested fact in one

section of this document, its use is not limited to that section or to the issue

addressed in that section.  Defendants reserve the right to use any assertion of fact

in this document in connection with any defense they advance.  By way of

Exhibit 2B

Defendants' Statement of Issues of Fact

example, a statement of contested fact asserted in connection with one theory of

anticipation may be used, to the extent applicable, with any other theory of

anticipation, and with any theory of obviousness or any other defense that

Defendants advance.  As another example, Defendants' failure to repeat, in

connection with a theory or defense, statements of contested fact that are already

asserted elsewhere in this document with respect to other theories or defenses, is

not a waiver of using such contested fact with all applicable theories and defenses.

## I.    CLAIM CONSTRUCTION

1.    The parties have stipulated to the following construction of the claim

term "ready to use,"

| Claim Term | Construction |
|---|---|
| "ready to use" | Able to be dispensed with minimal if any effort or preparation; prepackaged |

2.    Any remaining claim terms are construed consistent with their

meaning to a person having ordinary skill in the art at the time of the invention, in

view of the specification and prosecution history.

3.    The '483 patent also defines various terms within the specification

itself.  *See e.g.,* '483 patent, at 3:62-67.  To the extent the '483 specification

defines terms not addressed by the Court but that are relevant, the definitions in the

specification are used in this Statement.

4.    Eagle has agreed in a separate litigation involving the '483 patent that

Exhibit 2B
Defendants' Statement of Issues of Fact

a "stabilizing amount of an antioxidant" is "any amount of an antioxidant that

decreases the amount of bendamustine degradation after any time period and at any

temperature." *See Eagle Pharms., Inc. v. Celerity Pharms., LLC*, No. 22-cv-42-

CFC, D.I. 64, Joint Claim Construction Chart, at 5.

## II.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")

5.    The person of ordinary skill in the art ("POSA") for the asserted

claims of the '483 patent, as of their priority dates, would have had the skills,

education, and expertise of a team of individuals working together to formulate a

liquid injectable drug product. Such a team would have included individuals with

doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical

sciences, chemical engineering, biochemical engineering or related fields, with at

least two years of post-graduate experience in developing liquid injectable drug

products, or master's or bachelor's degrees in similar fields of study, with a

commensurate increase in their years of postgraduate experience. Such a team also

would have been familiar with a variety of issues relevant to developing liquid

injectable drug formulations, including, among other things, solubility, stability,

pharmacokinetics, pharmacodynamics, and other pharmaceutical characteristics.

Such a team also would have included persons with expertise in analytical

chemistry, including the detection and measurement of chemical degradants. The

team also would have included skilled medical professionals that have experience

Exhibit 2B
Defendants' Statement of Issues of Fact

in selecting, dispensing, administering cancer treatments including treatments for

patients with chronic lymphocytic leukemia and indolent B cell non-Hodgkin's

lymphoma. The medical professional would have a medical degree and several

years of experience in the clinical development of drugs, including cytotoxic drugs

those that are administered intravenously and are prescribed/ordered, dispensed

and administered in a manner that is safe and appropriate for patient treatment.

This team would further include individuals that are or have regular interactions

with oncologists, pharmacologists, toxicologists, clinical oncology pharmacists,

specialty pharmacists, oncology nurses, and the like.

6.      Defendants dispute the POSA definition for the '483 patent previously

furnished by Plaintiff in this case:

> The person of ordinary skill in the art ("POSA") for the asserted
> claims of the '483 patent, as of their priority dates, would have had
> the skills, education, and expertise of a team of individuals working
> together to formulate a liquid injectable drug product. Such a team
> would have included individuals with doctoral degrees in chemistry,
> biochemistry, pharmaceutics, pharmaceutical sciences, chemical
> engineering, biochemical engineering or related fields, with at least
> two years of post-graduate experience in developing liquid injectable
> drug products, or master's or bachelor's degrees in similar fields of
> study, with a commensurate increase in their years of postgraduate
> experience. Such a team also would have been familiar with a variety
> of issues relevant to developing liquid injectable drug formulations,
> including, among other things, solubility, stability, pharmacokinetics,
> pharmacodynamics, and other pharmaceutical characteristics. Such a
> team also would have included persons with expertise in analytical
> chemistry, including the detection and measurement of chemical
> degradants. The team also would have had access to an individual
> with a medical degree with experience in treating patients with

Exhibit 2B
Defendants' Statement of Issues of Fact

chronic lymphocytic leukemia and indolent B cell non-Hodgkin's lymphoma. *Cephalon, Inc. v. Slayback Pharma LLC*, 456 F. Supp. 3d 594, 603 (D. Del. 2020).

7.     Using either proposed definition of a POSA (above), the asserted claims of the Patent-in-Suit are invalid for the reasons set forth below.

## III.   THE '483 PATENT

8.     The '483 patent, titled "Formulations of Bendamustine," was filed on July 12, 2019 as U.S. Patent App. No. 16/509,920 ("The '920 Application"). The '483 patent claims a benefit of priority from U.S. Provisional App. No. 61/299,100 ("the '100 provisional application"), filed on January 28, 2010.  As such, the earliest possible effective filing date of the '483 patent with respect to prior art under pre-AIA 35 U.S.C. § 102(b) is January 28, 2010.

### A.     The Specification

9.     The '483 patent is directed to "long term storage stable bendamustine-containing compositions" that "can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxideant or chloride ion source."  '483 patent at Abstract.

### B.     The Claims

10.     The '483 patent issued with 16 claims.  Plaintiff is asserted Claims 2, 4, and 12 of the '483 patent against Defendants.

11.     Claim 1 of the '483 patent is the sole independent claim of the '483

Exhibit 2B

Defendants' Statement of Issues of Fact

patent. Claims 1-9 and 11-16 of the '483 patent are reproduced below:

1.      A ready to use liquid bendamustine-containing composition comprising
bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;
polyethylene glycol; and
a stabilizing amount of an antioxidant;
the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C. to about 25°C.

2. The ready to use liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

4. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

8. A method of treating cancer in a mammal, comprising administering an effective amount of the ready to use liquid bendamustine-containing composition of claim 1 to the mammal.

12. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities

Exhibit 2B
Defendants' Statement of Issues of Fact

> resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

'483 Patent at 13:21-14:48.

### C.   The Prosecution History

12.    The '483 Patent issued from U.S. Patent Application No. 16/509,920 filed on July12, 2019. *See* '483 Patent, at (21), (22).

13.    On May 27, 2020, the Patent Examiner issued an Office Action rejecting claims 1-16 under 35 U.S.C. § 103(a) as being unpatentable over Brittain et al. (US 20060159713) and TREANDA (Highlights of prescribing information 2008) and Von Stetten et al. (US 4711906) and Miekka et al. (US 7252799). *See* Office Action Summary, May 27, 2020, at 3.

14.    Applicants responded requesting reconsideration and withdrawal of the rejection. *See* Applicant Amendment/Remarks Made in an Amendment, November 25, 2020. The Examiner maintained the prior rejections of claims 1-16. *See* Office Action Summary, December 21, 2020, at 3.

15.    Applicants then initiated an Examiner Interview conducted on March 11, 2021, in which the Examiner suggested amending the claims to include "for administration" to differentiate the composition from other compositions which are not for administration. *See* Applicant-Initiated Interview Summary, Telephonic, March 16, 2021, Proposed Amendment(s).

Exhibit 2B

Defendants' Statement of Issues of Fact

16.     On May 20, 2021, Applicants amended the pending claims to recite

"ready to use" liquid bendamustine-containing compositions. *See* Amendment,

May 20, 2021, at 2-4. The Examiner responded indicating that the proposed

amendments would not be entered because they raised new issues and did not place

the application in better form for appeal. *See* Advisory Action Before the Filing of

an Appeal Brief, June 2, 2021.

17.     In refusing to allow the application, the Examiner noted that the

specification did not define "ready to use" and focused on the ambiguity of the

term "ready to use," stating:

> It is reasonable to presume that "ready to use" could mean
> ready to be administered without any further
> dilution/preparation but the instant claim does not define
> the use such as ready for use without further dilution. And
> the instant specification read as a whole suggests that the
> doses of bendamustine administered to treat cancer in a
> mammal is similar to those employed any treatment
> regimen designed for bendamustine as marketed under the
> trade name TREANDA. . . . Since the package insert of
> TREANDA teaches dilution to 5 mg/ml and then further
> dilatation to 500 ml to a final concentration of 0.2-0.6
> mg/mL, the "ready to use" appears to infer "ready for
> further dilution", which is also disclosed in the instant
> specification . . . , in order to administer the proper dosage
> amount of bendamustine as taught by TREANDA.
> Consequently, it appears the term "ready for use" appears
> indefinite because there are two or more ways of
> interpreting it. . . . Instant claim 8 does not clarify the issue
> because the ready to use liquid composition is not
> necessarily the about 10 mg/ml to about 100 mg/ml
> concentration but rather some diluted concentration.

*Id.*

Exhibit 2B
Defendants' Statement of Issues of Fact

18.     On July 12, 2021, Applicants conducted an interview with the Examiner. *See* Applicant-Initiated Interview Summary, July 16, 2021. In summarizing that interview, the Examiner noted that Applicants proposed amending the claims to "ready for further dilution." *Id.*

19.     The Examiner further noted that the term "ready for use" "has a specific meaning that is not ambiguous" citing a Medical Dictionary defining that term as "[a]ble to be dispensed with minimal if any effort or preparation; prepackaged." *Id.* The Examiner then "left it to Applicants to decide whether 'ready to use' or 'ready for further dilution' in the claim preamble was appropriate because either would work in terms of patentable subject matter." *Id.* Applicants indicated that "ready to use" would be the "best" option of the two. *Id.*

20.     On August 4, 2021, a Notice of Allowance for the '483 Patent was sent wherein the Examiner stated "the term 'ready to use' is a term of the art that does give meaning and life to the claim." *See* Notice of Allowance, August 4, 2021. The '483 patent issued on August 31, 2021.

21.     Additional portions of the prosecution history of the '483 patent are reference and discussed further herein.

## IV.   TECHNICAL BACKGROUND

22.     The following technical background information would have been well known to a POSA as of January 28, 2010.

Exhibit 2B
Defendants' Statement of Issues of Fact

### A.     Formulations for Parenteral Administration

23.     A pharmaceutical formulation is the composition of a drug product

that contains the active pharmaceutical ingredient ("API"), and one or more

excipients, the pharmacologically inactive ingredients. The API primarily provides

the intended therapeutic effect. In the pharmaceutical field, the term "parenteral" is

used to refer to products that are administered so that the API does not need to

cross a protective barrier (*e.g.*, the intestines or skin), and generally are

administered by injection.

24.     One class of parenteral products are intravenous, or "IV" injections.

IV injections are often used because of the ability to precisely control the

administration rate and quantity of a drug. They can be administered either quickly

via an IV "push" (or bolus) or they can be administered slowly over a prolonged

time via an IV infusion. IV injections are widely used in the medical field for

treatment of a variety of ailments, including cancer.

25.     A POSA, or a formulator, working on developing the IV or injectable

products would have known that the aim of developing the formulations is to

develop a formulation (*i.e.*, pharmaceutical composition) that is suitable to receive

approval from regulatory agencies, including the FDA, for use in patients. A POSA

would be generally aware of the regulatory requirements for IV or injectable

products to obtain an approval and would rely on knowledge about the ingredients'

Exhibit 2B
Defendants' Statement of Issues of Fact
functions.

## B.      Excipient Selection for Parenteral Formulations

26.     A pharmaceutical formulation is a combination of an active

ingredient(s) and inactive ingredients, which are generally termed as excipients. By

at least 2000, formulations for parenteral administration with suitable solvents and

antioxidants as well as various excipients used in this approach, were well

established in the pharmaceutical art. *See, e.g.*, Remington 2000.

27.     The API is included in a pharmaceutical formulation to achieve some

desired pharmacological result, whereas excipients are used to facilitate formation

of the API into a dosage form. Additionally, excipients may confer desired

formulation characteristics, such as an antioxidant behavior (and potentially its

related ability to reduce degradation and impurities).

28.     A drug administered parenterally is one injected into the body such

that the body's natural protective barriers (e.g., the skin) are bypassed, such as by

using a hollow needle passed into tissues. The most frequent parenteral routes are

subcutaneous, intramuscular, and intravenous.  Injectable preparations are usually

sterile solutions, colloids, or suspensions of drugs in water or other suitable

physiologically acceptable vehicles, although the exact character is dependent on

the intended parenteral route. For example, oils and certain suspensions may be

suitable for intramuscular routes yet unsuitable for the intravenous route.

Exhibit 2B
Defendants' Statement of Issues of Fact
Remington 2000 at 781.

29.    Injections may be classified into six general categories:

1) Solutions ready for injection.

2) Dry, soluble products ready to be combined with a solvent just prior to use.

3) Suspensions ready for injection.

4) Dry, insoluble products ready to be combined with a vehicle just prior to use.

5) Emulsions.

6) Liquid concentrates ready for dilution prior to administration.

Remington 2000 at 781.

30.    Excipients in parenteral formulations are added for a number of purposes. They can be added to maintain isotonicity of a solution in relation to human blood, to adjust the pH, to increase the solubility of a drug substance, to increase the stability of a drug substance and increase the shelf life of the product or act as a preservative.  When used for these purposes, the excipients should not adversely affect the action of the drug substance, or cause any side effects of toxicity at the concentrations used in a given formula.  At least for parenteral formulations, it was known as early as 2000, that in order to avoid degradation of API and formulation excipients and thereby optimize reduced levels of impurities, the formulator can turn to including specific solvents and/or antioxidants. *See generally* Remington 2000.

Exhibit 2B

Defendants' Statement of Issues of Fact

31.     Cosolvents are used to increase water solubility of drugs that do not contain ionizable groups or drugs whose solubility cannot be increased by pH adjustment alone.  These drugs are generally considered to be nonpolar, i.e., their chemical structure does not have a significant dipole moment, or in other words, does not have a relatively positive and a relatively negative end.  Water has one of the strongest dipole moments of known solvents, and thus nonpolar drug molecules often have relatively poor solubility in water.  To increase the solubility of these nonpolar drugs in the polar solvent of water, a lower- polarity water-miscible organic liquid can be used as a cosolvent.  Most water-miscible organic liquids are toxic, and only a few are used as cosolvents in pharmaceutical solutions. Examples include glycerol, propylene glycol, ethanol, and the low molecular weight polyethylene glycols. *See*, for example, Rowe 2009.  The solubility of nonpolar drugs in water can be increased by several orders of magnitude with cosolvents.

32.     Oxidation is the loss of electrons or an increase in oxidative state during a reaction by a molecule or atom.  Where a drug substance may be prone to degradation by oxidation, a number of formulation processes and excipients can be used to reduce the rate of drug degradation in the product and thus increase the shelf life or extend the expiration date.  A wide variety of antioxidants were known in the art, at least as early as 2002. *See* Waterman 2002 at 8-14.

Exhibit 2B
Defendants' Statement of Issues of Fact

33.    "Wherever possible, formulations should be developed using excipients which have an established use in parenteral products administered by the same route as the product under development." Broadhead 2001 at 334. As a result, parenteral formulators have a limited number of acceptable inactive ingredients, or "excipients," that can be used to develop formulations for human administration. *See, e.g.*, Akers 2002 at 2283 ("Formulation component precedence takes on high stature in the sterile [parenteral] product world because of significant toxicological and regulatory concerns."); Nema 1997 at 166 ("These factors limit the choice of excipients available to the formulators.").

34.    A formulator would have consulted references such as Remington 2000, as well as, for example, Nema 1997 to identify excipients and amounts already established for use in FDA-approved intravenous formulations.

### 1.    API-Bendamustine

35.    Bendamustine was a known compound with a chemical structure that would lead a formulator to make specific decisions about what to include as excipients in a parental formulation containing the bendamustine compound or a pharmaceutically acceptable salt form.

36.    Bendamustine is neither a new nor recently developed anti-cancer drug; it is a nitrogen mustard compound that has been widely used in the prior art for decades to treat a number of cancers and malignant tumors, including chronic

Exhibit 2B

Defendants' Statement of Issues of Fact

lymphocytic leukemia ("CLL") and non-Hodgkin's Lymphoma ("NHL"). *See, e.g.*, Drager 1:16-17; *see also* Olthoff at 1; Brittain 2006 at ¶ [0004]–[0006].

Bendamustine was initially synthesized in 1963 in the German Democratic Republic and was available from 1971 to 1992 in that location under the name Cytostasan®. *See, e.g.*, Brittain 2006 at ¶ [0006]; *see also* Drager at 1:11-13; Olthoff at 1. Since 1992, bendamustine has been marketed in Germany under the tradename Ribomustin®. *See, e.g.*, Brittain 2006 at [0006]; *see also* Drager at 1:13-15. Ribomustin® was marketed in the form of a vial containing a lyophilized mixture of two ingredients - bendamustine HCl and mannitol.

37.     Bendamustine was also formulated and sold in the United States before the '483 patent. For example, in 2008, Cephalon began selling bendamustine for use in the United States under the tradename Treanda®. *See generally* 2008 Treanda Label. Treanda was marketed to treat CLL. Treanda was manufactured and sold as a lyophilized powder due to bendamustine's rapid degradation in water. *See, e.g.*, Brittain 2006 at [0007]-[0011]; *see also* 2008 Treanda Label at § 2.3 (Reconstitution/Preparation for Intravenous Administration). In order to administer Treanda, a medical professional must reconstitute the lyophilized powder and then dilute the reconstituted product in an aqueous liquid. See 2008 Treanda Label at 2 ("Reconstitution/Preparation for Intravenous Administration").

Exhibit 2B
Defendants' Statement of Issues of Fact

### a) PHYSICAL AND CHEMICAL PROPERTIES OF BENDAMUSTINE

38.   The physical and chemical properties of bendamustine have been well documented. Bendamustine belongs to the class of drugs known as "nitrogen mustards," or mustards for short. *See, e.g.*, Olthoff at 1; *see also* Brittain 2006 at ¶ [0004]; Drager at 1:7-11. The chemical structure of bendamustine is shown below:



Drager at 1:9.

39.   As discussed above, it has long been known that bendamustine, like other nitrogen mustards, degrades rapidly in water. *See, e.g.*, Drager at 1:18 ("Like other nitrogen mustards, bendamustine hydrolyzes in aqueous solution . . . ."); *see also* Olthoff at 2 ("Bendamustine hydrochloride is a relatively instable compound. Its mustard-halogen groups are almost completely hydrolyzed in aqueous solutions after a short period of time."); Brittain 2006 at ¶ [0004]. The prior art explains, for example, that bendamustine undergoes rapid hydrolysis in aqueous solutions. *See, e.g.*, Olthoff at 2. The major degradation products of bendamustine in water and polyols (solvents containing more than one hydroxyl, or –OH group in their

Exhibit 2B
Defendants' Statement of Issues of Fact

chemical structure), such as PG, have also been thoroughly studied.

40.   Bendamustine is also susceptible to esterification at its carboxylic acid

group by reaction to hydroxyl groups from an alcohol, including polyols. One such

alcohol is PG, which reacts to degrade bendamustine into PG-esters. See Drager at

5:10-15 (figures reproduced below):



PG ester 1



PG ester 2

41.   The esterification of bendamustine involves reacting with a (solvent)

molecule containing at least one –OH group. The greater the abundance of –OH

groups coming from the solvent molecules surrounding bendamustine in solution,

the more favorable the conditions toward esterification of the drug, *i.e.*, by Le

Exhibit 2B

Defendants' Statement of Issues of Fact

Châtelier's principle, a higher concentration of alcohol reactants pushes the

equilibrium of bendamustine toward forming ester products. Drager uses the

commonly used terms of "protic" and "aprotic" to refer to organic solvents that

either contain or lack hydroxyl (–OH) groups in their molecular structure,

respectively. Drager taught that "undesirable polar [miscible with water] protic [-

OH containing] solvent-bendamustine adducts [esters] . . . will not form during

typical commercial storage if the concentration of the polar protic solvent is kept

within the scope of the present invention." *Id.* at 4:22-26. That is, the esterification

reaction involves the –OH group of the solvent, "if the concentration of the polar

protic solvent is kept" sufficiently low such that the esters "will not form during

typical commercial storage."

42.     The significance of Drager's teaching was that the concentration of –

OH groups (borne by the protic solvent) was what needed to be kept low, in order

to reduce ester formation of bendamustine.

43.     A POSA would be aware that other polar protic solvents commonly

used in commercial pharmaceutical formulations, such as PEG 400, have fewer

OH groups for a given volume than a low molecular weight alcohol such as

ethanol.

44.     Using the molecular weights and densities, well known from the prior

art, the relative number of OH groups for several common protic pharmaceutical

Exhibit 2B

Defendants' Statement of Issues of Fact

solvents can be demonstrated, showing that PEGs have relatively fewer OH groups

per unit volume.

| Solvent | Nominal average molecular weight | Average density (20˚C) grams/Liter | Solvent as Moles per Liter | OH groups as Moles per Liter |
|---|---|---|---|---|
| Ethanol (100%) | 46.068 g/mol | 789.3 | 17.13 | 17.13 |
| Glycerin | 92.09 g/mol | 1263.6 | 13.72 | 41.16 |
| Propylene glycol | 76.09 g/mol | 1036 | 13.62 | 13.62 |
| PEG 200 | 200. g/mol | 1124 | 5.62 | 11.2 |
| PEG 300 | 300. g/mol | 1125 | 3.75 | 7.50 |
| PEG 400 | 400. g/mol | 1125 | 2.81 | 5.63 |
| PEG 600 | 600. g/mol | 1125 | 1.88 | 3.75 |

45.    A POSA would have known that using PEG would also require use of

an antioxidant to help address the esterification of bendamustine. That is because

the esterification reaction is catalyzed by an acid if present. PEG produces formic

acids when it oxidizes. Thus, a POSA would have known to include antioxidants in

formulations comprising bendamustine and PEG.

## 2.    Polyethylene Glycol ("PEG")

46.    As addressed above, solvents are a type of excipient in parenteral

formulations. The primary purpose of a solvent is to uniformly disperse, at the

molecular level, the active ingredient in a liquid medium. Examples of

non-aqueous solvents include ethanol, propylene glycol ("PG"), polyethylene

glycol ("PEG"), and N,N di-methylacetamide (DMA). *See, e.g.*, Broadhead 2001 at

337.

Exhibit 2B

Defendants' Statement of Issues of Fact

47.     Polyethylene glycol (and especially PEG 400) is a common solvent in injectable products. *See, e.g.*, Nema 1997 at 167 (Table 1). The chemical structure of PEG is shown below:



PEG 400

or



PEG

Rowe 2009 at 517; 2009 USP Monograph for Polyethylene Glycol at 1308. The notation "PEG 400" refers to PEG with a molecular weight of approximately 400 grams/mol. PEG (or PEGs) is actually the name used to designate a group of compounds. Rowe 2009 at 517.

48.     The molecular structure of each PEG[1] consists of a polymeric chain

---

[1] The term polyethylene oxide (PEO) is sometimes used interchangeably with PEG, as the two polyethylene ether polymers have identical chemical structures, although the PEO terminology is more often used when referring to polymers >20,000 g/mol as a different synthetic pathway is commonly utilized.

Exhibit 2B
Defendants' Statement of Issues of Fact

of a length of repeating ethylene glycol groups (designated by "n" above), such

that the molecular weight of the particular PEG is determined by the length (based

on the number repeating groups) of the chain, and "n" is the number of $-CH_2-$

$CH_2-O-$ concatenated ethylene glycols (analogous to the beads of a necklace) that

make the chain – n is equal to approximately 9 in the case of PEG 400. *See* 2009

USP Monograph for Polyethylene Glycol at 1308. Among the various available

weights of PEGs, PEG 300 and PEG 400 are the most widely used in injectable

formulations.

### 3.     Antioxidants

49.     Oxidation is the loss of electrons or an increase in oxidative state

during a reaction by a molecule or atom; generally in pharmaceuticals, oxidation

results in a gain of oxygen or loss in hydrogen content. *See* Waterman 2002 at 1-2.

This process may lead to degradation in a pharmaceutical formulation, and was a

known process for the loss of API and the formation of impurities in formulations,

and methods and procedures for predicting, measuring, and preventing oxidation of

formulations are well known. *See generally* Waterman 2002.

50.     Antioxidants are well known and commonly used to prevent the

oxidation of drugs and/or excipients. *See, e.g.*, Nema 1997 at 168; Waterman 2002

at 8-14.

### a)     Oxidative degradation was known in parenteral

Exhibit 2B
Defendants' Statement of Issues of Fact

**formulations**

51.    Most oxidation mechanisms in pharmaceutical formulations involve oxygen, either dissolved in the formulation or as part of other reactive molecular species. Reactive radical species of oxygen are generated by heat, light, peroxides, labile compounds or heavy metal contaminants. Remington 2000 at 722. An example free radical reactant (R*) and its reactions that may occur include:

$$R^* + \textit{dissolved } O_2 \rightarrow ROO^* \qquad \text{(peroxy radical)}$$

$$ROO^* + \textit{drug/excipient-}H \rightarrow \textit{drug/excipient-}OOH + R^*$$

52.    These types of oxidation reactions can be very destructive to pharmaceutical formulations since the peroxy radicals are stable and long lived, the radicals can be regenerated (essentially a chain reaction), and the oxidation reactions can produce new reactive species that can undergo further degradation reactions with the API or excipients. Antioxidants are added to formulations to both prevent initiation of the oxidative reaction and to terminate or prevent further propagation of the radical chain reaction. *See* Remington 2000 Chapter 39 at 722; *see also* Harmon 2006 at 2014-2016.

53.    Oxidation reactions can also occur due to other peroxides that are in the formulation, *e.g.*, contaminants in the excipients, or due to heat, light and heavy metals. *See* Hovorka 2001 at 256. For example, excipients including poly(oxythlene) alcohol groups [*e.g.*, R–$(OCH_2CH_2)_n$OH ] can form hydroxyl

Exhibit 2B
Defendants' Statement of Issues of Fact
and/or alkoxyl radicals:

$$HO\text{-}OH \rightarrow 2\ HO^* \text{ (hydroxyl radicals)}$$

$$RO\text{-}OH \rightarrow RO^* + HO^* \text{ (alkoxyl and hydroxyl radicals)}$$

54.    These radicals are highly oxidizing, and polyethylene glycol-based excipients are notorious for containing residual peroxides. *See* Hovorka 2001 at 256; *see also* Waterman 2002 at 18. Many grades and molecular weights of PEGs, *e.g.*, PEG 400, from varying manufactures are well known to contain substantial quantities of these peroxides, both as alkoxyl and hydroxy radicals. *See* Wasylaschuk 2007 at 112.

55.    Peroxyacids are another group of oxidizing radicals, which form due to the reaction of a carboxylic acid with hydrogen peroxide species. Peroxyacids are known to be highly reactive with many organic species. Indeed, peroxyacids have been known for over 75 years to be reactive with nitrogen mustard pharmaceutical drugs, including the nitromustard methyl-bis(β-chloroethyl)amine ("MBA") or mechlorethamine. *See* Stahmann 1946 at 586. Mechlorethamine was the first chemotherapeutic drug to be approved in the US in 1949, and subsequently, it was commercialized as the anti-cancer drug Mustargen. Mechlorethamine can oxidize in the presence of peroxyacids to the corresponding N-oxide degradant:

Exhibit 2B
Defendants' Statement of Issues of Fact



Stahmann 1946 at 586.

56.     Liquid topical formulations of mechlorethamine have been used for treating patients for over 45 years. Van Scott 1973 at 19. The original topical formulation, which was compounded from the lyophilized parenteral formulation, was unstable to hydrolysis and to nucleophilic attack in ethanol solvent, so a non-aqueous formulation was developed that had improved stability for 3 years. *See* the '694 Publication, ¶ [0044], [0045], [0048]. The non-aqueous liquid formulations of this nitrogen mustard comprise an antioxidant (butylated hydroxytoluene), metal chelator (EDTA, which can function as an antioxidant), a polar protic solvent from the group (propylene glycol, PEG, polypropylene glycol, or ethylene glycol), and additional non-aqueous solvents and excipients. *Id.* at Table 2.

### b)     Excipients in formulations may also undergo oxidative degradation

57.     Even when the drug API itself is not subject to direct oxidation by various oxidizers and free radical species, oxidizers may lead to the formation of unwanted impurities such as aldehydes and carboxylic acids. These impurities can

Exhibit 2B
Defendants' Statement of Issues of Fact

then undergo cross-linking, transesterification, and other conjugation reactions

(e.g. ester formation) with other species in the formulation. *See* Wasylaschuk 2007

at 114. For example, the polyether groups within polyethylene containing

excipients (e.g. PEG and PEO) are highly susceptible to oxidative degradation via

a chain oxidation reaction that can produce aldehyde and water in the formulation.



Waterman 2002 at 17.

58.    Similar reactions in these excipients can proceed to produce new

reactive diols, acids, and formaldehyde.

Exhibit 2B
Defendants' Statement of Issues of Fact



Waterman 2007 at 1503.

59.     The new degradant species produced by auto-oxidation of polyethylene ether chains in excipients (., PEG) are well known to result in the degradation of APIs in formulations. For example, the investigational anti-HIV drug DMP323 was formulated in PEG 400 to improve solubility. The addition of an antioxidant was effective to prevent degradation of DMP 323 in PEG 400. *See* Maurin 1996 at 104-106. In another example, an aqueous PEG 400 and propylene glycol (PG) formulation of the topical corticosteroid tripredane was found to be unstable due to peroxide oxidation of the API. The addition of an antioxidant and chelating agent were necessary to prevent oxidative degradation. *See* Varia 1991 at 872-873. In yet another example, the prostaglandin fenprostalene, an abortifacient agent approved as the commercial product Synchrocept-B for aborting pregnancies in feedlot animals was formulated in PEG 400 and required an antioxidant. *See*

Exhibit 2B
Defendants' Statement of Issues of Fact

Etherington 1994 at 740. During development, it was found that fenprostalene

degraded rapidly due to hydrolysis in water. *See* Johnson 1984 at 1414.

Furthermore, fenprostalene contained a carboxylic acid esterified as the methyl

ester that readily underwent transesterification to form an ester degradant when

fenprostalene was formulated in diethylene glycol, a protic solvent with a high diol

content. *See id.* at 1415-1416. Thus, due to the potential for transesterification in

the high diol content solvent, a PEG 400-based formulation was chosen for

commercial development. *See id.* at 1414. However, the PEG 400 formulation

degraded due to peroxide formation in the excipient and resulted in degradation of

the API. *Id.* at 1417. The study found that addition of an antioxidant, tocopherol, to

the PEG 400 was sufficient to prevent oxidation. *See id.* at 1416, Figure 4

(reproduced below); *see also* the '823 Patent at 6:8-11; Example 1.



Figure 4—*Degradation rate of 1 at 80°C in diethylene glycol (▲) and in polyethylene glycol 400 solutions containing no additive (●), formic acid (□), and dl-α-tocopherol (○). All solutions were stored in test tubes exposed to air.*

Stabilization of fenprostalene(I) (sold as Synchrocept-B by Syntex Inc.) against oxidation in PEG400 formulation by addition of an antioxidant, tocopherol. Johnson 1984 at 1416.

60.   In another example, robenacoxib is a non-steroidal anti-inflammatory

drug formulated as a solution for injection, and approved in the European Union

Exhibit 2B
Defendants' Statement of Issues of Fact

since 2008 for veterinarian use. Because of its poor solubility in water, co-solvents

PEG 400 (macrogol 400) and ethanol along with the surfactant poloxamer 188

were added to the formulation. *See* EMA 2008 at 2-3. However, the formulation

formed significant colored degradants within 3 months during stability studies. *See*

*id.* at 3. The addition of an antioxidant, sodium metabisulphite, gave the

formulation sufficient stability for a recommended shelf life of at least 3 years. *See*

*id.* at 8-9.

61.     As described above, the degradation reactions for excipients,

particularly for excipients containing PEG chains, can result in formation of new

aldehyde, carboxylic acid, and alcohol species along with formaldehyde that can

form new degradants in the formulation by reacting with other components of the

formulation. In addition, the degradation can result in the formation of formic acid

that can decrease the stability of the API. *See* Waterman 2007 at 1503. Vendors of

excipients may offer special high purity grades with reduced peroxides, add in

antioxidants to the excipients, recommend that high temperatures be avoided, or

recommend that additional antioxidants be added to preparations containing the

excipient. *See* Waterman 2002 at 16-17.

### c)     Antioxidants were routinely used for prevention of oxidative degradation

62.     At the time of the invention, oxidation was a known potential problem

in pharmaceutical formulations for certain APIs and excipients, and antioxidants

Exhibit 2B
Defendants' Statement of Issues of Fact

were known to be able to prevent oxidative degradation in pharmaceutical

formulations. *See* Waterman 2002 at 1. A wide variety of antioxidants were known,

which prevented oxidation by a variety of mechanisms. *See id.* at 8-14.

Antioxidants in formulations fall into several groups based on their primary

mechanism of action. Classes of antioxidants include chain terminators, which

donate hydrogen and form stable radicals, *i.e.* poorly reactive, radicals, hence

halting further propagation of the radical chain reaction. Examples include phenol-

containing compounds such as butylhydroxytoluene (BHT), butylhydroxytoluene,

methyl paraben, propyl gallate, and tocopherol; thiols such as monothioglycerol

and cysteine; and niacin-related compounds such as nicotinamide. *See* Waterman

2002 at 21-22, 26; *see also* Ogata 2002 at 641-642, 644. Another class of

antioxidants are sacrificial antioxidants, which are reducing agents that are more

easily oxidized than the API and/or can scavenge oxygen in the formulation. *See*

Waterman 2002 at 22. Examples of sacrificial antioxidants include ascorbic acid,

cysteine, metabisulfite, methionine, and lipoic acid. *See* Waterman 2002 at 17-26,

Moini 2002 at abstract. Another class of antioxidants are metal chelators and

complexing agents, which may directly stabilize the API or complex contaminants

that may induce the formation of free radicals Examples include citric acid, EDTA,

and cyclodextrins. *See* Waterman 2002 at 20, 23 and 26.

     63.    The purposes of an antioxidant is to reduce the levels of oxidation that

Exhibit 2B
Defendants' Statement of Issues of Fact

can occur in a drug formulation, these levels giving rise to degradants that reduce

the overall activity and effectiveness of the treatment while also increasing the

potential for impurities.  As such, the use of an antioxidant by its nature will

increase the stability of a formulation to deter formation of impurities and ensure

longer periods of time for the active pharmaceutical ingredient to stay in its

chemical form and retain its activity.

> ### d)   A POSA Knew Routine Formulation Methods To Enhance Stability In Parenteral Formulations, Including In Bendamustine Formulations

64.    During pre-formulation drug development, the stability of the drug in

solvents, including water is evaluated. *See* Steele 2001 at 196 ("Development of a

solution formulation requires a number of key pieces of preformulation

information. Of these, solubility . . . and stability are probably the most

important."); *id.* at 197 ("One of the main problems associated with developing a

parenteral or other solution formulation of a compound is its aqueous solubility.").

65.    A POSA would have known that bendamustine is not stable in water.

*See, e.g.*, Drager at 1:18 ("Like other nitrogen mustards, bendamustine hydrolyzes

in aqueous solution . . . ."); *see also* Olthoff at 2 ("Bendamustine hydrochloride is a

relatively instable compound. Its mustard-halogen groups are almost completely

hydrolyzed in aqueous solutions after a short period of time."). These drugs can be

formulated using a number of various known approaches, including lyophilization

Exhibit 2B
Defendants' Statement of Issues of Fact

(freeze drying). The POSA would know that freeze-drying is an easy first solution,

but would recognize it to be a costly process and that it has several other

disadvantages. *See, e.g.*, Olthoff at 3 ("It is furthermore unsatisfying that high

amounts of micro particles were found after the dissolution of the lyophilisate [of

bendamustine], which indicate a further instability of the system."); the '286

Ppatent at 2:33-3:10; Drager at 2:6-7 ("The reconstitution of the bendamustine

lyophilized powder is time consuming and cumbersome."); *see also generally*

Waterman 2002 at 20 ("Since the primary dosage form is parenteral, the selection

of a ready-to-use liquid or a lyophilized dosage form is critical for oxidative

stability . . . Lyophilization minimizes the formation of hydroxyl free-radicals, but

results in higher production costs, more elaborate administration, and a more

complicated formulation involving cryoprotectants.").

66.     Preformulation work also involves the physicochemical

characterization of the drug, which includes, among other things, solubility

measurements in pharmaceutically acceptable solvents. The POSA would also

perform experiments to determine if the drug is susceptible to oxidation. *See*

Waterman 2002 at 3-7.

67.     A POSA would have known that bendamustine is susceptible to

oxidative degradation. Prior art teaches the preparation of solutions of

bendamustine under inert atmosphere. *See* Olthoff at 8, claim 1 ("N-mustard

Exhibit 2B
Defendants' Statement of Issues of Fact

compounds are used in concentrations of 25 mg/ ml to 100 mg/ ml. dissolved in an

anhydrous monovalent or polyvalent alcohol (polyol), wherein the solution is

dissolved, filled and stored under inert gas . . . ."). In addition, chemically similar

nitrogen mustard alkylating chemotherapeutics, such as mechlorethamine, were

known to be susceptible to oxidation and their stable liquid formulations contain

antioxidants. *See supra*, ¶¶ 55-56.

68.     A POSA would have known that solutions are prepared and stored

under an inert atmosphere when they are susceptible to oxidative degradation. *See*

Agalloco 2008 at 127 ("An inerting gas (typically nitrogen, but other gases can be

utilized) may be added to the headspace of the container to protect formulations

that are oxygen sensitive."); *see also* Waterman 2002 at 27 ("For oxygen-sensitive

compounds in liquid formulations, including a nitrogen sparge during the

manufacturing process and a nitrogen headspace in the final package can suppress

oxidation of the drug.").

69.     A POSA would have known that including an antioxidant in the

formulation is a widely used method of preventing oxidative degradation of the

drug. *See generally* Wayne Bequette 2008 at 170; Waterman 2002 at 1, 20-27

("This review also provides a decision tree for addressing oxidative degradation,

along with a detailed table of antioxidant additives and their commercial

precedence."). The POSA would also run a number of tests on antioxidants to

Exhibit 2B
Defendants' Statement of Issues of Fact

determine which antioxidants would be most effective in protecting the API from

oxidation. *Id.* at 3 ("Liquid dosage form oxidative stability screening generally

involves examining the drug stability under a number of conditions.").

70. Moreover, Drager also discloses exemplary liquid bendamustine

formulations comprising an antioxidant. *See* Drager at 9:10-12 (disclosing

bendamustine solutions comprising 25 mg/mL niacinamide). A POSA would have

known that niacins such as niacinamide and nicotinic acid are antioxidants. *See*

*generally* Kamat 1999 at 179 ("Hence our studies suggest that nicotinamide

[niacinamide] (vitamin $B_3$) can be considered as a potent antioxidant . . . ."); *see*

*also* Ogata 2002 at 643 ("In the case of OH radical, which had the highest

reactivity among various ROS [reactive oxygen species], most niacin-related

compounds had scavenging abilities."); *id.* at 644 (Table 1) (showing that

niacinamide [nicotinamide] scavenges OH radicals).[2] Thus, a POSA would have

known that examples in Drager specifically disclose solution comprising

bendamustine and an antioxidant.

---

[2] Although Drager teaches that niacinamide is a complexing agent, the POSA would recognize that a complexing agent such as niacinamide can function as an antioxidant as a result of their chelating activity. *See* Waterman 2002 at 23-26 (disclosing complexing agents can function as antioxidants). In addition, a POSA would understand that excipients can have multiple functions in a formulation, as such, complexing agents can additionally work as antioxidants in formulations. *See id.* at 20, disclosing that the metal chelator EDTA (*i.e.*, complexing agent) can work as an antioxidant.

Exhibit 2B
Defendants' Statement of Issues of Fact

### e)   HPLC was a well-known method for measurement of impurities

71.    Methods of the testing of stability and measurement of remaining API and impurities in formulations were well-known in the art. *See generally* Remington 2000 Chapter 52 at 986-994; *see also id.* at 986 ("The use of kinetic and predictive studies for establishing credible expiration dates for pharmaceutical products is now accepted worldwide."); *id.* ("Stability of a drug also can be defined as the time from the date of manufacture and packaging of the formulation until its chemical or biological activity is not less than a predetermined level of labeled potency and its physical characteristics have not changed appreciably or deleteriously."); *id.* at 993 ("It is not necessary to determine the mechanism of the degradation reaction … Either the amount of intact drug or the amount of a formed degradation product may be followed."). The use of HPLC for measuring degradants and active ingredients in formulations during stability testing was well known. *See generally* Remington 2000 Chapter 33 at 587 ("pharmaceutical formulations are complex mixtures … [a]mong the most powerful techniques available to the analyst for the resolution of these mixtures are a group of highly efficient methods collectively called chromatography"); *id.* at 604 ("The most frequently used [HPLC detection] instrument is an ultraviolet-visible spectrometer that has been fitted with a flow cell", "photodiode array detectors…can scan the entire UV spectrum repeatedly during the elution of a peak to determine if more

Exhibit 2B
Defendants' Statement of Issues of Fact

than one substance is coeluting."). The term "peak area response" refers to the

concentration of a component, *e.g.*, an impurity, measured in a given sample,

which is determined by integrating the instrument signal (*e.g.*, UV absorbance),

over the elution time of the peak of interest, and using a calibration standard to

convert the integrated signal response to the equivalent concentration. *See figure*

*below, adapted from* Ahuja 2005 at 22 (annotations added in blue).



**FIGURE 1**   A chromatogram showing retention time ($t_R$), void time ($T_0$), peak at base width ($W_b$), and peak height ($h$).

72.     When determining whether degradants are present, screening at

wavelengths between 220 to 230 nm are commonly used, while optimizing

detection methods. *See* Ahuja 2005 at 155, Table 4 ("Gradient Conditions for

Screening Experiments", "inspect chromatograms at wavelength of 220, 230, 240,

254, 260, 275, and 300 nm."); *id.* at 161 ("When choosing a detection wavelength,

Exhibit 2B
Defendants' Statement of Issues of Fact

the following factors need to be taken into consideration: The major components

must have suitable dynamic range at the selected wavelength. All impurities should

be detected with suitable sensitivity at the selected wavelength."); *id.* at 403 ("Poor

chromatographic response by many of today's molecules above 220-240 nm means

that man cleaning assays are forced into the lower end of the UV range. This

presents additional challenges . . .  due to solvent and impurity interferences at low

wavelengths.").

### f) Extrapolations for predicting drug stability were routinely used

73.    Methods of predicting drug stability and shelf life were well-known in

the art. It is common during early development that stability data is only available

for a short time span (*e.g.*, < 1 year). In these cases, it is routine to use degradation

and stability data from a limited timespan to predict the purity at later time points

(*e.g.*, > 1 year). *See* FDA Guidance 2004 at 1 ("This guidance describes when and

how extrapolation can be considered when proposing a retest period for a drug

substance or a shelf life for a drug product that extends beyond the period covered

by available data from the stability study under the long-term storage condition

(long-term data)."); *see also* FDA Guidance at 7; Carstensen 1976 at 311

(disclosing methods of modeling shelf life); Remington 2000 Chapter 52 at 991

("This concept further assumes that the degradation reactions follows zero- or

pseudo-zero-order kinetics…this is an excellent assumption…shelf life

Exhibit 2B

Defendants' Statement of Issues of Fact

calculations assuming zero-order kinetics are more conservative than those for higher orders."). Although oxidative degradation processes can make it difficult to use short-term accelerated stability studies at elevated temperatures to predict shelf life at typical storage temperatures, it is still routine to predict future stability from stability data collected at typical storage conditions. *See id.*, Waterman 2002 at 3-4.

74.     Generally, knowledge of the exact mechanism of degradation is relatively unimportant when modeling stability data, if relatively little degradation actually occurs over the period, thus stability generally can be predicted for later time points. Remington 2000 Chapter 52 at 993 explains:

75.     It is not necessary to determine the mechanism of the degradation reaction. In most cases, it is necessary only to follow some property of degradation and to linearize this function. Either the amount of intact drug or the amount of a formed degradation product may be followed. It usually is impractical to determine the exact order of the reaction. With assay errors in the range of 2 to 5%, at least 50% decomposition must occur before the reaction order can be determined. As the loss with pharmaceuticals generally is less, zero-order kinetics should be assumed, unless the reaction order is known from previous work.

## C.     Parental Products Containing Cytotoxic Agents

76.     When using a cytotoxic agent, a POSA would look to several sources of information to understand how the product should be handled and dispensed.

Exhibit 2B

Defendants' Statement of Issues of Fact

77.    A POSA would understand that there are several guidelines and procedures that regulate how these agents must be handled due to the potential harm that may result from exposure to cytotoxic agents, such as:

- Occupational Safety and Health Administration (OSHA) issued guidelines in 1986, updated them in 1995, and made them available online in 1999;
- American Society of Health-System Pharmacists (ASHP) published guidelines on the safe handling of cytotoxic agents as Technical Assistance Bulletins in 1985 and 1990, and new guidelines on hazardous drugs in 2006;
- Oncology Nursing Society (ONS), "in an attempt to influence nursing practice and protect its members form exposure, published guidelines for safe handling and also developed an extensive educational program based on 'Chemotherapy and Biotherapy Guidelines and Recommendations for Practice.'"
- National Institute for Occupational Safety and Health (NIOSH) published guidelines on Preventing Occupational Exposures to Antineoplastic and Other Hazardous Drugs in Health Care Settings.

See U.S. DEP'T OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMIN., *Guidelines for Cytotoxic (Antineoplastic) Drugs*, (Jan. 29, 1986), https://www.osha.gov/enforcement/directives/std-01-23-001 ("OSHA Guidelines"); DEP'T OF HEALTH AND HUMAN SERVS., CTRS. FOR DISEASE CONTROL AND PREVENTION, NAT'L INST. FOR OCCUPATIONAL SAFETY AND HEALTH, *Preventing Occupational Exposures to Antineoplastic and Other Hazardous Drugs in Health Care Settings* (Sept. 2004), https://www.cdc.gov/niosh/docs/2004-165/pdfs/2004-165.pdf?id=10.26616/NIOSHPUB2004165 ("NIOSH Guidelines"), Sewell Opening Report at Ex. C*; see also* Power, L.A & Polovich, M. *Safe Handling Of*

Exhibit 2B

Defendants' Statement of Issues of Fact

*Hazardous Drugs: Reviewing Standards for Worker Protection*, Clinical Oncology

News Special Edition 2009, No. 2, 93-101 (available at:

https://www.clinicaloncology.com/download/093Safe_handling_clinoncse1209_W

M.pdf).

78.     The health risks to pharmacists, nurses, physicians, and other health

care workers charged with handling cytotoxic agents are severe. For example, in

addition to the extreme irritability to mucous membranes, eyes and skin, these agents

have been shown in studies to cause known side effects, *e.g.*, sterility and organ

damage, not only in patients receiving the cytotoxic drugs, but also among

employees.   OHSA Guidelines at A-3.

79.     The OSHA Guidelines also address "Handling of Cytotoxic Drugs" and

specify use of "Drug Preparation" with a section (1) Personal Protective Equipment,

(2) Preparation Area, (3) Preparation Equipment, (4) Work Practices in Preparation.

*See id.* at A-6–A-10.

80.     A POSA would understand personal protective equipment to include (i)

surgical latex gloves, double layer and changed regularly; (ii) protective disposable

gown with closed front, long sleeves and closed cuffs worn inside the preparation

area; (iii) a BSC is "essential for the preparation of CDs"; (iv) plastic face shield or

splash goggles.  The guidelines stated the "[w]e realize that this would be a departure

from usual hospital/clinic/pharmacy procedures, but in this case we are dealing with

Exhibit 2B
Defendants' Statement of Issues of Fact

a variety of known carcinogens and therefore appropriate preventive measures are

necessary." *Id.* at A-7.

81.    The OSHA Guidelines also address the advised conditions for the

Preparation Area, with details around each subject specifying the considerations and

steps that must be taken into account when dealing with cytotoxic drugs. *See id.* at

A-6–A-9.  In particular, the POSA would understand that there is a need for (i) a

centralized area (or minimized number of areas) for preparation of CDs with posted

warning sights designating them as such and not allowing entry to unauthorized staff,

(ii) a vertical airflow hood that is on at all times (24/7) and venting to an outside

location away from air intake units, (iii) a posting of special spill and containment

procedures, (iv) warning hood technicians servicing the hoods and filters of the

nature of CDs and that they should use the same personal protective equipment, (v)

disposal of all used gowns, gloves and disposable materials according to hospitals'

toxic waste procedures. *See id.* at A-7–A-8.

82.    A POSA would understand that when working with cytotoxic agents,

one much be sure that a certain hood be used, the syringes and IV sets with Leur-

lock fittings be used with nonsplash disposal collection vessels and plastic or metal

trays lined with sterile gauze pads to collect excess solution. *Id.* at A-8.  The work

area should be provided with a closable, puncture-resistant, shatter-proof container

for disposal of contaminated sharp/breakable materials.  The hood/cabinet should be

Exhibit 2B
Defendants' Statement of Issues of Fact

cleaned daily and decontaminated weekly. *Id.* It further states "ordinary decontamination procedures, which include fumigation with a germicidal agent, are inappropriate in a BSC used for CDs because such procedures do not deactivate the drugs and in addition may cause chemical reactions." *Id.* at A-8–A-9.

83. In terms of "Work Practices in Preparation" during "Drug Preparation," a POSA would understand that specific conditions for the (a) Syringes and IV Bottles, (b) Needles, (c) Handling Vials, and (d) Handling Ampules be satisfied. *See id.* at A-9–A-10.

84. A POSA would understand that syringes and IV bottles "should be labeled with patient's names and room number, drug name and quantity per total volume, route of administration, date and time prepared, dose, expiration date, and storage requirements if the drug is not to be transported immediately." *Id.* Furthermore, a POSA would know that "[a]ll syringes, IV bags and bottles containing CDs should be labeled with a distinctive warning label such as "Chemotherapy – handle with gloves – dispose of properly." *Id.* at A-9.

85. A POSA would know that "[d]rug administration sets should be attached and primed within the hood, before the drug is added to the fluid, to obviate the need to prime the set in a less well-controlled environment, and to ensure that any fluid that escapes during priming contains no drug." *Id.*at A-9.

Exhibit 2B

Defendants' Statement of Issues of Fact

86.     A POSA would know that when handling a vial containing a cytotoxic agent "[d]iluent should be added slowly to the vial by alternately injecting small amounts, allowing displaced air to escape into the syringe. . . . When all diluent has been added, a small amount of additional air may be withdrawn to create a negative pressure in the vial, but this should not be expelled into room air because it may contain drug residue.  It should either be injected into a vacuum vial or remain in the syringe to be discarded." *Id.* at A-10.

### D.     Dispensing Bendamustine Hydrochloride Parenteral Products

87.     A POSA would understand that prior to administering bendamustine hydrochloride parental products, it should consult the information contained in the prescribing information contains detailed information about the drug including, *inter alia*, any boxed warnings, indications and usage, dosage and administration, dosage forms and strength, contraindications, warnings and precautions, adverse reactions, drug interactions, use in specific populations, drug abuse and dependence, overdosage, description, clinical pharmacology, nonclinical toxicology, clinical studies, references, how supplied/storage and handling, and patient counseling information.

88.     A POSA would understand that, typically, parenteral products containing cytotoxic agents, such as bendamustine hydrochloride parenteral products, are provided with prescribing information that contains or refers to special

Exhibit 2B
Defendants' Statement of Issues of Fact

and detailed product handling information, such as the OSHA Guidelines discussed

above.

89.    As such, a POSA would understand that it is critical to consider

information in addition to the label and prescribing information and, when provided

such as it is here, to consider any of the Guidelines explicitly referenced within the

prescribing information.

90.    In order to dispense bendamustine hydrochloride parenteral products

(*e.g.*, Bendeka® or Belrapzo®) in a safe and appropriate manner, a POSA must

consider and act upon numerous factors.  These factors include, but are not limited

to:

> (i) placement of a prescription (chemotherapy order) through integrated electronic medical record programs that allow the practitioner to indicate the intended chemotherapeutic;

> (ii) ordering the desired treatment regiment, including but not necessarily limited to: concurrent chemotherapy medications; infusional hydration; anti-nausea medications; supportive medications; concurrent lab tests or patient parameter guidelines (*e.g.*, 'hold' the medication if the blood pressure is outside acceptable limits); and/or adjunct medications specific to the regimen or individual chemotherapeutic agent;

> (iii) assessing the completeness of the order for potential allergies;

> (iv) ensuring the timing of the order is clinically relevant for the patient (due to the fact that chemotherapy patients must have specific spacing between receipt of these types of medications during the course of their chemotherapy treatment);

Exhibit 2B
Defendants' Statement of Issues of Fact

(v) reviewing the patient's medical record (*e.g.*, to confirm the avoidance of drug-drug interaction, drug-disease interaction, dietary interactions, etc.);

(vi) calculating/confirming the dosage required for the patient based on the patient's overall health which includes the body weight, height, lab values and body health (*e.g.*, determining the patient's body-surface area ($m^2$) from a review of the medical history and recent medical record ensuring the value of recent (*e.g.*, within 72 hours) measurements of the patient's body weight;

(vii) reviewing the patient's recent lab values to ensure they are inside a normal range and if outside that range to understand how to adjust the dose and timing of administration of the medication; and

(viii) grading the patient by the Common Terminology Criteria for Adverse Events (CTCAE) to understand certain health parameters (*e.g.*, hepatic function, that can affect the patient's dosage levels).

91.     Once these initial preparatory steps are completed, the POSA would understand that it must release the chemotherapy order—with confirmed calculated dosing—to the pharmacy mixing room and a second phase of preparation would then begin.

92.     Within this second phase of preparation, a POSA would task another individual in the clinical pharmacy would double-check the dosage calculations and associated volumes to be withdrawn from the vial.  As such, working with parenteral products demands a watchful process that by its very nature requires more than "minimal if any effort or preparation." *See* Remington at 805 ("unless a direct pharmacological antagonist is immediately available, correction of an error may be impossible").

Exhibit 2B
Defendants' Statement of Issues of Fact

93.    As this second phase of preparation begins, the POSA would take extra safety and handling precautions because he/she is dealing with a cytotoxic agent, including working with the product in a hazardous drug mixing hood.  This means the POSA would don protective gear (disposable lab coat, head gear, mask, goggles, two pairs of gloves certified for mixing hazardous drugs, foot booties), and utilize a close system drug transfer device ("CSTD").

94.    The POSA would also understand the need to set up the final intravenous volume bag that will hold the prescribed dosage volume (which includes identifying the correct type and volume final infusion bag based on the label, prescribing information, and the facility in which the patient will be receiving the infusion, as different facilities use different equipment for infusion bags which require different types of bag and tubing lines for connection to the patient).

95.    After identifying the bag, the POSA then needs to identify the correct type of tubing to be utilized with the correct final infusion bag and the specific infusion pump at the desired facility that patient utilizes.

96.    Once identified, the POSA needs to conform or tailor the tubing to the correct length given awareness of the physical set up at the particular hospital/clinic site of administration the patient will utilize.

97.    Once the POSA knows the correct dosage for the patient as determined from the chemotherapy order and has prepared the appropriate set up for hazardous

Exhibit 2B

Defendants' Statement of Issues of Fact

drugs in the pharmacy mixing hood, a POSA will have a clinical pharmacist review the drug preparation to reduce the chance for errors and visually confirm that the appropriate amount of bendamustine hydrochloride injection product is extracted from the vial into the syringe.

98.    Upon confirming all the required information and setting up all of the necessary environments, a POSA would understand that it needed to transfer the extracted liquid bendamustine from the vial to dilute it in the final infusion bag with additional diluent.

99.    The POSA would then understand the need to prepare the chemotherapeutic for the final steps of dispensing with the order and transporting to the appropriate facility to administer the chemotherapeutic to the patient. This includes placing the diluted product's infusion bag into a double bag, affixing a patient label, confirming the label information to ensure the patient information and drug information are correct, sealing the infusion bag, and preparing for transportation to a remote administration facility if necessary.

100.   At this stage, a POSA would understand that it must turn to the multi-dose vial and ensuring handling of the drug product is in accordance with the label and prescribing information in order to enable the drug product to be used for a second, third or multiple dose.

Exhibit 2B
Defendants' Statement of Issues of Fact

101.   Generally, for a product like liquid bendamustine, a POSA would understand this process to include steps described in the product labeling, *e.g.*, returning the vial to a temperature controlled area, maintaining and updating the information tracking the use of the vial to account for the aliquot taken, and allowing for determination of the opportunity for additional samples to be prepared.

## V.   SCOPE AND CONTENT OF THE PRIOR ART

102.   The '483 patent addresses formulation of liquid bendamustine compositions; therefore the as discussed herein,[3] the relevant prior art includes references on liquid bendamustine compositions as well as literature references reflecting what was known in the art regarding the formulation of liquid bendamustine compositions.

### A.   Drager

103.   International Application No. PCT/US2009/058023 was filed on September 23, 2009 and published as WO 2010/036702 A1 listing Anthony S. Drager, Rachel Y. Labell, and Piyush R. Patel as named inventors ("Drager"). Drager claims priority to U.S. Provisional App. No. 61/100,074 ("the '074 provisional application"), filed on September 25, 2008. Cephalon, Inc. is listed as

---

[3] This section includes specific discussion of Drager and its related progeny; however, to the extent additional prior art is referenced herein, these additional prior art references are relied on as evidence of the knowledge of the POSA at the time of the inventions.

Exhibit 2B
Defendants' Statement of Issues of Fact
the Applicant for Drager.

104.    Drager generated multiple continuation applications that share the same specification, including U.S. Patent Application No. 13/362,430, which issued as U.S. Patent No. 8,344,006 (the '006 Patent).

### 1.    Drager discloses liquid bendamustine formulations within the claimed concentration ranges

105.    Drager concerns "[s]table liquid formulations of bendamustine, and pharmaceutically acceptable salts thereof, and polar aprotic solvents." Drager at Abstract.

106.    Drager states that "improved liquid formulations of bendamustine are still needed" (id. at 2:15-16) and further discloses "liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent.  Certain preferred embodiments include liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt of prodrug thereof, a polar aprotic solvent, and a non-aqueous polar protic solvent."  Id. at 2:18-22.

107.    In particular, Drager is directed to "[s]table, liquid formulations of bendamustine" that are "commercially viable" and could be stored under "typical commercial storage conditions." Id. at 3:6, 8, 27-28.

108.    Drager discloses liquid bendamustine solutions comprising polar aprotic solvents and non-aqueous polar protic solvents. See generally id. at 4.

Exhibit 2B

Defendants' Statement of Issues of Fact

Drager further discloses that in most preferred embodiments, the formulations of the invention will comprise "about 80%," by volume of the formulation, of the non-aqueous polar protic solvent. Id. at 4:14-15 ("In most preferred embodiments, formulations will comprise about 80%, about 67% or about 34%, by volume of the formulation, of the nonaqueous polar protic solvent.").

109.    Drager discloses concentration ranges that include all ranges between "about 5 mg/mL to about 200 mg/mL", stating:

> Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof.  Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL.  Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, range from about 5 mg/mL to about 120 mg/mL.  Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof.  Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof.
> As used herein, the term "about" is defined as ± 10%, preferably ± 5%,

Drager at 7:14-25.

110.    Drager claims the specific concentrations of from "about 5 mg/ml to about 120 mg/mL of bendamustine, or the pharmaceutically acceptable salt

Exhibit 2B
Defendants' Statement of Issues of Fact

thereof."  Drager at 15:15-16, claim 20.  Thus, a POSA would have envisaged that

Drager specifically points to concentrations of bendamustine in stable liquid

formulations that transverse this range having disclosed and claimed the range and

having specified numerous amounts throughout the entire range that each include a

defined variation of "about" that allows for the range to effectively be covered at

each and every point by the disclosure.  Thus, a POSA would understand that

Drager's disclosure would operate no differently across the disclosed range, and

there would be no meaningful difference in its operation at any particular

concentration within the claimed range.

### 2.    Drager discloses PEG as an excipient in bendamustine liquid formulations

111.   Drager also specifically teaches that polyethylene glycol ("PEG") is

suitable for use in its disclosed bendamustine compositions. For example, Drager

identifies PEG as both a suitable solvent and/or excipient that can be used in a

liquid bendamustine composition. *Id.* at 4:3-8; 7:27-8:3. Drager expressly discloses

that "stable formulations of bendamustine can be obtained by mixing a polar

aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar

protic solvent or mixture of nonaqueous polar protic solvents. Pharmaceutically

acceptable nonaqueous polar protic solvents are known in the art and include . . . .

polyalkylene glycols, ***such as polyethylene glycol***, polypropylene glycol, and

polybutylene glycol . . . ." *Id.* at 4:1-8 (emphasis added). Drager further discloses

Exhibit 2B
Defendants' Statement of Issues of Fact

that "formulations of the present invention may further comprise other

pharmaceutically acceptable excipients[, including] . . . hydrophilic polymers (*e.g.*,

***polyethylene glycols (PEG 300, PEG 400*****)** . . . ." *Id.* at 7:27-8:2 (emphasis added)

112.   Indeed, Drager specifically claims bendamustine formulations

comprising polyalkylene glycols, such as PEG. *See* Drager at 14:11-12, claim 5;

*see also id.* at 18:18-19, claim 54; *id.* at 19:14-15, claim 61. Drager only provides

three specific examples of polyalkylene glycols: PEG, polypropylene glycol, and

polybutylene glycol. *Id.* at 4:4-8. Thus, in effect, a POSA would have envisaged

that Drager specifically points out a solution comprising bendamustine and PEG.

113.   This is particularly the case for Drager's disclosure of PEG as a

"hydrophilic polymer" in the claimed pharmaceutical formulation.  *See, e.g.*,

Drager at 17:5-7, claim 38("The formulation of any one of claims 1 and 4, further

comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, **a**

**hydrophilic polymer**, a complexing agent, a preservative, or a combination

thereof.") (emphasis added); '006 Patent at Claim 5.  Notably, Drager identifies

PEG as the *only* example of a hydrophilic polymer.

114.   Drager also discloses formulations that do not require any certain

amount of aprotic solvent: "[a]lternatively, formulations of the present invention

will comprise 10 moles per liter, or less, of the nonaqueous polar protic solvent.

Preferably, formulations of the present invention will comprise between about 4

Exhibit 2B
Defendants' Statement of Issues of Fact

moles per liter to about 9.5 moles per liter, of the nonaqueous polar protic solvent."

*Id.* at 4:16-19. Several PEGs of less than 1000 g/mol are typically liquids at room

temperature and are suitable as nonaqueous polar protic solvents in the production

of liquid formulations, especially as they are generally regarded as nontoxic and

nonirritant materials. Rowe 2009 at 521. In addition, a POSA would know that

several liquid PEGs had been used as excipients in FDA-approved injectable

products as of at least December 2009, namely PEG 200, PEG 300, PEG 400 and

PEG 600, and hence would be preferable solvents in a formulation intended for

regulatory approval. All of these PEGs have densities and molecular weights such

that a solution of the PEG, without additional solvents, can produce a solution of

10 moles per liter or less. In the table below, the moles per liter of several liquid

PEG can be calculated based on USP specifications. *See* 2009 USP Monograph for

Polyethylene Glycol at 1308-1309; Rowe 2009 at 518-519.

| PEG | Molecular weight (USP: 95.0%-105.0%) | Density (20˚C) grams/Liter | Moles per Liter |
|---|---|---|---|
| PEG 200 | 190. to 210.0 g/mol | 1124 | 5.92 to 5.35 |
| PEG 300 | 285 to 315.0 g/mol | 1125 | 3.94 to 3.57 |
| PEG 400 | 380. to 420.0 g/mol | 1125 | 2.96 to 2.68 |
| PEG 600 | 570. to 630.0 g/mol | 1125 | 1.97 to 1.79 |

115.   Thus, Drager discloses that formulations comprising PEG 200, PEG

300, PEG 400, and PEG 600 as a nonaqueous polar protic solvent would all be

suitable formulations, without the need of any certain amount of an apolar solvent,

Exhibit 2B
Defendants' Statement of Issues of Fact

since the PEG alone can meet the embodiment's limitation of "less than 10 moles per liter, or less." Furthermore, a POSA would find it immediately apparent that if no certain nor minimum amount of apolar solvent is required, and "undesirable polar protic solvent-bendamustine adducts…will not form during typical commercial storage if the concentration of the polar protic solvent is kept within [this range]," then a formulation with an acceptable liquid PEG (*i.e.*, PEG 200, 300, 400 or 600) and no apolar solvent would have a reasonable likelihood of producing stable formulations of bendamustine.

116.    Drager also discloses the inclusion of PEG in its liquid bendamustine formulations as a hydrophilic polymer.  *See* Drager at 17:5-7, claim 38 ("The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, **a hydrophilic polymer**, a complexing agent, a preservative, or a combination thereof.") (emphasis added). As discussed above, the only example of a hydrophilic polymer identified in Drager is PEG. *Id.* at 7:27-8:2.

117.    Thus, in effect, Drager discloses liquid bendamustine formulations that are stable under the commercial storage conditions comprising, *inter alia*, bendamustine and PEG.

### 3.    Drager discloses antioxidants as an excipient that reduced oxidation and thereby increases stability of bendamustine liquid

Exhibit 2B
Defendants' Statement of Issues of Fact

formulations

118.   Drager also discloses the inclusion of antioxidants in its liquid

bendamustine formulations. *See* Drager at 7:26-32 ("In addition to comprising a

polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a

nonaqueous polar protic solvent, or mixture of solvents, formulations of the present

invention may further comprise other pharmaceutically acceptable excipients.

Pharmaceutically acceptable excipients are known in the art and include, for

example, **antioxidants** (*e.g.*, tocopherol (Vitamin E), ascorbic acid, methylparaben,

butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate) . . .

.") (emphasis added). Indeed, bendamustine formulations comprising antioxidants

were also included in the claims of Drager. *Id.* at 15:11-12, claim 18 ("The

formulation of claim 1, further comprising a pharmaceutically acceptable

**antioxidant**."); *see also id.* at 17:5-7, claim 38("The formulation of any one of

claims 1 and 4, further comprising **an antioxidant**, a surfactant, a lipid, a filler, an

organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a

combination thereof.") (emphasis added).

119.   Drager also discloses specific examples of liquid bendamustine

formulations comprising an antioxidant. *See* Drager at 9:10-12 (disclosing

bendamustine solutions comprising 25 mg/mL niacinamide). As discussed *supra*, a

POSA would recognize niacinamide as an antioxidant. *See supra*, Section IV.B.3.

Exhibit 2B
Defendants' Statement of Issues of Fact

In addition, Drager teaches that addition of the antioxidant improved stability over a formulation without the antioxidant. For example, Drager teaches that a bendamustine formulation in DMA without an antioxidant had about 6% impurities after about 12 months, and would be expected to have about 7% impurities (93% purity) after 15 months. However, after the addition of niacinamide, an antioxidant, the formulation had about 3% impurities after 12 months, and it would be apparent that the antioxidant-containing formulation would have <5% impurities after 15 months.



*left*, Drager at 21, Fig. 2, with modeled data annotated in blue (DMA) and orange (DMA + 25 mg/mL niacinamide); *right*, Fig. 1 bendamustine stability data modeled using zero-order regression models, showing ca. 96.6% purity with an antioxidant at 15 mo. and ca. 93.1% purity without an antioxidant.

**4.     Drager discloses bendamustine liquid formulations that are stable over typical commercial storage periods, including 15**

Exhibit 2B
Defendants' Statement of Issues of Fact

**months**

120.   Finally, Drager teaches that the formulations are commercially viable
and do not form adducts "over the course of typical commercial storage
conditions."  Drager at 3:25-28.

121.   Drager also defines the typical commercial storage conditions as
"includ[ing] time periods of, for example, about 30 days, about 90 days, about 180
days, and about 365 days (about 1 month, about 3 months, about 6 months, and
about 1 year)."  *Id.* at 3:28-30.  Drager defines about "[a]s used herein, the term
'about' is defined as ± 10%, preferably ± 5%."  *Id.* at 7:25.

122.   Drager further describes the typical commercial storage conditions as
including "temperatures of about 23ºC (ambient room temperature) and
refrigerated temperatures below ambient room temperature, for example, about 5
ºC" for a period of up to 1 year. *Id.* at 3:28-32.

123.   Drager teaches the disclosed formulations "are stable over the course
of a typical commercial storage period." *Id.* at 4:27-28. Drager further describes
the term "stable" as follows:

> Liquid formulations of the present invention are stable
> over the course of a typical commercial storage period. As
> used herein, "stable" is defined as no more than about a
> 10% loss of bendamustine under typical commercial
> storage conditions. Preferably, formulations of the present
> inventions will have no more than about a 10% loss of
> bendamustine, more preferably, no more than about a 5%
> loss of bendamustine, under typical commercial storage

Exhibit 2B
Defendants' Statement of Issues of Fact
                  conditions.

'Drager at 4:28-32.

124.   Drager discloses the degradation potential known for bendamustine to "convert to non-bendamustine products [] upon exposure to certain nucelophiles, for example, water and alkyene [sic] glycols such as propylene glycol." *Id.* at 5:1-2.  Drager further discloses "preferred embodiments of the present invention" with analysis of multiple formulations and their degradants "after about 1 year (about 365 days) at about 5ºC. *See, e.g.*, *id.* at 5:14-6:24.

125.   Drager discloses "[p]referably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5ºC and time period of about 30 days (about 1 month) to about 365 days (about 1 year)." *Id.* at 7:7-10.

126.   Drager also discloses the stability data for specific exemplary liquid bendamustine formulations. In particular, Drager discloses that liquid bendamustine formulations comprising 34% propylene glycol, stored at 5°C have a purity of approximately 98.8% at 200 days. *See* Drager, at 21, Fig. 2. A POSA would be familiar with "typical commercial storage conditions" as representing time frames up to about 12 months to 18 months, even 24 months and would be readily familiar with the methods to predict the stability of these formulations at

Exhibit 2B
Defendants' Statement of Issues of Fact

time points later than 365 days, *i.e.*, time points beyond the time points for which

the measured stability data is provided, using regression models, and thus

extrapolation could be used to predict the commercial shelf life. *See* FDA

Guidance at 7; *see also* Carstensen 1976 at 311, Remington 2000 Chapter 52 at

991 ("This concept further assumes that the degradation reactions follows zero- or

pseudo-zero-order kinetics…this is an excellent assumption…shelf life

calculations assuming zero-order kinetics are more conservative than those for

higher orders."). Fitting of these data to a zero-order regression model and

predicting stability to 15 months, shows that about 97.6% of the bendamustine

would remain intact.



*left,* bendamustine stability data from Drager, fitted to a zero-order regression

model, and stability predicted to 15 months;[4] *right,* Drager at 21, Fig. 2, with

---

[4] Stability data were fit to zero-order degradation models since these typically
predict drug stability well and are conservative.  Remington 2000 at 991.  The
specification did not state any given purity for the starting material, and even
pharmaceutical grade materials are not 100% pure, thus the kinetic models were

Exhibit 2B
Defendants' Statement of Issues of Fact

modeled formulation's (66%DMA/34%PG) stability data annotated in green.

127.   Drager also discloses stability data for specific exemplary liquid bendamustine formulations at 25°C. In particular, Drager discloses that liquid bendamustine formulations comprising DMSO, stored at 25°C have a purity of approximately 96.3% at 12 months. *Id.* at 20, Fig. 1. Fitting of these data to a zero-order regression model and predicting stability to 15 months, shows that about 95.6% of the bendamustine would remain intact.



*left,* bendamustine stability data from Drager, fitted to a zero-order regression model, and stability predicted to 15 months; *right,* Drager at 20, Fig. 1, with the modeled formulation's (DMSO) stability data annotated in green.

### 5.   Drager discloses specific bendamustine liquid formulations that include each of the limitations of the '483 patent

128.   The claims of Drager embody the specific aspects of the disclosure as provided herein.  In particular, claims 19-27, 31-33, 37-38, 56 and 60 of Drager

---

not forced to 100% purity at time zero (0 months storage).

Exhibit 2B
Defendants' Statement of Issues of Fact

disclose the concentration of bendamustine, the use of a non-aqueous protic

solvent, the use of an antioxidant, and the use of a hydrophilic polymer, all of

which result in a stable liquid formulation for bendamustine as addressed *infra*.

*See generally* Drager, at 15-19.  Claim 38, for example, which depends from either

of claims 1 and 4 and thereby includes all the imitations of claim 1 and 4,

respectively, additionally specifies the use of an antioxidant, which as discussed

herein was known by the POSA to account for stability of the liquid formulation.

*See id.* at 17:5-7, claim 38.

129.   Specifically, Drager recites:

What is Claimed:
1.  A liquid pharmaceutical formulation comprising
bendamustine, or a pharmaceutically acceptable salt or
prodrug thereof, and a polar aprotic solvent.

…

4.  The formulation of claim 1, further comprising a non-
aqueous polar protic solvent.

…

19. The formulation of claim 1, comprising about 5 mg/ml
to about 200 mg/mL of bendamustine, or the
pharmaceutically acceptable salt thereof.

20.  The formulation of claim 1, comprising about 5 mg/ml
to about 120 mg/mL of bendamustine, or the
pharmaceutically acceptable salt thereof.

21.  The formulation of claim 1, comprising about 5 mg/ml
of bendamustine, or the pharmaceutically acceptable salt

Exhibit 2B
Defendants' Statement of Issues of Fact

thereof.

22.   The formulation of claim 1, comprising about 40 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

23.   The formulation of claim 1, comprising about 60 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

24.   The formulation of claim 1, comprising about 80 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

25.   The formulation of claim 1, comprising about 100 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

26.   The formulation of claim 1, comprising about 200 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

27.   The formulation of claim 1, wherein the formulation is stable at about 5 °C for about 30 days to about 365 days.

…

31.   The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions.

32.   The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions.

33.   The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for about 30 days to about 365 days.

Exhibit 2B
Defendants' Statement of Issues of Fact

…

37.  The formulation of any one of claims 1 and 4, further comprising at least one pharmaceutically acceptable excipient.

38.  The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

…

56.  A method of treating cancer comprising
identifying a patient in need of treatment of cancer;
providing a liquid pharmaceutical formulation comprising a therapeutically effective amount of bendamustine, or a pharmaceutically acceptable salt thereof, and nonaqueous solvent;
diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent to form a pharmaceutical preparation;
administering the pharmaceutical preparation to the patient in need of treatment.

…

60.    The method of claim 56, wherein the liquid pharmaceutical formulation further comprising a non-aqueous polar protic solvent.

Drager, at 14-19.

130.  Other similar claims are disclosed in the related applications and patents of Drager, such as the '006 Patent. For example, claims 1-5 of the '006 Patent disclose similar stable liquid bendamustine compositions comprising a

Exhibit 2B

Defendants' Statement of Issues of Fact

specific concentration of bendamustine, the use of a non-aqueous protic solvent,

the use of an antioxidant, the use of a hydrophilic polymer, all of which result in a

stable liquid formulation for bendamustine as addressed *infra*. *See generally* '006

Patent, at 11:5-12:5, claims 1-5.  Claim 5, for example, which depends from claim

1 and thereby includes all the limitations of claim 1.

131.   Specifically, the '006 Patent claims:

What is claimed is:

> 1.   A stable, non-aqueous liquid, pharmaceutical formulation comprising from about 5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, wherein said formulation, following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization.
>
> 2.   The formulation of claim 1, comprising about 100 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof.
>
> 3. The formulation of claim 1, wherein the bendamustine is bendamustine hydrochloride.
>
> 4.   The formulation of claim 1, further comprising at least one pharmaceutically acceptable excipient or diluent.
>
> 5.   The formulation of claim 1, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

'006 Patent, at 11:5-12:5.

Exhibit 2B
Defendants' Statement of Issues of Fact

## VI.   DEFENDANTS' PROPOSED NDA PRODUCTS DO NOT INFRINGE THE '483 PATENT

132.   Neither Apotex's Proposed NDA Product nor its indicated use would infringe any of the Asserted Claims of the '483 patent because Apotex's Proposed NDA product would not be able to be dispensed with minimal if any effort or preparation, and thus, is not "ready to use" as required by the Asserted Claims.[5]

133.   Neither Slayback's Proposed NDA Product nor its indicated use would infringe any of the Asserted Claims of the '483 patent because Slayback's Proposed NDA product would not be able to be dispensed with minimal if any effort or preparation, and thus, is not "ready to use" as required by the Asserted Claims

**A.**

134.

135.



---

[5] Since all asserted claims depend on claim 1, and since there is no infringement of claim 1, there would be no infringement (literally or under the doctrine of equivalents) of any asserted dependent claim (which are narrower in scope than independent claim 1).

Exhibit 2B
Defendants' Statement of Issues of Fact



Exhibit 2B

Defendants' Statement of Issues of Fact

138.



139.

_____

[6] OSHA Hazardous Drugs. OSHA (Accessed on 02/16/16, from http://www.osha.gov/SLTC/hazardousdrugs/index.html). (footnote in original)

Exhibit 2B

Defendants' Statement of Issues of Fact



Exhibit 2B
Defendants' Statement of Issues of Fact



142.

143.

Exhibit 2B
Defendants' Statement of Issues of Fact



144.

145.

---

[7] OSHA Hazardous Drugs. OSHA (Accessed on 02/16/16, from http://www.osha.gov/SLTC/hazardousdrugs/index.html. (footnote in original)

[8] *Id.*

Exhibit 2B
Defendants' Statement of Issues of Fact

**B.    The Apotex Proposed NDA Product Is Not "Ready to Use"**

146.    The effort and preparation required to dispense Apotex's Proposed

NDA Product begins when the medical oncologist or treating physician places an

order within the electronic medical record system and the pharmacy receives the

prescription (or chemotherapy order).

147.    The preparatory dispensing process for the pharmacist would then

continue as he/she would need to, inter alia: (i) assess the completeness of the

order for potential allergies; (ii) ensure the timing of the order is clinically relevant

for the patient; (iii) review the patient's medical record to confirm the avoidance

of, e.g., drug-drug interaction, drug-disease interaction, and dietary interactions;

(iv) calculate and/or confirm the patient's body-surface area (m2) used to arrive at

the prescribed dosage (mg/m2); (v) calculate and/or confirm the prescribed dosage

(mg/m2) for the patient based on the applicable body-surface area and prescribing

information; (vi) review the patient's recent lab values to ensure they are inside a

normal range and, if outside that range, to understand how to adjust the dose and

Exhibit 2B
Defendants' Statement of Issues of Fact

timing of administration of the medication; and (vii) grade the patient by the

CTCAE grading scale to understand applicable health parameters; and potentially

(viii) communicate with the treating physician to discuss any proposed alterations

to the prescribed dosage. *See supra* at ¶¶ 76-101.

148.   Once these initial preparatory steps are completed, the clinical

pharmacist would release the chemotherapy order—with confirmed calculated

dosage—to the pharmacy mixing room and a second phase of preparation would

begin.  Within this second phase of preparation, there would be double-checking of

the measured volumes and setup to reduce errors.  The pharmacist and/or

technician would also take extra safety and handling precautions since

bendamustine hydrochloride is a cytotoxic agent; these precautions include

working efficiently with the product given its limited admixture stability and

working in a hazardous drug mixing hood.  *See supra* at ¶¶ 76-101; *see also, e.g.*,

Remington at 802; OSHA Guidelines at A-1–A-11; Power at 94.

149.   The technician would then draw the desired volume from the multi-

dosage vial using the techniques known for cytotoxic drugs (*see generally* OSHA

Guidelines) and a second set of eyes (*e.g.*, from the pharmacist) would double-

check to visually examine that the appropriate amount of bendamustine

hydrochloride injection product is extracted from the vial into the syringe.  *See*

*supra* at ¶¶ 76-101; *see also, e.g.*, Remington at 805.

Exhibit 2B
Defendants' Statement of Issues of Fact

150.   Upon confirming all the required information and setting up all of the necessary environments, the technician would then transfer the extracted liquid bendamustine from the vial to dilute it in the final infusion bag with additional diluent.  At that point, final preparation steps for dispensing the chemotherapeutic would commence followed by transporting the appropriately prepared dosage to the appropriate facility administering it to the patient.  These steps would include, *e.g.*, placing the diluted product's infusion bag into a double bag, affixing a patient label to the double bag, confirming the label information to ensure the patient information and drug information are correct, sealing the infusion bag, and preparing for transportation to a remote administration facility if necessary.  *See supra* at ¶¶ 87-101.

151.   Only after the successful completion of these dispensing steps would Apotex's Proposed NDA Product be ready to administer to the patient.

**C.**

152.

153.



Exhibit 2B

Defendants' Statement of Issues of Fact



Exhibit 2B
Defendants' Statement of Issues of Fact



157.

158.

Exhibit 2B

Defendants' Statement of Issues of Fact

Exhibit 2B
Defendants' Statement of Issues of Fact



159. ██████████████████████████

Exhibit 2B
Defendants' Statement of Issues of Fact



161.

### D.   The Slayback Proposed NDA Product Is Not "Ready to Use"

162.   The effort and preparation that would be needed to dispense

Exhibit 2B
Defendants' Statement of Issues of Fact

Slayback's Proposed NDA Product begins when the medical oncologist or treating physician places an order within the electronic medical record system and the pharmacy receives the prescription (chemotherapy order). Furthermore, for the same reasons as above with regard to Apotex's Proposed NDA Product (*see supra* at ¶¶ 146-151), these additional steps are required in order to dispense Slayback's Proposed NDA Product.

### E. Apotex's and Slayback's NDA Products Do Not Infringe the '483 Patent Under the Doctrine of Equivalents

163.    The Applicant distinguished "ready to use" from "ready for further dilution" both in the specification and during prosecution.  For example, the specification states "[t]he inventive formulations are advantageously ready to use **<u>or</u>** ready for further dilution."  *See* '483 patent at 2:18-21 (emphasis added). A POSA would understand that "or" means "ready to use" products are different than products that are "ready for further dilution." This comports with how such compositions would be understood by a POSA at the time of the '483 patent. For example, as discussed above, Remington similarly distinguishes compositions that are "ready for injection" from "concentrates that require dilution." *See* Remington at 805.

164.    When presented with an option between "ready to use" and "ready for further dilution," applicants indicated to the Examiner that "ready to use" "would be best," which implies they readily distinguished the two phrases. '483 Patent File

Exhibit 2B
Defendants' Statement of Issues of Fact
History, Interview Summary, July 16, 2021.

165.   A solution that is "ready for further dilution" is necessarily not "ready to use," as "ready to use" encompasses compositions that need no further dilution, a point expressly recognized by the Examiner. *See* Advisory Action Before the Filing of an Appeal Brief, June 2, 2021; *see also* Remington at 805 (identifying examples of solutions ready for injection).

166.   The claims as filed did not recite the "ready to use" limitation. These original claims were rejected over compositions disclosed in the prior art. *See* Office Action Summary, May 27, 2020.  In rejecting the claims, the Examiner repeatedly indicated that the prior art disclosed liquid bendamustine compositions that were "further diluted for administration." *Id.* at 4; *see also id.* at 5 ("Brittain et al. . . . then further dilutes it for administration at the desired concentration."), *id.* at 8 ("Thus TREANDA teaches that a bendamustine concentrate is made first and then the desired volume needed is taken from the concentrate and further diluted by the artisan.").

167.   In its response to that Office Action, the Applicant did not challenge the Examiner's finding that liquid bendamustine compositions "ready for further dilution" were taught in the prior art. *See* Applicant Amendment/Remarks Made in an Amendment, November 25, 2020.

168.   The Examiner renewed the rejection, stressing that the prior art

Exhibit 2B

Defendants' Statement of Issues of Fact

"clearly and unambiguously set forth" liquid Bendamustine compositions requiring

"further dilution . . . for administration."  *See* Office Action Summary, December

21, 2020 at 7; *see also id.* at 5 ("Thus it is well known in this art to first make a

concentrated solution of bendamustine which is subsequently further diluted for

administration.").In order to distinguish its claimed compositions from the prior art

bendamustine compositions that were "ready for further dilution," applicants

amended their claims to include the phrase "ready to use."

## VII.   THE ASSERTED CLAIMS OF THE '483 PATENT ARE INVALID AS ANTICIPATED BY THE '006 PATENT AND AS ANTICIPATED BY DRAGER

### A.   Claim 1 of the '483 Patent is Anticipated by Drager

169.   Claim 1 of the '483 patent recites a ready to use liquid formulation

comprising about 10 mg/mL to about 100 mg/mL bendamustine, PEG, and a

stabilizing amount of an antioxidant, wherein the composition has less than about

5% peak area response to total impurities resulting from the degradation of the

bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15

months at a temperature of from about 5 ℃ to about 25 ℃. *See* '483 Patent at

13:22-34, claim 1.

170.   The transitional phrase "comprising" in the claims of the patent

indicates that the claimed composition allows for the presence of additional

excipients in the scope of the claims. Thus, the compositions covered by claim 1 of

Exhibit 2B
Defendants' Statement of Issues of Fact

the '483 patent may include excipients in addition to those explicitly recited in

claim 1 of the '483 patent.

171.   The formulations of claim 1 of the '483 patent are anticipated by

Drager. In particular, as discussed in detail below, all the elements recited in claim

1 of the '483 patent are disclosed either expressly or inherently by Drager.

172.   In particular, Drager discloses each of the: the "ready to use" liquid

formulation limitation; the 10 mg/mL to 100 mg/mL bendamustine limitation; the

polyethylene glycol limitation; the stabilizing antioxidant limitation; and the

stability limitation; by way of the disclosure contained in Drager, including the

recitation of its claims which particularly point out to the POSA the aspects of the

invention regarded as of particular interest and by way of the supporting

specification.

173.   For example, Drager (and the '006 Patent) claim compositions that

teach and disclose each and every limitation of Claim 1 of the '483 patent. The

table highlights exemplary claims (which are re-written in independent form for

sake of clarity:

| Claim 1 of the '483 Patent | Drager, Claim 38 | '006 Patent, Claim 5 |
|---|---|---|
| 1. A ready to use liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, | 38. [A liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt or prodrug | 5. [A stable, non-aqueous liquid, pharmaceutical formulation comprising from about 5 mg/ml to about 120 mg/mL of bendamustine, or a |

Exhibit 2B
Defendants' Statement of Issues of Fact

| | | |
|---|---|---|
| wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL; *polyethylene glycol*; and a stabilizing amount of an antioxidant; the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5° C. to about 25° C. | thereof, and a polar aprotic solvent, further comprising a non-aqueous polar protic solvent], further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof. | pharmaceutically acceptable salt thereof, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, wherein said formulation, following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization], further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof. |

174.   As described in more detail below, Drager specification provides further insight as to how these claims contain each limitation of Claim 1 of the '483 patent.

## 1.   Claim 1 of the '483 Patent is Anticipated by Claim 5 of the '006 Patent

175.   In particular, claim 5 of the '006 patent discloses all of the elements of the bendamustine compositions recited in Claim 1.  An annotated version of claim 5 of the Drager '006 patent (herein referred to as "'006 patent, claim 5") is reproduced below with key elements in bold:

Exhibit 2B
Defendants' Statement of Issues of Fact

5. A **stable**, non-aqueous **liquid**, pharmaceutical **formulation comprising** from **about 5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof**, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, wherein said formulation, **following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization**, further comprising **an antioxidant**, a surfactant, a lipid, a filler, an organic acid, **a hydrophilic polymer**, a complexing agent, a preservative, or a combination thereof.

'006 patent, claim 5 (emphasis added).

176.   As set out in the table below, a POSA would understand that '006 patent, claim 5 discloses each and every element of Claim 1 of the '483 patent, arranged in the same manner as it appears in the Asserted Claims:

Exhibit 2B
Defendants' Statement of Issues of Fact

| Claim 1, '483 Patent | '006 patent, claim 5[9] |
|---|---|
| 1. A ready to use liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof … | 5. A stable, **non-aqueous liquid, pharmaceutical formulation comprising** from about 5 mg/ml to about 120 mg/mL of **bendamustine, or a pharmaceutically acceptable salt thereof**, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, **wherein said formulation, following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization**, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof. |
| . . .wherein the <u>bendamustine</u> concentration in the composition is from **about 10 mg/mL to about 100 mg/mL**; | "… comprising from about **5 mg/ml to about 120 mg/mL** of **bendamustine, or a pharmaceutically acceptable salt** thereof,…" |

---

[9] '006 patent, claim 5 is rewritten in its independent format.

Exhibit 2B
Defendants' Statement of Issues of Fact

| | |
|---|---|
| **polyethylene glycol**; and | ". . . further compris[ing] … **a hydrophilic polymer** …"<br><br>", … **hydrophilic polymers (*e.g.*, polyethylene glycols (PEG 300, PEG 400) …"<br>Drager at 7:26-8:3 (emphasis added). |
| a **stabilizing amount** of an **antioxidant**; | "A **stable**, non-aqueous liquid, pharmaceutical formulation. . . further comprising … an **antioxidant**…" |
| the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C. to about 25°C.<br><br>'483 patent at claim 1 (emphasis added). | "A **stable**, non-aqueous **liquid**, pharmaceutical formulation …"<br><br>"As used herein, 'stable' is defined as . . . more preferably, no more than about a 5% loss of bendamustine under typical commercial storage conditions." Drager at 4:28-32 (emphasis added). |

### a)   '006 patent, claim 5 discloses a "ready to use" liquid bendamustine composition

177.   As discussed above, the term "ready to use" has been agreed to by stipulation of the parties to mean "able to be dispensed with minimal if any effort or preparation; prepackaged."  To the extent that Plaintiff's attempts to construe

Exhibit 2B
Defendants' Statement of Issues of Fact

this term to include a limitation to "not require additional reconstitution" and thus

are "able to be dispensed with minimal if any effort or preparation," the attempts to

further construe the term render it indefinite. To the extent that it is not found to be

indefinite, then Drager expressly teaches "ready to use" liquid bendamustine

compositions.

178.   As set forth above, '006 patent, claim 5 recites a composition that

"following dilution with a pharmaceutically acceptable diluent, is suitable for

injection into a patient without lyophilization." A POSA would understand that this

claim element meets the "ready to use" limitation under the interpretation offered

by Plaintiff.

**b)** **'006 patent, claim 5 discloses the same concentrations of bendamustine**

179.   '006 patent, claim 5 recites a formulation comprising "**about 5 mg/ml**

**to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt**

**thereof.**" A POSA would understand that a range of "about 5 mg/ml to about 120

mg/mL" (where "about is defined as $\pm 10\%$, preferably $\pm 5\%$" (Drager at 7:25)),

discloses the "about 10 mg/mL to about 100 mg/mL" concentrations ranges recited

in claim 1 of the '483 patent.  Moreover, Drager specifically describes additional

concentrations of bendamustine within the range of '006 patent, claim 5, such that

a POSA would understand the range to further disclose discrete concentrations

within that range, including for example "about 5 mg/mL, about 10 mg/mL, about

Exhibit 2B
Defendants' Statement of Issues of Fact

20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine." *See* Drager at 7:14-25.

180.   In view of the above, a POSA would have understood that '006 patent, claim 5 teaches and discloses the claimed concentrations of bendamustine as arranged in Claim 1 of the '483 patent.

### c)   '006 patent, claim 5 discloses liquid formulations of bendamustine comprising PEG

181.   '006 patent, claim 5 expressly recites a formulation which includes a "**hydrophilic polymer.**" The *only* example of a hydrophilic polymer disclosed in Drager is polyethylene glycol ("PEG"). *See* Drager at 7:29-8:3 (emphasis added) ("Pharmaceutically acceptable excipients are known in the art and include, for example, . . . **hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400) . . . .**"). Accordingly, a POSA would have understood that '006 patent, claim 5 discloses a bendamustine composition comprising PEG.

182.   '006 patent, claim 5 explicitly discloses a liquid bendamustine composition comprising PEG.

### d)   '006 patent, claim 5 discloses liquid bendamustine compositions comprising a stabilizing amount of an antioxidant

183.   The '006 Patent, claim 5 also expressly recites "stable" liquid bendamustine compositions comprising "an **antioxidant**." '006 Patent, claim 5. A POSA would understand '006 Patent claim 5 discloses a bendamustine

Exhibit 2B
Defendants' Statement of Issues of Fact

composition comprising "a stabilizing amount of antioxidant" as recited in Claim 1 of the '483 patent.

184.   A POSA would have known at the time of the claimed invention that antioxidants were used in many liquid pharmaceutical formulations to enhance stability and, thus, would have performed the same function in a liquid bendamustine formulation based on the disclosures of Drager.

185.   Additionally, the '483 patent states: "'stabilizing amount' shall be understood to include those amounts which increase or enhance the stability of the Bendamustine compositions described herein." '483 patent, 3:63-67.

186.   Eagle has agreed in a separate litigation involving the '483 patent that a "stabilizing amount of an antioxidant" is "any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature." *See Eagle Pharms., Inc. v. Celerity Pharms., LLC*, No. 22-cv-42-CFC, D.I. 64, Joint Claim Construction Chart, at 5.  Under Eagle's proposed definition, a POSA would understand that the disclosure of a "stable" bendamustine composition comprising "an antioxidant" in '006 patent, claim 5 means that the composition contains a "stabilizing amount of an antioxidant."

187.   Whether or not niacinamide's mechanism of action was known, does not change the fact that its effect as an antioxidant was known, and a POSA does not have to know the exact mechanism of action to know the properties of a

Exhibit 2B
Defendants' Statement of Issues of Fact
compound.

188.   As discussed above, at the time of the '483 patent, niacinamide was a known antioxidant.  Moreover, Drager teaches that the addition of niacinamide improved the stability of certain bendamustine compositions disclosed in Drager.

189.   Accordingly, in view of the above, a POSA would readily understand that '006 patent, claim 5 discloses bendamustine compositions comprising a "stabilizing amount of antioxidant" as recited in Claim 1 of the '483 patent.

### e)   '006 patent, claim 5 discloses liquid formulations of bendamustine having less than 5% peak area response of total impurities resulting from the degradation of the bendamustine

190.   As set forth above, '006 patent, claim 5 recites a "**stable**, non-aqueous, **liquid**" bendamustine formulation. Drager defines "stable" as "… more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions." Drager at 4:28-32.  A POSA would readily understand that this definition of "stable" includes compositions "having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5° C to about 25° C" as recited in claim 1 of the '483 patent.

191.   With regard to "typical storage conditions," a POSA would not limit their understanding of "typical storage conditions" to exclude any time periods not

Exhibit 2B
Defendants' Statement of Issues of Fact

expressly listed in Drager. Drager does not provide an exhaustive list, but rather,

discloses exemplary time periods that could be included.  Thus, Drager's

disclosure of "typical storage conditions" includes periods of up to 12, 18, and

even 24 months, but definitely includes 15 months.

192.    Moreover, the disclosed stability data translates to longer time periods

of 15 months based on the knowledge of the POSA and based on modeling studies

that extrapolate stability data disclosed by Drager.  Indeed, the inventors of the

'483 patent appear to have engaged in the same type of analysis to support their

15-month stability limitation.    For example, the '483 patent contends that its

bendamustine compositions "are substantially free of impurities after at least about

15 months . . . ." *See, e.g.*, '483 patent, 2:13-21.  Yet, the '483 patent fails to

provide any stability data for its compositions at 15 months. The inventors

supported the long-term stability of their claimed compositions by extrapolating

from stability studies for much shorter periods (*e.g.*, 12 months).  *See* '483 patent,

Table 6, 11:35-38 ("The data corresponds to bendamustine solutions being stable

under ambient or refrigerated storage conditions for well in excess of 2 years, and

thus long term stable.").  Accordingly, a POSA would understand the disclosure of

12-month stability data presented in Drager to include at least 15 months.

### f)    '006 patent, claim 5 discloses the bendamustine compositions of Claim 1 and are arranged in the same way

193.    As set forth above, each and every element of Claim 1 is taught and

Exhibit 2B
Defendants' Statement of Issues of Fact

disclosed in Drager.  Moreover, at least '006 patent, claim 5 arranges these claim

elements in the same way they appear in Claim 1.

194.   Accordingly, Claim 1 of the '483 patent is anticipated by claim 5 of

the '006 patent.

## 2.      Claim 1 of the '483 Patent is Anticipated by Drager

195.   Claim 1 of the '483 patent is also anticipated by Drager, both by its

disclosure in the specification it shares with the '006 patent and by the Drager

claim set (independent from the '006 patent, claim 5).  In sum, Drager anticipates

the '483 patent as it discloses each and every element in the same manner as set

forth in the claimed invention.

196.   First, Drager discloses "ready to use" liquid formulations comprising

bendamustine.  In the "Summary of the Invention" section, Drager disclosed that

the "[t]he present invention is directed to liquid pharmaceutical formulations

comprising bendamustine . . . ." Drager at 2:18-20. Drager further discloses:

> The liquid formulations of bendamustine described herein
> are intended to be administered *via* injection, for example,
> they may be administered subcutaneously,
> intracutaneously, intravenously, intramuscularly, intra-
> articularly, intrasynovially, intrasternally, intrathecally,
> intralesionally, intracranially or via infusion. In a typical
> preparation, the volume of the liquid formulation of the
> present invention needed for the required dose can be
> aseptically withdrawn and transferred to an infusion bag
> of 0.9% Sodium Chloride (or other pharmaceutically
> acceptable intravenous solution) for injection. After
> transfer, the contents of the infusion bag are thoroughly

Exhibit 2B
Defendants' Statement of Issues of Fact

> mixed. Administration by intravenous infusion is typically provided over a time period of from about 30 to about 60 minutes. Previously described lyophilized formulations of bendamustine required reconstitution of the lyophilized bendamustine prior to mixture with the acceptable intravenous solution before infusion.

*Id.* at 8:18-29.

197.  As is evident from the above, Drager distinguished his invention from the lyophilized bendamustine formulations taught in the prior art. Thus, a POSA would have known that Drager discloses "ready to use" liquid bendamustine formulations. Indeed, specific Examples taught in Drager teach multiple "ready to use" liquid formulations comprising bendamustine. *Id.* at 10, Table II.

198.  Second, Drager discloses liquid formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine. Regarding the concentration of bendamustine in the disclosed liquid formulations, Drager discloses:

> Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL. Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about 5 mg/mL to about 120 mg/mL. Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope

Exhibit 2B
Defendants' Statement of Issues of Fact

> of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof. As used herein, the term "about" is defined as ± 10%, preferably ± 5%.

*Id.* at 7:14-25.

199. Thus, Drager taught liquid bendamustine solutions comprising about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL bendamustine, *i.e.*, the concentrations encompassed by "about 10 mg/mL to about 100 mg/mL," recited in claim 1 of the '483 patent.

200. Third, Drager discloses liquid bendamustine compositions comprising PEG.

> It has also been discovered that **stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent** or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable **nonaqueous polar protic solvents** are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as **<u>polyethylene glycol</u>**, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

*Id.* at 4:1-8 (emphasis added). Drager specifically claims bendamustine formulations comprising polyalkylene glycols. *See id.* at 14:11-12, claim 5; *see*

Exhibit 2B
Defendants' Statement of Issues of Fact

*also id.* at 18:18-19, claim 54; *id.* at 19:14-15, claim 61. Drager only provides three

specific examples of polyalkylene glycols: PEG (*i.e.*, polyethylene glycol),

polypropylene glycol, and polybutylene glycol. *Id.* at 4:4-8. Thus, in effect, a

POSA would have envisaged that Drager specifically points out a solution

comprising bendamustine and PEG.

201.   Drager also discloses that PEG is used in its bendamustine

formulations as a hydrophilic polymer. For example, Drager states "formulations

of the present invention may further comprise other pharmaceutically acceptable

excipients [,including] . . . hydrophilic polymers (e.g., ***polyethylene glycols (PEG***

***300, PEG 400***) . . .." *Id.* at 7:27-8:2 (emphasis added).

202.   Thus, a POSA would have known that Drager explicitly taught liquid

bendamustine compositions comprising PEG, either as a non-aqueous polar protic

solvent or as a hydrophilic polymer.

203.   Fourth, Drager discloses the use of an antioxidant in the liquid

bendamustine formulations. *See* Drager at 7:29-31 ("Pharmaceutically acceptable

excipients are known in the art and include, for example, **antioxidants** (e.g.,

tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole

(BHA), butylhydroxytoluene (BHT), and propyl gallate). . . .") (emphasis added).

Drager further explicitly included the formulations comprising antioxidants in the

claims. Drager at 15:11-12, claim 18 ("The formulation of claim 1, further

Exhibit 2B
Defendants' Statement of Issues of Fact

comprising a **pharmaceutically acceptable antioxidant**."); *see also id.* at 17:5-7,

claim 38 ("The formulation of any one of claims 1 and 4, further comprising **an**

**antioxidant**, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a

complexing agent, a preservative, or a combination thereof.") (emphasis added).

204.    Indeed, Drager discloses examples of liquid bendamustine

formulations comprising antioxidants. In particular, Drager discloses liquid

bendamustine formulations comprising 25 mg/mL niacinamide. *Id.* at 9:10-11. As

discussed above, a POSA would have known that niacinamide is an antioxidant.

*See supra*, Section IV.B.3. Thus, in effect, a POSA would have known that Drager

discloses specific examples of liquid bendamustine formulations comprising an

antioxidant.

205.    In addition, as discussed above, based on the data provided in Drager,

a POSA would have known that bendamustine formulations comprising an

antioxidant are more stable as compared to formulations lacking an antioxidant.

For example, Drager taught that a bendamustine formulation in DMA without an

antioxidant had about 6% impurities after about 12 months. However, after the

addition of niacinamide, a known antioxidant, the formulation had about 3%

impurities after 12 months. Thus, a POSA would have known that antioxidants

improve stability of bendamustine liquid compositions.

206.    Moreover, these liquid bendamustine formulations comprising an

Exhibit 2B
Defendants' Statement of Issues of Fact

antioxidant are stable under the conditions of commercial storage. *See* Drager at

21, Fig. 2. Because the liquid bendamustine formulation comprising niacinamide

has good commercial stability, a POSA would know that this formulation includes

a stabilizing amount of an antioxidant.

207.   The last remaining claim limitation of claim 1 of the '483 patent, the

stability profile requiring that "the composition having less than about 5% peak

area response of total impurities resulting from the degradation of the

bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15

months at a temperature of from about 5℃. to about 25℃.," is an inherent property

of an otherwise anticipated liquid bendamustine formulation. In essence, this

limitation recites that the claimed composition has more than 95% purity when

determined by HPLC as a wavelength of 223 nm after at least 15 months at a

temperature of from about 5℃ to about 25℃. As discussed below, this limitation is

an inherent property of the formulations disclosed by Drager.

208.   Recitation of an inherent property of a previously disclosed

composition does not make the previously known composition patentable. Here, as

discussed further below, the formulations disclosed in Drager would have less than

5% degradation as determined by HPLC at[10] a wavelength of 223 nm after at least

---

[10] The '483 patent's recitation of "as," rather than "at," is treated as a typographical error that does not impact the plain meaning of the claim language.

Exhibit 2B
Defendants' Statement of Issues of Fact

15 months at a temperature of from about 5°C to about 25°C.

209.    As an initial matter, a POSA would readily understand that Drager is directed to "stable" liquid formulations of bendamustine. Drager at Abstract, 3:5-7; 4:1-3; 4:27-32; '006 Patent at Claims 1-10. Indeed, the specification of the '483 patent discloses that the formulations disclosed in Drager, *i.e.*, formulations comprising bendamustine, PEG, and a stabilizing amount of an antioxidant have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C to about 25°C. *See* '483 Patent at 4:36-40 ("Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR [peak area response] as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5°C to about 25°C."); *see also id.* at 6:48-7:28 (Table 1); *id.* at 8:10-43 (Example 3, Table 3).

210.    Because the stability profile recited in claim 1 of the '483 patent is an inherent property of the liquid bendamustine formulation otherwise disclosed in Drager, the mere recitation of the stability profile will not make a previously disclosed formulation patentable. Moreover, the technique used to measure the impurity of formulations disclosed in Drager, *i.e.*, measuring impurities using HPLC with a 223 nm wavelength for detection, does not add anything patentable

Exhibit 2B
Defendants' Statement of Issues of Fact

to formulation recited in claim 1 of the '483 patent. Indeed, these are routine and

typical methods for measuring stability of formulations. *See supra*, Section IV.B.3.

Thus, this limitation reciting the stability profile of liquid bendamustine

formulations does not add anything patentable to the remainder of claim 1 of the

'483 patent.

211.   Moreover, as discussed below, based on the data provided in Drager, a

POSA would have understood that a liquid bendamustine formulation comprising

bendamustine, PEG, and a stabilizing amount of an antioxidant, would have less

than about 5% peak area response to total impurities resulting from the degradation

of the bendamustine as determined by HPLC at a wavelength of 223 nm after at

least 15 months at a temperature of from about 5℃ to about 25℃.

212.   The measurement technique used to measure the amount of impurities

in the liquid bendamustine compositions disclosed in Drager, by itself, does not

add anything patentable to claim 1 of the '483 patent. As such, Drager teaches the

use of HPLC to measure impurities of liquid bendamustine formulations. *See*

Drager at 6:25-26 ("Analysis of the liquid formulations of the present invention

can be performed using techniques known in the art, including, for example,

HPLC, gas chromatography, and NMR."); *see also id.* at 5:14-6:31 (disclosing the

use of HPLC analysis to measure impurities in the liquid bendamustine

formulations). The particular wavelength used to measure degradative impurities in

Exhibit 2B
Defendants' Statement of Issues of Fact

the liquid bendamustine formulations taught by Drager would not have a

significant impact on the measured amount of impurities. As such, the choice and

optimization of wavelengths for detection of impurities was routine, and adds

nothing to the invention. *See supra*, Section IV.B.3.

213.   Drager teaches that the liquid bendamustine formulations are stable

under the conditions for commercial storage. *See* Drager at 3:25-34. Indeed,

regarding the stability of liquid bendamustine formulations, Drager discloses:

> Liquid formulations of the present invention are stable over the course of a typical commercial storage period. As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions. Preferably, formulations of the present inventions will have no more than about a 10% loss of bendamustine, more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions.

*Id.* at 4:27-32.

> Preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month) to about 365 days (about 1 year). More preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month), about 90 days (about 3 months), and about 180 days (about 6 months).

*Id.* at 7:7-13.

Exhibit 2B
Defendants' Statement of Issues of Fact

214.   Thus, a POSA would have known that Drager teaches liquid

bendamustine formulations that are stable under commercial storage conditions. In

other words, a POSA would have known that the liquid bendamustine formulations

disclosed in Drager would be stable at 5°C for up to 1 year (12 months).

215.   Drager also discloses the stability data for specific exemplary liquid

bendamustine formulations. In particular, Drager discloses that liquid

bendamustine formulations comprising 34% propylene glycol, stored at 5°C have a

purity of approximately 98.8% at 200 days. *See* Drager at 21, Fig. 2. A POSA

would know that this stability data indicates that based on this data, the stability of

liquid bendamustine compositions comprising 34% propylene glycol at 15 months

would be greater than 97%. As discussed above, the prediction of impurities at

time points beyond those measured was routine and accepted in the art. *See supra*,

Section IV.B.3. In other words, liquid bendamustine formulations comprising 34%

propylene glycol would have less than 5% impurities when stored under

commercial storage conditions for 15 months.

216.   As discussed above, a POSA would have known that the rate of

degradation of bendamustine goes up with increasing amount of –OH groups in the

solvents. *See supra*, ¶¶ 41-44. A POSA would also have known that the amount of

–OH groups present in a given volume of PEG would be lower than the number of

hydroxyl groups in the same volume of propylene glycol. *See id*. Thus, a POSA

Exhibit 2B
Defendants' Statement of Issues of Fact

would have known that liquid bendamustine formulations comprising PEG would

have lower degradation as compared to liquid bendamustine compositions

comprising PG. Since the liquid bendamustine solutions comprising PG have lower

than 5% impurities when stored at 5℃ for 15 months, a POSA would have known

that liquid bendamustine formulations comprising PEG, which possesses a lower

number of –OH groups per unit volume, would also have less than 5% impurities

when stored at 5℃ for 15 months.

217.   Because the liquid bendamustine formulations taught in Drager would

have less than 5% impurities under commercial storage conditions, a POSA would

also have known that these formulations would have less than about 5% peak area

response to total impurities resulting from the degradation of the bendamustine as

determined by HPLC at a wavelength of 223 nm after at least 15 months at a

temperature of from about 5℃ to about 25℃.

218.   Accordingly, at least for the reasons discussed above, the limitation

requiring less than about 5% peak area response to total impurities resulting from

the degradation of the bendamustine as determined by HPLC as a wavelength of

223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃

does not add anything patentable to remainder of claim 1 of the '483 patent.

219.   Thus, for all the reasons discussed above, independent claim 1 of the

'483 patent would be anticipated by Drager

Exhibit 2B
Defendants' Statement of Issues of Fact

### B. Claim 2 of the '483 Patent is Anticipated by Either of the ''006 Patent or Drager

220.   Claim 2 of the '483 patent depends from claim 1 and further recites

that the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine,

cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing

aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid,

or a mixture thereof. Drager specifically discloses using antioxidants, such as

propyl gallate, for liquid bendamustine formulations. *See* Drager at 7:26-31

("Pharmaceutically acceptable excipients are known in the art and include, for

example, antioxidants (*e.g.*, tocopherol (Vitamin E), ascorbic acid, methylparaben,

butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and **propyl gallate**) . . .

.") (emphasis added). In addition, tocopherol, butylhydroxyanisole and

butylhydroxytolune are phenol-containing aliphatic compounds, which are covered

by claim 2 of the '483 patent. Thus, the limitations recited in claim 2 of the '483

patent are explicitly disclosed by Drager.

221.   For the reasons set forth above, the additional limitation recited in

claim 2 of the '483 patent does not add anything patentable to claim 1 of the '483

patent. Accordingly, dependent claim 2 of the '483 patent is also anticipated over

Drager.

222.   Claim 3 of the '483 Patent is Anticipated by Either of the ''006 Patent

or Drager

Exhibit 2B
Defendants' Statement of Issues of Fact

223.   Claim 3 of the '483 patent depends from independent claim 1 and further recites that liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5°C. The additional limitation recited in claim 3 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 3 of the '483 patent is that claim 1 of the '483 patent recited that the composition is stable at "a temperature of from about 5°C to about 25°C" and claim 3 of the '483 patent recited that the composition is stable at "at a temperature of about 5°C."

224.   Thus, claim 3 of the '483 patent is anticipated by Drager for the same reasons as those discussed above in the anticipation analysis of claim 1 above. Accordingly, dependent claim 3 of the '483 patent is also anticipated by Drager.

## C.   Claim 4 of the '483 Patent is Anticipated by Either of the ''006 Patent or Drager

225.   Claim 4 of the '483 patent depends from independent claim 1 and further recites that liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C. The additional limitation recited in claim 4

Exhibit 2B
Defendants' Statement of Issues of Fact

of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 4 of the '483 patent is that in claim 1 of the '483 patent it recited that the composition is stable at "a temperature of from about 5°C to about 25°C" and claim 4 of the '483 patent recited that the composition is stable at "at a temperature of about 25°C."

226.    The specification of the '483 patent discloses that a solution comprising bendamustine, PG, and an antioxidant, *i.e.*, a formulation disclosed in Drager, has a "shelf life of at least about 15 months at 5°C and 25°C." '483 patent at 8:10-46 (Example 3, Table 3). In other words, the data provided in the specification of the '483 patent demonstrates that the formulation disclosed in Drager would have the stability profile recited in claim 4 of the '483 patent.

227.    Accordingly, dependent claim 4 of the '483 patent is also anticipated by Drager.

### D.    Claim 8 of the '483 Patent is Anticipated by Either of the ''006 Patent or Drager

228.    Claim 8 of the '483 patent is directed to a method of treating cancer in a mammal by administering an effective amount of the ready to use formulation recited in claim 1 of the '483 patent. Drager discloses the use of a therapeutically effective amount of a bendamustine composition for the treatment of cancer.

Also within the scope of the invention are methods of

Exhibit 2B
Defendants' Statement of Issues of Fact

> treating diseases, such as, for example, chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention. These methods comprise administering to the patient a therapeutically effective amount of a preparation prepared from a pharmaceutical formulation of the present invention.

Drager at 8:4-8; *see also id.* at 18:22-26, claim 56.

229.   Thus, the additional limitation recited in claim 8 of the '483 patent is disclosed in Drager

230.   Thus, the additional limitation recited in claim 8 of the '483 patent does not add anything patentable to claim 1 of the '483 patent.  Accordingly, for the reasons discussed above in the anticipation analysis of claim 1 of the '483 patent and the additional reasons discussed herein, dependent claim 8 of the '483 patent is also anticipated by Drager.

### E.   Claim 12 of the '483 Patent Is Anticipated by Either of the ''006 Patent or Drager

231.   Claim 12 of the '483 patent depends from claim 8, and the additional limitations recited in claim 12 of the '483 patent of the '483 patent depends from independent claim 8 and further recites that the method of treating cancer in a mammal by administering an effective amount of the ready to use formulation recited in claim 1 of the '483 patent, wherein the ready to use liquid bendamustine

Exhibit 2B
Defendants' Statement of Issues of Fact

composition of has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5℃.

232.   The additional limitation recited in claim 12 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the method of administering the liquid bendamustine composition recited in claim 8 of the '483 patent and claim 12 of the '483 patent is that claim 8 of the '483 patent recites that the composition (indirectly via claim 1) is stable at "a temperature of from about 5℃ to about 25℃" and claim 3 of the '483 patent recited that the composition is stable at "at a temperature of about 5℃."

233.   Thus, claim 12 of the '483 patent is anticipated by Drager for same reasons as those discussed above in the analyses of claims 1 and claim 8 of the '483 patent.

## VIII.  THE ASSERTED CLAIMS OF THE '483 PATENT ARE INVALID AS OBVIOUS TO A POSA OVER DRAGER, THE '006 PATENT, AND THE GENERAL KNOWLEDGE IN THE ART

### A.    Claim 1 of the '483 Patent is Obvious Over Drager

234.    Based on the disclosures of Drager and/or the '006 Patent, a POSA would have been (i) motivated to select PEG, (ii) motivated to use a stabilizing amount of antioxidant, and (iii) had a reasonable expectation of success in

Exhibit 2B
Defendants' Statement of Issues of Fact

obtaining a stable liquid bendamustine formulation that contains both PEG and

antioxidant as recited in the Asserted Claims.

### 1.    A POSA would be motivated to use PEG in stable liquid bendamustine formulations

235.    Drager provides at least two separate motivations for a POSA to use

PEG in a liquid bendamustine composition. First, '006 patent, claim 5 discloses

stable liquid bendamustine compositions comprising a hydrophilic polymer. *See*

'006 patent, claim 5; Drager at claim 38.  The only example of a hydrophilic

polymer disclosed by Drager is PEG.  *See* Drager at 8:2-3.  This alone is sufficient

to provide motivation to a POSA to include PEG in stable liquid bendamustine

formulations.

236.    The incorporation of PEG as a hydrophilic polymer comes from

multiple disclosures within Drager, including at least '006 patent, claim 5 (as

discussed above), Drager at claim 38, and the specification's description for

hydrophilic polymers.  As such, Drager's suggestion for PEG as a hydrophilic

polymer alone is enough to render its inclusion in the Asserted Claims obvious in

view of the prior art.

237.    Second, Drager also teaches "stable formulations of bendamustine can

be obtained by mixing a polar aprotic solvent . . . with a non-aqueous polar protic

solvent or mixture of nonaqueous polar protic solvents."  Drager at 4:1-3.  Drager

expressly identifies PEG as an example of a suitable polar protic solvent.  *See id.* at

Exhibit 2B
Defendants' Statement of Issues of Fact

4:3-8. Indeed, similar to the focused disclosure of PEG as a hydrophilic polymer, PEG is disclosed as the first of only three examples of a polyalkylene glycol as a polar protic solvent. For these reasons, a POSA would be further motivated by Drager's disclosure to use PEG as a suitable solvent in stable liquid bendamustine formulations.

238. Drager's disclosure of a formulation containing PG would not have discouraged a POSA from using other well-known polar protic solvents in liquid bendamustine formulations. This is particularly true here because Drager explicitly identifies PEG as a pharmaceutically acceptable polar protic solvent that is suitable for formulation with bendamustine, rendering it an equivalent choice with PG. *See* Drager at 4:3-8. Moreover, PG and PEG were both routinely used by pharmaceutical formulators developing parenteral solutions prior to the critical date of the '483 patent. The use of these particular co-solvents was well known to a POSA because, *inter alia*, of their known ability to increase the solubility of nonpolar drugs by several orders of magnitude. Therefore, it would have been obvious for a POSA at the time of the invention to select and use PEG, a well-known solvent that was also directly taught by Drager for use in a stable liquid bendamustine formulation.

239. Furthermore, Drager contemplates potential issues with polar protic solvents and provides a solution to avoid them. For example, Drager expressly

Exhibit 2B
Defendants' Statement of Issues of Fact

teaches that the potential degradation of bendamustine associated with polar protic

solvents can be avoided by adjusting the concentration of those solvents. Drager at

4:22-26. A POSA would understand that keeping the polar protic solvent

concentration low would reduce and/or eliminate any concerns associated with

degradation via nucleophilic attack. *Id.* To put in another way, regardless of

whether the formulation solvent affects the reactivity of bendamustine to

nucleophiles, if the nucleophile concentration is low enough, degradation cannot

occur due to a lack of reactant.

240.   As recognized by Rowe 2009, "[p]olyethylene glycols (PEGs) are

widely used in a variety of pharmaceutical formulations, including parenteral."

*See* Rowe 2009 at 517; *see also id.* at 518 stating "[i]n concentrations up to

approximately 30% v/v, PEG 300 and PEG 400 have been used as the vehicle for

parenteral dosage forms." As to the formation of peroxides, it was well understood

how to stabilize PEGs; as recognized by Rowe 2009, "[o]xidation of polyethylene

glycols may also be inhibited by the inclusion of a suitable antioxidant." *See* Rowe

2009 at 520. Thus, the use of PEG was hardly uncommon in parenteral

formulation. A POSA would have significant experience and understanding of

PEG and its suitability for parenteral formulations, further motivating its selection

by a POSA in view of Drager.

241.   As set forth above, the teachings of Drager, as viewed with the

Exhibit 2B
Defendants' Statement of Issues of Fact

knowledge and experiences of a POSA at the time of the '483 patent, provide

sufficient motivation to select PEG.

### 2.    A POSA would be motivated to use a stabilizing amount of antioxidant in stable liquid bendamustine formulations

242.    First, '006 patent, claim 5 explicitly discloses the use of an

antioxidant in stable liquid bendamustine formulations.   Moreover, at the time of

the '483 patent, a POSA would have also known that an antioxidant can enhance

the stability of a formulation and that when used with certain excipients, like PEG,

its use was beneficial to reduce the presence of peroxyacids and free radicals that

could reduce overall stability of the composition.  These understandings are further

confirmed by Drager's disclosure of stable liquid bendamustine formulations

containing a known antioxidant, niacinamide.  Thus, Drager would have motivated

a POSA to include antioxidant in a liquid bendamustine formulation, and would

have done so in combination with PEG.

243.    Moreover, determining the particular antioxidant and amounts would

have been a matter of routine experimentation, and a mere recitation of a

"stabilizing amount" of antioxidant represents the normal process when developing

a formulation.  Put another way, a POSA would not develop a formulation that was

unstable, rather they would change the amount of antioxidant to arrive at a

"stabilizing amount."  The recitation of "stabilizing amount" reflects nothing more

than the direction a POSA would have gone in every formulation.  As if this were

Exhibit 2B
Defendants' Statement of Issues of Fact

not enough, the POSA would have also been motivated to use a stabilizing amount

of antioxidant from the recitation of "stable" in '006 patent, claim 5.

244.   Drager expressly teaches including an antioxidant in "stable" liquid

bendamustine formulations.  *See* '006 patent, claim 5.  Moreover, Drager discloses

the very same antioxidants described in the '483 patent (*e.g.*, propyl gallate).

Drager at 7:30-31. Thus, the use of an antioxidant as suggested by Drager is

apparent.  These clear teachings would not be ignored by a POSA based on their

understanding of the degradative pathways of bendamustine.

245.   Moreover, a POSA was well aware of the use of antioxidants in

parenteral compositions to help reduce the presence of peroxyacids and free

radicals that could reduce overall stability of the composition.  It was known that

antioxidants can act as reducing agents or may serve as free radical scavengers.

*See* Nema 1997.  It was also known that polyether groups—like those in PEG—are

highly susceptible to oxidative degradation in a chain process analogous to

autooxidation *See* Waterman 2002.   This aspect of antioxidant activity—namely

free radical scavenging—was known to be particularly relevant for formulations

containing PEG, like those of the Asserted Claims and disclosed in Drager.

246.   As such, there is clear motivation for a POSA to use an antioxidant,

because of its known function in scavenging free radicals, the nitrogen mustard

compound structure of bendamustine, and because of PEG's known susceptibility

Exhibit 2B
Defendants' Statement of Issues of Fact

to oxidative degradation of PEG.

247.    In addition, Drager disclosed exemplary liquid bendamustine

formulations containing a known antioxidant, niacinamide that possessed

"scavenging abilities"  *See* Kamat; Ogata.  By disclosing the use of niacinamide,

Drager necessarily teaches all of the known properties of niacinamide, including its

utility as an antioxidant.

248.    The example containing niacinamide in Drager underwent stability

testing which combined three replicates (*see* Drager at 9:25-26) stored at 5°C and

25°C over the disclosed periods of time and then extracted for measurement of

stability as demonstrated by "bendamustine purity" and certain levels of

bendamustine adducts, with the resulting analysis of the stability samples being

presented graphically in Figure 2 and numerically in Table II.  The graphical

analysis of Figure 2 shows that the Niacinamide/DMA formulation (represented as

"Niacinamide," the filled black circle line of Figure 2) exhibited "bendamustine

purity" stability of ~97% (corresponding to ~3% total impurities) after 365 days of

storage under the defined conditions leaving it in "third place" in the stacked

comparison of solvent systems of Figure 2.  *See* Drager at Fig. 2.  In comparison,

the same data show the stability results for the DMA formulation (without

antioxidant-Niacinamide) (represented as "DMA," the filled black diamond line of

Figure 2) exhibited "bendamustine purity" stability closer to ~94-95%

Exhibit 2B
Defendants' Statement of Issues of Fact

(corresponding to ~5-6% total impurities) after 365 days of storage under the

defined conditions, leaving it in "fifth place" in the stacked comparison of solvent

systems.  *See id.*

249.   The stability testing data from Drager demonstrate to the POSA that

when compared to the use of DMA (without antioxidant), the use of niacinamide

with DMA in the liquid bendamustine formulation *increased* the overall stability of

bendamustine (as represented by the % bendamustine purity) after storage of the

formulations at 5°C over the course of one year.  *See* Drager, at Fig 2.

250.   More specifically, as presented by Drager, the results in Table II

represent the impurity profile of five selected impurities (DCE, HP1, BM1 dimer,

PG-1 and PG-2) measured in the formulations.  *See* Drager at Table II.  This

understanding is supported by the mathematical totals of the degradant impurities

for the two comparative formulations in Figure 2 as greater in absolute value than

the total of the measured degradant impurities for the same formulations in Table

II.  Indeed, the description of Figure 2 indicates analysis of "% bendamustine

purity" whereas Table II shows an "impurity profile" for five specific measured

bendamustine degradants.  With regard to the antioxidant-containing formulation

of Niacinamide/DMA, the mathematical total of impurities represented in Table II

is ~1.54% [calculated as the sum of 1.40% (DCE) + 0.08% (HP1) + 0.06% (BM1

dimer)].  This value is *less than* the total impurities of ~3% as shown for this

Exhibit 2B
Defendants' Statement of Issues of Fact

formulation in Figure 2.   Similarly, with regard to the DMA-only formulation, the mathematical total of impurities represented in Table II is ~1.23% [calculated as the sum of 1.10% (DCE) + 0.08% (HP1) + 0.05% (BM1 dimer)].  This value is also *less than* the total impurities of ~5-6% as shown for this formulation in Figure 2.  In other words, the POSA reading Drager would understand that there are very likely other degradants that are represented in the impurity results of Figure 2, but these are not identified nor are they quantified in Table II.

251.   A POSA would not find it difficult to draw conclusions from Drager, nor would it be contradictory or ambiguous that Drager did not fully characterize every single impurity in an exemplary formulation, but instead quantified only a few selected ones. In fact, the '483 patent does the same. For example, in Table 5 of the '483 patent, the "BDM – 50 mg/ml Lipoic acid – 5 mg/mL" formulation at 40˚C and 1M, has 0.11% HP1, 0.43% PG ester(1.10) and 0.13% PG ester(1.13) impurities. These impurities sum to (0.11 + 0.43 + 0.13)=0.67% impurities but the total impurities is listed as 1.03%. *See* '483 patent, Table 5.  And furthermore, the POSA would conclude that based on the disclosures of Figure 2 of Drager, the antioxidant-containing Niacinamide/DMA formulation achieved higher bendamustine purity (~97%) as compared to the DMA-only formulation without antioxidant (~94-95%).  As such, Drager's data consistently and reliably demonstrates to a POSA that the use of a known antioxidant can enhance the

Exhibit 2B
Defendants' Statement of Issues of Fact
bendamustine stability of a liquid formulation.

252.   Drager discloses exemplary formulations of bendamustine that include an antioxidant and that demonstrate enhanced stability when compared to the same formulations without antioxidant.  As such, a POSA would be motivated to include an antioxidant in stable formulations of liquid bendamustine based on the teachings of Drager.

253.   For all of the reasons provided above, Drager provided clear teachings that would motivate a POSA to include a "stabilizing amount of an antioxidant" in a liquid bendamustine formulations.

### 3.   A POSA would have had a reasonable expectation of success in arriving at the liquid bendamustine formulations of the asserted claims

254.   Drager would have provided a POSA with a reasonable expectation of success in obtaining a stable liquid bendamustine formulation comprising PEG and a stabilizing amount of antioxidant.

255.   As set out above, Drager provides sufficient motivation to a POSA to prepare a stable, liquid bendamustine composition comprising PEG and a stabilizing amount of antioxidant.  A POSA would also have had a reasonable expectation of success in preparing such compositions.

256.   As discussed above, at least '006 patent, claim 5 discloses stable liquid bendamustine compositions comprising the exact same elements of the

Exhibit 2B
Defendants' Statement of Issues of Fact

Asserted Claims arranged in the same way. A POSA, in view of Drager, would be

immediately aware of Drager's formulations—like those disclosed in '006 patent,

claim 5 containing PEG and a stabilizing amount of antioxidant—and would have

a reasonable expectation of success in arriving at the Asserted Claims because in

the same compositions are expressly disclosed in Drager.[11]

257.    Furthermore, as discussed above, there are several motivating factors

to use PEG, and those same motivations would have provided a reasonable

expectation of success. First, PEG is disclosed as a hydrophilic polymer to be used

in the stable liquid bendamustine formulations of Drager. Second, PEG is taught

---

[11] Drager '006 patent is listed in connection with a product approved for use by the FDA and listed by Cephalon in the FDA's publication Approved Drug Products with Therapeutic Equivalents (known as the "Orange Book") as a patent under the "Patent and Exclusivity Information" for a—now discontinued—liquid formulation product of Bendamustine Hydrochloride (Treanda) Solution 45 mg/0.5ml (90 mg/ml) and for Bendamustine Hydrochloride (Treanda) Solution 180 mg/2ml (90 mg/ml).  *See* FDA Orange Book, Product and Exclusivity for Product 003

BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 45MG/0.5ML (90MG/ML) (available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=003 &Appl_No=022249&Appl_type=N); FDA Orange Book, Product and Exclusivity for Product 004

BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 180MG/2ML (90MG/ML) (available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=004 &Appl_No=022249&Appl_type=N).  This further supports my opinion that Drager would have provided a reasonable expectation of success to make the disclosed compositions, as it taught and disclosed products that were ultimately approved for use by the FDA.

Exhibit 2B
Defendants' Statement of Issues of Fact

as a pharmaceutically acceptable polar protic solvent. Furthermore, Drager also

discloses a stable composition with PG (a polar protic solvent) and DMA could be

achieved and teaches how to reduce potential for degradation in compositions

containing polar protic solvent (*supra*, ¶¶ 41-44). As such, a POSA would have a

reasonable expectation of success using PEG in the formulations of the Asserted

Claims.

258. Moreover, stability is central to the teachings of Drager as stated in

the abstract "Stable liquid formulations of bendamustine." Drager at abstract. Drager

goes on to discuss the need for liquid formulations "[i]n light of its

instability in aqueous solution." Drager at 1:22. In its "Brief Description of the

Drawings," Drager provides a number of figures of "stability analysis of

bendamustine in various solvents" at temperatures of 5°C and 25°C. Drager at

Figs. 1, 2. The "Detailed Description of the Invention" states "[s]table, liquid

formulations of bendamustine have been discovered and are reported herein."

Drager at 3:6-7.

259. "Stable" is defined by Drager as "no more than about a 10% loss of

bendamustine under typical commercial storage conditions. Preferably,

formulations of the present inventions will have no more than about a 10% loss of

bendamustine, more preferably, no more than about a 5% loss of bendamustine,

under typical commercial storage conditions." Drager at 4:28-32. The POSA

Exhibit 2B
Defendants' Statement of Issues of Fact

would understand this disclosure to directly include less than 5% as recited in the

Asserted Claims.

260.   Drager discloses formulations describing them as stable under typical

commercial storage conditions, which the POSA would understand to include (and

exceed) 15 months.  Moreover, Drager provides exemplary formulations that meet

the required stability limitations at 15 months.  As discussed above, the 12-month

stability data provided in Drager is sufficient to demonstrate stability of those same

compositions at 15 months and beyond.  Like Drager, the inventors of the '483

patent present stability data of twelve months and in many cases, as little as 1

month or even 1 week, to demonstrate longer term stability of 15 months and up to

2 years.  *See id*.  Some of these examples are identified in summary below:

> Example 1, stability data from "48 hrs" and "7 day" … "translates to a
> bendamustine containing compositions … having a shelf life of at
> least about 15 months";[12]
>
> Example 2, stability data from "48 hrs" or "1 week" … "translates to
> bendamustine-containing compositions … expected to have a long
> term stability for periods beyond 15 months, i.e. up to 2 years or
> greater";[5]
>
> Example 3, stability data from "15 days" … "translates to
> bendamustine-containing compositions … having a shelf life of at
> least about 15 months":
>
> Example 4, stability data from … "supports the position that
> bendamustine-containing compositions according to the invention

---

[12] These examples are conducted at a single temperature of 40˚C and then draw
conclusions about shelf life at 5˚ or 25˚C.

Exhibit 2B
Defendants' Statement of Issues of Fact

have a shelf life of at least about 2 years";[5]

Example 5, stability data from "1 week, 15 days, or one month" … "translates to bendamustine-containing compositions having a shelf life of at least about 2 years";

Example 6, stability data from "3 months" and "6-12 months" … "corresponds to bendamustine solutions being stable … well in excess of 2 years, and thus long term stable";

Example 7, stability data from "3 months" and "6 months" … "supports the conclusion that these bendamustine solutions are stable … for about 2 years"

Example 8, stability data from "three months" … "supports the conclusion that these bendamustine solutions are stable … for at least about 2 years if not longer"

*See* '483 patent at 6:31–13:20.

261.   A POSA would further understand that demonstrated stability over a shorter time period is sufficient to demonstrate stability over a longer time period. For at least these reasons, Drager would provide a POSA with a reasonable expectation of success in achieving stable liquid bendamustine compositions having the recited stability for at least 15 months.

**B.     Claim 1 of the '483 Patent is Obvious Over Drager**

262.   Claim 1 of the '483 patent recites a ready to use liquid formulation comprising about 10 mg/mL to about 100 mg/mL bendamustine, polyethylene glycol, and a stabilizing amount of an antioxidant, wherein the composition has less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC as a wavelength of 223

Exhibit 2B
Defendants' Statement of Issues of Fact

nm after at least 15 months at a temperature of from about 5°C to about 25°C.

263.    As discussed in detail above in the anticipation analysis of claim 1,

Drager discloses a formulation comprising bendamustine, PEG, and a stabilizing

amount of an antioxidant. To the extent any limitation of claim 1 of the '483 patent

is not found to be disclosed in Drager, a POSA would have been motivated to

prepare liquid bendamustine formulations recited in claim 1 of the '483 patent with

a reasonable expectation of success. Thus, independent claim 1 of the '483 patent

is obvious over Drager.

264.    First, prior art taught that the previously known lyophilized

formulations of bendamustine required reconstitution prior to administration.

> In light of its instability in aqueous solution,
> **bendamustine is currently supplied as a lyophilized
> powder for injection**. Just prior to its infusion, the
> medical practitioner reconstitutes the powder with Sterile
> Water for Injection. Reconstitution should yield a clear,
> colorless to pale yellow solution and the powder should
> completely dissolve in about 5 minutes. If particulate
> matter is observed, the reconstituted product should not
> be used and should be discarded. The reconstituted
> product is then transferred to a 0.9% Sodium Chloride
> Injection infusion bag within 30 minutes of
> reconstitution. This admixture should be a clear and
> colorless to slightly yellow solution. If the admixture
> comprises particulate matter or is discolored, it should be
> discarded and a fresh sample prepared.
> **The reconstitution of the bendamustine lyophilized
> powder is time consuming and cumbersome**.
> Moreover, lyophilization of solids on a commercial scale
> requires specialized equipment and incurs significant
> expense. As such, formulations of bendamustine that do

Exhibit 2B
Defendants' Statement of Issues of Fact

> not require lyophilization and/or reconstitution are
> needed.

Drager at 1:22-2:9 (emphasis added).

265.   Because Drager specifically taught that reconstitution of lyophilized
bendamustine compositions is cumbersome, a POSA would have been motivated to
develop liquid formulations of bendamustine. Furthermore, Drager clearly states
that a POSA would be motivated to develop liquid formulations, "[a]s such,
formulations of bendamustine that do not require lyophilization and/or
reconstitution are needed." *Id.* at 2:8-9.

266.   Indeed, Drager discloses "ready to use" liquid formulations
comprising bendamustine. In the "Summary of the Invention" section, Drager
disclosed that the "[t]he present invention is directed to liquid pharmaceutical
formulations comprising bendamustine . . . ." Drager at 2:18-20. Drager further
disclosed:

> **The liquid formulations of bendamustine described
> herein are intended to be administered *via* injection**, for
> example, they may be administered subcutaneously,
> intracutaneously, **intravenously**, intramuscularly, intra-
> articularly, intrasynovially, intrasternally, intrathecally,
> intralesionally, intracranially or via infusion. In a typical
> preparation, the volume of the liquid formulation of the
> present invention needed for the required dose can be
> aseptically withdrawn and transferred to an infusion bag
> of 0.9% Sodium Chloride (or other pharmaceutically
> acceptable intravenous solution) for injection. After
> transfer, the contents of the infusion bag are thoroughly
> mixed. Administration by intravenous infusion is typically

Exhibit 2B
Defendants' Statement of Issues of Fact

> provided over a time period of from about 30 to about 60 minutes. **Previously described lyophilized formulations of bendamustine required reconstitution of the lyophilized bendamustine prior to mixture with the acceptable intravenous solution before infusion**.

Drager at 8:18-29 (emphasis added).

267.   Moreover, specific Examples taught in Drager teach multiple "ready to use" liquid formulations comprising bendamustine. *Id.* at 10, Table II.

268.   Second, Drager discloses liquid formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine. Regarding the concentration of bendamustine in the disclosed liquid formulations, Drager discloses:

> Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL. Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about 5 mg/mL to about 120 mg/mL. Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof. As used herein, the term "about" is defined as ± 10%, preferably ± 5%.

Drager at 7:14-25.

Exhibit 2B
Defendants' Statement of Issues of Fact

269.   Thus, POSA would have known that Drager taught liquid bendamustine solutions comprising about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL bendamustine, *i.e.*, the concentrations encompassed by "about 10 mg/mL to about 100 mg/mL," recited in claim 1 of the '483 patent.

270.   Third, Drager discloses liquid bendamustine compositions comprising PEG.

> It has also been discovered that **stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent** or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable **nonaqueous polar protic solvents** are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as **polyethylene glycol**, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

Drager at 4:1-8 (emphasis added).

271.   Thus, a POSA would have known that Drager explicitly taught liquid bendamustine compositions comprising PEG. Drager provides a very concise list of nonaqueous polar protic solvents, but the POSA would immediately understand that a smaller subset of nonaqueous polar protic solvents would be even more preferable. For example, as discussed above, polyethylene glycol was known to be

Exhibit 2B
Defendants' Statement of Issues of Fact

widely used and they are regarded as nontoxic and nonirritant materials.

272.    Indeed, Drager specifically claims bendamustine formulations

comprising polyalkylene glycols. *See* Drager at claim 5, 14:11-12; *see also id.* at

claim 54, 18:18-19; *id.* at claim 61, 19:14-15. Drager only provides three specific

examples of polyalkylene glycols: PEG (*i.e.*, polyethylene glycol), polypropylene

glycol, and polybutylene glycol. *Id.* at 4:4-8. Thus, in effect, a POSA would have

understood that Drager specifically points out a solution comprising bendamustine

and PEG.

273.    Drager further discloses that "formulations of the present invention

may further comprise other pharmaceutically acceptable excipients [including] . . .

hydrophilic polymers *(e.g.*, ***polyethylene glycols (PEG 300, PEG 400)*** . . . ." *Id.* at

7:27-8:2 (emphasis added).

274.    Thus, a POSA would have prepared bendamustine liquid formulations

containing PEG with a reasonable expectation of success.

275.    Fourth, Drager taught that previously known solutions of

bendamustine were prepared under an inert atmosphere. *See* Drager at 2:10-11

("Solutions of bendamustine hydrochloride in anhydrous propylene glycol,

prepared under an inert gas atmosphere, have been reported  . . . ."). As discussed

above, a POSA would have known that an inert atmosphere is used to prevent

oxidative degradation. A POSA would have known that including an antioxidant in

Exhibit 2B
Defendants' Statement of Issues of Fact

the formulation is widely-used method of preventing oxidative degradation of the

drug. *See generally* Wayne Bequette 2008 at 170; Waterman 2002 at 20-27.

276.   Indeed, Drager also discloses the use of an antioxidant in the liquid

bendamustine formulations. *See* Drager at 7:29-31 ("Pharmaceutically acceptable

excipients are known in the art and include, for example, antioxidants (e.g.,

tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole

(BHA), butylhydroxytoluene (BHT), and propyl gallate). . . ."). Drager further

explicitly included the formulations comprising antioxidants in the claims. Drager

at 15:11-12, claim 18 ("The formulation of claim 1, further comprising a

pharmaceutically acceptable antioxidant."); *see also id.* at 17:5-7, claim 38 ("The

formulation of any one of claims 1 and 4, further comprising an antioxidant, a

surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing

agent, a preservative, or a combination thereof.").

277.   Moreover, Drager further discloses examples of liquid bendamustine

formulations comprising an antioxidant. In particular, Drager discloses liquid

bendamustine formulations comprising 25 mg/mL niacinamide. Drager at 9:10-11.

As discussed above, a POSA would have known that niacinamide is an antioxidant.

*See supra*, Section IV.B.3. Thus, in effect, Drager discloses examples of liquid

bendamustine formulations comprising an antioxidant. In addition, Drager also

teaches that bendamustine formulations comprising an antioxidant is more stable

Exhibit 2B
Defendants' Statement of Issues of Fact

as compared to the corresponding bendamustine formulations lacking

bendamustine. *See supra*, ¶ 93 (disclosing that bendamustine formulations

comprising DMA and niacinamide (an antioxidant) are more stable under storage

conditions as compared to bendamustine formulations comprising only DMA).

278.   Thus, a POSA would have been motivated to include antioxidants in

liquid bendamustine formulations with a reasonable expectation of success.

279.   The liquid bendamustine formulations disclosed in Drager are stable

under the conditions of commercial storage. *See* Drager at 21, Fig. 2. Because

Drager teaches that the liquid bendamustine formulation comprising niacinamide

has good commercial stability, a POSA would know that this formulation includes

a stabilizing amount of an antioxidant.

280.   Thus, a POSA would have been motivated to use a stabilizing amount

of an antioxidant to prevent oxidative degradation in the liquid bendamustine

formulations in the course of routine experimentation and optimization with a

reasonable expectation of success.

281.   Accordingly, a POSA would have prepared liquid bendamustine

formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine,

PEG, and a stabilizing amount of an antioxidant in the course of routine

experimentation and optimization with a reasonable expectation of success.

282.   Finally, the remaining limitation recited in claim 1 of the '483 patent

Exhibit 2B
Defendants' Statement of Issues of Fact

requiring the liquid bendamustine formulation to "have less than about 5% peak

area response to total impurities resulting from the degradation of the

bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15

months at a temperature of from about 5°C to about 25°C" is an inherent property

of an otherwise obvious formulation.

283.   Recitation of an inherent property does not add anything patentable to

an otherwise obvious formulation. Here, as discussed below, liquid bendamustine

formulations comprising bendamustine, PEG, and an antioxidant, which are

obvious, would have less than about 5% peak area response to total impurities

resulting from the degradation of the bendamustine as determined by HPLC at a

wavelength of 223 nm after at least 15 months at a temperature of from about 5°C

to about 25°C.

284.   Indeed, the specification of the '483 patent discloses that the

formulations disclosed in Drager, *i.e.*, formulations comprising about 10 mg/mL to

about 100 mg/mL bendamustine, PEG, and a stabilizing amount of an antioxidant,

have less than about 5% peak area response to total impurities resulting from the

degradation of the bendamustine as determined by HPLC at a wavelength of 223

nm after at least 15 months at a temperature of from about 5°C to about 25°C. *See*

'483 Patent at 4:36-40 ("Each of these compositions have the same stability

profiles already described, i.e. having less than about 5% total impurities, PAR as

Exhibit 2B
Defendants' Statement of Issues of Fact

determined by HPLC at a wavelength of 223 nm, after at least about 15 months of

storage at a temperature of from about 5℃ to about 25℃."); *see also id.* at 6:48-

7:28 (Table 1); *id.* at 8:10-43 (Example 3, Table 3).

285.    Because the stability profile recited in claim 1 of the '483 patent is an

inherent property of an obvious liquid bendamustine formulation, the mere

recitation of the stability profile will not make an otherwise obvious formulation

patentable. Thus, this limitation does not add anything patentable to the remainder

of claim 1 of the '483 patent.

286.    Moreover, the technique used to measure the impurity of formulations

disclosed in Drager, *i.e.*, measuring impurities using HPLC with a 223 nm

wavelength for detection, does not add anything patentable to formulation recited

in claim 1 of the '483 patent. Indeed, Drager discloses the use of HPLC analysis to

determine the levels of impurities. Drager at 6, 7, 10, 12. ("[P]urity was determined

over time at room temperature for up to 8 hours using HPLC."). Thus, this

limitation reciting the stability profile of liquid bendamustine formulations does

not add anything patentable to the remainder of claim 1 of the '483 patent.

287.    Moreover, for the same reasons as those discussed above in the

anticipation analysis of claim 1 of the '483 patent above, based on the data

provided in Drager, a POSA would have known that the formulations disclosed in

Drager would have less than about 5% peak area response to total impurities

Exhibit 2B
Defendants' Statement of Issues of Fact

resulting from the degradation of the bendamustine as determined by HPLC at a

wavelength of 223 nm after at least 15 months at a temperature of from about 5℃

to about 25℃. Furthermore, to the extent the formulations disclosed in Drager do

not have the stability profile recited in claim 1 of the '483 patent, a POSA would

have prepared the claimed liquid bendamustine formulations in the course of

routine experimentation and optimization with a reasonable expectation of success.

288.   In addition, recitation of a disclosed value can render a claimed

invention with a similar, but not identical value obvious where the disclosed value

or property is "close enough" to the claimed invention that, based on the

disclosure, a POSA would consider the claimed invention to also have been

disclosed.  Here, as discussed above, the stability of the formulations is repeatedly

characterized as "typical commercial storage conditions" and includes conditions

that by application of the defined "about" recited before the timing of "about 365

days" equates to a disclosed range of up to 13.2 months which is "close enough" to

the claimed invention of 15 months such that the POSA understanding "typical

storage conditions" can even include up to 18 months, would have understood the

disclosure of Drager to teach the claimed inventions stability timing of 15 months.

289.   As if that were not enough, separately and independently of all of the

above, the text of Claims 32 and 33 of Drager states:

> 32.    The formulation of claim 1, wherein analysis of the
> formulation indicates that the formulation contains no less

Exhibit 2B

Defendants' Statement of Issues of Fact

> than about 95% of the amount of bendamustine present prior to exposure to storage conditions.
>
> 33. The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for about 30 days to about 365 days.

Drager at 16:16-20.

290.    A dependent claim being narrower in scope as compared to its associated prior claim, aids this analysis.  In this case, claim 33 states that storage conditions are "about 365 days", or, as explained above, use of the word "about" means that "about 365 days" equates to 13.4 months.[13]  Claim 33 depends from Claim 32, and Claim 32 makes a recitation to "storage conditions."  Therefore, the POSA would have known that "storage conditions" as taught in Claim 32 is broader than 13.4 months.  Therefore the disclosure of Drager is not limited to an outer bound of 13.4 months (i.e., "about 365 days") but is more than 13.4 months. As explained above, the POSA would consider 15 months (and more) to be typical storage conditions.  This would only be confirmed by the analysis of Drager for the reasons explained in this paragraph and this Report generally.  Indeed, the stability data disclosed by Drager for several formulations indicated that the formulations would be stable for in excess of 15 months. *See supra*, ¶ 100. Therefore, even if

---

[13] 365 days X 110% = 402 days, and 402 days / 30 (days per month) = 13.4 months.

Exhibit 2B
Defendants' Statement of Issues of Fact

Drager does not expressly use the word "15 months" in its disclosure, Drager still

teaches it.

291.   Accordingly, at least for the reasons discussed above, the limitation

requiring less than about 5% peak area response to total impurities resulting from

the degradation of the bendamustine as determined by HPLC at a wavelength of

223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃

does not add anything patentable to the remainder of claim 1 of the '483 patent.

292.   Thus, for all the reasons discussed above, independent claim 1 of the

'483 patent would be obvious over Drager.

### C.   Claim 2 of the '483 Patent is Obvious Over Drager

293.   Claim 2 of the '483 patent depends from claim 1 and further recites

that the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine,

cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing

aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid,

or a mixture thereof. Drager specifically discloses the use of propyl gallate as an

antioxidant for liquid bendamustine formulations. *See* Drager at 7:26-31

("Pharmaceutically acceptable excipients are known in the art and include, for

example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methylparaben,

butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and **propyl gallate**) . . .

.") (emphasis added). In addition, tocopherol, butylhydroxyanisole and

Exhibit 2B
Defendants' Statement of Issues of Fact

butylhydroxytolune are phenol-containing aliphatic compounds, which are covered by claim 2 of the '483 patent. Thus, the limitations recited in claim 2 of the '483 patent are explicitly disclosed by Drager.

294.   Thus, the additional limitation recited in claim 2 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in the obviousness analysis of claim 1 of the '483 patent and the additional reasons discussed herein, dependent claim 2 of the '483 patent is also obvious over Drager.

### D.   Claim 4 of the '483 Patent is Obvious Over Drager

295.   Claim 4 of the '483 patent depends from independent claim 1 and further recites that liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25°C. The additional limitation recited in claim 4 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 4 of the '483 patent is that in claim 1 of the '483 patent it recited that the composition is stable at "a temperature of from about 5°C to about 25°C" and claim 4 of the '483 patent recited that the composition is stable at "at a temperature of about 25°C."

Exhibit 2B
Defendants' Statement of Issues of Fact

296.   The specification of the '483 patent discloses that a solution comprising bendamustine, PEG, and an antioxidant, *i.e.,* a formulation disclosed in Drager, has a "shelf life of at least about 15 months at 5°C and 25°C." '483 patent at 8:10-46 (Example 3). In other words, the data provided in the specification of the '483 patent demonstrates that the formulation disclosed in Drager would have the stability profile recited in claim 4 of the '483 patent. Moreover, a POSA would have a prepared liquid bendamustine formulations with less than 5% peak area response in the course of routine experimentation and optimization with a reasonable expectation of success.

297.   Thus, at least for these reasons, claim 4 of the '483 patent is obvious over Drager.

**E.     Claim 8 of the '483 Patent is Obvious Over Drager**

298.   Claim 8 of the '483 patent is directed to a method of treating cancer in a mammal by administering effective amount of ready to use formulation recited in claim 1 of the '483 patent. Drager discloses the use of therapeutically effective amount of bendamustine compositions for the treatment of cancer.

> Also within the scope of the invention are methods of treating diseases, such as, for example, **chronic lymphocytic leukemia, Hodgkin's disease**, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention. These methods **comprise administering to the patient a therapeutically effective amount of a preparation prepared from a pharmaceutical**

Exhibit 2B
Defendants' Statement of Issues of Fact

**formulation of the present invention**.

Drager at 8:4-8; *see also id.* at 18:22-26, claim 56.

299.    Thus, the additional limitation recited in claim 8 of the '483 patent is disclosed in Drager. Indeed, the "Background of the Invention" section in the specification of the '483 patent discloses that bendamustine is used for treatment of cancers. *See* '483 Patent at 1:39-41 ("**Bendamustine is used in the treatment of a number of cancers** including leukemias, Hodgkins disease and multiple myelomas.") (emphasis added). Thus, in effect, the patentee admits that a POSA would have known that bendamustine was used for treatment of cancer.

300.    Thus, the additional limitation recited in claim 8 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in obviousness analysis of claim 1 of the '483 patent and the additional reasons discussed herein, dependent claim 8 of the '483 patent is also obvious over Drager.

### F.    Claim 12 of the '483 Patent Is Obvious Over Drager

301.    Claim 12 of the '483 patent depends from claim 8, which depends from claim 1, and the additional limitations recited in claim 12 of the '483 patent further recite that the method of claim 1 using the liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by

Exhibit 2B
Defendants' Statement of Issues of Fact

HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about

5°C. The additional limitation recited in the liquid bendamustine composition

administered by the method of claim 12 of the '483 patent is similar to the stability

profile for the composition recited in independent claim 1 of the '483 patent. The

only difference between the limitation recited in claim 12 of the '483 patent and

claim 1 of the '483 patent is that claim 1 of the '483 patent recites that the

composition is stable at "a temperature of from about 5°C to about 25°C" and

claim 12 of the '483 patent recited that the composition is stable "at a temperature

of about 5°C."

302.   Thus, claim 12 of the '483 patent is obvious for the same reasons as

those discussed above in the obviousness analysis of claims 1 and claim 8.  Indeed,

Drager discloses stability data for at least one formulation at 5°C that indicates it

would be stable for in excess of 15 months.  *See supra*, ¶¶ 100.  Accordingly,

dependent claim 12 of the '483 patent is also obvious over Drager.

303.   Accordingly, for all the reasons discussed above, claim 12 of the '483

patent is also invalid as obvious over Drager.

## G.   SECONDARY CONSIDERATIONS[14]

### 1.   No Evidence of Unexpected Results

304.    During the prosecution of the '483 patent, the patentee asserted that

---

[14] Defendants reserve the right to modify, amend, supplement this section for the

Exhibit 2B
Defendants' Statement of Issues of Fact

the claimed invention has purported unexpected results. In particular, the patentee

asserted that the claimed composition is surprisingly and unexpectedly stable in

storage. *See* Prosecution History of the '483 patent, Nov. 25, 2020 Amendment at

9. The patentee also asserted:

> Despite the **poor stability of bendamustine/PEG, <u>surprisingly,</u> adding an antioxidant substantially eliminated the formation of degradation products.** As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).
>
> The claimed liquid bendamustine/PEG **compositions exhibit <u>surprising</u> storage stability if an antioxidant is added**. Such an **<u>unexpected result could not have been predicted</u>**. The claims are patentable for at least this reason.

*Id.* at p. 10 (emphasis added).

305.   In short, the patentee asserted purported unexpected results for the

claimed formulations as a result of the addition of antioxidants to the compositions

comprising bendamustine and PEG.

306.   Unexpected results of an invention are to be compared against the

---

reasons stated herein and in addition because at the time of initial drafting, Plaintiff
has not provided its Plaintiff's Statement of Issues of Fact that alleges any
secondary considerations.  Upon receipt of such information, Defendants reserve
the right to amend the Statement of Issues of Fact herein.

Exhibit 2B
Defendants' Statement of Issues of Fact

closest prior art. Here, as discussed above, prior art (Drager) explicitly teaches a

liquid bendamustine formulation comprising bendamustine, PEG, and a stabilizing

amount of an antioxidant. Moreover, Drager also teaches that formulations

comprising an antioxidant are stable. *See* Drager at 21, Fig. 2 (disclosing stability

of liquid bendamustine compositions comprising niacinamide – an antioxidant). In

other words, the liquid bendamustine compositions taught by prior art specifically

teach the purported "surprising" and "unexpected" stability of bendamustine

formulations including an antioxidant. Because the prior art teaches that liquid

bendamustine compositions comprising bendamustine, PEG, and an antioxidant

and that bendamustine compositions comprising an antioxidant have good stability,

a POSA would have known that there is nothing unexpected about the purported

enhanced stability of the claimed liquid bendamustine formulations.

307.   With regard to any alleged unexpected results, to the extent that

Plaintif asserts that the use of PEG with antioxidant resulted in unexpected stability

as compared to PEG alone, this is insufficient at least because the POSA was well

aware that the use of an antioxidant with PEG would reduce degradation due to

peroxyacid formation and thereby increase stability.  This alone eliminates any

alleged surprise or unexpected result.  Any knowledge regarding bendamustine's

susceptibility to oxidative degradation is also irrelevant because the claims are not

bound by any particular mechanism of reducing stability.  A POSA would know

Exhibit 2B
Defendants' Statement of Issues of Fact

that less oxidative reactivity would occur with the use of an antioxidant and PEG, thereby increasing stability.  Moreover, any unexpected results must be compared to the closest prior art compositions.  As discussed herein, Drager discloses the same compositions as the Asserted Claims, and thus, would achieve the same results of the '483 patent.  To the extent that it is alleged the closest prior art does not teach that bendamustine is subject to oxidation and addition of an antioxidant provides surprising stability, it has been known for over 75 years that related nitrogen mustard anticancer drugs, *e.g.*, mechlorethamine, are subject to oxidative degradation, and clinical liquid formulations incorporate an antioxidant for shelf stability. *See supra*, ¶¶ 55-56. To the extent that it is alleged to be surprising that an antioxidant can provide stability to a formulation containing PEG, it has long been known that formulations containing PEG can be subject to oxidation, and that addition of an antioxidant can provide stability. Indeed, shelf-stable drug formulations containing PEG and an antioxidant were commercially available at the time of the invention. *See supra*, ¶ 59.  For these reasons any evidence presented along these lines is insufficient to rise to the level required for unexpected or surprising results.

308.   With regard to any alleged long-felt need, the objective evidence does not show that an art-recognized problem existed for a long period of time without solution.  The mere lack of any "commercially viable" liquid bendamustine

Exhibit 2B
Defendants' Statement of Issues of Fact

formulations available on the market that did not require lyophilization, does not

alone establish a long-felt, unmet need.  This is not only inadequate as the

objective indicia under this test to require, but it is inaccurate.  The claims of the

'483 patent do not recite any "commercially viable" limitation, nor is that term

readily defined in the specification.  Any alleged "long-felt need" was expressly

recognized and met by Drager.  As set forth above, this need was satisfied by

Drager's disclosure of stable liquid bendamustine formulations.  For all these

reasons, there was no long-felt that was otherwise met by the formulations of the

Asserted Claims.

309.   With regard to any alleged failure of others, to the extent Plaintiff

refers to a "commercially viable formulation" as the goal to achieve, this is

countered by the presence of other formulations that were established, but later

discontinued, e.g., Cephalon—did in fact achieve that goal.  A discontinued

product does not connote any "failure."  Rather, it suggests that the teachings of

Drager were sufficient to achieve a successful result—earning FDA approval of a

stable liquid bendamustine formulation.   As such, there is no failure of others as it

relies on insufficient evidence.

310.   Finally, with regard to teaching away, a reference in the prior art may

be found to teach away if it criticizes an element of the invention.  To the extent

that Plaintiff alleges that Drager teaches away from PEG, this is inaccurate.

Exhibit 2B
Defendants' Statement of Issues of Fact

Drager contains no language that in any way diminishes or reduces the value of

PEG as an option for hydrophilic polymer or polar protic solvent in the Asserted

Claims.  Indeed, it does the very opposite—it expressly includes PEG as a suitable

solvent and/or hydrophilic polymer that can be used in formulating stable, liquid

bendamustine compositions.  Moreover, as discussed above, Drager specifically

addresses how polar protic solvents, like PEG, can be used to avoid any potential

drawbacks.  Accordingly, Drager would not "teach away" from the use of PEG.

311.   Accordingly, there is insufficient evidence of unexpected results in

support of non-obviousness of the claimed invention.

## IX.   THE ASSERTED CLAIMS OF THE ''483 PATENT ARE INVALID UNDER 35 U.S.C. § 112

312.   The parties have stipulated that the claim term "ready to use" means

"able to be dispensed with minimal if any effort or preparation; prepackaged."

Although differing from the position taken during prosecution of the '483 patent,

Plaintiff asserts in this litigation that "ready to use" includes "ready for further

dilution."

313.   The '483 patent states that "[t]he inventive formulations are

advantageously ready to use **or** ready for further dilution." '483 Patent at 2:18-20.

During prosecution of the '483 patent, Plaintiff expressly distinguished its claimed

"ready to use" compositions from prior art reconstituted solutions because they

"avoid the multi-step reconstitution and preparation for administration required[.]"

Exhibit 2B
Defendants' Statement of Issues of Fact
05/20/2021 Response to Office Action, p. 5.

314.   In response to that amendment, the Examiner rejected the pending claims on the ground that "it appears the term 'ready for use' appears indefinite because there are two or more ways of interpreting it." '920 Application, 06/02/2021 Advisory Action. The Examiner ultimately concluded that "ready to use" "is a term of the art that does give meaning and life to the claim." 07/26/2021 Notice of Allowance, p. 3.

315.   In addition to being anticipated and/or obvious as discussed above, the claims of the '483 patent are invalid as indefinite because the '483 patent fails to provide objective boundaries such that a POSA would be informed, with reasonable certainty, about the scope of the claims. For example, the definition applied by the Examiner, as stipulated by the parties, recites "minimal if any effort or preparation." Yet, there is no disclosure in the '483 patent or its file history that provides sufficient guidance or objective boundaries that would allow a POSA to discern how the level of "effort or preparation" should be measured, let alone do so with reasonable certainty. Absent such guidance or other objective boundaries, this determination would necessarily depend on the subjective assessment of any one person.

316.   Accordingly, without the ability to provide reasonable certainty on the scope of the claims, they are invalid as indefinite.

# EXHIBIT 3A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

Plaintiff,

v.

SLAYBACK PHARMA LLC,
APOTEX INC., and APOTEX CORP.,

Defendants.

C.A. No. 21-1256-CFC-JLH

## EXHIBIT 3A
## PLAINTIFF'S STATEMENT OF ISSUES OF LAW
## THAT REMAIN TO BE LITIGATED

Exhibit 3A
Plaintiff's Statement of Issues of Law

## TABLE OF CONTENTS

I.    INFRINGEMENT ..................................................................2

    A.    Issues to Be Litigated ...............................................2

    B.    Legal Principles .......................................................3

        1.    A Patentee Need Only Prove Infringement by a Preponderance of the Evidence...................................3

        2.    A Patentee May Prove Infringement Based on the Content of a Defendant's NDA...................................5

        3.    A Patentee May Prove Infringement Under the Doctrine of Equivalents. ............................................6

        4.    Prosecution History Estoppel Limits the Doctrine of Equivalence Only if Claim Scope Was Unambigously Disclaimed ................................................................10

        5.    Prosecution history estoppel applies only when the applicant takes a position before the PTO.  "[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope." *Salazar v, Procter & Gamble Co.,* 414 F.3d 1342, 1345 (Fed.Cir.2005) (citing *3M Innovative Props. Co. v. Avery Dennison Corp.,* 350 F.3d 1365, 1373 ("Prosecution history ... cannot be used to limit the scope of a claim unless the applicant took a position before the PTO.")) (emphasis in original).The Disclosure-Dedication Rule Does Not Apply Where the Reference to Alternatives is Generic. ..................................11

II.    ANTICIPATION ..................................................................13

    A.    Issues to Be Litigated ...............................................13

    B.    Legal Principles .......................................................13

        1.    The Knowledge and Attributes of the POSA. ..........14

Exhibit 3A
Plaintiff's Statement of Issues of Law

2.    A Single Prior Art Reference Must Disclose Every Element of the Claimed Invention as Arranged in the Claims ........................................................................15

3.    A Prior Art Reference that Does Not Disclose a Feature of the Claimed Invention May Anticipate by Inherency Only Where the Missing Descriptive Material Is Necessarily Present in the Single Prior Art Reference. ..............................................................18

III.   NON-OBVIOUSNESS.........................................................19

A.    Issues to Be Litigated .................................................19

B.    Legal Principles .........................................................19

1.    The Knowledge and Attributes of the POSA. .........................20

2.    Obviousness Cannot Rely on Hindsight. ..................................24

3.    Obviousness Must Be Assessed Based on the Prior Art as a Whole..............................................................25

4.    Non-Prior Art Experiments Cannot Be Used to Prove Obviousness. ..........................................................26

5.    "Background" References Cannot Be Used to Prove Obviousness. ..........................................................28

6.    A Party Alleging Obviousness Must Prove *Prima Facie* Obviousness. ..................................................29

a.    Motivation or Reason to Make or Use the Claimed Invention .........................................30

b.    Reasonable Expectation of Success.............................34

c.    "Inherent" Obviousness....................................36

d.    "Obvious to Try" .........................................38

7.    A Patentee May Negate *Prima Facie* Obviousness.................40

Exhibit 3A
Plaintiff's Statement of Issues of Law

8.    A Patentee May Negate *Prima Facie* Obviousness by Alleging that the Prior Art "Taught Away" from the Invention. ....................................................................42

9.    A Patentee May, But Need Not, Assert Objective Indicia of Non-Obviousness. ..................................................44

    a.    Nexus ..............................................................45

    b.    Teaching Away .............................................47

    c.    Unexpected Properties .................................49

    d.    Long Felt Need ............................................50

    e.    Failure of Others .........................................52

10.    Objective Indicia of Non-Obviousness Are Distinct from the Elements of the *Prima Facie* Case. ...........................52

IV.    INDEFINITENESS ..........................................................54

    A.    Issues to Be Litigated .............................................54

    B.    Legal Principles .....................................................54

V.    REMEDIES .....................................................................57

    C.    Issues to Be Litigated .............................................57

    D.    Legal Principles .....................................................59

Exhibit 3A
Plaintiff's Statement of Issues of Law

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
   566 F.3d 1282 (Fed. Cir. 2009)...........................................................10

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
   903 F.3d 1310 (Fed. Cir. 2018)...........................................................47

*Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*,
   949 F.3d 1366 (Fed. Cir. 2020)................................................... 14, 15

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
   616 F.3d 1283 (Fed. Cir. 2010).............................................................9

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
   344 F.3d 1186 (Fed. Cir. 2003)...........................................................14

*Alcon Research, Ltd. v. Watson Labs., Inc.*,
   2018 WL 1115090 (D. Del. Mar. 1, 2018)........................ 32, 39, 41, 42

*Allergan, Inc. v. Apotex Inc.*,
   754 F.3d 952 (Fed. Cir. 2014).............................................................18

*Allergan, Inc. v. Sandoz Inc.*,
   796 F.3d 1293 (Fed. Cir. 2015)...........................................................39

*Allergan, Inc. v. Teva Pharms. USA, Inc.*,
   2017 WL 132244 (E.D. Tex. 2017) ......................................................9

*Apple Inc. v. Samsung Elecs. Co.*,
   839 F.3d 1034 (Fed. Cir. 2016)................................................... 20, 44

*AquaTex Indus., Inc. v. Techniche Solutions*,
   419 F.3d 1374 (Fed. Cir. 2005)...........................................................11

*Arcelormittal France v. AK Steel Corp.*,
   No. 10-050-SLR, 2011 WL 63417 (D. Del. Jan. 4, 2011)....................13

Exhibit 3A
Plaintiff's Statement of Issues of Law

*AstraZeneca LP v. Apotex, Inc.*,
   633 F.3d 1042 (Fed. Cir. 2010).................................................................6

*AstraZeneca Pharm. LP v. Anchen Pharm., Inc.*,
   C.A. No. 10-1835-JAP-TJB, 2012 WL 1065458 (D.N.J. Mar. 29, 2012)..... 21, 41

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
   750 F.2d 1569 (Fed. Cir. 1984)................................................................9

*Avnet, Inc. v. Motio, Inc.*,
   C.A. No. 12-2100-SIS, 2016 WL 3365430 (N.D. Ill. June 15, 2016).................28

*Bausch & Lomb, Inc. v. Barnes- Hind/Hydrocurve, Inc.*,
   796 F.2d 443 (Fed. Cir. 1986)................................................................26

*Bayer Schering Pharm. AG v. Barr Labs., Inc.*,
   575 F.3d 1341 (Fed. Cir. 2009)..............................................................39

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
   320 F.3d 1339 (Fed. Cir. 2003)................................................................7

*Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*,
   C.A. No. 17-379-LPS, 2017 WL 3980155 (D. Del. Sept. 11, 2017) ....................4

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
   752 F.3d 967 (Fed. Cir. 2014)......................................................... 33, 54

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
   923 F. Supp. 2d 602 (D. Del. 2013)..........................................................23

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
   229 F.3d 1120 (Fed. Cir. 2000)..............................................................46

*Busch v. Jones*,
   184 U.S. 598, 22 S. Ct. 511, 46 L. Ed. 707 (1902) .............................................14

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
   289 F.3d 801 (Fed. Cir. 2002)................................................................8

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)................................................................25

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,*
   460 F.3d 1349 (Fed. Cir. 2006)...........................................................................11

*Continental Can Co. v. Monsanto Co.,*
   948 F.2d 1264 (Fed. Cir. 1991)...........................................................................46

*Cordis Corp. v. Medtronic Ave, Inc.,*
   511 F.3d 1157 (Fed. Cir. 2008)...........................................................................11

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.,*
   807 F.2d 955 (Fed. Cir. 1986).......................................................................20, 45

*Cybor Corp. v. FAS Techs., Inc.,*
   138 F.3d 1448 (Fed. Cir. 1998) (en banc)............................................................11

*Daiichi Sankyo Co. v. Apotex, Inc.,*
   501 F.3d 1254 (Fed. Cir. 2007)...........................................................................21

*Dey L.P. v. Teva Parenteral Meds., Inc.,*
   6 F. Supp. 3d 651 (N.D. W. Va. Mar. 21, 2014) .................................................38

*Discovision Assocs. v. Disc Mfg., Inc.,*
   25 F. Supp. 2d 301 (D. Del. 1998)......................................................................26

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.,*
   464 F.3d 1356 (Fed. Cir. 2006).....................................................................31, 40

*Ecolab, Inc. v. FMC Corp.,*
   569 F.3d 1335 (Fed. Cir. 2009)...........................................................................11

*Ecolochem, Inc. v. S. Cal. Edison Co.,*
   227 F.3d 1361 (Fed. Cir. 2000).....................................................................16, 46

*Eli Lilly & Co. v. Hospira, Inc.,*
   933 F.3d 1320 (Fed. Cir. 2019)..........................................................................8, 9

*Eli Lilly & Co. v. Medtronic, Inc.,*
   496 U.S. 661 (1990) ...........................................................................................4

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.,*
   845 F.3d 1357 (Fed. Cir. 2017)............................................................................6

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
    471 F.3d 1369 (Fed. Cir. 2006).................................................................. 17, 31

*Endo Pharm. Inc. v. Actavis Labs. UT, Inc.*,
    C.A. No. 13-192-JRG, 2015 WL 12910639 (E.D. Tex., Aug. 27, 2015) .............34

*Endo Pharm. Inc. v. Actavis Labs. UT, Inc.*,
    660 F. App'x 959 (Fed. Cir. 2016)..........................................................34

*Endo Pharm. Sols., Inc. v. Custopharm Inc.*,
    894 F.3d 1374 (Fed. Cir. 2018)..........................................................30

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty., Ltd.*,
    122 F.3d 1040 (Fed. Cir. 1997)..........................................................20

*Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*,
    713 F.2d 693 (Fed. Cir. 1983)..........................................................21

*Ferring B.V. v. Watson Labs., Inc.*,
    764 F.3d 1401 (Fed. Cir. 2014)..........................................................6

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002) ..................................................................... 6, 10

*Forest Labs., Inc. v. Abbott Labs.*,
    239 F.3d 1305 (Fed. Cir. 2001)..........................................................5

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
    655 F.3d 1291 (Fed. Cir. 2011)................................................ 23, 47, 53

*Glaxo, Inc. v. Novopharm, Ltd.*,
    110 F.3d 1562 (Fed. Cir. 1997)..........................................................4

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ................................................................. 20, 24, 44

*Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*,
    339 U.S. 605 (1950) ................................................................. 7, 8, 9

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*,
    865 F.3d 1348 (Fed. Cir. 2017)..........................................................37, 38

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Hospira, Inc. v. Amneal Pharm., LLC*,
    285 F. Supp. 3d 776 (D. Del. 2018).....................................................................38

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
    877 F.3d 1361 (Fed. Cir. 2017)...........................................................................18

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)...............................................................................5

*Impax Labs. Inc. v. Lannet Holdings, Inc.*,
    893 F.3d 1372 (Fed. Cir. 2018)...........................................................................31

*In re Arkley*,
    455 F.2d 586 (1972).............................................................................................16

*In re Armodafinil Patent Litig. ('722 Patent Litig.)*,
    939 F. Supp. 2d 456 (D. Del. 2013)........................................................ 26, 27, 39

*In re Corkill*,
    771 F.2d 1496 (Fed. Cir. 1985)...........................................................................49

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012)................................................................... passim

*In re DBC*,
    545 F.3d 1373 (Fed. Cir. 2008)...........................................................................47

*In re De Blauwe*,
    736 F.2d 699 (Fed. Cir. 1984).............................................................................49

*In re Deuel*,
    51 F.3d 1552 (Fed. Cir. 1995).............................................................................32

*In re Gurley*,
    27 F.3d 551 (Fed. Cir. 1994)...............................................................................48

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000)...........................................................................20

*In re O'Farrell*,
    853 F.2d 894 (Fed. Cir. 1988).................................................................... 35, 39

Exhibit 3A
Plaintiff's Statement of Issues of Law

*In re Oelrich*,
    666 F.2d 578 (C.C.P.A. 1981) ..................................................37

*In re Omeprazole Patent Litig. v. Apotex Corp.*,
    536 F.3d 1361 (Fed. Cir. 2008)...............................................59

*In re OxyContin Antitrust Litig.*,
    994 F. Supp. 2d 367 (S.D.N.Y. 2014)....................................22

*In re Petering*,
    49 C.C.P.A. 993, 301 F.2d 676 (1962) ..................................17

*In re Rijckaert*,
    9 F.3d 1531 (Fed. Cir. 1993)...................................................37

*In re Soni*,
    54 F.3d 746 (Fed. Cir. 1995)...................................................49

*In re Stepan Co.*,
    868 F.3d 1342 (Fed. Cir. 2017)...............................................32

*In re Urbanski*,
    809 F.3d 1237 (Fed. Cir. 2016)...............................................43

*In re Wagner*,
    371 F.2d 877 (C.C.P.A. 1967)..................................................50

*In re Wesslau*,
    353 F.2d 238 (C.C.P.A. 1965)..................................................26

*In re Young*,
    927 F.2d 588 (Fed. Cir. 1991)..................................................41

*Institut Pasteur v. Focarino*,
    738 F.3d 1337 (Fed. Cir. 2013).................................... 33, 36, 42

*Intendis GmbH v. Glenmark Pharms. Ltd.*,
    117 F. Supp. 3d 549 (D. Del. 2015)................................... 9, 31

*Intendis GmbH v. Glenmark Pharms., Inc.*,
    822 F.3d 1355 (Fed. Cir. 2016)..........................................8, 9

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Johnson & Johnson v. R.E. Service Co.*,
  285 F.3d 1046 (Fed. Cir. 2002)............................................................12

*Karsten Mfg. Corp. v. Cleveland Golf Co.*,
  242 F.3d 1376 (Fed. Cir. 2001)............................................................40

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
  780 F.3d 1376 (Fed. Cir. 2015)............................................................17

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012)............................................................44

*Knoll Pharm. Co. v. Teva Pharm USA, Inc.*,
  367 F.3d 1381 (Fed. Cir. 2004)............................................................23

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
  381 F.3d 1142 (Fed. Cir. 2004)............................................................15

*Kowa Co. v. Amneal Pharm., LLC*,
  C.A. No. 14-2758, 2017 WL 10667089 (S.D.N.Y. Nov. 19, 2017) ....................27

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ..................................................................... passim

*Largan Precision Co. v. Genius Elec. Optical Co.*,
  C.A. No. 13-2502-JD, 2014 WL 6882275 (N.D. Cal. Dec. 5, 2014)..................28

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013)................................................ 25, 27, 35

*Lucent Techs. Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..............................................................5

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009)..............................................................5

*Mass. Inst. of Tech. v. Shire Pharm., Inc.*,
  839 F.3d 1111 (Fed. Cir. 2016) .............................................................11

*Medichem, S.A. v. Rolabo, S.L.*,
  437 F.3d 1157 (Fed. Cir. 2006)...........................................................35

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Medinol Ltd. v. Guidant Corp.*,
   341 F. Supp. 2d 301 (S.D.N.Y. 2004)...................................................................21

*Meiresonne v. Google, Inc.*,
   849 F.3d 1379 (Fed. Cir. 2017)..........................................................................48

*Merck & Co., Inc. v. Sandoz, Inc.*,
   C.A. No. 10-1625-SRC, 2012 WL 266412 (D.N.J. Jan. 30, 2012)......... 28, 36, 40

*Merck Sharp & Dohme Corp. v. Hospira Inc.*,
   C.A. No. 14-915-RGA, 2016 WL 5872620 (D. Del. July 10, 2016) ..................18

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*,
   874 F.3d 724 (Fed. Cir. 2017)....................................................................... 46, 47

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
   370 F.3d 1354 (Fed. Cir. 2004)............................................................................3

*Metalcraft of Mayville, Inc. v. Toro Co.*,
   848 F.3d 1358 (Fed. Cir. 2017)..........................................................................24

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ............................................................................................3

*Microsoft Corp. v. Biscotti, Inc.*,
   878 F.3d 1052 (Fed. Cir. 2017)..................................................................... 14, 15

*Millennium Pharm., Inc. v. Sandoz Inc.*,
   862 F.3d 1356 (Fed. Cir. 2017).................................................................. 37, 43, 48

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012)..........................................................................24

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
   435 F. App'x 927 (Fed. Cir. 2011) ................................................................ 31, 40

*Mitsubishi Chem. Corp. v. Barr Labs., Inc.*,
   718 F. Supp. 2d 382 (S.D.N.Y. 2010) ........................................................... 31, 40

*Monroe Auto Equip. Co. v. Heckethorn Mfg. & Supply Co.*,
   332 F.2d 406 (1964)..................................................................................... 24, 44

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*,
   878 F.3d 1336 (Fed. Cir. 2018)...............................................................15

*NetMoneyIN, Inc. v. Verisign, Inc.*,
   545 F. 3d 1359 (Fed. Cir. 2008).................................................... 15, 16

*Nevro Corp. v. Stimwave Techs.*,
   C.A. No. 19-325-CFC, 2019 WL 3322368 (D. Del. July 24, 2019) . 31, 40, 44, 53

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270 (Fed.
   Cir. 2017) .............................................................................17

*Novartis Pharm. Corp. v. Noven Pharm., Inc.*,
   125 F. Supp. 3d 474 (D. Del. 2015)........................................................21

*Novartis Pharm. Corp. v. W.-Ward Pharm. Int'l Ltd.*,
   287 F. Supp. 3d 505 (D. Del. 2017)................................................. 44, 45

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ....................................................................60

*Orexo AB v. Actavis Elizabeth LLC*,
   903 F.3d 1265 (Fed. Cir. 2018)..................................................... 30, 34

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006).............................................................45

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008)................................................ 24, 26, 39, 41

*Pactiv Corp. v. Multisorb Techs., Inc.*,
   C.A. No. 10-461-HDL, 2013 WL 2384249 (N.D. Ill. May 29, 2013) .................28

*Par Pharm., Inc. v. TWi Pharm., Inc.*,
   773 F.3d 1186 (Fed. Cir. 2014)................................................... passim

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005)............................................................12

*Pharmacyclics LLC v. Alvogen Pine Brook LLC*,
   C.A. No. 19-0434-CFC-CJB, 2021 WL 3680317 (D. Del. Aug. 19, 2021).........23

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Pozen Inc. v. Par Pharm., Inc.*,
   696 F.3d 1151 (Fed. Cir. 2012)....................................................... 7, 48

*Procter & Gamble Co. v. Team Techs.*,
   C.A. No. 12-552-TSB, 2014 WL 12656554 (S.D. Ohio July 3, 2014)...............25

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009)....................................................... 29, 49

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
   805 F.3d 1092 (Fed. Cir. 2015)...............................................................45

*PSC Computer Prods., Inc. v. Foxconn Int'l*,
   355 F.3d 1353 (Fed. Cir. 2004)...............................................................12

*Rambus Inc. v. Rea*,
   731 F.3d 1248 (Fed. Cir. 2013)...............................................................47

*Reckendorfer v. Faber*, 92 U.S. 347 (1875)........................................................14

*Reckitt Benckiser Pharm. Inc. v. Watson Labs., Inc.*,
   C.A. No. 13- 1674-RGA, 2015 WL 6456551 (D. Del. Oct. 26, 2015) ...............23

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
   809 F. App'x 903 (Fed. Cir. 2020)...............................................................11

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
   853 F.3d 1370 (Fed. Cir. 2017)...............................................................43

*Rolls-Royce, PLC v. United Techs. Corp.*,
   603 F.3d 1325 (Fed. Cir. 2010)...............................................................34

*Royal Typewriter Co. v. Remington Rand, Inc.*,
   168 F.2d 691 (2d Cir. 1948)...............................................................7

*Rsch. Found. of State Univ. of N.Y. v. Mylan Pharms., Inc.*,
   C.A. No. 09-184-LPS, 2012 WL 1901267 (D. Del. May 25, 2012) ...................59

*SanDisk Corp. v. Kingston Tech. Co.*,
   695 F.3d 1348 (Fed. Cir. 2012)...............................................................12

*Sanofi- Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*,
   748 F.3d 1354 (Fed. Cir. 2014)...............................................................22

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Schering Corp. v. Geneva Pharms.*,
    339 F.3d 1373 (Fed. Cir. 2003)...................................................................18

*Schumer v. Lab. Computer Sys., Inc.*
    308 F.3d 1304 (Fed. Cir. 2002)...................................................................15

*Senju Pharm. Co. v. Lupin Ltd.*,
    780 F.3d 1337 (Fed. Cir. 2015)...................................................................48

*Spectralytics v. Cordis*,
    649 F.3d 1336 (Fed. Cir. 2011)...................................................................49

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
    655 F.3d 1364 (Fed. Cir. 2011)........................................................ 31, 40, 46

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983)...................................................................44

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358 (Fed. Cir. 2007).....................................................................8

*Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013).....................................................................5

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
    522 F.3d 1279 (Fed. Cir. 2008).....................................................................5

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
    417 F. Supp. 2d 341 (S.D.N.Y. 2006)..........................................................42

*Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
    785 F.3d 625 (Fed. Cir. 2015).......................................................................3

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012).....................................................................3

*Unigene Labs., Inc v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011)........................................................... 30, 39

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
    837 F.2d 1044 (Fed. Cir. 1988)...................................................................24

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Univ. of Rochester v. G.D. Searle & Co.*,
   249 F. Supp. 2d 216 (W.D.N.Y.2003)....................................................................21

*Vanda Pharm. Inc. v. Roxane Labs., Inc.*,
   203 F. Supp. 3d 412 (D. Del. 2016),
   *aff'd sub nom.*, *Vanda Pharm. Inc. v. W.- Ward Pharm. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018) .........................................................................27

*Vanda Pharm. Inc. v. W.- Ward Pharm. Int'l Ltd.*,
   887 F.3d 1117 (Fed. Cir. 2018) ...........................................................................6

*Verinata Health, Inc. v. Sequenom, Inc.*,
   C.A. No. 12-865-SI, 2014 WL 4100638 (N.D. Cal. Aug. 20, 2014) ..................29

*Warner Chilcott Labs. Ire. Ltd. v. Impax Labs., Inc.*,
   C.A. No. 8-6304-WJM, 2012 WL 1551709 (D.N.J. Apr. 30, 2012)...................38

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997) ..................................................................................... 7, 8, 9

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003)............................................................................3

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016).................................................... 32, 33, 45, 46

*Winner Int'l Royalty Corp. v. Wang*,
   202 F.3d 1340 (Fed. Cir. 2000)................................................... 33, 43, 44

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356 (Fed. Cir. 2012)
   ...........................................................................................................................17

## Statutes

35 U.S.C. § 102(e) ..............................................................................................14

35 U.S.C. § 103(a) ........................................................................... 13, 19, 20, 26

35 U.S.C. § 271(a) ................................................................................................3

35 U.S.C. § 271(b) ................................................................................................3

35 U.S.C. § 271(c) ................................................................................................4

Exhibit 3A
Plaintiff's Statement of Issues of Law

35 U.S.C. § 271(e)(2) ...........................................................................................4

35 U.S.C. § 271(e)(2)(A) ......................................................................................4

35 U.S.C. § 271(e)(4)(A) ......................................................................................59

**Other Authorities**

Manual of Patent Examining Procedure § 2141.03 ................................................23

Exhibit 3A
Plaintiff's Statement of Issues of Law

## PLAINTIFF'S STATEMENT OF ISSUES OF LAW
## THAT REMAIN TO BE LITIGATED

Pursuant to Local Rule 16.3(c)(5), the Court's Scheduling Order (D.I. 27), and the Court's June 9, 2022 Oral Order, Plaintiff Eagle Pharmaceuticals, Inc. ("Plaintiff") hereby submits the following Statement of Issues of Law that Remain to be Litigated ("Statement"). Plaintiff incorporates by reference any issues of law set forth in its responsive papers to any comparable material filed by Defendants Apotex, Inc., Apotex Corp. (together, "Apotex"), and Slayback Pharma LLC ("Slayback") (together, "Defendants"). The citation of authorities is not exhaustive. Plaintiff reserves the right to rely on additional authorities in support of its claims and defenses and intended proofs.

By including an issue of law in this Statement, Plaintiff does not assume the burdens of proof that govern that issue.  Plaintiff reserves the right to modify or supplement this Statement to the extent necessary to reflect any future rulings by the Court, or to fairly respond to any new issues that Defendants may raise.  By submitting this Statement, Plaintiff does not waive its right to amend or supplement this submission after they consider Defendants' submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, trial, or post-trial briefing.

If any of these issues of law is deemed to be an issue of fact rather than an issue of law, Plaintiff incorporates the issues by reference into Plaintiff's Statement

Exhibit 3A
Plaintiff's Statement of Issues of Law

of Issues of Fact that Remain to be Litigated (Exhibit 2A).  Conversely, if any issue

in Plaintiff's Statement of Issues of Fact that Remain to be Litigated is deemed to be

an issue of law, Plaintiff incorporates the issues by reference into this Statement.

## I.   INFRINGEMENT

### A.   Issues to Be Litigated

1.      Whether Slayback's submission of New Drug Application No. 212209

("Slayback's NDA") constitutes an act of infringement of claims 2, 4, and 12

("asserted claims") of U.S. Patent No. 11,103,483 (the "'483 patent"), pursuant to

35 U.S.C. § 271(e)(2)(A), either literally or under the doctrine of equivalents.

2.      Whether Apotex's submission of New Drug Application No. 215033

("Apotex's NDA") constitutes an act of infringement of claims 2, 4, and 12

("asserted claims") of U.S. Patent No. 11,103,483 (the "'483 patent"), pursuant to

35 U.S.C. § 271(e)(2)(A), either literally or under the doctrine of equivalents.

3.      Whether Slayback's commercial use, manufacture, sale, offer for sale,

or importation of Slayback's NDA Product would infringe, actively induce and/or

contribute to the infringement by others of the asserted claims under any of 35 U.S.C.

§ 271(a), (b), or (c), either literally or under the doctrine of equivalents.

4.      Whether Apotex's commercial use, manufacture, sale, offer for sale, or

importation of Apotex's NDA Product would infringe, actively induce and/or

Exhibit 3A
Plaintiff's Statement of Issues of Law

contribute to the infringement by others of the asserted claims under any of 35 U.S.C.

§ 271(a), (b), or (c), either literally or under the doctrine of equivalents.

### B.   Legal Principles

#### 1.   A Patentee Need Only Prove Infringement by a Preponderance of the Evidence.

5.      Whoever "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271(a).

6.      "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).  To establish inducement, a patentee must prove "specific intent and action to induce infringement."  *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (quoting *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003)).  A generic applicant is liable for inducement if its proposed labeling "encourage[s]," "recommend[s]," or "promote[s]" infringement.  *Id.* (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005);  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004).

7.      "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or

Exhibit 3A
Plaintiff's Statement of Issues of Law

composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."  35 U.S.C. § 271(c).

8.     Whoever submits "an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent" infringes the patent. 35 U.S.C. § 271(e)(2)(A). The filing of such an NDA is deemed a technical act of infringement. 35 U.S.C. § 271(e)(2); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990).  "The only difference in actions brought under § 271(e)(2) is that the allegedly infringing drug has not yet been marketed and therefore the question of infringement must focus on what the [] applicant will likely market if its application is approved, an act that has not yet occurred." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).  The acts of infringement an NDA filer has committed "includes all of the acts that would constitute ordinary patent infringement if, upon FDA approval, the [] drug product is launched into the market." *Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*, C.A. No. 17-379-LPS, 2017 WL 3980155, at *14–15 (D. Del. Sept. 11, 2017).

Exhibit 3A
Plaintiff's Statement of Issues of Law

9.      Infringement is a question of fact.  *i4i Ltd. P'ship v. Microsoft Corp*., 598 F.3d 831, 849 (Fed. Cir. 2010).  To establish infringement, a patentee need only prove infringement by a preponderance of the evidence (i.e., that it is more likely than not that infringement occurred). *Lucent Techs. Inc. v. Gateway, Inc*., 580 F.3d 1301, 1317–18 (Fed. Cir. 2009).  A patentee need not prove infringement by any heightened standard. *Id.*

10.     A patentee may prove infringement by direct or circumstantial evidence.  *Lucent Techs.*, 580 F.3d at 1318; *Symantec Corp. v. Comput. Assocs. Int'l, Inc*., 522 F.3d 1279, 1293 (Fed. Cir. 2008).  Thus, infringement may be proven "by 'any method of analysis that is probative of the fact of infringement.'"  *Martek Biosciences Corp. v. Nutrinova, Inc*., 579 F.3d 1363, 1372 (Fed. Cir. 2009) (quoting *Forest Labs., Inc. v. Abbott Labs*., 239 F.3d 1305, 1312 (Fed. Cir. 2001)).

## 2.      A Patentee May Prove Infringement Based on the Content of a Defendant's NDA.

11.  "What a generic applicant asks for and receives approval to market, if within the scope of a valid claim, is an infringement." *Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1279 (Fed. Cir. 2013).  Thus, where a generic applicant's specification encompasses formulations that, if approved, would infringe the claim, it is liable for infringement.  *See id.* at 1278-79.  In addition,  in circumstances where the applicant's "specification does not resolve the infringement

Exhibit 3A
Plaintiff's Statement of Issues of Law

question in the first instance" the Federal Circuit has endorsed the fact finder's

consideration of other "relevant evidence, including biobatch data and actual

samples of the proposed [] composition that the [NDA] filer had submitted to the

FDA." *Ferring B.V. v. Watson Labs., Inc.*, 764 F.3d 1401, 1409 (Fed. Cir. 2014).

"[S]ilence of the specification" does not answer the question of infringement." *Id.*

12. The contents of a generic applicant's submission are also relevant to a finding

of induced infringement of method claims. "Where 'the proposed label instructs

users to perform the patented method ... the proposed label may provide evidence of

[the applicant's] affirmative intent to induce infringement.'" *Vanda Pharm. Inc. v.*

*W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018) (citing

*AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010)); *see also Eli*

*Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017)

(explaining that "evidence that the product labeling that Defendants seek would

inevitably lead some physicians to infringe establishes the requisite intent for

inducement")

### 3.    A Patentee May Prove Infringement Under the Doctrine of Equivalents.

13.    "The scope of a patent is not limited to its literal terms but instead

embraces all equivalents to the claims described." *Festo Corp. v. Shoketsu Kinzoku*

*Kogyo Kabushiki Co.*, 535 U.S. 722, 732 (2002).  Thus, the doctrine of equivalents

Exhibit 3A
Plaintiff's Statement of Issues of Law

prevents an infringer from avoiding liability for infringement by "stealing the benefit

of an invention" by making insubstantial changes to that invention. *Graver Tank &*

*Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608 (1950) (quoting *Royal Typewriter*

*Co. v. Remington Rand, Inc.*, 168 F.2d 691, 692 (2d Cir. 1948) (Hand, J.)); *see also*

*Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1167 (Fed. Cir. 2012).

14.     Infringement under the doctrine of equivalents is a question of fact and

is determined on an element-by-element basis, evaluated at the time of the invention.

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37, 40 (1997). "What

constitutes equivalency must be determined against the context of the patent, the

prior art, and the particular circumstances of the case.   Equivalence, in the patent

law, is not the prisoner of a formula and is not an absolute to be considered in a

vacuum. It does not require complete identity for every purpose and in every

respect." *Id.* at 24-25 (quoting *Graver Tank*, 339 U.S. at 609).   "[T]he relevant

analysis is 'of the role played by each element in the context of the specific patent

claim,' not whether the accused element is capable of performing different roles than

the claim element in other contexts." *Boehringer Ingelheim Vetmedica, Inc. v.*

*Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003) (quoting *Warner-*

*Jenkinson,* 520 U.S. at 40).

15.     Although no particular test controls the inquiry, *Warner-Jenkinson*, 520

U.S. at 39-40, the Supreme Court has articulated two frameworks for determining

Exhibit 3A
Plaintiff's Statement of Issues of Law

equivalence.  First, under the "insubstantial differences" test, a component in "an accused product or process may be equivalent to a claim element if the two are insubstantially different with respect to the 'role played by [the] element in the context of the specific patent claim.'"  *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1335 (Fed. Cir. 2019) (quoting *Warner-Jenkinson*, 520 U.S. at 39-40). Whether such differences are "insubstantial" is determined from the perspective of "one of ordinary skill in the art ['POSA']."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002) (citing *Warner-Jenkinson*, 520 U.S. at 40).

16.     Second, under the "function-way-result" test, a component may be equivalent to a claim element if it "performs substantially the same function in substantially the same way to obtain the same result."  *Graver Tank*, 339 U.S. at 608. As with the insubstantial differences test, the relevant function, way, and result are determined from the POSA's perspective.  *See, e.g.*, *Intendis GmbH v. Glenmark Pharms., Inc.*, 822 F.3d 1355, 1362 (Fed. Cir. 2016); *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1365 (Fed. Cir. 2007).  Significantly, the function-way-result test does not require absolute identity; "requiring a high degree of mechanistic similarity would not comport with the court's duty to determine whether the accused product [or method] 'performs substantially the same function in substantially the same way' as the claimed limitation."  *Intendis GmbH v. Glenmark Pharms. Ltd.*,

Exhibit 3A
Plaintiff's Statement of Issues of Law

117 F. Supp. 3d 549, 569 (D. Del. 2015) (quoting *Graver Tank*, 339 U.S. at 608).

Indeed, equivalence may exist even though the accused product or method is "an

improvement." *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569,

1580 n.3 (Fed. Cir. 1984).

17.    Known interchangeability in the context of the claim can demonstrate

equivalence for purposes of the doctrine. *See Warner-Jenkinson*, 520 U.S. at 24–25;

*Eli Lilly*, 933 F.3d at 1335-36 (affirming infringement under doctrine of equivalents

because accused product was "functionally identical" in the relevant context of the

claimed method of treatment). Thus, "when a commercial product meets all of the

claim limitations, then a comparison to that product may support a finding of

infringement." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283,

1289 (Fed. Cir. 2010).

18.    In analyzing infringement under the doctrine of equivalents, an accused

infringer's statements to the U.S. Food & Drug Administration ("FDA") can be

persuasive evidence. *See, e.g.*, *Intendis*, 822 F.3d at 1361-62; *Allergan, Inc. v. Teva

Pharms. USA, Inc.*, 2017 WL 132244, *2–4 (E.D. Tex. 2017) (Bryson, J.).

"Defendants should not be permitted to liken their product to the claimed

composition to support their bid for FDA approval, yet avoid the consequences of

such a comparison for purposes of infringement." *Intendis*, 117 F. Supp. 3d at 573,

*aff'd*, 822 F.3d at 1362 ("We see no reason why a district court acting as a fact finder

9

Exhibit 3A
Plaintiff's Statement of Issues of Law

should ignore a party's representation to a federal regulatory body that is directly on

point."). Bioequivalence also can be relevant to infringement under the doctrine of

equivalents. *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir.

2009) (*en banc*).

### 4. Prosecution History Estoppel Limits the Doctrine of Equivalence Only if Claim Scope Was Unambiguously Disclaimed

19.    Prosecution history estoppel prevents a patentee from using the

doctrine of equivalents to recapture subject matter surrendered during prosecution

from the literal scope of a claim. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki*

*Co.*, 535 U.S. 722, 733-34 (2002) ("When … the patentee originally claimed the

subject matter alleged to infringe but then narrowed the claim in response to a

rejection, he may not argue that the surrendered territory comprised unforeseen

subject matter that should be deemed equivalent to the literal claims of the issued

patent. On the contrary, by the amendment the patentee recognized and emphasized

the difference between the two phrases, and the difference which the patentee thus

disclaimed must be regarded as material.")

20.    Prosecution history estoppel may be based on amendments to the

claims to overcome rejections or through arguments made to the Examiner to

distinguish prior art references. However, argument-based disavowals will be found

"only if they constitute clear and unmistakable surrenders of subject matter." *Cordis*

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177, 85 U.S.P.Q.2d 1427, 1441 (Fed. Cir. 2008); *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1364 (Fed. Cir. 2006). In order to constitute binding surrenders of claim scope, the statements made during prosecution must be such that "a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998) (en banc); *see also AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382, 76 U.S.P.Q.2d 1213 (Fed. Cir. 2005). "'Where the alleged disavowal is ambiguous, or even "amenable to multiple reasonable interpretations," we have declined to find prosecution disclaimer.'" *Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016).

21. Further, the prosecution history must be read as a whole. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (prosecution statements must be viewed in context, not isolation). Further, a claim of disclaimer is rarely, if ever, correct when it would read out the preferred embodiments. *Rembrandt Diagnostics, LP v. Alere, Inc.*, 809 F. App'x 903, 908 (Fed. Cir. 2020) (rejecting construction that would "omit a preferred embodiment" based on alleged prosecution disclaimer).

**5.      Prosecution history estoppel applies only when the applicant takes a position before the PTO. "[A]n applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope."**

Exhibit 3A
Plaintiff's Statement of Issues of Law

> ***Salazar v, Procter & Gamble Co.,*** **414 F.3d 1342, 1345 (Fed.Cir.2005) (citing** ***3M Innovative Props. Co. v. Avery Dennison Corp.,*** **350 F.3d 1365, 1373 ("Prosecution history ... cannot be used to limit the scope of a claim unless the applicant took a position before the PTO.")) (emphasis in original).The Disclosure-Dedication Rule Does Not Apply Where the Reference to Alternatives is Generic.**

22. Subject matter disclosed, but not claimed in a patent will be deemed "dedicated to the public" and is, consequently, ineligible for re-capture under the doctrine of equivalents. *Johnson & Johnson v. R.E. Service Co.,* 285 F.3d 1046, 1054 (Fed. Cir. 2002). This disclosure-dedication rule, however, has restrictions. The doctrine does not apply to an asserted equivalent unless a skilled artisan would understand that the specification discloses the asserted equivalent as an alternative to the claim limitation at issue in the context of the claimed invention. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1377-79 (Fed. Cir. 2005). The claim limitation itself must be viewed in the context of the claim as a whole. *Id.*

23. Further, the dedication-disclosure rule does not apply when the reference to alternatives in the specification is generic to a "genus" that includes the equivalent. *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012) (quoting *PSC Computer Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353, 1360 (Fed. Cir. 2004)). Instead, the disclosure must be "of such specificity" that a person of ordinary skill in the art could immediately "identify the subject matter that had been disclosed and not claimed." *PSC Computer Prods.*, 355 F.3d at 1363; *see also Arcelormittal*

Exhibit 3A
Plaintiff's Statement of Issues of Law

*France v. AK Steel Corp.*, No. 10-050-SLR, 2011 WL 63417, at *1 (D. Del. Jan. 4, 2011) (concluding that the specification was "imprecise with respect to the range of thermal treatments that [could] be applied to the claimed compositions," so the disclosure was not of "such specificity that one of ordinary skill in the art could identify precise tensile strength ranges disclosed but not claimed.").

## II.   ANTICIPATION

### A.   Issues to Be Litigated

24. Whether Defendants have proven by clear and convincing evidence that the asserted claims are invalid as anticipated under 25 U.S.C. § 102.

### B.   Legal Principles

25. Under 35 U.S.C. § 102, a person shall be entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent," or "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States[.]" 35 U.S.C. § 102(a) - (b) (pre-AIA).  A person is not entitled to a patent if "the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the

Exhibit 3A
Plaintiff's Statement of Issues of Law

United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language[.]"  35 U.S.C. § 102(e) (pre-AIA).

26. Anticipation is a question of fact.  *See, e.g.*, *Busch v. Jones*, 184 U.S. 598, 604, 22 S. Ct. 511, 46 L. Ed. 707 (1902) ("Anticipation is a question of fact[.]"); *Reckendorfer v. Faber*, 92 U.S. 347, 352 (1875); *Microsoft Corp. v. Biscotti, Inc.*, 878 F.3d 1052, 1068 (Fed. Cir. 2017).

## 1.    The Knowledge and Attributes of the POSA.

27. In an anticipation analysis, each and every limitation recited in a claim must be found in one item of prior art, either expressly or inherently, and arranged in the item of prior art in the same way as it is claimed, so that the disclosure effectively puts the public in possession of the invention.  *See e.g.*, *Acoustic Technology, Inc. v. Itron Networked Solutions, Inc.*, 949 F.3d 1366, 1374 (Fed. Cir. 2020) (quoting *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003)) (explaining "the dispositive question is whether a skilled artisan would 'reasonably understand or infer' from a prior art reference that every claim limitation is disclosed [by] that single reference.").  Expert testimony can "shed light

Exhibit 3A
Plaintiff's Statement of Issues of Law

on what a skilled artisan would reasonable understand or infer" from the prior art,

and can also "constitute substantial evidence of anticipation when the expert

explains in detail how each claim element is disclosed [by] the prior art reference."

*Id*. (citing *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co*., 878 F.3d 1336,

1345 (Fed. Cir. 2018)).  Expert testimony on anticipation "must identify each claim

element, state the witnesses' interpretation of the claim element, and explain in detail

how each claim element is disclosed in the prior art reference.  The testimony is

insufficient if it is merely conclusory."  *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,

381 F.3d 1142, 1152 (Fed. Cir. 2004) (citing *Schumer v. Lab. Computer Sys., Inc*.

308 F.3d 1304, 1315-16 (Fed. Cir. 2002)).

### 2.    A Single Prior Art Reference Must Disclose Every Element of the Claimed Invention as Arranged in the Claims

28. In order to anticipate the claimed invention under 35 U.S.C. § 102, a party

must show that "that the four corners of a single, prior art document describe every

element of the claimed invention" and disclose those elements "as arranged in the

claim[s]." *NetMoneyIN, Inc. v. Verisign, Inc*., 545 F. 3d 1359, 1369 (Fed. Cir. 2008)

(internal quotations and citations omitted); *Microsoft Corp.*, 878 F.3d at 1068.  It is

not enough that a prior art reference discloses only part of the claimed invention,

which an "ordinary artisan might supplement to make the whole, or that it includes

multiple, distinct teachings that the artisan might somehow combine to achieve the

Exhibit 3A
Plaintiff's Statement of Issues of Law

claimed invention." *NetMoneyIN*, 545 F. 3d at 1371.  The prior art "reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." *In re Arkley*, 455 F.2d 586, 587-88 (1972) ("Such picking and choosing may be entirely proper in the making of a 103, obviousness rejection . . . but it has no place in the making of 102, anticipation rejection."); *see NetMoneyIN*, 545 F. 3d at 1371 ("differences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation.").

The "arranged as in the claim" requirement applies to all claims and refers to "the need for an anticipatory reference to show all of the limitations of the claims arranged or combined in the same way as recited in the claims, not merely in a particular order." *NetMoneyIN*, 545 F.3d at 1370.  Thus, the requirement is more accurately understood to mean "*arranged or combined in the same way* as in the claim." *Id*. (emphasis added).  Even where a reference discloses each of the elements of a claim, to anticipate, the prior art reference must contain a discussion suggesting or linking the claim elements so as to arrange them as in the claim at issue. *Id.* at 1370-71; *see Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1369 (Fed. Cir. 2000) (reversing anticipation finding where prior art reference contained a figure and accompanying text, which taught the use hydrogen with a

Exhibit 3A
Plaintiff's Statement of Issues of Law

mixed bed to deoxygenate water, and a separate passage discussing deoxygenating

water with hydrazine, because though both disclosures taught all the elements in

the claim, the reference did not contain a discussion linking hydrazine with the

mixed bed, and thus did not show the limitation as arranged or combined in the

claim).

29. If a prior art reference merely discloses a genus and the claim at issue recites

a species of that genus, anticipation turns on whether the genus was of such a defined

and limited class that one of ordinary skill in the art could "at once envisage" each

member of the genus. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683

F.3d 1356, 1361 (Fed. Cir. 2012); *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*,

471 F.3d 1369, 1376 (Fed. Cir. 2006); *In re Petering*, 49 C.C.P.A. 993, 301 F.2d

676, 681 (1962). A POSA is not permitted to "fill in missing limitations simply

because a skilled artisan would immediately envision them." *Nidec Motor Corp. v.*

*Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270, 1274-75 (Fed. Cir. 2017).

Thus, the relevant inquiry for the "at once envisage" requirement is "whether the

number of categories and components disclosed [in the prior art reference] is so large

that the combination . . . would not be immediately apparent to one of ordinary skill

in the art." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1382

(Fed. Cir. 2015). There can be no anticipation where the POSA cannot at once

envisage "each member of the class." *Eli Lilly*, 471 F.3d at 1376 (finding no

Exhibit 3A
Plaintiff's Statement of Issues of Law

anticipation and distinguishing cases where prior art "expressly spelled out a definite and limited class of compounds that enabled a person of ordinary skill in the art to at once envisage each member of this limited class").

> **3.  A Prior Art Reference that Does Not Disclose a Feature of the Claimed Invention May Anticipate by Inherency Only Where the Missing Descriptive Material Is Necessarily Present in the Single Prior Art Reference.**

30. A prior art reference may anticipate without disclosing a feature of the claimed invention only if that missing characteristic is inherent in the single anticipating reference. *Schering Corp. v. Geneva Pharms*., 339 F.3d 1373, 1377 (Fed. Cir. 2003). A party seeking to establish inherent anticipation must show that a person of ordinary skill in the art would "recognize that [a] missing descriptive matter in a prior art reference is nevertheless necessarily present." *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1368 (Fed. Cir. 2017).

31. The missing descriptive material cannot be "probably or possibly present" in the prior art reference; it must be "necessarily present." *Merck Sharp & Dohme Corp. v. Hospira Inc*., C.A. No. 14-915-RGA, 2016 WL 5872620, at *2 (D. Del. July 10, 2016); *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 960-61 (Fed. Cir. 2014) (affirming judgment that claims were not inherently anticipated where the prior art only showed that the limitation might occur, not that it inevitably occurred). For this reason, the "mere fact that a certain thing *may* result from a given set of

Exhibit 3A
Plaintiff's Statement of Issues of Law

circumstances is not sufficient" to establish inherency. *Merck Sharp & Dohme Corp. v. Hospira Inc.*, 221 F. Supp. 3d 497, 507 (D. Del. 2016) (emphasis in original) ("In fact, [Defendant's expert] admitted that, while these are not the only possible scenarios, a skilled formulator could 'possibly select th[e]se scenarios . . . . Since the teachings of the '820 patent may or may not result in the formation of the adduct, there can be no inherent anticipation.").

## III.   NON-OBVIOUSNESS

### A.   Issues to Be Litigated

32. Whether Defendants have proven by clear and convincing evidence that the asserted claims would have been obvious under 35 U.S.C. § 103(a).

### B.   Legal Principles

33. Under 35 U.S.C. § 103(a), a claim is invalid for obviousness only "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).

34. Obviousness is a question of law based on several factual determinations, including (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) any secondary considerations (i.e., objective indicia) of non-obviousness.

Exhibit 3A
Plaintiff's Statement of Issues of Law

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)).  A determination of obviousness requires consideration of all four factors, "and it is error to reach a conclusion of obviousness until all those factors are considered."  *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc) (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075–76 (Fed. Cir. 2012)).

## 1.    The Knowledge and Attributes of the POSA.

35. Obviousness is determined as of the time of the claimed invention, from the perspective of a hypothetical POSA to which the claimed invention pertains.  *See* 35 U.S.C. § 103(a); *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).  The POSA is a "theoretical construct" and "is not descriptive of some particular individual;" rather it reflects a hypothetical individual who is "presumed to be aware of all the pertinent prior art."  *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty., Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997) (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 963 (Fed. Cir. 1986)).  Factors relevant to determining the attributes of the POSA include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field."  *Daiichi Sankyo Co. v. Apotex,*

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Inc.*, 501 F.3d 1254, 1256–58 (Fed. Cir. 2007) (quoting *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983)).

36. Significantly, the POSA is not limited to a single individual from a single discipline.  Where, as here, the factors relevant to determining the attributes of the POSA reflect that the problem in the pertinent art (i.e., formulating a drug product of an unstable molecule or developing a safe and effective administration protocol for a cytotoxic, liquid injectable drug product) would involve multiple disciplines, the POSA would consist of a team of individuals combining the knowledge, education, and experience of each of those disciplines.  *See, e.g.*, *Novartis Pharm. Corp. v. Noven Pharm., Inc.*, 125 F. Supp. 3d 474, 478 (D. Del. 2015) ("The [POSA] is an individual, or team of individuals, with an advanced degree in chemistry, pharmacy, or a related field with at least two years of practical experience, or a master's or bachelor's degree in those disciplines and at least four or six years of practical experience, respectively."); *AstraZeneca Pharm. LP v. Anchen Pharm., Inc.*, C.A. No. 10-1835-JAP-TJB, 2012 WL 1065458, at *19 (D.N.J. Mar. 29, 2012) ("The POSA may be a composite of different types of individuals." (citing *Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301, 321 (S.D.N.Y. 2004); *Univ. of Rochester v. G.D. Searle & Co.*, 249 F. Supp. 2d 216, 228 n.6 (W.D.N.Y.2003)).

37. For similar reasons, the POSA is not limited to possession of either theoretical or practical knowledge, but would possess all relevant theoretical and practical

Exhibit 3A
Plaintiff's Statement of Issues of Law

knowledge, as the problem in the pertinent art would have required. *See, e.g.*, *Merck Sharp & Dohme Corp. v. Hospira, Inc.*, 221 F. Supp. 3d 497, 504 (D. Del. 2016) (finding that the POSA for claims directed to "pharmaceutical compositions" and related methods would be "a scientist responsible for drug formulation, such as a pharmaceutical chemist, physical chemist, medicinal chemist, or organic chemist, involved in the research and development of pharmaceutical compounds"); *In re OxyContin Antitrust Litig.*, 994 F. Supp. 2d 367, 395 (S.D.N.Y. 2014) (finding that the POSA for claims directed to "oral dosage forms" and "active pharmaceutical ingredients" comprising low amounts of certain impurities would be "an organic chemist with experience in synthetic and organic chemistry" having "knowledge of the chemical reactions relevant to the field, how to search the relevant literature, and how to accomplish complicated organic chemistry reactions").

38. References published after the priority date of a claimed invention cannot be used to prove that the invention would have been obvious. However, certain information published after the priority date may be considered as evidence of non-obviousness. *See, e.g.*, *Sanofi- Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354, 1360 (Fed. Cir. 2014) ("[T]here is no requirement that an invention's properties and advantages were fully known before the patent application was filed, or that the patent application contains all of the work done in studying the invention, in order for that work to be introduced into evidence in

22

Exhibit 3A
Plaintiff's Statement of Issues of Law

response to litigation attack." (quoting *Knoll Pharm. Co. v. Teva Pharm USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004))); *Reckitt Benckiser Pharm. Inc. v. Watson Labs., Inc.*, C.A. No. 13- 1674-RGA, 2015 WL 6456551, at *1–2 (D. Del. Oct. 26, 2015) ("[R]eferences are not irrelevant simply by virtue of having been published after the patent priority date."); *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1307 (Fed. Cir. 2011) ("[I]t would be error to prohibit a ... patentee from presenting relevant indicia of nonobviousness, whether or not this evidence was available or expressly contemplated at the filing of the patent application"); *Pharmacyclics LLC v. Alvogen Pine Brook LLC*, C.A. No. 19-0434-CFC-CJB, 2021 WL 3680317, at *31 (D. Del. Aug. 19, 2021) (Connolly, J.) (finding a requirement that evidence of secondary considerations pre-date the priority date "contrary to the law"); *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 923 F. Supp. 2d 602, 684 (D. Del. 2013) (finding that "[e]vidence of unexpected results 'may be [considered] even if that evidence was obtained after the patent's filing or issue date'"); *see also* Manual of Patent Examining Procedure § 2141.03 ("References which do not qualify as prior art because they postdate the claimed invention may be relied upon to show the level of ordinary skill in the art at or around the time the invention was made.").

Exhibit 3A
Plaintiff's Statement of Issues of Law

## 2. Obviousness Cannot Rely on Hindsight.

39. Because the obviousness inquiry is conducted from the perspective of the POSA at the time of the claimed invention, courts must be careful to avoid "slipping into use of hindsight." *Graham*, 383 U.S. at 36 (quoting *Monroe Auto Equip. Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 412 (1964)); *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("[W]e cannot allow hindsight bias to be the thread that stitches together prior art patches into something that is the claimed invention."). In other words, "the proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of invention." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

40. For this reason, obviousness cannot be proved by starting from the claimed invention and working backward to identify each limitation in the prior art. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (defendant did not prove obviousness where its expert "simply retraced the path of the inventor with hindsight"); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1051 (Fed. Cir. 1988) (district court erred by using hindsight to reconstruct the invention from prior art, rather than viewing the invention from the perspective of the POSA at the time the invention was made).

Exhibit 3A
Plaintiff's Statement of Issues of Law

41. Where there is a "considerable time lapse" between the prior art relied on to prove obviousness and the patent's filing date, this suggests that the claimed invention would not have been obvious and that the alleged evidence depends impermissibly on hindsight. *See Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed. Cir. 2013) ("The elapsed time between the prior art and the '013 patent's filing date [22 years] evinces that the '013 patent's claimed invention was not obvious to try. Indeed this considerable time lapse suggests instead that the Board only traverses the obstacles to this inventive enterprise with a resort to hindsight."); *Procter & Gamble Co. v. Team Techs.*, C.A. No. 12-552-TSB, 2014 WL 12656554, at *23 (S.D. Ohio July 3, 2014) ("[T]he age of the Saffir reference is strong evidence that the challenged claims are not obvious based on the combination of Saffir and Gaglio.").

42. Similarly, where the invention emerged from a crowded field, an allegation that the claimed invention would have been obvious likely relies on hindsight. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 928–29 (Fed. Cir. 2012) ("[T]he district court correctly emphasized and found based on the preliminary record that the art was a crowded field for many years and yet there was not one reference").

43.

**3. Obviousness Must Be Assessed Based on the Prior Art as a**

Exhibit 3A
Plaintiff's Statement of Issues of Law

**Whole.**

44. Another safeguard against the use of hindsight is the requirement that obviousness be assessed on the basis of the prior art as a whole. *See Discovision Assocs. v. Disc Mfg., Inc.*, 25 F. Supp. 2d 301, 345 (D. Del. 1998). Failure to consider the prior art as a whole compels rejection of an obviousness contention. *See Ortho-McNeil Pharm.*, 520 F.3d at 1364 (rejecting obviousness challenge on the basis that challenger's expert "discounted the number and complexity of alternatives"). All of the relevant teachings of the prior art must be considered, as it is improper to "pick and choose from any one reference only so much of it as will support a given position, to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art." *Bausch & Lomb, Inc. v. Barnes- Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986) (quoting *In re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965)). It is thus critical to consider what the prior art as a whole taught concerning the state of the art.

### 4. Non-Prior Art Experiments Cannot Be Used to Prove Obviousness.

45. Because obviousness is assessed "at the time the invention was made," a party alleging obviousness "cannot establish obviousness through non-prior art experiments," which had not been conducted as of the priority date. *In re Armodafinil Patent Litig. ('722 Patent Litig.)*, 939 F. Supp. 2d 456, 502 (D. Del. 2013) (quoting 35 U.S.C. § 103(a); *KSR Int'l*, 550 U.S. at 421). For this reason, an

Exhibit 3A
Plaintiff's Statement of Issues of Law

invention would not have been "obvious simply because it was obvious to conduct experiments to try to solve the problem." *Vanda Pharm. Inc. v. Roxane Labs., Inc.*, 203 F. Supp. 3d 412, 427 (D. Del. 2016), *aff'd sub nom. Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117 (Fed. Cir. 2018).  This principle applies even more forcefully where, as here, the experiments that the POSA would have needed to perform would not have resulted in the invention itself, but would have required the POSA to resort to further "trial and error experimentation" involving additional variables.  *Kowa Co. v. Amneal Pharm., LLC*, C.A. No. 14-2758, 2017 WL 10667089, at *26 (S.D.N.Y. Nov. 19, 2017). *In re Armodafinil*, 939 F. Supp. 2d at 501.

46. Furthermore, even where it would have been obvious to conduct experiments, an invention would not have been obvious unless the POSA could have reasonably predicted the outcome of those experiments.  *See Leo Pharm.*, 726 F.3d at 1357 ("There is no indication in the prior art which of these possible formulations would be the most promising to try. . . . Without a reasonable expectation of success or clues pointing to the most promising combinations, an artisan could have spent years experimenting without success."); *In re Cyclobenzaprine*, 676 F.3d at 1070 ("While it may have been obvious to experiment with the use of the same PK profile when contemplating an extended-release formulation, there is nothing to indicate that a skilled artisan would have had a reasonable expectation that such an experiment

Exhibit 3A
Plaintiff's Statement of Issues of Law

would succeed in being therapeutically effective."); *Merck & Co., Inc. v. Sandoz, Inc.*, C.A. No. 10-1625-SRC, 2012 WL 266412, at *2 (D.N.J. Jan. 30, 2012) (granting summary judgment of non-obviousness where the evidence established that the POSA "would have been unable to predict the outcome of the experiments necessary to develop the formulation").

### 5. "Background" References Cannot Be Used to Prove Obviousness.

47. "Background" references cannot be used to prove obviousness.  Although some courts have permitted parties to introduce "background" references under limited circumstances, such references may not be used as evidence that the POSA would have (1) known of one or more claim limitations, (2) been motivated or had reason to make or use the claimed invention or to combine one or more prior art references to make or use the claimed invention, or (3) had a reasonable expectation of success in making or using the claimed invention.  *See Avnet, Inc. v. Motio, Inc.*, C.A. No. 12-2100-SIS, 2016 WL 3365430, at *6 (N.D. Ill. June 15, 2016) (holding that a reference is not "background" where it is used to disclose a claim limitation (citing *Pactiv Corp. v. Multisorb Techs., Inc.*, C.A. No. 10-461-HDL, 2013 WL 2384249 (N.D. Ill. May 29, 2013))); *Largan Precision Co. v. Genius Elec. Optical Co.*, C.A. No. 13-2502-JD, 2014 WL 6882275, at *6 (N.D. Cal. Dec. 5, 2014) ("Dr. Barbastathis references . . . Shinohara '829 . . . [as evidence that the POSA would

Exhibit 3A
Plaintiff's Statement of Issues of Law

have modified] Kwon '111 . . . . That is not background; it is asserted prior art.");

*Verinata Health, Inc. v. Sequenom, Inc.*, C.A. No. 12-865-SI, 2014 WL 4100638, at

*5 (N.D. Cal. Aug. 20, 2014) (striking purported "background" reference to the

extent expert relied "on it as prior art that allegedly renders the asserted claims . . .

obvious").

### 6. A Party Alleging Obviousness Must Prove *Prima Facie* Obviousness.

48. Courts commonly refer to the first three factors of the obviousness inquiry—

i.e., the scope and content of the prior art, the differences between the prior art and

the claims at issue, and the level of ordinary skill in the pertinent art—as the "*prima*

*facie* case." *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1076 & n.3. A party

alleging obviousness must prove by clear and convincing evidence that "that all

claimed limitations are disclosed in the prior art." *Par Pharm., Inc. v. TWi Pharm.,*

*Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014). If the party succeeds in doing so, the

party must generally also prove "by clear and convincing evidence that a skilled

artisan would have had reason to combine the teaching of the prior art references to

achieve the claimed invention, and that the skilled artisan would have had a

reasonable expectation of success from doing so." *In re Cyclobenzaprine*, 676 F.3d

at 1068–69 (quoting *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989,

994 (Fed. Cir. 2009)).

Exhibit 3A
Plaintiff's Statement of Issues of Law

## a.   Motivation or Reason to Make or Use the Claimed Invention

49. Simply because the prior art disclosed a particular combination of claim elements does not mean that an invention would have been obvious.  Rather, the POSA must have had a motivation or "reason" to combine those elements to make or use the claimed invention.  *See KSR Int'l*, 550 U.S. at 421; *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1271 (Fed. Cir. 2018); *In re Cyclobenzaprine*, 676 F.3d at 1068–69.  In other words, the party alleging obviousness must prove that the POSA would have had an affirmative reason to both select particular features of the prior art and to modify or combine those features to achieve those inventions.  *See, e.g.*, *Endo Pharm. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1380 (Fed. Cir. 2018) ("To meet its burden, Custopharm needed to do more than merely show that the prior art does not preclude lowering the dose of TU.  Custopharm needed to affirmatively demonstrate that a skilled artisan would have been motivated to lower the dose of TU despite no clear evidence of overdosing under the FDA Guidelines."); *Unigene Labs., Inc v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) ("In this case, the patent claims a new composition or formulation to deliver an FDA-approved active ingredient.  Thus, the claimed invention is not obvious if a person of ordinary skill would not select and combine the prior art references to reach the

Exhibit 3A
Plaintiff's Statement of Issues of Law

claimed composition or formulation." (citing *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006)).

50. In determining whether the POSA would have been motivated or had reason to make or use the claimed invention, a fact finder must consider the prior art as a whole.  Thus, evidence showing that the POSA would not have been motivated or had reason to make or use the claimed invention must be considered.  *See, e.g.*, *Impax Labs. Inc. v. Lannet Holdings, Inc.*, 893 F.3d 1372, 1380–81 (Fed. Cir. 2018); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)); *Nevro Corp. v. Stimwave Techs.*, C.A. No. 19-325-CFC, 2019 WL 3322368, at *13 (D. Del. July 24, 2019).

51. As courts have recognized, the art of pharmaceutical formulation is unpredictable.  *Intendis*, 117 F. Supp. 3d at 590–91 ("Defendants' own substantial efforts to swap ingredients to create a bioequivalent formula, coupled with testimony from both experts that excipients and active ingredients react differently depending on the formulation . . . leads the court to understand that swapping ingredients in complex chemical formulations is anything but routine."); *Mitsubishi Chem. Corp. v. Barr Labs., Inc.*, 718 F. Supp. 2d 382, 401 (S.D.N.Y. 2010) ("Drug formulation is a difficult and frequently unpredictable science."), *aff'd*, 435 F. App'x 927 (Fed. Cir. 2011).

Exhibit 3A
Plaintiff's Statement of Issues of Law

52. Accordingly, where, as here, a party alleges that the POSA would have combined various teachings in the prior art to make or use a pharmaceutical composition and associated methods of use, the party must identify a "teaching in the prior art that predicts that the combination" of excipients "at the particular concentrations, with the other claimed excipients, would solve the challenge" faced by the POSA. *Alcon Research, Ltd. v. Watson Labs., Inc.*, C.A. No. 15-1159-GMS, 2018 WL 1115090, at *23 (D. Del. Mar. 1, 2018).

53. "A general incentive does not make obvious a particular result, nor does the existence of techniques by which those efforts can be carried out." *In re Deuel*, 51 F.3d 1552, 1559 (Fed. Cir. 1995). Thus, a party cannot make establish that an invention would have been obvious merely by asserting that the POSA "would have arrived at the claimed invention through routine experimentation." *Alcon Research*, 2018 WL 1115090, at *23 (quoting *In re Stepan Co.*, 868 F.3d 1342, 1346 (Fed. Cir. 2017)).

54. "Whether a skilled artisan would be motivated to make a combination includes whether he would select particular references in order to combine their elements." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016). "Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine . . . the references in a way that renders the claimed

Exhibit 3A
Plaintiff's Statement of Issues of Law

invention obvious." *Id.* "The real question is whether that skilled artisan would have plucked one reference out of the sea of prior art . . . and combined it with [any other relevant references] to address some need present in the field . . . ." *Id.*

55. The POSA's alleged motivation or reason for modifying or combining the prior art must be assessed with respect to the actual needs in the pertinent art. *See KSR Int'l*, 550 U.S. at 421. In other words, if the POSA would not have believed that the invention would solve those needs, the invention would not have been obvious. *See Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 974–75 (Fed. Cir. 2014) (assessing whether the proposed changes would have been expected to achieve the actual goal of "improved activity"); *Institut Pasteur v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013) (analysis should remain focused on the "highly desired goal, not switch to a different goal that may be a less challenging but also less worthwhile pursuit").

56. Furthermore, although a POSA need not have believed that an invention would have been the "best option," *see, e.g.*, *Par Pharm.*, 773 F.3d at 1198, it is not enough for the POSA to have believed that the invention would have been possible. Rather, to have a motivation on reason to modify or combine the prior art, the POSA must have believed that the invention would have been desirable. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 (Fed. Cir. 2000) ("Trade-offs often concern what is feasible, not what is, on balance, desirable. Motivation to combine

Exhibit 3A
Plaintiff's Statement of Issues of Law

requires the latter."); *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339

(Fed. Cir. 2010) ("A particular course or selection is not obvious to try unless some

design need or market pressure or other motivation would suggest to one of ordinary

skill to pursue the claimed course or selection." (citing *KSR Int'l*, 550 U.S. at 421)).

57. A situation where multiple parties pursued a solution to the same problem, but

only the inventor succeeded in solving that problem, strongly suggests that the

invention would not have been obvious. *See Orexo*, 903 F.3d at 1273 (reversing

finding of obvious, where the pertinent art "received extensive scientific study" prior

to the invention, but the claimed invention was "not proposed or suggested in the

[prior art] references"); *Endo Pharm. Inc. v. Actavis Labs. UT, Inc.*, C.A. No. 13-

192-JRG, 2015 WL 12910639, at *22–25 (E.D. Tex., Aug. 27, 2015) ("The evidence

before the Court suggests that a number of parties, including corporations and

countless persons of ordinary skill in the art, were, in the relevant timeframe, actively

considering the issues" but despite "this extensive effort, the path to effective and

commercially-desirable results for [the claimed invention] was not clear."), *aff'd*,

660 F. App'x 959 (Fed. Cir. 2016).

### b.    Reasonable Expectation of Success

58. Proving obviousness also requires a showing by clear and convincing

evidence that the POSA would have had a reasonable expectation of success in

achieving the claimed invention. *See In re Cyclobenzaprine*, 676 F.3d at 1068–69.

Exhibit 3A
Plaintiff's Statement of Issues of Law

To have such an expectation, the POSA must have been "motivated to do more than merely to 'vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.'" *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)). Similarly, the POSA must have been motivated to do more than "to pursue a 'general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.'" *Id.*

59. Even where the prior art would have motivated the POSA to perform experiments that would ultimately have resulted in the claimed invention, the invention would not have been obvious if the POSA would not have had a reasonable expectation that such experiments would succeed in yielding the claimed properties. *See Leo Pharm.*, 726 F.3d at 1357 ("There is no indication in the prior art which of these possible formulations would be the most promising to try. . . . Without a reasonable expectation of success or clues pointing to the most promising combinations, an artisan could have spent years experimenting without success."); *In re Cyclobenzaprine*, 676 F.3d at 1070 ("While it may have been obvious to experiment with the use of the same PK profile when contemplating an extended-

35

Exhibit 3A
Plaintiff's Statement of Issues of Law

release formulation, there is nothing to indicate that a skilled artisan would have had a reasonable expectation that such an experiment would succeed in being therapeutically effective."); *Merck*, 2012 WL 266412, at *2 (granting summary judgment of non-obviousness where the evidence established that the POSA "would have been unable to predict the outcome of the experiments necessary to develop the formulation").

60. As with the POSA's reason for modifying or combining the prior art, the POSA's expectation of success must be assessed with respect to the actual needs in the pertinent art. *See Institut Pasteur*, 738 F.3d at 1345–46. Thus, in assessing whether the POSA would have had a reasonable expectation of success, a fact finder must determine whether the POSA would have believed that the invention would succeed based on the goals that the POSA would have had, regardless of whether those goals are reflected in particular claim limitations. *See, e.g.*, *id.* (finding that the POSA would not have had a reasonable expectation of practicing a method of manipulating a living cell based on prior art references stating that such a method would be toxic to the cell, even though the claims did not expressly require that the cell remain viable).

### c.    "Inherent" Obviousness

61. The requirement to prove a reasonable expectation of success cannot be satisfied simply by asserting that a claim element was "inherently" present in the

Exhibit 3A
Plaintiff's Statement of Issues of Law

prior art.  As the Federal Circuit has instructed, "the use of inherency in the context of obviousness must be carefully circumscribed because '[t]hat which may be inherent is not necessarily known' and that which is unknown cannot be obvious." *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (citing *In re Rijckaert*, 9 F.3d 1531, 1534 (Fed. Cir. 1993)). To be inherent, an element must be "necessarily present" or "the natural result flowing from the operation as taught." *Millennium Pharm., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1365 (Fed. Cir. 2017) (quoting *Par Pharm.*, 773 F.3d at 1195).  In other words, inherency "may not be established by probabilities or possibilities," and the "mere fact that a certain thing may result from a given set of circumstances is not sufficient."  *Id.* (quoting *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981)).

62. In assessing whether a claim limitation would have been inherently obvious, a fact finder must consider whether the prior art would have provided an expectation of successfully meeting the claim limitation.  *See Millennium Pharm.*, 862 F.3d at 1367 ("Sandoz argues that although lyophilization in the presence of mannitol produced an unexpected result, the result was 'inevitable' and thus 'inherent,' and thus not 'inventive.'  However, invention is not a matter of what the inventor intended when the experiment was performed; obviousness is measured objectively in light of the prior art, as viewed by a person of ordinary skill in the field of the invention."); *Honeywell Int'l*, 865 F.3d at 1355.

Exhibit 3A
Plaintiff's Statement of Issues of Law

63. For these reasons, the fact that a formulation's "stability" is a property of some or even all embodiments of a pharmaceutical formulation does not mean that the formulation would have been "inherently" obvious. *See, e.g.*, *Honeywell Int'l*, 865 F.3d at 1353–56 (vacating conclusion of inherent obviousness where POSA would not have predicted that the inventions would have the claimed stability, even if stability was a property of those inventions); *Hospira, Inc. v. Amneal Pharm., LLC*, 285 F. Supp. 3d 776, 798–801 (D. Del. 2018) (stability not an inherent property of claimed formulation even though all examples in the record satisfied stability limitation); *Dey L.P. v. Teva Parenteral Meds., Inc.*, 6 F. Supp. 3d 651, 666 (N.D. W. Va. Mar. 21, 2014) (prior art reference did not "inherently" disclose stability limitations where differences between the prior-art and claimed formulations could have affected stability); *Warner Chilcott Labs. Ire. Ltd. v. Impax Labs., Inc.*, C.A. No. 8-6304-WJM, 2012 WL 1551709, at *44–48 (D.N.J. Apr. 30, 2012) (prior art reference did not inherently disclose dissolution stability limitations where evidence did not support inference that formulations would necessarily have claimed dissolution stability).

### d.    "Obvious to Try"

64. An invention would have been "obvious to try" only if the prior art identified the path to the claimed invention and there are "there are a finite number of identified, predictable solutions" to be tried. *KSR Int'l*, 550 U.S. at 421.  Put

Exhibit 3A
Plaintiff's Statement of Issues of Law

differently, the number of possible solutions, "in the context of the art," must be

"small or easily traversed." *Ortho-McNeil Pharm.*, 520 F.3d at 1364.  When these

circumstances are not present, the invention would not have been obvious.  *See*

*Unigene Labs.*, 655 F.3d at 1361 ("When a field is 'unreduced by direction of the

prior art,' and when prior art gives 'no indication of which parameters were critical

or no direction as to which of many possible choices is likely to be successful,' an

invention is not obvious to try." (citing *Bayer Schering Pharm. AG v. Barr Labs.,*

*Inc.*, 575 F.3d 1341, 1350 (Fed. Cir. 2009)); *In re O'Farrell*, 853 F.2d at 903).

65. Accordingly, courts regularly reject simplistic allegations that pharmaceutical

inventions would have been "obvious to try" based on the results of "routine

pharmaceutical development" given the unpredictability of the field.  *See Allergan,*

*Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1301 (Fed. Cir. 2015) (affirming finding that

ophthalmic formulation was "unpredictable, and it was not a field with a finite

number of identified and predictable solutions"); *Alcon Research*, 2018 WL

1115090, at *23 ("[W]hen dealing with complex and unpredictable fields like

ophthalmic formulation, courts are quick to reject the simplistic assertion that the

invention is the obvious result of 'routine' pharmaceutical development."); *In re*

*Armodafinil*, 939 F. Supp. 2d at 501 ("'Obvious to try' is not equivalent to

obviousness in every case, particularly where, as here, the prior art provided at most

general motivation to conduct trial and error experimentation in a decidedly

Exhibit 3A
Plaintiff's Statement of Issues of Law

unpredictable field"); *Merck*, 2012 WL 266412, at *2 (granting summary judgment of non-obviousness where the evidence established that the POSA "would have been unable to predict the outcome of the experiments necessary to develop the formulation"); *Mitsubishi Chem.*, 718 F. Supp. 2d at 401 (S.D.N.Y. 2010) ("Drug formulation is a difficult and frequently unpredictable science."), *aff'd,* 435 F. App'x 927 (Fed. Cir. 2011).

### 7.  A Patentee May Negate *Prima Facie* Obviousness.

66. To rebut an allegation of obviousness, a patentee may refute the elements of the *prima facie* case. Thus, even where the prior art discloses each of the claimed elements, a patentee can establish that the invention would not have been *prima facie* obvious by showing that the POSA would have been motivated or had reason not to make the invention or that the POSA would have expected the invention not to be successful.  *See Star Sci.*, 655 F.3d at 1375; *DyStar Textilfarben*, 464 F.3d at 1360; *Nevro*, 2019 WL 3322368, at *13.  Moreover, even where the prior art would have provided the POSA with some positive reason or expectation, a patentee can demonstrate that the prior art as a whole would not have provided that the POSA with that reason or expectation.  *See Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1385 (Fed. Cir. 2001) ("conflicting teachings can not reasonably be viewed as suggesting their combination" where the only possible reason to combine those references is "the hindsight knowledge" of the claimed invention); *In re*

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Young*, 927 F.2d 588, 591 (Fed. Cir. 1991) ("When prior art contains apparently conflicting references, the Board must weigh each reference for its power to suggest solutions to an artisan of ordinary skill. . . . The Board, in weighing the suggestive power of each reference, must consider the degree to which one reference might accurately discredit another.").

67. For example, a patentee can show that the party alleging obviousness "discounted" the "number and complexity of alternatives" in conducting its analysis. *See Ortho- McNeil Pharm.*, 520 F.3d at 1364. Thus, in the pharmaceutical context, a patentee can rebut *prima facie* obviousness by showing that the prior art disclosed numerous possible, alternative formulation options without providing a reason to select the invention from among those possibilities. *See, e.g.*, *Alcon Research*, 2018 WL 1115090, at *22 ("The prior art disclosed hundreds of different cyclodextrins, polymers, cosolvents, and other potential solubilizing agents, yet provided no teaching to select the ternary system from what was an exponential number of possibilities." (citing *Ortho-McNeil Pharm.*, 520 F.3d at 1364)); *AstraZeneca Pharm.*, 2012 WL 1065458, at *45 ("Defendants have not proven by clear and convincing evidence that the POSA would have had a reasonable expectation of success in creating such a formulation because of (1) the vast number of formulation options and the unpredictable nature of formulation science and (2) the unique features of quetiapine.").

41

Exhibit 3A
Plaintiff's Statement of Issues of Law

68. Similarly, a patentee can show that the POSA would not have been motivated or had reason to make or use the claimed inventions based on concerns that the inventions would have been toxic or undesirable. *See Institut Pasteur*, 738 F.3d at 1345–46 (concluding that the possibility that the claimed method "could be highly toxic" "counts significantly against finding a motivation to take the claimed steps with a reasonable expectation of success"); *Alcon, Inc. v. Teva Pharm. USA, Inc.*, 664 F. Supp. 2d 443, 462–63 (D. Del. 2009) (finding that the "uncertain toxicity status" of the prior art compound "would have also weighed against its development" and that the POSA "would only consider viable a treatment that exhibited a similar risk profile" to prior art compounds); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 417 F. Supp. 2d 341, 370 (S.D.N.Y. 2006) (holding invention not obvious where defendant "has not shown by any persuasive evidence, much less by clear and convincing evidence, that [the POSA] would have had any reasonable expectation based on the prior art that [making the claimed invention] would result in discovery of a non-toxic, effective treatment for [the targeted disease], and therefore would not have had any motivation to do so").

### 8. A Patentee May Negate *Prima Facie* Obviousness by Alleging that the Prior Art "Taught Away" from the Invention.

69. In some instances, a patentee can refute an allegation that the POSA would have had a motivation or reason to make or use the claimed invention by showing

Exhibit 3A
Plaintiff's Statement of Issues of Law

that a particular prior art reference "taught away" from the invention. *See Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1379 (Fed. Cir. 2017) ("[A] showing that a prior art reference teaches away from a given combination is evidence that one of skill in the art would not have been motivated to make that combination to arrive at the claimed invention."). A reference teaches away from the claimed invention if the POSA, "upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Millennium Pharm.*, 862 F.3d at 1366 (quoting *In re Urbanski*, 809 F.3d 1237, 1244 (Fed. Cir. 2016)). "A prior art reference that teaches away "alone can defeat [an] obviousness claim," by defeating the motivation required to establish a *prima facie* case of obviousness. *Winner Int'l Royalty*, 202 F.3d at 1349–50. Nevertheless, as the above rationales demonstrate, courts have made clear that a patentee can rebut an allegation of obviousness without arguing that the prior art "taught away" from the invention.

70. Where a patentee chooses to allege that the prior art "taught away" from a claimed invention in response to an allegation of motivation rather than as a separate objective indicium of non-obviousness, that allegation is properly considered as part of the *prima facie* case. *See, e.g.*, *Millennium Pharm.*, 862 F.3d at 1366–67 (addressing "teaching away" in connection with *prima facie* obviousness and separately from objective indicia); *Par Pharm.*, 773 F.3d at 1198–99 (same); *Kinetic*

43

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1361–65, 1367 (Fed. Cir. 2012) (same); *Winner Int'l Royalty*, 202 F.3d at 1349–51 (same); *Nevro*, 2019 WL 3322368, at *13 (same).

### 9.   A Patentee May, But Need Not, Assert Objective Indicia of Non-Obviousness.

71.The fourth factor of the obviousness inquiry—objective indicia (or "secondary considerations") of non-obviousness—serves "to 'guard against slipping into use of hindsight,' and to resist the temptation to read into the prior art the teachings of the invention in issue." *Graham*, 383 U.S. at 36 (quoting *Monroe Auto Equip. Co.*, 332 F.2d at 412). Thus, objective indicia of non-obviousness "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). Objective indicia of non-obviousness include long-felt, but unmet need; failure of others; commercial success; industry acceptance and praise; and skepticism—all of which tend to demonstrate that the claimed inventions would not have been obvious.

72.In contrast with the factors that constitute the *prima facie* obviousness case, a patentee bears the burden of proving any objective indicia by a preponderance of the evidence. *See Apple*, 839 F.3d at 1053. However, the patentee is "not required to present evidence" of objective indicia. *Novartis Pharm. Corp. v. W.-Ward Pharm. Int'l Ltd.*, 287 F. Supp. 3d 505, 510 (D. Del. 2017) (citing *Prometheus Labs., Inc. v.*

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Roxane Labs., Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015)). "When present, such objective evidence must be considered. It can be the most probative evidence of nonobviousness in the record, and enables the district court to avert the trap of hindsight. On the other hand, the absence of objective evidence does not preclude a holding of nonobviousness because such evidence is not a requirement for patentability." *Custom Accessories*, 807 F.2d at 960. Thus, an invention would not have been obviousness if the party asserting obvious does not advance sufficient evidence to meet its burden by clear and convincing evidence or if the patentee successfully rebuts any of the factors that constitute the *prima facie* case. *See, e.g.*, *Novartis Pharm.*, 287 F. Supp. 3d at 510.

### a.   Nexus

73. A patentee asserting objective indicia must prove a "nexus" between the objective indicia and the claimed invention. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). Nexus is presumed where "the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP*, 829 F3d. at 1329. Under such circumstances, the burden shifts to the party alleging obviousness to rebut the presumed nexus. *See id.* The party alleging obviousness "cannot successfully rebut the presumption with argument alone—it must present evidence." *Id.* (citing *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120,

Exhibit 3A
Plaintiff's Statement of Issues of Law

1130 (Fed. Cir. 2000)).  A showing that the objective indicia relate to both claimed

and unclaimed features is insufficient to rebut the presumption.  *See, e.g.*,

*Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000).

74. To be entitled to some weight, a patented invention need not be solely

responsible for the objective indicia.  *See, e.g.*, *Continental Can Co. v. Monsanto

Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991) ("It is not necessary, however, that the

patented invention be solely responsible for the commercial success, in order for this

factor to be given weight appropriate to the evidence, along with other pertinent

factors.").  Accordingly, the fact that a marketed product embodies multiple patents

does not undermine the nexus between that product and the claimed inventions or

require the objective indicia to be apportioned between those inventions.  *See, e.g.*,

*WBIP*, 829 F.3d at 1331–37 (presumption of nexus exists where marketed products

were covered by and coextensive with claims of two patents); *In re Cyclobenzaprine*,

676 F.3d at 1080–83 (objective indicia attributable to multiple patents); *Star Sci.*,

655 F.3d at 1376 (objective indicia attributable to two patents).

75. Similarly, the fact that a patentee (or other entity) owns other patents covering

the same invention does not detract from the probative value of any objective indicia.

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*, 874 F.3d 724, 730–31 (Fed. Cir.

2017) ("[M]ultiple patents do not necessarily detract from evidence of commercial

success of a product or process, which speaks to the merits of the invention, not to

Exhibit 3A
Plaintiff's Statement of Issues of Law

how many patents are owned by a patentee."). Whether a so-called blocking patent would or would not deter others from improving engaging in further innovation is "a fact-specific inquiry." *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1339 (Fed. Cir. 2018) (quoting *Merck Sharp & Dohme*, 874 F.3d at 731). Where, as here, the evidence establishes that the existence of other patents did not, in fact, deter further innovation, such patents have little probative value in refuting nexus. *See id.* at 1338–39.

76. Objective evidence of non-obviousness need only be "reasonably commensurate with the scope of the claims." *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). Thus, a patentee need not "produce objective evidence of nonobviousness for every potential embodiment of the claim." *Id.* Were it otherwise, a patentee would need to "sell every conceivable embodiment of the claims in order to rely on evidence of [objective indicia]." *In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008). For these reasons, objective indicia relating to a single embodiment in a claim covering multiple embodiments can be sufficient and should be considered in assessing obviousness. *See, e.g.*, *Genetics Inst.*, 655 F.3d at 1308–09.

### b.   Teaching Away

77. A "reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result

Exhibit 3A
Plaintiff's Statement of Issues of Law

sought by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). The determination of whether a prior art teaches away is a question of fact. *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382–83 (Fed. Cir. 2017).

78. Courts have found that teaching away can be proven by showing that the references discouraged the combination or *implied* that the resulting combination would not work as described in the patent. *Meiresonne*, 849 F.3d at 1382–83 (emphasis added). *See also Pozen*, 696 F.3d at 1164 (Fed. Cir. 2012) (finding that the prior art reference teaches away, even without a clear discouragement of the challenged claims for a certain treatment with sumatriptan and naproxen, because it "concludes that the only effective treatment . . . is sumatriptan and acupuncture"); *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1356 (Fed. Cir. 2015) (finding that "a reference teaches away when it leads to a path divergent from that taken by the patentee" even without an indication that the claimed invention would not work); *Millennium Pharm*, 862 F.3d at 1366 (Fed. Cir. 2017) (finding that the prior art reference teaches away from the claimed invention because the reference leads the person of ordinary skill in the art to note that the claimed invention is unattractive "for fear of disturbing the [desired] chemical properties" even if the reference does not specifically mention the claimed invention unattractive). Additionally, courts have also found that teaching away does not require words *per se*, but rather the prior art design itself can teach away from an invention. *See, e.g.*, *Spectralytics v. Cordis*,

Exhibit 3A
Plaintiff's Statement of Issues of Law

649 F.3d 1336, 1343 (Fed. Cir. 2011) (finding that prior art design taught away from embracing the claimed design because *all* prior machines adopted the design described in the prior art).

### c. Unexpected Properties

79. The existence of unexpected properties is another objective indicium of nonobviousness. A patentee can establish unexpected properties by demonstrating "that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected." *Procter & Gamble*, 566 F.3d at 997–98. "The basic principle behind this rule is straightforward—that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995). Where unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art. *In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984).

80. While minor differences in degree may be insufficient to demonstrate unexpected results, it is not necessary to show a difference "in kind" to support non-obviousness. *See In re Soni*, 54 F.3d at 751 ("[W]hen an applicant demonstrates substantially improved results . . . and states that the results were unexpected, this should suffice to establish unexpected results."); *In re Corkill*, 771 F.2d 1496, 1501 (Fed. Cir. 1985) ("A greater than expected result is an evidentiary factor pertinent to

Exhibit 3A
Plaintiff's Statement of Issues of Law

the legal conclusion of . . . obviousness."); *In re Wagner*, 371 F.2d 877, 885 (C.C.P.A. 1967) ("Whether the difference between the claimed invention and the prior art is a difference 'in kind' or a difference 'in degree' is not mentioned in section 103. Section 103 simply requires a determination as to whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time of appellant's invention. An unexpected increase in physiological activity may be persuasive evidence of unobviousness.").

### d.    Long Felt Need

81.Evidence that a claimed invention satisfied a long-felt, but unmet need supports a conclusion of non-obviousness. *See KSR Int'l*, 550 U.S. at 406; *Apple Inc. v. Samsung Elecs.*, 839 F.3d 1034, 1057 (Fed. Cir. 2016) (en banc). This is "because it is reasonable to infer the need would not have persisted had the solution been obvious." *Apple*, 839 F.3d at 1057. A long-felt need arises when there is "an articulated identified problem [as of the priority date] and evidence of efforts to solve that problem." *AstraZeneca Pharm. LP v. Anchen Pharm., Inc.*, C.A. No. 10-1835-JAP-TJB, 2012 WL 1065458, at *48 (D.N.J. Mar. 29, 2012) (quoting *Perfect Web Tech. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 33 (Fed. Cir. 2009)). Thus, there is no requirement that the need remain unmet until the invention actually becomes available on the market. In the pharmaceutical context, a claimed drug satisfies a long-felt, unmet need even if that need no longer exists by the time the claimed drug

Exhibit 3A
Plaintiff's Statement of Issues of Law

is actually marketed. *Procter & Gamble*, 566 F.3d at 998 (rejecting argument that because competing drug product became available before claimed drug product, claimed drug product could not have satisfied long-felt need).

82. To satisfy a long-felt, unmet need, a claimed invention need not completely eliminate a problem; it need only reach a result superior to prior available options. *Eli Lilly & Co. v. Sicor Pharm., Inc.*, 705 F. Supp. 2d 971, 1008 (S.D. Ind. 2010) (finding "the first drug in thirty years to produce an improvement in overall survival" satisfied a long-felt, unmet need for new treatment options, even though it did not present a complete cure for pancreatic cancer), *aff'd* 426 F. App'x 892 (Fed. Cir. 2011). Thus, the fact that the prior art contained other drug products with the same active pharmaceutical ingredient does not mean that there was no longfelt, unmet need for an improved product. *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1082–83 (reversing judgment of obviousness based on various objective indicia, including long-felt, unmet need and failure of others, where prior art contained intermediate-release cyclobenzaprine formulations, but not claimed extended release formulation); *Allergan v. Sandoz Inc.*, C.A. No. 11-441-MHS, 2014 WL 12622277, *25 (E.D. Tex. Jan. 13, 2014) (finding improved 0.01% bimatoprost formulation satisfied long-felt, unmet need for a glaucoma drug with fewer side effects even though the prior art contained 0.03% bimatoprost formulations), *aff'd*, 796 F.3d 1293, 1301–07 (Fed. Cir. 2015).

Exhibit 3A
Plaintiff's Statement of Issues of Law

### e.      Failure of Others

83.  Similarly, evidence that others attempted, but failed to achieve a claimed invention supports a conclusion of non-obviousness.  *KSR Int'l*, 550 U.S. at 406; *In re Cyclobenzaprine*, 676 F.3d at 1081–82.  "The purpose of evidence of failure of others is to show 'indirectly the presence of a significant defect in the prior art, while serving as a simulated laboratory test of the obviousness of the solution to a skilled artisan.'"  *In re Cyclobenzaprine*, 676 F.3d at 1082 (quoting *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578–79 (Fed. Cir. 1991)).

84.  In assessing failure of others, the question is not whether others attempted and failed to create the specific inventions claimed by the patents, but whether others attempted and failed to solve the problem addressed by the inventions.  *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d at 1082; *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.,* 364 F. Supp. 2d 820, 852 (S.D. Ind. 2005) (fact that numerous investigators had "tried but failed to develop a safe, atypical antipsychotic drug between 1975 and 1990" supported non-obviousness of patented drug); *In re '318 Patent Infringement Litig.*, 578 F. Supp. 2d 711, 732 (D. Del. 2008) (fact that other groups had tried to develop other cholinesterase inhibitors as treatments for Alzheimer's disease but failed was relevant evidence of the non-obvious of the patented drug), *aff'd*, 583 F.3d 1317 (Fed. Cir. 2009)

### 10. Objective Indicia of Non-Obviousness Are Distinct from the

Exhibit 3A
Plaintiff's Statement of Issues of Law

### Elements of the *Prima Facie* Case.

85. Crucially for present purposes, because different burdens and standards of proof govern the prima facie case and objective indicia, a patentee's decision to assert objective indicia has important strategic consequences. Thus, where a patentee argues that the POSA would not have been motivated to make or use the claimed invention because the prior art "taught away" from that invention, that argument is properly considered as part of the prima facie case, separate and apart from any objective indicia. *See, e.g.*, *Par Pharm.*, 773 F.3d at 1198–99; *Nevro*, 2019 WL 3322368, at *13.

86. Likewise, the prima facie inquiry of whether the POSA would have had a reasonable expectation of success is a distinct issue from whether a claimed invention exhibits unexpected properties for purposes of the objective indicia analysis. The issue of reasonable expectation of success relates to the POSA's expectations in making and using the claimed invention—and is assessed before the priority date and on the basis of the prior art as a whole. *See In re Cyclobenzaprine*, 676 F.3d at 1069. By contrast, the issue of unexpected properties involves a comparison of the properties of a claimed embodiment to the closest prior art, using "evidence [that] was obtained after the patent's filing or issue date." *Genetics Inst.*, 655 F.3d at 1307. An assertion that the POSA would have lacked an expectation of success is a bedrock effort to refute prima facie obviousness. *See In re*

Exhibit 3A
Plaintiff's Statement of Issues of Law

*Cyclobenzaprine*, 676 F.3d at 1069.  It is not the same as an assertion of unexpected

properties.  *See, e.g.*, *Bristol-Myers*, 752 F.3d at 976.  Thus, a patentee does not

invoke an unexpected properties dispute by refuting that the prior art provided the

requisite expectation of success.  *See, e.g.*, *Par Pharm.*, 773 F.3d at 1198.

## IV.   INDEFINITENESS

### A.     Issues to Be Litigated

87. Whether Defendants have proven by clear and convincing evidence that the

claim term "ready to use" is indefinite under 35 U.S.C. § 112 ¶ 2.

### B.     Legal Principles

88. Under 35 U.S.C. § 112 ¶ 2, a patent "specification shall conclude with one or

more claims particularly pointing out and distinctly claiming the subject matter

which the applicant regards as his invention."  35 U.S.C. § 112 ¶ 2.  Because a patent

is presumed to be valid, a party alleging indefiniteness has the burden of proving its

factual allegations by clear and convincing evidence.  *See, e.g.*, *Teva Pharm. USA,*

*Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015).

89. A claim is indefinite only if the claim "viewed in light of the specification and

prosecution history," fails to "inform those skilled in the art about the scope of the

invention with reasonable certainty."  *Nautilus, Inc. v. Biosig Instruments, Inc*., 572

U.S. 898, 910 (2014).  The inquiry focuses "on the understanding of a skilled artisan

at the time of the patent application."  *Id.* at 911.  Although the claims must provide

Exhibit 3A
Plaintiff's Statement of Issues of Law

"clear notice of what is claimed," they are allowed "a modicum of uncertainty." *Id.* at 909. The definiteness standard "mandates clarity, while recognizing that absolute precision is unattainable." *Id.* at 910. "[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quoting *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)). Instead, "[t]he degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Biosig Instruments, Inc. v. Nautilus*, Inc., 783 F.3d 1374, 1382 (Fed. Cir. 2015) (alteration in original) (quoting *Miles Labs., Inc. v. Shandon, Inc.,* 997 F.2d 870, 875 (Fed. Cir. 1993)).

90. A patent with claims involving terms of degree "must provide objective boundaries for those of skill in the art" in the context of the invention. *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1360 (Fed. Cir. 2019) (quoting Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1371 (Fed. Cir. 2014)). Intrinsic evidence—such as the claims, figures, written description, or prosecution history of a patent—can provide the necessary objective boundaries. *See, e.g., One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1064-67 (Fed. Cir. 2017) (ruling that consistent use of a disputed term in the claims, specification, and prosecution history informed claim scope). Extrinsic evidence can also help identify objective boundaries. *See, e.g., Guangdong Alison Hi-Tech,* 936 F.3d at 1360-63

Exhibit 3A
Plaintiff's Statement of Issues of Law

(finding that the accused infringer "seeks a level of numerical precision beyond that required when using a term of degree," where "a person of ordinary skill in this field "can tell when a material has zero or a negligible amount of resilience without needing a mathematical definition,"); *see also BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1368 (Fed. Cir. 2017) (considering expert testimony); D*DR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260–61 (Fed. Cir. 2014) (considering advertising for prior art system).

91. To be definite, a patent need only define the universe over which the patentee seeks protection.  The patent need not define every possible embodiment of the claims.  *See, e.g.*, *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014); *In re Wakefield*, 422 F.2d 897, 903 (C.C.P.A. 1970).

92. In examining whether a disputed claim term is definite, the examiner's remarks about a claim term are relevant.  *See Tinnus Enterprises, LLC v. Telebrands Corp.*, 733 Fed. Appx. 1011, 1020 (Fed. Cir. 2018) ("The examiner's own remarks confirm that the claim language informs a person of ordinary skill of the objective boundaries of the claim term. Additionally, we presume that an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance.")

Exhibit 3A
Plaintiff's Statement of Issues of Law

## V.   REMEDIES

### C. Issues to Be Litigated

93. Whether Plaintiff is entitled to a judgment that Slayback has infringed, will infringe, will actively induce infringement of, and/or will contribute to the infringement by others of the '483 patent.

94. Whether Plaintiff is entitled to a judgment that Apotex has infringed, will infringe, will actively induce infringement of, and/or will contribute to the infringement by others of the '483 patent.

95. Whether Plaintiff is entitled to an order pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval for Slayback's NDA Product be not earlier than the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

96. Whether Plaintiff is entitled to an order pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval for Apotex's NDA Product be not earlier than the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

97. Whether Plaintiff is entitled to a preliminary and permanent injunction pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283 enjoining Slayback, its officers, agents, servants, employees and attorneys, and all persons acting in concert with them, from making, using, selling, offering for sale,

Exhibit 3A
Plaintiff's Statement of Issues of Law

marketing, distributing, or importing Slayback's NDA Product, or the inducement of

or the contribution to any of the foregoing, prior to the expiration date of the '483

patent, inclusive of any extension(s) and additional period(s) of exclusivity.

98. Whether Plaintiff is entitled to a preliminary and permanent injunction

pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283 enjoining

Apotex, its officers, agents, servants, employees and attorneys, and all persons acting

in concert with them, from making, using, selling, offering for sale, marketing,

distributing, or importing Apotex's NDA Product, or the inducement of or the

contribution to any of the foregoing, prior to the expiration date of the '483 patent,

inclusive of any extension(s) and additional period(s) of exclusivity.

99. Whether Plaintiff is entitled to a judgment that making, using, selling, offering

for sale, marketing, distributing, or importing Slayback's NDA Product, prior to the

expiration date of the '483 patent, will infringe, actively induce infringement of,

and/or contribute to the infringement by others of the '483 patent.

100.     Whether Plaintiff is entitled to a judgment that making, using, selling,

offering for sale, marketing, distributing, or importing Apotex's NDA Product, prior

to the expiration date of the '483 patent, will infringe, actively induce infringement

of, and/or contribute to the infringement by others of the '483 patent.

101.     Whether Plaintiff is entitled to a judgment that this is an exceptional

case and an award of attorneys' fees pursuant to 35 U.S.C. § 285.

58

Exhibit 3A
Plaintiff's Statement of Issues of Law

102.     Whether Plaintiff is entitled to costs and expenses in this action.

103.     Whether Plaintiff is entitled to further and other relief the Court may

deem just and proper.

### D. Legal Principles

104.      Under 35 U.S.C. § 271(e)(4)(A), for an act of infringement described

in 35 U.S.C. § 271(e)(2)(A), the Court "shall order the effective date of any approval

of the drug or veterinary biological product involved in the infringement to be a date

which is not earlier than the date of the expiration of the patent which has been

infringed."  35 U.S.C. § 271(e)(4)(A); *In re Omeprazole Patent Litig. v. Apotex

Corp.*, 536 F.3d 1361, 1367 (Fed. Cir. 2008).

105.     Under 35 U.S.C. § 271(e)(4)(B), for an act of infringement described

in 35 U.S.C. § 271(e)(2)(A), the Court may grant a permanent injunction "to prevent

the commercial manufacture, use, offer to sell, or sale within the United States or

importation into the United States of an approved drug."  *See also Rsch. Found. of

State Univ. of N.Y. v. Mylan Pharms., Inc.*, C.A. No. 09-184-LPS, 2012 WL

1901267, at *4–7 (D. Del. May 25, 2012) (ordering a permanent injunction upon a

finding of infringement).  In addition, under 35 U.S.C. § 283, the Court "may grant

injunctions in accordance with the principles of equity to prevent the violation of

any right secured by patent, on such terms as the court deems reasonable."

Exhibit 3A
Plaintiff's Statement of Issues of Law

106.     Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." A case is "exceptional" if it "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)." *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014). District courts make a determination as to whether a case is "exceptional" on a case-by-case basis, in the exercise of their discretion, considering the totality of the circumstances. *Id*. A court may properly award attorneys' fees under section 285 as a remedy for infringement by the NDA filer. *See* 35 U.S.C. § 271(e)(4)(D).

107.     Under FEDERAL RULE OF CIVIL PROCEDURE 54(d)(1), unless provided otherwise, "costs—other than attorney's fees—should be allowed to the prevailing party."

# EXHIBIT 3B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,   )
                                      )
                Plaintiff,   )
                                        )
              v.           )
                                      )  C.A. No. 21-1256-CFC
SLAYBACK PHARMA LLC, *et al.*,   )
                                        )
            Defendants.  )
_____  )

# EXHIBIT 3B

## DEFENDANTS' STATEMENT OF THE ISSUES OF LAW

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INFRINGEMENT ................................................................................................ 2

        A.      Infringement Under The Doctrine of Equivalents ................................ 4

II.     INVALIDITY ................................................................................................ 11

        A.      Burden of Proof ................................................................................ 11

        B.      Person of Ordinary Skill in the Art ................................................... 11

        C.      Anticipation ...................................................................................... 11

        D.      Obviousness ...................................................................................... 15

        E.      Written Description .......................................................................... 20

        F.      Indefiniteness ................................................................................... 22

III.    REMEDIES ................................................................................................ 24

        A.      Permanent Injunction ...................................................................... 24

        B.      Exceptional Case ............................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs. V. Baxter Pharm. Prods., Inc.*,
  471 F.3d 1363 (Fed. Cir. 2006)........................................................................10, 11

*Abbott Labs. v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009)........................................................................8

*Acorda Therapeutics Inc. v. Aptoex Inc.*,
  No. 07-4937, 2011 WL 4074116 (D.N.J. Sept. 6, 2011), *aff'd*, 476 F. App'x
  746 (Fed. Cir. 2012)........................................................................8

*Advanced Cardiovascular Sys. v. Scimed Life Sys.*,
  261 F.3d 1329 (Fed. Cir. 2001)........................................................................2, 3

*Alcon, Inc. v. Teva Pharm. USA, Inc.*,
  No. 06-cv-234-SLR, 2010 U.S. Dist. LEXIS 78987 (D. Del. Aug. 5, 2010) .........................23

*Allergan, Inc. v. Sandoz, Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015)........................................................................17

*Amgen Inc. v. Hoescht Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)........................................................................3

*Amgen Inc. v. Sandoz Inc.*,
  No. 2018-1551, 2019 WL 2017501 (Fed. Cir. May 8, 2019) ...................................5

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012)........................................................................16

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010)........................................................................18, 19, 20

*Bayer AG v. Elan Pharm. Research Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000)........................................................................3

*Beckman Instruments, Inc. v. LKB Produkter AB*,
  892 F.2d 1547 (Fed. Cir. 1989)........................................................................25

*In re Best*,
  562 F.2d 1252 (Fed. Cir. 1977)........................................................................11

*Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*,
  642 F.3d 1031 (Fed. Cir. 2011)........................................................................19

*Buehler AG v. Ocrim S.p.A.*,
    836 F. Supp. 1305 (N.D. Tex. 1993), *aff'd sub nom. Buehler AG v. Ocrim SpA*, 34 F.3d 1080 (Fed. Cir. 1994) ........................................................................4

*Carter Wallace, Inc. v. Gillette Co.*,
    531 F. Supp. 840 (D. Mass. 1981) ...............................................................18, 19

*Centocor Ortho Biotech, Inc. v, Abbott Labs.*,
    636 F.3d 1341 (Fed. Cir. 2011)...........................................................................19

*Chalumeau Power Sys. LLC v. Alcatel–Lucent*,
    No. 11–1175-RGA, 2014 U.S. Dist. LEXIS 127645 (D. Del. Sept. 12, 2014), *aff'd*, 611 Fed. App'x 1008 (Fed. Cir. 2015) ...................................................25

*Cognex Corp. v. Microscan Sys., Inc.*,
    No. 13-cv-2027, 2014 U.S. Dist. LEXIS 91203 (S.D.N.Y. June 30, 2014) ...........................25

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006)............................................................................6

*In Re Copaxone Consolidated Cases*,
    No. 14-1171-GMS, 2017 U.S. Dist. LEXIS 12168 (D. Del. Jan. 30, 2017) ...................14, 15

*Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*,
    305 F.3d 1303 (Fed. Cir. 2002)............................................................................4

*eBay Inc. v. MercExchange, L.L.C.*,
    126 S.Ct. 1837 (2006)........................................................................................23

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001)............................................................................11

*Enzo Biochem Inc. v. Applera Corp.*,
    702 F. App'x 971 (Fed. Cir. 2017) ......................................................................5

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    344 F.3d 1359 (Fed. Cir. 2003).......................................................................6, 7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002)........................................................................................6, 7

*In re Geisler*,
    116 F.3d 1465 (Fed. Cir. 1997).........................................................................16

*General Mills, Inc. v. Hunt-Wesson, Inc.*,
    103 F.3d 978 (Fed. Cir. 1997)............................................................................4

*Glaxo, Inc. v. Novopharm*,
110 F.3d 1562 (Fed. Cir. 1997)................................................................3

*GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*,
744 F.3d 725 (Fed. Cir. 2014)................................................................20

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995)................................................................9

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)................................................................13

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008)................................................................21

*Hoffmann–La Roche Inc. v. Invamed Inc.*,
213 F.3d 1359 (Fed. Cir. 2000)................................................................25

*Hospira, Inc. v. Amneal Pharm., LLC*,
285 F. Supp. 3d 776 (D. Del. 2018)................................................................3

*Intellect Wireless, Inc. v. Sharp Corp.*,
45 F. Supp. 3d 839 (N. D. Ill. 2014)................................................................25

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)................................................................22

*Johnson & Johnston Assocs. V. R.E. Servs. Co.*,
285 F.3d 1046 (Fed. Cir. 2002)................................................................6

*Kennametal, Inc. v. Ingersoll Cutting Toll Co*,
780 F.3d 1376................................................................13

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)................................................................13, 14, 15, 16

*LizardTech, Inc. v. Earth Resource Mapping*,
424 F.3d 1336 (Fed. Cir. 2005)................................................................19

*Manville Sales Corp. v. Paramount Sys., Inc.*,
917 F.2d 544 (Fed. Cir. 1990)................................................................2

*Markman v. Westview Instruments, Inc.*,
517U.S. 370(1996)................................................................3

*Medgraph, Inc. v. Medtronic, Inc.*,
843 F.3d 942 (Fed. Cir. 2016)................................................................4

*Medichem, S.A. v. Rolado, S.L.*,
    437 F.3d 1157 (Fed. Cir. 2006).........................................................................15

*Mehl/Biophile Int'l Corp. v. Milgraum*,
    192 F.3d 1362 (Fed. Cir. 1999).........................................................................11

*Merck & Co. v. Biocraft Laboratories, Inc.*,
    874 F.2d 804 (Fed. Cir. 1989)....................................................................16, 18

*Microsoft v. i4i*,
    564 U.S. 91 (2011).............................................................................................9

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)...............................................................................21, 22

*Newell Cos. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1988), cert. denied, 493 U.S. 814 (1989) .........................18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014)....................................................................................24

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir, 2006).........................................................................16

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
    No. CV 07-1000 (MLC), 2015 U.S. Dist. LEXIS 137887 (D.N.J. Oct. 9, 2015)...................24

*In re Packard*,
    751 F.3d 1307 (Fed. Cir. 2014).........................................................................21

*Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*,
    822 F.2d 1528 (Fed. Cir. 1987)...........................................................................5

*In re Petering*,
    301 F.2d 676 (C.C.P.A. 1962) .........................................................................12

*re Peterson*,
    315 F.3d 1325 (Fed. Cir. 2003)....................................................................16, 17

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007)....................................................................14, 15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)...........................................................................9

*PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*,
    355 F.3d 1353 (Fed. Cir. 2004)...........................................................................5

*Reckitt Benckiser Inc. v. Watson Labs., Inc.*,
430 F. App'x 871 (Fed. Cir. 2011) ...................................................................8

*Rhine v. Casio, Inc.*,
183 F.3d 1342 (Fed. Cir. 1999)......................................................................21

*Richardson-Vicks Inc. v. Upjohn Co.*,
122 F.3d 1476 (Fed. Cir. 1997)......................................................................14

*Rockwell Int'l Corp. v. United States*,
147 F.3d 1358 (Fed. Cir. 1998)......................................................................10

*Rosemount, Inc. v. Beckman Instruments, Inc.*,
727 F.2d 1540 (Fed. Cir. 1984)......................................................................25

*Sakraida v. AG Pro, Inc.*,
425 U.S. 273 (1976)........................................................................................18

*Schering Corp. v. Geneva Pharm., Inc.*,
339 F.3d 1373 (Fed. Cir. 2003)......................................................10, 11, 12

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*,
172 F.3d 836 (Fed. Cir. 1999).........................................................................3

*In re Sebela Patent Litig.*,
2017 U.S. Dist. LEXIS 128258 (D.N.J. Jun. 9, 2017)...................................3

*Shire Dev., LLC v. Watson Pharm., Inc.*,
787 F.3d 1359 (Fed. Cir. 2015).......................................................................7

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
859 F.2d 878 (Fed. Cir. 1988).........................................................................2

*Southwall Techs., Inc. v. Cardinal JG Co.*,
54 F.3d 1570 (Fed. Cir. 1995).........................................................................2

*Stratoflex Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983)......................................................................18

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001)......................................................................11

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)......................................................................22

*Titanium Metals Corp. v. Banner*,
778 F.2d 775 (Fed. Cir. 1985)........................................................................11

*Toro Co. v. White Consol. Indus., Inc.*,
  383 F.3d 1326 (Fed. Cir. 2004)................................................................5

*Tris Pharma, Inc. v. Actavis Labs. FL, Inc.*,
  276 F. Supp. 3d 226 (D. Del. 2017), *vacated on other grounds*, 755 F. App'x
  983 (Fed. Cir. 2019)...............................................................................16, 17

*TruePosition, Inc. v. Andrew Corp.*,
  611 F. Supp. 2d 400 (D. Del. 2009)......................................................24

*Union Carbide Corp. v. Am. Can Co.*,
  724 F.2d 1567 (Fed. Cir. 1984)...............................................................9

*Union Oil Co. of Cal. V. Atl. Richfield Co.*,
  208 F.3d 989 (Fed. Cir. 2000)................................................................10

*Voda v. Cordis Corp.*,
  536 F.3d 1311 (Fed. Cir. 2008)..............................................................22

*Wahpeton Canvas Co. v. Frontier, Inc.*,
  870 F.2d 1546 (Fed. Cir. 1989)...............................................................3

*Warner Chilcott Co., LLC v. Teva Pharms. USA, Inc.*,
  89 F. Supp. 3d 641 ...........................................................................12, 17

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997).............................................................................4, 6, 7

*Wavetronix v. EIS Elec. Integrated Sys.*,
  573 F.3d 1343 (Fed. Cir. 2009)...............................................................4

*Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*,
  576 F.3d 1302 (Fed. Cir. 2009)..............................................................25

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
  683 F.3d 1356 (Fed. Cir. 2012)..............................................................12

*In re Woodruff*,
  919 F.2d 1575 (Fed. Cir. 1990)..............................................................16

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*,
  231 F.3d 1339 (Fed. Cir. 2000)..............................................................25

**Statutes**

35 U.S.C. § 102..................................................................................9, 11

35 U.S.C. § 102(a) ..................................................................................................9

35 U.S.C. § 102(b) ..................................................................................................9

35 U.S.C. § 102(e) ................................................................................................10

35 U.S.C. § 103 ....................................................................................................16

35 U.S.C. § 103(a) ...............................................................................................13

35 U.S.C. § 112 ..............................................................................................20, 21

35 U.S.C. § 112(a) ...............................................................................................18

35 U.S.C. § 112(b) ...............................................................................................20

35 U.S.C. § 271(a) .................................................................................................2

35 U.S.C. § 271(e)(4)(B) .....................................................................................22

35 U.S.C. § 282(a) .................................................................................................9

35 U.S.C. § 285 ..............................................................................................23, 25

Pursuant to Local Rule 16.3(c)(5), Defendants Slayback Pharma LLC, Apotex Inc., and Apotex Corp. ("Defendants") submit the following issues of law that remain to be litigated.

Defendants further incorporate by reference any issues of law set forth in its pretrial submissions or responsive papers to any comparable material filed by Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle" or "Plaintiff"). Defendants also reserve the right to modify or supplement this Statement of the Issues of Law ("Statement") to fairly respond to any new issues that Plaintiff may raise. By submitting this Statement, Defendants are in no way waiving their rights to amend or supplement this submission after considering Plaintiff's submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, the trial itself, or post-trial briefing. The citation of authorities is not exhaustive. Defendants reserve the right to rely on additional authorities in support of their claims and defenses and intended proofs.

To the extent any of these issues of law is deemed an issue of fact rather than an issue of law, Defendants incorporate said issue by reference into Defendants' Statement of the Issues of Fact (Exhibit 2B). Conversely, to the extent any issue in Defendants' Statement of Issues of Fact is deemed an issue of law, Defendants incorporate said issue by reference into this Statement.

Defendants reserve the right to further modify, supplement, and/or amend

the Final Pretrial Order and the attachments thereto, including this Statement, in light of any future rulings by the Court and/or issues that remain open, including ongoing expert discovery, until entry of the Final Pretrial Order.

## I.    INFRINGEMENT

1.    The burden of proving infringement rests with the patentee who must prove infringement by a preponderance of the evidence. *Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001).

2.    This same burden of proof applies to both direct and indirect infringement. See *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) (induced infringement); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (direct infringement).

3.    A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A patent owner may prove infringement under two theories: literal infringement or the doctrine of equivalents. Literal infringement occurs where "every limitation set forth in a claim" is "found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal JG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).

4.    Determination of a claim of infringement involves a two-step inquiry. First, the claims are construed, a question of law in which the scope of the asserted

claims is defined. Second, the claims, as construed, are compared to the accused device, composition or method. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996); *Amgen Inc. v. Hoescht Marion Roussel, Inc.*, 314 F.3d 1313, 1324 (Fed. Cir. 2003); *Hospira, Inc. v. Amneal Pharm., LLC*, 285 F. Supp. 3d 776, 784-85 (D. Del. 2018). This is a question of fact. To prevail, the plaintiff must establish by a preponderance of the evidence that the accused device, composition or method infringes one or more claims of the patent either literally or under the doctrine of equivalents. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000); *Advanced Cardiovascular Sys.*, 261 F.3d at 1336.

5.      If an accused product does not infringe an independent claim, it also does not infringe any claim depending from that independent claim. *See Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989).

6.      A finding of infringement requires that every element of the patent claim be found to be present in the accused product or method. The absence of a single element of the patent claim requires a finding of non-infringement. *Glaxo, Inc. v. Novopharm*, 110 F.3d 1562, 1565-66 (Fed. Cir. 1997) ("In order to prove infringement, a patentee must show that every limitation of the claims asserted to be infringed is found in the accused device."); *In re Sebela Patent Litig.*, 2017 U.S. Dist. LEXIS 128258, *45-46 (D.N.J. Jun. 9, 2017) ("the Court concludes that all of the listed peaks must be present in order to show infringement); *see also Seal-Flex,*

*Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999) ("To show infringement of a patent, a patentee must supply sufficient evidence to prove that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim."); *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016) ("As such, a grant of summary judgment of noninfringement is proper when no reasonable factfinder could find that the accused product contains every claim limitation or its equivalent."); *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 981 (Fed. Cir. 1997) ("Literal infringement requires that every limitation of the patent claim be found in the accused infringing device.").

### A.    Infringement Under The Doctrine of Equivalents

7.    If the requirements of literal infringement are not met, the doctrine of equivalents allows the patent owner to establish infringement by showing that the accused product or process is equivalent to the subject matter claimed. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997); *see also Wavetronix v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1360 (Fed. Cir. 2009).

8.    The determination of equivalence should be applied as an objective inquiry on an element-by-element basis. *See Warner-Jenkinson*, 520 U.S. at 29. "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art."

*Wavetronix*, 573 F.3d at 1360 (citing *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002)).

9.     A patentee may invoke the doctrine of equivalents when a device or element performs substantially the same function in substantially the same way to obtain substantially the same result. *See Eagle Comtronics*, 305 F.3d at 1315 (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

10.     Given the important public notice function of patent claims, application of the doctrine of equivalents is the exception rather than the rule. *See Buehler AG v. Ocrim S.p.A.*, 836 F. Supp. 1305, 1322 (N.D. Tex. 1993), *aff'd sub nom. Buehler AG v. Ocrim SpA*, 34 F.3d 1080 (Fed. Cir. 1994). The doctrine of equivalents cannot be used to erase "meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 (Fed. Cir. 1987). The doctrine of equivalents applies only in exceptional cases and is not "simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims." *Amgen Inc. v. Sandoz Inc.*, No. 2018-1551, 2019 WL 2017501, at *5 (Fed. Cir. May 8, 2019) (citation omitted).

11.     "The doctrine of equivalents also cannot 'render[] a claim limitation

inconsequential or ineffective.'" *Enzo Biochem Inc. v. Applera Corp.*, 702 F. App'x 971, 976 (Fed. Cir. 2017) (quoting *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016)).

12.     "[I]f one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public." *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1357, 1360 (Fed. Cir. 2004) ("A patentee may not write narrow claims for allowance by the PTO and subsequently attempt to broaden the claims in court by using the doctrine of equivalents."); *see also Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004). "[W]hen a patent drafter discloses but declines to claim subject matter[, as in this case,] this action dedicates that unclaimed subject matter to the public." *Johnson & Johnston Assocs. V. R.E. Servs. Co.*, 285 F.3d 1046, 1054-55 (Fed. Cir. 2002) (citing *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106 (Fed. Cir. 1996)) ("Having disclosed without claiming the steel substrates, Johnston cannot now invoke the doctrine of equivalents o extend its aluminum limitation to encompass steel.").

13.     The doctrine of "prosecution history estoppel limits the broad application of the doctrine of equivalents by barring an equivalents argument for subject matter relinquished when a patent claim is narrowed during prosecution." *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006);

*see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002) ("*Festo I*"). Prosecution history estoppel is triggered by amended an original claim to narrow the literal scope of the element at issue, *Festo I*, 535 U.S. at 732, for reasons substantially related to satisfying any requirement of the Patent Act. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003) ("*Festo IX*").

14.    Arguments or concessions made by the patentee during prosecution may affirmatively establish that a narrowing amendment was made to overcome patentability rejections or secure allowance of a claim. *See Warner-Jenkinson*, 520 U.S. at 33 (placing "the burden on the patent holder to establish the reason for an amendment"); *see also Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1364-65 (Fed. Cir. 2015) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)). Alternatively, "[w]hen the prosecution history record reveals no reason for the narrowing amendment [it is presumed under *Warner-Jenkinson*] that the patentee had a substantial reason relating to patentability." *Festo IX*, 344 F.3d at 1366-67. This presumption can only be rebutted by evidence in the prosecution history record demonstrating that the reason for the amendment was not related to patentability. *Id.* at 1367 ("[O]nly the prosecution history record may be considered in determining whether a patentee has overcome the *Warner-Jenkinson* presumption.") (citing *Pioneer Magnetics Inc. v. Micro Linear Corp.*,

330 F.3d 1352, 1356 (Fed. Cir. 2003)).

15.    Once prosecution history estoppel is triggered, the patentee is

presumed to have "surrendered all territory between the original claim limitation

and the amended claim limitation." *Festo IX*, 344 F.3d at 1367.

16.    A patentee may rebut the presumption of prosecution history estoppel

by establishing one of three exceptions: "the equivalent [was] unforeseeable at the

time of the application; the rationale underlying the amendment [bore] no more

than a tangential relation to the equivalent in question; or there [was] some other

reason suggesting that the patentee could not reasonably be expected to have

described the [equivalent]." *Festo I*, 535 U.S. at 740-41.

17.    The disclosure-dedication rule also limits application of the doctrine

of equivalents.  "[W]hen a patent drafter discloses but declines to claim subject

matter . . . this action dedicates that unclaimed subject matter to the public.

Application of the doctrine of equivalents to recapture subject matter deliberately

left unclaimed would 'conflict with the primacy of the claims in defining the scope

of the patentee's exclusive right.'" *Johnson & Johnston Assoc. v. R.E. Serv. Co.,*

*Inc.,* 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc) (*quoting Sage Prods. Inc. v.*

*Devon Indus., Inc.,* 126 F.3d 1420, 1424 (Fed. Cir. 1997)).

18.    "The disclosure-dedication doctrine bars a patentee from using the

doctrine of equivalents to recapture claim scope that it disclosed in the

specification but did not literally include in the patent's claims." *CSP Techs., Inc. v. Sud-Chemie, AG,* 643 Fed.Appx. 953, 958 (Fed. Cir. 2016).

19.    "[I]f one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public. This 'disclosure-dedication' rule does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public. The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.,* 355 F.3d 1353, 1360 (Fed. Cir. 2004).

20.    "[T]he public notice function of patents suggests that before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee as an alternative to a claim limitation." *Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1379 (Fed. Cir. 2005).

21.    "The requirement that the patent must identify the dedicated embodiment as an alternative to a claimed embodiment is therefore not, as [patentee] suggests, one of form requiring us to identify some language specifically stating that an embodiment is an "alternative." If that were the case, an artful drafter could avoid describing embodiments as alternatives and make the patent

immune to the disclosure-dedication doctrine. Instead, the requirement is one of substance where we determine from the specification's disclosure whether 'one of ordinary skill would have come to the conclusion that the inventor[ ] ha[s] identified [the unclaimed embodiment] as an alternative to [the claimed embodiment].'" *CSP Techs., Inc. v. Sud-Chemie, AG,* 643 Fed.Appx. 953, 959 (Fed. Cir. 2016) (*quoting Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1379 (Fed. Cir. 2005)).  Application of the disclosure-dedication rule is a question of law subject to de novo review. Pfizer, Inc. 429 F.3d at1378.

22.    Bioequivalence is a regulatory and medical concern aimed at establishing that two compounds are effectively the same for pharmaceutical purposes. In contrast, equivalence for purposes of patent infringement requires an element-by-element comparison of the patent claim and the accused product, requiring not only equivalent function but also equivalent way and result." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009). "[I]f bioequivalency meant per se infringement, no alternative to a patented medicine could ever be offered to the public during the life of a patent." *Id.* (citation omitted). While such bioequivalence determinations may be "potentially relevant," therapeutic equivalence "of an accused product with a product produced from the patent at issue is not sufficient to establilsh infringement by equivalents." *Id.*; *see also Reckitt Benckiser Inc. v. Watson Labs., Inc.*, 430 F. App'x 871, 878 (Fed. Cir.

2011) (nonprecedential) ("We have clarified, however, that 'bioequivalency and equivalent infringement are different inquiries.'") (citations omitted); *Acorda Therapeutics Inc. v. Aptoex Inc.*, No. 07-4937 (GEB-MCA), 2011 WL 4074116, *9 (D.N.J. Sept. 6, 2011), *aff'd*, 476 F. App'x 746 (Fed. Cir. 2012).

## II.   INVALIDITY

### A.   Burden of Proof

23.    A United States patent is afforded a presumption of validity under 35 U.S.C. § 282(a). This presumption requires that the party asserting invalidity at trail establish the facts supporting invalidity with clear and convincing evidence. *Microsoft v. i4i*, 564 U.S. 91, 111 (2011).

### B.   Person of Ordinary Skill in the Art

24.    A patent and its prior art are viewed through the eyes of a person of ordinary skill in the art ("POSA") at the time the invention was made. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The person of ordinary skill in the art is a legal construct—a hypothetical person who is presumed to know all of the relevant prior art. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1576 (Fed. Cir. 1984) (describing the POSA as "the inventor working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him").

### C.   Anticipation

25.    Under 35 U.S.C. § 102, a person shall be entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent," 35 U.S.C. § 102(a), or "the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). A person is not entitled to a patent if "the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the internal application designated the United States and was published under Article 21(2) of such treaty in the English language." 35 U.S.C. § 102(e).

26.    A patent claim is anticipated if comparison of the claim with a prior art reference reveals that every element of the claim is described, either expressly or inherently, in the prior art reference. *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003); *Union Oil Co. of Cal. V. Atl. Richfield Co.*, 208 F.3d 989, 994-95 (Fed. Cir. 2000); *Rockwell Int'l Corp. v. United States*, 147

F.3d 1358, 1363 (Fed. Cir. 1998).

27.     Either a single element of claimed subject matter or the entire claimed subject matter may be inherently disclosed. *Schering*, 339 F.3d at 1379. Inherency arises when a limitation not expressly found in a prior art reference is necessarily present based on what the prior art reference conveys to those of ordinary skill in the art. *See Abbott Labs. V. Baxter Pharm. Prods., Inc.*, 471 F.3d 1363, 1368 (Fed. Cir. 2006). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *Mehl/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999); *see also Schering*, 339 F.3d at 1377, 1379.

28.     A reference includes an inherent characteristic if that characteristic is the "natural result" flowing from the references' explicitly recited teachings. *See Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001).

29.     A prior art reference that discloses every limitation of a claimed invention, either explicitly or inherently, renders the patent claim invalid as anticipated under 35 U.S.C. § 102. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001); *Schering*, 339 F.3d at 1379. A claim is anticipated even when some property of the claimed subject matter was not appreciated at the time. *Abbott Labs.*, 471 F.3d at 1367; *Schering*, 339 F.3d at 1379; *Titanium Metals Corp. v. Banner*, 778 F.2d 775 (Fed. Cir. 1985).

Accordingly, the general principle that a newly discovered property of the prior art is unpatentable cannot be avoided by explicitly claiming that inherent unknown property. *In re Best*, 562 F.2d 1252, 1254 (Fed. Cir. 1977). "[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Schering*, 339 F.3d at 1377 (citing *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991)). "[I]nherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Id.* (citing *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1351 (Fed. Cir. 2002)).

30.     Disclosure of a definite and limited class of compounds is sufficient disclosure for anticipation of each member of the class that a person of ordinary skill in the art would envisage from reading the prior art reference. *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962).  "The question for purposes of anticipation is therefore whether the number of categories and components in [the prior art] was so large that the combination … would not be immediately apparent to one of ordinary skill in the art." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1362 (Fed. Cir. 2012).

31.     A reference that discloses a definite and limited class of compounds will anticipate so long as a single reference "does not require combining different

disclosures or random selection from unrelated elements in the prior art, rather it 'combine[s] [the elements] in the same way as recited in the claim." *Warner Chilcott Co., LLC v. Teva Pharms. USA, Inc.*, 89 F. Supp. 3d 641, 657 (citing *NetMoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

32.     "A reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would "at once envisage" the claimed arrangement or combination. *Kennametal, Inc. v. Ingersoll Cutting Toll Co*, 780 F.3d 1376, 1381 (citing *In re Petering*, 301 F.2d at 681).

### D.     Obviousness

33.     A patent is invalid if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art. 35 U.S.C. § 103(a); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007); *Graham v. John Deere Co.*, 383 U.S. 1 (1966).

34.     "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

35.     Obviousness is a question of law that is predicated on several underlying factual inquiries. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476 (Fed. Cir. 1997); *In Re Copaxone Consolidated Cases*, No. 14-1171-GMS, 2017

U.S. Dist. LEXIS 12168, at *49 (D. Del. Jan. 30, 2017).

36.     The patent challenger bears the burden of proving the factual elements of invalidity or obviousness by clear and convincing evidence. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60 (Fed. Cir. 2007).

37.     The obviousness analysis involves a determination of the scope and content of the prior art, an ascertainment of the differences between the prior art and the claims at issue, and a determination of the level of ordinary skill in the pertinent art. *KSR*, 550 U.S. at 406. *See also In Re Copaxone Consolidated Cases*, 2017 U.S. Dist. LEXIS 12168, at *49 ("The trier of fact is directed to assess four considerations: (1) the scope and content of the prior art; the level of ordinary skill in the art; the differences between the claimed subject matter and the prior art; and (4) secondary considerations of non-obviousness, such as commercial success, long-felt but unsolved need, failure of others, acquiescence of others in the industry that the patent is valid, and unexpected results.").

38.     "The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *KSR*, 550 U.S. at 419.

39.     Although the question of obviousness cannot be judged from hindsight, "[r]igid preventative rules that deny factfinders recourse to common

sense are neither necessary under, nor consistent with, [the Supreme Court's obviousness] case law." *KSR*, 550 U.S. at 421 (discussing the improper use of a hindsight criticism to find non-obviousness).

40.    "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S.Ct. at 1739.

41.    "'Obviousness does not require absolute predictability of success,' but rather, requires 'a reasonable expectation of success.' *See Medichem, S.A. v. Rolado, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (quoting *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988). To this end, obviousness 'cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success.' *Pfizer, Inc. v. Apotex*, 480 F.3d 1348, 1364 (Fed. Cir. 2007)." *In re Copaxone Consolidated Cases*, 2017 U.S. Dist. LEXIS 12168, at *50.

42.    "Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *KSR*, 127 S.Ct. at 1741.

43.    "When a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one

would expect from such an arrangement, the combination is obvious." *KSR*, 127 S.Ct. at 1740.

44.    A patent claim is obvious when an obvious-to-try solution is applied to a known problem and there are a finite number of predictable solutions that a person of ordinary skill in the art would have good reason to pursue. *KSR*, 550 U.S. at 421.

45.    "'Patentability shall not be negatived by the manner in which the invention was made.' 35 U.S.C. § 103. But the converse is equally true: patentability is not imparted where 'the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in light of the prior art.'" *Merck & Co. v. Biocraft Laboratories, Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989) (citation omitted).

46.    "Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir, 2006); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012); *Inn re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003); *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997); *In re Woodruff*, 919 F.2d 1575, 1577-78 (Fed. Cir. 1990); *Tris Pharma, Inc. v. Actavis Labs. FL, Inc.*, 276 F. Supp. 3d 226, 252 (D. Del. 2017), *vacated on other grounds*, 755 F. App'x 983 (Fed. Cir. 2019).

47.     This *prima facie* case exists where there is "even a slight overlap in range." *In re Peterson*, 315 F.3d at 1329; *see also, e.g.*, *In re Geisler*, 116 F.3d at 1469 (claimed invention was rendered prima facie obvious by a prior art reference whose disclosed range (50-100 Angstroms) overlapped the claimed range (100-600 Angstroms)); *In re Woodruff*, 919 F.2d at 1576-77 (claimed invention was rendered obvious by a prior art reference whose disclosed range of "about 1-5%" carbon monoxide abutted the claimed range of "more than 5% to about 25%" carbon monoxide).

48.     Even where the claimed range and the prior art range do not overlap, "a prima facie case of obviousness exists when the claimed range and the prior art range . . . are close enough such that one skilled in the art would have expected them to have the same properties." *In re Peterson*, 315 F.3d at 1329.

49.     "[T]he existence of overlapping o encompassing ranges shifts the burden to the applicant to show that his invention would not have been obvious." *In re Peterson*, 315 F.3d at 1329-30; *see also, e.g.*, *Tris Pharma*, 276 F. Supp. 2d at 253; *Warner Chilcott Co. v. Teva Pharm. USA, Inc.*, 89 F. Supp. 3d 641, 655-56 (D.N.J. 2015), *aff'd*, 642 F. App'x 996 (Fed. Cir. 2016). In such cases, "the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent

secondary considerations." *Allergan, Inc. v. Sandoz, Inc.*, 796 F.3d 1293, 1304-05 (Fed. Cir. 2015); *accord, Galderma*, 737 F.3d at 738 (citing *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1352-54 (Fed. Cir. 2013)).

50.     Secondary considerations do not support non-obviousness unless there is a nexus between the patent claims and the secondary indicia. *Stratoflex Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

51.     Secondary indicia of non-obviousness cannot overcome clear and convincing evidence of obviousness. *Sakraida v. AG Pro, Inc.*, 425 U.S. 273, 282-83 (1976); *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 n.* (Fed. Cir.), cert. denied, 493 U.S. 975 (1989); *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768-69 (Fed. Cir. 1988), cert. denied, 493 U.S. 814 (1989); *Carter Wallace, Inc. v. Gillette Co.*, 531 F. Supp. 840, 871-72 (D. Mass. 1981) ("Regardless of its potential relevance to the question of obviousness, evidence of secondary factors can never substitute for invention." – citing, *Graham*, 383 U.S. at 36; *A&P Tea Co.*, 340 U.S. at 153; *Dow Chemical Co.*, 324 U.S. at 330).

### E.     Written Description

52.     A patent specification must "contain a written description of the invention." 35 U.S.C. § 112(a).

53.     To comply with the written description requirement, a patent's specification "must clearly allow persons of ordinary skill in the art to recognize

that the inventor invented what is claimed." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (internal alterations and quotation marks omitted). "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. . . . [T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." Id.

54.   "[T]he written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." *Id.* at 1352. However, "a description that merely renders the invention obvious does not satisfy the requirement." *Id*.

55.   "The written description requirement exists to ensure that inventors do not attempt to preempt the future before it has arrived." *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011) (citation and internal quotation marks omitted). The pharmaceutical industry cannot be left to "complete an unfinished invention." *Ariad*, 598 F.3d at 1353.

56.   Similarly, "[a] mere wish or plan for obtaining the claimed invention" fails the written description requirement. *Centocor Ortho Biotech, Inc. v, Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011) (citation and internal quotation marks

omitted). A disclosure that is a "mere mention of a desired outcome" does not satisfy the requirement. *Ariad*, 598 F.3d at 1357.

57.    Additionally, describing one embodiment of a claimed invention does not necessarily satisfy the written description requirement; rather, description of a "single embodiment would support [] a generic claim only if the specification would reasonably convey to a person skilled in the art that [the inventor] had possession of the claimed subject matter at the time of filing." *LizardTech, Inc. v. Earth Resource Mapping*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (citation and internal quotation marks omitted). Thus, a patentee "cannot always satisfy the requirements of section 112, in supporting expansive claim language, merely by clearly describing one embodiment of the thing claimed." *Id*. The specification itself must demonstrate that the inventor was in possession of the entirety of the claimed invention. *See Ariad*, 598 F.3d at 1352.

7.    Whether a specification satisfies the written description requirement is a question of fact. *See GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 729 (Fed. Cir. 2014).

## F.    Indefiniteness

58.    35 U.S.C. § 112(b) provides that a patent's specification:

> shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as his invention.

35 U.S.C. § 112.

59.     "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs., Inc. v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996)); *Morton Int'l, Inc. v. Cardinal Chem.* Co., 5 F.3d 1464, 1470 (Fed. Cir. 1993).

60.     Claim language cannot be "ambiguous, vague, incoherent, opaque, or otherwise unclear in describing and defining the claimed invention." *In re Packard,* 751 F.3d 1307, 1311 (Fed. Cir. 2014). A claim must be comprehensible to the ordinary skilled artisan and precise enough to provide clear notice of what is claimed; otherwise, the claims are indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) (quoting *Markman*, 517 U.S. at 373). If the correct claim construction "renders the claim invalid, then . . . the claim is simply invalid." *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999).

61.     Addressing the proper reading of the statute's demand for clarity and precision, the Supreme Court has held "that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the

prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124. "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

62.     A claim may be indefinite if the patent does not convey with reasonable certainty how to measure a claimed feature. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).

63.     Whether a claim is invalid for indefiniteness is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). Definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed. *Nautilus*, 134 S. Ct. at 2128 (emphasis omitted).

## III.   REMEDIES

### A.   Permanent Injunction

64.     Under 35 U.S.C. § 271(e)(4)(B), "injunctive relief *may* be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug or veterinary biological product" (emphasis added); *see also Voda v. Cordis Corp.,* 536 F.3d 1311, 1329 (Fed. Cir. 2008) (affirming the denial of a permanent injunction where generic drug manufacturer lost infringement decision).

65.     In order to establish that an injunction is warranted, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 126 S.Ct. 1837, 1839 (2006); *Alcon, Inc. v. Teva Pharm. USA, Inc.*, No. 06-cv-234-SLR, 2010 U.S. Dist. LEXIS 78987, at \*5 (D. Del. Aug. 5, 2010).

66.     "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court . . . ." *Id.* (citing *Weinberger v. Romero–Barcelo,* 102 S.Ct. 1798, 1802-04 (1982)).

67.     A patentee's "statutory right to exclude alone [does not justify] [a] general rule in favor of permanent injunctive relief," and that "injunctive relief 'may' issue only 'in accordance with the principles of equity.'" *eBay,* 126 S.Ct at 1840; *Alcon*, 2010 U.S. Dist. LEXIS 78987, at \*6.

## B.     Exceptional Case

68.     In exceptional cases, a court may award reasonable attorneys' fees to the prevailing party. *See* 35 U.S.C. § 285.

69.     In deciding whether to award attorneys' fees, the court must undertake a two-step inquiry. *See TruePosition, Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400,

413 (D. Del. 2009) (*citing Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994)).

70.     First, the court "must determine whether there is clear and convincing evidence that the case is 'exceptional.'" *TruePosition, Inc.*, 611 F. Supp. 2d at 413 (citation and quotation marks omitted). In deciding whether a case is exceptional, the court must evaluate whether it "stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). This determination is a "case-by-case exercise" to be made "considering the totality of the circumstances." *Id.* The burden of proof rests with the prevailing party. *See Otsuka Pharm. Co. v. Sandoz, Inc.*, No. CV 07-1000 (MLC), 2015 U.S. Dist. LEXIS 137887, at *8 (D.N.J. Oct. 9, 2015).

71.     Second, the court must determine whether an award of attorneys' fees to the prevailing party is warranted. *Id*. Absent serious misconduct, courts have been reluctant to award fees to a prevailing party. *See Otsuka*, 2015 U.S. Dist. LEXIS 137887 at *10-11. Examples of such serious misconduct include misleading statements "coupled with affirmative, false declarations submitted to the PTO in order to procure patents," filing of frivolous lawsuits, and re-litigation of issues already decided by the court. *See, e.g.*, *Intellect Wireless, Inc. v. Sharp*

*Corp.*, 45 F. Supp. 3d 839, 853 (N. D. Ill. 2014); *Chalumeau Power Sys. LLC v. Alcatel–Lucent*, No. 11–1175-RGA, 2014 U.S. Dist. LEXIS 127645, at *9-10 (D. Del. Sept. 12, 2014), *aff'd*, 611 Fed. App'x 1008 (Fed. Cir. 2015); *Cognex Corp. v. Microscan Sys., Inc.*, No. 13-cv-2027, 2014 U.S. Dist. LEXIS 91203, at *9 (S.D.N.Y. June 30, 2014). Such conduct is akin to the "'pattern of deceit' recognized by the Federal Circuit" in determining whether a case is exceptional under Section 285. *Intellect Wireless, Inc.*, 45 F. Supp. 3d at 853; *see also Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1548 (Fed. Cir. 1984); *Hoffmann–La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1365 (Fed. Cir. 2000); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989); *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1346-47 (Fed. Cir. 2000).

1

# EXHIBIT 4A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-1256-CFC-JLH |
| SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., | **CONFIDENTIAL – FILED UNDER SEAL** |
| Defendants. | |

## EXHIBIT 4A
## PLAINTIFF'S TRIAL EXHIBIT LIST[1]

---

[1] Plaintiff reserves the right to add exhibits to its Trial Exhibit List, including but not limited to, documents used in expert discovery.

## **Defendants' Objection Codes**

| | |
|---|---|
| A | Authenticity (FRE 901) |
| Arg | Argumentative |
| AT | Attorney Objections Not Removed |
| B | Not Best Evidence Rule Prohibits Introduction (FRE 1002, 1003 and/or 1004) |
| BS | Beyond the Scope of Direct / Cross / Redirect Examination; answer beyond scope of question |
| 30(b)(6) | Beyond the Scope of the Rule 30(b)(6) Deposition Topic |
| C | Cumulative, Duplicative, Wasteful or Undue Delay (FRE 403) |
| Char | Improper Character Evidence (FRE 404) |
| Cmpd | Compound |
| D | Demonstrative/Should Not Be Admitted Into Evidence |
| Db | Subject to Daubert Motion |
| F | Form (including hypothetical, calling for opinion testimony, document speaks for itself, asked and answered, narrative, confusing, misleading, ambiguous, vague, unintelligible, argumentative, misstates evidence, cumulative, assumes facts not in evidence) |
| H | Hearsay/Improper Use of Deposition (FRE 802 and/or FRCP 32) |
| I | Reserved Because Exhibit Has Not Been Provided, the Copy Provided Is Illegible and/or the Entry Includes Multiple Documents |
| IC | Improper Designation / Counter Designation (FRE 106; FRCP 32(a)(6) |
| In | Incomplete Testimony (FRE 106; FRCP 32(a)(6)) |
| L | Lack of Personal Knowledge or Competency (FRE 602) |
| LA | Limited Admissibility (Admissible for Some Purposes but Not Others) (FRE 105) |
| LC | Legal Conclusion |
| LD | Leading (FRE 611) |
| LF | Lack of Foundation (FRE 103, 104 and/or 105) |
| M | Misleading/Mischaracterizes Prior Testimony (FRE 401-403, 611) |
| MD | Mischaracterizes Underlying Document (FRE 401-403, 611) |
| ML | Subject to Motion In Limine |
| NE | Assumes Facts Not In Evidence |
| ND | Not disclosed or identified by Plaintiffs in response to one or more Defendants' discovery requests (including in response to interrogatories propounded under FRCP 33) or as required by FRCP 26; not disclosed or identified in Plaintiffs' contentions. |
| NR | Nonresponsive |
| NT | Not Testimony |
| O | Improper Lay or Expert Opinion (FRE 701-703) |
| OC | Offer to Compromise, Settlement (FRE 408) |
| P | Unfair, Prejudicial, Confusing, Misleading and/or waste of time (FRE 403) |
| R | Irrelevant and/or Immaterial (Relevance) (FRE 401/402) |
| S | Calls for Speculation (FRE 602) |
| U | Untimely/Never Produced (FRCP 26, 37) |
| V | Vague/Ambiguous/Overbroad (FRE 611) |
| W | Privileged/Work Product (FRE 501/502) |
| X | Incomplete Document (FRE 106) |
| Y | Wrong Document Identified or Incorrectly Described |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-001 | 2021.08.31 | U.S. Patent No. 11,103,483 issued to N. Palepu et al. | EAGLEBEN-SLAYBACK-00010375 | EAGLEBEN-SLAYBACK-00010386 | |
| PTX-002 | | File History for U.S. Patent No. 11,103,483 issued to N. Palepu et al. | EAGLEBEN-SLAYBACK-00265008 | EAGLEBEN-SLAYBACK-00272591 | |
| PTX-003 | 2021.05.20 | Applicant Amendment and Remarks | EAGLEBEN-SLAYBACK-00271857 | EAGLEBEN-SLAYBACK-00271869 | |
| PTX-004 | 2021.06.02 | Advisory Action | EAGLEBEN-SLAYBACK-00272476 | EAGLEBEN-SLAYBACK-00272477 | |
| PTX-005 | 2021.07.16 | Examiner Interview Summary | EAGLEBEN-SLAYBACK-00272501 | EAGLEBEN-SLAYBACK-00272502 | |
| PTX-006 | 2015.07 | Bendeka Highlights of Prescribing Information | EAGLEBEN-SLAYBACK-00010568 | EAGLEBEN-SLAYBACK-00010593 | |
| PTX-007 | 2013.06.11 | HPLC Assay and Related Substances - Method Validation Report No. TPML-P1268-12-R001-0 | EAGLEBEN-SLAYBACK-00018684 | EAGLEBEN-SLAYBACK-00018793 | |
| PTX-008 | | Eagle Pharmaceuticals, Inc. Module 3 - 3.2.P.8.3 Stability Data | EAGLEBEN-SLAYBACK-00018936 | EAGLEBEN-SLAYBACK-00018944 | |
| PTX-009 | | Eagle Pharmaceuticals, Inc. Module 3 - 3.2.P.5.6 Justification of Specification(s) | EAGLEBEN-SLAYBACK-00044126 | EAGLEBEN-SLAYBACK-00044132 | |
| PTX-010 | 2019.10.00 | Belrapzo Highlights of Prescribing Information, 10/2019 | EAGLEBEN-SLAYBACK-00049612 | EAGLEBEN-SLAYBACK-00049633 | |
| PTX-011 | 2020.11.00 | Belrapzo Highlights of Prescribing Information, 11/2020 | EAGLEBEN-SLAYBACK-00050294 | EAGLEBEN-SLAYBACK-00050315 | |
| PTX-012 | | Eagle Pharmaceuticals, Inc. Module 3 - 3.2.P.8.1 Stability Summary and Conclusion | EAGLEBEN-SLAYBACK-00050663 | EAGLEBEN-SLAYBACK-00050663 | |
| PTX-013 | 2018.05.15 | Letter from R. de Claro to R. Ashworth regarding NDA Approval, with attachment | EAGLEBEN-SLAYBACK-00051937 | EAGLEBEN-SLAYBACK-00051965 | |
| PTX-014 | 2021.01.00 | Bendeka Highlights of Prescribing Information, 01/2021 | EAGLEBEN-SLAYBACK-00052446 | EAGLEBEN-SLAYBACK-00052473 | |
| PTX-015 | | Eagle Pharmaceuticals, Inc. Module 1 - 1.13.5 Summary of Manufacturing Changes | EAGLEBEN-SLAYBACK-00053040 | EAGLEBEN-SLAYBACK-00053067 | |
| PTX-016 | 2015.12.07 | Letter from E. Kaminskas to F. Rashkovsky regarding NDA Approval | EAGLEBEN-SLAYBACK-00053661 | EAGLEBEN-SLAYBACK-00053664 | |
| PTX-017 | 2013.09.01 | Zydus Method of Analysis - Finished Product Shelf Life | EAGLEBEN-SLAYBACK-00064605 | EAGLEBEN-SLAYBACK-00064614 | |
| PTX-018 | | Eagle Pharmaceuticals, Inc. Module 3 - 3.2.P.5.3 Validation of Analytical Procedures | EAGLEBEN-SLAYBACK-00065024 | EAGLEBEN-SLAYBACK-00065025 | |
| PTX-019 | 2013.08.01 | Investigator's Brochure | EAGLEBEN-SLAYBACK-00074139 | EAGLEBEN-SLAYBACK-00074186 | |
| PTX-020 | 2013.01.15 | Eagle Pharmaceuticals, Inc. Type B (Pre-IND) Meeting Background Materials - Date of Meeting January 15, 2013 | EAGLEBEN-SLAYBACK-00170548 | EAGLEBEN-SLAYBACK-00170572 | |
| PTX-021 | | Advantages of Eagle's Bendamustine Hydrochloride Concentrate for Injection Product | EAGLEBEN-SLAYBACK-00171183 | EAGLEBEN-SLAYBACK-00171186 | |
| PTX-022 | 2014.03.05 | Letter from F. Rashkovsky to G. Rao regarding Application for Orphan Designation for Bendamustine Hydrochloride, with attachment | EAGLEBEN-SLAYBACK-00175857 | EAGLEBEN-SLAYBACK-00176136 | |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-023 | 2009.12.14 | Bendamustine Infusion Cumulative Progress Report December 2009 | EAGLEBEN-SLAYBACK-00220735 | EAGLEBEN-SLAYBACK-00220760 | |
| PTX-024 | 2017.12.00 | Treanda Highlights of Prescribing Information, 12/2017 | EAGLEBEN-SLAYBACK-00238405 | EAGLEBEN-SLAYBACK-00238425 | |
| PTX-025 | 2016.03.15 | Letter from K. Crawford to A. Farrell regarding Pre-IND Meeting Request for Modified Formulation of Bendamustine for Injection - 25mg/mL, for the Treatment of Chronic Lymphocytic Leukemia (CLL) and Indolent B-Cell Non-Hodgkin's Lymphoma (NHL) | SLAY BEND 0212848 | SLAY BEND 0212851 | H, M, P, R |
| PTX-026 | 2016.03.11 | Letter from K. Crawford to A. Farrell regarding Pre-IND Meeting Request for Modified Formulation of Bendamustine for Injection - 100mg/mL, for the Treatment of Chronic Lymphocytic Leukemia (CLL) and Indolent B-Cell Non-Hodgkin's Lymphoma (NHL) | SLAY BEND 0254856 | SLAY BEND 0254859 | H, M, P, R |
| PTX-027 | 2016.03.15 | Letter from K. Crawford to A. Farrell regarding Pre-IND Meeting Request for Modified Formulation of Bendamustine for Injection - 100mg/mL, for the Treatment of Chronic Lymphocytic Leukemia (CLL) and Indolent B-Cell Non-Hodgkin's Lymphoma (NHL) | SLAY BEND 0254965 | SLAY BEND 0254969 | H, M, P, R |
| PTX-028 | 2016.05.20 | Slayback Pharma, LLC Pre-IND Meeting Briefing Book - Type B Meeting - Meeting Date May 20, 2016 | SLAY BEND 0255661 | SLAY BEND 0255673 | H, M, P, R |
| PTX-029 | 2016.03.16 | Letter from K. Crawford to A. Farrell regarding Type B Pre-IND Meeting Request for Modified Formulation of Bendamustine for Injection -25mg/mL, for the Treatment of Chronic Lymphocytic Leukemia (CLL) and Indolent B-Cell Non-Hodgkin's Lymphoma (NHL) | SLAY BEND 0263859 | SLAY BEND 0263862 | H, M, P, R |
| PTX-030 | 2018.08.31 | Application to Market a New or Abbreviated New Drug or Biologic for Human Use | SLAY-BEL0000012 | SLAY-BEL0000017 | |
| PTX-031 | | Slayback Pharma Cover Letter - Annexure - 1 | SLAY-BEL0000018 | SLAY-BEL0000023 | |
| PTX-032 | | Slayback Pharma Bendamustine Hydrochloride Injection 100mg/4mL (25mg/mL) New Drug Application - 1.12.11 Basis for | SLAY-BEL0000087 | SLAY-BEL0000087 | |
| PTX-033 | | Side-by-Side Labeling Comparison of Package Insert | SLAY-BEL0000167 | SLAY-BEL0000210 | |
| PTX-034 | | Slayback Pharma Bendamustine Hydrochloride Injection 100mg/4mL (25mg/mL) New Drug Application - 2.3 Quality Overall Summary | SLAY-BEL0000243 | SLAY-BEL0000321 | |
| PTX-035 | 2020.08.17 | Slayback Pharma Application to Market a New or Abbreviated New Drug or Biologic for Human Use | SLAY-BEL0007070 | SLAY-BEL0007078 | P, M |
| PTX-036 | | Slayback Pharma Pre-IND Meeting Briefing Book Type C Meeting | SLAY-BEL0007125 | SLAY-BEL0007139 | P, M |
| PTX-037 | 2021.06.16 | Letter from P. Subbappa to FDA 2 regarding Bendamustine Hydrochloride Injection | SLAY-BEL0007500 | SLAY-BEL0007501 | |
| PTX-038 | 2022.03.16 | Letter from N. Gormley to P. Subbappa regarding Tentative Approval of NDA, with attachment | SLAY-BEL0007973 | SLAY-BEL0007973 | |
| PTX-039 | 2020.02.25 | Email from T. Smolenski to R. Sood regarding Project Guiness slide deck | SLAY-BEL0008376 | SLAY-BEL0008376 | H, In, M, P, R, S |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-040 | 2020.02 | Slayback Pharma Investor Presentation, Project Guinness, February 2020 | SLAY-BEL0008377 | SLAY-BEL0008454 | |
| PTX-041 | 2020.02.24 | Email from T. Smolenski to S. Bhattacharya regarding Aprepitant; Benda; Bijuva Imvexxy.2019-10-10.pptx, with attachment | SLAY-BEL0008773 | SLAY-BEL0008773 | H, In, M, P, R, S |
| PTX-042 | 2017.11.09 | Slayback Pharma Aprepitant Injectable Emulsion 130mg/18mL presentation | SLAY-BEL0008774 | SLAY-BEL0008798 | |
| PTX-043 | 2019. 10.00 | Slayback Pharma Investor Presentation, Project Surf, October 2019 | SLAY-BEL0011114 | SLAY-BEL0011158 | |
| PTX-044 | 2021.08.30 | Email from Y. Bhaskar to A. Singh et al. regarding Bendamustine injection_IMS July 2021 | SLAY-BEL0011196 | SLAY-BEL0011213 | H, In, M, P, R, S |
| PTX-045 | 2021.06.22 | Email from S. Bhattacharya to P. Meyers et al. regarding Thank You | SLAY-BEL0012807 | SLAY-BEL0012807 | H, In, M, P, R, S |
| PTX-046 | 2021.06.21 | Slayback Pipeline Overview Presentation | SLAY-BEL0012808 | SLAY-BEL0012854 | |
| PTX-047 | 2020.02.13 | Email from T. Smolenski to P. Reddy regarding Surf Investor Presentation Materials | SLAY-BEL0011113 | SLAY-BEL0011113 | H, In, M, P, R, S |
| PTX-048 | 2020.02.04 | Email from T. Smolenski to J. Mathew et al. regarding Benda Customer Interviews | SLAY-BEL0023958 | SLAY-BEL0023958 | H, In, M, P, R, S |
| PTX-049 | 2020.01.11 | Email from T. Smolenski to T. Jha regarding Aprepitant; Benda; Bijuva Imvexxy.2019-10-10.pptx | SLAY-BEL0024212 | SLAY-BEL0024212 | H, In, M, P, R, S |
| PTX-050 | 2020.03.30 | Email from J. Mathew to A. Singh regarding Benda Market Research | SLAY-BEL0027987 | SLAY-BEL0027987 | H, In, M, P, R, S |
| PTX-051 | 2020.03.30 | Bendamustine HCP Interview Summary | SLAY-BEL0027988 | SLAY-BEL0027992 | |
| PTX-052 | 2020.03.17 | Email from T. Smolenski to A. Singh et al. regarding update benda presentation for review | SLAY-BEL0028709 | SLAY-BEL0028710 | H, In, M, P, R, S |
| PTX-053 | 2020.03 | Slayback Pharma Project Guinness, Case of Slayback's Bendamustine Novel Product, March 2020 | SLAY-BEL0028711 | SLAY-BEL0028718 | |
| PTX-054 | 2020.12.14 | Email from A. Singh to J. Tatum et al. regarding Please pick an option for Bendamustine Brand name artworks | SLAY-BEL0030896 | SLAY-BEL0030897 | H, In, M, P, R, S |
| PTX-055 | 2020.03.31 | Apotex Application to Market a New or Abbreviated New Drug or Biologic for Human Use | APO-BENDA_0000002 | APO-BENDA_0000004 | |
| PTX-056 | 2020.08.12 | Letter from G. Sirianni to Food and Drug Administration regarding Request for Type B Meeting (Pre-NDA), NDA# 215033 | APO-BENDA_0000005 | APO-BENDA_0000006 | |
| PTX-057 | 2020.08.12 | Apotex Bendamustine Hydrochloride Injection, 25 mg/mL (4 mL) NDA 215,044, Type B Meeting (Pre-NDA) Request and Package | APO-BENDA_0000007 | APO-BENDA_0000023 | |
| PTX-058 | 2021.05 | Apotex 505(b)(b) NDA 215033 (Bendamustine Hydrochloride Injection) Biowaiver Scientific Bridge | APO-BENDA_0000052 | APO-BENDA_0000061 | |
| PTX-059 | | 2 Way Label Comparison of RLD and Apotex's Proposed Label | APO-BENDA_0000195 | APO-BENDA_0000224 | |
| PTX-060 | 2021.06.08 | Letter from K. Krishnan to Center for Drug Evaluation and Research regarding Original New Drug Application 505(b)(2) | APO-BENDA_0000249 | APO-BENDA_0000252 | |
| PTX-061 | 2021.05.00 | Apotex NDA - Bendamustine Hydrochloride Injection - Quality Overall Summary | APO-BENDA_0000296 | APO-BENDA_0000482 | |
| PTX-062 | 2021.05 | Apotex Bendamustine Hydrochloride Injection Module 2.4: Non-Clinical Overview | APO-BENDA_0000680 | APO-BENDA_0000689 | |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-063 | 2021.12.03 | Finished Product Specification No. FPS-CV010A-001-02, Bendamustine Hydrochloride Injection 25 mg/ml | APO-BENDA_0002123 | APO-BENDA_0002129 | |
| PTX-064 | 2021.05.00 | Apotex's NDA - Bendamustine Hydrochloride Injection - 3.2.P.5 Control of Drug Product | APO-BENDA_0002165 | APO-BENDA_0002167 | |
| PTX-065 | 2020.01.30 | Analytical Method Validation Report for Analytical Method of Bendamustine Hydrochloride in Bendamustine Hydrochloride Injection 25 mg/mL by HPLC | APO-BENDA_0002753 | APO-BENDA_0002855 | |
| PTX-066 | 2020.07.31 | Analytical Method Validation Report for Related Substances of Bendamustine Hydrochloride in Bendamustine Hydrochloride Injection 25 mg/mL by HPLC | APO-BENDA_0002856 | APO-BENDA_0002931 | |
| PTX-067 | 2021.03.05 | MSN Accelerated Stability Study Report | APO-BENDA_0003429 | APO-BENDA_0003432 | |
| PTX-068 | 2021.03.05 | MSN Accelerated Stability Study Report | APO-BENDA_0003433 | APO-BENDA_0003436 | |
| PTX-069 | | Bendamustine Hydrochloride Injection Batch Exhibit/Processing Validation - Manufacturing Record | APO-BENDA_0003501 | APO-BENDA_0003707 | |
| PTX-070 | 2021.02.27 | Analytical Method Verification Report for Organic Impurities of Bendamustine Hydrochloride USP API by HPLC | APO-BENDA_0004554 | APO-BENDA_0004616 | |
| PTX-071 | 2021.08.27 | Apotex Bendamustine Hydrochloride Injection, 25 mg/mL (4 mL) NDA 215033, Response to Information Request dated July 28, 2021 | APO-BENDA_0005821 | APO-BENDA_0005828 | |
| PTX-072 | 2021.11 | Bendamustine Hydrochloride Injection Highlights of Prescribing Information | APO-BENDA_0006157 | APO-BENDA_0006179 | |
| PTX-073 | 2021.11 | Bendamustine Hydrochloride Injection Highlights of Prescribing Information | APO-BENDA_0006180 | APO-BENDA_0006212 | |
| PTX-074 | 2019.11.14 | Development and Technology Transfer Agreement between Apotex Inc. and Orbicular Pharmaceutical Technologies | APO-BENDA_0006351 | APO-BENDA_0006378 | |
| PTX-075 | 2021.12.21 | Apotex Response to Information Request email dated October 20, 2021 | APO-BENDA_0006395 | APO-BENDA_0006402 | |
| PTX-076 | 2021.12.21 | Apotex Response to Information Request email dated October 20, 2021 | APO-BENDA_0006403 | APO-BENDA_0006410 | |
| PTX-077 | | Shelf Life Regulatory Specification for Budamustine Hydrochloride Injection, 25 mg/mL (4 mL) | APO-BENDA_0006419 | APO-BENDA_0006420 | |
| PTX-078 | 2021.12.00 | Apotex's NDA - Bendamustine Hydrochloride Injection - 3.2.P.8 Stability | APO-BENDA_0006490 | APO-BENDA_0006508 | |
| PTX-079 | 2022.02.00 | Bendamustine Hydrochloride Injection Highlights of Prescribing Information, revised 2/2022 | APO-BENDA_0006629 | APO-BENDA_0006650 | |
| PTX-080 | 2021.07.28 | Letter from R. Haider to K. Krishnan regarding Information Request re NDA | APO-BENDA_0007357 | APO-BENDA_0007359 | H, In, M, P, R, S |
| PTX-081 | 2021.08.18 | Email from K. Krishnan to B. Singh et al. regarding Injectable Portfolio Strategy: APO Universe Complexity Alignment | APO-BENDA_0007513 | APO-BENDA_0007516 | H, In, M, P, R, S |
| PTX-082 | 2022.02.19 | Email from C. Walkton to S. Mahajan et al. regarding Portfolio Team Project Revisions | APO-BENDA_0008096 | APO-BENDA_0008098 | H, In, M, P, R, S |
| PTX-083 | | Apotex FY22 Submission Pool: US Market Presentation | APO-BENDA_0008120 | APO-BENDA_0008127 | |
| PTX-084 | 2021.01.12 | Email from C. Walton to S. Kovacs et al. regarding Pack Profile Confirmation for Bendamustine 505b2 NDA | APO-BENDA_0008128 | APO-BENDA_0008129 | H, In, M, P, R, S |
| PTX-085 | 2021.07.19 | Email from C. Walton to C. de Lima et al. regarding Submission Transitions | APO-BENDA_0008141 | APO-BENDA_0008142 | H, In, M, P, R, S |

EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.
No. 21-1256-CFC-JLH (D.. Del.)
PLAINTIFF'S EXHIBIT LIST

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-086 | 2021.09.03 | Email from C. Walton to P. Davis regarding Injectable Portfolio Launch timeline | APO-BENDA_0008148 | APO-BENDA_0008149 | H, In, M, P, R, S |
| PTX-087 | 2021.12.01 | Email from P. Davis to J. Kalish regarding Bendamustine Injections | APO-BENDA_0008168 | APO-BENDA_0008169 | H, In, M, P, R, S |
| PTX-088 | 2021.11.30 | Email from J. Kalish to L. Quijada et al. regarding Bendamustine - Gland Forecast | APO-BENDA_0008171 | APO-BENDA_0008172 | H, In, M, P, R, S |
| PTX-089 | 2021.11.30 | Bendamustine FC Summmary_P08 | APO-BENDA_0008173 | APO-BENDA_0008173 | |
| PTX-090 | 2022.03.22 | Email from V. Rivadeneira to C. de Lima et al. regarding Questions | APO-BENDA_0008366 | APO-BENDA_0008367 | H, In, M, P, R, S |
| PTX-091 | 2021.04.07 | Email from S. Kovacs to A. Ijacic et al. regarding Bendamustine 505v2 US (ID#4432US) Submission Shift | APO-BENDA_0008588 | APO-BENDA_0008588 | H, In, M, P, R, S |
| PTX-092 | 2020.09.17 | Email from K. Tang to C. de Lima et al. regarding PPF Dev P06 Qlik vs IBP P06 Feeder File | APO-BENDA_0008743 | APO-BENDA_0008743 | H, In, M, P, R, S |
| PTX-093 | 2021.10.28 | Email from V. Rocher to J. Kalish et al. regarding Lenalidomide Submission | APO-BENDA_0008744 | APO-BENDA_0008746 | H, In, M, P, R, S |
| PTX-094 | 2020.09.24 | Email from M. Bohling to C. de Lima et al. regarding Center Lane, LLC: Alex's Daily Disposition, THursday, September 24th, 2020: Accord, Alkem, CMP Pharma, Dr. Reddy's, Lupin, Mallinckrodt, Mylan, Perrigo, Lannett, Rhodes, Teva, Zydus,... | APO-BENDA_0008349 | APO-BENDA_0008353 | H, In, M, P, R, S |
| PTX-095 | 2021.10.28 | Email from D. Uppala to J. Kalish et al. regarding Bendamustine 505(b)(2) Launch Forecast | APO-BENDA_0008751 | APO-BENDA_0008752 | H, In, M, P, R, S |
| PTX-096 | 2022.03.22 | Email from C. Walton to M. Bohling et al re Bendamustine | APO-BENDA_0008852 | APO-BENDA_0008852 | H, In, M, P, R, S |
| PTX-097 | 2020.10.06 | Email from J. Kalish to C. Walton re ready to use or ready to dilute | APO-BENDA_0008853 | APO-BENDA_0008853 | H, In, M, P, R, S |
| PTX-098 | 2020.10.06 | Email from J. Kalish to C. Walton re ready to use injection | APO-BENDA_0008854 | APO-BENDA_0008854 | H, In, M, P, R, S |
| PTX-099 | 2021.10.07 | Email from J. Kalish to C. Walton re Benda projections | APO-BENDA_0008897 | APO-BENDA_0008897 | H, In, M, P, R, S |
| PTX-100 | 2020.09.22 | Email from R. Misri to P. Kumar et al. regarding Physiological Study - Treanda RLD | APO-BENDA_0009014 | APO-BENDA_0009016 | H, In, M, P, R, S |
| PTX-101 | 2021.11.05 | Email from R. Misri to G. Sirianni et al. regarding NDA 215033 Bendamustine Information Request Follow-up * - Extension Granted | APO-BENDA_0009380 | APO-BENDA_0009388 | H, In, M, P, R, S |
| PTX-102 | | Investigation Summary of OOS | APO-BENDA_0009501 | APO-BENDA_0009506 | |
| PTX-103 | 2021.08.16 | Apotex Bendamustine Hydrochloride Injection, 25 mg/mL (4 mL) NDA 215033, Response to Information Request dated July 28, 2021 | APO-BENDA_0009582 | APO-BENDA_0009590 | |
| PTX-104 | 2021.09.21 | Email from S. Kovacs to A. Ijacic et al. regarding 4470CDN - Tiotropium DPIN - CDN:Sept/21 TTM - Proposed Agenda Items (Advanced Notice) | APO-BENDA_0009599 | APO-BENDA_0009601 | H, In, M, P, R, S |
| PTX-105 | | Investigation Summary of OOS | APO-BENDA_0010956 | APO-BENDA_0010961 | |
| PTX-106 | | Investigation Summary of OOS | APO-BENDA_0010995 | APO-BENDA_0011000 | |
| PTX-107 | | Excel document re Summary and Assumptions, APO-BENDA_0012584 | APO-BENDA_0012584 | APO-BENDA_0012584 | |
| PTX-108 | | Excel document re Summary and Assumptions, APO-BENDA_0012585 | APO-BENDA_0012585 | APO-BENDA_0012585 | |
| PTX-109 | | Excel document re Summary and Assumptions, APO-BENDA_0012586 | APO-BENDA_0012586 | APO-BENDA_0012586 | |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-110 | 2022.04.30 | Email from R. Schweers to K. Alexander et al. regarding topics of testimony | | | P, M |
| PTX-111 | 2022.03.30 | Defendants' Objections and Responses to Plaintiff's Notice of Deposition 30(b)(6) | | | |
| PTX-112 | 2022.02.18 | Joint Stipulation and Order regarding Claim Construction | | | |
| PTX-113 | 2022.05.03 | Plaintiff's Notice of Deposition of Ted Smolenski | | | |
| PTX-114 | | LinkedIn Profile for Ted Smolenski | | | P, R |
| PTX-115 | 2019.03.15 | Deposition Transcript of P. Subbappa in *Cephalon Inc. v. Slayback Pharma Ltd.* , No. 17-1154 (D. Del.) | EAGLEBEN-SLAYBACK-00280242 | EAGLEBEN-SLAYBACK-00280303 | P, M, R, BS, LF |
| PTX-116 | 2018.11.29 | Deposition Transcript of N. Palepu in Cephalon v. Slayback dated November 29, 2018 | | | P, M, R, BS, LF |
| PTX-117 | 2018.11.30 | Deposition Transcript of N. Palepu in Cephalon v. Slayback, dated November 30, 2018 | | | P, M, R, BS, LF |
| PTX-118 | | Curriculum Vitae of Edmund J. Elder, Jr. | | | |
| PTX-119 | 2022.06.04 | Listing of Testimony for Edmund J. Elder Jr. | | | |
| PTX-120 | 2004.09.00 | Niosh Alert, Preventing Occupational Exposures to Antineoplastic and Other Hazardous Drugs in Health Care Settings | EAGLEBEN-SLAYBACK-00280449 | EAGLEBEN-SLAYBACK-00280506 | |
| PTX-121 | 2019.01.28 | Niosh, Hazardous Drug Exposures in Healthcare, Closed System Drug-Transfer Device (CSTD) Research | EAGLEBEN-SLAYBACK-00280404 | EAGLEBEN-SLAYBACK-00280406 | |
| PTX-122 | 2019.00.00 | Gurusamy et al, Closed-System Drug-Transfer Devices Plus Safe Handling of Hazardous Drugs Versus Safe Handling Alone for Reducing Exposure to Infusional Hazardous Drugs in Healthcare Staff (Review), CCochrane Database of Systematic Reviews 2018, Issue 3d (Wiley 2019) | EAGLEBEN-SLAYBACK-00280511 | EAGLEBEN-SLAYBACK-00280639 | |
| PTX-123 | 2012.06.00 | NIOSH List of Antineoplastic and Other Hazardous Drugs in Healthcare Settings 2012 | EAGLEBEN-SLAYBACK-00280933 | EAGLEBEN-SLAYBACK-00280952 | |
| PTX-124 | | Curriculum Vitae of Jeffrey D. Kittendorf, Ph.D. | | | |
| PTX-125 | 2018.04.13 - 2018.05.18 | Teva Bendeka Laboratory Notebook | | | V, IC |
| PTX-126 | | Chromatograms (Kittendorf Ex. C) | | | |
| PTX-127 | | Records and photographs of the Bendeka package used by Kittendorf experiments | | | |
| PTX-128 | | Certificates of Analysis (Kittendorf Ex. E) | | | |
| PTX-129 | | Chromatograms (Kittendorf Ex. F) | | | |
| PTX-130 | | Chromatograms (Kittendorf Ex. G) | | | |
| PTX-131 | | Curriculum Vitae of Graham Sewell | | | |
| PTX-132 | | Curriculum Vitae of Bernhardt L. Trout | | | |
| PTX-133 | | Listing of Testimony for Bernhardt L. Trout | | | |
| PTX-134 | | Curriculum Vitae of F. Dean Toste, Ph.D. | | | |
| PTX-135 | 2012 | Allen Jr., Lloyd, The Art, Science and Technology of Pharmaceutical Compounding (2012) | EAGLEBEN-SLAYBACK-00278174 | EAGLEBEN-SLAYBACK-00278202 | |
| PTX-136 | 2006 | Anslyn et al., Modern Physical Organic Chemistry 124-26 (2006) | EAGLEBEN-SLAYBACK-00278203 | EAGLEBEN-SLAYBACK-00278439 | |
| PTX-137 | | Approved Drug Products with Therapeutic Equivalence Evaluations - Belrapzo | EAGLEBEN-SLAYBACK-00280322 | EAGLEBEN-SLAYBACK-00280322 | |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-138 | | Approved Drug Products with Therapeutic Equivalence Evaluations - Bendeka | EAGLEBEN-SLAYBACK-00280323 | EAGLEBEN-SLAYBACK-00280323 | P, R |
| PTX-139 | 1993 | Bolton et al., Kinetic Analysis of the Reaction of Melphalan with Water, Phosphate, and Glutathione, 21 Drug Metabolism & Disposition 986, 988 (1993) | EAGLEBEN-SLAYBACK-00278440 | EAGLEBEN-SLAYBACK-00278450 | |
| PTX-140 | 2009 | Broadhead, J. & Gibson, M., Parenteral Dosage Forms, in Pharmaceutical Preformulation & Formulation (2009) | EAGLEBEN-SLAYBACK-00278539 | EAGLEBEN-SLAYBACK-00279098 | |
| PTX-141 | 1999.02.10 | Busulfex™ Label | EAGLEBEN-SLAYBACK-00278451 | EAGLEBEN-SLAYBACK-00278478 | |
| PTX-142 | 1994 | Calado et al., Interpretation of Hydroxylic Solvent Effects Based on Correlations with Solvent Parameters. Reactions of Et3N with EtI., 59 Collect. Czech. Chem. Commun. 898 (1994) | EAGLEBEN-SLAYBACK-00278479 | EAGLEBEN-SLAYBACK-00278485 | |
| PTX-143 | 2006 | Chua et al., Screening of Nitrogen Mustards and Their Degradation Products in Water and Decontamination Solution by Liquid Chromatography-Mass Spectrometry, J. Chromatogr. A 1102:214-223 (2006) | EAGLEBEN-SLAYBACK-00280394 | EAGLEBEN-SLAYBACK-00280403 | |
| PTX-144 | 2015.11.20 | CMS Manual System Pub. 100-07 State Operations Provider Certification | EAGLEBEN-SLAYBACK-00280407 | EAGLEBEN-SLAYBACK-00280448 | |
| PTX-145 | 2003.02.20 | Eur. Agency for the Evaluation of Med. Prods., Note for Guidance on Excipients, Antioxidants, and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of a Medicinal Product at 2 (Feb. 20, 2003) | EAGLEBEN-SLAYBACK-00278523 | EAGLEBEN-SLAYBACK-00278532 | |
| PTX-146 | 1990 | Gamcsik et al., NMR Studies of the Conjugation of Mechlorethamine with Glutathione, 33 J. Med. Chem. 1009 (1990) | EAGLEBEN-SLAYBACK-00278533 | EAGLEBEN-SLAYBACK-00278538 | |
| PTX-147 | 1983.03.02 | GDC Patent 159289 ("Olthoff") | EAGLEBEN-SLAYBACK-00278486 | EAGLEBEN-SLAYBACK-00278504 | |
| PTX-148 | 2008.00.00 | Hughes et al., NCBI Bookshelf Patient Safety and Quality: Chapter 37 Medication Administration Safety (2008) | EAGLEBEN-SLAYBACK-00280871 | EAGLEBEN-SLAYBACK-00280932 | |
| PTX-149 | 2007.00.00 | ISOPP, 13 J. Onco. Pharm. Pract. Suppl:1-81 (2007) | EAGLEBEN-SLAYBACK-00280642 | EAGLEBEN-SLAYBACK-00280720 | |
| PTX-150 | 1983 | Kamlet et al., Linear Solvation Energy Relationships. 23. A Comprehensive Collection of the Solvatochromatic Parameters, π*, α and β and Some Methods for Simplifying the Generalized Solvatochromic Equation, 48 J. ORG. CHEM. 2877 (1983) | EAGLEBEN-SLAYBACK-00280721 | EAGLEBEN-SLAYBACK-00280731 | |
| PTX-151 | 2002 | Kim et al., Dipolarity, Hydrogen-Bond Basicity and Hydrogen-Bond Acidity of Aqueous Poly(ethylene glycol) Solutions, 18 Anal. Scis. 1357 (2002) | EAGLEBEN-SLAYBACK-00279099 | EAGLEBEN-SLAYBACK-00279102 | |
| PTX-152 | 2006 | Kumar et al., Removal of Peroxides in Polyethylene Glycols by Vacuum Drying: Implications in the Stability of Biotech and Pharmaceutical Formulations, 7 AAPS PharmSciTech 62 (2006) | EAGLEBEN-SLAYBACK-00280863 | EAGLEBEN-SLAYBACK-00280870 | |
| PTX-153 | 2005 | Leon Shargel, Applied Biopharmaceutics & Pharmacokinetics (2005) | EAGLEBEN-SLAYBACK-00246949 | EAGLEBEN-SLAYBACK-00246953 | |
| PTX-154 | 2020.10.09 | Letter from J. Lee to K. Krishnan re Preliminary Meeting Comments, with attachment | APO-BENDA_0000278 | APO-BENDA_0000294 | H, In, M, P, R, S |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-155 | 1986 | Lokich, Doxorubicin/Vinblastine and Doxorubicin/Cyclophosphamide Combination Chemotherapy by Continuous Infusion, Cancer, 1021-1024 (1986) | EAGLEBEN-SLAYBACK-00280507 | EAGLEBEN-SLAYBACK-00280510 | |
| PTX-156 | 1994 | Maas et al., Stabilität von Bendamustinhydrochlorid in Infusionslösungen, 49 Pharmazie 775 (1994) | EAGLEBEN-SLAYBACK-00279103 | EAGLEBEN-SLAYBACK-00279111 | |
| PTX-157 | 1998 | Marcus, The Properties of Solvents (1998) | EAGLEBEN-SLAYBACK-00279112 | EAGLEBEN-SLAYBACK-00279128 | |
| PTX-158 | 2000 | Nairn, J.G., Solutions, Emulsions, Suspensions, and Extracts, in Remington: The Science and Practice of Pharmacy (2000) | EAGLEBEN-SLAYBACK-00279129 | EAGLEBEN-SLAYBACK-00279162 | |
| PTX-159 | 1997 | Nema, Sandeep, et al., Excipients and Their Use in Injectable Products, PDA Journal of Pharmaceutical Science & Technology, Vol 51, No. 3 (1997) | EAGLEBEN-SLAYBACK-00247072 | EAGLEBEN-SLAYBACK-00247079 | |
| PTX-160 | | Niacinamide, DRUGS.COM, https://www.drugs.com/ingredient/niacinamide.html | EAGLEBEN-SLAYBACK-00279172 | EAGLEBEN-SLAYBACK-00279174 | H |
| PTX-161 | 2002 | Ogata et al., Redical Scavenging Activities of Niacin-Related Compounds, 66 BioSci., Biotech. & BioChem 641-45 (2002) | JDG-BELRAP0000260 | JDG-BELRAP0000265 | |
| PTX-162 | 2086.01.29 | OSHA Archive, Guidelines for Cytotoxic (Antineoplastic) Drugs, Occupational Safety and Health Administration | JDG-BELRAP0000884 | JDG-BELRAP0000910 | |
| PTX-163 | | OSHA, USP Chapter 800 | | | |
| PTX-164 | 2020.06.05 | Perego, Continuous-Infusion and Outpatient Setting: A Chance for Patients, a Challenge for Hospital Pharmacists, 26 J. Oncol. Pract. 1715 (2020) | EAGLEBEN-SLAYBACK-00280953 | EAGLEBEN-SLAYBACK-00280958 | |
| PTX-165 | 2004 | Physicians' Desk Reference (58th ed. 2004) | EAGLEBEN-SLAYBACK-00279175 | EAGLEBEN-SLAYBACK-00279206 | |
| PTX-166 | 2013.12.00 | Policy for Transcribing of Medicines by Pharmacists, East Cheshire NHS Trust (December 2013) | EAGLEBEN-SLAYBACK-00280222 | EAGLEBEN-SLAYBACK-00280241 | |
| PTX-167 | 2014.00.00 | Prescribing Information for Keytruda® injection and Belrapzo® | EAGLEBEN-SLAYBACK-00280738 | EAGLEBEN-SLAYBACK-00280862 | |
| PTX-168 | 2020 | Robnik et al., A Novel Testing Approach for Oxidative Degradation Dependent Incompatibility of Amine Moiety Containing Drugs with PEGs in Solid-State, 12 Pharmaceutics 37 (2020) | EAGLEBEN-SLAYBACK-00279207 | EAGLEBEN-SLAYBACK-00279227 | |
| PTX-169 | 2009 | Rowe et al., Handbook of Pharmaceutical Excipients (2009) | EAGLEBEN-SLAYBACK-00281004 | EAGLEBEN-SLAYBACK-00281020 | |
| PTX-170 | 2005.00.00 | Scholtz, Jean, M., Antineoplastic Drugs in Remington The Science and Practive of Pharmacy 1556, 1558 (21st ed. 2005) | EAGLEBEN-SLAYBACK-00280970 | EAGLEBEN-SLAYBACK-00281003 | |
| PTX-171 | 2013.00.00 | Scope of Hematology/Oncology Pharmacy Practice (2013) | EAGLEBEN-SLAYBACK-00281021 | EAGLEBEN-SLAYBACK-00281038 | |
| PTX-172 | | Sewell, Stability and compatibility of four cytotoxic drug infusions in the Graseby 9000 ambulatory pump, Journal of Oncology Pharmacy Practice 4(3), 142-149 (1998). | EAGLEBEN-SLAYBACK-00281039 | EAGLEBEN-SLAYBACK-00281046 | |
| PTX-173 | 2020.04.27 | Slip Opinion for *Cephalon, Inc. v. Slayback*, No. 17-1154-CFC | EAGLEBEN-SLAYBACK-00280324 | EAGLEBEN-SLAYBACK-00280393 | P, R, M |
| PTX-174 | 1985 | Stout et al., The Hydrolysis of L-Phenylalanine Mustard (Melphalan), 24 Int'l J. Pharmaceutics 193 (1985) | EAGLEBEN-SLAYBACK-00113207 | EAGLEBEN-SLAYBACK-00113222 | |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-175 | 2020.00.00 | Sundaramurthi et al., Physiochemical Stability of Pembrolizumab Admixture Solution in Normal Saline Intravenous Infusion Bag, 26 J. Onco. Pharm. Pract. 641, 641 (2020) | EAGLEBEN-SLAYBACK-00280732 | EAGLEBEN-SLAYBACK-00280737 | |
| PTX-176 | 2021.06 | Treanda Highlights of Prescribing Information | EAGLEBEN-SLAYBACK-00281047 | EAGLEBEN-SLAYBACK-00281065 | |
| PTX-177 | 2013 | Treanda Highlights of Prescribing Information, 2013 | EAGLEBEN-SLAYBACK-00157933 | EAGLEBEN-SLAYBACK-00157945 | |
| PTX-178 | 2022 | Trissel, Physical and Chemical Stability of Methotrexate, Cytarabine, and Hydrocortisone in Elliott's B Solution for Intrathecal Use, J. Oncol. Pract. 8:27-32 (2002) | EAGLEBEN-SLAYBACK-00281066 | EAGLEBEN-SLAYBACK-00281071 | |
| PTX-179 | 2022 | Turan et al. Solvent Effects on the Menshutkin Reaction, 126 J. Phys. Chem. B  1951 (2022) | EAGLEBEN-SLAYBACK-00281072 | EAGLEBEN-SLAYBACK-00281082 | |
| PTX-180 | 2006.07.20 | U.S. Application No. 2006/0159713, filed by Brittain et al. | EAGLEBEN-SLAYBACK-00075155 | EAGLEBEN-SLAYBACK-00075183 | |
| PTX-181 | 2013.01.01 | U.S. Patent No. 8,344,006, issued to Drager et al. | EAGLEBEN-SLAYBACK-00140030 | EAGLEBEN-SLAYBACK-00140041 | |
| PTX-182 | 2013.12.17 | U.S. Patent No. 8,609,707 | | | |
| PTX-183 | 2007 | Wang et al., Reactions of 11-[Bis(2-chloroethyl)amino]phenyl}acetic Acid (Phenylacetic Acid Mustard) with 2 '-Deoxyribonucleosides, 4 Chemistry & Biodiversity 406 (2007) | EAGLEBEN-SLAYBACK-00279228 | EAGLEBEN-SLAYBACK-00279245 | |
| PTX-184 | 2002 | Waterman et al., Stabilization of Pharmaceuticals to Oxidative Degradation, 7 Pharmaceutical Development & Technology (2002) | EAGLEBEN-SLAYBACK-00279246 | EAGLEBEN-SLAYBACK-00279278 | |
| PTX-185 | 1992 | Williams, A Review of the Stability and Compatibility of Antineoplastic Drugs for Multiple-Drug Infusions, 31 Cancer Chemo. & Pharm. 171-181 (1992) | EAGLEBEN-SLAYBACK-00281083 | EAGLEBEN-SLAYBACK-00281093 | |
| PTX-186 | 2010.04.01 | WO 2010/036702 ("Drager") | EAGLEBEN-SLAYBACK-00019888 | EAGLEBEN-SLAYBACK-00019912 | |
| PTX-187 | | www.epipen.com | | | H, V |
| PTX-188 | | www.gvokeglucagon.com | | | H, V |
| PTX-189 | 1977 | Zimmerman, H. & Zimmerman, Isaak, Elements of Organic Chemistry (1977) | EAGLEBEN-SLAYBACK-00279279 | EAGLEBEN-SLAYBACK-00279286 | |
| PTX-190 | 2021.12.06 | Slayback Responses and Objections to Plaintiff's First Set of Interrogatories | | | AT, C, R |
| PTX-191 | 2021.12.06 | Slayback's Responses and Objections to Plaintiff's First Set of Requests for Production | | | AT, C, R |
| PTX-192 | 2021.12.06 | Apotex Responses to First Set of Interrogatories (Nos. 1-12) | | | AT, C, R |
| PTX-193 | 2021.12.06 | Apotex's Objections and Responses to Plaintiff's First Set of Requests for Production (Nos. 1-104) | | | AT, C, R |
| PTX-194 | 2022.03.16 | Plaintiff's Notice of Rule 30(b)(6) Deposition of Apotex Inc. and Apotex Corp. | | | AT, C, R |
| PTX-195 | 2022.03.16 | Plaintiff's Notice of Rule 30(b)(6) Deposition of Slayback Pharma LLC | | | AT, C, R |
| PTX-196 | 2022.03.30 | Apotex's Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories (1-12) | | | AT, C, R |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-197 | 2022.04.01 | Slayback Pharma LLC's First Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (1-12) | | | AT, C, R |
| PTX-198 | 2022.04.04 | Defendant Slayback Pharma LLC's Responses and Objections to Plaintiff's Notice of Rule 30(b)(6) Deposition | | | AT, C, R |
| PTX-199 | 2022.04.13 | Apotex's Response to Plaintiff's Second Set of Interrogatories (Nos. 13-16) | | | AT, C, R |
| PTX-200 | 2022.04.13 | Slayback's Response and Objection to Plaintiff's Second Set of Interrogatories (Nos. 13-16) | | | AT, C, R |
| PTX-201 | 2022.04.13 | Apotex Inc and Apotex Corp's Objections and Responses to Plaintiffs' First Set of Requests for Admission (1-19) | | | AT, C, R |
| PTX-202 | 2022.04.13 | Slayback's Responses and Objections to Plaintiff's First set of Requests for Admission (1-19) | | | AT, C, R |
| PTX-203 | 2022.05.13 | Defendant Slayback Pharma LLC's Second Supplemental Responses and Objections to Plaintiff's First Set of Interrogatories (1-12) | | | AT, C, R |
| PTX-204 | 2022.05.13 | Apotex's Second Supplemental Response to Plaintiff's First Set of Interrogatories (Nos. 1-16) | | | AT, C, R |
| PTX-205 | 2022.05.13 | Slayback's First Supplemental Responses to Plaintiff's Second Set of Interrogatories | | | AT, C, R |
| PTX-206 | | Handwritten notes: A Stable Nonaqueous Liquid Pharmaceutical Formulation, Containing Only the Following Ingredients | | | BS, H, In, LF, M, P, R, S |
| PTX-207 | 2002.11.00 | Akers, Excipient - Drug Interactions in Parental Formulations, J. Pharm. Scis. Vol. 91, 2283-2300 (2002_ | JDG-BELRAP0000057 | JDG-BELRAP0000074 | |
| PTX-208 | | Blank note paper | | | In, M, P, R, S |
| PTX-209 | 1999.00.00 | Kamat et al., Nicotinamide (Vitamin B3) as an Effective Antioxidant Against Oxidative Damage in Rat Brain Mitochondria, Vol. 4:4, 179-184 (1999) | JDG-BELRAP0000239 | JDG-BELRAP0000245 | |
| PTX-210 | | CFR - Code of Federal Regulations Title 21 | | | BS, H, In, LF, M, P, R, S |
| PTX-211 | 2022.05.12 | Beginner's Guide to Pre-IND Meetings | | | BS, H, In, LF, M, P, R, S |
| PTX-212 | 1991.07.00 | CPG Sec. 120.100 Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities | | | BS, H, In, LF, M, P, R, S |
| PTX-213 | 2022.01.13 | U.S. Patent Publication No. US 2022/00008337 ("Du Bewar") | | | BS, LF, M, P, R, S |
| PTX-214 | 2021.03.00 | MyoBloc Highlights of Prescribing Infromation | | | BS, LF, M, P, R, S |
| PTX-215 | 2017.09.00 | CSL Behring 1.14.1.3 Drafting Labeling Text, Immune Globulin Intravenous (Human), 10% Liquid,Privigen | | | BS, LF, M, P, R, S |
| PTX-216 | 2015.01.00 | Center for Drug Evaluation and Research, App'n No. 209604Orig1s00 | | | BS, LF, M, P, R, S |
| PTX-217 | 2011.04.26 | Center for Drug Evaluation and Research, App'n No. 201525Orig1s000 | | | BS, LF, M, P, R, S |
| PTX-218 | 2021.01.00 | Docetaxel Injection Highlights of Prescribing Information | | | BS, LF, M, P, R, S |
| PTX-219 | 2010.00.00 | Levact 25 mg powder for concentrate for solution for infusion, Levact 100 mg powder for concentrate for sulution for infusion package leaflet | | | BS, LF, M, P, R, S |
| PTX-220 | 2022.08.22 | Ready-To-Use Solution of Bortezomib | | | BS, LF, M, P, R, S |
| PTX-221 | 2017.08.00 | Gemcitabine Injection Highlights of Prescribing Information | EAGLEBEN-SLAYBACK-00281094 | EAGLEBEN-SLAYBACK-00281121 | BS, LF, M, P, R, S |

*EAGLE PHARMACEUTICALS, INC. v. SLAYBACK PHARMA LLC, APOTEX INC. APOTEX CORP.*
*No. 21-1256-CFC-JLH (D.. Del.)*
**PLAINTIFF'S EXHIBIT LIST**

| EXHIBIT NO. | DATE | DESCRIPTION | BEG BATES | END BATES | OBJECTIONS |
|---|---|---|---|---|---|
| PTX-222 | 2015.07.22 | EP 3 120 837 ("Schridde") | EAGLEBEN-SLAYBACK-00281122 | EAGLEBEN-SLAYBACK-00281133 | BS, LF, M, P, R, S |
| PTX-223 | 2015.07.22 | EP 3 120 837 ("Schridde") translation | EAGLEBEN-SLAYBACK-00281134 | EAGLEBEN-SLAYBACK-00281156 | BS, LF, M, P, R, S |
| PTX-224 | 2009.05.00 | Guidance for Industry, Formal Meetings Between the FDA and Sponsors or Applicants | EAGLEBEN-SLAYBACK-00281157 | EAGLEBEN-SLAYBACK-00281170 | BS, LF, M, P, R, S |

# EXHIBIT 4B

**EXHIBIT 4B**

**DEFENDANTS' EXHIBIT LIST**

| Exhibit No. | Date | Description | BeginBates | EndBates | Objections | Admitted |
|---|---|---|---|---|---|---|
| DTX-1 | | U S  Patent No  11,103,483 issued to N  Palepu et al | EAGLEBEN-SLAYBACK-00010375 | EAGLEBEN-SLAYBACK-00010386 | | |
| DTX-2 | | File History for U S  Patent No  11,103,483 issued to N  Palepu et al | EAGLEBEN-SLAYBACK-00265008 | EAGLEBEN-SLAYBACK-00272591 | | |
| DTX-3 | 1/12/2006 | United States Patent Application Publication No  2006/0159713 (filed January 12, 2006) (published July 20, 2006) ("Brittain 2006") | JDG-BELRAP0000075 | JDG-BELRAP0000103 | 402, 403, 602, 802 | |
| DTX-4 | 9/23/2009 | WO 2010/036702 (filed September 23, 2009) (published April 1, 2010) ("Drager") | JDG-BELRAP0000134 | JDG-BELRAP0000161 | 402, 403, 602, 802 | |
| DTX-5 | Sep-04 | DEP'T OF HEALTH AND HUMAN SERVS , CTRS  FOR DISEASE CONTROL AND PREVENTION, NAT'L INST  FOR OCCUPATIONAL SAFETY AND HEALTH, Preventing Occupational Exposures to Antineoplastic and Other Hazardous Drugs in Health Care Settings (Sept  2004), https://www cdc gov/niosh/docs/2004-165/pdfs/2004- 165 pdf?id=10 26616/NIOSHPUB2004165 ("NIOSH Guidelines") | | | 402, 403, 602, 802 | |
| DTX-6 | 6/1/1981 | German Democratic Republic Patent No  159289 (filed June 1, 1981) (issued March 2, 1983) (with translation from German to English) ("Olthoff") | JDG-BELRAP0000266 | JDG-BELRAP0000284 | 402, 403, 602, 802 | |
| DTX-7 | 1/29/1986 | U S  DEP'T OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMIN , Guidelines for Cytotoxic (Antineoplastic) Drugs, (Jan  29, 1986), https://www osha gov/enforcement/directives/std-01- 23-001 ("OSHA Guidelines") | | | 402, 403, 602, 802 | |
| DTX-8 | | Luci A  Power & Martha Polovich, Safe Handling of Hazardous Drugs: Reviewing Standards for Worker Protection 2 CLIN  ONCOLOGY NEWS 93 (2009), https://www clinicaloncology com/download/093Safe_handling_clinoncse1209_WM pdf ("Power") | | | 402, 403, 602, 802 | |
| DTX-9 | 6/27/1905 | Parenteral Preparations, in 21 REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY, 802 (Beringer et al , eds , 2005) ("Remington") | | | 106, 402, 403, 602, 802 | |
| DTX-10 | 9/1/2021 | Pharmaceutical Compounding—Sterile Preparations, in U S  PHARMACOPEIA (rev  Sept  1, 2021), https://go usp org/l/323321/2021-08- 31/5kmjww/323321/16304645801icecobH/797_PHARMACEUTICAL_COMPOUNDING_S TERILE_PREPARATIONS_POST_Revised pdf ("USP ") | | | 106, 402, 403, 602, 802 | |
| DTX-11 | 7/9/1905 | Hazardous Drugs—Handling in Healthcare Settings, in U S  PHARMACOPEIA (rev  2017), https://www usp org/sites/default/files/usp/document/our-work/healthcare-quality safety/general-chapter- 800 pdf ("USP ") | | | 106, 402, 403, 602, 802 | |
| DTX-12 | | BELRAPZO® Prescribing Information | EAGLEBEN SLAYBACK-00050294 | EAGLEBEN SLAYBACK-00050315 | 402, 403, 602, 802 | |
| DTX-13 | | BENDEKA® Prescribing Information | EAGLEBEN SLAYBACK-00052446 | EAGLEBEN SLAYBACK-00052473 | 402, 403, 602, 802 | |
| DTX-14 | | TREANDA® Prescribing Information | JDG-BELRAP0000001 | JDG-BELRAP0000006 | 402, 403, 602, 802 | |
| DTX-15 | | | SLAY-BEL0007976 | SLAY-BEL0008000 | 402, 403, 602, 802 | |
| DTX-16 | | | APO-BENDA_0000040 | APO-BENDA_0000043 | 106, 402, 403, 602, 802 | |
| DTX-17 | | | APO-BENDA_0000005 | APO-BENDA_000006 | 402, 403, 602, 802 | |
| DTX-18 | | | APO-BENDA_0000028 | | 402, 403, 602, 802 | |
| DTX-19 | | Apotex's Prescribing Information | APO-BENDA_0000087; APO-BENDA_0000195 | APO-BENDA_0000107; APO-BENDA_0000224 | 402, 403, 602, 802 | |
| DTX-20 | | | APO-BENDA_00005821 | APO-BENDA_00005827 | 106, 402, 403, 602, 802 | |
| DTX-21 | 1/28/2010 | U S  Provisional Appl  No  61/299,100 (filed on January 28, 2010) | | | 106, 402, 403, 602, 802 | |
| DTX-22 | 2008 | Agalloco, J , and James Akers  "Sterile Product Manufacturing " Section 2 1, In Pharmaceutical Manufacturing Handbook: Production and Processes, Gad, S C , Ed , Wiley-Interscience, Hoboken, NJ, 2008, pp  99–134 | JDG-BELRAP0000011 | JDG-BELRAP0000056 | 106, 402, 403, 602, 802 | |
| DTX-23 | Nov-02 | Akers, Michael J  "Excipient–Drug Interactions in Parenteral Formulations " Journal of Pharmaceutical Sciences, vol  91, no  11, Nov  2002, pp  2283–2300 | JDG-BELRAP0000057 | JDG-BELRAP0000074 | 402, 403, 602, 802 | |
| DTX-24 | 2001 | Broadhead, Joanne  "Parenteral Dosage Forms " Pharmaceutical Preformulation and Formulation: A Practical Guide from Candidate Drug Selection to Commercial Dosage Form, edited by Mark Gibson, Interpharm/CRC Press, Boca Raton, Florida, 2001, pp  331–354 | JDG-BELRAP0000104 | JDG-BELRAP0000133 | 106, 402, 403, 602, 802 | |
| DTX-25 | 1976 | Carstensen J T  and Nelson E , "Terminology Regarding Labeled and Contained Amounts in Dosage Forms," J  Pharm  Sci , 1976, 65(2), 311- 312 | JDG-BELRAP0000688 | JDG-BELRAP0000689 | 402, 403, 602, 802 | |
| DTX-26 | 1994 | Etherington, W G , et al  "Reproductive Performance of Dairy Cows Following Treatment with Fenprostalene, Dinoprost, or Cloprostenol between 24 and 31 Days Post Partum: A Field Trial " Theriogenology, vol  42, no  5, 1994, pp  739–752 | JDG-BELRAP0000189 | JDG-BELRAP0000202 | 402, 403, 602, 802 | |
| DTX-27 | 2008 | European Medicine Agency, Scientific Discussion in Approval of Onsior, published Dec  2008 (available at https://www ema europa eu/en/documents/scientific-discussion/onsior epar-scientific-discussion_en pdf) | JDG-BELRAP0000162 | JDG-BELRAP0000188 | 402, 403, 602, 802 | |
| DTX-28 | 2003 | FDA GFI Q1A(R2) Stability Testing of New Drug Substances and Products, FDA GFI Q1A(R2) Stability Testing of New Drug Substances and Products, November 2003 | JDG-BELRAP0000711 | JDG-BELRAP0000735 | 402, 403, 602, 802 | |
| DTX-29 | Jun-04 | Guidance for Industry Q1E Evaluation of Stability Data, U S  Department of Health and Human Services, Food and Drug Administration, June 2004 | JDG-BELRAP0000690 | JDG-BELRAP0000710 | 402, 403, 602, 802 | |

EXHIBIT 48

DEFENDANTS' EXHIBIT LIST

| | | | | | | |
|---|---|---|---|---|---|---|
| DTX-30 | 2006 | Harmon, Paul A , et al "A Novel Peroxy Radical Based Oxidative Stressing System for Ranking the Oxidizability of Drug Substances " Journal of Pharmaceutical Sciences, vol 95, no 9, 2006, pp 2014–2028 | JDG-BELRAP0000203 | JDG-BELRAP0000217 | 402, 403, 602, 802 | |
| DTX-31 | 2001 | Hovorka, Susan W , and Christian Schöneich "Oxidative Degradation of Pharmaceuticals: Theory, Mechanisms and Inhibition " Journal of Pharmaceutical Sciences, vol 90, no 3, 2001, pp 253–269 | JDG-BELRAP0000218 | JDG-BELRAP0000234 | 402, 403, 602, 802 | |
| DTX-32 | 1984 | Johnson, David M , and William F Taylor "Degradation of Fenprostalene in Polyethylene Glycol 400 Solution " Journal of Pharmaceutical Sciences, vol 73, no 10, 1984, pp 1414–1417 | JDG-BELRAP0000235 | JDG-BELRAP0000238 | 402, 403, 602, 802 | |
| DTX-33 | 1999 | Kamat, J P , and T P A Devasagayam "Nicotinamide (Vitamin B3) as an Effective Antioxidant against Oxidative Damage in Rat Brain Mitochondria " Redox Report, vol 4, no 4, 1999, pp 179–184 | JDG-BELRAP0000239 | JDG-BELRAP0000245 | 402, 403, 602, 802 | |
| DTX-34 | 1996 | Maurin, Michael B , et al "Physicochemical Properties of a Nonpeptide Cyclic Urea HIV Protease Inhibitor (DMP 323) " International Journal of Pharmaceutics, vol 144, no 1, 1996, pp 99–106 | JDG-BELRAP0000246 | JDG-BELRAP0000253 | 402, 403, 602, 802 | |
| DTX-35 | 2002 | Moini et al , Antioxidant and Prooxidant Activities of α-Lipoic Acid and Dihydrolipoic Acid, Toxicol Appl Pharmacol , 2002, 182, 84-90 | JDG-BELRAP0000736 | JDG-BELRAP0000742 | 402, 403, 602, 802 | |
| DTX-36 | 1997 | Nema, Sandeep, et al "Excipients and Their Use in Injectable Products " Journal of Pharmaceutical Science & Technology, vol 51, no 4, 1997, pp 166–171 | JDG-BELRAP0000254 | JDG-BELRAP0000259 | 402, 403, 602, 802 | |
| DTX-37 | 2002 | Ogata, Shin, et al "Radical Scavenging Activities of Niacin-Related Compounds " Bioscience, Biotechnology, and Biochemistry, vol 66, no 3, 2002, pp 641–645 | JDG-BELRAP0000260 | JDG-BELRAP0000265 | 402, 403, 602, 802 | |
| DTX-38 | 2005 | Rasmussen, H T , et al "HPLC Method Development " Chapter 6, In Handbook of Pharmaceutical Analysis by HPLC, Ahuja, S , and Michael Dong, Eds , vol 6, Elsevier, London, UK, 2005, pp 145–190 | JDG-BELRAP0000285 | JDG-BELRAP0000335 | 402, 403, 602, 802 | |
| DTX-39 | 2000 | Bailey L C , "Chromatography," Chapter 33, In Remington, The Science and Practice of Pharmacy, Gennaro, A R , Ed , Lippincott Williams & Wilkins, Baltimore, MD 2000 | JDG-BELRAP0000339 | JDG-BELRAP0000365 | 106, 402, 403, 602, 802 | |
| DTX-40 | 2000 | Nairn J G , "Solutions, Emulsions, Suspensions, and Extracts," Chapter 39, In Remington, The Science and Practice of Pharmacy, Gennaro, A R , Ed , Lippincott Williams & Wilkins, Baltimore, MD 2000 | JDG-BELRAP0000366 | JDG-BELRAP0000399 | 402, 403, 602, 802 | |
| DTX-41 | 2000 | Vadas, E B , "Stability of Pharmaceutical Products," Chapter 52, In Remington, The Science and Practice of Pharmacy, Gennaro, A R , Ed , Lippincott Williams & Wilkins, Baltimore, MD 2000 | JDG-BELRAP0000400 | JDG-BELRAP0000411 | 402, 403, 602, 802 | |
| DTX-42 | 2009 | Wallick, D , "Polyethylene Glycol " Handbook of Pharmaceutical Excipients, edited by Richard C Rowe, Paul J Sheskey, and Marian E Quinn, Pharmaceutical Press, Grayslake, Illinois, 2009, pp 517–522 | JDG-BELRAP0000412 | JDG-BELRAP0000422 | 402, 403, 602, 802 | |
| DTX-43 | 2008 | Santoro, Maria I R M , and Ann Kumst Singh "Packaging and Labeling " Section 3 2, In Pharmaceutical Manufacturing Handbook: Production and Processes, Gad, S C , Ed , Wiley-Interscience, Hoboken, NJ, 2008, pp 159–232 | JDG-BELRAP0000423 | JDG-BELRAP0000472 | 402, 403, 602, 802 | |
| DTX-44 | 1946 | Stahmann, Mark A , and Max Bergmann "Chemical Reactions of the Nitrogen Mustard Gases 1 VIII the Oxidation of the Nitrogen Mustard Gases by Peracids " The Journal of Organic Chemistry, vol 11, no 5, 1946, pp 586–591 | JDG-BELRAP0000505 | JDG-BELRAP0000510 | 402, 403, 602, 802 | |
| DTX-45 | 2001 | Steele, G , "Preformulation as an Aid to Product Design in Early Drug Development," Chapter 6, In Pharmaceutical Preformulation and Formulation, Gibson, M , Ed , CRC Press, Boca Raton, FL 2001 | JDG-BELRAP0000511 | JDG-BELRAP0000574 | 106, 402, 403, 602, 802 | |
| DTX-46 | Mar-08 | TREANDA® (bendamustine hydrochloride) for Injection, for intravenous infusion, Prescribing Information, Revised 03/2008 | JDG_BELRAP0000001 | JDG_BELRAP0000006 | 402, 403, 602, 802 | |
| DTX-47 | 2006 | United States Patent Application Publication No 2006/0205694 (filed March 7, 2006) (published September 14, 2006) | JDG-BELRAP0000575 | JDG-BELRAP0000595 | 402, 403, 602, 802 | |
| DTX-48 | 11/7/1989 | United States Patent No 4,879,286 (filed April 4, 1988) (issued November 7, 1989) | JDG-BELRAP0000596 | JDG-BELRAP0000599 | 402, 403, 602, 802 | |
| DTX-49 | 3/5/1991 | United States Patent No 4,997,823 (filed July 20, 1987) (issued March 5, 1991) | JDG-BELRAP0000600 | JDG-BELRAP0000605 | 402, 403, 602, 802 | |
| DTX-50 | 1/1/2013 | United States Patent No 8,344,006 (filed January 31, 2012) (issued January 1, 2013) | JDG-BELRAP0000606 | JDG-BELRAP0000617 | 402, 403, 602, 802 | |
| DTX-51 | 2009 | "Polyethylene Glycol " United States Pharmacopea and the National Formulary, USP 32/NF 27, The United States Pharmacopeial Convention, Rockville, Maryland, 2009, pp 1308–1310 | JDG_BELRAP0000007 | JDG_BELRAP0000010 | 106, 402, 403, 602, 802 | |
| DTX-52 | 1973 | Van Scott, Eugene J , and Jacob D Kalmanson "Complete Remissions of Mycosis Fungoides Lymphoma Induced by Topical Nitrogen Mustard (HN2) Control of Delayed Hypersensitivity to HN2 by Desensitization and by Induction of Specific Immunologic Tolerance " Cancer, vol 32, no 1, 1973, pp 18–30 | JDG-BELRAP0000618 | JDG-BELRAP0000630 | 402, 403, 602, 802 | |
| DTX-53 | 1991 | Varia, Sailesh A , et al "Optimization of Cosolvent Concentration and Excipient Composition in a Topical Corticosteroid Solution " Journal of Pharmaceutical Sciences, vol 80, no 9, 1991, pp 872–875 | JDG-BELRAP0000631 | JDG-BELRAP0000634 | 402, 403, 602, 802 | |
| DTX-54 | 2008 | Wayne Bequette, B , From Pilot Plant to Manufacturing: Effect of Scale-Up on Operation of Jacketed Reactors, Chapter 3, In Pharmaceutical Manufacturing Handbook, Production and Processes, 2008, Wiley-Interscience | JDG_BELRAP0000743 | JDG_BELRAP0000843 | 402, 403, 602, 802 | |
| DTX-55 | 2007 | Wasylaschuk, Walter R , et al "Evaluation of Hydroperoxides in Common Pharmaceutical Excipients " Journal of Pharmaceutical Sciences, vol 96, no 1, 2007, pp 106–116 | JDG-BELRAP0000635 | JDG-BELRAP0000645 | 402, 403, 602, 802 | |
| DTX-56 | 2002 | Waterman, Kenneth C , et al "Stabilization of Pharmaceuticals to Oxidative Degradation " Pharmaceutical Development and Technology, vol 7, no 1, 2002, pp 1–32 | JDG-BELRAP0000646 | JDG-BELRAP0000678 | 402, 403, 602, 802 | |

EXHIBIT 49

DEFENDANTS' EXHIBIT LIST

| DTX | Date | Description | Begin Bates | End Bates | Objections | |
|---|---|---|---|---|---|---|
| DTX-57 | 2008 | Waterman, Kenneth C , et al  "N-Methylation and n-Formylation of a Secondary Amine Drug (Varenicline) in an Osmotic Tablet " Journal of Pharmaceutical Sciences, vol  97, no  4, 2008, pp  1499–1507 | JDG-BELRAP0000679 | JDG-BELRAP0000687 | 402, 403, 602, 802 | |
| DTX-58 | | FDA Orange Book, Product and Exclusivity for Product 003 BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 45MG/0 5ML (90MG/ML) (available at: https://www accessdata fda gov/scripts/cder/ob/patent_info cfm?Product_No=003&Appl_No=022249&Appl_type=N) | | | 402, 403, 602, 802, 901 | |
| DTX-59 | | FDA Orange Book, Product and Exclusivity for Product 004 BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 180MG/2ML (90MG/ML) (available at: https://www accessdata fda gov/scripts/cder/ob/patent_info cfm?Product_No=004&Appl_No=022249&Appl_type=N) | | | 402, 403, 602, 802, 901 | |
| DTX-60 | | Defendant's Notice of Deposition Under Fed  R  Civ  P  30(b)(6) to Eagle Pharmaceuticals, Inc | | | 402, 403, 602, 802 | |
| DTX-61 | | Plaintiff's Responses and Objections to Defendants' Notice of Rule 30(b)(6) Deposition of Plaintiff | | | 402, 403, 602, 802 | |
| DTX-62 | | LinkedIn Profile for Daniel O'Connor | | | 402, 403, 602, 802, 901 | |
| DTX-63 | | Belrapzo Packaging | EAGLEBEN-SLAYBACK-00249750 | | 402, 403, 602, 802 | |
| DTX-64 | Nov-21 | Belrapzo Prescribing Information, Rev  11/2021 | EAGLEBEN-SLAYBACK-00249755 | EAGLEBEN-SLAYBACK-00249756 | 402, 403, 602, 802 | |
| DTX-65 | 12/22/2020 | Belrapzo Adhesive Label, 12/22/20 | EAGLEBEN-SLAYBACK-00249889 | | 402, 403, 602, 802 | |
| DTX-66 | 3/5/2014 | Letter from Foma Rashkovsky to Dr  Gayatri Rao, Office of Orphan Drug Products Development, Food and Drug Aministration and Application for Orphan Designation | EAGLEBEN-SLAYBACK-00162272 | EAGLEBEN-SLAYBACK-00162551 | 402, 403, 602, 802 | |
| DTX-67 | 7/12/2012 | Eagle Pharmaceuticals, Inc  Board of Directors Meeting Agenda | EAGLEBEN-SLAYBACK-00144323 | EAGLEBEN-SLAYBACK-0144468 | 402, 403, 602, 802 | |
| DTX-68 | 6/3/2022 | Curriculum Vitae of Dr  Laird Forrest, Ph D , Rev  03-June-2022 | | | 402, 403, 602, 802 | |
| DTX-69 | 12/2/2019 | Curriculum Vitae of Dr  Laird Forrest, Ph D , Rev  02-Dec-2019 | | | 402, 403, 602, 802 | |
| DTX-70 | Apr-22 | Curriculum Vitae of Dr  Edmund J. Elder, Ph d, R Ph, Rev  April 2022 | | | 402, 403, 602, 802 | |
| DTX-71 | May 2021 | ██████████████████ | APO-BENDA_0000296 | APO-BENDA_000751 | 106, 402, 403, 602, 802 | |
| DTX-72 | | ██████████████████ | APO-BENDA_0009501 | APO-BENDA_0009506 | 402, 403, 602, 802 | |
| DTX-73 | 1/30/2020 | ██████████████████ | APO-BENDA_0002753 | APO-BENDA_0002855 | 402, 403, 602, 802 | |
| DTX-74 | 7/31/2020 | ██████████████████ | APO-BENDA_00002856 | APO-BENDA_0002931 | 402, 403, 602, 802 | |
| DTX-75 | May 2021 | ██████████████████ | APO-BENDA_0002165 | APO-BENDA_0002167 | 106, 402, 403, 602, 802 | |
| DTX-76 | December 2021 | ██████████████████ | APO-BENDA_0006490 | APO-BENDA_0006508 | 106, 402, 403, 602, 802 | |
| DTX-77 | 12/21/2021 | ██████████████████ | APO-BENDA_0006395 | APO-BENDA_0006402 | 402, 403, 602, 802 | |
| DTX-78 | 8/12/2020 | ██████████████████ | APO-BENDA_0000007 | APO-BENDA_0000023 | 402, 403, 602, 802 | |
| DTX-79 | | ██████████████████ | APO-BENDA_0000195 | APO-BENDA_0000224 | 106, 402, 403, 602, 802 | |
| DTX-80 | 8/12/2020 | ██████████████████ | APO-BENDA_0000005 | APO-BENDA_0000006 | 402, 403, 602, 802 | |
| DTX-81 | 8/12/2020 | ██████████████████ | APO-BENDA_0000002 | APO-BENDA_0000004 | 106, 402, 403, 602, 802 | |
| DTX-82 | 6/8/2021 | ██████████████████ | APO-BENDA_0000249 | APO-BENDA_0000252 | 402, 403, 602, 802 | |
| DTX-83 | | ██████████████████ | APO-BENDA_0006419 | APO-BENDA_0006420 | 106, 402, 403, 602, 802 | |
| DTX-84 | December 2021 | ██████████████████ | APO-BENDA_0006490 | APO-BENDA_0006508 | 106, 402, 403, 602, 802 | |
| DTX-85 | 7/28/2021 | ██████████████████ | APO-BENDA_0007357 | APO-BENDA_0007359 | 402, 403, 602, 802 | |
| DTX-86 | 8/27/21 | ██████████████████ | APO-BENDA_0005821 | APO-BENDA_0005828 | 402, 403, 602, 802 | |
| DTX-87 | | ██████████████████ | APO-BENDA_0006629 | APO-BENDA_0006650 | 402, 403, 602, 802 | |
| DTX-88 | | ██████████████████ | APO-BENDA_0000195 | APO-BENDA_0000224 | 402, 403, 602, 802 | |
| DTX-89 | | ██████████████████ | APO-BENDA_0000052 | APO-BENDA_0000061 | 106, 402, 403, 602, 802 | |
| DTX-90 | | ██████████████████ | APO-BENDA_0000065 | APO-BENDA_0000075 | 106, 402, 403, 602, 802 | |
| DTX-91 | | ██████████████████ | APO-BENDA_0000296 | APO-BENDA_0000689 | 106, 402, 403, 602, 802 | |
| DTX-92 | | ██████████████████ | APO-BENDA_0000694 | APO-BENDA_0000806 | 402, 403, 602, 802 | |
| DTX-93 | | ██████████████████ | APO-BENDA_0000691 | APO-BENDA_0000693 | 106, 402, 403, 602, 802 | |
| DTX-94 | May-21 | ██████████████████ | APO-BENDA_0002932 | APO-BENDA_0002938 | 106, 402, 403, 602, 802 | |
| DTX-95 | May-21 | ██████████████████ | APO-BENDA_0002997 | APO-BENDA_0002998 | 106, 402, 403, 602, 802 | |

EXHIBIT 48

DEFENDANTS' EXHIBIT LIST

| | | | | | |
|---|---|---|---|---|---|
| DTX-96 | | | APO-BENDA_0003472 | APO-BENDA_0003487 | 106, 402, 403, 602, 802 |
| DTX-97 | | | APO-BENDA_0005244 | APO-BENDA_0005259 | 106, 402, 403, 602, 802 |
| DTX-98 | Aug-21 | | APO-BENDA_0005681 | APO-BENDA_0005702 | 402, 403, 602, 802 |
| DTX-99 | Nov-21 | | APO-BENDA_0006180 | APO-BENDA_0006202 | 402, 403, 602, 802 |
| DTX-100 | 12/13/2021 | | APO-BENDA_0006319 | APO-BENDA_0006323 | 106, 402, 403, 602, 802 |
| DTX-101 | | | APO-BENDA_0006555 | | 402, 403, 602, 802 |
| DTX-102 | | | APO-BENDA_0006556 | APO-BENDA_0006564 | 402, 403, 602, 802 |
| DTX-103 | | | APO-BENDA_0006604 | APO-BENDA_0006672 | 402, 403, 602, 802 |
| DTX-104 | | | APO-BENDA_0006754 | APO-BENDA_0006764 | 402, 403, 602, 802 |
| DTX-105 | | | APO-BENDA_0007401 | | 106, 402, 403, 602, 802 |
| DTX-106 | 4/8/2022 | | APO-BENDA_0011581 | APO-BENDA_0011608 | 402, 403, 602, 802 |
| DTX-107 | 5/27/2020 | 2020 05 27 Non Final Office Action (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00271044 | EAGLEBEN_SLAYBACK-00271075 | 106, 402, 403, 602, 802 |
| DTX-108 | 11/25/2020 | 2020 11 25 Amendment (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00271708 | EAGLEBEN_SLAYBACK-00271718 | 106, 402, 403, 602, 802 |
| DTX-109 | 12/21/2020 | 2020 12 21 Final Rejection (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00271719 | EAGLEBEN_SLAYBACK-00271754 | 106, 402, 403, 602, 802 |
| DTX-110 | 3/16/2021 | 2021 03 16 Examiner Interview Summary (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00271815 | EAGLEBEN_SLAYBACK-00271817 | 106, 402, 403, 602, 802 |
| DTX-111 | 5/20/2021 | 2021 05 20 Response After Final Action (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00271857 | EAGLEBEN_SLAYBACK-00271869 | 106, 402, 403, 602, 802 |
| DTX-112 | 6/2/2021 | 2021 06 02 Advisory Action (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00272475 | EAGLEBEN_SLAYBACK-00272478 | 106, 402, 403, 602, 802 |
| DTX-113 | 6/2/2021 | 2021 06 02 Amendment After Final Action (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00272479 | EAGLEBEN_SLAYBACK-00272484 | 106, 402, 403, 602, 802 |
| DTX-114 | 6/2/2021 | 2021 06 11 Electronic Request for Interview with Examiner (Excerpt - File History for U S Patent No 11,10 | EAGLEBEN_SLAYBACK-00272490 | EAGLEBEN_SLAYBACK-00272490 | 106, 402, 403, 602, 802 |
| DTX-115 | 6/11/2021 | 2021 06 11 Request for Continued Examination (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00272480 | EAGLEBEN_SLAYBACK-00272484 | 106, 402, 403, 602, 802 |
| DTX-116 | 7/12/2021 | 2021 07 12 Terminal Disclaimer (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00272492 | EAGLEBEN_SLAYBACK-00272494 | 106, 402, 403, 602, 802 |
| DTX-117 | 7/16/2021 | 2021 07 16 Examiner Interview Summary (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00272500 | EAGLEBEN_SLAYBACK-00272503 | 106, 402, 403, 602, 802 |
| DTX-118 | 8/4/2021 | 2021 08 04 Notice of Allowance (Excerpt - File History for U S Patent No 11,103,483) | EAGLEBEN_SLAYBACK-00272570 | EAGLEBEN_SLAYBACK-00272574 | 106, 402, 403, 602, 802 |
| DTX-119 | 8/26/2022 | | SLAY-BEL0034520 | SLAY-BEL0034546 | 402, 403, 602, 802 |

# EXHIBIT 4C

EXHIBIT 4C
JOINT TRIAL EXHIBIT LIST

| Exhibit No. | Date | Description | BeginBates | EndBates | Objections | Admitted |
|---|---|---|---|---|---|---|
| JTX-1 | 8/31/2021 | U.S. Patent No. 11,103,483 issued to N. Palepu et al. | EAGLEBEN-SLAYBACK-00010375 | EAGLEBEN-SLAYBACK-00010386 | | |
| JTX-2 | | File History for U.S. Patent No. 11,103,483 issued to N. Palepu et al. | EAGLEBEN-SLAYBACK-00265008 | EAGLEBEN-SLAYBACK-00272591 | | |
| JTX-3 | 11/2020 | Belrapzo Highlights of Prescribing Information, 11/2020 | EAGLEBEN-SLAYBACK-00050294 | EAGLEBEN-SLAYBACK-00050315 | | |
| JTX-4 | 01/2021 | BENDEKA® Prescribing Information | EAGLEBEN-SLAYBACK-00052446 | EAGLEBEN- SLAYBACK-00052473 | | |
| JTX-5 | 5/27/2020 | 2020.05.27 Non Final Office Action (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00271044 | EAGLEBEN SLAYBACK-00271075 | | |
| JTX-6 | 11/25/2020 | 2020.11.25 Amendment (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00271708 | EAGLEBEN SLAYBACK-00271718 | | |
| JTX-7 | 12/21/2020 | 2020.12.21 Final Rejection (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00271719 | EAGLEBEN SLAYBACK-00271754 | | |
| JTX-8 | 3/16/2021 | 2021.03.16 Examiner Interview Summary (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00271815 | EAGLEBEN SLAYBACK-00271817 | | |
| JTX-9 | 5/20/2021 | 2021.05.20 Response After Final Action (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00271857 | EAGLEBEN SLAYBACK-00271869 | | |
| JTX-10 | 6/2/2021 | 2021.06.02 Advisory Action (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00272475 | EAGLEBEN SLAYBACK-00272478 | | |
| JTX-11 | 6/2/2021 | 2021.06.02 Amendment After Final Action (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00272479 | EAGLEBEN SLAYBACK-00272484 | | |
| JTX-12 | 6/2/2021 | 2021.06.11 Electronic Request for Interview with Examiner (Excerpt - File History for U.S. Patent No. 11,103 | EAGLEBEN SLAYBACK-00272490 | EAGLEBEN SLAYBACK-00272490 | | |
| JTX-13 | 6/11/2021 | 2021.06.11 Request for Continued Examination (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00272480 | EAGLEBEN SLAYBACK-00272484 | | |
| JTX-14 | 7/12/2021 | 2021.07.12 Terminal Disclaimer (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00272492 | EAGLEBEN SLAYBACK-00272494 | | |
| JTX-15 | 7/16/2021 | 2021.07.16 Examiner Interview Summary (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00272500 | EAGLEBEN SLAYBACK-00272503 | | |
| JTX-16 | 8/4/2021 | 2021.08.04 Notice of Allowance (Excerpt - File History for U.S. Patent No. 11,103,483) | EAGLEBEN SLAYBACK-00272570 | EAGLEBEN SLAYBACK-00272574 | | |

# EXHIBIT 5A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br>APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH |

## EXHIBIT 5A
## PLAINTIFF'S WITNESS LIST

Exhibit 5A
Plaintiff's Witness List

## **PLAINTIFFS' WITNESS LIST**

Plaintiff may call the following witnesses to testify in their case-in-chief or in rebuttal to Defendants' case-in-chief, either in person or by deposition. Some of the witnesses listed below are outside of Plaintiff's control and, to Plaintiff's understanding, outside the subpoena power of the Court. If a witness designated as appearing live is unable to appear, Plaintiff reserves the right to designate deposition testimony for such witnesses.

Plaintiff reserves the right to amend or supplement this list in light of any case developments, including without limitation: any rulings by the Court; any change in position or theories by Defendants, its witnesses, or its experts; Plaintiff's review of Defendants' pre-trial disclosures; and any additional documents or information produced in the future by Defendants. Plaintiff further reserves the right to add to its witness list any witness designated by Defendants. Plaintiff also reserves the right to designate and offer testimony from Defendants' experts to the extent they do not testify live. Plaintiff reserves the right to call additional witnesses to resolve evidentiary issues, including to testify regarding the authenticity of or foundation for exhibits to the extent the parties cannot agree on such issues.

Plaintiff expects to present the following witnesses' testimony at trial:

Exhibit 5A

Plaintiff's Witness List

| Witness | Expected Presentation of Testimony |
|---|---|
| Edmund J. Elder | Live |
| Graham James Sewell | Live |
| F. Dean Toste | Live |
| Bernhardt Trout | Live |
| Any witness Defendants may bring to trial to provide live testimony | Live |

Plaintiff may present the following witnesses' testimony at trial:

| Witness | Expected Presentation of Testimony |
|---|---|
| Ripen Misri | Live or by Deposition |
| Bhupesh Singh | Live or by Deposition |
| Ted Smolenski | Live or by Deposition |
| Praveen Subbappa | Live or by Deposition |
| Claire Walton | Live or by Deposition |
| Slayback through its 30(b)(6) representatives | By Deposition |
| Apotex through its 30(b)(6) representatives | By Deposition |
| Document custodian(s) to authenticate documents from the parties and third parties that have produced documents in this case | Live or by Deposition |

# EXHIBIT 5B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC.,

                Plaintiff,

      v.

SLAYBACK PHARMA LLC, APOTEX INC.,
and APOTEX CORP.,

                Defendants.

C.A. No. 21-1256-CFC-JLH

**CONFIDENTIAL –
FILED UNDER SEAL**

**EXHIBIT 5B
PLAINTIFF'S OBJECTIONS TO DEFENDANTS' WITNESS LIST**

<u>**DEFENDANTS' WITNESS LIST**</u>

Defendants Slayback Pharma LLC, Apotex Inc., and Apotex Corp. ("Defendants") identify the following witnesses whom they may call live or by deposition with the following summaries. This list is not a commitment that Defendants will call any particular witness at trial, or a representation that any of the witnesses listed are available or will appear for trial. Defendants also reserve the right to call any witnesses called by Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle" or "Plaintiff"), and/or to revise this list in light of further rulings by the Court or any other changed circumstances.

Defendants reserve the right to further modify, supplement, and/or amend the Final Joint Pretrial Order and the attachments thereto, including this Exhibit, in light of any future rulings by the Court and/or issues that remain open, including ongoing expert discovery, until entry of the Final Pretrial Order.

Based on present information available to Defendants and subject to the reservations stated above, the qualifications addressed in the main section of the Pretrial Order, time constraints at trial, and the case presented at trial by the Plaintiff, Defendants identify the following witnesses it expects to present at trial:

| Witness | Expected Presentation of Testimony |
|---|---|
| Laird Forrest, Ph.D. | Live |
| Michael L. Brandt, B.S., PharmD, FASHP | Live |

Based on present information available to Defendants and subject to the reservations stated above, the qualifications addressed in the main section of the Pretrial Order, time constraints at trial, and the case presented at trial by the Plaintiff, Defendants identify the following witnesses it may present at trial:

| Witness | Expected Presentation of Testimony |
|---|---|
| Daniel O'Connor | By Deposition |
| Apotex through its 30(b)(6) representatives | By Deposition |

## **PLAINTIFF'S OBJECTIONS TO DEFENDANTS' WITNESS LIST**

Plaintiff Eagle Pharmaceuticals, Inc. ("Plaintiff") hereby preserves its objections to all testimony introduced by Slayback Pharma LLC ("Slayback"), Apotex Inc., and Apotex Corp. (together, "Apotex") (collectively, "Defendants") that is not allowed by the Federal Rules of Evidence of the Court's Scheduling Order, or is otherwise improper.  This is includes, but is not limited to testimony that is not relevant under Federal Rules of Evidence 402; testimony whose probative value is substantially outweighed by the risk of unfair prejudice, confusion, undue delay, wasted time, or cumulative evidence under Federal Rule of Evidence 403; or inadmissible hearsay under Federal Rule of Evidence 802. Plaintiff also objects to any fact testimony as to which the witness lacks personal knowledge and any expert testimony offered by fact witnesses.  Plaintiff further objects to expert testimony that was not properly disclosed under Federal Rule of Evidence 702 or in accordance with the Court's Scheduling Order. Plaintiff also incorporates all objections in its motions *in limine* and objections to Defendants' exhibit list.

# EXHIBIT 6A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC, <br> APOTEX INC., and APOTEX CORP., <br><br> Defendants. | C.A. No. 21-1256-CFC-JLH |

## <u>EXHIBIT 6A</u>
## <u>PLAINTIFF'S DEPOSITION DESIGNATIONS</u>

Ripen Misri Deposition Designations
May 19, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 5 | 22 | 6 | 4 | | | |
| 6 | 20 | 6 | 24 | | | |
| 9 | 19 | 10 | 3 | | | |
| 10 | 21 | 11 | 7 | | | |
| 11 | 13 | 11 | 18 | | | |
| 11 | 21 | 11 | 25 | | | |
| 12 | 9 | 12 | 16 | | | |
| 12 | 19 | 12 | 19 | | | |
| 12 | 22 | 13 | 1 | | | |
| 17 | 12 | 18 | 25 | | | |
| 19 | 2 | 19 | 9 | AT | | |
| 19 | 12 | 19 | 18 | | | |
| 19 | 24 | 20 | 5 | | | |
| 22 | 11 | 23 | 11 | | | |
| 23 | 21 | 24 | 3 | | | |
| 24 | 8 | 24 | 17 | In | | |
| 25 | 22 | 26 | 23 | | | |
| 27 | 6 | 27 | 18 | | | |
| 27 | 24 | 28 | 23 | | | |
| 29 | 1 | 29 | 4 | H, R, P | | |
| 29 | 6 | 29 | 11 | AT, H, R, P | | |
| 30 | 5 | 30 | 20 | | | |
| 30 | 22 | 31 | 12 | H, R, P, LD, LF | | |
| 33 | 13 | 33 | 15 | AT | | |
| 33 | 19 | 33 | 21 | AT | | |
| 34 | 17 | 34 | 18 | | | |
| 34 | 24 | 35 | 3 | H, 30(b)(6), L | | |
| 35 | 25 | 36 | 1 | | | |
| 36 | 5 | 37 | 19 | AT, H | | |
| 37 | 22 | 37 | 25 | AT, O | | |
| 38 | 4 | 38 | 8 | AT | | |
| 38 | 12 | 38 | 15 | | | |
| 38 | 22 | 39 | 23 | C, H, B, O | | |
| 40 | 13 | 40 | 20 | F, P, H, O | | |
| 42 | 14 | 42 | 15 | | | |
| 42 | 20 | 42 | 22 | | | |

Ripen Misri Deposition Designations
May 19, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 44 | 19 | 45 | 3 | P, H, O, S | | |
| 45 | 13 | 45 | 15 | AT, V, R, P | | |
| 45 | 19 | 45 | 22 | AT | | |
| 45 | 25 | 45 | 25 | AT | | |
| 46 | 16 | 47 | 8 | AT, F, H, S | | |
| 47 | 11 | 47 | 14 | S, O | | |
| 47 | 25 | 48 | 5 | S, LD | | |
| 48 | 9 | 48 | 15 | AT | | |
| 48 | 19 | 49 | 3 | AT, B, H | | |
| 49 | 6 | 49 | 14 | O | | |
| 49 | 18 | 49 | 25 | AT | | |
| 50 | 4 | 50 | 10 | AT, S, MD | | |
| 50 | 13 | 50 | 16 | O, S | | |
| 50 | 18 | 50 | 21 | H, O | | |
| 51 | 5 | 51 | 9 | AT | | |
| 51 | 12 | 51 | 13 | M | | |
| 52 | 2 | 52 | 4 | AT, S | | |
| 52 | 8 | 52 | 9 | M | | |
| 53 | 25 | 54 | 3 | AT | | |
| 54 | 6 | 55 | 1 | O, LD, F, P, R | | |
| 59 | 11 | 59 | 12 | | | |
| 59 | 18 | 59 | 20 | F, LD | | |
| 59 | 25 | 60 | 11 | F | | |
| 62 | 24 | 63 | 12 | F, LD, C | | |
| 64 | 25 | 65 | 4 | F, C | | |
| 65 | 10 | 65 | 12 | F, C | | |
| 66 | 18 | 67 | 8 | F, H, 30(b)(6) | | |
| 67 | 10 | 67 | 16 | M, F | | |
| 68 | 21 | 68 | 24 | F, C | | |
| 69 | 15 | 69 | 21 | | | |
| 70 | 3 | 70 | 11 | C | | |
| 71 | 16 | 71 | 18 | | | |
| 72 | 12 | 72 | 18 | F, C | | |
| 73 | 7 | 77 | 4 | LD, H, F, C | | |
| 78 | 23 | 78 | 24 | | | |
| 79 | 3 | 79 | 4 | | | |

Ripen Misri Deposition Designations
May 19, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 79 | 6 | 79 | 12 | | | |
| 79 | 15 | 79 | 18 | C, R, M | | |
| 79 | 21 | 79 | 23 | C, R, M | | |
| 80 | 1 | 81 | 17 | F, LD, C | 80:2-81:17 | |
| 82 | 12 | 82 | 13 | | | |
| 82 | 19 | 82 | 23 | | | |
| 83 | 4 | 83 | 16 | LD, F, C | | |
| 96 | 16 | 98 | 12 | C, F, LD | | |
| 98 | 14 | 98 | 17 | AT | | |
| 98 | 21 | 98 | 23 | In, M, P, R | | |
| 98 | 25 | 99 | 2 | AT, LD | | |
| 99 | 5 | 99 | 12 | AT, 30(b)(6) | | |
| 99 | 16 | 99 | 21 | AT | | |
| 99 | 24 | 100 | 6 | C, F | 100:3-100:6 | |
| 100 | 10 | 100 | 15 | | | |
| 100 | 19 | 100 | 20 | | | |
| 100 | 22 | 102 | 2 | AT | | |
| 102 | 5 | 102 | 17 | AT, LD, C, H | | |
| 102 | 20 | 102 | 23 | | | |
| 103 | 2 | 103 | 16 | | | |
| 103 | 19 | 105 | 18 | AT, C | | |
| 105 | 21 | 106 | 14 | AT, C, O | | |
| 106 | 17 | 106 | 23 | | | |
| 107 | 12 | 107 | 17 | AT | | |
| 107 | 20 | 107 | 25 | AT, C | | |
| 108 | 3 | 108 | 9 | AT | | |
| 108 | 12 | 108 | 15 | AT | | |
| 108 | 18 | 108 | 20 | | | |
| 108 | 25 | 109 | 9 | | | |
| 109 | 14 | 109 | 19 | R | | |
| 109 | 21 | 110 | 25 | AT, C, S | | |
| 111 | 3 | 111 | 4 | | | |
| 111 | 8 | 111 | 13 | C | 111:8-111:11 | |
| 111 | 22 | 113 | 4 | C, H | | |
| 113 | 6 | 114 | 5 | F, C | | |
| 114 | 7 | 115 | 6 | C | | |

Ripen Misri Deposition Designations
May 19, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 115 | 8 | 115 | 10 | | | |
| 116 | 7 | 116 | 9 | | | |
| 116 | 18 | 118 | 25 | C, B, F | | |
| 120 | 3 | 120 | 8 | AT | | |
| 120 | 10 | 120 | 13 | | | |
| 120 | 19 | 121 | 12 | F, C, S | | |
| 121 | 15 | 121 | 22 | AT | | |
| 121 | 25 | 122 | 3 | AT | | |
| 122 | 6 | 122 | 18 | AT | | |
| 122 | 21 | 123 | 8 | R | | |
| 123 | 10 | 123 | 10 | | | |
| 123 | 14 | 123 | 21 | M | 123:25-124:3 | |
| 128 | 12 | 128 | 14 | AT, C | | |
| 128 | 18 | 128 | 18 | | | |
| 137 | 11 | 137 | 12 | | | |
| 137 | 15 | 137 | 18 | | | |
| 137 | 25 | 138 | 6 | R | | |
| 143 | 22 | 144 | 25 | AT | | |
| 145 | 2 | 145 | 3 | R | | |
| 145 | 8 | 145 | 10 | | | |
| 145 | 12 | 146 | 16 | | | |
| 146 | 20 | 147 | 14 | AT, C | | |
| 147 | 16 | 147 | 19 | AT | | |
| 147 | 22 | 147 | 25 | C | | |
| 148 | 2 | 149 | 13 | AT, C | | |
| 149 | 16 | 150 | 4 | AT | | |
| 150 | 7 | 150 | 14 | AT | | |
| 150 | 16 | 150 | 24 | AT, C, R | | |
| 151 | 2 | 152 | 10 | AT, C, R, S | | |
| 152 | 12 | 153 | 4 | AT | | |
| 153 | 19 | 153 | 21 | | | |
| 154 | 2 | 154 | 10 | AT | | |
| 154 | 17 | 155 | 7 | C, B, AT | | |
| 155 | 11 | 155 | 18 | AT | | |
| 155 | 21 | 156 | 4 | AT | 156:5-156:23 | 106, 402, 403, 702, 802 |
| 156 | 24 | 157 | 1 | AT | | |

Ripen Misri Deposition Designations
May 19, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 157 | 5 | 157 | 9 | AT | | |
| 157 | 12 | 158 | 8 | AT, C | | |
| 158 | 14 | 158 | 18 | C | | |
| 158 | 25 | 159 | 1 | | | |
| 159 | 5 | 159 | 9 | H | | |
| 160 | 3 | 160 | 4 | | | |
| 160 | 8 | 160 | 23 | | | |
| 160 | 25 | 161 | 8 | | | |
| 161 | 10 | 161 | 10 | C | | |
| 161 | 11 | 161 | 14 | C | | |
| 162 | 16 | 162 | 20 | AT | | |
| 162 | 24 | 163 | 5 | AT | | |
| 163 | 8 | 163 | 10 | AT | | |
| 163 | 13 | 163 | 14 | | | |
| 164 | 8 | 164 | 10 | AT | | |
| 164 | 13 | 164 | 16 | AT | | |
| 164 | 19 | 164 | 21 | | | |
| 165 | 1 | 165 | 4 | | | |
| 165 | 6 | 165 | 11 | AT | | |
| 165 | 14 | 166 | 1 | AT, S | | |
| 166 | 3 | 166 | 4 | AT | | |
| 166 | 7 | 166 | 13 | AT, C | | |
| 166 | 15 | 167 | 5 | AT | | |
| 167 | 8 | 167 | 9 | C | | |
| 167 | 15 | 167 | 23 | AT | | |
| 168 | 1 | 168 | 8 | AT, C | | |
| 168 | 11 | 168 | 12 | C | | |
| | | | | | | |

Bhupesh Singh Deposition Designations
May 13, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 6 | 2 | 6 | 8 | | | |
| 54 | 4 | 54 | 10 | | 54:11-55:7 | 402, 403, 802 |
| 73 | 3 | 73 | 5 | | | |
| 73 | 14 | 73 | 18 | AT | | |
| 73 | 21 | 73 | 24 | | | |
| 74 | 13 | 74 | 14 | AT | | |
| 74 | 16 | 75 | 1 | | 75:2-75:18 | 402, 403, 602, 802 |
| 78 | 24 | 79 | 1 | | | |
| 79 | 3 | 80 | 7 | C, H | | |
| 83 | 5 | 83 | 24 | C, H | | |
| 85 | 16 | 85 | 22 | AT, H | | |
| 85 | 24 | 86 | 18 | AT, H, C | | |
| 86 | 21 | 88 | 12 | AT, H, C | | |
| 88 | 14 | 89 | 23 | AT, C | | |
| 90 | 1 | 90 | 5 | C | | |
| 92 | 17 | 92 | 18 | | | |
| 92 | 22 | 93 | 23 | | | |
| 93 | 25 | 94 | 8 | AT | | |
| 94 | 11 | 95 | 9 | R, P | | |
| 95 | 15 | 95 | 18 | AT | | |
| 95 | 20 | 95 | 23 | | | |
| 96 | 1 | 96 | 1 | | | |
| 96 | 3 | 96 | 4 | | | |
| 96 | 8 | 97 | 4 | AT | 97:2-97:25 | 106, 402, 403, 602, 701, 802 |
| 97 | 6 | 98 | 21 | AT | | |
| 126 | 20 | 126 | 21 | | | |
| 127 | 1 | 127 | 6 | | | |
| 128 | 14 | 128 | 16 | | 128:14-130:8 | 106, 402, 403, 602, 701, 702, 802 |
| 128 | 25 | 130 | 3 | AT, C | | |
| 130 | 5 | 130 | 8 | | | |
| 130 | 17 | 130 | 19 | AT | | |
| 130 | 21 | 131 | 5 | AT, M | | |
| 131 | 7 | 131 | 14 | In, L, LF, S | 131:15-132:13 | 106, 402, 403, 602, 701, 702, 802 |
| 140 | 11 | 140 | 12 | | | |
| 140 | 14 | 140 | 21 | | | |
| 141 | 5 | 141 | 11 | | | |
| 141 | 13 | 141 | 24 | AT, C | | |
| 142 | 1 | 142 | 8 | AT | | |
| 142 | 11 | 142 | 20 | | | |
| 147 | 24 | 148 | 2 | AT | | |
| 148 | 4 | 148 | 11 | AT | | |
| 148 | 15 | 148 | 24 | | | |
| 149 | 20 | 149 | 23 | AT | | |
| 150 | 2 | 150 | 9 | AT | | |
| 151 | 18 | 151 | 23 | AT, P | | |
| 151 | 25 | 152 | 11 | | | |

Bhupesh Singh Deposition Designations
May 13, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 153 | 12 | 153 | 17 | AT, C | | |
| 153 | 19 | 154 | 12 | AT | | |
| 154 | 15 | 154 | 19 | AT | | |
| 154 | 22 | 154 | 25 | AT | | |
| 155 | 2 | 155 | 13 | AT, C | | |
| 155 | 15 | 155 | 16 | | | |
| | | | | | | |

Theodore Smolenski Deposition Designations
June 7 2022

| Begin Page | Begin Line | End Page | End Line | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 7 | 10 | 7 | 15 | | | |
| 14 | 20 | 14 | 25 | | | |
| 52 | 4 | 52 | 7 | LF | 52:8-10 | 106, 402, 403, 80 |
| 52 | 11 | 52 | 23 | LF; P; R | 52:8-10 | |
| 58 | 8 | 59 | 5 | LF; O; P; R; S; V | | |
| 59 | 8 | 59 | 8 | LF; O; P; R; S; V | | |

Praveen Subbappa Deposition Designations
March 15, 2019

| Begin Page | Begin Line | End Page | End Line | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 8 | 8 | 8 | 11 | | | |
| 26 | 13 | 27 | 6 | M; P; R; V | | |
| 27 | 8 | 27 | 18 | P; R; V | | |
| 32 | 7 | 33 | 7 | P; R | | |
| 35 | 13 | 35 | 16 | P; R | | |
| 62 | 16 | 63 | 15 | LF; P; R | | |
| 68 | 10 | 68 | 22 | H; LF; M; O; P; R; V | | |
| 69 | 2 | 69 | 3 | H; LF; M; O; P; R; V | | |
| 72 | 2 | 72 | 21 | LF; M; O; P; R; V | | |
| 73 | 1 | 73 | 13 | H; LF; M; O; P; R; V | | |
| 73 | 16 | 73 | 16 | H; LF; M; O; P; R; V | | |
| 103 | 12 | 105 | 20 | LF; M; P; R | | |
| 109 | 1 | 109 | 5 | H; M; O; P; R | | |
| 115 | 1 | 115 | 10 | 30(b)(6); H; LF; M; O; P; R | | |
| 115 | 13 | 116 | 8 | 30(b)(6); H; LF; M; O; P; R | | |
| 116 | 12 | 117 | 11 | AT; 30(b)(6); H; LF; M; MD; O; P; R; V | | |
| 168 | 2 | 168 | 5 | 30(b)(6); H; M; O; P; R | | |
| 168 | 8 | 168 | 17 | 30(b)(6); H; M; O; P; R | | |
| 168 | 20 | 170 | 11 | 30(b)(6); H; LF; M; O; P; R | | |
| 197 | 14 | 197 | 15 | 30(b)(6); P; R | | |
| 197 | 18 | 197 | 21 | 30(b)(6); M; O; P; R; V | | |
| 198 | 2 | 198 | 20 | 30(b)(6); H; M; O; P; R; V | | |
| 198 | 22 | 199 | 16 | 30(b)(6); H; M; O; P; R; V | | |
| 199 | 18 | 199 | 22 | 30(b)(6); H; M; O; P; R; V | | |
| 200 | 1 | 200 | 4 | 30(b)(6); H; M; O; P; R; V | | |
| 200 | 6 | 200 | 9 | 30(b)(6); H; M; O; P; R; V | | |
| 200 | 12 | 200 | 18 | 30(b)(6); H; M; O; P; R; V | | |
| 200 | 21 | 201 | 6 | 30(b)(6); H; M; O; P; R; V | | |
| 201 | 8 | 201 | 13 | 30(b)(6); H; M; O; P; R; V | | |
| 201 | 16 | 202 | 8 | 30(b)(6); H; M; O; P; R; V | | |
| 202 | 11 | 202 | 18 | 30(b)(6); H; M; O; P; R; V | | |
| 202 | 22 | 203 | 2 | 30(b)(6); H; M; O; P; R; V | | |
| 203 | 4 | 203 | 8 | 30(b)(6); H; M; O; P; R; V | | |
| 206 | 3 | 206 | 4 | 30(b)(6); H; M; O; P; R; V | | |
| 206 | 6 | 207 | 16 | 30(b)(6); H; M; O; P; R; V | | |
| 207 | 20 | 208 | 4 | 30(b)(6); H; M; O; P; R; V | | |
| 231 | 13 | 231 | 15 | 30(b)(6); H; M; O; P; R; V | | |
| 231 | 18 | 232 | 16 | 30(b)(6); H; M; O; P; R; V | | |

Praveen Subbappa Deposition Designations
March 15, 2019

| Begin Page | Begin Line | End Page | End Line | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 232 | 18 | 233 | 5 | 30(b)(6); H; M; O; P; R; V | | |
| 233 | 7 | 233 | 18 | 30(b)(6); H; M; O; P; R; V | | |
| 233 | 20 | 234 | 3 | 30(b)(6); H; M; O; P; R; V | | |
| 234 | 5 | 234 | 5 | 30(b)(6); H; M; O; P; R; V | | |
| 257 | 12 | 257 | 13 | 30(b)(6); H; M; O; P; R; V | | |
| 257 | 16 | 257 | 20 | 30(b)(6); H; M; O; P; R; V | | |
| 258 | 1 | 258 | 22 | 30(b)(6); H; M; O; P; R; V | | |
| 259 | 2 | 259 | 5 | 30(b)(6); H; M; O; P; R; V | | |
| 259 | 7 | 259 | 7 | 30(b)(6); H; M; O; P; R; V | | |

Praveen Subbappa Deposition Designations
June 2, 2022

| Begin Page | Begin Line | End Page | End Line | Defendant's Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 7 | 20 | 7 | 24 | | | |
| 30 | 25 | 31 | 22 | R | 31:23-32:1 | 402, 403, 602, 802 |
| 32 | 12 | 33 | 7 | LF; R; S | 31:23-32:1 | 402, 403, 602, 802 |
| 33 | 19 | 35 | 5 | LF; O; P; R; V | | |
| 35 | 7 | 35 | 23 | LF; O; P; R; V | | |
| 35 | 25 | 36 | 11 | LF; O; P; R; V | | |
| 36 | 13 | 36 | 13 | LF; O; P; R; V | | |
| 37 | 5 | 37 | 10 | LF; O; P; R; V | | |
| 78 | 3 | 79 | 2 | | | |
| 83 | 6 | 86 | 4 | O; R | | |
| 86 | 7 | 86 | 9 | O; R | | |
| 94 | 11 | 95 | 5 | M; P; R; V | | |
| 97 | 3 | 100 | 17 | O; R | | |
| 101 | 24 | 102 | 24 | H; M; O; P; R; V | | |
| 103 | 11 | 103 | 19 | H; M; O; P; R; V | | |
| 103 | 22 | 104 | 1 | H; M; O; P; R; V | | |
| 104 | 4 | 104 | 17 | H; M; O; P; R; V | | |
| 104 | 19 | 105 | 1 | H; M; O; P; R; V | | |
| 105 | 4 | 105 | 6 | H; M; O; P; R; V | | |
| 105 | 11 | 105 | 23 | P; R | | |
| 106 | 2 | 107 | 12 | H; M; O; P; R | | |
| | | | | | | |

Claire Walton Deposition Designations
May 11, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 10 | 2 | 10 | 6 | R | | |
| 10 | 13 | 10 | 18 | R | | |
| 69 | 20 | 69 | 24 | AT, R | | |
| 70 | 1 | 70 | 5 | R | | |
| 91 | 19 | 92 | 3 | AT, S, R | | |
| 113 | 9 | 113 | 13 | R | | |
| 116 | 10 | 116 | 14 | R | | |
| 116 | 17 | 116 | 19 | AT, R | | |
| 116 | 21 | 116 | 21 | R | | |
| 118 | 22 | 119 | 6 | AT, R | | |
| 119 | 9 | 119 | 10 | R | | |
| 119 | 12 | 119 | 15 | AT, R | | |
| 119 | 18 | 119 | 18 | R | | |
| 151 | 2 | 151 | 5 | R | | |
| 151 | 11 | 151 | 15 | R | | |
| 165 | 5 | 165 | 9 | AT, R | | |
| 165 | 11 | 165 | 17 | AT, R | | |
| 165 | 19 | 165 | 21 | R | | |
| 165 | 23 | 166 | 3 | AT, R | | |
| 166 | 5 | 166 | 8 | R | | |
| 182 | 18 | 182 | 25 | AT, R, P | | |
| 183 | 3 | 183 | 10 | AT, R, C | | |
| 183 | 12 | 183 | 12 | R, C | | |
| 183 | 14 | 184 | 7 | AT, R, P | | |
| 184 | 10 | 184 | 17 | R, P | | |
| 186 | 9 | 186 | 12 | AT, F, R | | |
| 186 | 15 | 186 | 15 | R | | |
| 186 | 17 | 186 | 20 | AT, R | | |
| 187 | 3 | 187 | 5 | AT, R, S, C | | |
| 187 | 8 | 187 | 9 | R | | |
| 187 | 11 | 187 | 12 | R | | |
| 202 | 23 | 203 | 2 | R | | |
| 203 | 7 | 203 | 15 | R | | |
| 213 | 9 | 214 | 2 | AT, R | | |
| 214 | 4 | 214 | 4 | R | | |
| 214 | 20 | 214 | 21 | AT, S, R | | |
| 214 | 23 | 215 | 1 | R | | |
| 216 | 2 | 216 | 6 | R | | |
| 216 | 9 | 217 | 16 | AT, R | | |
| 217 | 18 | 217 | 18 | R | | |
| 217 | 20 | 218 | 11 | AT, R | | |
| 218 | 14 | 218 | 14 | R | | |

Claire Walton Deposition Designations
May 11, 2022

| Begin Page | Begin Line | End Page | End Line | Objections | Defendant's Counter-Designations | Plaintiff's Objections to Defendant's Counter-Designations |
|---|---|---|---|---|---|---|
| 218 | 18 | 218 | 21 | AT, S, R | | |
| 218 | 23 | 218 | 25 | R | | |
| 229 | 25 | 230 | 5 | R | | |
| 230 | 9 | 230 | 11 | R | | |
| 230 | 17 | 230 | 22 | AT, R | | |
| 230 | 24 | 230 | 24 | R | | |
| 231 | 1 | 231 | 13 | AT, R, P | | |
| 231 | 16 | 231 | 16 | R | | |
| 231 | 18 | 231 | 21 | AT, R, P | | |
| 231 | 24 | 231 | 24 | R | | |
| | | | | | | |

# EXHIBIT 6B

Exhibit 6B Defendants' Deposition Designations

Daniel O'Connor

| Begin Page | Begin Line | End Page | End Line | Objections | Plaintiff's Counter-Designations | Defendant's Objections to Plaintiff's Counter-Designations | Defendant's Counter-Counter Designations | Plaintiff's Objections to Defendant's Counter-Counter Designations |
|---|---|---|---|---|---|---|---|---|
| 28 | 20 | 31 | 21 | 106, 401, 402, 403, 802 | 8:21-23, 31:22-32:17 | | | |
| 99 | 1 | 99 | 20 | 106, 401, 402, 403, 702, 802 | | | | |
| 100 | 5 | 100 | 23 | 106, 401, 402, 403, 702, 802 | | | | |
| 102 | 2 | 102 | 5 | 106, 401, 402, 403, 702, 802 | 101:11-18 | | | |
| 102 | 8 | 102 | 16 | 106, 401, 402, 403, 702, 802 | | | | |
| 103 | 15 | 103 | 17 | 106, 401, 402, 403, 702, 802 | 103:1-12 | | | |
| 103 | 24 | 103 | 25 | 106, 401, 402, 403, 702, 802 | | | | |
| 104 | 16 | 105 | 1 | 106, 401, 402, 403, 701, 702, 802 | 104:4-15 | | | |
| 105 | 24 | 106 | 25 | 106, 401, 402, 403, 701, 702, 802 | | | | |
| 107 | 7 | 107 | 17 | 106, 401, 402, 403, 702, 802 | 107:44-5 | Y; NR | | |
| 121 | 19 | 122 | 25 | 106, 401, 402, 403, 701, 702, 802 | 108:12-20, 120:10-121:14 | | | |
| 123 | 5 | 124 | 2 | 106, 401, 402, 403, 701, 702, 802 | | | | |
| 128 | 3 | 128 | 4 | 106, 401, 402, 403, 702, 802 | | | | |
| 128 | 15 | 128 | 23 | 106, 401, 402, 403, 701, 702, 802 | | | | |
| 129 | 8 | 129 | 11 | 106, 401, 402, 403, 702, 802 | 129:12-19 | | 129:20-130:10; 130:16-131:9 | 106, 401, 402, 403, 602, 701, 702, 802 |
| 129 | 20 | 130 | 7 | 106, 401, 402, 403, 701, 702, 802 | | | | |

# EXHIBIT 7A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-1256-CFC-JLH |
| SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., | |
| Defendants. | |

**EXHIBIT 7A
PLAINTIFF'S STATEMENT OF INTENDED PROOF**

Exhibit 7A
Plaintiff's Statement of Intended Proof

# TABLE OF CONTENTS

I.    INFRINGEMENT ..............................................................................2

II.   VALIDITY ........................................................................................3

III.  PLAINTIFF'S REQUESTED RELIEF...........................................4

i

Exhibit 7A
Plaintiff's Statement of Intended Proof

## **PLAINTIFF'S STATEMENT OF INTENDED PROOF**

Pursuant to Local Rule 16.3(c)(5), the Court's Scheduling Order (D.I. 27), and the Court's June 9, 2022 Oral Order, Plaintiff Eagle Pharmaceuticals, Inc. ("Plaintiff") hereby submits the following Statement of Intended Proof ("Statement").  Plaintiff incorporates by reference any issues set forth in its responsive papers to any comparable material filed by Defendants.

By including an issue in this Statement, Plaintiff does not assume the burdens of proof that govern that issue.  For the inquiries on which Defendants bear the burden of proof, Defendants have not yet provided its Statement of Issues of Fact that Remain to Be Litigated, Statement of Issues of Law that Remain to Be Litigated, or Statement of Intended Proof prior to Plaintiff's service of this document.  Plaintiff has undertaken to identify issues potentially relevant to those inquiries, but reserves the right to amend or modify its submission after receiving Defendants' Statement of Issues of Fact that Remain to Be Litigated, Statement of Issues of Law that Remain to Be Litigated, and Statement of Intended Proof for those inquiries.

Plaintiff reserves the right to modify or supplement this Statement to the extent necessary to reflect any future rulings by the Court, or to fairly respond to any new issues that Defendants may raise.  By submitting this Statement, Plaintiff does not waive its right to amend or supplement this submission after it considers

1

Exhibit 7A
Plaintiff's Statement of Intended Proof

Defendants' submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, trial, or post-trial briefing.

## I.    INFRINGEMENT

1.      Plaintiff will prove by a preponderance of the evidence that Defendant Slayback Pharma LLC's ("Slayback") submission of New Drug Application No. 212209 ("Slayback's NDA") constitutes an act of infringement of claims 2, 4, and 12 ("asserted claims") of U.S. Patent No. 11,103,483 (the "'483 patent"), either literally or under the doctrine of equivalents.

2.      Plaintiff will prove by a preponderance of the evidence that Defendants Apotex Inc.'s and Apotex Corp.'s (together, "Apotex") submission of New Drug Application No. 215033 ("Apotex's NDA") constitutes an act of infringement of the asserted claims of the '483 patent, either literally or under the doctrine of equivalents.

3.      Plaintiff will prove by a preponderance of the evidence that Slayback's commercial use, manufacture, sale, offer for sale, or importation of Slayback's NDA Product infringes, actively induces and/or contributes to the infringement by others of the asserted claims of the '483 patent under any of 35 U.S.C. § 271(a), (b), or (c), either literally or under the doctrine of equivalents.

4.      Plaintiff will prove by a preponderance of the evidence that Apotex's commercial use, manufacture, sale, offer for sale, or importation of Apotex's NDA

Exhibit 7A
Plaintiff's Statement of Intended Proof

Product infringes, actively induces and/or contributes to the infringement by others of the asserted claims of the '483 patent under any of 35 U.S.C. § 271(a), (b), or (c), either literally or under the doctrine of equivalents.

5.      Plaintiff will prove by a preponderance of the evidence that Slayback's NDA Product is a "ready to use" liquid bendamustine-containing composition, either literally or under the doctrine of equivalents.

6.      Plaintiff will prove by a preponderance of the evidence that Apotex's NDA Product is a "ready to use" liquid bendamustine-containing composition, either literally or under the doctrine of equivalents.

## II.     VALIDITY

7.      Defendants have failed to prove by clear and convincing evidence that the asserted claims of the '483 patent are invalid under 35 U.S.C. § 102 as anticipated by either International Patent Publication No. WO 2010/036702 A1 (filed September 23, 2009) to Drager et al. ("Drager"), or U.S. Patent No. 8,344,006 (the "'006 patent") (filed January 31, 2012).

8.      Defendants have failed to prove by clear and convincing evidence that the asserted claims of the '483 patent are invalid under 35 U.S.C. § 103 as obvious as of their priority date over Drager or the '006 patent.

Exhibit 7A
Plaintiff's Statement of Intended Proof

9.     Objective indicia of non-obviousness, including unexpected results, teaching away, long-felt need, and failure of others, support the validity of the asserted claims of the '483 patent.

10.     Defendants have not proven by clear and convincing evidence that the asserted claims of the '483 patent are invalid under 35 U.S.C. § 112(b) based on their argument that the term "ready to use" is indefinite.

## III.     PLAINTIFF'S REQUESTED RELIEF

11.     Plaintiff will prove it is entitled to a judgment that Slayback has infringed, will infringe, will actively induce infringement of, and/or will contribute to the infringement by others of the asserted claims of the '483 patent.

12.     Plaintiff will prove it is entitled to a judgment that Apotex has infringed, will infringe, will actively induce infringement of, and/or will contribute to the infringement by others of the asserted claims of the '483 patent.

13.     Plaintiff will prove it is entitled to an order pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(A) ordering that the effective date of any FDA approval for Slayback's NDA Product be not earlier than the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

14.     Plaintiff will prove it is entitled to an order pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(A) ordering that the effective date of any FDA approval for

Exhibit 7A
Plaintiff's Statement of Intended Proof

Apotex's NDA Product be not earlier than the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

15.     Plaintiff will prove it is entitled to a preliminary and permanent injunction pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283 enjoining Slayback, its officers, agents, servants, employees and attorneys, and all persons acting in concert with them, from making, using, selling, offering for sale, marketing, distributing, or importing Slayback's NDA Product, or the inducement of or the contribution to any of the foregoing, prior to the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

16.     Plaintiff will prove it is entitled to a preliminary and permanent injunction pursuant to, *inter alia*, 35 U.S.C. § 271(e)(4)(B) and 35 U.S.C. § 283 enjoining Apotex, its officers, agents, servants, employees and attorneys, and all persons acting in concert with them, from making, using, selling, offering for sale, marketing, distributing, or importing Apotex's NDA Product, or the inducement of or the contribution to any of the foregoing, prior to the expiration date of the '483 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

17.     Plaintiff will prove it is entitled to a judgment that making, using, selling, offering for sale, marketing, distributing, or importing Slayback's NDA Product, prior to the expiration date of the '483 patent, will infringe, actively

Exhibit 7A
Plaintiff's Statement of Intended Proof

induce infringement of, and/or contribute to the infringement by others of the '483 patent.

18.     Plaintiff will prove it is entitled to a judgment that making, using, selling, offering for sale, marketing, distributing, or importing Apotex's NDA Product, prior to the expiration date of the '483 patent, will infringe, actively induce infringement of, and/or contribute to the infringement by others of the '483 patent.

19.     Plaintiff will prove it is entitled to a judgment that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285.

20.     Plaintiff will prove it is entitled to costs and expenses in this action.

21.     Plaintiff will prove it is entitled to further and other relief the Court may deem just and proper.

# EXHIBIT 7B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EAGLE PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 18-304-CFC-CJB |
| SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>EXHIBIT 7B</u>
<u>DEFENDANT'S BRIEF STATEMENT OF INTENDED PROOFS</u>**

Pursuant to Local Rule 16.3(c)(9), the Court's Scheduling Order (D.I. 27), and the Court's June 9, 2022 Oral Order, Defendants Apotex Inc. and Apotex Corp. ("Apotex"); and Slayback Pharma LLC ("Slayback") (collectively, "Defendants") make the following brief statement of intended proofs. This statement is based on the arguments Defendants expect to make at trial, as well as their understanding of the arguments that Plaintiff intends to make. Defendants reserve the right to supplement or amend this statement if Plaintiff seeks to introduce different arguments and in light of any further decisions and orders of the Court, any of Plaintiff's pretrial statements, and to the extent any amendments or other events arise impacting the facts or issues for trial.

This statement is not intended to be exhaustive, and Defendants reserve the right to prove any matters identified in the pleadings, fact and expert discovery, and any of the accompanying statements of facts and legal issues to be litigated at trial. With respect to proof to be presented by expert testimony, Defendants incorporate by reference the reports of Defendants' expert witnesses addressing the issues identified below. Defendants further reserve the right to respond to issues raised by Plaintiff, and to rebut any alleged proof offered by Plaintiff before and during trial, in response to rulings by the Court, or for any other reason.

I.    **Issue on Which Plaintiff Bears the Burden of Proof**

1.    Plaintiff will not be able to show by a preponderance of the evidence that Defendants infringe any of the asserted claims of the patent-in-suit[1] either literally or through the doctrine of equivalents.

2.    Defendants will, to the extent necessary, introduce evidence to rebut Plaintiff' evidence regarding induced infringement of the asserted claims of the '483 patent.

---

[1] Plaintiff asserts claims 2, 4, and 12 ("asserted claims") of U.S. Patent No. 11,103,483 (the "'483 patent") against Defendants.

**Error! Unknown document property name.**

3.     Plaintiff will not be able to show by a preponderance of the evidence that any entity or person will directly infringe any of the asserted claims of the '483 patent, a necessary element of induced infringement.

4.     Defendants will, to the extent necessary, introduce evidence to rebut Plaintiff' evidence regarding direct infringement of the asserted claims of the '483 patent.

5.     Plaintiff will not be able to show by a preponderance of the evidence that Defendants contribute to the infringement of one or more claims of the '483 patent.

6.     Plaintiff will not be able to prove infringement of the '483 patent by Defendants under 35 U.S.C. § 271(a), (b), and (c).

7.     Plaintiff will not be able to show this is an exceptional case under 35 U.S.C. § 271(e)(4) and 35 U.S.C. § 285 which permits Plaintiff to be awarded attorneys' fees and costs.

## II.     Person of Ordinary Skill

8.     Defendants will show that a person of ordinary skill in the art relevant to the claims of the '483 patent would be a formulator of drugs with a Ph.D. or equivalent degree in pharmaceutics, chemistry, chemical engineering, or a related field. The POSA would have had several (at least two) years of experience in formulating parenteral drugs, including drugs designed for intravenous administration. The POSA would have collaborated, as needed, with other skilled persons such as: a clinical scientist with a medical degree and several years of experience in the clinical development of drugs, including those that are administered intravenously and the medical preparation and administration of the same; oncologists; pharmacologists; toxicologists; clinical oncology pharmacists; specialty pharmacists; oncology nurses; and the like. Defendants incorporate by reference their discussion as to the Person of Ordinary Skill as set forth in Exhibit 2B-Defendants' Statement of Issues of Fact.

### III.     Issues on Which Defendants Bear the Burden of Proof

9.      Defendants will prove by clear and convincing evidence that the asserted claims of the '483 patent are invalid under 35 U.S.C. § 102, because they would have been anticipated as of the effective priority date in view of the prior art.

10.      Defendants will prove by clear and convincing evidence that the asserted claims of the '483 patent are invalid under 35 U.S.C. § 103, because they would have been obvious as of the effective priority date in view of the prior art.

11.      Defendants will prove by clear and convincing evidence that the asserted claims of the '483 patent are invalid under 35 U.S.C. § 112(b), because they are indefinite.

12.      Defendants will, to the extent necessary, rebut Plaintiff' arguments regarding any alleged objective indicia of non-obviousness related to the claimed subject matter of the asserted claims of the '483 patent.

### IV.     Relief

13.      Defendants will prove that they are entitled to declaratory judgment of invalidity of the '483 patent.

14.      Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's case for infringement of the '483 patent, including any applicable limitations on the application of the doctrine of equivalents, and will request a judgment that Defendants have not infringed, do not infringe, and will not infringe the '483 patent.

15.      Defendants will prove that they are entitled to declaratory judgment of non-infringement of the '483 patent.

16.      Defendants will prove that they are entitled to appropriate relief under 35 U.S.C. § 285.

17.     Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's request for an injunction entered against Defendants with respect to the '483 patent, and will request that no injunctions be entered.

18.     Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's request for an Order pursuant to 35 U.S.C. § 271(e)(4)(A) delaying approval of Defendants' ANDAs.

19.     Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's request that judgment should be entered permanently enjoining Defendants and each of Defendants' respective officers, agents, attorneys, employees, successors, affiliates, assigns, and those acting in privity or concert with them, from directly or indirectly engaging in the commercial manufacture, use, sale, or offer for sale of Defendants' NDA Products in the United States, or importation of Defendants' NDA Products into the United States, or inducing or contributing to any such conduct until after the expiration of the '483 patent, including any extension(s) and additional period(s) of exclusivity.

20.     Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's request that a declaration should be issued and judgment entered under 28 U.S.C. §§ 2201 and 2202 that any future commercial manufacture, use, sale, or offer  for sale of Defendants' NDA Products in the United States, or importation of Defendants' NDA Products into the United States, prior to the expiration of the '483 patent (including any extension(s) and additional period(s) of exclusivity) will constitute infringement of the '483 patent under 35 U.S.C. § 271(a), (b), and (c), either literally or under the doctrine of equivalents.

21.     Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's request for damages or other monetary relief, and will request that no such relief be granted.

22.     Defendants will rebut any evidence offered by Plaintiff in support of Plaintiff's request for relief under 35 U.S.C. § 285, and will request that no such relief be granted.