# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br>APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**<u>CONFIDENTIAL –<br>FILED UNDER SEAL</u>** |

## PLAINTIFF'S MOTION *IN LIMINE* # 1

Plaintiff Eagle Pharmaceuticals, Inc. moves *in limine* to preclude argument and testimony by Defendants Slayback Pharma LLC ("Slayback") and Apotex Inc. and Apotex Corp. (collectively, "Apotex") (together, "Defendants") and their experts that is contrary to express representations Defendants made to FDA, under oath, in the course of Slayback's New Drug Application ("NDA") No. 212209 and Apotex's NDA No. 215033.

Defendants' expert Dr. Brandt has opined that Slayback's and Apotex's Proposed NDA Products do not infringe the Asserted Claims of the '483 patent because they purportedly are not "ready to use" liquid bendamustine-containing compositions per the parties stipulated construction of the term. *See* Ex. A, ¶¶ 101-103. The stipulated construction of "ready to use," adopted by this Court, is "able to be dispensed with minimal if any effort or preparation; prepackaged." D.I. 42. This construction tracks the Medical Dictionary definition of "ready to use" cited by the Examiner in reaching the conclusion that the term "in the medical arts has a specific meaning that is not ambiguous" (Ex. B, EAGELBEN-SLAYBACK-00272500, 272529) and that said ordinary meaning "does give meaning and life to the claim" (Ex. C, EAGELBEN-SLAYBACK-00272537).

Consistent with the stipulated ordinary meaning construction, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1



Specifically, Defendants and their expert now argue that their Proposed NDA

Products are not "ready to use" as they cannot be "dispensed with minimal if any

preparation" in part █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████        Putting aside that Defendants' argument appears to focus on pure

semantics, █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

    Recognizing the blatant contradiction, Defendants offer the conclusory

assertion from Dr. Brandt that ████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ But Defendants cannot have it both ways: they cannot

make statements "to support [their] bid for FDA approval, yet avoid the

consequences" of such admissions in litigation. *Intendis GMBH v. Glenmark

Pharm. Inc., USA*, 822 F.3d 1355, 1361 (Fed. Cir. 2016). Defendants should not be

permitted to offer argument and testimony that seeks to contradict or undermine

these "representation[s] to a federal regulatory body that [are] directly on point." *Id.*

at 1362. In short, Defendants should not be permitted to make representations to

one branch of the government, under oath and for purposes of facilitating approval

of their drug products, and attempt to contradict those representations in front of

another branch of the government, such that Defendants should be precluded from

offering evidence on that score pursuant to FED. RULES EVID. 402 and 403.

DATED: August 29, 2022

OF COUNSEL:

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

MCCARTER & ENGLISH, LLP

/s/ *Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff Eagle
Pharmaceuticals, Inc.*

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., <br><br> Defendants. | C.A. No. 21-1256-CFC-JLH |

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that Plaintiff's Motion *In Limine* #1 was prepared in 14-point Times New Roman font, and contains 675 words (excluding the caption, title, signature blocks, and tables of contents and authorities), which were counted by Alexandra M. Joyce using the word count feature in Microsoft Word.

DATED: August 29, 2022

OF COUNSEL:

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

MCCARTER & ENGLISH, LLP

/s/ *Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff Eagle*
*Pharmaceuticals, Inc.*

# EXHIBIT A

**IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EAGLE PHARMACEUTICALS, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-1256-CFC |
| v. | ) | |
| | ) | **HIGHLY CONFIDENTIAL** |
| SLAYBACK PHARMA LLC, APOTEX INC., | ) | |
| and APOTEX CORP., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REBUTTAL EXPERT REPORT OF DR. MICHAEL L. BRANDT, B.S., PharmD, FASHP**

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 4

II.    COMPENSATION AND PRIOR TESTIMONY ....................................... 5

III.   QUALIFICATIONS .................................................................................... 5

IV.    MATERIALS CONSIDERED ................................................................... 12

V.     LEGAL STANDARDS .............................................................................. 12

VI.    THE SPECIFICATION OF THE '483 PATENT .................................. 15

VII.   THE PROSECUTION OF THE '483 PATENT ..................................... 16

VIII.  LEVEL OF ORDINARY SKILL IN THE ART .................................... 17

IX.    TUTORIAL / TECHNICAL BACKGROUND ...................................... 20

   A.   Parenteral Drug Products .................................................................. 20

   B.   Sterile Preparation of an Injection or Infusion ............................. 21

   C.   Parenteral Products Containing Cytotoxic Agents ....................... 23

   D.   Bendamustine Hydrochloride Parenteral Products ....................... 30

   E.   Dispensing Bendamustine Hydrochloride Parenteral Products ......... 31

X.     ASSERTED CLAIMS OF THE '483 PATENT ..................................... 36

   A.   Asserted Claims .................................................................................. 36

   B.   Claim Construction ............................................................................ 38

XI.    DEFENDANTS' PROPOSED NDA PRODUCTS DO NOT INFRINGE THE '483
       PATENT ..................................................................................................... 40

   A.   Apotex's Proposed NDA Product .................................................... 41

   B.   The Apotex Proposed NDA Product Is Not "Ready to Use" ............. 46

   C.   Slayback's Proposed NDA Product ................................................. 50

   D.   The Slayback Proposed NDA Product Is Not "Ready to Use" ......... 54

   E.   Dr. Sewell's Opinions Do Not Support a Finding of Infringement ......... 56

   F.   Dr. Elder's Opinions Do Not Support a Finding of Infringement ......... 59

   G.   Apotex's and Slayback's Statements In Their Regulatory Filings Do Not Alter My
        Opinions ............................................................................................... 59

   H.   No Infringement Under Doctrine of Equivalents .......................... 61

   I.    No Indirect Infringement of "Ready to Use" Claim Limitation by Apotex's Proposed
        NDA ....................................................................................................... 65

J.    No Indirect Infringement of "Ready to Use" Claim Limitation by Slayback's Proposed NDA Product.................................................................................................................... 66

XII.    BELRAPZO® AND BENDEKA® ARE NOT "READY TO USE"................................ 66

# I.   INTRODUCTION

1.      At the request of counsel for Defendants Slayback Pharma LLC ("Slayback"), Apotex Inc., and Apotex Corp. (together, "Apotex") (Slayback and Apotex collectively, "Defendants"), I hereby submit this Rebuttal Expert Report pursuant to Fed. R. Civ. P. 26(a)(2)(B) in response to the Opening Expert Reports of Graham James Sewell, Ph.D. ("Sewell Opening Report") and Edmund J. Elder, Ph.D. ("Elder Opening Report").

2.      For the reasons stated herein, it is my opinion that the bendamustine hydrochloride products described in NDA Nos. 212209 ("Slayback's Proposed NDA Product") or 215033 ("Apotex's Proposed NDA Product") or their contemplated use would not infringe any asserted claim of U.S. Patent No. 11,103,483 (the "'483 Patent"), including: Claims 1-9 and 11-16. This report provides the bases for my opinions, information considered by me in forming my opinions, my qualifications, and compensation for my services.

3.      If called upon to testify at trial, I expect to testify about the following:

- my professional background, qualifications, and experience;

- the knowledge and level of skill of a person of ordinary skill in the art ("POSA") as of the earliest alleged priority date of the '483 Patent;

- the '483 patent and its claims, specifications and prosecution history

- certain concepts in the pharmaceutical sciences, including those that are relevant to liquid injectable products;

- the knowledge of a POSA with respect to the use of parenterally administered drugs, including injectable products containing cytotoxic agents;

- my opinions concerning the non-infringement of claims 1-9 and 11-16 of the '483 patent by Slayback's Proposed NDA Product;

- my opinions concerning the non-infringement of claims 1-9 and 11-16 of the '483 patent by Apotex's Proposed NDA Product; and

- any other topics discussed in this Report.

4.    I may also testify in rebuttal to any opinions offered by expert(s) testifying on behalf of Eagle Pharmaceuticals, Inc. ("Plaintiff" or "Eagle") at deposition or trial.  I reserve the right to amend or supplement my opinions in light of any evidence offered by Eagle, or additional information made available to me in the future.  To the extent Eagle and/or their expert(s) provide any additional statements, opinions, or conclusions, including in any future reports, I may offer further opinions.

5.    I also reserve the right to illustrate my opinions using demonstrative exhibits at trial.  I have not yet created any exhibits that I expect to use at trial, but they may include diagrams, presentations, videos, animations, still images, or call-outs.  I also reserve the right to provide a technology tutorial at trial if called upon to do so.  In addition, I may use the cited materials to assist me in preparing demonstratives, such as graphics and animations, for my testimony or in the event that I am asked to provide a technology tutorial.

## II.    COMPENSATION AND PRIOR TESTIMONY

6.    I am being compensated for my time at the rate of $250 per hour for consulting and $500 per hour for testimony.  My compensation is not contingent on the outcome of this litigation.

7.    In the last three years, I have not given testimony, either at trial or at deposition, as an expert consultant.

## III.    QUALIFICATIONS

8.    A true and correct copy of my current curriculum vitae is attached as Exhibit A.

99.     As the agreed upon construction makes clear, "minimal" effort/preparation is closely correlated with "if any" effort/preparation.  This suggests to a POSA that "ready to use" products include products that can be dispensed with no effort/preparation.  Similarly, the agreed upon construction is "[a]ble to be dispensed with minimal if any effort or preparation; **prepackaged**."  In my opinion, the inclusion of the term "prepackaged" suggest that "ready to use" is directed towards the distinct categorization in Remington of parenteral products that can be either "solutions ready for injection" (i.e. prepackaged) as opposed to "liquid concentrates ready for dilution prior to administration".  *See supra* at ¶ 57 (citing Remington at 805).

100.    Indeed, there are products available that are regarded as "ready to inject", prepackaged in a pen injector, autoinjector or prefilled syringe and can be dispensed with "minimal if any effort or preparation."  Some examples include:

- EPIPEN (epinephrine injection, USP auto-injector) is an injectable epinephrine for emergency treatment of allergic reaction, packaged with 2 single-dose pre-filled auto-injectors and 1 auto-injector trainer device (*see* www.epipen.com)

- Neulasta® (pegfilgrastim) is an injectable granulocyte colony stimulating factor, packaged in a single-dose prefilled syringe co-packaged with an on-body injector (*see* www.neulasta.com)

  GVOKE (glucagon) is an injectable antihypoglycemic agent, packaged in single-dose auto-injectors or pre-filled syringes (*see* www.gvokeglucagon.com)

## XI.     DEFENDANTS' PROPOSED NDA PRODUCTS DO NOT INFRINGE THE '483 PATENT

101.    The Asserted Claims each recite a "ready to use" composition or method of using the same.  I have been asked to offer my opinions on whether the products described in NDA Nos.

21-2209 ("Slayback's Proposed NDA Product") and 21-5033 ("Apotex's Proposed NDA Product") are "ready to use" as that term is used in the '483 patent.

102.    For the reasons set forth below, it is my opinion that Apotex's Proposed NDA Product or its indicated use would not infringe any of the Asserted Claims of the '483 patent because, *inter alia*, that product would not be able to be dispensed with minimal if any effort or preparation, and thus, is not "ready to use" as required by the Asserted Claims.[3]

103.    It is also my opinion that Slayback's Proposed NDA Product or its indicated use would not infringe any of the Asserted Claims of the '483 patent because, *inter alia*, that product would not be able to be dispensed with minimal if any effort or preparation, and thus, is not "ready to use" as required by the Asserted Claims.



---

[3] Since all asserted claims depend on claim 1, and since there is no infringement of claim 1, there would be no infringement (literally or under the doctrine of equivalents) of any asserted dependent claim (which are narrower in scope than independent claim 1).



106.

107.

108.

109.



110.

---

[4] OSHA Hazardous Drugs. OSHA (Accessed on 02/16/16, from http://www.osha.gov/SLTC/hazardousdrugs/index.html). (footnote in original)



111.



112. ██████████████████████████████████

113. ██████████████████████████████████

---

[5] OSHA Hazardous Drugs. OSHA (Accessed on 02/16/16, from http://www.osha.gov/SLTC/hazardousdrugs/index.html. (footnote in original)
[6] Id..

██████████████████████   ██   ████████   ████████   ██████   ██   ██   ████
████████████████████

**B.      The Apotex Proposed NDA Product Is Not "Ready to Use"**

114.    Based on my review of the prescribing information for the Apotex Proposed NDA Product and my experience as an oncology pharmacist and a POSA, it is my opinion that Apotex's Proposed NDA Product or its indicated use would not infringe any of the Asserted Claims of the '483 patent because, *inter alia*, that product is not able to be dispensed with minimal if any effort or preparation, and thus, is not "ready to use" as required by the Asserted Claims.

115.    As discussed in detail above, the act of dispensing liquid bendamustine hydrochloride products, such as Apotex's Proposed NDA Product, requires significant effort and preparation. *See supra* at ¶¶ 82-91.  Although I Apotex's Proposed NDA Product is not currently available on the market, I am familiar with the details set forth in Apotex's Prescribing Information. Moreover, based on my years of experience as an oncology pharmacist dealing with other bendamustine hydrochloride products, the steps outlined above for dispensing of cytotoxic chemotherapeutic infusion agents are indeed the same steps that would be required to dispense Apotex's Proposed NDA Product.  *See supra* at ¶¶ 82-91.

116.    For example, the effort and preparation required to dispense Apotex's Proposed NDA Product begins when the medical oncologist or treating physician places an order within the electronic medical record system and the pharmacy receives the prescription (or chemotherapy order). *See supra* at ¶ 85.

117.    The preparatory dispensing process for the pharmacist would then continue as he/she would need to, *inter alia*: (i) assess the completeness of the order for potential allergies; (ii) ensure the timing of the order is clinically relevant for the patient; (iii) review the patient's medical

record to confirm the avoidance of, *e.g.*, drug-drug interaction, drug-disease interaction, and dietary interactions; (iv) calculate and/or confirm the patient's body-surface area ($m^2$) used to arrive at the prescribed dosage ($mg/m^2$); (v) calculate and/or confirm the prescribed dosage ($mg/m^2$) for the patient based on the applicable body-surface area and prescribing information; (vi) review the patient's recent lab values to ensure they are inside a normal range and, if outside that range, to understand how to adjust the dose and timing of administration of the medication; and (vii) grade the patient by the CTCAE grading scale to understand applicable health parameters; and potentially (viii) communicate with the treating physician to discuss any proposed alterations to the prescribed dosage. *See supra* at ¶¶ 82-91. Should a discrepancy arise between the prescribed dose(s) and the interpretation of the oncology pharmacists, the prescribing provider would be consulted and any alterations to the prescription would be set forth in the EMR. The pharmacists would then reconsider the prescription and, if agreed, would proceed with subsequent steps. The level of scrutiny at this last step is higher when dealing with medications necessary to treat cancer, as the potential for untoward toxicity or decreased efficacy is greater.

118. Once these initial preparatory steps are completed, the clinical pharmacist would release the chemotherapy order—with confirmed calculated dosage—to the pharmacy mixing room and a second phase of preparation would begin. Within this second phase of preparation, there would be double-checking of the measured volumes and setup to reduce errors. The pharmacist and/or technician would also take extra safety and handling precautions since bendamustine hydrochloride is a cytotoxic agent; these precautions include working efficiently with the product given its limited admixture stability and working in a hazardous drug mixing hood. *See supra* at ¶¶ 57-65, 82-91; *see also, e.g.*, Remington at 802; OSHA Guidelines at A-1–A-11; Power at 94. The pharmacist or technician would be wearing protective gear and likely

utilizing a CSTD.  *See supra* at ¶¶ 57-65, 82-91.  The pharmacist and/or technician would have reviewed the patient medical record to understand the accommodations of the clinic/hospital infusion room and would have set up the appropriate receiving final intravenous volume bag and tubing.  *See id.*

119.    Knowing the correct dosage for the patient as determined from the chemotherapy order and providing for the appropriate set up for hazardous drugs in the pharmacy mixing hood, the technician would then draw the desired volume from the multi-dosage vial using the techniques known for cytotoxic drugs (*see supra* at ¶¶ 57-65; 68-78; *see also generally* OSHA Guidelines) and a second set of eyes (*e.g.*, from the pharmacist) would double-check to visually examine that the appropriate amount of bendamustine hydrochloride injection product is extracted from the vial into the syringe.  *See supra* at ¶¶ 82-91; *see also, e.g.*, Remington at 805.  This checkpoint would be used to confirm that the syringe is transferring the correct amount of medication to the infusion bag and the bag is also double-checked to ensure it has the correct label and required information as compared to that provided in the original chemotherapy order and relevant patient medical record.

120.    Upon confirming all the required information and setting up all of the necessary environments, the technician would then transfer the extracted liquid bendamustine from the vial to dilute it in the final infusion bag with additional diluent.  At that point, final preparation steps for dispensing the chemotherapeutic would commence followed by transporting the appropriately prepared dosage to the appropriate facility administering it to the patient.  These steps would include, *e.g.*, placing the diluted product's infusion bag into a double bag, affixing a patient label to the double bag, confirming the label information to ensure the patient information and drug

information are correct, sealing the infusion bag, and preparing for transportation to a remote administration facility if necessary. *See supra* at ¶¶ 90-91.

121.    At this point, the technician and/or pharmacist would also be tending to the multiple-dose vial to ensure handling of the drug product abides by the required conditions to enable the drug product to be used for a second, third or multiple dose. *See, e.g.*, OSHA Guidelines at A-4–A-6; A-8–A-9.  This latter step for a product like liquid bendamustine also includes steps described in the product labeling, *e.g.*, returning the vial to a temperature controlled area, and the pharmacist would also need to maintain and update the information tracking the use of the vial pharmacy's drug system to account for the aliquot taken to create the immediate patient sample and allow the opportunity for additional samples to be prepared.  *See, e.g.*, APO-BENDA_0000087-0000107 at 0000090, 0000106.

122.    Only after the successful completion of these dispensing steps would Apotex's Proposed NDA Product be ready to administer to the patient. The complexities of oncology pharmacy described above illustrate a specialized process that commands the need for skilled and experienced medical professionals.  I consider these hazardous parenteral chemotherapeutic products, like bendamustine hydrochloride, to be some of the most difficult and complex compositions to dispense.  As provided above, it is my experience that the time and effort required to dispense these products is considerable and depends on several variables that must be considered each time the product is dispensed, and ultimately administered to the patient.  Executing these processes requires significant effort and preparation, particularly when compared to the dispensing procedures for other parenteral pharmaceutical products.

123.     For the reasons set forth above, Apotex's Proposed NDA Product is not "ready to use," as that term is used in the Asserted Claims, because, *inter alia*, it would not be able to be dispensed with the "minimal if any effort or preparation" required. Accordingly, it is my opinion Apotex's Proposed NDA Product would not infringe any of the Asserted Claims.

**C.**     ████████████████████████

124.     It is also my opinion that Slayback's proposed NDA product is not a "ready to use" composition as that term is used in the Asserted Claims of the '483 patent because, *inter alia*, that product cannot be dispensed with minimal if any effort or preparation.

125.     ████████████████████████████████
████████████████████████████████████
████████████████

126.     ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████    ████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████

50

127.

128.

129.

130.

131.





132.



133.



**D.     The Slayback Proposed NDA Product Is Not "Ready to Use"**

136.    Slayback's Proposed NDA Product is not a "ready to use" product as claimed in the '483 patent.  In particular, Slayback's NDA product does not meet the limitation of the asserted

claims as it is not "[a]ble to be dispensed with *minimal if any effort or preparation*; prepackaged." As described further herein, it is my opinion that Slayback's Proposed NDA Product does not infringe asserted claims 1-9 and 11-16 of the '483 Patent.

137.    As discussed in detail above, dispensing liquid bendamustine hydrochloride products, such as Slayback's Proposed NDA Product, requires significant effort and preparation. Although I have not dispensed Slayback's Proposed NDA Product due to the fact that it is not available to the market yet, I am familiar with the details set forth in the Full Prescribing Information contained in the Slayback NDA. Moreover, based on my years of experience as an oncology pharmacist dealing with similar products, the steps outlined above for dispensing of cytotoxic chemotherapeutic infusion agents (such as Belrapzo® or Bendeka®) are indeed the same steps that would be required to dispense Slayback's Proposed NDA Product. *See supra* at ¶¶ 82-91.

138.    For example, the effort and preparation that would be needed to dispense Slayback's Proposed NDA Product begins when the medical oncologist or treating physician places an order within the electronic medical record system and the pharmacy receives the prescription (chemotherapy order). Furthermore, for the same reasons as above with regard to Apotex's Proposed NDA Product (*see supra* at ¶¶ 112-123), these additional steps are required in order to dispense Slayback's Proposed NDA Product.

139.    Accordingly, for at least the reasons set forth above, it is my opinion that Slayback's Proposed NDA Product or its indicated use would not infringe any of the Asserted Claims of the '483 patent because, *inter alia*, that product is not able to be dispensed with minimal if any effort or preparation, and thus, is not "ready to use" as required by the Asserted Claims.

do all of this while under a time constraint of preparing the product admixture as directed by the manufacturer "as close as possible to the time of patient administration." *See supra* at ¶¶ 109, 133.

### F.      Dr. Elder's Opinions Do Not Support a Finding of Infringement

149.    Dr. Elder's opening report is largely duplicative of Dr. Sewell's arguments regarding alleged infringement by Defendants' Proposed NDA Products.

150.    Dr. Elder contends that Defendants' Proposed NDA Products are "ready to use" because they do not require reconstitution. *See,* Elder Opening Report at¶¶ 85-91*;* 103-107.  I disagree. First, the POSA would not equate "ready to use" with "does not require reconstitution." There is no reference to reconstitution in the agreed-upon construction of "ready to use," and a POSA would not read such a requirement into that definition. Rather, as discussed above, the agreed-upon definition of "ready to use" focuses on the level of effort and preparation required to dispense a pharmaceutical product, regardless of whether that product is reconstituted or not.  As set forth above, the level of effort and preparation required to dispense Defendants' Proposed NDA Products would be significantly higher than the "minimal if any" required by the claims. *See, e.g.*, ¶¶ 82-91.  Despite acknowledging that bendamustine hydrochloride products present "real risks to the pharmacists or others who prepare and dispense [these products] over days, weeks, months, and years[,]" Dr. Elder fails to engage in any analysis of the effort and preparation required to reduce these risks, such as the clean room preparation and the NIOSH or OSHA Guidelines discussed above. *See supra* at ¶¶ 57-65; ¶¶68-78.





152. ████████████████████████████████████

153. ████████████████████████████████████

154.   For the reasons discussed above, these products are not "ready to use." ████

[REDACTED]

### H.    No Infringement Under Doctrine of Equivalents

155.    As explained above, it is my opinion each of Defendants' Proposed NDA Products (or their indicated use) would not infringe the Asserted Claims because they are not "ready to use" as that term is used in the '483 patent. I understand that Dr. Elder contends that Defendants' Proposed NDA Products would infringe the "ready to use" under the doctrine of equivalents.  *See* Elder Opening Report at ¶¶ 108-110.  For the reasons set forth below, I disagree.

156.    It is my understanding that the doctrine of equivalents is not unbounded but rather has various limitations. One such limitation is the disclosure-dedication doctrine, whereby a applicant cannot reclaim any subject matter it willing gave up by disclosing in its specification but failing to claim.

157.    Based on my review of the specification and prosecution history, as discussed in further detail above (*see supra* at ¶¶ 41-46), it is clear that the Applicant distinguished "ready to use" from "ready for further dilution" both in the specification and during prosecution.  For example, the specification states "[t]he inventive formulations are advantageously ready to use **_or_** ready for further dilution."  *See* '483 patent at 2:18-21 (emphasis added). A POSA would understand that "or" means "ready to use" products are different than products that are "ready for further dilution." This comports with how such compositions would be understood by a POSA at the time of the '483 patent. For example, as discussed above, Remington similarly distinguishes compositions that are "ready for injection" from "concentrates that require dilution." *See*

61

# EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311          7590          07/16/2021
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/16/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SLAYBACK-00272500

| ***Applicant-Initiated Interview Summary*** | Application No.<br>16/509,920 | Applicant(s)<br>Palepu et al. | | |
|---|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art<br>Unit<br>1613 | AIA (First Inventor to File) Status<br>No | Page<br>1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney | |

**Date of Interview:** 12 July 2021

**Issues Discussed:**

**35 U.S.C. 103**

The art of Brittain 20050159713 was discussed. See below.

**Proposed Amendment(s)**

See attached. The Examiner noted that the instant claims are directed to liquid bendamustine compositions and the proposed amendment is "ready for further dilution". In contrast, Brittain US 20060159713 teaches liquid compositions ready for further concentration via lyophilization ( pre-lyophilization). See claim 77 of Brittain. The Examiner also researched the term "ready for use" which in the medical arts has a specific meaning that is not ambiguous. See attached Medical Dictionary definition for example. The pre-lyophilized solution of Britttain is not "ready for use" in this context because it is ready for lyophilization. The Examiner noted that while only sulfur based antioxidants were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention. Also the Examiner noted that t-butyl alcohol used by Brittain has a high vapor pressure and is thus an excellent freeze-drying medium (Abstract of: Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) whereas PEG does not sublime under practical and common lyophilization conditions (left column page 2245 of: Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). As a result, in view of the prosecution history and art of record, the Examiner left it to Applicants to decide whether "ready to use" or "ready for further dilution" in the claim preamble was appropriate because either would work in terms of patentable subject matter. Applicant thought "ready to use" as per the claims filed 5/20/21 would be best and would file terminal disclaimers.

**Non-statutory Double Patenting**

Applicant would file terminal disclaimers.

| | /ERNST V ARNOLD/<br>Primary Examiner, Art Unit 1613 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

EAGLEBEN-SLAYBACK-00272501

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | Applicant(s) Palepu et al. | | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 2 of 2 |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

EAGLEBEN-SLAYBACK-00272502

| | *Notice of References Cited* | Application/Control No.<br>16/509,920 | | Applicant(s)/Patent Under<br>Reexamination<br>Palepu et al. | |
|---|---|---|---|---|---|
| | | Examiner<br>ERNST V ARNOLD | | Art Unit<br>1613 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| | A | | | | | |
| | B | | | | | |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). (Year: 2004) |
| | V | Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) (Year: 2001) |
| | W | "ready-to-use" [online] retrieved on 5/27/21 from: https://medical-dictionary.thefreedictionary.com/ready-to-use; 1 page). (Year: 2021) |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

EAGLEBEN-SLAYBACK-00272503

ELSEVIER

International Journal of Pharmaceutics 226 (2001) 39–46

international
journal of
pharmaceutics

www.elsevier.com/locate/ijpharm

# Use of pure *t*-butanol as a solvent for freeze-drying: a case study

Nina Ni [a,*], Marc Tesconi [b], S. Esmail Tabibi [c], Shanker Gupta [c], Samuel H. Yalkowsky [a]

[a] *College of Pharmacy, University of Arizona, Tucson, AZ 85721, USA*
[b] *Chiron Corporation, Emeryville, CA 94608, USA*
[c] *Pharmaceutical Resources Branch, DTP, DCTD, NCI, NIH, Bethesda, MD 20892-7446, USA*

Received 23 January 2001; received in revised form 24 May 2001; accepted 24 May 2001

## Abstract

1-(2-Chloroethyl)-3-sarcosinamide-1-nitrosourea, (SarCNU) (NSC-364432) is a new antitumor drug that is of interest to the National Cancer Institute. It is intended for use as an intravenous injection. Although SarCNU is sufficiently soluble in water to obtain the desired dosage, it is highly unstable. Its $T_{90}$ in aqueous solution at room temperature is less than 6 h. Neat tertiary butyl alcohol (TBA), a low toxicity, high vapor pressure and low melting solvent, was determined to be an excellent freeze-drying medium. Lyophilization of SarCNU from pure TBA produces a uniform cake composed of needle-shaped crystals. Thermal analysis and gas chromatography indicate that the cake contains less than 0.001% residual solvent. The SarCNU cake can be readily reconstituted with either water or an aqueous solution of 40% propylene glycol and 10% ethanol. The reconstituted solutions are stable for 4 and 13 h, respectively. © 2001 Elsevier Science B.V. All rights reserved.

*Keywords:* 1-(2-Chloroethyl)-3-sarcosinamide-1-nitrosourea; Lyophilization; Tertiary butyl alcohol

## 1. Introduction

1-(2-Chloroethyl)-3-sarcosinamide-1-nitrosourea (SarCNU) (Fig. 1) was selected for formulation by the National Cancer Institute because of its therapeutic advantage in the treatment of malignant glioma. Most nitrosoureas are stable in acidic media at pH 3–5, and in nonaqueous solvents such as methanol, ethanol (EtOH), and tertiary butyl alcohol (TBA), but they are very labile in neutral aqueous media (Bosanquet, 1985). SarCNU is a chloroethylnitrosourea that is methylated in the *N*-3 position to make it more stable. In spite of its being more stable than other nitrosoureas, we have found that it still degrades rapidly in aqueous media, especially in the presence of light and at high temperatures. Although it is soluble in aqueous media, the instability of SarCNU prevents the formulation of the drug in an aqueous or a semi-aqueous vehicle.

* Corresponding author. Tel.: +1-520-626-4308; fax: +1-520-626-4063.
*E-mail address:* na@pharmacy.arizona.edu (N. Ni).

0378-5173/01/$ - see front matter © 2001 Elsevier Science B.V. All rights reserved.
PII: S 0 3 7 8 - 5 1 7 3 ( 0 1 ) 0 0 7 5 7 - 8

EAGLEBEN-SLAYBACK-00272504

Case 1:21-cv-01256-CFC-JLH   Document 107-2   Filed 09/23/22   Page 40 of 445 PageID #: 3142

Fig. 1. Structure of SarCNU.

Generally a product is freeze-dried, if it is not stable in aqueous media. Although inherently expensive in terms of manufacturing costs, freeze-drying is often the processing method of choice for the production of an unstable parenteral product. Generally a reconstitutable freeze-dried product has improved stability, dosing accuracy, and rapid reconstitution. However, freeze-drying is commonly restricted to drugs that are soluble and stable in an aqueous medium for at least the time required for dissolution, filtration, filling, and freezing of the product.

The ideal freeze-drying medium has a high vapor pressure, a melting point either below or slightly above room temperature, a high viscosity, and a low toxicity. It must provide a stable environment for freeze-drying and be rapidly and completely removed to produce a readily reconstitutable cake. In this report, we will show that neat TBA is an excellent nonaqueous solvent for freeze-drying highly water unstable drugs, such as SarCNU.

## 2. Experimental

### 2.1. Materials

SarCNU (NSC-364432) was provided by the Pharmaceutical Resources Branch, Developmen-

Table 2
Vapor pressure of TBA and water

| Temperature (°C) | TBA[a] | Water[b] |
|---|---|---|
| | Vapor pressure (mmHg) | Vapor pressure (mmHg) |
| −20.5 | 1 | 0.74 |
| −3.0 | 5 | 3.57 |
| 5.5 | 10 | 6.77 |
| 14.5 | 20 | 12.38 |
| 24.4 | 40 | 22.92 |
| 31.0 | 60 | 33.69 |
| 39.8 | 100 | 54.74 |
| 52.5 | 200 | 104.65 |
| 68.0 | 400 | 214.17 |
| 83.0 | 760 | 400.60 |

[a] All data were obtained from reference (Chemical Engineer's Handbook, 1973).

[b] All data were obtained from reference (Lange's Handbook of Chemistry, 1992).



Fig. 2. Sublimation of TBA and $H_2O$ during the primary drying ($-20$ °C and 60 mTorr).

Table 1
The physical properties of the solvents

| Name | Molecular weight | Melting point (°C) | Boiling point (°C) | Density (g/ml) 25 °C | Vapor pressure (mmHg) 25 °C | Viscosity (mPa·s) 20 °C |
|---|---|---|---|---|---|---|
| $H_2O$ | 18.02 | 0 | 100 | 0.9970 | 23.78 | 1.00 |
| HAc | 60.05 | 17 | 118 | 1.0429 | 15.75 | 1.31 |
| TBA | 74.12 | 25 | 82 | 0.7812 | 41.25 | 3.62 |
| DMSO | 78.14 | 19 | 189 | 1.0955 | 0.60 | 2.20 |

All data were obtained from reference (Handbook of Chemistry and Physics, 1991–1992), except for the viscosity of TBA that was experimentally determined.

EAGLEBEN-SLAYBACK-00272505

*N. Ni et al. / International Journal of Pharmaceutics 226 (2001) 39–46* 41

tal Therapeutics Program, Division of Cancer Treatment, National Cancer Institute (Bethesda, MD). 'Baker Analyzed' *tert*-butyl alcohol was at least 99.9% pure. All other chemicals were analytical or high pressure liquid chromatographic assay (HPLC) grade.

Table 3
Degradation of SarCNU in different solvents at 25 °C

| Solvent | Degradation rate constants (per day) | $T_{90}$ (days) |
|---------|--------------------------------------|-----------------|
| HAc | 1.8324 | 0.06 |
| DMSO | 0.0912 | 1.16 |
| MeOH | 0.0216 | 4.88 |
| $H_2O$ | 0.4128 | 0.26 |
| 20% TBA/$H_2O$ | 0.2880 | 0.36 |
| 50% TBA/$H_2O$ | 0.1032 | 1.02 |
| 80% TBA/$H_2O$ | 0.0336 | 3.14 |
| TBA | 0.0072 | 14.93 |



Fig. 3. Degradation of SarCNU in different solvents at 25 °C.



Fig. 4. Degradation of SarCNU in TBA/water mixture at 25 °C.



Fig. 5. Crystallinity of the cake.

## 2.2. Freeze-drying process

A laboratory freeze-drier (Virtis 15 SRC-X, The Virtis Co., Inc. Gardiner, NY) was used. The freeze-drying process was as follows: (1) freezing at −20 °C for 24 h; (2) primary drying at −20 °C for 10 h; and (3) secondary drying at 10 °C for 10 h and then 20 °C for 5 h. The cooling and heating rate was not controlled during freezing. The chamber pressure was maintained at 60 mTorr throughout the drying process. Solutions of SarCNU were prepared at a concentration of 5.0 mg/ml in TBA. The amber freeze-drying vials (Serum vials, Borosilicate Glass, Kimble) were 10.0 ml with a fill volume of 1.0 ml and were covered using rubber stoppers (Gray Buty Rubber Stoppers, Kimble).

## 2.3. Thermal Analysis

Differential scanning calorimetry (DSC) was conducted on 3–5 mg samples. The samples were placed in sealed aluminum pans and an empty sealed aluminum pan was used as a reference. They were heated at 10 °C/min using a TA Instruments DSC 910 (TA, Instruments, Inc., New Castle, DE).

Thermogravimetric analysis (TGA) was conducted on 3–5 mg samples in open aluminum pans at a heating rate of 10 °C/min using a TA Instruments TGA 951 (TA, Instruments, Inc.).

EAGLEBEN-SLAYBACK-00272506

Case 1:21-cv-01256-CFC-JLH   Document 107-2   Filed 09/23/22   Page 42 of 445 PageID #:
3144

### 2.4. Analysis of sublimation of TBA and water during primary drying

Preweighed 10 ml freeze-drying vials were filled with 1 ml of TBA or water, reweighed and transferred to the freeze-dryer. The solutions were cooled at $-20\ °C$ over night to allow for complete solidification. Sublimation of the solutions was undertaken at a shelf temperature of $-20\ °C$ and a chamber pressure of 60 mTorr. Samples that were removed at various stage of drying were weighed and the weight loss was recorded.

### 2.5. Polarizing microscope and camera

Photomicrographs of the freeze-dried cakes were taken using a SPOT camera and a Leica DMLP polarizing microscope (E. Licht Co., Denver, CO).

### 2.6. Gas chromatographic assay

A gas chromatographic assay (GC) with flame ionization detection (Hewlett Packard 5890, series II, Hewlett Packard Inc., Wilmington, DE) was used to measure the amount of residual TBA. The column used was a Supelco Simplicity-Wax Fused Silica Capillary Column, 30 m, 0.25 mm ID, 0.25 μm film (Lot no. 12130-08A) (Supelco Inc., Bellefonte, PA). Three aqueous solutions: TBA/SarCNU, pure drug, and the cake were prepared. A PIERCE Reacti-Therm™ Stirring/heating module (Pierce Inc., Rockford, IL) was used to heat the sample solution at 85 °C for 1 h, until a saturated vapor was obtained. The injection volume was 100 μl.



Fig. 6. DSC thermograph of SarCNU.

EAGLEBEN-SLAYBACK-00272507

N. Nv et al. / International Journal of Pharmaceutics 226 (2001) 39–46    43



Fig. 7. TGA thermograph of SarCNU.

## 2.7. High pressure liquid chromatographic assay

The gradient high pressure liquid chromatography assay of Peninsula Laboratories has been modified for SarCNU as described below: A Beckman System Gold (Beckman Instruments Inc., Fullerton, CA) equipped with a model no. 167 detector at 254 nm was used for HPLC analysis. The injection volume was 20 μl. Separations were achieved on a Restek Pinnacle ODS Amine column (5 U, $4.6 \times 250$ mm$^2$) (Restek Inc., Bellefonte, PA) at room temperature with a flow rate of 1.0 ml/min. The initial composition of the mobile phases was 9 parts of 1% acetic acid and 1 part acetonitrile. This was changed over a period of 20 min to the final composition of 1 part of 1% acetic acid and 9 parts of acetonitrile. Samples were dissolved in methanol and filtered through a 0.45 μm nylon filter membrane (Alltech Associates Inc. Deerfield, IL) before injection. The observed relative retention time of SarCNU was 9 min.

## 3. Results and discussion

### 3.1. Selection of a freeze-drying medium

Water and three possible alternate freeze-drying vehicles: glacial acetic acid, TBA, and dimethyl sulfoxide (DMSO) were chosen for evaluation. Table 1 shows the physical properties of water and the three nonaqueous vehicles considered. Each of these relatively nontoxic solvents has a low molecular weight, a melting point that is only slightly lower than room temperature, and the

EAGLEBEN-SLAYBACK-00272508

ability to readily sublime. Solvents with high vapor pressures sublime rapidly and thus accelerate the freeze-drying process. The cooling produced by rapid sublimation also helps to prevent the collapse of the cake by helping to keep the temperature of the cake below the collapse temperature. Solvents with a high viscosity are likely to reduce collapse or crystallization of amorphous drugs by inhibiting viscous flow during the formation of the cake. Table 1 shows that TBA has the highest viscosity as well as the highest vapor



Fig. 8. GC of aqueous solution containing 0.7 g/100 ml SarCNU and 0.1 ml/100 ml TBA.



Fig. 9. GC of the cake aqueous solution containing 0.7 g/100 ml SarCNU cake.



Fig. 10. GC of the pure drug aqueous solution containing 0.7 g/100 ml SarCNU.

pressure. In addition, it was observed that TBA forms small loosely packed needle-shaped crystals. This further decreases the resistance of the partially dried solids to further drying, because the needle-shaped crystals sublime to leave a highly porous matrix. Since this matrix has a low resistance to vapor transfer and a large surface area, both primary and secondary drying are efficient and rapid. Thus, as a result of its high vapor pressure (Table 2) and its crystal morphology the sublimation rate of TBA is more than 2.5 times greater than that of water as shown in Fig. 2. Although TBA has been used as an aqueous cosolvent in freeze-drying (Kasraian and DeLuca, 1994; Wittaya-Areekul and Nail, 1998), it is rarely used as a neat vehicle. This may be due to the fact that it is solid at most ambient temperatures. However, Tesconi and Yalkowsky (Tesconi et al., 1999) have shown that solid vehicles can be successfully used for freeze-drying.

### 3.2. Freeze-drying cake

No cake was formed when water was used to freeze-dry SarCNU. It was found that higher concentrations of TBA in TBA–water mixtures improve cake quality and the most uniform cake is produced from pure TBA. It is believed that the poor quality of cake formed in the presence of water is due to the lower vapor pressure and the

EAGLEBEN-SLAYBACK-00272509

N. Ni et al. / International Journal of Pharmaceutics 226 (2001) 39–46

lower viscosity of water even though the primary drying temperature was maintained below the collapse temperature. The stronger interaction of water with SarCNU may also contribute to the reduction of cake quality. The rapid sublimation of TBA helps to keep the product temperature below the collapse temperature. (For a crystalline drug, the collapse temperature is the eutectic temperature and for an amorphous drug, the collapse temperature is the glass transition temperature.) The high viscosity of TBA is also believed to help to prevent collapse by reducing viscous flow during the formation of the cake. Table 3 and Figs. 3 and 4 show that SarCNU is more stable in pure TBA than in any of the other pure solvents or in any of the TBA–water mixtures.

Fig. 5 shows that needle-shaped crystals of SarCNU were obtained after freeze-drying with TBA. The DSC scans in Fig. 6 show that there is no significant difference between the crystals of the cake and those of the pure bulk drug. The high surface area of the crystals in the cake ensures rapid reconstitution. The drug can be stored at 4 °C over 6 months without any measurable physical or chemical change and at 25 °C with some cake collapse but without any chemical degradation. The drug also can be stored at 4 °C over 12 months with some cake collapse but without any chemical degradation. A possible reason for the collapse of the cake is that small amounts of SarCNU (which melts at 93 °C) slowly sublime and recrystallize in a process similar to caking or sintering. This process is faster at room temperature than in the refrigerator. The cake is readily reconstituted with water. However, the resultant SarCNU solution has a $T_{90}$ of only 4 h. The cake can also be reconstituted with an aqueous solution of 40% propylene glycol (PG) and 10% EtOH. This solvent, which is less polar and has less water, was chosen to minimize hydrolysis. It gives a $T_{90}$ of 13 h for SarCNU. In either case, both the 4 and 25 °C products can be reconstituted within 30 s with only gently shaking.

### 3.3. Residual solvent

The TGA scans in Fig. 7 show no detectable TBA in the SarCNU cake. The gas chro-

matograms of Figs. 8–10 confirm that there is less than 0.001% TBA in the cake. The absence of TBA in the cake results from its ability to form high surface area crystals and from the fact that the intermolecular forces among TBA molecules and between TBA and SarCNU are not as strong as those of water. This allows TBA to sublime more completely and easily than water. The detrimental effects of TBA on health are minimal (Faulkner et al., 1989). The 0.001% TBA (0.05 μg TBA per cake) that is left in the cake is much lower than the toxic level. It has also been reported that a volatile organic solvent such as TBA can significantly reduce microbial contamination during filling or drying (Olson, 1997).

### 3.4. Recovery

Samples were assayed by the HPLC method described above before freeze-drying and after reconstitution. Only about 4% of the drug was lost during the lyophilization process. The same recovery ratio was obtained by repeating the freeze-drying process. Most of the drug loss is believed to be due to sublimation as evidenced by the fact that the chromatograms show no evidence of degradation of SarCNU and that it can be detected on the condenser after the TBA is removed.

## 4. Conclusion

TBA can improve the solubility and stability of hydrophobic and/or water sensitive drugs that must be freeze-dried. The needle-shaped crystals of TBA allow it to freeze and dry quickly and completely. There is less than 0.001% residual solvent left in the cake after secondary drying. The rapid sublimation of TBA prevents the collapse of the cake. The high crystallinity of the drug formed after freeze-drying from TBA increases its stability and shelf life. The SarCNU cake is readily reconstituted with water or an aqueous solution containing 40% PG and 10% EtOH. Thus, based upon its high volatility, high viscosity, crystal morphology and low reactivity, TBA is determined to be a suitable freeze-drying

EAGLEBEN-SLAYBACK-00272510

medium for SarCNU, and perhaps for other poorly water stable and poorly water-soluble drugs.

## Acknowledgements

This work was performed under contract CM-77 109 from the National Cancer Institute.

## References

Bosanquet, A.G., 1985. Stability of solutions of antineoplastic agents during preparation and storage for in vitro assays. Cancer Chem. Pharm. 14, 83–95.

Chemical Engineer's Handbook, fifth ed., 1973. R.C. Weast (Ed.) McGraw-Hill, New York, pp. 3–50.

Faulkner, T.P., Wiechart, J.D., Hartman, D.M., 1989. The effects of prenatal tertiary butanol administration in CBA/J and CS7BI/6J mice. Life Sci. 45, 1989–1995.

Handbook of Chemistry and Physics, 72nd ed., 1991–1992. Chemical Rubber Publishing Company.

Kasraian, K., DeLuca, P.P., 1994. The effect of tertiary butyl alcohol on the resistance of the dry product layer during primary drying. Pharm. Res. 12 (4), 491–495.

Lange's Handbook of Chemistry, 14th Ed., 1992. J.A. Dean (Ed.) McGraw-Hill, New York, pp. 5.26–5.29.

Olson, W.P., 1997. Volatile solvents for drying and microbial kill in the final container: a proposal and a review, with emphasis on tert-butyl alcohol. Pharm. Eng. July/August, 112–117.

Tesconi, M.S., Sepassi, K., Yalkowsky, S.H., 1999. Freeze-drying above room temperature. J. Pharm. Sci. 88 (5), 501–506.

Wittaya-Areekul, S., Nail, S.L., 1998. Freeze-drying of tert-butyl alcohol/water cosolvent systems: effects of formulation and process variables on residual solvents. J. Pharm. Sci. 87 (4), 491–495.

EAGLEBEN-SLAYBACK-00272511

*For Discussion Purposes Only*
U.S. Application 16/509,920

U.S. Application 16/509,920
Telephonic Interview Agenda
March 11, 2021, 10.00
Examiner Arnold
Michael Mercanti (for Applicant)
Stephanie Lodise (for licensee)

### *Brief Summary of Claimed Subject Matter*

1.  A **liquid bendamustine-containing composition** comprising
    bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine
    concentration in the composition is from about **10 mg/mL to about 100 mg/mL**;
    **polyethylene glycol**; and
    a stabilizing amount of an **antioxidant**;
    the composition having less than about 5% peak area response of total impurities resulting
    from the degradation of the bendamustine, as determined by HPLC at a wavelength of
    223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.

8.  A method of treating cancer in a mammal, comprising administering an effective amount of
    the liquid bendamustine-containing composition of claim 1 to the mammal.

### *Art for Discussion:  Brittain[1] in view of TREANDA®*

| Brittain |  |
| --- | --- |
| [0008]  Currently bendamustine is formulated as a lyophilized powder for injection with 100 mg of drug per 50 mL vial or 25 mg of drug per 20 mL vial. The vials are opened and reconstituted as close to the time of patient administration as possible. The product is reconstituted with 40 mL (for the 100 mg presentation) or 10 mL (for the 25 mg presentation) of Sterile Water for Injection. The reconstituted product is further diluted into 500 mL q.s., 0.9% Sodium Chloride for Injection. The route of administration is by intravenous infusion over 30 to 60 minutes. |  |

---

[1] US 2006/0159713

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272512

*For Discussion Purposes Only*
U.S. Application 16/509,920

| Brittain | |
|---|---|
| [0088]   A pharmaceutically acceptable lyophilization excipient can be dissolved in the aqueous phase. Examples of excipients useful for the present invention include, without limitation, sodium or potassium phosphate, citric acid, tartaric acid, gelatin, glycine, and carbohydrates such as lactose, sucrose, maltose, glycerin, dextrose, dextran, trehalose and hetastarch. Mannitol is a preferred excipient. Other excipients that may be used if desired include antioxidants, such as, without limitation, ascorbic acid, acetylcysteine, cysteine, sodium hydrogen sulfite, butyl-hydroxyanisole, butyl-hydroxytoluene or alpha-tocopherol acetate, or chelators. | [0087]   As described herein, a lyophilized formulation of bendamustine is achieved following removal of an organic solvent in water. The most typical example of the solvent used to prepare this formulation is tertiary butanol (TBA). Other organic solvents can be used including ethanol, n-propanol, n-butanol, isopropanol, ethyl acetate, dimethyl carbonate, acetonitrile, dichloromethane, methyl ethyl ketone, methyl isobutyl ketone, acetone, 1-pentanol, methyl acetate, methanol, carbon tetrachloride, dimethyl sulfoxide, hexafluoroacetone, chlorobutanol, dimethyl sulfone, acetic acid, cyclohexane. These preceding solvents may be used individually or in combination. Useful solvents must form stable solutions with bendamustine and must not appreciably degrade or deactivate the API. The solubility of bendamustine in the selected solvent must be high enough to form commercially useful concentrations of the drug in solvent. Additionally, the solvent should be capable of being removed easily from an aqueous dispersion or solution of the drug product, e.g., through lyophilization or vacuum drying. Preferably, a solution having a concentration of about 2-80 mg/mL, preferably about 5 to 40 mg/mL, more preferably 5-20 mg/mL and even more preferably 12 to 17 mg/mL bendamustine is used. |
| [0099]   After lyophilization, the bendamustine lyophilization powder may be filled into containers, such as vials, or alternatively the pre-lyophilization solution can be filled into such vials and lyophilized therein, resulting in vials which directly contain the lyophilized bendamustine formulation. Such vials are, after filling or lyophilization of the solution therein, sealed, as with a stopper, to provide a sealed, sterile, pharmaceutical dosage form. Typically, a vial will contain a lyophilized powder including about 10-500 mg/vial, preferably about 100 mg/vial, bendamustine and about 5 mg-2 g/vial, preferably about 170 mg/vial, mannitol. | [0057]   By "stable pharmaceutical composition" is meant any pharmaceutical composition having sufficient stability to have utility as a pharmaceutical product. Preferably, a stable pharmaceutical composition has sufficient stability to allow storage at a convenient temperature, preferably between ~20° C. and 40° C., more preferably about 2° C. to about 30° C., for a reasonable period of time, e.g., the shelf-life of the product which can be as short as one month but is typically six months or longer, more preferably one year or longer even more preferably twenty-four months or longer, and even more preferably thirty-six months or longer. The shelf-life or expiration can be that amount of time where the active ingredient degrades to a point below 90% purity. For purposes of the present invention stable pharmaceutical composition includes reference to pharmaceutical compositions with specific ranges of impurities as described herein. Preferably, a stable pharmaceutical composition is one which has minimal degradation of the active ingredient, e.g., it retains at least about 85% of un-degraded active, preferably at least about 90%, and more preferably at least about 95%, after storage at 2-30° C. for a 2-3 year period of time. |
| | [0108]   Preferably, a lyophilized preparation of the invention is stable with respect to HP1, i.e., the amount of HP1 does not increase appreciably (does not exceed the shelf-life specifications), for 6 months, more preferably 12 months, and even more preferably greater than 24 months, e.g., 36 months, when stored at about 2° C. to about 30° C., preferably 5° C. |

EAGLEBEN-SLAYBACK-00272513

*For Discussion Purposes Only*
U.S. Application 16/509,920

| Brittain | |
|---|---|
| [0067]  A "pharmaceutical dosage form" as used herein means the pharmaceutical compositions disclosed herein being in a container and in an amount suitable for reconstitution and administration of one or more doses, typically about 1-2, 1-3, 1-4, 1-5, 1-6, 1-10, or about 1-20 doses. Preferably, a "pharmaceutical dosage form" as used herein means a lyophilized pharmaceutical composition disclosed herein in a container and in an amount suitable for reconstitution and delivery of one or more doses, typically about 1-2, 1-3, 1-4, 1-5, 1-6, 1-10, or about 1-20 doses. The pharmaceutical dosage form can comprise a vial or syringe or other suitable pharmaceutically acceptable container. The pharmaceutical dosage form suitable for injection or infusion use can include sterile aqueous solutions or dispersions or sterile powders comprising an active ingredient which are adapted for the extemporaneous preparation of sterile injectable or infusible solutions or dispersions. In all cases, the ultimate dosage form should be sterile, fluid and stable under the conditions of manufacture and storage. The liquid carrier or vehicle can be a solvent or liquid dispersion medium comprising, for example, water, ethanol, a polyol such as glycerol, propylene glycol, or liquid polyethylene glycols and the like, vegetable oils, nontoxic glyceryl esters, and suitable mixtures thereof. The prevention of the growth of microorganisms can be accomplished by various antibacterial and antifungal agents, for example, parabens, chlorobutanol, phenol, sorbic acid, thimerosal, and the like. | |

| TREANDA |
|---|
| **2.3   Reconstitution/Preparation for Intravenous Administration** |
| Aseptically reconstitute each TREANDA vial as follows: |
| ○   25 mg TREANDA vial: Add 5 mL of only **Sterile Water for Injection, USP**. |
| ○   100 mg TREANDA vial: Add 20 mL of only **Sterile Water for Injection, USP**. |
| Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used. |
| Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500 mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL. The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution. |
| Use Sterile Water for Injection, USP, for reconstitution and then either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, for dilution, as outlined above. No other diluents have been shown to be compatible. |
| Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Any unused solution should be discarded according to institutional procedures for antineoplastics. |
| **2.4   Admixture Stability** |
| TREANDA contains no antimicrobial preservative.  The admixture should be prepared as close as possible to the time of patient administration. Once diluted with either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2-8°C or 36-47°F) or for 3 hours when stored at room temperature (15-30°C or 59-86°F) and room light. Administration of TREANDA must be completed within this period. |

EAGLEBEN-SLAYBACK-00272514

*For Discussion Purposes Only*
U.S. Application 16/509,920

### Examiner-Cited "Hydrogen Peroxide" Art

| Waterman (2002) p 18 | |
| --- | --- |
| Peroxide impurities, commonly found in polysorbates such as Tween 80 and Tween 20, as well as commercial polyethylene glycol (PEG), are typically at sufficient levels to cause appreciable degradation, especially at elevated temperatures (see "Peroxides and Other Oxidizing Agents" and "Detecting and Controlling Impurities"). Peroxides can prevent an excipient's use in protein formulations or lead to the use of specially processed excipients in cases where the excipient is an essential formulation component. This illustrates an important point in protein formulation: the variety of routes by which proteins degrade often leads to situations where a particular excipient or formulation/storage condition is optimal to prevent one route of degradation (e.g., aggregation or adsorption) but accelerates another route of degradation (e.g., oxidation or microbial growth). Unfortunately, there is no general means to address these situations and they must be treated on a case-by-case basis, factoring in | not only the physico-chemical properties of the protein, but also the desired product profile and the storage and shipping restrictions. |

**Jones (1999) p 39**

Undissociated hydrogen peroxide behaves, to some extent, as a nucleophile, being about $10^4$ times more nucleophilic than water. For example, hydrogen peroxide readily adds to carbonyl bonds giving rise to hydroxyhydroperoxides (peracetals and perketals). Such compounds are often used as polymerization initiators on account of their radical decomposition at moderate temperatures (O–O bond homolysis). Neutral hydrogen peroxide can also react with activated acyl compounds such as anhydrides to give peroxyacids.

**Hsu (2002) p 7**

Hydrogen peroxide is one of oxidizing reagents commonly used in the oxidation of a tertiary amine to its N-oxide.[6] Accordingly, a homogeneous solution of HN-1 (1) and 30% hydrogen peroxide in methanol or acetonitrile at room temperature produced white precipitate in less than an hour, with a more profound effect in methanol. The white solid was soluble in water, aqueous acidic or basic solution indicating a charged species might be formed. After an extremely careful examination of the $^1$H and $^{13}$C NMR spectra and comparison with known piperazine compounds, the chemical structure of the white solid was identified as the bispiperazine quaternary ammonium salt 10 as shown in Scheme 3. Under identical reaction conditions, the bis-quaternary ammonium salt 11 was produced from HN-2 (2) in the same manner. It was surprising that HN-1 and HN-2 were not oxidized by 30% hydrogen peroxide under these conditions. The cyclized dimeric bisquaternary ammonium salts 10 and 11 were also formed rapidly in acetonitrile alone at ambient temperature. These results suggest that HN-1 and HN-2 proceed *via* a bimolecular nucleophilic substitution at a rapid rate in polar solvents which lead to the formation of bis-quaternary ammonium salts and thus, completely blocks the oxidation reaction at the nitrogen.

Under the same conditions, a mixture of HN-3 (3) and 30% hydrogen peroxide in methanol at room temperature yielded a new compound 12 in which a methanol molecule was incorporated into the product. When acetonitrile, a weaker nucleophile, was used to replace methanol as the solvent, a bi-molecular nucleophilic substitution took place as in the case of HN-1 and HN-2, but at a much slower rate. The cyclized bis-quaternary ammonium salt 13 was isolated in only three percent yield, and the remaining was

EAGLEBEN-SLAYBACK-00272515

*For Discussion Purposes Only*
U.S. Application 16/509,920

the starting material, HN-3 (Scheme 4). This slow reaction was also observed in the acetonitrile-only media. The solution of HN-3 in acetonitrile did not form any cyclized quaternary salt after 14 days. Addition of a small amount of water into the mixture did enhance the formation of 13, but in very low yield. These results suggest that HN-3 is less reactive than HN-1 and HN-2 and water is the favored solvent for formation of bisquaternary salts.



1  R = CH$_2$CH$_3$  (HN-1)
2  R = CH$_3$  (HN-2)
3  R = CH$_2$CH$_2$Cl  (HN-3)

Scheme 3

Scheme 4

Qin (2009) Introduction, Scheme 1

The observation that oligo(ethylene glycol) (OEG)-terminated monolayers remained highly protein-resistant for a month at 37 °C in PBS buffer while they degraded faster in air can be rationalized by a proposed mechanism formulated from a model study using the first internal hydroperoxide of OEG.

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272516

*For Discussion Purposes Only*
U.S. Application 16/509,920



**Scheme 1**

<u>*Non-Obviousness of Invention*</u>

| December 21, 2020, Office Action |
|---|
| Applicant asserts that: "Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition." Respectfully, the Examiner cannot agree because in [0088] in the same paragraph that Brittain discusses adding excipient antioxidants, Brittain states: "A pharmaceutically acceptable lyophilization excipient can be dissolved in the aqueous phase." The Examiner properly interprets "dissolved in the aqueous phase" to mean that the antioxidant is added to the liquid bendamustine/PEG composition. |

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272517

*For Discussion Purposes Only*
U.S. Application 16/509,920

pages. Accordingly, it is obvious to the ordinary artisan in this art to add antioxidants to pharmaceutical compositions containing PEG due to the presence of hydrogen peroxide impurity which can readily degrade bendamustine via reaction with the chloroethylamine functional group. A further motivation to add antioxidants to PEG compositions is to prevent the autoxidation of PEG as taught by Qin et al. (Introduction and Scheme 1 of: Chem Commun. 2009;5112-5114).

storage-stable composition." Respectfully, the Examiner cannot agree. The ordinary artisan in the pharmaceutical arts would have recognized that an antioxidant is required to prevent PEG autoxidation and/or to counteract any hydrogen peroxide impurities in the PEG that would serve to degrade the bendamustine. Thus it would appear that these are expected results. It is noted that Brittain et al. does not specifically name lipoic acid but Applicant did not compare lipoic acid against any of the disclosed antioxidant species of Brittain including acetylcysteine, ascorbic acid and cysteine. Furthermore, even if Applicant can show that lipoic acid is superior compared to the species taught by Brittain, the instantly claimed subject matter is not commensurate in scope. "The evidence presented to rebut a prima facie case of obviousness must be commensurate in scope with the claims to which it pertains." *In re Dill,* 604 F.2d 1356, 1361 (CCPA 1979).

In summary with the instant case, Applicant fails to provide any comparison showing an unexpected result compared with the closest prior art. See *In re Baxter*

**November 25, 2020, Applicant Remarks**
***Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations***
        Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant.  Instead, industry guidance encouraged addressing oxidation by ***other*** means.  For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that "Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided."  (EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead at 334).

EAGLEBEN-SLAYBACK-00272518

Even if oxidation of a liquid bendamustine composition was for some reason a concern, industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation.*  Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be withdrawn for at least this reason.

*There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant. (Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | $T^{\circ}C$ | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  (Siepmann Report at ¶¶ 359, 469-71)

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products.  As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C.  (Specification at Example 3, page 13, Table 3).

EAGLEBEN-SLAYBACK-00272519

*For Discussion Purposes Only*
U.S. Application 16/509,920

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CEPHALON, INC., *et al.*, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 17-01154-CFC |
| | ) (Consolidated) |
| SLAYBACK PHARMA LIMITED | ) |
| LIABILITY CO., *et al.*, | ) Highly Confidential |
| | ) |
| Defendants. | ) |
| | ) |

**RESPONSIVE EXPERT REPORT OF JUERGEN SIEPMANN, PH.D.**

**Siepmann Report at ¶¶355-358**

355.    A review of the marketed parenteral formulations available in the United States as of the priority date that contained PEG indicates that those formulations do not have antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006), JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999), JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003), JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219, JDG_BENDA_00003290 at 3308.

356.    Of the four formulations listed above containing PEG, none of them contain excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV). Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr. Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272520

*For Discussion Purposes Only*
U.S. Application 16/509,920

357.    I understand that citric acid (which is in VePesid®) may potentially act synergistically in conjunction with other antioxidants. *See, e.g.,* Akers 1982 at 227, JDG_BENDA_00006113 at 6119 (listing citric acid as an "antioxidant synergist," which is a compound that has "no capability of protecting oxygen-sensitive drugs, but, when combined with antioxidants, do serve to increase the maintenance of oxidative stability of the drug" either by "complexing trace amounts of metal," "lowering the solution pH," or "decreasing the oxygen stability in the solution"); Rowe 2009 at 181 ("Citric acid monohydrate is used as a sequestering agent and antioxidant synergist."). However, citric acid is principally a pH adjustor. *See* Rowe 2009 at 181. A publication discussing the VePesid® formulation states that the citric acid in that formulation is for pH adjustment. *See* Jonkman-de Vries at 479, JDG_BENDA_00002062 at 2066 ("The commercial formulation of etoposide (Vepesid®) contains . . . 2 mg citric acid (for pH adjustment) . . . .").

358.    From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. REDACTED

---

Siepmann Report at ¶¶ 359, 469-71

359.    The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

EAGLEBEN-SLAYBACK-00272521

*For Discussion Purposes Only*
U.S. Application 16/509,920

469.   I further agree with Dr. Pinal that it was known that PEG could form various degradation products.  As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent.  *See, e.g.,* ¶¶ 339–360.

470.   I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG.  I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471.   As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation.  *See* ¶¶ 344–360.  The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine.  *See* ¶¶ 344–345.  The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation.  *See* ¶ 346.  Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant.  *See* ¶ 347.  The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort.  *See* ¶¶ 349–352.

EAGLEBEN-SLAYBACK-00272522

# Lyophilization of Polyethylene Glycol Mixtures

KETAN AMIN, ROSE-MARIE DANNENFELSER, JOSEPH ZIELINSKI, BARBARA WANG

Novartis Pharmaceuticals Corporation, Pharmaceutical Development, One Health Plaza, East Hanover, New Jersey 07936

Received 3 December 2003; revised 29 March 2004; accepted 1 April 2004

Published online in Wiley InterScience (www.interscience.wiley.com). DOI 10.1002/jps.20135

**ABSTRACT:** Lyophilization of cosolvent systems may be a beneficial way of enhancing both physical and chemical stability of a drug product. The objective of this research is to establish whether cosolvent systems commonly used in the formulation of poorly water-soluble drugs can be successfully lyophilized. Polyethylene glycol (PEG) 400 was selected because it is widely used and can be easily frozen. The addition of PEG 400 to commonly used bulking agents, such as mannitol, sucrose, or polyvinylpyrrolidone, caused a significant change in the thermal properties of the bulking agents as observed by modulated differential scanning calorimetry. In addition, PEG 8000 was evaluated as a bulking agent because it also can function as a cosolvent in solution and forms an acceptable cake after lyophilization. Addition of PEG 400 to PEG 8000 caused negligible changes in the thermogram of this bulking agent. Surprisingly, the combination of PEG 8000 and PEG 400 forms a solid lyophilized cake. The current system can be best described as the lyophilization of a miscible solution of PEG 8000 and PEG 400 resulting in a lyophile that has a crystalline structure of PEG 8000 which is able to support PEG 400.
© 2004 Wiley-Liss, Inc. and the American Pharmacists Association J Pharm Sci 93:2244–2249, 2004
**Keywords:** freeze drying/lyophilization; solubility; calorimetry (DSC); excipients; formulation; formulation vehicle; injectables; microscopy; glass transition; thermal analysis

## INTRODUCTION

Many new active pharmaceutical ingredients exhibit poor aqueous solubility necessitating additional solubilizing excipients to develop parenteral drug products. Often these poorly water-soluble drugs are incorporated into systems that contain organic solvents (i.e., cosolvent systems).[1,2] Although these liquid cosolvent systems increase solubility, they may do little to augment drug substance stability. As a result, lyophilization of these cosolvent systems may be a beneficial way of enhancing both physical and chemical stability of the drug product. Typically, the ideal lyophiliza-tion medium has a high vapor pressure, a melting point either below or slightly above room temperature, low toxicity, and should be rapidly and completely removed to produce a stable and readily reconstitutable cake.[3] Currently there is little guidance in the literature for the development of an unstable and highly insoluble drug that requires a lyophilized cosolvent system.

Organic solvents, solubility enhancers, typically used in cosolvent systems include propylene glycol, polyethylene glycols (PEGs), polysorbate 80, and Cremophor. However, previous attempts to lyophilize cosolvent systems have focused primarily on excipients with relatively high vapor pressures, such as ethanol, isopropanol, or *tert*-butanol, to ensure removal of the solvent from the drug product. Selection of an appropriate cosolvent system involves an understanding of the numerous problems that may arise. A list of some potential disadvantages includes toxicity, operator safety due to the high degree of flammability

Barbara Wang's present address is HGB International Ltd., Summit, NJ 07901.
*Correspondence to:* Ketan Amin (Telephone: 862-778-7372; Fax: 973-781-4556;
E-mail: ketan.amin@pharma.novartis.com)
Journal of Pharmaceutical Sciences, Vol. 93, 2244–2249 (2004)
© 2004 Wiley-Liss, Inc. and the American Pharmacists Association

EAGLEBEN-SLAYBACK-00272523

or explosivity, lack of compendial grades or monographs, requirement of special manufacturing facilities/equipment and/or storage areas, difficult handling properties, requirements of high-purity solvents with low impurities, minimal residual solvent levels in the final product, high usage cost, potential for splash/spattering of product in vial neck, and lack of regulatory familiarity.[4]

The properties of PEG mixtures have been examined here because PEGs are commonly used and well tolerated, both orally and parenterally. Lyophilization of these cosolvents does not remove PEGs from the final product because they do not sublime under practical and common lyophilization conditions. PEG 400 was selected because it can be easily frozen and is widely accepted. PEG 8000 (solid at room temperature and a solubility enhancer) was evaluated and used as a bulking agent because it also has been reported to have an acceptable lyophilized product appearance.[5] The objective of this study is to identify a nonvolatile system consisting of commonly used cosolvents that is capable of undergoing lyophilization for poorly water-soluble drugs. Assessment of the physical properties of the lyophilized cakes will assist in understanding the implications on drug product stability due to the lyophilized system. Characterization of key physical properties of materials intended for lyophilization should be performed because identification of the thermal events provides information that is predictive in terms of determining whether a particular solvent system can be successfully lyophilized.

## MATERIALS AND METHODS

### Materials

PEGs of various molecular weights were obtained from Union Carbide Corp. (Danbury, CT). Polyvinylpyrrolidone (PVP) (Povidone K-90) was obtained from ISP Technologies, Inc. (Wayne, NJ). Mannitol, sucrose, glycine, dextran (45,000 MW), and Ficoll (Type 400) were obtained from Sigma Chemical Co. (St. Louis, MO). Excipients were dissolved in Millipore water at the concentration indicated in the figure legends on a weight-per-volume basis. The vials were purchased from Schott Pharmaceutical Packaging (Cleona, PA), stoppers from Daikyo Seiko, Ltd. (Tokyo, Japan), and seals from West Pharmaceutical Services (Lionville, PA).

### Methods

#### Thermal Analysis

Thermal analysis was performed using modulated differential scanning calorimetry (MDSC) with indium being used for temperature calibration. Samples were analyzed in hermetically sealed aluminum pans using a TA Instruments model 2920 DSC (TA Instruments, Newcastle, DE) equipped with an automated liquid nitrogen cooling accessory. An empty hermetically sealed aluminum pan was used as reference. MDSC thermograms were recorded at a heating rate of $1°C/min$ with a modulation of $1°C$ every 100 s. For rapid freezing, samples were quenched in liquid nitrogen externally and loaded into the precooled MDSC cell at $-150°C$.

#### Lyophilization

Solutions were filled into 10-mL serum vials with a 2-mL fill volume and transferred to a freeze dryer (Usifroid Model SMH 90, Maurepas, France) equipped with an MKS Instruments Residual Gas Analyzer (MKS Instruments, Methuen, MA) which uses a mass spectrometer to monitor the drying process. The lyophilization cycle consisted of cooling the solutions down to a shelf temperature of $-50°C$ at $1°C/min$, establishing vacuum, and primary drying at temperatures below the collapse temperature ($T_c$) with secondary drying taking place at $25°C$. Figure legends indicate composition of lyophilized cakes as a weight/weight ratio. The water content of freeze-dried samples was determined to be $<1.5\%$ using the Karl Fisher titrimetry method (EM Science, Cherry Hill, NJ). Reconstitution time for all lyophilized samples was 1–2 min.

#### Freeze-Drying Microscopy

Freeze-drying microscopy was used to observe the $T_c$ of solutions using a procedure described by Hsu et al.[6] and Nail et al.[7] Briefly, a Linkam freeze-drying microscope stage, model FDCS 196, with LinkSys software and real-time video measurement was used. A small volume of sample (3 μL) was placed in a quartz holder. $T_c$ was determined while samples were maintained under vacuum. Direct thermal contact between the quartz sample holder and the stage was achieved with a suitable thermal fluid, which is capable of temperatures to $-90°C$. Composition of the samples was the same as that used for thermal analysis.

EAGLEBEN-SLAYBACK-00272524

**2246**   AMIN ET AL.

### Scanning Electron Microscopy (SEM)

The surface structure of the lyophilized samples was studied by SEM (JEOL 6301FXV X-vision field emission SEM, Peabody, MA). Samples were lyophilized on aluminum specimen stubs and coated with gold palladium (coating thickness approximately 15 nm) in an argon atmosphere by a sputter coater (Denton Desktop cold sputter coater, Cherry Hill, NJ) before a photograph was taken.

### X-ray Powder Diffraction

A Rigaku RINT (D/Max) 2200 diffractometer equipped with an Ultima+ goniometer was used with Cu Kα radiation at a voltage of 40 kV and a current of 40 mA. Alignment was verified with a Corundum standard using reflections at 25.578, 35.153, and 37.777° 2θ. Samples were prepared by front loading powders into a 0.5-mm deep glass well slide and scanning from 2 to 40° 2θ at a rate of 2°/min.

## RESULTS AND DISCUSSION

PEGs have been extensively discussed elsewhere as being primarily a crystalline polymer with high water solubility, melting point ~60°C, and <10% amorphous content.[8] Identification of $T'_g$, the glass transition temperature for the maximally freeze-concentrated solution, is critical to the development of lyophilization cycles because this represents the highest temperature that is safe for the product during primary drying. In fact, $T'_g$ can be considered to be closely related to $T_c$ for amorphous systems just as the eutectic temperature ($T_e$) is related to $T_c$ for crystalline devices. $T'_g$ for common bulking agents alone and in the presence of varying concentrations of PEG 400 is shown in Table 1. The addition of up to 20% PEG 400 causes a negligible shift in the $T'_g$ for an

**Table 1.** $T'_g$ for Common Bulking Agents Alone and in the Presence of PEG 400

|  | $T'_g$ (°C) | | |
|---|---|---|---|
| % PEG 400 | 0% | 10% | 20% |
| PEG 8000 5% | −67 | −77 | −79 |
| Mannitol 5% | −29 | −81 | −80 |
| Sucrose 10% | −33 | −71 | −75 |
| PVP K90 5% | −21 | −82 | NT |

NT, not tested.





**Figure 1.** MDSC profiles of frozen solutions containing PEG 8000 and PEG 400. Samples were cooled to −150°C followed by a heating rate of 1°C/min with a modulation of 1°C every 100 s. MDSC provides the sum of the reversing and nonreversing heat flow signals whereby $T'_g$ will be found in the reversing heat flow signal. Panel A illustrates $T'_g$ of −67°C, −77°C, and −79°C for 5% PEG 8000, 5% PEG 8000 with 10% PEG 400, 5% PEG 8000 with 20% PEG 400, respectively. Panel B illustrates an endotherm at −11°C, −17°C, and −18°C for 5% PEG 8000, 5% PEG 8000 with 10% PEG 400, 5% PEG 8000 with 20% PEG 400, respectively.

aqueous solution of 5% PEG 8000 (Fig. 1A). Conversely, addition of PEG 400 to solutions of mannitol, sucrose, or PVP results in a significant decrease in $T'_g$. Model crystalline bulking materials, mannitol and PEG 8000, and model amorphous bulking materials, sucrose and PVP, were evaluated with PEG 400, a plasticizer, for their interactions in aqueous solutions.

To examine the lyophilization process of various solutions, approximately 3 µL of solution was placed onto the cooling stage of a freeze-drying microscope, covered with a quartz slide, and cooled from room temperature to −70°C at 10°C/min. Figure 2 shows the freeze-drying microscopy image for an aqueous solution containing 5% PEG 8000 and 10% PEG 400. After a 3-min hold, the sample was reheated to −30°C at 5°C/min and then to −18°C at 1°C/min. After a 5-min hold, the



**Figure 2.** Freeze-drying micrograph of solution containing 5% PEG 8000 and 10% PEG 400. Micrograph depicts drying along the freeze-drying front advancing from right to left with drying occurring at $-35^\circ$C and collapse occurring at $-18^\circ$C. Bands of dried and collapsed material are evident by repeated oscillation between the drying and collapse temperatures.



**Figure 3.** MDSC profile of frozen solutions containing PEG 8000, PEG 400, and their mixture. Samples were cooled to $-150^\circ$C followed by a heating rate of $1^\circ$C/min with a modulation of $1^\circ$C every 100 s. MDSC provides the sum of the reversing and nonreversing heat flow signals whereby $T_g'$ will be found in the reversing heat flow signal. Frozen solutions containing PEG 8000 and PEG 400 show a single $T_g'$ ($-75.79^\circ$C), in the reversing heat flow, between the $T_g'$ of the individual components ($-83.74^\circ$C and $-66.99^\circ$C for PEG 400 and PEG 8000 solution, respectively).

sample was then recooled to $-35^\circ$C at $10^\circ$C/min and then reheated to $-18^\circ$C at $1^\circ$C/min followed by a return to $-35^\circ$C to allow for additional lyophilization along the freeze-drying front. Freeze-drying microscopy observations of 5% PEG 8000 with 10% PEG 400 indicates a $T_c$ of $-18^\circ$C which corresponds to the endothermic event observed in MDSC thermograms (Fig. 1B). Similar observations were made by freeze-drying microscopy for 5% PEG 8000 with 20% PEG 400. However, freeze-drying microscopy studies indicated that lyophilization of PEG 400 with mannitol, sucrose, or PVP are not feasible at temperatures above $-50^\circ$C because of structure collapse or lack thereof within the lyophilized sample.

MDSC profiles of frozen solutions containing PEG 8000, PEG 400, and their mixtures (Fig. 3) were evaluated to determine phase behavior during freezing. Frozen aqueous solutions containing PEG 8000, and PEG 400 show a single $T_g'$ region between their individual $T_g'$s, indicating that a single phase is formed when frozen. Similarly, Izutsu et al.[9] observed a single $T_g'$ region between the individual components of the sucrose and PVP or sucrose and Ficoll solutions indicating miscibility of the two components. However, frozen solutions that contained both dextran and Ficoll, or both dextran and PVP, showed two $T_g'$ regions that were close to those of their respective

individual $T_g'$s,[9] indicating phase separation in the frozen state.[10]

Thermal analysis of a 5% PEG 8000 aqueous solution yields an endothermic event at $-11.18^\circ$C which corresponds to the $T_c$ noted by MacKenzie[5] (Fig. 1B). Upon addition of 10% or 20% PEG 400, this endotherm shifts from $-11^\circ$C to $-17^\circ$C or $-18^\circ$C, respectively. Observations of $T_c$'s obtained from freeze-drying microscopy correspond to the endothermic events observed in MDSC thermograms for 5% PEG 8000 with 10% or 20% PEG 400. Similarly, thermal analysis of 5% PEG 8000 with 10% or 20% PEG 600 yields endothermic events at $-15^\circ$C or $-16^\circ$C, respectively. The physical state of the solutes in frozen solutions is typically evaluated by MDSC which, in addition, provides an estimate of the maximum allowable product temperature for primary drying which also corresponds to $T_c$.[11]

A $T_g$ was not detected by MDSC upon lyophilization of PEG 8000. Thermally stimulated current spectrometry studies, beneficial for materials with low amorphous content, were performed based on methods described elsewhere.[12,13] Thermally stimulated current analysis indicated that lyophilized PEG 8000 has a $T_g$ at $-16.16^\circ$C. Lyophilization of PEG 8000 with increasing concentrations of PEG 400 resulted in a $T_g$ close to the $T_g$ of neat PEG 400. Thermal analysis of lyophilized mixtures of

EAGLEBEN-SLAYBACK-00272526

**2248**    AMIN ET AL.



**Figure 4.** Thermal analysis of lyophilized mixtures of PEG 8000 and PEG 400. Samples were cooled to $-150°$C followed by a heating rate of $1°$C/min with a modulation of $1°$C every 100 s. MDSC provides the sum of the reversing and nonreversing heat flow signals whereby $T_g$ will be found in the reversing heat flow signal. MDSC was unable to detect a $T_g$ for PEG 8000, whereas the $T_g$ for the tested ratios of PEG 8000/PEG 400 are in close proximity to the $T_g$ for neat PEG 400 ($-79°$C).



**Figure 5.** SEM micrograph illustrating the extensive porous nature on the surface of the lyophilized PEG 8000/PEG 400 (1:4) mixture suitable for the efficient passage of escaping water vapor.

PEG 8000 and PEG 400 are illustrated in Figure 4. The lack of a $T_g$ between the $T_g$ values of the pure components indicates that lyophilization of PEG 8000 with PEG 400 results in a phase-separated system analogous to immiscible amorphous systems previously described.[14]

An SEM micrograph of the surface structure of a lyophilized sample consisting of PEG 8000 and PEG 400 (5% and 20%, respectively, in the initial aqueous solution) is shown in Figure 5. Evident in the micrograph is the extensive porous nature of the freeze-dried cake or lyophile surface suitable for the efficient passage of escaping water vapor. Typically, lyophiles consist of contiguous systems of channels or pores created by the sublimation of ice as water vapor travels from the ice to the outer surface of the cake. The porous nature of lyophiles aids in the reconstitution time and therefore is another property necessary for the acceptance of a good lyophilized product. The resultant PEG 8000 and PEG 400 lyophile, because of its porous nature, reconstitutes in <2 min, indicative of a good lyophile.

## CONCLUSIONS

Nonaqueous cosolvent systems have been previously used in the development of lyophilized pharmaceutical drug products with one such product, Caverject® Sterile Powder, currently on the market.[15,16] Most attempts to lyophilize non-aqueous cosolvent systems have involved combinations of *tert*-butyl alcohol due to the ease with which it freezes and sublimes.[17,18] Nevertheless, the use of such volatile solvents has inherent disadvantages in terms of explosivity and residual solvent levels.

An alternative approach for the development of highly insoluble and unstable drugs requiring cosolvent systems was discussed. The proposed system uses an aqueous solution of PEG 8000 with PEG 400 to enhance the solubility of poorly water-soluble drugs. During lyophilization, both PEG 8000 and PEG 400 are not removed from the resultant lyophile. The lyophile is crystalline in structure (Fig. 6) due to 5% PEG 8000 and is able to support up to 20% PEG 400. Optimization of the proposed system would require the selection of an ideal molecular-weight PEG as the bulking agent. Higher-molecular-weight PEGs, >8000, may be better suited to support larger quantities of low-molecular-weight PEGs. The ideal ratio of high- to low-molecular-weight PEGs will also need to be ascertained along with the properties of the active pharmaceutical ingredient. Attention to any possible toxicities associated with the parenteral delivery of high-molecular-weight PEGs is

EAGLEBEN-SLAYBACK-00272527



**Figure 6.** X-ray powder diffractograms depicting crystallinity of (A) colyophilized PEG 8000/PEG 400 (1:6), (B) colyophilized PEG 8000/PEG 400 (1:2), (C) lyophilized PEG 8000, and (D) PEG 400.

required. The proposed system allows for the lyophilization of a nonaqueous cosolvent system void of explosivity, toxicity, and special handling issues related to the more commonly used volatile cosolvent systems that incorporate ethanol, isopropanol, or *tert*-butanol.

## ACKNOWLEDGMENTS

The authors thank Paul Grosenstein for assistance with SEM studies and Marilyn Alvine for assistance with X-ray powder diffraction studies.

## REFERENCES

1. Ni N, Sanghvi T, Yalkowsky SH. 2002. Stabilization and preformulation of anticancer drug SarCNU. Int J Pharm 249:257–264.
2. Sweetana S, Akers MJ. 1996. Solubility principles and practices for parenteral drug dosage form development. PDA J Pharm Sci Technol 50:330–342.
3. Ni N, Tesconi M, Tabibi E, Gupta S, Yalkowsky SH. 2001. Use of pure *t*-butanol as a solvent for freeze drying: A case study. Int J Pharm 226:39–46.
4. Teagarden DL, Baker DS. 2002. Practical aspects of lyophilization using non-aqueous co-solvent systems. Eur J Pharm Sci 15:115–133.
5. MacKenzie AP. 1976. The physico-chemical basis for the freeze-drying process. Dev Biol Stand 36: 51–67.
6. Hsu CC, Walsh AJ, Nguyen HM, Overchasier DE, Koning-Bastiaan H, Bailey RC, Nail SL. 1996. Design and application of a low-temperature peltier-cooling microscope stage. J Pharm Sci 85: 70–74.
7. Nail SL, Her LM, Proffitt C, Nail L. 1994. An improved microscope stage for direct observation of freezing and freeze-drying. Pharm Res 11:1098–1100.
8. Buckley CP, Kovacs AJ. 1976. Melting behavior of low molecular weight poly(ethylene-oxide) fractions. 2. Folded chain crystals. Colloid Polym Sci 254:695–715.
9. Izutsu K, Yoshioka S, Kojima S, Randolph TW, Carpenter JF. 1996. Effects of sugars and polymers on crystallization of poly(ethylene glycol) in frozen solutions: Phase separation between incompatible polymers. Pharm Res 13:1393–1400.
10. Her LM, Deras M, Nail SL. 1995. Electrolyte-induced changes in glass transition temperatures of freeze-concentrated solutes. Pharm Res 12:768–772.
11. Jiang S, Nail SL. 1998. Effect of process conditions on recovery of protein activity after freezing and freeze drying. Eur J Pharm Biopharm 45:249–257.
12. Venkatesh GM, Barnett ME, Owusu-Fordjour C, Galop M. 2001. Detection of low levels of the amorphous phase in crystalline pharmaceutical materials by thermally stimulated current spectrometry. Pharm Res 18:98–103.
13. Boutonnet-Fagegaltier N, Menegotto J, Lamure A, Duplaa H, Caron A, Lacabanne C, Bauer M. 2002. Molecular mobility study of amorphous and crystalline phases of a pharmaceutical product by thermally stimulated current spectrometry. J Pharm Sci 91:1548–1560.
14. Shamblin SL, Taylor LS, Zografi G. 1998. Mixing behavior of colyophilized binary systems. J Pharm Sci 87:694–701.
15. Teagarden DL, Petre WJ, Gold PM. April 21, 1998. Stabilized Prostaglandin E₁. United States Patent 5,741,523.
16. Teagarden DL, Petre WJ, Gold PM. June 23, 1998. Method for preparing stabilized prostaglandin E₁. US patent 5,770,230.
17. Baldi G, Gasco M, Pattarino F. 1994. Statistical procedures for optimizing the freeze-drying of a model drug in *tert*-butyl alcohol water mixtures. Eur J Pharm Biopharm 40:138–141.
18. Kasraian K, DeLuca PP. 1995. Thermal analysis of the tertiary butyl alcohol-water system and its implications on freeze-drying. Pharm Res 12:484–490.

EAGLEBEN-SLAYBACK-00272528

# Ready-to-use | definition of ready-to-use by Medical dictionary

https://medical-dictionary.thefreedictionary.com/ready-to-use



## ready-to-use

### ready-to-use

Able to be dispensed with minimal if any effort or preparation; prepackaged.

Medical Dictionary, © 2009 Farlex and Partners

Advertisement. Bad banner? Please let us know Remove Ads



EAGLEBEN-SLAYBACK-00272529

# EXHIBIT C

| *Notice of Allowability* | Application No.<br>16/509,920 | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art Unit<br>1613 | AIA (FITF) Status<br>No |

**-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address*--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to 6/11/21.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-16. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

    a) ☐All     b) ☐ Some     *c) ☐ None of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

    Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)

2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____.

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☐ Examiner's Amendment/Comment

6. ☑ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SLAYBACK-00272535

Application/Control Number: 16/509,920                                         Page 2
Art Unit: 1613

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent

provisions.

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on 6/11/21

has been entered.


### **Claims Status:**

Claims 1-16 are pending.


### *Terminal Disclaimer*

The terminal disclaimer filed on 7/12/21 disclaiming the terminal portion of any

patent granted on this application which would extend beyond the expiration date of **US**

**Patents:**

      9572887

      9572797

      9572796

      8609707

      9579384

      10010533

EAGLEBEN-SLAYBACK-00272536

Application/Control Number: 16/509,920                                              Page 3
Art Unit: 1613

> 9597399
>
> 9144568
>
> 9265831
>
> 9597397
>
> 9034908

has been reviewed and is accepted.  The terminal disclaimer has been recorded.


### Withdrawn rejections and Reasons for Allowance


Applicant's amendments and arguments filed 5/20/21 and 6/11/21 are

acknowledged and have been fully considered.  The Examiner has re-weighed all the

evidence of record. Any rejection and/or objection not specifically addressed below is

herein withdrawn. Specifically, claims 1-16 were rejected under 35 U.S.C. 103(a) as

being unpatentable over Brittain et al. (US 20060159713) and TREANDA (Highlights of

prescribing information 2008) and Von Stetten et al. (US 4711906) and Miekka et al.

(US 7252799). As discussed in the interview held 7/12/21, the term "ready to use" is a

term of the art that does give meaning and life to the claim. Brittain et al. do not teach or

suggest a ready to use liquid formulation as instantly claimed. Accordingly, it would then

only be through hindsight using the instant inventor's disclosure as a blueprint that the

ordinary artisan would modify the art of record to derive the instantly claimed subject

matter.

EAGLEBEN-SLAYBACK-00272537

Application/Control Number: 16/509,920                                          Page 4
Art Unit: 1613

### *Conclusion*

Claims 1-16 are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509.  The examiner can normally be reached on M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Y Kwon can be reached on 571-272-0581.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see https://ppair-my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private

EAGLEBEN-SLAYBACK-00272538

Application/Control Number: 16/509,920                                              Page 5
Art Unit: 1613

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

If you would like assistance from a USPTO Customer Service Representative or access

to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SLAYBACK-00272539

# EXHIBIT D



CONFIDENTIAL

SLAY-BEL0007125



CONFIDENTIAL

SLAY-BEL0007126

CONFIDENTIAL

SLAY-BEL0007127



CONFIDENTIAL

SLAY-BEL0007128

CONFIDENTIAL

SLAY-BEL0007129



CONFIDENTIAL

SLAY-BEL0007130



SLAY-BEL0007131



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

SLAY-BEL0007134



CONFIDENTIAL

SLAY-BEL0007135

CONFIDENTIAL

SLAY-BEL0007136



CONFIDENTIAL

SLAY-BEL0007137

CONFIDENTIAL

SLAY-BEL0007138



CONFIDENTIAL

SLAY-BEL0007139

# EXHIBIT E



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000007



Highly Confidential – Attorney's Eyes Only



**Highly Confidential – Attorney's Eyes Only**

APO-BENDA_0000009



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000012



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000013



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000014



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000015



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000016



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000017



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000018



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000021



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000022



Highly Confidential – Attorney's Eyes Only

# EXHIBIT F

CONFIDENTIAL

SLAY-BEL0007070

CONFIDENTIAL

SLAY-BEL0007071

| 30. This application contains the following items *(Continued; select all that apply)* | |
|---|---|
| ☐ 9. Safety update report *(e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2)* | ☐ 10. Statistical section *(e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2)* |
| ☐ 11. Case report tabulations *(e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2)* | ☐ 12. Case report forms *(e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2)* |
| ☐ 13. Patent information on any patent that claims the drug/ biologic *(21 U.S.C. 355(b) or (c))* | ☐ 14. A patent certification with respect to any patent that claims the drug/biologic *(21 U.S.C. 355 (b)(2) or (j)(2)(A))* |
| ☐ 15. Establishment description *(21 CFR Part 600, if applicable)* | ☐ 16. Debarment certification *(FD&C Act 306 (k)(1))* |
| ☐ 17. Field copy certification *(21 CFR 314.50 (l)(3))* | ☐ 18. User Fee Cover Sheet *(PDUFA Form FDA 3397, GDUFA Form FDA 3794, BsUFA Form FDA 3792, or MDUFA Form FDA 3601)* |
| ☐ 19. Financial Disclosure Information *(21 CFR Part 54)* | |
| ☑ 20. Other *(Specify)*: TYPE C meeting request | |

## CERTIFICATION

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to, the following:

1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in applications in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state, and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.

The data and information in this submission have been reviewed and, to the best of my knowledge, are certified to be true and accurate.

**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| 31. Typed Name and Title of Applicant's Responsible Official | 32. Date *(mm/dd/yyyy)* |
|---|---|
| Mr.Praveen Subbappa - Senior Director | 08/17/2020 |

| 33. Telephone Number *(Include country code if applicable and area code)* | 34. FAX Number *(Include country code if applicable and area code)* | 35. Email Address |
|---|---|---|
| 609-945-3443, Ext. 130 | 609-455-1514 | Refer to Exhibit 1 |

36. Address of Applicant's Responsible Official

| Address 1 *(Street address, P.O. box, company name c/o)* | |
|---|---|
| 301 Carnegie Center | |
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | |
| Suite 303 | |
| City | State/Province/Region |
| Princeton | New Jersey |
| Country | ZIP or Postal Code |
| USA | 08540 |

| 37. Signature of Applicant's Responsible Official or Other Authorized Official | [ Sign ] | 38. Countersignature of Authorized U.S. Agent | [ Sign ] |
|---|---|---|---|
| **Praveen Subbappa** | Digitally signed by Praveen Subbappa Date: 2020.08.17 11:49:46 -04'00' | | |

### The information below applies only to requirements of the Paperwork Reduction Act of 1995.

The burden time for this collection of information is estimated to average 24 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the address to the right:

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

Department of Health and Human Services
Food and Drug Administration
Office of Operations
Paperwork Reduction Act (PRA) Staff
PRAStaff@fda.hhs.gov

**DO NOT SEND YOUR COMPLETED FORM TO THIS PRA STAFF EMAIL ADDRESS.**

**FORM FDA 356h (08/18 - PREVIOUS EDITIONS OBSOLETE)**     Page 3 of 9

SLAY-BEL0007072

CONFIDENTIAL

SLAY-BEL0007073

CONFIDENTIAL

SLAY-BEL0007074



CONFIDENTIAL

SLAY-BEL0007075



CONFIDENTIAL

CONFIDENTIAL

SLAY-BEL0007077

CONFIDENTIAL

SLAY-BEL0007078

# EXHIBIT G



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000002



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**CONFIDENTIAL – FILED UNDER SEAL** |

**DEFENDANTS' OPPOSITION TO EAGLE'S MOTION *IN LIMINE* # 1**

Eagle seeks to bar Defendants from rebutting Eagle's contention that the accused formulations are "ready to use" under the Court's construction of this term. To allow for such a finding on a motion *in limine* would be improper and prejudicial to Defendants. *See, e.g., TecSec, Inc. v. Adobe Inc.,* 978 F.3d 1278, 1288–89 (Fed. Cir. 2020) (finding motion *in limine*, unlike a motion for summary judgment, cannot support the wholesale exclusion of all evidence in support of that claim).

████████████████████████████████████████████

████████████████████████████████████████ Nor can they be, as they were made in a context divorced from the very specific—and narrow—meaning of that term offered by the Examiner during prosecution, and adopted by the parties and the Court in this case: "Able to be dispensed with minimal if any effort or preparation; prepackaged."[1] Defendants filed their NDAs in 2020, before the '483 patent issued. The term "ready to use" is not expressly defined in the specification, the Examiner did not propose his definition of "ready to use" until 2021, and the parties and the Court did not agree to the Examiner's construction until 2022.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *See* Ex. A to Eagle's MIL 1, ¶¶ 106,

---

[1] Eagle's motion ignores the Court's construction of "ready to use" as discussed in Defendants' Motion *in Limine* No. 1.

██████████████████████████████████████████

██████████████████████████████████████████

Eagle dismisses the difference between "ready to use" and "ready to dilute" as "pure semantics," but that is not the case. Eagle was the lexicographer here.[3] The Examiner offered Eagle a choice between "ready to use" **or** "ready for further dilution," thus differentiating these two terms. Eagle chose "ready to use" with the understanding that the Examiner's narrow definition would control the meaning of that term – "able to be dispensed with minimal if any effort or preparation; prepackaged." Eagle never challenged this definition, or suggested to the Examiner that this construction encompassed the non-elected term "ready for further dilution." Eagle cannot now change course to argue that the differences are "mere semantics." *See Cephalon, Inc. v. Abraxis Bioscience, LLC*, 618 F. App'x 663, 666-67 (Fed. Cir. 2015) (rejecting patentee's contention that substitution of "nanoparticles and microparticles" for "microparticles" was matter of "semantics, not substance").

Courts have long rejected patentees' attempts to use statements in FDA communications as admissions of patent infringement. *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009) (distinguishing regulatory

---

[2] ████████████████████████████████████████████████
████████████████████████████████████████

[3] The '483 patent specification clearly states "ready to use **or** ready for further dilution" as alternatives connected by the disjunctive term "or." *See* Ex. 2, '483 patent, 2:19-20 (emphasis added).

requirements from issues of patent infringement). The same is true of Defendants' statements here, made to the FDA in a regulatory context and unrelated to the claim construction in this patent litigation. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████.[4] *See All Star Seed v. Nationwide Agribusiness Ins. Co.,* No. 12-146, 2014 U.S. Dist. LEXIS 44798, at *26 (S.D. Cal. Mar. 31, 2014) (finding no admission of 'agent' by colloquial use of term).

*Intendis GmbH v. Glenmark Pharms., Inc.* is distinguishable. 822 F.3d 1355 (Fed. Cir. 2016). The court expressly considered expert testimony and other evidence adduced during a five-day trial before issuing its ruling. Moreover, there was no evidence of contradictory statements in Glenmark's ANDA or on its product labeling. Finally, there was no attempt by the *Intendis* patentee to expand upon a narrowed understanding of a claim term adopted during prosecution.

Put simply, Defendants' statements to FDA are not dispositive to the infringement issues in this case. Accordingly, Eagle's motion should be denied as it would unduly prejudice Defendants' ability to defend against accusations of infringement that are divorced from the specific construction adopted by Eagle.

---

[4] All three parties to this litigation have used the terms "ready to use" and "ready to dilute" colloquially to differentiate their products from lyophilized powders.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., <br><br> Defendants. | C.A. No. 21-1256-CFC-JLH <br><br> **CONFIDENTIAL – FILED UNDER SEAL** |

## DECLARATION OF BETH C. FINKELSTEIN IN SUPPORT OF DEFENDANTS' OPPOSITION TO EAGLE'S MOTION *IN LIMINE* # 1

I, Beth C. Finkelstein, declare as follows:

1.      I am an attorney at the law firm of Windels Marx Lane & Mittendorf, LLP, counsel for Defendant Slayback Pharma LLC in the above-captioned matter. As such, I have personal knowledge of the facts set forth herein.

2.      This Declaration is submitted in support of Defendants' Opposition to Eagle's Motion *in Limine* # 1.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the prescribing information for BELRAPZO®, revised 11/2020, which bears bates numbers EAGLEBEN-SLAYBACK-00050294-315 and has been marked Highly Confidential under the Protective Order in this case.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of U.S. Patent

No. 11,103,483, which bears bates numbers EAGLEBEN-SLAYBACK-00010375-

86.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of a ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████  has  been  marked  Highly  Confidential

under the Protective Order in this case.


I declare under penalty of perjury that the foregoing statements made by me

are true and correct to the best of my knowledge and belief.


Dated: September 6, 2022

                                                *s/ Beth C. Finkelstein*
                                                Beth C. Finkelstein

# EXHIBIT 1 [1]

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use BELRAPZO safely and effectively. See full prescribing information for BELRAPZO.

**BELRAPZO® (bendamustine hydrochloride injection), for intravenous use.**
Initial U.S. Approval: 2008

------------------------**INDICATIONS AND USAGE**------------------------
BELRAPZO is an alkylating drug indicated for treatment of patients with:
- Chronic lymphocytic leukemia (CLL). Efficacy relative to first line therapies other than chlorambucil has not been established. (1.1)
- Indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. (1.2)

--------------------**DOSAGE AND ADMINISTRATION**----------------------
For CLL:
- 100 mg/m² infused intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles. (2.1)
For NHL:
- 120 mg/m² infused intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles. (2.2)

----------------------**DOSAGE FORMS AND STRENGTHS**------------------
Injection: 100 mg/4mL (25 mg/mL) in a multiple-dose vial. (3)

--------------------------**CONTRAINDICATIONS**--------------------------
BELRAPZO is contraindicated in patients with a history of a hypersensitivity reaction to bendamustine, polyethylene glycol 400, propylene glycol, or monothioglycerol. Reactions to bendamustine hydrochloride have included anaphylaxis and anaphylactoid reactions. (4, 5.3)

------------------------**WARNINGS AND PRECAUTIONS**---------------------
- Myelosuppression: Delay or reduce dose, and restart treatment based on ANC and platelet count recovery. (5.1)
- Infections: Monitor for fever and other signs of infection or reactivation of infections and treat promptly. (5.2)
- Anaphylaxis and Infusion Reactions: Severe anaphylactic reactions have occurred. Monitor clinically and discontinue drug for severe reactions. Pre-medicate in subsequent cycles for milder reactions. (5.3)

- Tumor Lysis Syndrome: May lead to acute renal failure and death; anticipate and use supportive measures in patients at high risk. (5.4)
- Skin Reactions: Discontinue for severe skin reactions. Cases of SJS, DRESS and TEN, some fatal, have been reported. (5.5)
- Hepatotoxicity: Monitor liver chemistry tests prior to and during treatment. (5.6)
- Other Malignancies: Pre-malignant and malignant diseases have been reported. (5.7)
- Extravasation Injury: Take precautions to avoid extravasation, including monitoring intravenous infusion site during and after administration. (5.8)
- Embryo-fetal toxicity: Can cause fetal harm. Advise females of reproductive potential of the potential risk to a fetus and to use an effective method of contraception. (5.9, 8.1)

------------------------------**ADVERSE REACTIONS**---------------------------
- Adverse reactions (frequency >5%) during infusion and within 24 hours post-infusion are nausea and fatigue. (6.1)
- Most common adverse reactions (≥15%) for CLL are anemia, thrombocytopenia, neutropenia, lymphopenia, leukopenia, hyperbilirubinemia, pyrexia, nausea, vomiting. (6.2, 6.3)
- Most common adverse reactions (≥15%) for NHL are lymphopenia, leukopenia, anemia, neutropenia, thrombocytopenia, nausea, fatigue, vomiting, diarrhea, pyrexia, constipation, anorexia, cough, headache, weight decreased, dyspnea, rash, and stomatitis.(6.2, 6.3)

**To report SUSPECTED ADVERSE REACTIONS, contact Eagle Pharmaceuticals, Inc. at 1-855-318-2170 or FDA at 1-800-FDA-1088 or http://www.fda.gov/medwatch**

------------------------------**DRUG INTERACTIONS**---------------------------
Consider alternative therapies that are not CYP1A2 inducers or inhibitors during treatment with BELRAPZO (7.1)

------------------------**USE IN SPECIFIC POPULATIONS**---------------------
- Lactation: Advise not to breastfeed. (8.2)
- Infertility: May impair fertility. (8.3)
- Renal Impairment: Do not use in patients with creatinine clearance < 30 mL/min. (8.6)
- Hepatic Impairment: Do not use in patients with total bilirubin 1.5-3 x ULN and AST or ALT 2.5-10 x ULN, or total bilirubin > 3 x ULN. (8.7)

See **17** for PATIENT COUNSELING INFORMATION

**Revised: 11/2020**

**FULL PRESCRIBING INFORMATION: CONTENTS**
**1 INDICATIONS AND USAGE**
  1.1 Chronic Lymphocytic Leukemia (CLL)
  1.2 Non-Hodgkin Lymphoma (NHL)
**2 DOSAGE AND ADMINISTRATION**
  2.1 Dosing Instructions for CLL
  2.2 Dosing Instructions for NHL
  2.3 Preparation for Intravenous Administration
  2.4 Admixture Stability
  2.5 Stability of Partially Used Vials (Needle Punched Vials)
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
  5.1 Myelosuppression
  5.2 Infections
  5.3 Anaphylaxis and Infusion Reactions
  5.4 Tumor Lysis Syndrome
  5.5 Skin Reactions
  5.6 Hepatotoxicity
  5.7 Other Malignancies
  5.8 Extravasation Injury
  5.9 Embryo-Fetal Toxicity
**6 ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Clinical Trials Experience in CLL
  6.3 Clinical Trials Experience in NHL
  6.4 Postmarketing Experience
**7 DRUG INTERACTIONS**
  7.1 Effect of Other Drugs on BELRAPZO
**8 USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.2 Lactation
  8.3 Females and Males of Reproductive Potential

  8.4 Pediatric Use
  8.5 Geriatric Use
  8.6 Renal Impairment
  8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
  14.1 Chronic Lymphocytic Leukemia (CLL)
  14.2 Non-Hodgkin Lymphoma (NHL)
**15 REFERENCES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
  16.1 Safe Handling and Disposal
  16.2 How Supplied
  16.3 Storage
**17 PATIENT COUNSELING INFORMATION**
*Sections or subsections omitted from the full prescribing information are not listed.

1

EAGLEBEN-SLAYBACK-00050294

**FULL PRESCRIBING INFORMATION**

**1 INDICATIONS AND USAGE**

**1.1 Chronic Lymphocytic Leukemia (CLL)**

BELRAPZO is indicated for the treatment of patients with chronic lymphocytic leukemia. Efficacy relative to first line therapies other than chlorambucil has not been established.

**1.2 Non-Hodgkin Lymphoma (NHL)**

BELRAPZO is indicated for the treatment of patients with indolent B-cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

**2 DOSAGE AND ADMINISTRATION**

**2.1 Dosing Instructions for CLL**

Recommended Dosage:
The recommended dose is 100 mg/m$^2$ administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles.

Dose Delays, Dose Modifications and Reinitiation of Therapy for CLL:

Delay BELRAPZO administration in the event of Grade 4 hematologic toxicity or clinically significant Grade 2 or greater non-hematologic toxicity. Once non-hematologic toxicity has recovered to less than or equal to Grade 1 and/or the blood counts have improved [Absolute Neutrophil Count (ANC) $\geq$ 1 x 10$^9$/L, platelets $\geq$ 75 x 10$^9$/L], reinitiate BELRAPZO at the discretion of the treating physician. In addition, consider dose reduction. *[see Warnings and Precautions (5.1)]*

Dose modifications for hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 50 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 25 mg/m$^2$ on Days 1 and 2 of each cycle.

Dose modifications for non-hematologic toxicity: for clinically significant Grade 3 or greater toxicity, reduce the dose to 50 mg/m$^2$ on Days 1 and 2 of each cycle.

Consider dose re-escalation in subsequent cycles at the discretion of the treating physician.

**2.2 Dosing Instructions for NHL**

Recommended Dosage:
The recommended dose is 120 mg/m$^2$ administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles.

Dose Delays, Dose Modifications and Reinitiation of Therapy for NHL:
Delay BELRAPZO administration in the event of a Grade 4 hematologic toxicity or clinically significant greater or equal to Grade 2 non-hematologic toxicity. Once non-hematologic toxicity has recovered to $\leq$ Grade 1 and/or the blood counts have improved [Absolute Neutrophil Count (ANC) $\geq$ 1 x 10$^9$/L, platelets $\geq$ 75 x 10$^9$/L], reinitiate BELRAPZO at the discretion of the treating physician. In addition, consider dose reduction. *[see Warnings and Precautions (5.1)]*

HIGHLY CONFIDENTIAL                                                                 EAGLEBEN-SLAYBACK-00050295

Dose modifications for hematologic toxicity: for Grade 4 toxicity, reduce the dose to 90 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 4 toxicity recurs, reduce the dose to 60 mg/m$^2$ on Days 1 and 2 of each cycle.

Dose modifications for non-hematologic toxicity: for Grade 3 or greater toxicity, reduce the dose to 90 mg/m$^2$ on Days 1 and 2 of each cycle; if Grade 3 or greater toxicity recurs, reduce the dose to 60 mg/m$^2$ on Days 1 and 2 of each cycle.

## 2.3 Preparation for Intravenous Administration

BELRAPZO is a cytotoxic drug. Follow applicable special handling and disposal procedures.[1]

BELRAPZO is in a multiple-dose vial. BELRAPZO is a clear and colorless to yellow solution. Store BELRAPZO at recommended refrigerated storage conditions (2° to 8°C or 36° to 46°F). When refrigerated the contents may freeze. Allow the vial to reach room temperature (15° to 30°C or 59° to 86°F) prior to use. Observe the contents of the vial for any visible solid or particulate matter. Do not use the product if solid or particulate matter is observed after reaching room temperature.

Intravenous Infusion
Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table A below and immediately transfer to a **500 mL infusion bag** of one of the following diluents:

- 0.9% Sodium Chloride Injection, USP; or

- 2.5% Dextrose/0.45% Sodium Chloride Injection, USP.

**The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.7 mg/mL.** After transferring, thoroughly mix the contents of the infusion bag. The admixture should be a clear and colorless to slightly yellow solution.

Use either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, for dilution, as outlined above. No other diluents have been shown to be compatible.

**Table A: Volume (mL) of BELRAPZO required for <u>dilution into 500 mL</u> of 0.9% Saline, or 0.45% Saline/2.5% Dextrose for a given dose (mg/m$^2$) and Body Surface Area (m$^2$)**

| Body Surface Area (m$^2$) | Volume of BELRAPZO to withdraw (mL) | | | | | |
|---|---|---|---|---|---|---|
| | 120 mg/m$^2$ | 100 mg/m$^2$ | 90 mg/m$^2$ | 60 mg/m$^2$ | 50 mg/m$^2$ | 25 mg/m$^2$ |
| 1 | 4.8 | 4 | 3.6 | 2.4 | 2 | 1 |
| 1.1 | 5.3 | 4.4 | 4 | 2.6 | 2.2 | 1.1 |
| 1.2 | 5.8 | 4.8 | 4.3 | 2.9 | 2.4 | 1.2 |
| 1.3 | 6.2 | 5.2 | 4.7 | 3.1 | 2.6 | 1.3 |
| 1.4 | 6.7 | 5.6 | 5 | 3.4 | 2.8 | 1.4 |
| 1.5 | 7.2 | 6 | 5.4 | 3.6 | 3 | 1.5 |
| 1.6 | 7.7 | 6.4 | 5.8 | 3.8 | 3.2 | 1.6 |
| 1.7 | 8.2 | 6.8 | 6.1 | 4.1 | 3.4 | 1.7 |

HIGHLY CONFIDENTIAL

EAGLEBEN-SLAYBACK-00050296

| Body Surface Area (m²) | Volume of BELRAPZO to withdraw (mL) | | | | | |
|---|---|---|---|---|---|---|
| | 120 mg/m² | 100 mg/m² | 90 mg/m² | 60 mg/m² | 50 mg/m² | 25 mg/m² |
| 1.8 | 8.6 | 7.2 | 6.5 | 4.3 | 3.6 | 1.8 |
| 1.9 | 9.1 | 7.6 | 6.8 | 4.6 | 3.8 | 1.9 |
| 2 | 9.6 | 8 | 7.2 | 4.8 | 4 | 2 |
| 2.1 | 10.1 | 8.4 | 7.6 | 5 | 4.2 | 2.1 |
| 2.2 | 10.6 | 8.8 | 7.9 | 5.3 | 4.4 | 2.2 |
| 2.3 | 11 | 9.2 | 8.3 | 5.5 | 4.6 | 2.3 |
| 2.4 | 11.5 | 9.6 | 8.6 | 5.8 | 4.8 | 2.4 |
| 2.5 | 12 | 10 | 9 | 6 | 5 | 2.5 |
| 2.6 | 12.5 | 10.4 | 9.4 | 6.2 | 5.2 | 2.6 |
| 2.7 | 13 | 10.8 | 9.7 | 6.5 | 5.4 | 2.7 |
| 2.8 | 13.4 | 11.2 | 10.1 | 6.7 | 5.6 | 2.8 |
| 2.9 | 13.9 | 11.6 | 10.4 | 7 | 5.8 | 2.9 |
| 3 | 14.4 | 12 | 10.8 | 7.2 | 6 | 3 |

Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Any unused solution should be discarded according to institutional procedures for antineoplastics.

## 2.4 Admixture Stability

BELRAPZO contains no antimicrobial preservative. The admixture should be prepared as close as possible to the time of patient administration.

If diluted with 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2° to 8°C or 36° to 46°F) or for 3 hours when stored at room temperature (15° to 30°C or 59° to 86°F) and room light. Administration of diluted BELRAPZO must be completed within this period of time.

BELRAPZO (bendamustine hydrochloride injection) is supplied in a multiple-dose vial. Retain the partially used vial in original package to protect from light and store refrigerated (2° to 8°C or 36° to 46°F) if additional dose withdrawal from the same vial is intended.

## 2.5 Stability of Partially Used Vials (Needle Punched Vials)

BELRAPZO is supplied as a multiple-dose vial. Although it does not contain any antimicrobial preservative, BELRAPZO is bacteriostatic. The partially used vials are stable for up to 28 days when stored in its original carton under refrigeration (2° to 8°C or 36° to 46°F). Each vial is not recommended for more than a total of six (6) dose withdrawals.

After first use, store the partially used vial in original carton at 2° to 8°C (36° to 46°F), and then discard after 28 days.

HIGHLY CONFIDENTIAL

EAGLEBEN-SLAYBACK-00050297

## 3 DOSAGE FORMS AND STRENGTHS

Injection: 100 mg/4 mL (25 mg/mL) as a clear and colorless to yellow ready-to-dilute solution in a multiple-dose vial.

## 4 CONTRAINDICATIONS

BELRAPZO is contraindicated in patients with a known hypersensitivity (e.g., anaphylactic and anaphylactoid reactions) to bendamustine, polyethylene glycol 400, propylene glycol, or monothioglycerol. *[see Warnings and Precautions (5.3)]*

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Myelosuppression

Bendamustine hydrochloride caused severe myelosuppression (Grade 3-4) in 98% of patients in the two NHL studies (*see Table 4*). Three patients (2%) died from myelosuppression-related adverse reactions; one each from neutropenic sepsis, diffuse alveolar hemorrhage with Grade 3 thrombocytopenia, and pneumonia from an opportunistic infection (CMV).

BELRAPZO causes myelosuppression. Monitor complete blood counts, including leukocytes, platelets, hemoglobin (Hgb), and neutrophils frequently. In the clinical trials, blood counts were monitored every week initially. Hematologic nadirs were observed predominantly in the third week of therapy. Myelosuppression may require dose delays and/or subsequent dose reductions if recovery to the recommended values has not occurred by the first day of the next scheduled cycle. Prior to the initiation of the next cycle of therapy, the ANC should be $\geq 1$ x $10^9$/L and the platelet count should be $\geq 75$ x $10^9$/L. *[see Dosage and Administration (2.1) and (2.2)]*

### 5.2 Infections

Infection, including pneumonia, sepsis, septic shock, hepatitis and death has occurred in adult and pediatric patients in clinical trials and in postmarketing reports for bendamustine hydrochloride. Patients with myelosuppression following treatment with bendamustine hydrochloride are more susceptible to infections. Advise patients with myelosuppression following BELRAPZO treatment to contact a physician immediately if they have symptoms or signs of infection.

Patients treated with BELRAPZO are at risk for reactivation of infections including (but not limited to) hepatitis B, cytomegalovirus, Mycobacterium tuberculosis, and herpes zoster. Patients should undergo appropriate measures (including clinical and laboratory monitoring, prophylaxis, and treatment) for infection and infection reactivation prior to administration.

### 5.3 Anaphylaxis and Infusion Reactions

Infusion reactions to bendamustine hydrochloride have occurred commonly in clinical trials. Symptoms include fever, chills, pruritus and rash. In rare instances severe anaphylactic and anaphylactoid reactions have occurred, particularly in the second and subsequent cycles of therapy. Monitor clinically and discontinue drug for severe reactions. Ask patients about symptoms suggestive of infusion reactions after their first cycle of therapy. Patients who experience Grade 3 or worse allergic-type reactions should not be rechallenged. Consider measures to prevent severe reactions, including antihistamines, antipyretics and corticosteroids in subsequent cycles in patients who have experienced Grade 1 or 2 infusion reactions. Discontinue

5

EAGLEBEN-SLAYBACK-00050298

BELRAPZO for patients with Grade 4 infusion reactions. Consider discontinuation for Grade 3 infusion reactions as clinically appropriate considering individual benefits, risks, and supportive care.

## 5.4 Tumor Lysis Syndrome

Tumor lysis syndrome associated with bendamustine hydrochloride has occurred in patients in clinical trials and in post-marketing reports. The onset tends to be within the first treatment cycle of bendamustine hydrochloride and, without intervention, may lead to acute renal failure and death. Preventive measures include vigorous hydration and close monitoring of blood chemistry, particularly potassium and uric acid levels. Allopurinol has also been used during the beginning of bendamustine hydrochloride therapy. However, there may be an increased risk of severe skin toxicity when bendamustine hydrochloride and allopurinol are administered concomitantly. *[see Warnings and Precautions (5.5)]*

## 5.5 Skin Reactions

Fatal and serious skin reactions have been reported with bendamustine hydrochloride treatment in clinical trials and postmarketing safety reports, including toxic skin reactions [Stevens-Johnson Syndrome (SJS), toxic epidermal necrolysis (TEN), and drug reaction with eosinophilia and systemic symptoms (DRESS), bullous exanthema, and rash. Events occurred when bendamustine hydrochloride was given as a single agent and in combination with other anticancer agents or allopurinol.

Where skin reactions occur, they may be progressive and increase in severity with further treatment. Monitor patients with skin reactions closely. If skin reactions are severe or progressive, withhold or discontinue BELRAPZO.

## 5.6 Hepatotoxicity

Fatal and serious cases of liver injury have been reported with bendamustine hydrochloride injection. Combination therapy, progressive disease or reactivation of hepatitis B were confounding factors in some patients. *[see Warnings and Precautions (5.2)]* Most cases were reported within the first three months of starting therapy. Monitor liver chemistry tests prior to and during BELRAPZO therapy.

## 5.7 Other Malignancies

There are reports of pre-malignant and malignant diseases that have developed in patients who have been treated with bendamustine hydrochloride, including myelodysplastic syndrome, myeloproliferative disorders, acute myeloid leukemia and bronchial carcinoma. The association with bendamustine hydrochloride therapy has not been determined.

## 5.8 Extravasation Injury

Bendamustine hydrochloride extravasations have been reported in postmarketing resulting in hospitalizations from erythema, marked swelling, and pain. Assure good venous access prior to starting BELRAPZO infusion and monitor the intravenous infusion site for redness, swelling, pain, infection, and necrosis during and after administration of BELRAPZO.

HIGHLY CONFIDENTIAL                                    EAGLEBEN-SLAYBACK-00050299

**5.9 Embryo-Fetal Toxicity**

Based on findings from animal reproduction studies and the drug's mechanism of action, BELRAPZO can cause fetal harm when administered to a pregnant woman. Single intraperitoneal doses of bendamustine (that approximated the maximum recommended human dose based on body surface area)  to pregnant mice and rats during organogenesis caused adverse developmental outcomes, including an increase in resorptions, skeletal and visceral malformations, and decreased fetal body weights. Advise pregnant women of the potential risk to a fetus. Advise females of reproductive potential to use an effective method of contraception during treatment with BELRAPZO and for at least 6 months after the final dose. Advise males with female partners of reproductive potential to use effective contraception during treatment with BELRAPZO and for at least 3 months after the final dose.  *[see Use in Specific Populations (8.1, 8.3) and Clinical Pharmacology (12.1)]*

**6 ADVERSE REACTIONS**

The following clinically significant serious adverse reactions are discussed in greater detail in other sections of the prescribing information.

- Myelosuppression *[see Warnings and Precautions (5.1)]*

- Infections *[see Warnings and Precautions (5.2)]*

- Anaphylaxis and Infusion Reactions*[see Warnings and Precautions (5.3)]*

- Tumor Lysis Syndrome *[see Warnings and Precautions (5.4)]*

- Skin Reactions *[see Warnings and Precautions (5.5)]*

- Hepatotoxicity *[see Warnings and Precautions (5.6)]*

- Other Malignancies *[see Warnings and Precautions (5.7)]*

- Extravasation Injury *[see Warnings and Precautions (5.8)]*

**6.1 Clinical Trials Experience**

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

**6.2 Clinical Trials Experience in CLL**

The data described below reflect exposure to bendamustine hydrochloride in 153 patients. Bendamustine hydrochloride was  studied in an active-controlled, randomized trial. The population was 45-77 years of age, 63% male, 100% white, and had treatment naïve CLL. All patients started the study at a dose of 100 mg/m$^2$ intravenously over 30 minutes on Days 1 and 2 every 28 days.

Adverse reactions were reported according to NCI CTC v.2.0. In the randomized CLL clinical study, non-hematologic adverse reactions (any grade) in the bendamustine hydrochloride group that occurred with a frequency greater than 15% were pyrexia (24%), nausea (20%), and vomiting (16%).

HIGHLY CONFIDENTIAL

Other adverse reactions seen frequently in one or more studies included asthenia, fatigue, malaise, and weakness; dry mouth; somnolence; cough; constipation; headache; mucosal inflammation and stomatitis.

Worsening hypertension was reported in 4 patients treated with bendamustine hydrochloride in the randomized CLL clinical study and in none treated with chlorambucil. Three of these 4 adverse reactions were described as a hypertensive crisis and were managed with oral medications and resolved.

The most frequent adverse reactions leading to study withdrawal for patients receiving bendamustine hydrochloride were hypersensitivity (2%) and pyrexia (1%).

Table 1 contains the treatment emergent adverse reactions, regardless of attribution, that were reported in ≥ 5% of patients in either treatment group in the randomized CLL clinical study.

**Table 1: Non-Hematologic Adverse Reactions Occurring in Randomized CLL Clinical Study in at Least 5% of Patients**

| Body System<br>Adverse Reaction | Number (%) of patients | | | |
| --- | --- | --- | --- | --- |
| | Bendamustine Hydrochloride<br>(N=153) | | Chlorambucil<br>(N=143) | |
| | All Grades | Grade 3/4 | All Grades | Grade 3/4 |
| **Total number of patients with at least 1 adverse reaction** | **121 (79)** | **52 (34)** | **96 (67)** | **25 (17)** |
| **Gastrointestinal disorders** | | | | |
| Nausea | 31 (20) | 1 (<1) | 21 (15) | 1 (<1) |
| Vomiting | 24 (16) | 1 (<1) | 9 (6) | 0 |
| Diarrhea | 14 (9) | 2 (1) | 5 (3) | 0 |
| **General disorders and administration site conditions** | | | | |
| Pyrexia | 36 (24) | 6 (4) | 8 (6) | 2 (1) |
| Fatigue | 14 (9) | 2 (1) | 8 (6) | 0 |
| Asthenia | 13 (8) | 0 | 6 (4) | 0 |
| Chills | 9 (6) | 0 | 1 (<1) | 0 |
| **Immune system disorders** | | | | |
| Hypersensitivity | 7 (5) | 2 (1) | 3 (2) | 0 |
| **Infections and infestations** | | | | |
| Nasopharyngitis | 10 (7) | 0 | 12 (8) | 0 |
| Infection | 9 (6) | 3 (2) | 1 (<1) | 1 (<1) |
| Herpes simplex | 5 (3) | 0 | 7 (5) | 0 |
| **Investigations** | | | | |
| Weight decreased | 11 (7) | 0 | 5 (3) | 0 |
| **Metabolism and nutrition disorders** | | | | |
| Hyperuricemia | 11 (7) | 3 (2) | 2 (1) | 0 |
| **Respiratory, thoracic and mediastinal disorders** | | | | |
| Cough | 6 (4) | 1 (<1) | 7 (5) | 1 (<1) |
| **Skin and subcutaneous tissue disorders** | | | | |
| Rash | 12 (8) | 4 (3) | 7 (5) | 3 (2) |

8

EAGLEBEN-SLAYBACK-00050301

|  | Number (%) of patients | | | |
|  | Bendamustine Hydrochloride (N=153) | | Chlorambucil (N=143) | |
| Pruritus | 8 (5) | 0 | 2 (1) | 0 |

The Grade 3 and 4 hematology laboratory test values by treatment group in the randomized CLL clinical study are described in Table 2. These findings confirm the myelosuppressive effects seen in patients treated with bendamustine hydrochloride. Red blood cell transfusions were administered to 20% of patients receiving bendamustine hydrochloride compared with 6% of patients receiving chlorambucil.

**Table 2: Incidence of Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride or Chlorambucil in the Randomized CLL Clinical Study**

| Laboratory Abnormality | Bendamustine Hydrochloride N=150 | | Chlorambucil N=141 | |
|  | All Grades n (%) | Grade 3/4 n (%) | All Grades n (%) | Grade 3/4 n (%) |
| Hemoglobin Decreased | 134 (89) | 20 (13) | 115 (82) | 12 (9) |
| Platelets Decreased | 116 (77) | 16 (11) | 110 (78) | 14 (10) |
| Leukocytes Decreased | 92 (61) | 42 (28) | 26 (18) | 4 (3) |
| Lymphocytes Decreased | 102 (68) | 70 (47) | 27 (19) | 6 (4) |
| Neutrophils Decreased | 113 (75) | 65 (43) | 86 (61) | 30 (21) |

In the randomized CLL trial, 34% of patients had bilirubin elevations, some without associated significant elevations in AST and ALT. Grade 3 or 4 increased bilirubin occurred in 3% of patients. Increases in AST and ALT of Grade 3 or 4 were limited to 1% and 3% of patients, respectively. Patients treated with bendamustine hydrochloride may also have changes in their creatinine levels. If abnormalities are detected, monitoring of these parameters should be continued to ensure that further deterioration does not occur.

## 6.3 Clinical Trials Experience in NHL

The data described below reflect exposure to bendamustine hydrochloride in 176 patients with indolent B-cell NHL treated in two single-arm studies. The population was 31-84 years of age, 60% male, and 40% female. The race distribution was 89% White, 7% Black, 3% Hispanic, 1% other, and <1% Asian. These patients received bendamustine hydrochloride at a dose of 120 mg/m$^2$ intravenously on Days 1 and 2 for up to eight 21-day cycles.

The adverse reactions occurring in at least 5% of the NHL patients, regardless of severity, are shown in Table 3. The most common non-hematologic adverse reactions (≥30%) were nausea (75%), fatigue (57%), vomiting (40%), diarrhea (37%) and pyrexia (34%). The most common non-hematologic Grade 3 or 4 adverse reactions (≥5%) were fatigue (11%), febrile neutropenia (6%), and pneumonia, hypokalemia and dehydration, each reported in 5% of patients.

9

EAGLEBEN-SLAYBACK-00050302

**Table 3: Non-Hematologic Adverse Reactions Occurring in at Least 5% of NHL Patients Treated with Bendamustine Hydrochloride by System Organ Class and Preferred Term (N=176)**

| Body System | Number (%) of patients* | |
|---|---|---|
| Adverse Reaction | All Grades | Grade 3/4 |
| Total number of patients with at least 1 adverse reaction | 176 (100) | 94 (53) |
| **Cardiac Disorders** | | |
| Tachycardia | 13 (7) | 0 |
| **Gastrointestinal disorders** | | |
| Nausea | 132 (75) | 7 (4) |
| Vomiting | 71 (40) | 5 (3) |
| Diarrhea | 65 (37) | 6 (3) |
| Constipation | 51 (29) | 1 (<1) |
| Stomatitis | 27 (15) | 1 (<1) |
| Abdominal pain | 22 (13) | 2 (1) |
| Dyspepsia | 20 (11) | 0 |
| Gastroesophageal reflux disease | 18 (10) | 0 |
| Dry mouth | 15 (9) | 1 (<1) |
| Abdominal pain upper | 8 (5) | 0 |
| Abdominal distension | 8 (5) | 0 |
| **General disorders and administration site conditions** | | |
| Fatigue | 101 (57) | 19 (11) |
| Pyrexia | 59 (34) | 3 (2) |
| Chills | 24 (14) | 0 |
| Edema peripheral | 23 (13) | 1 (<1) |
| Asthenia | 19 (11) | 4 (2) |
| Chest pain | 11 (6) | 1 (<1) |
| Infusion site pain | 11 (6) | 0 |
| Pain | 10 (6) | 0 |
| Catheter site pain | 8 (5) | 0 |
| **Infections and infestations** | | |
| Herpes zoster | 18 (10) | 5 (3) |
| Upper respiratory tract infection | 18 (10) | 0 |
| Urinary tract infection | 17 (10) | 4 (2) |
| Sinusitis | 15 (9) | 0 |
| Pneumonia | 14 (8) | 9 (5) |
| Febrile neutropenia | 11 (6) | 11 (6) |
| Oral candidiasis | 11 (6) | 2 (1) |
| Nasopharyngitis | 11 (6) | 0 |
| **Investigations** | | |
| Weight decreased | 31 (18) | 3 (2) |
| **Metabolism and nutrition disorders** | | |
| Anorexia | 40 (23) | 3 (2) |
| Dehydration | 24 (14) | 8 (5) |
| Decreased appetite | 22 (13) | 1 (<1) |
| Hypokalemia | 15 (9) | 9 (5) |
| **Musculoskeletal and connective tissue disorders** | | |
| Back pain | 25 (14) | 5 (3) |
| Arthralgia | 11 (6) | 0 |

10

| Body System | Number (%) of patients* | |
|---|---|---|
| **Adverse Reaction** | **All Grades** | **Grade 3/4** |
| Pain in extremity | 8 (5) | 2 (1) |
| Bone pain | 8 (5) | 0 |
| **Nervous system disorders** | | |
| Headache | 36 (21) | 0 |
| Dizziness | 25 (14) | 0 |
| Dysgeusia | 13 (7) | 0 |
| **Psychiatric disorder** | | |
| Insomnia | 23 (13) | 0 |
| Anxiety | 14 (8) | 1 (<1) |
| Depression | 10 (6) | 0 |
| **Respiratory, thoracic and mediastinal disorders** | | |
| Cough | 38 (22) | 1 (<1) |
| Dyspnea | 28 (16) | 3 (2) |
| Pharyngolaryngeal pain | 14 (8) | 1 (<1) |
| Wheezing | 8 (5) | 0 |
| Nasal congestion | 8 (5) | 0 |
| **Skin and subcutaneous tissue disorders** | | |
| Rash | 28 (16) | 1 (<1) |
| Pruritus | 11 (6) | 0 |
| Dry skin | 9 (5) | 0 |
| Night sweats | 9 (5) | 0 |
| Hyperhidrosis | 8 (5) | 0 |
| **Vascular disorders** | | |
| Hypotension | 10 (6) | 2 (1) |

*Patients may have reported more than 1 adverse reaction.
**NOTE:** Patients counted only once in each preferred term category and once in each system organ class category

Hematologic toxicities, based on laboratory values and CTC grade, in NHL patients treated in both single arm studies combined are described in Table 4. Clinically important chemistry laboratory values that were new or worsened from baseline and occurred in >1% of patients at Grade 3 or 4, in NHL patients treated in both single arm studies combined were hyperglycemia (3%), elevated creatinine (2%), hyponatremia (2%), and hypocalcemia (2%).

**Table 4: Incidence of Hematology Laboratory Abnormalities in Patients Who Received Bendamustine Hydrochloride in the NHL Studies**

| Hematology Variable | Percent of Patients | |
|---|---|---|
| | **All Grades** | **Grade 3/4** |
| Lymphocytes Decreased | 99 | 94 |
| Leukocytes Decreased | 94 | 56 |
| Hemoglobin Decreased | 88 | 11 |
| Neutrophils Decreased | 86 | 60 |
| Platelets Decreased | 86 | 25 |

In both studies, serious adverse reactions, regardless of causality, were reported in 37% of patients receiving bendamustine hydrochloride. The most common serious adverse reactions occurring in ≥5% of patients were febrile neutropenia and pneumonia. Other important serious

11

adverse reactions reported in clinical trials and/or post-marketing experience were acute renal failure, cardiac failure, hypersensitivity, skin reactions, pulmonary fibrosis, and myelodysplastic syndrome.

Serious drug-related adverse reactions reported in clinical trials included myelosuppression, infection, pneumonia, tumor lysis syndrome and infusion reactions. *[see Warnings and Precautions (5)]* Adverse reactions occurring less frequently but possibly related to bendamustine hydrochloride treatment were hemolysis, dysgeusia/taste disorder, atypical pneumonia, sepsis, herpes zoster, erythema, dermatitis, and skin necrosis.

## 6.4 Postmarketing Experience

The following adverse reactions have been identified during post-approval use of bendamustine hydrochloride. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Blood and lymphatic systems disorders:* Pancytopenia

*Cardiovascular disorders:* Atrial fibrillation, congestive heart failure (some fatal), myocardial infarction (some fatal), palpitation

*General disorders and administration site conditions:* Injection site reactions (including phlebitis, pruritus, irritation, pain, swelling), infusion site reactions (including phlebitis, pruritus, irritation, pain, swelling)

*Immune system disorders:* Anaphylaxis

*Infections and infestations:* Pneumocystis jiroveci pneumonia

*Respiratory, thoracic and mediastinal disorders*: Pneumonitis

*Skin and subcutaneous tissue disorders:* Stevens-Johnson syndrome, Toxic epidermal necrolysis, DRESS (Drug reaction with eosinophilia and systemic symptoms). *[see Warnings and Precautions (5.5)]*

## 7 DRUG INTERACTIONS

### 7.1 Effect of Other Drugs on BELRAPZO

CYP1A2 Inhibitors
The coadministration of BELRAPZO with CYP1A2 inhibitors may increase bendamustine plasma concentrations and may result in increased incidence of adverse reactions with BELRAPZO *[see Clinical Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inhibitors during treatment with BELRAPZO.

CYP1A2 Inducers
The coadministration of BELRAPZO with CYP1A2 inducers may decrease bendamustine plasma concentrations and may result in decreased efficacy of BELRAPZO *[see Clinical*

12

HIGHLY CONFIDENTIAL

*Pharmacology (12.3)]*. Consider alternative therapies that are not CYP1A2 inducers during treatment with BELRAPZO.

## 8 USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Risk Summary

In animal reproduction studies, intraperitoneal administration of bendamustine to pregnant mice and rats during organogenesis at doses 0.6 to 1.8 times the maximum recommended human dose (MRHD) resulted in embryo-fetal and/or infant mortality, structural abnormalities, and alterations to growth *(see Data)*. There are no available data on bendamustine hydrochloride use in pregnant women to evaluate for a drug-associated risk of major birth defects, miscarriage or adverse maternal or fetal outcomes. Advise pregnant women of the potential risk to a fetus.

The estimated background risk of major birth defects and miscarriage for the indicated population is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2-4% and 15-20%, respectively.

Data

*Animal data*

Bendamustine hydrochloride was intraperitoneally administered once to mice from 210 mg/m$^2$ (approximately 1.8 times the MRHD) during organogenesis and caused an increase in resorptions, skeletal and visceral malformations (exencephaly, cleft palates, accessory rib, and spinal deformities) and decreased fetal body weights. This dose did not appear to be maternally toxic and lower doses were not evaluated. Repeat intraperitoneal administration of bendamustine hydrochloride in mice on gestation days 7-11 resulted in an increase in resorptions from 75 mg/m$^2$ (approximately 0.6 times the MRHD) and an increase in abnormalities from 112.5 mg/m$^2$ (approximately 0.9 times the MRHD), similar to those seen after a single intraperitoneal administration.

Bendamustine hydrochloride was intraperitoneally administered once to rats from 120 mg/m$^2$ (approximately the MRHD) on gestation days 4, 7, 9, 11, or 13 and caused embryo and fetal lethality as indicated by increased resorptions and a decrease in live fetuses. A significant increase in external (effect on tail, head, and herniation of external organs [exomphalos]) and internal (hydronephrosis and hydrocephalus) malformations were seen in dosed rats.

### 8.2 Lactation

Risk Summary

There are no data on the presence of bendamustine hydrochloride or its metabolites in either human or animal milk, the effects on the breastfed child, or the effects on milk production. Because of the potential for serious adverse reactions in the breastfed child, advise patients that breastfeeding is not recommended during treatment with BELRAPZO, and for at least 1 week after the last dose.

13

**8.3 Females and Males of Reproductive Potential**

BELRAPZO can cause fetal harm when administered to a pregnant woman *[see Warnings and Precautions (5.9) and Use in Specific Populations (8.1)]*.

Pregnancy Testing

Pregnancy testing is recommended for females of reproductive potential prior to initiation of treatment with BELRAPZO *[see Use in Specific Populations (8.1)]*.

Contraception

*Females*

BELRAPZO can cause embryo-fetal harm when administered to pregnant women *[see Use in Specific Populations (8.1)]*. Advise female patients of reproductive potential to use effective contraception during treatment with BELRAPZO and for 6 months after the final dose.

*Males*

Based on genotoxicity findings, advise males with female partners of reproductive potential to use effective  contraception during treatment with BELRAPZO and for at least 3 months after the final dose *[see Nonclinical Toxicology (13.1)]*.

Infertility

Based on findings from clinical studies, BELRAPZO may impair male fertility. Impaired spermatogenesis, azoospermia, and total germinal aplasia have been reported in male patients treated with alkylating agents, especially in combination with other drugs. In some instances spermatogenesis may return in patients in remission, but this may occur only several years after intensive chemotherapy has been discontinued. Advise patients of the potential risk to their reproductive capacities.

Based on findings from animal studies, BELRAPZO may impair male fertility due to an increase in morphologically abnormal spermatozoa. The long-term effects of BELRAPZO on male fertility, including the reversibility of adverse effects, have not been studied *[see Nonclinical Toxicology (13.1)]*.

**8.4 Pediatric Use**

Safety and effectiveness in pediatric patients have not been established.

Safety, pharmacokinetics and efficacy were assessed in a single open-label trial (NCT01088984) in patients aged 1-19 years with relapsed or refractory acute leukemia, including 27 patients with acute lymphocytic leukemia (ALL) and 16 patients with acute myeloid leukemia (AML). Bendamustine hydrochloride was administered as an intravenous infusion over 60 minutes on Days 1 and 2 of each 21-day cycle. There was no treatment response (CR+ CRp) in any patient. The safety profile in these patients was consistent with that seen in adults, and no new safety signals were identified.

The pharmacokinetics of bendamustine in 43 patients, aged 1 to 19 years (median age of 10 years) were within range of values previously observed in adults given the same dose based on body surface area.

**8.5 Geriatric Use**

No overall differences in safety were observed between patients ≥65 years of age  and younger patients. Efficacy was lower in patients 65 and over with CLL receiving bendamustine

14

hydrochloride based upon an overall response rate of 47% for patients 65 and over and 70% for younger patients. Progression free survival was also longer in younger patients with CLL receiving bendamustine (19 months vs. 12 months). No overall differences in efficacy in patients with non-Hodgkin Lymphoma were observed between geriatric patients and younger patients.

## 8.6 Renal Impairment

Do not use BELRAPZO in patients with creatinine clearance (CLcr) < 30 mL/min *[see Clinical Pharmacology (12.3)]*.

## 8.7 Hepatic Impairment

Do not use BELRAPZO in patients with AST or ALT 2.5-10 × upper limit of normal (ULN) and total bilirubin 1.5-3 × ULN, or total bilirubin > 3 × ULN *[see Clinical Pharmacology (12.3)]*

## 10 OVERDOSAGE

The intravenous LD50 of bendamustine hydrochloride is 240 mg/m$^2$ in the mouse and rat. Toxicities included sedation, tremor, ataxia, convulsions and respiratory distress.

Across all clinical experience, the reported maximum single dose received was 280 mg/m$^2$. Three of four patients treated at this dose showed ECG changes considered dose-limiting at 7 and 21 days post-dosing. These changes included QT prolongation (one patient), sinus tachycardia (one patient), ST and T wave deviations (two patients) and left anterior fascicular block (one patient). Cardiac enzymes and ejection fractions remained normal in all patients.

No specific antidote for bendamustine hydrochloride overdose is known. Management of overdosage should include general supportive measures, including monitoring of hematologic parameters and ECGs.

## 11 DESCRIPTION

BELRAPZO (bendamustine hydrochloride) is an alkylating agent. The chemical name of bendamustine hydrochloride is 1H-benzimidazole-2-butanoic acid, 5-[bis(2-chloroethyl)amino]-1-methyl-, monohydrochloride. Its empirical molecular formula is $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl$, and the molecular weight is 394.7. Bendamustine hydrochloride contains a mechlorethamine group and a benzimidazole heterocyclic ring with a butyric acid substituent, and has the following structural formula:



BELRAPZO (bendamustine hydrochloride) injection for intravenous use is supplied as a sterile, clear, and colorless to yellow ready-to-dilute solution in a multiple-dose clear glass vial. Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 0.1 mL of propylene glycol, USP, 5 mg of monothioglycerol, NF and q.s. to 1 mL polyethylene glycol 400, NF.

15

EAGLEBEN-SLAYBACK-00050308

## 12 CLINICAL PHARMACOLOGY

## 12.1 Mechanism of Action

Bendamustine is a bifunctional mechlorethamine derivative containing a purine-like benzimidazole ring. Mechlorethamine and its derivatives form electrophilic alkyl groups. These groups form covalent bonds with electron-rich nucleophilic moieties, resulting in interstrand DNA crosslinks. The bifunctional covalent linkage can lead to cell death via several pathways. Bendamustine is active against both quiescent and dividing cells. The exact mechanism of action of bendamustine remains unknown.

## 12.2 Pharmacodynamics

Based on the pharmacokinetics/pharmacodynamics analyses of data from adult NHL patients, nausea increased with increasing bendamustine $C_{max}$.

Cardiac Electrophysiology
The effect of bendamustine on the QTc interval was evaluated in 53 patients with indolent NHL and mantle cell lymphoma on Day 1 of Cycle 1 after administration of rituximab at 375 mg/m$^2$ intravenous infusion followed by a 30-minute intravenous infusion of bendamustine at 90 mg/m$^2$/day. No mean changes greater than 20 milliseconds were detected up to one hour post infusion. The potential for delayed effects on the QT interval after one hour was not evaluated.

## 12.3 Pharmacokinetics

Absorption
Following a single IV dose of bendamustine hydrochloride $C_{max}$ typically occurred at the end of infusion. The dose proportionality of bendamustine has not been studied.

Distribution
The protein binding of bendamustine ranged from 94-96% and was concentration independent from 1-50 μg/mL. The blood to plasma concentration ratios in human blood ranged from 0.84 to 0.86 over a concentration range of 10 to 100 μg/mL.

The mean steady-state volume of distribution ($V_{ss}$) of bendamustine was approximately 20-25 L.

Elimination
After a single intravenous dose of 120 mg/m$^2$ of bendamustine over 1 hour, the intermediate half-life ($t_{1/2}$) of the parent compound is approximately 40 minutes. The mean terminal elimination $t_{1/2}$ of two active metabolites, γ-hydroxybendamustine (M3) and N-desmethylbendamustine (M4) are approximately 3 hours and 30 minutes, respectively. Bendamustine clearance in humans is approximately 700 mL/min.

*Metabolism*
Bendamustine is extensively metabolized via hydrolytic, oxidative, and conjugative pathways. Bendamustine is primarily metabolized via hydrolysis to monohydroxy (HP1) and dihydroxy-bendamustine (HP2) metabolites with low cytotoxic activity in vitro. Two active minor metabolites, M3 and M4, are primarily formed via CYP1A2 in vitro. M3 and M4 concentrations of these metabolites in plasma are 1/10th and 1/100th that of the parent compound, respectively.

*Excretion*
Following IV infusion of radiolabeled bendamustine hydrochloride in cancer patients, approximately 76% of the dose was recovered. Approximately 50% of the dose was recovered in

16

EAGLEBEN-SLAYBACK-00050309

the urine (3.3% unchanged) and approximately 25% of the dose was recovered in the feces. Less than 1% of the dose was recovered in the urine as M3 and M4, and less than 5% of the dose was recovered in the urine as HP2.

*Specific Populations*

No clinically meaningful effects on the pharmacokinetics of bendamustine were observed based on age (31 to 84 years), sex, mild to moderate renal impairment (CLcr $\geq$ 30 mL/min), or hepatic impairment with total bilirubin 1.5 < ULN and AST or ALT < 2.5 × ULN. The effects of severe renal impairment (CLcr < 30 mL/min), or hepatic impairment with total bilirubin 1.5-3 × ULN and AST or ALT 2.5-10 × ULN or total bilirubin > 3 × ULN on the pharmacokinetics of bendamustine is unknown.

*Race/Ethnicity*

Exposures in Japanese subjects (n=6) were 40% higher than that in non-Japanese subjects receiving the same dose. The clinical importance of this difference on the safety and efficacy of bendamustine hydrochloride in Japanese subjects has not been established.

<u>Drug Interaction Studies</u>

*In Vitro Studies*

<u>*Effect of Bendamustine on CYP Substrates*</u>

Bendamustine did not inhibit CYP1A2, 2C9/10, 2D6, 2E1, or 3A4/5. Bendamustine did not induce metabolism of CYP1A2, CYP2A6, CYP2B6, CYP2C8, CYP2C9, CYP2C19, CYP2E1, or CYP3A4/5.

<u>*Effect of Transporters on Bendamustine Hydrochloride*</u>

Bendamustine is a substrate of P-glycoprotein and breast cancer resistance protein (BCRP).

## 13 NONCLINICAL TOXICOLOGY

## 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Bendamustine was carcinogenic in mice. After intraperitoneal injections at 37.5 mg/m$^2$/day  (the lowest dose tested, approximately 0.3 times the maximum recommended human dose [MRHD]) and 75 mg/m$^2$/day (approximately 0.6 times the MRHD) for 4 days, peritoneal sarcomas in female AB/jena mice were produced. Oral administration at 187.5 mg/m$^2$/day (the only dose tested, approximately 1.6 times the MRHD) for 4 days induced mammary carcinomas and pulmonary adenomas.

Bendamustine is a mutagen and clastogen. In a reverse bacterial mutation assay (Ames assay), bendamustine was shown to increase revertant frequency in the absence and presence of metabolic activation. Bendamustine was clastogenic in human lymphocytes *in vitro*, and in rat bone marrow cells *in vivo* (increase in micronucleated polychromatic erythrocytes) from 37.5 mg/m$^2$, (the lowest dose tested, approximately 0.3 times the MRHD).

Bendamustine induced morphologic abnormalities in spermatozoa in mice. Following tail vein injection of bendamustine at 120 mg/m$^2$  or a saline control on days 1 and 2 for a total of three weeks, the number of spermatozoa with morphologic abnormalities was 16% higher in the bendamustine-treated group as compared to the saline control group.

17

EAGLEBEN-SLAYBACK-00050310

## 14 CLINICAL STUDIES

### 14.1 Chronic Lymphocytic Leukemia (CLL)

The safety and efficacy of bendamustine hydrochloride were evaluated in an open-label, randomized, controlled multicenter trial comparing bendamustine hydrochloride to chlorambucil. The trial was conducted in 301 previously-untreated patients with Binet Stage B or C (Rai Stages I - IV) CLL requiring treatment. Need-to-treat criteria included hematopoietic insufficiency, B-symptoms, rapidly progressive disease or risk of complications from bulky lymphadenopathy. Patients with autoimmune hemolytic anemia or autoimmune thrombocytopenia, Richter's syndrome, or transformation to prolymphocytic leukemia were excluded from the study.

The patient populations in the bendamustine hydrochloride and chlorambucil treatment groups were balanced with regard to the following baseline characteristics: age (median 63 vs. 66 years), gender (63% vs. 61% male), Binet stage (71% vs. 69% Binet B), lymphadenopathy (79% vs. 82%), enlarged spleen (76% vs. 80%), enlarged liver (48% vs. 46%), hypercellular bone marrow (79% vs. 73%), "B" symptoms (51% vs. 53%), lymphocyte count (mean $65.7 \times 10^9$/L vs. $65.1 \times 10^9$/L), and serum lactate dehydrogenase concentration (mean 370.2 vs. 388.4 U/L). Ninety percent of patients in both treatment groups had immuno-phenotypic confirmation of CLL (CD5, CD23 and either CD19 or CD20 or both).

Patients were randomly assigned to receive either bendamustine hydrochloride at 100 mg/m$^2$, administered intravenously over a period of 30 minutes on Days 1 and 2 or chlorambucil at 0.8 mg/kg (Broca's normal weight) administered orally on Days 1 and 15 of each 28-day cycle. Efficacy endpoints of objective response rate and progression-free survival were calculated using a pre-specified algorithm based on NCI working group criteria for CLL.

The results of this open-label randomized study demonstrated a higher rate of overall response and a longer progression-free survival for bendamustine hydrochloride compared to chlorambucil (*see* Table 5). Survival data are not mature.

**Table 5: Efficacy Data for CLL**

|  | Bendamustine Hydrochloride (N=153) | Chlorambucil (N=148) | p-value |
|---|---|---|---|
| **Response Rate n (%)** |  |  |  |
| Overall response rate | 90 (59) | 38 (26) | <0.0001 |
| (95% CI) | (51, 66.6) | (18.6, 32.7) |  |
| Complete response (CR)* | 13 (8) | 1 (<1) |  |
| Nodular partial response (nPR)** | 4 (3) | 0 |  |
| Partial response (PR) [†] | 73 (48) | 37 (25) |  |
| **Progression-Free Survival[††]** |  |  |  |
| Median, months (95% CI) | 18 (11.7, 23.5) | 6 (5.6, 8.6) |  |

18

|  | Bendamustine Hydrochloride (N=153) | Chlorambucil (N=148) | p-value |
|---|---|---|---|
| Hazard ratio (95% CI) | 0.27 (0.17, 0.43) | | <0.0001 |

CI = confidence interval

\* CR was defined as peripheral lymphocyte count $\leq 4 \times 10^9$/L, neutrophils $\geq 1.5 \times 10^9$/L, platelets >100 x $10^9$/L, hemoglobin > 110g/L, without transfusions, absence of palpable hepatosplenomegaly, lymph nodes $\leq 1.5$ cm, < 30% lymphocytes without nodularity in at least a normocellular bone marrow and absence of "B" symptoms. The clinical and laboratory criteria were required to be maintained for a period of at least 56 days.

\*\* nPR was defined as described for CR with the exception that the bone marrow biopsy shows persistent nodules.

[†] PR was defined as $\geq 50\%$ decrease in peripheral lymphocyte count from the pretreatment baseline value, and either $\geq 50\%$ reduction in lymphadenopathy, or $\geq 50\%$ reduction in the size of spleen or liver, as well as one of the following hematologic improvements: neutrophils $\geq 1.5 \times 10^9$/L or 50% improvement over baseline, platelets >100 x $10^9$/L or 50% improvement over baseline, hemoglobin >110g/L or 50% improvement over baseline without transfusions, for a period of at least 56 days.

[††] PFS was defined as time from randomization to progression or death from any cause.

Kaplan-Meier estimates of progression-free survival comparing bendamustine hydrochloride with chlorambucil are shown in Figure 1.

**Figure 1. Progression-Free Survival**



## 14.2 Non-Hodgkin Lymphoma (NHL)

The efficacy of bendamustine hydrochloride was evaluated in a single arm study of 100 patients with indolent B-cell NHL that had progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Patients were included if they relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab. All patients received bendamustine hydrochloride intravenously at a dose of 120 mg/m², on Days 1 and 2 of a 21-day treatment cycle. Patients were treated for up to 8 cycles.

19

The median age was 60 years, 65% were male, and 95% had a baseline WHO performance status of 0 or 1. Major tumor subtypes were follicular lymphoma (62%), diffuse small lymphocytic lymphoma (21%), and marginal zone lymphoma (16%). Ninety-nine percent of patients had received previous chemotherapy, 91% of patients had received previous alkylator therapy, and 97% of patients had relapsed within 6 months of either the first dose (monotherapy) or last dose (maintenance regimen or combination therapy) of rituximab.

Efficacy was based on the assessments by a blinded independent review committee (IRC) and included overall response rate (complete response + complete response unconfirmed + partial response) and duration of response (DR) as summarized in Table 6.

**Table 6: Efficacy Data for NHL\***

|  | Bendamustine Hydrochloride (N=100) |
|---|---|
| **Response Rate (%)** | |
| Overall response rate (CR+CRu+PR) | 74 |
| (95% CI) | (64.3, 82.3) |
| Complete response (CR) | 13 |
| Complete response unconfirmed (CRu) | 4 |
| Partial response (PR) | 57 |
| **Duration of Response (DR)** | |
| Median, months (95% CI) | 9.2 months (7.1, 10.8) |

CI = confidence interval
*IRC assessment was based on modified International Working Group response criteria (IWG-RC). Modifications to IWG-RC specified that a persistently positive bone marrow in patients who met all other criteria for CR would be scored as PR. Bone marrow sample lengths were not required to be ≥20 mm.

## 15 REFERENCES

1. OSHA Hazardous Drugs. OSHA. [Accessed on 02/16/16, from http://www.osha.gov/SLTC/hazardousdrugs/index.html]

## 16 HOW SUPPLIED/STORAGE AND HANDLING

### 16.1 Safe Handling and Disposal

BELRAPZO (bendamustine hydrochloride) is a cytotoxic drug. Follow applicable special handling and disposal procedures[1]. Care should be exercised in the handling and preparation of solutions prepared from BELRAPZO. The use of gloves and safety glasses is recommended to avoid exposure in case of breakage of the vial or other accidental spillage. If gloves come in contact with BELRAPZO prior to dilution, remove gloves and follow disposal procedures[1]. If a solution of BELRAPZO (bendamustine hydrochloride) contacts the skin, wash the skin immediately and thoroughly with soap and water. If BELRAPZO (bendamustine hydrochloride) contacts the mucous membranes, flush thoroughly with water.

### 16.2 How Supplied

BELRAPZO (bendamustine hydrochloride) is supplied in individual cartons of 5 mL clear multiple-dose vials containing 100 mg of bendamustine hydrochloride as a clear, and colorless to yellow ready-to-dilute solution.

NDC 42367-521-25, 100 mg/4 mL (25 mg/mL).

20

HIGHLY CONFIDENTIAL                    EAGLEBEN-SLAYBACK-00050313

**16.3 Storage**

Store BELRAPZO (bendamustine hydrochloride) in refrigerator, 2 to 8 °C (36 to 46 °F). Retain in original carton until time of use to protect from light.

**17 PATIENT COUNSELING INFORMATION**

Allergic (Hypersensitivity) Reactions

Inform patients of the possibility of serious or mild allergic reactions and to immediately report rash, facial swelling, or difficulty breathing during or soon after infusion. *[see Warnings and Precautions (5.3)]*

Myelosuppression

Inform patients of the likelihood that BELRAPZO will cause a decrease in white blood cells, platelets, and red blood cells and the need for frequent monitoring of blood counts. Advise patients to report shortness of breath, significant fatigue, bleeding, fever, or other signs of infection. *[see Warnings and Precautions (5.1)]*

Hepatotoxicity

Inform patients of the possibility of developing liver function abnormalities and serious hepatic toxicity. Advise patients to immediately contact their health care provider if signs of liver failure occur, including jaundice, anorexia, bleeding or bruising. *[see Warnings and Precautions (5.6)]*.

Fatigue

Advise patients that BELRAPZO may cause tiredness and to avoid driving any vehicle or operating any dangerous tools or machinery if they experience this side effect. *[see Adverse Reactions (6.1)]*

Nausea and Vomiting

Advise patients that BELRAPZO may cause nausea and/or vomiting. Patients should report nausea and vomiting so that symptomatic treatment may be provided. *[see Adverse Reactions (6.1)]*

Diarrhea

Advise patients that BELRAPZO may cause diarrhea. Patients should report diarrhea to the physician so that symptomatic treatment may be provided. *[see Adverse Reactions (6.1)]*

Rash

Advise patients that a rash or itching may occur during treatment with BELRAPZO. Advise patients to immediately report severe or worsening rash or itching. *[see Adverse Reactions (5.5)]*

Embryo-Fetal Toxicity

Advise pregnant women and females of reproductive potential of the potential risk to a fetus. Advise females to inform their healthcare provider of a known or suspected pregnancy *[see Warnings and Precautions (5.9), Use in Specific Populations (8.1, 8.3), and Nonclinical Toxicology (13.1)]*. Advise female patients of reproductive potential to use effective contraception during treatment with BELRAPZO and for 6 months after the final dose *[see Use in Specific Populations (8.1, 8.3)]*. Advise males with female partners of reproductive potential to use effective contraception during treatment with BELRAPZO and for 3 months after the final dose *[see Use in Specific Populations (8.3), and Nonclinical Toxicology (13.1)]*.

21

EAGLEBEN-SLAYBACK-00050314

Lactation

Advise females not to breastfeed during treatment with BELRAPZO and for at least 1 week after the final dose *[see Use in Specific Populations (8.2)]*.

Infertility

Advise males of reproductive potential that BELRAPZO may impair fertility *[see Use in Specific Populations (8.3)]*.


Marketed by
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, NJ


All rights reserved.

HIGHLY CONFIDENTIAL                    EAGLEBEN-SLAYBACK-00050315

# EXHIBIT 2

US011103483B2

(12) **United States Patent**
Palepu et al.

(10) Patent No.: **US 11,103,483 B2**
(45) Date of Patent: *Aug. 31, 2021

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/509,920**

(22) Filed: **Jul. 12, 2019**

(65) **Prior Publication Data**

US 2019/0350904 A1    Nov. 21, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 9/08* | (2006.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/18* | (2017.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC .... A61K 31/4184; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/186; A61K 47/20; A61K 47/22; A61K 9/0019; A61K 9/08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 A | 1/1978 | Sklar | |
| 4,711,906 A * | 12/1987 | von Stetten | A61K 47/10 514/561 |
| 4,879,286 A | 11/1989 | Alam | |
| 5,204,335 A | 4/1993 | Sauerbier | |
| 5,223,515 A | 6/1993 | Mikura | |
| 5,741,523 A | 4/1998 | Teagarden | |
| 7,252,799 B2 * | 8/2007 | Miekka | A61L 2/0058 422/22 |
| 7,772,274 B1 | 8/2010 | Palepu | |
| 8,076,366 B2 | 12/2011 | Courvoisier | |
| 8,344,006 B2 | 1/2013 | Drager | |
| 8,389,558 B2 | 3/2013 | Alakhov | |
| 8,609,707 B2 * | 12/2013 | Palepu | A61K 47/22 514/394 |
| 8,791,270 B2 | 7/2014 | Brittain | |
| 9,000,021 B2 | 4/2015 | Sundaram | |
| 9,034,908 B2 * | 5/2015 | Sundaram | A61K 31/4184 514/394 |
| 9,144,568 B1 * | 9/2015 | Sundaram | A61K 47/22 |
| 9,265,831 B2 * | 2/2016 | Palepu | A61K 47/18 |
| 9,572,796 B2 * | 2/2017 | Palepu | A61K 9/08 |
| 9,572,797 B2 * | 2/2017 | Palepu | A61K 47/12 |
| 9,572,887 B2 * | 2/2017 | Sundaram | A61K 47/20 |
| 9,572,888 B2 | 2/2017 | Sundaram | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1850048 A | 10/2006 |
| CN | 101584668 | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Treanda (Highlights of prescribing information 2008) (Year: 2008).*
Rowe et al. ("Rowe", Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455) (Year: 2009).*
Qin et al. (Chem Commun. 2009;5112-5114). (Year: 2009).*
Hsu et al. Reactions of N-Ethyl-(HN-1), N-Methyl-Bis(2-Chloroethyl)Amine (HN-2), and Tris(2-Chloroethyl)Amine (HN-3) With Peroxides; 2002; 13 pages. (Year: 2002).*
Jones, C.W. Applications of Hydrogen Peroxide and Derivatives 1999 Royal Society of Chemistry). (Year: 1999).*
Waterman et al. (2002) Stabilization of Pharmaceuticals to Oxidative Degradation, Pharmaceutical Development and Technology, 7:1, 1-32, DOI: 10.1081/PDT-120002237). (Year: 2002).*

(Continued)

*Primary Examiner* — Ernst V Arnold
(74) *Attorney, Agent, or Firm* — BakerHostetler

(57) **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**16 Claims, No Drawings**

EAGLEBEN-SLAYBACK-00010375

## US 11,103,483 B2
Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,579,384 B2 | 2/2017 | Sundaram | |
| 9,597,397 B2 * | 3/2017 | Sundaram | A61K 47/22 |
| 9,597,398 B2 | 3/2017 | Sundaram | |
| 9,597,399 B2 * | 3/2017 | Sundaram | A61K 47/22 |
| 10,010,533 B2 * | 7/2018 | Palepu | A61K 9/08 |
| 2002/0102215 A1 | 8/2002 | Klaveness | |
| 2002/0122768 A1 | 9/2002 | Liu | |
| 2004/0014964 A1 | 1/2004 | Cheesman | |
| 2004/0043069 A1 | 3/2004 | Vanderbist | |
| 2005/0025702 A1 | 2/2005 | Decicco | |
| 2005/0042285 A1 | 2/2005 | Ukai | |
| 2006/0035945 A1 | 2/2006 | Attardo | |
| 2006/0128777 A1 | 6/2006 | Bendall | |
| 2006/0159713 A1 * | 7/2006 | Brittain | A61P 35/00 424/400 |
| 2006/0205694 A1 | 9/2006 | Alonso | |
| 2007/0116729 A1 | 5/2007 | Palepu | |
| 2008/0118544 A1 | 5/2008 | Wang | |
| 2009/0082416 A1 | 3/2009 | Czarnik | |
| 2009/0209606 A1 | 8/2009 | Bendall | |
| 2009/0264488 A1 | 10/2009 | Cooper | |
| 2009/0325978 A1 | 12/2009 | Onai | |
| 2010/0092474 A1 | 4/2010 | Gallagher | |
| 2010/0145266 A1 | 6/2010 | Orlowski | |
| 2010/0216858 A1 | 8/2010 | Popek | |
| 2010/0247669 A1 | 9/2010 | Eliasof | |
| 2010/0273730 A1 | 10/2010 | Hsu | |
| 2011/0015244 A1 | 1/2011 | Alakhov | |
| 2011/0015245 A1 | 1/2011 | Alakhov | |
| 2011/0184036 A1 | 7/2011 | Palepu | |
| 2011/0190363 A1 | 8/2011 | Drager | |
| 2012/0059000 A1 | 3/2012 | Ren | |
| 2012/0071532 A1 | 3/2012 | Cooper | |
| 2012/0157505 A1 | 6/2012 | Labell | |
| 2012/0308516 A1 | 12/2012 | Hlavinka | |
| 2013/0041003 A1 | 2/2013 | Brittain | |
| 2013/0041004 A1 | 2/2013 | Drager | |
| 2013/0210878 A1 | 8/2013 | Soppimath | |
| 2013/0210879 A1 | 8/2013 | Palepu | |
| 2013/0217888 A1 | 8/2013 | Shrawat | |
| 2013/0253025 A1 | 9/2013 | Sundaram | |
| 2014/0094496 A1 | 4/2014 | Sundaram | |
| 2014/0275196 A1 | 9/2014 | Sundaram | |
| 2018/0000789 A1 | 1/2018 | Palepu | |
| 2018/0000938 A1 | 1/2018 | Sundaram | |
| 2018/0185488 A1 | 7/2018 | Sundaram | |
| 2018/0296535 A1 | 10/2018 | Palepu | |
| 2018/0296536 A1 | 10/2018 | Palepu | |
| 2018/0369383 A1 | 12/2018 | Sundaram | |
| 2019/0192659 A1 | 6/2019 | Sundaram | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102164579 | 8/2011 |
| DE | 80967 | 1/1970 |
| DE | 159289 | 3/1983 |
| JP | H09508128 | 8/1997 |
| JP | 2005537285 | 12/2005 |
| JP | 2008526991 | 7/2008 |
| JP | 2012503666 | 2/2012 |
| JP | 2012525387 | 10/2012 |
| JP | 2015501814 | 1/2015 |
| WO | 9901118 | 1/1999 |
| WO | 2001097860 | 12/2001 |
| WO | 2001097861 | 12/2001 |
| WO | 2001098294 | 12/2001 |
| WO | 0202125 | 1/2002 |
| WO | 2006054315 | 5/2006 |
| WO | 2006110551 | 10/2006 |
| WO | 2010036702 | 4/2010 |
| WO | 2010126676 | 11/2010 |
| WO | 2010148288 | 12/2010 |
| WO | 2011094565 | 8/2011 |
| WO | 2011103150 A2 | 8/2011 |
| WO | 2012015810 | 2/2012 |
| WO | 2013142358 | 9/2013 |

OTHER PUBLICATIONS

Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). (Year: 2004).*
Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) (Year: 2001).*
"Ready-to-use" [online] retrieved on May 27, 2021 from: https://medical-dictionary.thefreedictionary.com/ready-to-use; 1 page). (Year: 2021).*
Sigma-Aldrich, Webpage Catalog for poly(ethylen glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en®ion-=US#, accessed Nov. 15, 2015 (2 pages).
Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).
Spectra Analysis, Inc., "Oxidative Degradation of Polyethyleneglycol (PEG) studied by LC-IR", Application Note 016, Mar. 2008.
Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).
Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).
Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.
T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).
Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.
Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).
Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).
Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010).
Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).
Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).
Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).
Treanda, "Highlights of Prescribing Information," Treanda ( bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).
USP 24/NF 19 (2000) entry for Propylene Glycol (USP).
V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.
V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.
Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.
W. Fürst, et al. "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).
Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118 (1997).
Weide et al., Bendamustine Mitoxantrone and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).
Werner et al., Hydrolysis Products of Cancerostatic Cytostasan® (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.

**US 11,103,483 B2**

Page 3

(56)  **References Cited**

OTHER PUBLICATIONS

William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.

Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).

Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.

Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.

Zimmerman et al., Elements of Organic Chemistry (1977).

Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo,vol. 19 pp. 1-8 (2005).

Zumdahl et al., Chemistry, 7th Ed. (2007).

Pokorny et al., Antioxidants in Food: Practical Applications 2001 CRC Press p. 324 (2004).

Cyclobond® Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.

Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.

*Cerhalon, Inc., et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company*—Civil Action No. 00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1: 17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.

*Cephalon, Inc., et al.*, v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Apotex Inc., et al.*—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Apotex Inc., et al.*—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.

*Teva Pharmaceuticals International GMBH, et al.* v. *Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Defendant Mylan Laboratories Limited's Answer to Complaint for Patent Infringement (Document 12), dated Feb. 14, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Addtional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc.*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc.*—Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc.*—Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc.*—Civil Action No. 1:18-cv-01074: Exhibit Index—Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc.*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted—public version dated Nov. 2, 2018.

*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc.*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al.*—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al.*—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al.*—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.

*Teva Pharmaceuticals International GMBH, et al.* v. *Fresenius Kabi, LLC., et al.*—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted—public version dated Feb. 12, 2019.

## US 11,103,483 B2

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.

Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.

Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.

U.S. Pharmacopeia 32-NF-27—General Notices and Requirements (2009).

Renu Chadha, et al., "Drug Carrier Systems for Anticancer Agents: a Review", Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.

American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).

American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin on Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.

Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).

Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).

Bernard Testa, et al., "Hydrolysis in Drug and Prodrug Metabolism", Verlag Helvetica Chimica Acta, pp. 681-684, 2003, ISBN 3-906390-25-X.

Biewenga et al., "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., vol. 39, No. 3, pp. 315-331 (1997).

Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).

Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.

Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.

Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.

Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).

Charles P. Carpenter, et al., "A Study of the Polyethylene Glycols as Vehicles for Intramuscular and Subcutaneous Injections", Journal of the American Pharmaceutical Association, vol. XII, No. 1, pp. 27-29, 1952.

Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27, 1492-1501 (2009).

Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0) 1-11.

Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.

Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.

E. Santacesaria, et al., "Thermal Stability of Nonionic Polyoxyalkylene Surfactants", Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.

EC Safety Data Sheet: Ribomustin® 2007.

Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.

Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er Up!', Series #52 Practical Gastroenterology 44-60 (2007).

Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).

Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).

Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).

Fujisawa Deutschland GmbH Ribomustin® Products and Technical Specifications.

Galacid Excel 88 fact sheet (lactic acid 88%), www.lactic.com, 2012.

Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.

Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).

Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte für Chemie, 128:291-99 (1997).

Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).

HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).

ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.

International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27,454-27,461 (May 19, 1997).

International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).

International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013 (4 pages).

International Search Report and Written Opinion issued in counterpart PCT/US2013/26187 dated May 6, 2013 (2 pages).

International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 12, 2011 (8 pages).

Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.

Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.

JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.

Jerry March, Advanced Organic Chemistry (4th ed., John Wiley & Sons, Inc. 1992).

John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).

Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).

Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.

Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lvmphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.

Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.

Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110 (11), 609a (abstract 2043) (2007).

Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.

Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration . . . Products, pp. 401-420, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.

Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.

EAGLEBEN-SLAYBACK-00010378

US 11,103,483 B2

Page 5

(56)                    References Cited

OTHER PUBLICATIONS

"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.
Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate, A Prototype, 82 J. Am. Chemistry Soc'y 6418-6419 (1960).
Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).
Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice . . . Support, pp. 113-132, 2008, ISBN 13: 978-0-8493-9644-1.
Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006).
Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.
Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2000.
Lyondell Tebol® 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003).
Lyophilization of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).
Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, vol. 49, No. 10 pp. 775-777 (1994). (Abstract Only).
Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).
McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.
Michael J. Akers, "Excipient-Drug Interactions in Parenteral Formulations," Journal of Pharmaceutical Sciences, vol. 91, Issue 11, pp. 2283-2300, 2002.
Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition,Parenteral preparation, chapter 41, pp. 802-835, 2005.
Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.
National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD _VA/hd_guide5.htm) (2006).
Neelam Seedher, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.
Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).
Ni et al., Stabilization and Preformulation of Anticancer Drug—SarCNU, Int'l J. of Pharma., 249:257-264 (2002).
Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'l J. of Pharma., 226:39-46 (2001).
Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).
O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939 (1991).
Orrie M. Friedman, et al., "Colorimetric Estimation of Nitrogen Mustards in Aqueous Media", Analytical Chemistry, vol. 33, No. 7, pp. 906-910, 1961.

Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(β-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).
Paul J. Sheskey, Handbook of Pharmaceutical Excipients, 7th Edition, Propyl Gallate, 2012.
Poulsen, Introduction to Chemistry (2010).
Pramod K. Gupta, et al., "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.
Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).
Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).
R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.
Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).
Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.
Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, chapter 85, 1570-1580.
Ribomustin Monograph (Updated Aug. 2005).
Ribomustin Monograph (Updated Jan. 2002).
Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).
Rote Liste 1996 for Ribomustin (86 023).
Rote Liste 2003 for Ribomustin (86 045).
Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).
Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition, pp. 454-455 (2009).
Raymond C. Rowe and Paul J. Sheskey, et al., Handbook of Pharmaceutical Excipients, 7th Edition, Pharmaceutical Press, Propyl Gallate, pp. 668-669.
Rowe, et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 5th edition, pp. 545-550, Polyethylene Glycol, (2006).
Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.
Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).
Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).
Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumors, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).
Schwänen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).
SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.
Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal of Pharmaceutical Science and Technology, 39(4):161-179 (1985).
Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.
Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).

* cited by examiner

US 11,103,483 B2

1

**FORMULATIONS OF BENDAMUSTINE**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010,533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)



(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically

2

acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:
    a) bendamustine or a pharmaceutically acceptable salt thereof; and
    b) a pharmaceutically acceptable fluid including
        i) PEG, PG or mixtures thereof; and
        ii) a stabilizing amount of an antioxidant.

US 11,103,483 B2

3

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described

4

herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) polyethylene glycol and propylene glycol; and
      ii) a stabilizing amount of thioglycerol; or
II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and
   b) a pharmaceutically acceptable fluid including
      i) about 90% PEG and about 10% PG; and
      ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

   a) bendamustine or a pharmaceutically acceptable salt thereof;
   b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and
   c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from

EAGLEBEN-SLAYBACK-00010381

US 11,103,483 B2

5

about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as

6

determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

A) i) PEG, PG or mixtures thereof; and

ii) a stabilizing amount of an antioxidant;

B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

ii) a stabilizing amount of a chloride salt; or

C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM—10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride— | 40° C. | 48 hrs | 10.48 | 1.27 |
| 215 mg/mL | | 7 day | 10.26 | 2.11 |
| Ethanol qs to 1 mL | | | | |
| BDM—10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |
| BDM—10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride— | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/mL | | 7 day | 9.43 | 2.31 |
| Propylene glycol qs | | | | |
| to 1 mL | | | | |
| BDM—10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol qs | 40° C. | 48 hrs | 9.45 | 0.88 |
| to 1 mL | | 7 day | 9.00 | 3.44 |
| BDM—10 mg/mL | | Initial | 9.95 | 1.19 |

US 11,103,483 B2

7

TABLE 1-continued

Stability of Bendamustine HCl

| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
|---|---|---|---|---|
| Choline Chloride—215 mg/mL Benzyl alcohol qs to 1 mL | 40° C. | 48 hrs 7 day | 9.89 8.97 | 3.51 4.24 |
| BDM—10 mg/mL Benzyl alcohol qs to 1 mL | Initial 40° C. | 48 hrs 7 day | 9.52 8.67 7.49 | 0.33 4.18 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

### Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

Stability of Bendamustine HCl in DMSO

| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
|---|---|---|---|---|
| BDM—10 mg/mL DMSO qs to 1 mL | Initial 40° C. | 48 hrs 1 week | 10.2 9.80 10.0 | 0.23 0.30 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs.

8

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

### Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 gm/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detetion

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an anti-oxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

### Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydro-lipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

| | | | | | % Impurities RRT | | % |
|---|---|---|---|---|---|---|---|
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | Total Imps |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |

EAGLEBEN-SLAYBACK-00010383

US 11,103,483 B2

9                                                                                                    10

### TABLE 4-continued

| | | | | | % Impurities RRT | | % |
|---|---|---|---|---|---|---|---|
| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | Total Imps |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

Stability of Bendamustine (50 mg/ml) in 90% PEG 400, 10% Propylene Glycol and Antioxidant

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of

a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

### Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed

after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

### TABLE 5

| | | | | | % Area of degradants | | | % |
|---|---|---|---|---|---|---|---|---|
| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | Total Imp. |
| BDM - | | Initial | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid - | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM - | | Initial | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM - | | Initial | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid - | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | BDL | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml) in PEG400 and Propylene glycol

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

### Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

EAGLEBEN-SLAYBACK-00010384

US 11,103,483 B2

**11**                                                                                                                       **12**

TABLE 6

| | | Time Per. | Amt. mg/ml | % of Initial | % Area of degradants | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Formulation | Temp | | | | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | |
| BDM - | Initial | | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid - | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | | | | | | | | | | | | |
| BDM - | Initial | | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid - | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 7

| | | Time Per. | Amt mg/ml | % of Initial | RRTs of degradants | | | | | | | | | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Formulation | Temp | | | | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | |
| BDM - | Initial | | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| Thioglycerol | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| 2.5 mg/mL | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| PEG | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| 400:PG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| (90:10) qs | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 11,103,483 B2

13

TABLE 8

Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
|---|---|---|---|---|---|
| BDM—50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol—5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs to | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

We claim:

1. A ready to use liquid bendamustine-containing composition comprising

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;

polyethylene glycol; and

a stabilizing amount of an antioxidant;

the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5° C. to about 25° C.

2. The ready to use liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

3. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5° C.

4. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of

14

the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25° C.

5. The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

6. The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL..

7. The ready to use liquid bendamustine-containing composition of claim 1, comprising bendamustine hydrochloride.

8. A method of treating cancer in a mammal, comprising administering an effective amount of the ready to use liquid bendamustine-containing composition of claim 1 to the mammal.

9. The method of claim 8, wherein the cancer is leukemia.

10. The method of claim 8, wherein the cancer is Hodgkin's disease.

11. The method of claim 8, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

12. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5° C.

13. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25° C.

14. The method of claim 8, wherein the bendamustine concentration in the ready to use liquid bendamustine-containing composition is from about 20 mg/mL to about 60 mg/mL.

15. The method of claim 8, wherein the bendamustine concentration in the ready to use liquid bendamustine-containing composition is about 25 mg/mL.

16. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition comprises bendamustine hydrochloride.

\* \* \* \* \*

EAGLEBEN-SLAYBACK-00010386

# EXHIBIT 3

Highly Confidential – Attorney's Eyes Only

APO-BENDA_0005821



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0005822



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0005824

Highly Confidential – Attorney's Eyes Only



APO-BENDA_0005825

Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



APO-BENDA_0005828

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br>APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**<u>CONFIDENTIAL –<br>FILED UNDER SEAL</u>** |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION *IN LIMINE* # 1

ME1 42229995v.1

Defendants' suggestion that █████████████████████████ █████████████████████ were made in a context "divorced" from the "very specific" and "narrow" meaning offered by the Examiner during prosecution (Opp. at 1), is incorrect.  The Examiner explained the stipulated construction reflects the ordinary meaning of "ready to use" in the "medical arts."  Mot. at 1.  ███████████



Defendants' description of the prosecution history is wrong and waived in any event.  Opp. at 2.  The narrow question before the Court is simple – should Defendants be able to tell the FDA one thing and this Court another?  Plaintiff respectfully submits that the answer is no.  *Intendis GmbH v. Glenmark Pharms., Inc.*, 22 F.3d 1355, 1362 (Fed. Cir. 2016).[1]

---

[1] Defendants' citation to *Abbott Labs. v. Sandoz, Inc.*, is irrelevant.  Opp. at 2-3. Eagle is not relying on statements of bioequivalence to establish infringement by equivalence.

1

McCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Attorneys for Plaintiff Eagle Pharmaceuticals, Inc.*

Dated:  September 8, 2022

2

# EXHIBIT A



**Planet Depos**
We Make It *Happen*™

<span style="color:darkred">**HIGHLY CONFIDENTIAL**</span>

# Transcript of Michael L. Brandt, PharmD, FASHP

**Date:** August 24, 2022
**Case:** Eagle Pharmaceuticals, Inc. -v- Slayback Pharma LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

eHIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL
Transcript of Michael L. Brandt, PharmD, FASHP
August 24, 2022

1 (1 to 4)

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3   -----------------------------x
4   EAGLE PHARMACEUTICALS, INC.,  :
5           Plaintiff,       :  Case No.
6        vs.               :  21-1256-CFC-JLH
7   SLAYBACK PHARMA LLC, APOTEX    :
8   INC., and APOTEX CORP.,        :
9           Defendants.       :
10  -----------------------------x
11
12          HIGHLY CONFIDENTIAL
13
14        Videotaped Deposition of
15     MICHAEL L. BRANDT, PharmD, FASHP
16            Chicago, Illinois
17        Wednesday, August 24, 2022
18            9:41 a.m.
19
20
21
22  Job No.: 461273
23  Pages: 1 - 227
24  Reported by: Stephanie A. Battaglia, CSR, RMR, CRR
25
```

**Page 2**

```
1         DEPOSITION OF MICHAEL L. BRANDT,
2   PharmD, FASHP, pursuant to notice, having taken
3   place at Katten, Muchin, Rosenman, LLP, 525 West
4   Monroe Street, Chicago, Illinois, before Stephanie
5   A. Battaglia, CSR, RMR, CRR, Notary Public in and
6   for the State of Illinois.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   PRESENT:
2     LATHAM & WATKINS, LLP
3     BY:  MR. KENNETH G. SCHULER
3     330 North Wabash Avenue, Suite 2800
      Chicago, Illinois  60661
4     (312) 876-7700
5        - and -
6     LATHAM & WATKINS, LLP
      BY:  MS. REBECCA LYNNE NEUBAUER
7     555 Eleventh Street NW, Suite 1000
      Washington, D.C.  20004-1304
8     (312) 876-7700
9     appeared on behalf of the Plaintiff;
10    KATTEN, MUCHIN, ROSENMAN, LLP
      BY:  MR. CHRISTOPHER B. FERENC
11    2900 K Street NW
      North Tower, Suite 200
12    Washington, D.C.  20007-5118
      (202) 625-3500
13       - and -
14    KATTEN, MUCHIN, ROSENMAN, LLP
      BY:  MS. RACHEL J. SCHAUB
15    525 West Monroe Street, Suite 1900
      Chicago, Illinois  60661
16    (312) 902-5200
17    appeared on behalf of the
      Apotex Defendants and the witness;
18
19    WINDELS, MARX, LANE & MITTENDORF, LLP
      BY:  MR. ROY H. WEPNER
20    MS. CONSTANCE S. HUTTNER
      One Giralda Farms
21    Madison, New Jersey  07940
      (973) 966-3206
22
23    appeared on behalf Defendant
      Slayback Pharma, LLC.
24  ALSO PRESENT:
25    Ms. Erin Schuppert, Videographer
```

**Page 4**

```
1        I  N  D  E  X
2   WITNESS:                    PAGE:
3   Michael L. Brandt,
    PharmD, FASHP
4   EXAMINATION BY:
5   Mr. Schuler                   8
6
7        E X H I B I T S
   Brandt Exhibits
8
9   Exhibit 1   Rebuttal Expert Report    9
                of Dr. Michael L. Brandt,
                B.S., PharmD, FASHP
10              (No Bates Numbers)
11  Exhibit 2   FDA Article              36
                CFR - Cod of Federal
12              Regulations Title 21
                (No Bates Numbers)
13
14  Exhibit 3   U.S. Patent No. 11,103, 483   45
                (No Bates Numbers)
15  Exhibit 4   Article                  72
                ADVARRA
16              Beginner's Guide to
                Pre-IND Meetings
17              (No Bates Numbers)
18  Exhibit 5   Article                  75
                Compliance Policy Guide
19              (CPG)
                CPG Sec. 120.100 Fraud,
20              Untrue Statements of
                Material Facts, Bribery,
21              and Illegal Gratuities
                July 1991
22              (No Bates Numbers)
23  Exhibit 6   Pre-IND Meeting Briefing   78
                Book Type C Meeting
24              SLAY-BEL0007125 -
                SLAY-BEL0007139
25
```

HIGHLY CONFIDENTIAL

Transcript of Michael L. Brandt, PharmD, FASHP
August 24, 2022

2 (5 to 8)

**5**

```
1  (Cont'd.):
2  Exhibit 7   Application to Market a        80
            New or Abbreviated New
3            Drug or Biologic for
            Human Use
4            SLAY-BEL0007070 -
            SLAY-BEL0007078
5
6  Exhibit 8   Bendamustine Hydrochloride    111
            Injection, 25 mg/mL (4 mL)
7            NDA 215033
            TYPE B MEETING (Pre-NDA)
8            Request and Package
            August 12, 2020
9            APO-BENDA_0000007 -
            APO-BENDA_0000023
10 Exhibit 9   Application to Market        129
            a New or Abbreviated
11            New Drug or Biologic
            for Human Use
12            APO-BENDA_0000002 -
            APO-BENDA_0000004
13
14 Exhibit 10  Patent Application          142
            Publication US
15            2002/0008337
            (No Bates Numbers)
16 Exhibit 11  Expert Report of            144
            Laird Forrest, PhD.
17            Regarding U.S. Patent
            No 11,103,483
18            (No Bates Numbers)
19 Exhibit 12  Prescribing Information     168
            MYOBLOC
20            (No Bates Numbers)
21 Exhibit 13  Draft Labeling Text         169
            Immune Globulin Intravenous
22            (Human), 10% Liquid,
            Privigen
23            (No Bates Numbers)
24 Exhibit 14  Center for Drug Evaluation  173
            and Research Application
25            Number: 209604Orig1s000
            (No Bates Numbers)
```

**6**

```
1  (Cont'd.):
2  Exhibit 15  USPTO                       185
            Office Communication
3            EAGLEBEN-SLAYBACK-00272500 -
            EAGLEBEN-SLAYBACK00272529
4  Exhibit 16  Center for Drug Evaluation  190
            and Research Application
5            Number 2015250rig1s000
            (No Bates Numbers)
6
7  Exhibit 17  Prescribing Information     193
            Docetaxel
8            (No Bates Numbers)
9  Exhibit 18  Package Leaflet             200
            Levact
10            (No Bates Numbers)
11 Exhibit 19  Ready-To-Use Solution of    220
            Bortezomib
12            (No Bates Numbers)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**7**

```
1          THE VIDEOGRAPHER:  Today's date is
2  August 24, 2022.  The time on the video monitor is
3  9:41.
4          Here begins Media No. 1 in the videotaped
5  deposition of Dr. Michael L. Brandt in the matter
6  of Eagle Pharmaceuticals Incorporated versus
7  Slayback Pharma, LLC, Apotex, Inc., and Apotex
8  Corp., in the United States District Court for the
9  District of Delaware, Case No. 21-1256-CFC-JLH.
10         The videographer today is Erin Schuppert
11 representing Planet Depos.
12         This video deposition is taking place at
13 Katten, Muchin Rosenman, LLP, 525 west Monroe,
14 Chicago, Illinois.
15         Would counsel please voice identify
16 themselves and state whom they represent.
17         MR. SCHULER:  Ken Schuler from Latham &
18 Watkins on behalf of Eagle Pharmaceuticals and
19 along with me is my colleague Rebecca Neubauer.
20         MR. FERENC:  Chris Ferenc of Katten Muchin
21 & Rosenman with my colleague Rachel Schaub on
22 behalf of the Apotex Defendants and the witness.
23         THE VIDEOGRAPHER:  The court reporter
24 today is Stephanie --
25         MR. WEPNER:  Roy Wepner from Windels Marx
```

**8**

```
1  on behalf of behalf of Slayback.
2          THE VIDEOGRAPHER:  The court reporter
3  today is Stephanie Battaglia, Certified Realtime
4  Reporter, representing Planet Depos.
5          Would the reporter please swear in the
6  witness and proceed.
7          MICHAEL BRANDT, PharmD, FASHP,
8  called as a witness herein, having been first duly
9  sworn was examined and testified as follows:
10                EXAMINATION
11              BY MR. SCHULER:
12 Q  Good morning, Dr. Brandt.
13 A  Good morning.
14 Q  Have you ever had your deposition taken
15 before?
16 A  No.
17 Q  So a few ground rules.
18       I will be asking a series of questions.
19 If anything is unclear to you just let me know and
20 I will try and rephrase it.
21       If you ever need to take a break just feel
22 free to let us know, and I would just simply ask
23 if you could answer any pending question before
24 you do.
25       I am going to ask my questions out loud,
```

HIGHLY CONFIDENTIAL
Transcript of Michael L. Brandt, PharmD, FASHP
August 24, 2022

26 (101 to 104)



# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-1256-CFC-JLH |
| SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., | **CONFIDENTIAL – FILED UNDER SEAL** |
| Defendants. | |

## PLAINTIFF'S MOTION *IN LIMINE* # 2

Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle") moves *in limine* to preclude Defendants Slayback Pharma LLC ("Slayback"), Apotex Inc., and Apotex Corp. (collectively, "Apotex") (together, "Defendants'") and their expert, Dr. Laird Forrest, from offering opinions or testimony on invalidity specific to the dependent claims of Eagle's U.S. Patent No. 11,103,483 (the "'483 patent") beyond those disclosed in Dr. Forrest's Opening and Reply Reports.

FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B) requires that an expert witness's written report contain "***a complete statement of all opinions the witness will express*** and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i) (emphasis added). Opinions not disclosed in a written report are "inadmissible for any purpose," and should be precluded by an order *in limine*. *See Hologic, Inc. v. Minervia Surgical, Inc*., C.A. No. 1:15-cv-1031, 2018 WL 3348998, at *1 (D. Del. Jul. 6, 2018) (quoting *Jonasson v. Lutheran Child & Family Servs*., 115 F.3d 436, 440 (7th Cir. 1997)).

In his Opening Report, the totality of Dr. Forrest's invalidity opinions for certain of the dependent claims of the '483 patent was to state that his analysis for independent claim 1 applied equally to the dependent claims. *See, e.g.,* Ex. A at ¶¶ 150-51 ("Thus, claim 3 of the '483 patent is anticipated by Drager for the same reasons as those discussed above in the anticipation analysis of claim 1 above."); *id.* at ¶¶ 200-01 ("Thus, claim 3 of the '483 patent is obvious for the same reasons as

1

those discussed above in the obviousness analysis of claim 1 above."). Responding to Dr. Forrest's Opening Report, Eagle's validity expert, Dr. Bernhardt Trout, explicitly opined on the unique aspects of dependent claims 2-4, and 11-13 of the '483 patent and how a proper validity analysis would have to account for the additional subject matter recited in those claims. *See, e.g.*, Ex. B at ¶¶ 53, 76 n.2 ("certain dependent claims limit th[e] temperature range specifically to either about 5°C or about 25°C"), 92 (noting that dependent claims 2 and 11 present "an independent basis for patentability insofar as they require specific antioxidants."). Dr. Forrest thereafter served his Reply Report, where he once again failed to offer any specific analysis of the unique aspects of the dependent claims, leaving Dr. Trout's opinions on the validity of the '483 patent's dependent claims unrebutted. Indeed, Dr. Forrest's Reply Report limits the discussion of the '483 patent's dependent claims to only two paragraphs in which Dr. Forrest merely repeats his opinions from his Opening Report. Ex. C at ¶¶ 39, 74.

This Court has explained that it "will, as it must, limit the expert testimony at trial to that disclosed in the expert reports." *Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, 2010 WL 3834457, at *2 n.1 (D. Del. Sep. 27, 2010); accord *Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, 2015 WL 10457176, at *4 (D. Del. April 23, 2015) ("Absent approval of the Court, all experts for all parties are PRECLUDED from testifying beyond the scope of their reports . . . ."); *Liqwd,*

*Inc. v. L'Oréal USA, Inc.*, C.A. No. 17-14-JFB-SRF, 2019 WL 10252611, at *1 (D. Del. June 25, 2019) ("The court will not permit any expert testimony that goes beyond the scope of expert reports."). Such limitation is appropriate here.

Allowing additional opinions or testimony from Dr. Forrest on the invalidity of the dependent claims of the '483 patent would allow Defendants to flout litigation disclosure rules and would unfairly prejudice Eagle at trial. *See* FED. R. CIV. P. 26(a)(2)(B)(i); FED. R. CIV. P. 37(c)(1); *see also Forest Labs., Inc. v. Ivax Pharm., Inc.*, 237 F.R.D. 106, 113-14 (D. Del. 2006) (sustaining plaintiffs' objection to expert's trial testimony as beyond the scope of his expert reports). Dr. Forrest served an eighty-nine page Opening Report, and a thirty-seven page Reply Report, was on notice of Eagle's positions on dependent claims 2-9, and 11-16 through at least Eagle's interrogatory responses and Dr. Trout's Responsive Report, and still failed to address the '483 patent's dependent claims. Expert discovery has now closed, and the parties are quickly approaching trial. D.I. 27; June 9, 2022 Oral Scheduling Order. As such, there is simply no time in the schedule to even cure such prejudice through supplemental discovery.

For the foregoing reasons, Eagle respectfully requests that the Court preclude Dr. Forrest from offering any opinions or testimony on the invalidity of the dependent claims of the '483 patent beyond those expressed in his Opening and Reply Reports.

DATED: August 29, 2022

OF COUNSEL:

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

MCCARTER & ENGLISH, LLP

/s/ *Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff Eagle
Pharmaceuticals, Inc.*

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC.,

Plaintiff,

v.

SLAYBACK PHARMA LLC,
APOTEX INC., and APOTEX CORP.,

Defendants.

C.A. No. 21-1256-CFC-JLH

## <u>WORD COUNT CERTIFICATION</u>

The undersigned counsel hereby certifies that Plaintiff's Motion *In Limine* #2 was prepared in 14-point Times New Roman font, and contains 746 words (excluding the caption, title, signature blocks, and tables of contents and authorities), which were counted by Alexandra M. Joyce using the word count feature in Microsoft Word.

ME1 42114891v.1

DATED: August 29, 2022

OF COUNSEL:

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

MCCARTER & ENGLISH, LLP

/s/ *Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff Eagle
Pharmaceuticals, Inc.*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

EAGLE PHARMACEUTICALS, INC.,     )
)
                        Plaintiff,    )
)
                   v.          )
)   C.A. No. 21-1256-CFC
SLAYBACK PHARMA LLC, *et al.*,    )
)
                Defendants.  )
_____  )

**EXPERT REPORT OF LAIRD FORREST, PH.D. REGARDING**
**U.S. PATENT NO. 11,103,483**

# TABLE OF CONTENTS

PAGE

I.     QUALIFICATIONS AND BACKGROUND ...................................................6
   A.    EDUCATION AND EXPERIENCE; PRIOR TESTIMONY................................... 6
   B.    MATERIALS CONSIDERED......................................................... 10
   C.    COMPENSATION ................................................................. 10
II.    SUMMARY OF OPINIONS .................................................10
III.   LEGAL STANDARDS ....................................................11
a.     Anticipation........................................................................11
b.     Obviousness .......................................................................12
c.     Indefiniteness ....................................................................15
IV.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")........................16
V.     THE '483 PATENT ....................................................17
VI.    CLAIM CONSTRUCTION.................................................19
VII.   TECHNICAL BACKGROUND .............................................20
   A.    FORMULATIONS FOR PARENTERAL ADMINISTRATION ................................. 20
   B.    EXCIPIENT SELECTION FOR PARENTERAL FORMULATIONS ......................... 21
         1.    API – Bendamustine ......................................................... 23
         2.    PEG .......................................................................... 24
         3.    Antioxidants.................................................................. 25
         a.    Oxidative degradation was known in parenteral formulations ............................ 25
         b.    Excipients in formulations may also undergo oxidative degradation .................. 28
         c.    Antioxidants were routinely used for prevention of oxidative degradation ......... 31
         4.    A POSA Would Have Been Motivated to Enhance Stability of Bendamustine Formulations....................................................................... 32
         5.    HPLC was a well-known method for measurement of impurities........................ 35
         6.    Extrapolations for predicting drug stability were routinely used.......................... 37
   C.    BENDAMUSTINE BACKGROUND .................................................. 38
   D.    PHYSICAL AND CHEMICAL PROPERTIES OF BENDAMUSTINE...................... 39
VIII.  SCOPE AND CONTENT OF PRIOR ART....................................42

A.     DRAGER .................................................................................................... 42

    1.    Drager discloses liquid bendamustine formulations within the claimed concentration ranges ................................................................. 43

    2.    Drager discloses PEG as an excipient in bendamustine liquid formulations ........ 44

    3.    Drager discloses antioxidants as an excipient that reduced oxidation and thereby increases stability of bendamustine liquid formulations ..................................... 47

    4.    Drager discloses bendamustine liquid formulations that are stable over typical commercial storage periods, including 15 months ............................................ 49

    5.    Drager discloses specific bendamustine liquid formulations that include each of the limitations of the '483 patent ......................................................................... 52

IX.    INVALIDITY OF THE '483 PATENT ........................................................55

A.     CLAIMS 1-9 AND 11-16 OF THE '483 PATENT ARE ANTICIPATED BY DRAGER ............................................................................................................ 55

    1.    Claim 1 of the '483 Patent is Anticipated by Drager .......................................... 55

    2.    Claim 2 of the '483 Patent is Anticipated by Drager .......................................... 65

    3.    Claim 3 of the '483 Patent is Anticipated by Drager .......................................... 66

    4.    Claim 4 of the '483 Patent is Anticipated by Drager .......................................... 66

    5.    Claim 5 of the '483 Patent is Anticipated by Drager .......................................... 67

    6.    Claim 6 of the '483 Patent is Anticipated by Drager .......................................... 67

    7.    Claim 7 of the '483 Patent is Anticipated by Drager .......................................... 68

    8.    Claim 8 of the '483 Patent is Anticipated by Drager .......................................... 69

    9.    Claim 9 of the '483 Patent is Anticipated by Drager .......................................... 70

    10.    Claims 11-16 of the '483 Patent Are Anticipated by Drager............................... 70

B.     CLAIMS 1-9 and 11-16 OF THE '483 PATENT ARE OBVIOUS OVER DRAGER.. 70

    1.    Claim 1 of the '483 Patent is Obvious Over Drager ............................................ 70

    2.    Claim 2 of the '483 Patent is Obvious Over Drager ............................................ 79

    3.    Claim 3 of the '483 Patent is Obvious Over Drager ............................................ 80

    4.    Claim 4 of the '483 Patent is Obvious Over Drager ............................................ 81

    5.    Claim 5 of the '483 Patent is Obvious Over Drager ............................................ 82

    6.    Claim 6 of the '483 Patent is Obvious Over Drager ............................................ 82

    7.    Claim 7 of the '483 Patent is Obvious Over Drager ............................................ 83

    8.    Claim 8 of the '483 Patent is Obvious Over Drager ............................................ 84

    9.    Claim 9 of the '483 Patent is Obvious Over Drager ............................................ 84

    10.    Claims 11-16 of the '483 Patent Are Obvious Over Drager................................ 85

C.    NO SECONDARY CONSIDERATIONS OVERCOME THE PRIMA FACIE OBVIOUSNESS OF CLAIMS 1-16 OF THE '483 PATENT ....................................... 86

D.    Claims 1-9 and 11-16 of the '483 Patent are invalid as Indefinite Under 35 U.S.C. § 112(b) .................................................................................................................. 87

1.     I submit this report on behalf of Defendants Slayback Pharma LLC ("Slayback"), Apotex Inc. and Apotex Corp. (collectively "Apotex") (Slayback and Apotex collectively "Defendants") regarding the invalidity of U.S. Patent No. 11,103,483 ("the '483 patent").  I understand that Plaintiff Eagle Pharmaceuticals, LLC ("Plaintiff" or "Eagle") asserts claims 1-9 and 11-16 of the '483 patent (collectively "the asserted claims") against Defendants in this litigation. In this report I provide my expert opinions and analysis on the invalidity of the asserted claims based on anticipation under 35 U.S.C. § 102, obviousness under 35 U.S.C. § 103, and indefiniteness under 35 U.S.C. § 112, as well as the relevant technical background. I also provide my qualifications, the materials I considered in forming my opinions and the compensation for my services in this report.

2.     If called upon to testify at trial, I expect to testify about:

- my background, experience and qualifications;

- certain background knowledge and concepts related to pharmaceutical formulations, including parenteral formulations, and excipients;

- the '483 patent (which includes its associated file history);

- the knowledge and level of skill of a person of ordinary skill in the art as of the earliest priority date of the '483 patent (i.e., January 28, 2010);

- the relevant prior art; and

- my opinions concerning the invalidity of the asserted claims of the '483 patent.

3.     I may also testify in rebuttal to expert(s) testifying on behalf of Plaintiff. I reserve the right to amend or supplement my opinions in light of evidence presented by Plaintiff or additional information that may be made available to me in the future. I also reserve the right to

supplement, alter, and/or modify my opinions to respond, to the extent necessary, to positions taken by Plaintiff and any witnesses Plaintiff may present. I also reserve the right to convey my opinions through the use of demonstrative exhibits at trial. I have not yet created the exhibits I may use at trial, but they will likely include charts, diagrams, photographs, presentations, or blowups to illustrate or explain my opinions.

# I.  QUALIFICATIONS AND BACKGROUND

## A.  EDUCATION AND EXPERIENCE; PRIOR TESTIMONY

4.     I am currently a Professor in the Department of Pharmaceutical Chemistry at the University of Kansas in Lawrence, Kansas, a position I have held since 2017. I am also Professor in the Bioengineering Center, a position I have held since 2011, and Professor in the Department of Medicinal Chemistry, a position I have held since 2015, both also at the University of Kansas. I have been a faculty member at the University of Kansas since 2007.

5.     I received a Bachelor of Science in Chemical Engineering from Auburn University in 1998, a Master of Science in Chemical Engineering from the University of Illinois in 2001, and a Ph.D. in Chemical and Biomolecular Engineering from the University of Illinois in 2003. I was a Postdoctoral Fellow in the Division of Pharmaceutical Sciences at the University of Wisconsin, Madison, from 2004 to 2006. In 2006, I became Adjunct Assistant Professor in the Department of Pharmaceutical Sciences at Washington State University, a position I held until 2011. In 2007, I accepted a position as Assistant Professor in the Department of Pharmaceutical Chemistry at the University of Kansas. I was promoted to Associate Professor at the University of Kansas in 2013. I was then promoted to the rank of Professor in 2017.

6.     Since 2009, I have been a Member of the Scientific and Medical Advisory Board of Exogenesis Corporation, which develops nanoscale surface modifications for implantable

6

medical devices. I am the co-founder of HylaPharm LLC, founded in 2011, which specializes in reformulation of anti-cancer chemotherapeutics by modification of the delivery route and pharmacokinetics. Also, I am a co-founder of Hafion LLC, founded in 2016, which specializes in development of vaccines, and Aerobyx LLC, founded in 2017, which specializes in the development of medications for treatment of neurological and metabolic disease. In addition, I am a co-founder of Vesarex, founded in 2018, which specializes in the development of ultrasound imaging devices and contrast agents. My research toward drug formulation has been competitively funded by multiple awards from the National Institutes of Health and the National Cancer Institute, the National Institute of Allergy and Infectious Disease, the American Cancer Society, the Department of Defense, Susan G. Komen Race for the Cure, and the Pharmaceutical Research and the Pharmaceutical Research and Manufacturers of America Foundation ("PhRMA"), among others. In addition, I have been funded by the Food and Drug Administration ("FDA") to develop methodologies for the in vitro determination of bioequivalence in follow-on complex botanical and biosimilar drug formulations.

7.      I have received many awards and honors, including the Baxendale Innovation Award (2016), the University of Kansas Leading Light Award (2014), the Japan Society for Promotion of Science Visiting Scholar Fellow (2010), the American Cancer Society Research Scholar (2008 to 2012), the American Association of Colleges of Pharmacy, the New Investigators Award (2007), and the PhRMA Foundation Postdoctoral Fellow (2006), among others.

8.      I am currently or have been in the past a member of various professional societies, including the American Association for Cancer Research, the American Association of Pharmaceutical Scientists, and the American Institute of Chemical Engineers. I serve or have served on numerous scientific review panels for the National Institutes of Health, the American

Cancer Society, and the Association for International Cancer Research (United Kingdom). I have been a standing member of the American Cancer Society review panel on Cancer Drug Development (now *ad hoc*).

9.      I have authored more than one hundred (100) peer-reviewed journal articles and eight (8) book chapters. I have also edited two (2) special journal issues on drug delivery and a book on drug delivery and formulation. In addition, I have filed for or received about thirty (30) United States and international patents or patent applications related to drug discovery, formulation or pharmacokinetics/pharmacology.

10.     I have taught drug formulation and biopharmaceutics, including all aspects of drug excipient choice and the effects of excipient modification on drug pharmacokinetics, ionic equilibrium, drug chemical stability, drug dissolution, and drug absorption, to clinical pharmacy students and graduate students studying pharmaceutical sciences since 2007.

11.     I have experience in all aspects of parenteral, topical, and oral drug formulation and pharmacokinetics through my research and teaching, as well as my work with HylaPharm, Exogenesis Inc., Atrin Pharmaceutics, Akari Therapeutics Inc., Roche, and Eli Lilly. I have worked on pharmaceutical formulations for intramuscular, subcutaneous, intravenous, topical, sublingual/buccal, and oral formulation. These formulations include immediate release, sustained release, targeted formulations, and drug eluting medical devices. In addition, I have worked on modeling and interpretation of dosage pharmacokinetics, metabolism, and pharmacology.

12.     In the past six years, I have testified in the following litigations:

- *Merck Sharp & Dohme Corp. v. Savior Lifetec Corp.*, No. 5:15-cv-00415-TWB (E.D.N.C.);

8

- *Halozyme, Inc. v. Joseph Matal (on behalf of USPTO)*, No. 1:16-cv-1580 (E.D. Va.);

- *Bracco Diagnostics v. Maia Pharm., Inc.*, No. 3:17-cv-13151 (D.N.J.);

- *Horizon Medicines LLC v. Dr. Reddy's Labs. Inc.*, No. 2:15-cv-03324 (D.N.J.) (consolidated);

- *Merck Sharp & Dohme Corp., v. Sun Pharmaceutical Industries Ltd.*, No. 19-md-2902 (D. Del);

- *Indivior Inc. et al. v. Dr. Reddy's Labs. Inc..*, No. 18-5288 (D.N.J);

- *Tris Pharma, Inc. v. Teva Pharmaceuticals USA, Inc.*, No. 20-cv-0521-KM-ESK (D.N.J)

- *Novartis Pharmaceuticals Corp., v. Alembic Pharmaceuticals Limited and Alembic Pharmaceuticals, Inc.; Alkem Laboratories, Ltd.; Aurobindo Pharma USA Inc. and Aurobindo Pharma Ltd.; Biocon Pharma Limited, Biocon Limited, and Biocon Pharma, Inc.; Crystal Pharmaceutical (Suzhou) Co., Ltd.; Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories, Ltd. ("DRL"); Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited Unit III; Laurus Labs Ltd. and Laurus Generics Inc.; Lupin Atlantis Holdings, S.A., Lupin Limited, Lupin Inc., and Lupin Pharmaceuticals, Inc.; Macleods Pharmaceuticals Ltd. and Macleods Pharma USA, Inc.; MSN Laboratories Private Limited, MSN Life Sciences Private Limited, and MSN Pharmaceuticals Inc.; Mylan Pharmaceuticals Inc.; Teva Pharmaceuticals USA, Inc.; Torrent Pharma Inc. and Torrent Pharmaceuticals Ltd.; and Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Limited*. No. Dd 20-2930-LPS (D. Del.).

13. In addition, I also gave sworn depositions in the following cases: *Mylan Institutional LLC v. Novo Nordisk A/S*; PTAB IPR2020-00324 (2019); and *Pfizer Inc. v. Novo Nordisk A/S*; PTAB IPR2020-01252 (2020) (consolidated).

14.     My *curriculum vitae*, which describes my experience and background in more detail, is attached as Exhibit A.

## B.     MATERIALS CONSIDERED

15.     To the extent not referenced in this report, Exhibit B includes a list of materials I considered, in addition to my experience, education, and training, in providing my opinions in this report. For clarity, I have used "short citations" in certain instances in this report to refer to various teachings in the art.  The corresponding "short citations" used in this report are also provided in Exhibit B.  I cite to portions of certain documents throughout this report. These citations are intended as examples and I may rely on additional portions of these documents.

## C.     COMPENSATION

16.     I am being compensated for my time at my standard consulting rate of $700/hour. Neither the amount of my compensation nor the fact that I am being compensated affects the opinions that I provide in this litigation. My compensation is in no way dependent on the outcome of this litigation.

## II. SUMMARY OF OPINIONS

17.     As discussed in detail in the following sections, it is my opinion that the claims 1-9, 11-16 of the '483 patent are anticipated by International Patent Publication No. WO 2010/036702 A1 (filed Sept. 23, 2009) to Drager et al. ("Drager").[1]  In short, Drager discloses each element of the inventions claimed in claims 1-9, 11-16 of the '483 patent either expressly or inherently.

---

[1] My opinions expressed herein are based on Drager and the related patents and applications that claim priority to Drager, such as U.S. Patent No. 8,344,006 (the "'006 Patent").

18.     It is also my opinion that claims 1-9 and 11-16 of the '483 patent are obvious over Drager. In short, the liquid bendamustine formulations disclosed in Drager render the liquid bendamustine formulations claimed in claims 1-7 of the '483 patent, and the method of treatment using these liquid bendamustine formulations claimed in claims 8-16 of the '483 patent obvious to a person of ordinary skill in the art ("POSA").

19.     It is also my opinion that there are no apparent secondary considerations supporting the nonobviousness of the claims. There is no evidence of unexpected results when the claimed formulations are compared to the liquid bendamustine formulations taught by Drager. I reserve the right to address any secondary considerations put forth by Plaintiff's experts.

20.     It is also my opinion that claims 1-9 and 11-16 of the '483 patent are invalid for indefiniteness.

## III.     LEGAL STANDARDS

21.     I understand from counsel the relevant legal standards and I apply them in forming my opinions in this report. I summarize these legal standards below.

22.     I understand that a patent claim is presumed to be valid, and overcoming this presumption to establish invalidity of a patent claim requires clear and convincing evidence. I have been informed that the clear and convincing standard means that the POSA would have an abiding conviction that the truth of the factual contentions is highly probable. Therefore, when determining invalidity of the patents-in-suit, including offering any conclusions from the perspective of a POSA, I use this standard.

### A.  ANTICIPATION

23.     I understand that the question of whether the claims of a patent are anticipated by, or obvious in view of, the prior art is to be considered from the perspective of the POSA.

24.     I understand that a patent claim is invalid if it is anticipated by the prior art. I understand that a prior art reference anticipates a claimed invention if the prior art reference discloses each of the claimed elements of the invention either expressly or inherently. A claim element is inherent in the anticipating reference if that element or characteristic is the natural result that flows from the reference's explicit limitations. In this regard, I understand that a reference could anticipate a claim even if the reference does not expressly spell out all the limitations arranged or combined as in the claim if a POSA reading the reference would at once envisage the claimed arrangement or combination. I further understand that if a patent claims a composition in terms of a function, property, or characteristic, and the composition itself is in the prior art, then the claim may be anticipated in view of the prior art reference disclosing the composition. I further understand that a claim does not become patentable upon recitation of an inherent property such as stability or a previously unmeasured property of the claimed formulation, if the formulation itself was anticipated by the prior art. In addition, I understand that when a claim recites a range and a prior art reference teaches a value that falls within that range, then the entire claimed range is anticipated.

### B.  OBVIOUSNESS

25.     I understand that a patent claim is invalid if it is obvious over the prior art. I understand that the following factors are considered in determining obviousness: (1) the scope and content of the prior art; (2) the difference or differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art at the time of the alleged invention; and (4) if

present, the evidence of "objective indicia" or "secondary considerations," such as unexpected results.

26.     I understand that an invention may be found obvious when there is some recognized reason to solve a problem, and there are a finite number of identified, predictable, and known solutions, and a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If such an approach leads to the expected success, it is likely not the product of innovation but of ordinary skill and common sense. In such a circumstance, when a patent simply arranges old elements with each performing its known function and yields no more than what one would expect from such an arrangement, the combination is obvious.

27.     I also have been advised that evaluating obviousness is done from the perspective of a POSA as of the earliest priority date and that such person may consider incentives that may prompt persons to seek variations of a product that works in the same field.

28.     I understand that claiming an inherent property of an otherwise obvious invention that is expressly disclosed does not make such a method non-obvious. An inherent property is one that necessarily flows from an obvious embodiment.

29.     I have also been informed by counsel that to find obviousness, a reasonable expectation of success in arriving at the claimed subject matter is required but an absolute prospect for success is not. Put another way, I have been informed that an obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art.

30.     I further understand that an invention can be obvious if the prior art teaches a version which is "close enough" to the claimed invention that the POSA would understand the

disclosed prior art to suggest that the claimed invention is also disclosed. For example, if there are two compositions that establish the ends of a range and a claimed invention falls between those two compositions, the claimed invention may be obvious based on the proximity of its value to the disclosed prior art. As such, in circumstances where there is no overlap with the specific compositions disclosed, a skilled artisan may expect that an intermediate composition would have the same properties.  However, it is my understanding that the claimed invention may overcome this presumed obviousness by disclosing evidence of a criticality for the claimed range; in other words, the claimed range must achieve some unexpected result over the previously disclosed ranges.

31.     I also have been advised that in considering obviousness, care must be taken to not employ a hindsight analysis. Thus, throughout this report, I am careful to take into account only knowledge that was within the level of ordinary skill in the art at the time the claimed invention was made. Furthermore, I understand that in performing my analysis, I am not to use the claims of the patents-in-suit as a blueprint (or roadmap) for conducting my obviousness analysis. In other words, I did not use hindsight in conducting my analysis. However, this is not to say that I did not review the patent in conducting my analysis. For example, to determine the proper level of the POSA, several of the factors outlined above make a review of the patent prudent. As another example, as stated above, one of the inquiries is the difference or differences, if any, between the claimed subject matter and the prior art. This necessarily involves an understanding of the claimed invention. However, when reviewing the art, I simply asked what would have been obvious to the POSA based on the relevant prior art without using the patent as a roadmap to piece together the prior art.

32.     I also understand that an invention may not be obvious if the prior art teaches away[2] from the invention. It is my understanding that a reference teaches away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken. However, a reference that merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the claimed invention does not teach away. Furthermore, the mere disclosure of alternative designs does not teach away. Indeed, my understanding is even if better alternatives exist in the prior art, under the law, it does not mean that an inferior combination is inapt for obviousness purposes.

33.     Finally, although I will not address them in this report (but reserve the right to do so later), I also understand that in determining the obviousness or non-obviousness of the subject matter of an alleged invention, secondary considerations such as unexpected results, commercial success, long-felt but unsolved needs, failure of others, etc., to the extent they exist, should be considered. I reserve the right to address any of these "secondary considerations" issues should Plaintiff or its expert(s) assert them as evidence of non-obviousness.

### C.  <u>INDEFINITENESS</u>

34.     I understand that 35 U.S.C. § 112 requires that the claims of a patent must particularly point out and distinctly claim the subject matter of the invention such that one skilled in the art would understand the bounds of the claim when read in light of the specification and the file history. I understand that a claim is indefinite if the claim fails to provide an adequate standard or boundaries so that a POSA could understand what is claimed and determine the scope or bounds

---

[2] It is my understanding that teaching away applies to an obviousness analysis.

of the claim when read in light of the specification and file history of the patent. I have been informed that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent and the patent's prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

## IV. PERSON OF ORDINARY SKILL IN THE ART ("POSA")

35.     I have been informed by counsel that in defining a person of ordinary skill the following factors may be considered: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) sophistication of the technology and educational level of active workers in the field.

36.     Based on my evaluation and experience, a POSA with respect to the '483 patent would be a formulator of drugs with a Ph.D. or equivalent degree in pharmaceutics, chemistry, chemical engineering, or a related field. The POSA would have had several (at least two) years of experience in formulating parenteral drugs, including drugs designed for intravenous administration. The POSA would have collaborated, as needed, with other skilled persons such as: a clinical scientist with a medical degree and several years of experience in the clinical development of drugs, including those that are administered intravenously and the medical preparation and administration of the same; oncologists; pharmacologists; toxicologists; clinical oncology pharmacists; specialty pharmacists; oncology nurses; and the like.

37.     I understand that Plaintiff has not yet provided the definition of POSA. I reserve the right to alter or supplement the above definition for a POSA based on Plaintiff's definition of POSA.

38.     My opinions with respect to the invalidity of the '483 patent are based on the knowledge or understanding of a POSA as of the earliest possible priority date claimed on the cover of the '483 patent, **January 28, 2010**, unless specified otherwise.

## V.  THE '483 PATENT

39.     I have reviewed the '483 patent and its associated file history, entitled "Formulations of Bendamustine." According to its cover page, the '483 patent was filed on July 12, 2019 as U.S. Patent App. No. 16/509,920 ("The '920 Application"). According to the cover page of the '483 patent, it claims priority to the U.S. Provisional App. No. 61/299,100 ("the '100 provisional application"), filed on January 28, 2010.

40.     Claim 1 of the '483 patent is the sole independent claim of the '483 patent. Claims 1-9 and 11-16 of the '483 patent are reproduced below:[3]

> 1.     A ready to use liquid bendamustine-containing composition comprising
>     bendamustine, or a pharmaceutically acceptable salt thereof, wherein the <u>bendamustine</u> concentration in the composition is from about 10 mg/mL to about 100 mg/mL;
>     polyethylene glycol; and
>     a stabilizing amount of an antioxidant;
>     the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C. to about 25°C.
>
> 2. The ready to use liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

---

[3] It is my understanding that Plaintiffs have not asserted Claim 10 of the '483 patent in this case and as such I do not address that claim herein.  I reserve the right, however, to address Claim 10 and any asserted basis for invalidity based on the prior art cited herein or on additionally relevant prior art if later asserted by Plaintiffs against Defendants in this case.

3. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5 ℃.

4. The ready to use liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25 ℃.

5. The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

6. The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

7. The ready to use liquid bendamustine-containing composition of claim 1, comprising bendamustine hydrochloride.

8. A method of treating cancer in a mammal, comprising administering an effective amount of the ready to use liquid bendamustine-containing composition of claim 1 to the mammal.

9. The method of claim 8, wherein the cancer is leukemia.

11. The method of claim 8, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

12. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5 ℃.

13. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25 ℃.

18

14. The method of claim 8, wherein the bendamustine concentration in the ready to use liquid bendamustine-containing composition is from about 20 mg/mL to about 60 mg/mL.

15. The method of claim 8, wherein the bendamustine concentration in the ready to use liquid bendamustine-containing composition is about 25 mg/mL.

16. The method of claim 8, wherein the ready to use liquid bendamustine-containing composition comprises bendamustine hydrochloride.

'483 Patent at 13:21-14:48.

## VI. CLAIM CONSTRUCTION

41.     I understand from counsel that the claims of a patent define the invention to which the patentee is entitled the right to exclude. I have been informed by counsel that generally claim terms are given their ordinary and customary meaning; in other words, claim terms are generally defined by the meaning that the term would have had to a POSA as of the effective filing date of the patent application. I have also been informed by counsel that unless some other reason exists, i.e., a claim construction order, a claim term should be accorded its plain and ordinary meaning as understood by a POSA when read in the context of the specification and prosecution history. Indeed, the patent's specification provides a similar understanding. Col. 2, lines 26-31.

42.     I understand that the asserted patent has defined certain terms. I have used those terms as defined by the patent to the extent they are used in the asserted claims. *See, e.g.*, Col, 2, lines 32-47.

43.     Each claim of the '483 patent recites a "ready to use" liquid bendamustine-containing solution, or a method of using the same. I understand that the parties have stipulated

that the term "ready to use" means "able to be dispensed with minimal if any effort or preparation; prepackaged."[4]

## VII.   TECHNICAL BACKGROUND

44.    Set forth herein is a brief overview of the technical background relevant to the subject matter of the '483 patent.

### A.    FORMULATIONS FOR PARENTERAL ADMINISTRATION

45.    A pharmaceutical formulation is the composition of a drug product that contains the active pharmaceutical ingredient ("API"), and one or more excipients, the pharmacologically inactive ingredients. The API primarily provides the intended therapeutic effect. In the pharmaceutical field, the term "parenteral" is used to refer to products that are administered so that the API does not need to cross a protective barrier (*e.g.*, the intestines or skin), and generally are administered by injection. One class of parenteral products are intravenous, or "IV" injections. IV injections are often used because of the ability to precisely control the administration rate and quantity of a drug. They can be administered either quickly via an IV "push" (or bolus) or they can be administered slowly over a prolonged time via an IV infusion. IV injections are widely used in the medical field for treatment of a variety of ailments, including cancer.

46.    A POSA, or a formulator, working on developing the IV or injectable products would have known that the aim of developing the formulations is to develop a formulation (*i.e.*, pharmaceutical composition) that is suitable to receive approval from regulatory agencies, including the FDA, for use in patients. A POSA would be generally aware of the regulatory

---

[4] I understand that this claim construction has been stipulated to by the parties; however, to the extent that Plaintiff asserts additional meaning—not included in this construction—to the agreed terms of this claim, I reserve the right to address those arguments.

requirements for IV or injectable products to obtain an approval and would rely on knowledge about the ingredients' functions.

## B.   EXCIPIENT SELECTION FOR PARENTERAL FORMULATIONS

47.    A pharmaceutical formulation is a combination of an active ingredient(s) and inactive ingredients, which are generally termed as excipients. By at least 2000, formulations for parenteral administration with suitable solvents and antioxidants as well as various excipients used in this approach, were well established in the pharmaceutical art. *See, e.g.*, Remington 2000.

48.    The API is included in a pharmaceutical formulation to achieve some desired pharmacological result, whereas excipients are used to facilitate formation of the API into a dosage form. Additionally, excipients may confer desired formulation characteristics, such as an antioxidant behavior (and potentially its related ability to reduce degradation and impurities).

49.    A drug administered parenterally is one injected into the body such that the body's natural protective barriers (e.g., the skin) are bypassed, such as by using a hollow needle passed into tissues. The most frequent parenteral routes are subcutaneous, intramuscular, and intravenous. Injectable preparations are usually sterile solutions, colloids, or suspensions of drugs in water or other suitable physiologically acceptable vehicles, although the exact character is dependent on the intended parenteral route. For example, oils and certain suspensions may be suitable for intramuscular routes yet unsuitable for the intravenous route. Remington 2000 at 781. Injections may be classified into six general categories:

1) Solutions ready for injection.

2) Dry, soluble products ready to be combined with a solvent just prior to use.

3) Suspensions ready for injection.

4) Dry, insoluble products ready to be combined with a vehicle just prior to use.

21

5) Emulsions.

6) Liquid concentrates ready for dilution prior to administration.

Remington 2000 at 781.

50.     Excipients in parenteral formulations are added for a number of purposes. They can be added to maintain isotonicity of a solution in relation to human blood, to adjust the pH, to increase the solubility of a drug substance, to increase the stability of a drug substance and increase the shelf life of the product or act as a preservative.  When used for these purposes, the excipients should not adversely affect the action of the drug substance, or cause any side effects of toxicity at the concentrations used in a given formula.  At least for parenteral formulations, it was known as early as 2000, that in order to avoid degradation of API and formulation excipients and thereby optimize reduced levels of impurities, the formulator can turn to including specific solvents and/or antioxidants. *See generally* Remington 2000.

51.     Cosolvents are used to increase water solubility of drugs that do not contain ionizable groups or drugs whose solubility cannot be increased by pH adjustment alone.  These drugs are generally considered to be nonpolar, i.e., their chemical structure does not have a significant dipole moment, or in other words, does not have a relatively positive and a relatively negative end.  Water has one of the strongest dipole moments of known solvents, and thus nonpolar drug molecules often have relatively poor solubility in water.  To increase the solubility of these nonpolar drugs in the polar solvent of water, a lower- polarity water-miscible organic liquid can be used as a cosolvent.  Most water-miscible organic liquids are toxic, and only a few are used as cosolvents in pharmaceutical solutions.  Examples include glycerol, propylene glycol, ethanol, and the low molecular weight polyethylene glycols. *See*, for example, Rowe 2009.  The solubility of nonpolar drugs in water can be increased by several orders of magnitude with cosolvents.

52.    Oxidation is the loss of electrons or an increase in oxidative state during a reaction by a molecule or atom.  Where a drug substance may be prone to degradation by oxidation, a number of formulation processes and excipients can be used to reduce the rate of drug degradation in the product and thus increase the shelf life or extend the expiration date.  A wide variety of antioxidants were known in the art, at least as early as 2002. *See* Waterman 2002 at 8-14.

53.    "Wherever possible, formulations should be developed using excipients which have an established use in parenteral products administered by the same route as the product under development." Broadhead 2001 at 334. As a result, parenteral formulators have a limited number of acceptable inactive ingredients, or "excipients," that can be used to develop formulations for human administration. *See, e.g.*, Akers 2002 at 2283 ("Formulation component precedence takes on high stature in the sterile [parenteral] product world because of significant toxicological and regulatory concerns."); Nema 1997 at 166 ("These factors limit the choice of excipients available to the formulators.").

54.    A formulator would have consulted references such as Remington 2000, as well as, for example, Nema 1997 to identify excipients and amounts already established for use in FDA-approved intravenous formulations.

### 1.  API – Bendamustine

55.    As discussed further herein, bendamustine was a known compound with a chemical structure that would lead a formulator to make specific decisions about what to include as excipients in a parental formulation containing the bendamustine compound or a pharmaceutically acceptable salt form.  *See* Section VII.C, *infra*.

## 2.  PEG

56.    As addressed above, solvents are a type of excipient in parenteral formulations. The primary purpose of a solvent is to uniformly disperse, at the molecular level, the active ingredient in a liquid medium. Examples of non-aqueous solvents include ethanol, propylene glycol ("PG"), polyethylene glycol ("PEG"), and N,N di-methylacetamide (DMA). *See, e.g.*, Broadhead 2001 at 337.

57.    Polyethylene glycol (and especially PEG 400) is a common solvent in injectable products. *See, e.g.*, Nema 1997 at 167 (Table 1). The chemical structure of PEG is shown below:



PEG 400

or



PEG

Rowe 2009 at 517; 2009 USP Monograph for Polyethylene Glycol at 1308. The notation "PEG 400" refers to PEG with a molecular weight of approximately 400 grams/mol. PEG (or PEGs) is actually the name used to designate a group of compounds. Rowe 2009 at 517. The molecular structure of each PEG consists of a polymeric chain of a length of repeating ethylene glycol groups (designated by "n" above), such that the molecular weight of the particular PEG is determined by

24

the length (based on the number repeating groups) of the chain, and "n" is the number of $-CH_2-CH_2-O-$ concatenated ethylene glycols (analogous to the beads of a necklace) that make the chain – n is equal to approximately 9 in the case of PEG 400. *See* 2009 USP Monograph for Polyethylene Glycol at 1308. Among the various available weights of PEGs, PEG 300 and PEG 400 are the most widely used in injectable formulations. The term polyethylene oxide (PEO) is sometimes used interchangeably with PEG, as the two polyethylene ether polymers have identical chemical structures, although the PEO terminology is more often used when referring to polymers >20,000 g/mol as a different synthetic pathway is commonly utilized.

### 3.  Antioxidants

58.     Oxidation is the loss of electrons or an increase in oxidative state during a reaction by a molecule or atom; generally in pharmaceuticals, oxidation results in a gain of oxygen or loss in hydrogen content. *See* Waterman 2002 at 1-2. This process may lead to degradation in a pharmaceutical formulation, and was a known process for the loss of API and the formation of impurities in formulations, and methods and procedures for predicting, measuring, and preventing oxidation of formulations are well known. *See generally* Waterman 2002. Antioxidants are well known and commonly used to prevent the oxidation of drugs and/or excipients. *See, e.g.*, Nema 1997 at 168; Waterman 2002 at 8-14.

### a.  Oxidative degradation was known in parenteral formulations

59.     Most oxidation mechanisms in pharmaceutical formulations involve oxygen, either dissolved in the formulation or as part of other reactive molecular species. Reactive radical species of oxygen are generated by heat, light, peroxides, labile compounds or heavy metal contaminants. Remington 2000 at 722. An example free radical reactant (R*) and its reactions that may occur include:

$R^* + dissolved\ O_2 \rightarrow ROO^*$   (peroxy radical)

$ROO^* + drug/excipient\text{-}H \rightarrow drug/excipient\text{-}OOH + R^*$

60.     These types of oxidation reactions can be very destructive to pharmaceutical formulations since the peroxy radicals are stable and long lived, the radicals can be regenerated (essentially a chain reaction), and the oxidation reactions can produce new reactive species that can undergo further degradation reactions with the API or excipients. Antioxidants are added to formulations to both prevent initiation of the oxidative reaction and to terminate or prevent further propagation of the radical chain reaction. *See* Remington 2000 Chapter 39 at 722; *see also* Harmon 2006 at 2014-2016.

61.     Oxidation reactions can also occur due to other peroxides that are in the formulation, *e.g.*, contaminants in the excipients, or due to heat, light and heavy metals. *See* Hovorka 2001 at 256. For example, excipients including poly(oxythlene) alcohol groups [*e.g.*, R–$(OCH_2CH_2)_nOH$ ] can form hydroxyl and/or alkoxyl radicals:

$HO\text{-}OH \rightarrow 2\ HO^*$ (hydroxyl radicals)

$RO\text{-}OH \rightarrow RO^* + HO^*$ (alkoxyl and hydroxyl radicals)

62.     These radicals are highly oxidizing, and polyethylene glycol-based excipients are notorious for containing residual peroxides. *See* Hovorka 2001 at 256; *see also* Waterman 2002 at 18. Many grades and molecular weights of PEGs, *e.g.*, PEG 400, from varying manufactures are well known to contain substantial quantities of these peroxides, both as alkoxyl and hydroxy radicals. *See* Wasylaschuk 2007 at 112.

26

63.     Peroxyacids are another group of oxidizing radicals, which form due to the reaction of a carboxylic acid with hydrogen peroxide species. Peroxyacids are known to be highly reactive with many organic species. Indeed, peroxyacids have been known for over 75 years to be reactive with nitrogen mustard pharmaceutical drugs, including the nitromustard methyl-bis(β-chloroethyl)amine ("MBA") or mechlorethamine. *See* Stahmann 1946 at 586. Mechlorethamine was the first chemotherapeutic drug to be approved in the US in 1949, and subsequently, it was commercialized as the anti-cancer drug Mustargen. Mechlorethamine can oxidize in the presence of peroxyacids to the corresponding N-oxide degradant:



Stahmann 1946 at 586.

64.     Liquid topical formulations of mechlorethamine have been used for treating patients for over 45 years. Van Scott 1973 at 19. The original topical formulation, which was compounded from the lyophilized parenteral formulation, was unstable to hydrolysis and to nucleophilic attack in ethanol solvent, so a non-aqueous formulation was developed that had improved stability for 3 years. *See* the '694 Publication, ¶ [0044], [0045], [0048]. The non-aqueous liquid formulations of this nitrogen mustard comprise an antioxidant (butylated hydroxytoluene), metal chelator (EDTA, which can function as an antioxidant), a polar protic solvent from the group (propylene glycol, PEG, polypropylene glycol, or ethylene glycol), and additional non-aqueous solvents and excipients. *Id.* at Table 2.

### b.  Excipients in formulations may also undergo oxidative degradation

65.    Even when the drug API itself is not subject to direct oxidation by various oxidizers and free radical species, oxidizers may lead to the formation of unwanted impurities such as aldehydes and carboxylic acids. These impurities can then undergo cross-linking, transesterification, and other conjugation reactions (e.g. ester formation) with other species in the formulation. *See* Wasylaschuk 2007 at 114. For example, the polyether groups within polyethylene containing excipients (e.g. PEG and PEO) are highly susceptible to oxidative degradation via a chain oxidation reaction that can produce aldehyde and water in the formulation.



Waterman 2002 at 17.

66.    Similar reactions in these excipients can proceed to produce new reactive diols, acids, and formaldehyde.

Waterman 2007 at 1503.

67.     The new degradant species produced by auto-oxidation of polyethylene ether chains in excipients (., PEG) are well known to result in the degradation of APIs in formulations. For example, the investigational anti-HIV drug DMP323 was formulated in PEG 400 to improve solubility. The addition of an antioxidant was effective to prevent degradation of DMP 323 in PEG 400. *See* Maurin 1996 at 104-106. In another example, an aqueous PEG 400 and propylene glycol (PG) formulation of the topical corticosteroid tripredane was found to be unstable due to peroxide oxidation of the API. The addition of an antioxidant and chelating agent were necessary to prevent oxidative degradation. *See* Varia 1991 at 872-873. In yet another example, the prostaglandin fenprostalene, an abortifacient agent approved as the commercial product Synchrocept-B for aborting pregnancies in feedlot animals was formulated in PEG 400 and required an antioxidant. *See* Etherington 1994 at 740. During development, it was found that fenprostalene degraded rapidly due to hydrolysis in water. *See* Johnson 1984 at 1414. Furthermore, fenprostalene contained a carboxylic acid esterified as the methyl ester that readily underwent transesterification

to form an ester degradant when fenprostalene was formulated in diethylene glycol, a protic solvent with a high diol content. *See id.* at 1415-1416. Thus, due to the potential for transesterification in the high diol content solvent, a PEG 400-based formulation was chosen for commercial development. *See id.* at 1414. However, the PEG 400 formulation degraded due to peroxide formation in the excipient and resulted in degradation of the API. *Id.* at 1417. The study found that addition of an antioxidant, tocopherol, to the PEG 400 was sufficient to prevent oxidation. *See id.* at 1416, Figure 4 (reproduced below); *see also* the '823 Patent at 6:8-11; Example 1.



Figure 4—*Degradation rate of 1 at 80°C in diethylene glycol (▲) and in polyethylene glycol 400 solutions containing no additive (●), formic acid (□), and di-α-tocopherol (○). All solutions were stored in test tubes exposed to air.*

Stabilization of fenprostalene(I) (sold as Synchrocept-B by Syntex Inc.) against oxidation in PEG400 formulation by addition of an antioxidant, tocopherol. Johnson 1984 at 1416.

68.    In another example, robenacoxib is a non-steroidal anti-inflammatory drug formulated as a solution for injection, and approved in the European Union since 2008 for veterinarian use. Because of its poor solubility in water, co-solvents PEG 400 (macrogol 400) and ethanol along with the surfactant poloxamer 188 were added to the formulation. *See* EMA 2008 at 2-3. However, the formulation formed significant colored degradants within 3 months during stability studies. *See id.* at 3. The addition of an antioxidant, sodium metabisulphite, gave the formulation sufficient stability for a recommended shelf life of at least 3 years. *See id.* at 8-9.

69.     As described above, the degradation reactions for excipients, particularly for excipients containing PEG chains, can result in formation of new aldehyde, carboxylic acid, and alcohol species along with formaldehyde that can form new degradants in the formulation by reacting with other components of the formulation. In addition, the degradation can result in the formation of formic acid that can decrease the stability of the API. *See* Waterman 2007 at 1503. Vendors of excipients may offer special high purity grades with reduced peroxides, add in antioxidants to the excipients, recommend that high temperatures be avoided, or recommend that additional antioxidants be added to preparations containing the excipient. *See* Waterman 2002 at 16-17.

### c.  Antioxidants were routinely used for prevention of oxidative degradation

70.     At the time of the invention, oxidation was a known potential problem in pharmaceutical formulations for certain APIs and excipients, and antioxidants were known to be able to prevent oxidative degradation in pharmaceutical formulations. *See* Waterman 2002 at 1. A wide variety of antioxidants were known, which prevented oxidation by a variety of mechanisms. *See id.* at 8-14. Antioxidants in formulations fall into several groups based on their primary mechanism of action. Classes of antioxidants include chain terminators, which donate hydrogen and form stable radicals, *i.e.* poorly reactive, radicals, hence halting further propagation of the radical chain reaction. Examples include phenol-containing compounds such as butylhydroxytoluene (BHT), butylhydroxytoluene, methyl paraben, propyl gallate, and tocopherol; thiols such as monothioglycerol and cysteine; and niacin-related compounds such as nicotinamide. *See* Waterman 2002 at 21-22, 26; *see also* Ogata 2002 at 641-642, 644. Another class of antioxidants are sacrificial antioxidants, which are reducing agents that are more easily oxidized than the API and/or can scavenge oxygen in the formulation. *See* Waterman 2002 at 22.

31

Examples of sacrificial antioxidants include ascorbic acid, cysteine, metabisulfite, methionine, and lipoic acid. *See* Waterman 2002 at 17-26, Moini 2002 at abstract. Another class of antioxidants are metal chelators and complexing agents, which may directly stabilize the API or complex contaminants that may induce the formation of free radicals Examples include citric acid, EDTA, and cyclodextrins. *See* Waterman 2002 at 20, 23 and 26.

71.     The purposes of an antioxidant is to reduce the levels of oxidation that can occur in a drug formulation, these levels giving rise to degradants that reduce the overall activity and effectiveness of the treatment while also increasing the potential for impurities.  As such, the use of an antioxidant by its nature will increase the stability of a formulation to deter formation of impurities and ensure longer periods of time for the active pharmaceutical ingredient to stay in its chemical form and retain its activity.

### 4.   A POSA Would Have Been Motivated to Enhance Stability of Bendamustine Formulations

72.     During pre-formulation drug development, the stability of the drug in solvents, including water is evaluated. *See* Steele 2001 at 196 ("Development of a solution formulation requires a number of key pieces of preformulation information. Of these, solubility . . . and stability are probably the most important."); *id.* at 197 ("One of the main problems associated with developing a parenteral or other solution formulation of a compound is its aqueous solubility.").

73.     A POSA would have known that bendamustine is not stable in water. *See, e.g.*, Drager at 1:18 ("Like other nitrogen mustards, bendamustine hydrolyzes in aqueous solution . . . ."); *see also* Olthoff at 2 ("Bendamustine hydrochloride is a relatively instable compound. Its mustard-halogen groups are almost completely hydrolyzed in aqueous solutions after a short period of time."). These drugs can be formulated using a number of various known approaches,

32

including lyophilization (freeze drying). The POSA would know that freeze-drying is an easy first solution, but would recognize it to be a costly process and that it has several other disadvantages. *See, e.g.*, Olthoff at 3 ("It is furthermore unsatisfying that high amounts of micro particles were found after the dissolution of the lyophilisate [of bendamustine], which indicate a further instability of the system."); the '286 Ppatent at 2:33-3:10; Drager at 2:6-7 ("The reconstitution of the bendamustine lyophilized powder is time consuming and cumbersome."); *see also generally* Waterman 2002 at 20 ("Since the primary dosage form is parenteral, the selection of a ready-to-use liquid or a lyophilized dosage form is critical for oxidative stability . . . Lyophilization minimizes the formation of hydroxyl free-radicals, but results in higher production costs, more elaborate administration, and a more complicated formulation involving cryoprotectants.").

74.     Preformulation work also involves the physicochemical characterization of the drug, which includes, among other things, solubility measurements in pharmaceutically acceptable solvents. The POSA would also perform experiments to determine if the drug is susceptible to oxidation. *See* Waterman 2002 at 3-7.

75.     A POSA would have known that bendamustine is susceptible to oxidative degradation. Prior art teaches the preparation of solutions of bendamustine under inert atmosphere. *See* Olthoff at 8, claim 1 ("N-mustard compounds are used in concentrations of 25 mg/ ml to 100 mg/ ml. dissolved in an anhydrous monovalent or polyvalent alcohol (polyol), wherein the solution is dissolved, filled and stored under inert gas . . . ."). In addition, chemically similar nitrogen mustard alkylating chemotherapeutics, such as mechlorethamine, were known to be susceptible to oxidation and their stable liquid formulations contain antioxidants (*see supra*, ¶ 63). A POSA would have known that solutions are prepared and stored under an inert atmosphere when they are susceptible to oxidative degradation. *See* Agalloco 2008 at 127 ("An inerting gas (typically

nitrogen, but other gases can be utilized) may be added to the headspace of the container to protect formulations that are oxygen sensitive."); *see also* Waterman 2002 at 27 ("For oxygen-sensitive compounds in liquid formulations, including a nitrogen sparge during the manufacturing process and a nitrogen headspace in the final package can suppress oxidation of the drug.").

76.     A POSA would have known that including an antioxidant in the formulation is a widely used method of preventing oxidative degradation of the drug. *See generally* Wayne Bequette 2008 at 170; Waterman 2002 at 1, 20-27 ("This review also provides a decision tree for addressing oxidative degradation, along with a detailed table of antioxidant additives and their commercial precedence."). The POSA would also run a number of tests on antioxidants to determine which antioxidants would be most effective in protecting the API from oxidation. *Id.* at 3 ("Liquid dosage form oxidative stability screening generally involves examining the drug stability under a number of conditions.").

77.     Moreover, Drager also discloses exemplary liquid bendamustine formulations comprising an antioxidant. *See* Drager at 9:10-12 (disclosing bendamustine solutions comprising 25 mg/mL niacinamide). A POSA would have known that niacins such as niacinamide and nicotinic acid are antioxidants. *See generally* Kamat 1999 at 179 ("Hence our studies suggest that nicotinamide [niacinamide] (vitamin $B_3$) can be considered as a potent antioxidant . . . ."); *see also* Ogata 2002 at 643 ("In the case of OH radical, which had the highest reactivity among various ROS [reactive oxygen species], most niacin-related compounds had scavenging abilities."); *id.* at 644 (Table 1) (showing that niacinamide [nicotinamide] scavenges OH radicals).[5] Thus, a POSA

---

[5] Although Drager teaches that niacinamide is a complexing agent, the POSA would recognize that a complexing agent such as niacinamide can function as an antioxidant as a result of their chelating activity. *See* Waterman 2002 at 23-26 (disclosing complexing agents can function as antioxidants). In addition, a POSA would understand that excipients can have multiple functions in a formulation; as such, complexing agents can additionally work as

34

would have known that examples in Drager specifically disclose solution comprising bendamustine and an antioxidant.

### 5. HPLC was a well-known method for measurement of impurities

78.     Methods of the testing of stability and measurement of remaining API and impurities in formulations were well known in the art. *See generally* Remington 2000 Chapter 52 at 986-994; *see also id.* at 986 ("The use of kinetic and predictive studies for establishing credible expiration dates for pharmaceutical products is now accepted worldwide."); *id.* ("Stability of a drug also can be defined as the time from the date of manufacture and packaging of the formulation until its chemical or biological activity is not less than a predetermined level of labeled potency and its physical characteristics have not changed appreciably or deleteriously."); *id.* at 993 ("It is not necessary to determine the mechanism of the degradation reaction … Either the amount of intact drug or the amount of a formed degradation product may be followed."). The use of HPLC for measuring degradants and active ingredients in formulations during stability testing was well known. *See generally* Remington 2000 Chapter 33 at 587 ("pharmaceutical formulations are complex mixtures … [a]mong the most powerful techniques available to the analyst for the resolution of these mixtures are a group of highly efficient methods collectively called chromatography"); *id.* at 604 ("The most frequently used [HPLC detection] instrument is an ultraviolet-visible spectrometer that has been fitted with a flow cell", "photodiode array detectors…can scan the entire UV spectrum repeatedly during the elution of a peak to determine if more than one substance is coeluting."). The term "peak area response" refers to the concentration of a component, *e.g.*, an impurity, measured in a given sample, which is determined

---

antioxidants in formulations. *See id*. at 20, disclosing that the metal chelator EDTA (*i.e.*, complexing agent) can work as an antioxidant.

by integrating the instrument signal (*e.g.*, UV absorbance), over the elution time of the peak of interest, and using a calibration standard to convert the integrated signal response to the equivalent concentration. *See figure below, adapted from* Ahuja 2005 at 22 (annotations added in blue).



| FIGURE 1   A chromatogram showing retention time ($t_R$), void time ($T_0$), peak at base width ($W_b$), and peak height (*h*).

79.     When determining whether degradants are present, screening at wavelengths between 220 to 230 nm are commonly used, while optimizing detection methods. *See* Ahuja 2005 at 155, Table 4 ("Gradient Conditions for Screening Experiments", "inspect chromatograms at wavelength of 220, 230, 240, 254, 260, 275, and 300 nm."); *id.* at 161 ("When choosing a detection wavelength, the following factors need to be taken into consideration: The major components must have suitable dynamic range at the selected wavelength. All impurities should be detected with suitable sensitivity at the selected wavelength."); *id.* at 403 ("Poor chromatographic response by many of today's molecules above 220-240 nm means that man cleaning assays are forced into the lower end of the UV range. This presents additional challenges . . . due to solvent and impurity interferences at low wavelengths.").

36

**6.  Extrapolations for predicting drug stability were routinely used**

80.     Methods of predicting drug stability and shelf life were well known in the art. It is common during early development that stability data is only available for a short time span (*e.g.*, < 1 year). In these cases, it is routine to use degradation and stability data from a limited timespan to predict the purity at later time points (*e.g.*, > 1 year). *See* FDA Guidance 2004 at 1 ("This guidance describes when and how extrapolation can be considered when proposing a retest period for a drug substance or a shelf life for a drug product that extends beyond the period covered by available data from the stability study under the long-term storage condition (long-term data)."); *see also* FDA Guidance at 7; Carstensen 1976 at 311 (disclosing methods of modeling shelf life); Remington 2000 Chapter 52 at 991 ("This concept further assumes that the degradation reactions follows zero- or pseudo-zero-order kinetics…this is an excellent assumption…shelf life calculations assuming zero-order kinetics are more conservative than those for higher orders."). Although oxidative degradation processes can make it difficult to use short-term accelerated stability studies at elevated temperatures to predict shelf life at typical storage temperatures, it is still routine to predict future stability from stability data collected at typical storage conditions. *See id.*, Waterman 2002 at 3-4.

81.     Generally, knowledge of the exact mechanism of degradation is relatively unimportant when modeling stability data, if relatively little degradation actually occurs over the period, thus stability generally can be predicted for later time points. Remington 2000 Chapter 52 at 993 explains:

> It is not necessary to determine the mechanism of the degradation reaction. In most cases, it is necessary only to follow some property of degradation and to linearize this function. Either the amount of intact drug or the amount of a formed degradation product may be followed. It usually is impractical to determine the exact order of the reaction. With assay errors in the range of 2 to 5%, at least 50% decomposition must occur before the reaction order can be

determined. As the loss with pharmaceuticals generally is less, zero-order kinetics should be assumed, unless the reaction order is known from previous work.

## C.   BENDAMUSTINE BACKGROUND

82.   Bendamustine is neither a new nor recently developed anti-cancer drug; it is a nitrogen mustard compound that has been widely used in the prior art for decades to treat a number of cancers and malignant tumors, including chronic lymphocytic leukemia ("CLL") and non-Hodgkin's Lymphoma ("NHL"). *See, e.g.*, Drager 1:16-17; *see also* Olthoff at 1; Brittain 2006 at ¶ [0004]–[0006]. Bendamustine was initially synthesized in 1963 in the German Democratic Republic and was available from 1971 to 1992 in that location under the name Cytostasan®. *See, e.g.*, Brittain 2006 at ¶ [0006]; *see also* Drager at 1:11-13; Olthoff at 1. Since 1992, bendamustine has been marketed in Germany under the tradename Ribomustin®. *See, e.g.*, Brittain 2006 at [0006]; *see also* Drager at 1:13-15. Ribomustin® was marketed in the form of a vial containing a lyophilized mixture of two ingredients - bendamustine HCl and mannitol.

83.   Bendamustine was also formulated and sold in the United States before the '483 patent. For example, in 2008, Cephalon began selling bendamustine for use in the United States under the tradename Treanda®. *See generally* 2008 Treanda Label. Treanda was marketed to treat CLL. Treanda was manufactured and sold as a lyophilized powder due to bendamustine's rapid degradation in water. *See, e.g.*, Brittain 2006 at [0007]-[0011]; *see also* 2008 Treanda Label at § 2.3 (Reconstitution/Preparation for Intravenous Administration). In order to administer Treanda, a medical professional must reconstitute the lyophilized powder and then dilute the reconstituted product in an aqueous liquid. See 2008 Treanda Label at 2 ("Reconstitution/Preparation for Intravenous Administration").

**D.      PHYSICAL AND CHEMICAL PROPERTIES OF BENDAMUSTINE**

84.     The physical and chemical properties of bendamustine have been well documented. Bendamustine belongs to the class of drugs known as "nitrogen mustards," or mustards for short. *See, e.g.*, Olthoff at 1; *see also* Brittain 2006 at ¶ [0004]; Drager at 1:7-11. The chemical structure of bendamustine is shown below:



Drager at 1:9.

85.     As discussed above, it has long been known that bendamustine, like other nitrogen mustards, degrades rapidly in water. *See, e.g.*, Drager at 1:18 ("Like other nitrogen mustards, bendamustine hydrolyzes in aqueous solution . . . ."); *see also* Olthoff at 2 ("Bendamustine hydrochloride is a relatively instable compound. Its mustard-halogen groups are almost completely hydrolyzed in aqueous solutions after a short period of time."); Brittain 2006 at ¶ [0004]. The prior art explains, for example, that bendamustine undergoes rapid hydrolysis in aqueous solutions. *See, e.g.*, Olthoff at 2. The major degradation products of bendamustine in water and polyols (solvents containing more than one hydroxyl, or –OH group in their chemical structure), such as PG, have also been thoroughly studied.

39

86.     Bendamustine is also susceptible to esterification at its carboxylic acid group by reaction to hydroxyl groups from an alcohol, including polyols. One such alcohol is PG, which reacts to degrade bendamustine into PG-esters. See Drager at 5:10-15 (figures reproduced below):



PG ester 1



PG ester 2

87.     The esterification of bendamustine involves reacting with a (solvent) molecule containing at least one –OH group. The greater the abundance of –OH groups coming from the solvent molecules surrounding bendamustine in solution, the more favorable the conditions toward esterification of the drug, *i.e.*, by Le Châtelier's principle, a higher concentration of alcohol reactants pushes the equilibrium of bendamustine toward forming ester products. Drager uses the commonly used terms of "protic" and "aprotic" to refer to organic solvents that either contain or

lack hydroxyl (–OH) groups in their molecular structure, respectively. Drager taught that "undesirable polar [miscible with water] protic [-OH containing] solvent-bendamustine adducts [esters] . . . will not form during typical commercial storage if the concentration of the polar protic solvent is kept within the scope of the present invention." *Id.* at 4:22-26. That is, the esterification reaction involves the –OH group of the solvent, "if the concentration of the polar protic solvent is kept" sufficiently low such that the esters "will not form during typical commercial storage." The significance of Drager's teaching was that the concentration of –OH groups (borne by the protic solvent) was what needed to be kept low, in order to reduce ester formation of bendamustine. A POSA would be aware that other polar protic solvents commonly used in commercial pharmaceutical formulations, such as PEG 400, have fewer OH groups for a given volume than a low molecular weight alcohol such as ethanol.  I have used the molecular weights and densities, well known from the prior art, to demonstrate the relative number of OH groups for several common protic pharmaceutical solvents, showing that PEGs have relatively fewer OH groups per unit volume.

| Solvent | Nominal average molecular weight | Average density (20˚C) grams/Liter | Solvent as Moles per Liter | OH groups as Moles per Liter |
|---|---|---|---|---|
| Ethanol (100%) | 46.068 g/mol | 789.3 | 17.13 | 17.13 |
| Glycerin | 92.09 g/mol | 1263.6 | 13.72 | 41.16 |
| Propylene glycol | 76.09 g/mol | 1036 | 13.62 | 13.62 |
| PEG 200 | 200. g/mol | 1124 | 5.62 | 11.2 |
| PEG 300 | 300. g/mol | 1125 | 3.75 | 7.50 |
| PEG 400 | 400. g/mol | 1125 | 2.81 | 5.63 |
| PEG 600 | 600. g/mol | 1125 | 1.88 | 3.75 |

88.    A POSA would have known that using PEG would also require use of an antioxidant to help address the esterification of bendamustine. That is because the esterification

reaction is catalyzed by an acid if present. PEG produces formic acids when it oxidizes (*see supra*,

¶ 67). Thus, a POSA would have known to include antioxidants in formulations comprising

bendamustine and PEG.

## VIII.   SCOPE AND CONTENT OF PRIOR ART[6]

89.   As discussed herein, there are multiple prior art references upon which I rely for

knowledge of the POSA at the time of the invention. Certain such prior art references are discussed

in the Technical Background section discussed above and listed in Exhibit B.  In particular, with

regard to the invalidity opinions as further stated *infra*, I reference Drager and include in this

section a non-limiting discussion of the Drager prior art references as they pertain to the claims of

the '483 patent.

### A.   DRAGER

90.   Drager was filed on September 23, 2009 as International Application No.

PCT/US2009/058023 and published as WO 2010/036702 A1 ("Drager").  Drager claims priority

to U.S. Provisional App. No. 61/100,074 ("the '074 provisional application"), filed on September

25, 2008. Cephalon, Inc. is listed as the Applicant for Drager. Anthony S. Drager, Rachel Y.

Labell, and Piyush R. Patel are listed as inventors. I have been informed by counsel that Drager is

prior art to the '483 patent. Drager generated multiple continuation applications that share the same

specification, including U.S. Patent Application No. 13/362,430, which issued as U.S. Patent No.

8,344,006 (the '006 Patent). I have been informed by counsel that Drager and its related progeny

(*i.e.*, the '006 Patent) are each prior art to the '483 patent.

---

[6] This section includes specific discussion of Drager and its related progeny; however, to the extent that I have
additionally referenced prior art herein, I rely on these additional prior art references as evidence of the knowledge
of the POSA at the time of the inventions and reserve the right to specifically rely on such prior art for its disclosure
of the claimed invention herein and for its representation of the knowledge of the POSA.

### 1. Drager discloses liquid bendamustine formulations within the claimed concentration ranges

91. Drager concerns "[s]table liquid formulations of bendamustine, and pharmaceutically acceptable salts thereof, and polar aprotic solvents." Drager at Abstract.

92. Drager states that "improved liquid formulations of bendamustine are still needed" (*id.* at 2:15-16) and further discloses "liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent. Certain preferred embodiments include liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt of prodrug thereof, a polar aprotic solvent, and a non-aqueous polar protic solvent." *Id.* at 2:18-22.

93. In particular, Drager is directed to "[s]table, liquid formulations of bendamustine" that are "commercially viable" and could be stored under "typical commercial storage conditions." *Id.* at 3:6, 8, 27-28.

94. Drager discloses liquid bendamustine solutions comprising polar aprotic solvents and non-aqueous polar protic solvents. *See generally id.* at 4. Drager further discloses that in most preferred embodiments, the formulations of the invention will comprise "about 80%," by volume of the formulation, of the non-aqueous polar protic solvent. *Id.* at 4:14-15 ("In most preferred embodiments, formulations will comprise about 80%, about 67% or about 34%, by volume of the formulation, of the nonaqueous polar protic solvent.").

95. Drager discloses concentration ranges that include all ranges between "about 5 mg/mL to about 200 mg/mL", stating:

> Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about

5 mg/mL to about 200 mg/mL.  Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, range from about 5 mg/mL to about 120 mg/mL.  Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof.

As used herein, the term "about" is defined as ± 10%, preferably ± 5%,

Drager at 7:14-25.

96.     Drager claims the specific concentrations of from "about 5 mg/ml to about 120 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof."  Drager at 15:15-16, claim 20.  Thus, a POSA would have envisaged that Drager specifically points to concentrations of bendamustine in stable liquid formulations that transverse this range having disclosed and claimed the range and having specified numerous amounts throughout the entire range that each include a defined variation of "about" that allows for the range to effectively be covered at each and every point by the disclosure.  Thus, a POSA would understand that Drager's disclosure would operate no differently across the disclosed range, and there would be no meaningful difference in its operation at any particular concentration within the claimed range.

## 2. Drager discloses PEG as an excipient in bendamustine liquid formulations

97.     Drager also specifically teaches that polyethylene glycol ("PEG") is suitable for use in its disclosed bendamustine compositions. For example, Drager identifies PEG as both a suitable solvent and/or excipient that can be used in a liquid bendamustine composition. *Id.* at 4:3-8; 7:27-8:3. Drager expressly discloses that "stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable

nonaqueous polar protic solvents are known in the art and include . . . . polyalkylene glycols, ***such as polyethylene glycol***, polypropylene glycol, and polybutylene glycol . . . ." *Id.* at 4:1-8 (emphasis added). Drager further discloses that "formulations of the present invention may further comprise other pharmaceutically acceptable excipients[, including] . . . hydrophilic polymers (*e.g.*, ***polyethylene glycols (PEG 300, PEG 400)***) . . . ." *Id.* at 7:27-8:2 (emphasis added)

98.     Indeed, Drager specifically claims bendamustine formulations comprising polyalkylene glycols, such as PEG. *See* Drager at 14:11-12, claim 5; *see also id.* at 18:18-19, claim 54; *id.* at 19:14-15, claim 61. Drager only provides three specific examples of polyalkylene glycols: PEG, polypropylene glycol, and polybutylene glycol. *Id.* at 4:4-8. Thus, in effect, a POSA would have envisaged that Drager specifically points out a solution comprising bendamustine and PEG.

99.     This is particularly the case for Drager's disclosure of PEG as a "hydrophilic polymer" in the claimed pharmaceutical formulation. *See, e.g.*, Drager at 17:5-7, claim 38("The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, **a hydrophilic polymer**, a complexing agent, a preservative, or a combination thereof.") (emphasis added); '006 Patent at Claim 5.  Notably, Drager identifies PEG as the *only* example of a hydrophilic polymer.

100.    Drager also discloses formulations that do not require any certain amount of aprotic solvent: "[a]lternatively, formulations of the present invention will comprise 10 moles per liter, or less, of the nonaqueous polar protic solvent. Preferably, formulations of the present invention will comprise between about 4 moles per liter to about 9.5 moles per liter, of the nonaqueous polar protic solvent." *Id.* at 4:16-19. Several PEGs of less than 1000 g/mol are typically liquids at room temperature and are suitable as nonaqueous polar protic solvents in the production of liquid

45

formulations, especially as they are generally regarded as nontoxic and nonirritant materials. Rowe 2009 at 521. In addition, a POSA would know that several liquid PEGs had been used as excipients in FDA-approved injectable products as of at least December 2009, namely PEG 200, PEG 300, PEG 400 and PEG 600, and hence would be preferable solvents in a formulation intended for regulatory approval. All of these PEGs have densities and molecular weights such that a solution of the PEG, without additional solvents, can produce a solution of 10 moles per liter or less. In the table below, I have calculated moles per liter of several liquid PEG based on USP specifications. *See* 2009 USP Monograph for Polyethylene Glycol at 1308-1309; Rowe 2009 at 518-519.

| PEG | Molecular weight (USP: 95.0%-105.0%) | Density (20˚C) grams/Liter | Moles per Liter |
|---|---|---|---|
| PEG 200 | 190. to 210.0 g/mol | 1124 | 5.92 to 5.35 |
| PEG 300 | 285 to 315.0 g/mol | 1125 | 3.94 to 3.57 |
| PEG 400 | 380. to 420.0 g/mol | 1125 | 2.96 to 2.68 |
| PEG 600 | 570. to 630.0 g/mol | 1125 | 1.97 to 1.79 |

101.    Thus, Drager discloses that formulations comprising PEG 200, PEG 300, PEG 400, and PEG 600 as a nonaqueous polar protic solvent would all be suitable formulations, without the need of any certain amount of an apolar solvent, since the PEG alone can meet the embodiment's limitation of "less than 10 moles per liter, or less." Furthermore, a POSA would find it immediately apparent that if no certain nor minimum amount of apolar solvent is required, and "undesirable polar protic solvent-bendamustine adducts…will not form during typical commercial storage if the concentration of the polar protic solvent is kept within [this range]," then a formulation with an acceptable liquid PEG (*i.e.*, PEG 200, 300, 400 or 600) and no apolar solvent would have a reasonable likelihood of producing stable formulations of bendamustine.

102.    Drager also discloses the inclusion of PEG in its liquid bendamustine formulations as a hydrophilic polymer.  *See* Drager at 17:5-7, claim 38 ("The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, **a hydrophilic polymer**, a complexing agent, a preservative, or a combination thereof.") (emphasis added). As discussed above, the only example of a hydrophilic polymer identified in Drager is PEG. *Id.* at 7:27-8:2.

103.    Thus, in effect, Drager discloses liquid bendamustine formulations that are stable under the commercial storage conditions comprising, *inter alia*, bendamustine and PEG.

### 3.  Drager discloses antioxidants as an excipient that reduced oxidation and thereby increases stability of bendamustine liquid formulations

104.    Drager also discloses the inclusion of antioxidants in its liquid bendamustine formulations. *See* Drager at 7:26-32 ("In addition to comprising a polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a nonaqueous polar protic solvent, or mixture of solvents, formulations of the present invention may further comprise other pharmaceutically acceptable excipients. Pharmaceutically acceptable excipients are known in the art and include, for example, **antioxidants** (*e.g.*, tocopherol (Vitamin E), ascorbic acid, methylparaben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate) . . . .") (emphasis added). Indeed, bendamustine formulations comprising antioxidants were also included in the claims of Drager. *Id.* at 15:11-12, claim 18 ("The formulation of claim 1, further comprising a pharmaceutically acceptable **antioxidant**."); *see also id.* at 17:5-7, claim 38("The formulation of any one of claims 1 and 4, further comprising **an antioxidant**, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.") (emphasis added).

105.    Drager also discloses specific examples of liquid bendamustine formulations comprising an antioxidant. *See* Drager at 9:10-12 (disclosing bendamustine solutions comprising 25 mg/mL niacinamide). As discussed *supra*, a POSA would recognize niacinamide as an antioxidant. *See supra*, ¶ 77.  In addition, Drager teaches that addition of the antioxidant improved stability over a formulation without the antioxidant. For example, Drager teaches that a bendamustine formulation in DMA without an antioxidant had about 6% impurities after about 12 months, and would be expected to have about 7% impurities (93% purity) after 15 months. However, after the addition of niacinamide, an antioxidant, the formulation had about 3% impurities after 12 months, and it would be apparent that the antioxidant-containing formulation would have <5% impurities after 15 months.



*left*, Drager at 21, Fig. 2, with modeled data annotated in blue (DMA) and orange (DMA + 25 mg/mL niacinamide); *right*, Fig. 1 bendamustine stability data modeled using zero-order regression models, showing ca. 96.6% purity with an antioxidant at 15 mo. and ca. 93.1% purity without an antioxidant.

### 4.   Drager discloses bendamustine liquid formulations that are stable over typical commercial storage periods, including 15 months

106.    Finally, Drager teaches that the formulations are commercially viable and do not form adducts "over the course of typical commercial storage conditions."  Drager at 3:25-28.

107.    Drager also defines the typical commercial storage conditions as "includ[ing] time periods of, for example, about 30 days, about 90 days, about 180 days, and about 365 days (about 1 month, about 3 months, about 6 months, and about 1 year)."  *Id.* at 3:28-30.  Drager defines about "[a]s used herein, the term 'about' is defined as ± 10%, preferably ± 5%."  *Id.* at 7:25.

108.    Drager further describes the typical commercial storage conditions as including "temperatures of about 23°C (ambient room temperature) and refrigerated temperatures below ambient room temperature, for example, about 5 °C" for a period of up to 1 year. *Id.* at 3:28-32.

109.    Drager teaches the disclosed formulations "are stable over the course of a typical commercial storage period." *Id.* at 4:27-28. Drager further describes the term "stable" as follows:

> Liquid formulations of the present invention are stable over the course of a typical commercial storage period. As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions. Preferably, formulations of the present inventions will have no more than about a 10% loss of bendamustine, more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions.

'Drager at 4:28-32.

110.    Drager discloses the degradation potential known for bendamustine to "convert to non-bendamustine products [] upon exposure to certain nucelophiles, for example, water and alkyene [sic] glycols such as propylene glycol."  *Id.* at 5:1-2.  Drager further discloses "preferred embodiments of the present invention" with analysis of multiple formulations and their degradants "after about 1 year (about 365 days) at about 5°C.  *See, e.g.*, *id.* at 5:14-6:24.

111.     Drager discloses "[p]referably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5ºC and time period of about 30 days (about 1 month) to about 365 days (about 1 year)." *Id.* at 7:7-10.

112.     Drager also discloses the stability data for specific exemplary liquid bendamustine formulations. In particular, Drager discloses that liquid bendamustine formulations comprising 34% propylene glycol, stored at 5°C have a purity of approximately 98.8% at 200 days. *See* Drager, at 21, Fig. 2. A POSA would be familiar with "typical commercial storage conditions" as representing time frames up to about 12 months to 18 months, even 24 months and would be readily familiar with the methods to predict the stability of these formulations at time points later than 365 days, *i.e.*, time points beyond the time points for which the measured stability data is provided, using regression models, and thus extrapolation could be used to predict the commercial shelf life. *See* FDA Guidance at 7; *see also* Carstensen 1976 at 311, Remington 2000 Chapter 52 at 991 ("This concept further assumes that the degradation reactions follows zero- or pseudo-zero-order kinetics…this is an excellent assumption…shelf life calculations assuming zero-order kinetics are more conservative than those for higher orders."). Fitting of these data to a zero-order regression model and predicting stability to 15 months, shows that about 97.6% of the bendamustine would remain intact.



*left,* bendamustine stability data from Drager, fitted to a zero-order regression model, and stability predicted to 15 months;[7] *right,* Drager at 21, Fig. 2, with modeled formulation's (66%DMA/34%PG) stability data annotated in green.

113.    Drager also discloses stability data for specific exemplary liquid bendamustine formulations at 25°C. In particular, Drager discloses that liquid bendamustine formulations comprising DMSO, stored at 25°C have a purity of approximately 96.3% at 12 months. *Id.* at 20, Fig. 1. Fitting of these data to a zero-order regression model and predicting stability to 15 months, shows that about 95.6% of the bendamustine would remain intact.



---

[7] Stability data were fit to zero-order degradation models since these typically predict drug stability well and are conservative.  Remington 2000 at 991.  The specification did not state any given purity for the starting material, and even pharmaceutical grade materials are not 100% pure, thus the kinetic models were not forced to 100% purity at time zero (0 months storage).

*left,* bendamustine stability data from Drager, fitted to a zero-order regression model, and stability predicted to 15 months; *right,* Drager at 20, Fig. 1, with the modeled formulation's (DMSO) stability data annotated in green.

### 5.   Drager discloses specific bendamustine liquid formulations that include each of the limitations of the '483 patent

114.    The claims of Drager embody the specific aspects of the disclosure as provided herein.  In particular, claims 19-27, 31-33, 37-38, 56 and 60 of Drager disclose the concentration of bendamustine, the use of a non-aqueous protic solvent, the use of an antioxidant, and the use of a hydrophilic polymer, all of which result in a stable liquid formulation for bendamustine as addressed *infra*.  *See generally* Drager, at 15-19.   Claim 38, for example, which depends from either of claims 1 and 4 and thereby includes all the imitations of claim 1 and 4, respectively, additionally specifies the use of an antioxidant, which as discussed herein was known by the POSA to account for stability of the liquid formulation. *See id.* at 17:5-7, claim 38.

115.    Specifically, Drager recites:

What is Claimed:

1. A liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent.

…

4.  The formulation of claim 1, further comprising a non-aqueous polar protic solvent.

…

19. The formulation of claim 1, comprising about 5 mg/ml to about 200 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

20.  The formulation of claim 1, comprising about 5 mg/ml to about 120 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

21.  The formulation of claim 1, comprising about 5 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

22.  The formulation of claim 1, comprising about 40 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

23.  The formulation of claim 1, comprising about 60 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

24.  The formulation of claim 1, comprising about 80 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

25.  The formulation of claim 1, comprising about 100 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

26.  The formulation of claim 1, comprising about 200 mg/ml of bendamustine, or the pharmaceutically acceptable salt thereof.

27.  The formulation of claim 1, wherein the formulation is stable at about 5 °C for about 30 days to about 365 days.

…

31.  The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions.

32.  The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions.

33.  The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for about 30 days to about 365 days.

…

37.  The formulation of any one of claims 1 and 4, further comprising at least one pharmaceutically acceptable excipient.

38.  The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

…

56.  A method of treating cancer comprising

identifying a patient in need of treatment of cancer;

> providing a liquid pharmaceutical formulation comprising a therapeutically effective amount of bendamustine, or a pharmaceutically acceptable salt thereof, and nonaqueous solvent;
>
> diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent to form a pharmaceutical preparation;
>
> administering the pharmaceutical preparation to the patient in need of treatment.
>
> …
>
> 60.  The method of claim 56, wherein the liquid pharmaceutical formulation further comprising a non-aqueous polar protic solvent.

Drager, at 14-19.

116.    Other similar claims are disclosed in the related applications and patents of Drager, such as the '006 Patent. For example, claims 1-5 of the '006 Patent disclose similar stable liquid bendamustine compositions comprising a specific concentration of bendamustine, the use of a non-aqueous protic solvent, the use of an antioxidant, the use of a hydrophilic polymer, all of which result in a stable liquid formulation for bendamustine as addressed *infra*. *See generally* '006 Patent, at 11:5-12:5, claims 1-5.  Claim 5, for example, which depends from claim 1 and thereby includes all the limitations of claim 1.

117.    Specifically, the '006 Patent claims:

> What is claimed is:
>
> 1. A stable, non-aqueous liquid, pharmaceutical formulation comprising from about 5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, wherein said formulation, following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization.
>
> 2. The formulation of claim 1, comprising about 100 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof.

3. The formulation of claim 1, wherein the bendamustine is bendamustine hydrochloride.

4. The formulation of claim 1, further comprising at least one pharmaceutically acceptable excipient or diluent.

5. The formulation of claim 1, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

'006 Patent, at 11:5-12:5.


## IX. INVALIDITY OF THE '483 PATENT

### A.   CLAIMS 1-9 AND 11-16 OF THE '483 PATENT ARE ANTICIPATED BY DRAGER

#### 1.  Claim 1 of the '483 Patent is Anticipated by Drager

118.    Claim 1 of the '483 patent recites a ready to use liquid formulation comprising about 10 mg/mL to about 100 mg/mL bendamustine, PEG, and a stabilizing amount of an antioxidant, wherein the composition has less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C. *See* '483 Patent at 13:22-34, claim 1.

119.    I have also been informed by the counsel that the transitional phrase "comprising" in the claims of the patent indicates that the claimed composition allows for the presence of additional excipients in the scope of the claims. Thus, the compositions covered by claim 1 of the '483 patent may include excipients in addition to those explicitly recited in claim 1 of the '483 patent.

120.    In my opinion, the formulations of claim 1 of the '483 patent are anticipated by Drager. In particular, as discussed in detail below, it is my opinion that all the elements recited in claim 1 of the '483 patent are disclosed either expressly or inherently by Drager.

55

121.    In particular, Drager discloses each of the: the "ready to use" liquid formulation limitation; the 10 mg/mL to 100 mg/mL bendamustine limitation; the polyethylene glycol limitation; the stabilizing antioxidant limitation; and the stability limitation; by way of the disclosure contained in Drager, including the recitation of its claims which particularly point out to the POSA the aspects of the invention regarded as of particular interest and by way of the supporting specification.

122.    For example, Drager (and the related '006 Patent) claim compositions that teach and disclose each and every limitation of Claim 1 of the '483 patent. The table highlights exemplary claims (which are re-written in independent form for sake of clarity:

| Claim 1 of the '483 Patent | Drager, Claim 38 | '006 Patent, Claim 5 |
|---|---|---|
| 1. A ready to use liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL; *polyethylene glycol*; and a stabilizing amount of an antioxidant; the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 | 38.  [A liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent, further comprising a non-aqueous polar protic solvent], further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof. | 5.  [A stable, non-aqueous liquid, pharmaceutical formulation comprising from about 5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, wherein said formulation, following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization], further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof. |

| months at a temperature of from about 5° C. to about 25° C. | | |
|---|---|---|

123.   As described in more detail below, Drager describes how these claims contain each limitation of Claim 1 of the '483 patent.

124.   First, Drager discloses "ready to use" liquid formulations comprising bendamustine.  In the "Summary of the Invention" section, Drager disclosed that the "[t]he present invention is directed to liquid pharmaceutical formulations comprising bendamustine . . . ." Drager at 2:18-20. Drager further discloses:

> The liquid formulations of bendamustine described herein are intended to be administered *via* injection, for example, they may be administered subcutaneously, intracutaneously, intravenously, intramuscularly, intra-articularly, intrasynovially, intrasternally, intrathecally, intralesionally, intracranially or via infusion. In a typical preparation, the volume of the liquid formulation of the present invention needed for the required dose can be aseptically withdrawn and transferred to an infusion bag of 0.9% Sodium Chloride (or other pharmaceutically acceptable intravenous solution) for injection. After transfer, the contents of the infusion bag are thoroughly mixed. Administration by intravenous infusion is typically provided over a time period of from about 30 to about 60 minutes. Previously described lyophilized formulations of bendamustine required reconstitution of the lyophilized bendamustine prior to mixture with the acceptable intravenous solution before infusion.

*Id.* at 8:18-29.

125.   As is evident from the above, Drager distinguished his invention from the lyophilized bendamustine formulations taught in the prior art. Thus, a POSA would have known that Drager discloses "ready to use" liquid bendamustine formulations. Indeed, specific Examples taught in Drager teach multiple "ready to use" liquid formulations comprising bendamustine. *Id.* at 10, Table II.

126.     Second, Drager discloses liquid formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine. Regarding the concentration of bendamustine in the disclosed liquid formulations, Drager discloses:

> Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL. Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about 5 mg/mL to about 120 mg/mL. Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof. As used herein, the term "about" is defined as ± 10%, preferably ± 5%.

*Id.* at 7:14-25.

127.     Thus, Drager taught liquid bendamustine solutions comprising about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL bendamustine, *i.e.*, the concentrations encompassed by "about 10 mg/mL to about 100 mg/mL," recited in claim 1 of the '483 patent.

128.     Third, Drager discloses liquid bendamustine compositions comprising PEG.

> It has also been discovered that **stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent** or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable **nonaqueous polar protic solvents** are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as **<u>polyethylene glycol</u>**, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

58

*Id.* at 4:1-8 (emphasis added). Drager specifically claims bendamustine formulations comprising polyalkylene glycols. *See id.* at 14:11-12, claim 5; *see also id.* at 18:18-19, claim 54; *id.* at 19:14-15, claim 61. Drager only provides three specific examples of polyalkylene glycols: PEG (*i.e.*, polyethylene glycol), polypropylene glycol, and polybutylene glycol. *Id.* at 4:4-8. Thus, in effect, a POSA would have envisaged that Drager specifically points out a solution comprising bendamustine and PEG.

129.    Drager also discloses that PEG is used in its bendamustine formulations as a hydrophilic polymer. For example, Drager states "formulations of the present invention may further comprise other pharmaceutically acceptable excipients [,including] . . . hydrophilic polymers (e.g., ***polyethylene glycols (PEG 300, PEG 400*)** . . .." *Id.* at 7:27-8:2 (emphasis added).

130.    Thus, a POSA would have known that Drager explicitly taught liquid bendamustine compositions comprising PEG, either as a non-aqueous polar protic solvent or as a hydrophilic polymer.

131.    Fourth, Drager discloses the use of an antioxidant in the liquid bendamustine formulations. *See* Drager at 7:29-31 ("Pharmaceutically acceptable excipients are known in the art and include, for example, **antioxidants** (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate). . . .") (emphasis added). Drager further explicitly included the formulations comprising antioxidants in the claims. Drager at 15:11-12, claim 18 ("The formulation of claim 1, further comprising a **pharmaceutically acceptable antioxidant**."); *see also id.* at 17:5-7, claim 38 ("The formulation of any one of claims 1 and 4, further comprising **an antioxidant**, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.") (emphasis added).

59

132.     Indeed, Drager discloses examples of liquid bendamustine formulations comprising antioxidants. In particular, Drager discloses liquid bendamustine formulations comprising 25 mg/mL niacinamide. *Id.* at 9:10-11. As discussed above, a POSA would have known that niacinamide is an antioxidant. *See supra*, ¶ 77. Thus, in effect, a POSA would have known that Drager discloses specific examples of liquid bendamustine formulations comprising an antioxidant.

133.     In addition, as discussed above, based on the data provided in Drager, a POSA would have known that bendamustine formulations comprising an antioxidant are more stable as compared to formulations lacking an antioxidant. For example, Drager taught that a bendamustine formulation in DMA without an antioxidant had about 6% impurities after about 12 months. However, after the addition of niacinamide, a known antioxidant, the formulation had about 3% impurities after 12 months. *See supra*, ¶ 105. Thus, a POSA would have known that antioxidants improve stability of bendamustine liquid compositions.

134.     Moreover, these liquid bendamustine formulations comprising an antioxidant are stable under the conditions of commercial storage. *See* Drager at 21, Fig. 2, *see also supra*, ¶ 109. Because the liquid bendamustine formulation comprising niacinamide has good commercial stability, a POSA would know that this formulation includes a stabilizing amount of an antioxidant.

135.     The last remaining claim limitation of claim 1 of the '483 patent, the stability profile requiring that "the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃. to about 25℃.," is an inherent property of an otherwise anticipated liquid bendamustine formulation. In essence, this limitation recites that the claimed composition has more than 95% purity when determined by HPLC as a

60

wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃. As discussed below, this limitation is an inherent property of the formulations disclosed by Drager.

136.   I have been informed by counsel that recitation of an inherent property of a previously disclosed composition does not make the previously known composition patentable. Here, as discussed in below, the formulations disclosed in Drager would have less than 5% degradation as determined by HPLC at[8] a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃.

137.   As an initial matter, a POSA would readily understand that Drager is directed to "stable" liquid formulations of bendamustine. Drager at Abstract, 3:5-7; 4:1-3; 4:27-32; '006 Patent at Claims 1-10. Indeed, the specification of the '483 patent discloses that the formulations disclosed in Drager, *i.e.*, formulations comprising bendamustine, PEG, and a stabilizing amount of an antioxidant have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃. *See* '483 Patent at 4:36-40 ("Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR [peak area response] as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5℃ to about 25℃."); *see also id.* at 6:48-7:28 (Table 1); *id.* at 8:10-43 (Example 3, Table 3).

138.   Because the stability profile recited in claim 1 of the '483 patent is an inherent property of the liquid bendamustine formulation otherwise disclosed in Drager, it is my opinion that the mere recitation of the stability profile will not make a previously disclosed formulation

---

[8] I understand that the '483 patent says "as," not "at," but this appears to be a typographical error.

patentable. Moreover, the technique used to measure the impurity of formulations disclosed in Drager, *i.e.*, measuring impurities using HPLC with a 223 nm wavelength for detection, does not add anything patentable to formulation recited in claim 1 of the '483 patent. Indeed, these are routine and typical methods for measuring stability of formulations. *See supra*, ¶¶ 78-79. Thus, this limitation reciting the stability profile of liquid bendamustine formulations does not add anything patentable to the remainder of claim 1 of the '483 patent.

139.     Moreover, as discussed below, it is also my opinion that based on the data provided in Drager, a POSA would have understood that a liquid bendamustine formulation comprising bendamustine, PEG, and a stabilizing amount of an antioxidant, would have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃.

140.     As an initial matter, the measurement technique used to measure the amount of impurities in the liquid bendamustine compositions disclosed in Drager, by itself, does not add anything patentable to claim 1 of the '483 patent. In any event, Drager teaches the use of HPLC to measure impurities of liquid bendamustine formulations. *See* Drager at 6:25-26 ("Analysis of the liquid formulations of the present invention can be performed using techniques known in the art, including, for example, HPLC, gas chromatography, and NMR."); *see also id.* at 5:14-6:31 (disclosing the use of HPLC analysis to measure impurities in the liquid bendamustine formulations). I note that Drager does not provide the wavelength that was used to measure impurities. Nonetheless, it is my opinion that the particular wavelength used to measure degradative impurities in the liquid bendamustine formulations taught by Drager would not have a significant impact on the measured amount of impurities. Regardless, the choice and optimization

of wavelengths for detection of impurities was routine, and adds nothing to the invention. *See supra*, ¶¶ 78-79.

141. Drager teaches that the liquid bendamustine formulations are stable under the conditions for commercial storage. *See* Drager at 3:25-34. Indeed, regarding the stability of liquid bendamustine formulations, Drager discloses:

> Liquid formulations of the present invention are stable over the course of a typical commercial storage period. As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions. Preferably, formulations of the present inventions will have no more than about a 10% loss of bendamustine, more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions.

*Id.* at 4:27-32.

> Preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month) to about 365 days (about 1 year). More preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month), about 90 days (about 3 months), and about 180 days (about 6 months).

*Id.* at 7:7-13.

142. Thus, a POSA would have known that Drager teaches liquid bendamustine formulations that are stable under commercial storage conditions. In other words, a POSA would have known that the liquid bendamustine formulations disclosed in Drager would be stable at 5°C for up to 1 year (12 months).

143. Drager also discloses the stability data for specific exemplary liquid bendamustine formulations. In particular, Drager discloses that liquid bendamustine formulations comprising 34% propylene glycol, stored at 5°C have a purity of approximately 98.8% at 200 days. *See* Drager

at 21, Fig. 2. A POSA would know that this stability data indicates that based on this data, the stability of liquid bendamustine compositions comprising 34% propylene glycol at 15 months would be greater than 97%. As discussed above, the prediction of impurities at time points beyond those measured was routine and accepted in the art. *See supra*, ¶ 80-81. In other words, liquid bendamustine formulations comprising 34% propylene glycol would have less than 5% impurities when stored under commercial storage conditions for 15 months.

144.   As discussed above, a POSA would have known that the rate of degradation of bendamustine goes up with increasing amount of –OH groups in the solvents. *See supra*, ¶ 87. A POSA would also have known that the amount of –OH groups present in a given volume of PEG would be lower than the number of hydroxyl groups in the same volume of propylene glycol. *See supra*, ¶ 87. Thus, a POSA would have known that liquid bendamustine formulations comprising PEG would have lower degradation as compared to liquid bendamustine compositions comprising PG. Since the liquid bendamustine solutions comprising PG have lower than 5% impurities when stored at 5°C for 15 months, a POSA would have known that liquid bendamustine formulations comprising PEG, which possesses a lower number of –OH groups per unit volume, would also have less than 5% impurities when stored at 5°C for 15 months.

145.   Because the liquid bendamustine formulations taught in Drager would have less than 5% impurities under commercial storage conditions, a POSA would also have known that these formulations would have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C to about 25°C.

146.   Accordingly, at least for the reasons discussed above, the limitation requiring less than about 5% peak area response to total impurities resulting from the degradation of the

bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C to about 25°C does not add anything patentable to remainder of claim 1 of the '483 patent.

147.    Thus, for all the reasons discussed above, it is my opinion that independent claim 1 of the '483 patent would be anticipated by Drager.

### 2.    Claim 2 of the '483 Patent is Anticipated by Drager

148.    Claim 2 of the '483 patent depends from claim 1 and further recites that the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof. Drager specifically discloses using antioxidants, such as propyl gallate, for liquid bendamustine formulations. *See* Drager at 7:26-31 ("Pharmaceutically acceptable excipients are known in the art and include, for example, antioxidants (*e.g.*, tocopherol (Vitamin E), ascorbic acid, methylparaben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and **propyl gallate**) . . . .") (emphasis added). In addition, tocopherol, butylhydroxyanisole and butylhydroxytolune are phenol-containing aliphatic compounds, which are covered by claim 2 of the '483 patent. Thus, the limitations recited in claim 2 of the '483 patent are explicitly disclosed by Drager.

149.    For the reasons set forth above, the additional limitation recited in claim 2 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, it is my opinion that dependent claim 2 of the '483 patent is also anticipated over Drager.

### 3.  Claim 3 of the '483 Patent is Anticipated by Drager

150.   Claim 3 of the '483 patent depends from independent claim 1 and further recites that liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 5°C. The additional limitation recited in claim 3 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 3 of the '483 patent is that claim 1 of the '483 patent recited that the composition is stable at "a temperature of from about 5°C to about 25°C" and claim 3 of the '483 patent recited that the composition is stable at "at a temperature of about 5°C."

151.   Thus, claim 3 of the '483 patent is anticipated by Drager for the same reasons as those discussed above in the anticipation analysis of claim 1 above. Accordingly, it is my opinion that dependent claim 3 of the '483 patent is also anticipated by Drager.

### 4.  Claim 4 of the '483 Patent is Anticipated by Drager

152.   Claim 4 of the '483 patent depends from independent claim 1 and further recites that liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C. The additional limitation recited in claim 4 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 4 of the '483 patent is that in claim 1 of the '483 patent it recited that the composition is stable at "a temperature of from about 5°C to about 25°C" and claim 4 of the '483 patent recited that the composition is stable at "at a temperature of about 25°C."

66

153. The specification of the '483 patent discloses that a solution comprising bendamustine, PG, and an antioxidant, *i.e.*, a formulation disclosed in Drager, has a "shelf life of at least about 15 months at 5℃ and 25℃." '483 patent at 8:10-46 (Example 3, Table 3). In other words, the data provided in the specification of the '483 patent demonstrates that the formulation disclosed in Drager would have the stability profile recited in claim 4 of the '483 patent.

154. Accordingly, it is my opinion that dependent claim 4 of the '483 patent is also anticipated by Drager.

### 5. Claim 5 of the '483 Patent is Anticipated by Drager

155. Claim 5 of the '483 patent depends from claim 1 and further requires that bendamustine concentration is from about 20 mg/mL to about 60 mg/mL. Drager discloses liquid bendamustine formulations comprising, among others, "about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL" bendamustine. Drager at 7:17-20. Thus, Drager discloses liquid bendamustine formulations comprising bendamustine concentrations encompassed by the range recited in dependent claim 5 of the '483 patent.

156. Thus, the additional limitation recited in claim 5 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in the anticipation analysis of claim 1 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 5 of the '483 patent is also anticipated over Drager.

### 6. Claim 6 of the '483 Patent is Anticipated by Drager

157. Claim 6 of the '483 patent depends from claim 1 and further requires that bendamustine concentration is about 25 mg/mL. Drager discloses liquid bendamustine formulations comprising "about 5 mg/mL to about 200 mg/mL" (Drager at 7:16), "about 5 mg/mL

67

to about 120 mg/mL" (*id.* at 7:18) and goes on to list specific recitations of concentrations that traverse the recited ranges, *e.g.*, "about 5 mg/mL, about 10/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof." *Id.* at 7:18-21. The POSA would understand Drager's disclosure to include all specific concentrations within the recited ranges as also included in the disclosure due to the reference to the initial broader, but still limited, range (5-200) and an internal tighter range (5-120) along with the explicit recitation of numerous concentrations that run within the entire range, and applying the definition of "about" as including ± 10%. Thus, a POSA would understand that Drager;s disclosure would operate no differently across the disclosed range, and there would be no meaningful difference in its operation at any particular concentration within the disclosed range. In particular, these recitations would be considered by the POSA to include 25 mg/mL as claimed in claim 6. Thus, Drager discloses liquid bendamustine formulations comprising bendamustine concentration recited in dependent claim 6 of the '483 patent.

158.    Thus, the additional limitation recited in claim 6 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in the anticipation analysis of claim 1 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 5 of the '483 patent is also anticipated over Drager.

### 7. Claim 7 of the '483 Patent is Anticipated by Drager

159.    Claim 7 of the '483 patent depends from independent claim 1 and further requires that the composition comprises bendamustine hydrochloride. Drager discloses bendamustine hydrochloride. *See generally* Drager at 9; *see also id.* at 3:14-16 ("It has been determined that pharmaceutically acceptable liquid formulations of bendamustine, and the pharmaceutically

acceptable salts thereof, in particular the **hydrochloride salt** . . . .”). Thus, the additional limitation

recited in dependent claim 7 of the ’483 patent is disclosed in Drager.

160.    Thus, the additional limitation recited in claim 7 of the ’483 patent does not add

anything patentable to claim 1 of the ’483 patent. Accordingly, for the reasons discussed above in

the anticipation analysis of claim 1 of the ’483 patent and the additional reasons discussed herein,

it is my opinion that dependent claim 7 of the ’483 patent is also anticipated by Drager.

### 8.    Claim 8 of the ’483 Patent is Anticipated by Drager

161.    Claim 8 of the ’483 patent is directed to a method of treating cancer in a mammal

by administering an effective amount of the ready to use formulation recited in claim 1 of the ’483

patent. Drager discloses the use of a therapeutically effective amount of a bendamustine

composition for the treatment of cancer.

> Also within the scope of the invention are methods of treating diseases, such as,
> for example, chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's
> lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical
> formulation of the present invention. These methods comprise administering to
> the patient a therapeutically effective amount of a preparation prepared from a
> pharmaceutical formulation of the present invention.

Drager at 8:4-8; *see also id.* at 18:22-26, claim 56.

162.    Thus, the additional limitation recited in claim 8 of the ’483 patent is disclosed in

Drager.

163.    Thus, the additional limitation recited in claim 8 of the ’483 patent does not add

anything patentable to claim 1 of the ’483 patent. Accordingly, for the reasons discussed above in

the inherent anticipation analysis of claim 1 of the ’483 patent and the additional reasons discussed

herein, it is my opinion that dependent claim 8 of the ’483 patent is also anticipated by Drager.

### 9.   Claim 9 of the '483 Patent is Anticipated by Drager

164.    Claim 9 of the '483 patent depends from claim 8 and further requires that the cancer is leukemia. Here, a POSA would have known that Drager teaches the use of liquid bendamustine formulations for the treatment of leukemia. Drager at 8:4-7 ("Also within the scope of the invention are methods of treating diseases, such as, for example, **chronic lymphocytic leukemia,** Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention.") (emphasis added). Thus, the additional limitations recited in claim 9 of the '483 patent are taught by Drager.

165.    Thus, the additional limitations recited in claim 9 of the '483 patent does not add anything patentable to claim 8 of the '483 patent. Accordingly, for the reasons discussed above in the anticipation analysis of claim 8 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 9 of the '483 patent is also anticipated by Drager.

### 10. Claims 11-16 of the '483 Patent Are Anticipated by Drager

166.    Claims 11, 12, 13, 14, 15 and 16 of the '483 patent depend from claim 8, and the additional limitations recited in claim 11, 12, 13, 14, 15 and 16 of the '483 patent are identical to the additional limitations recited in claims 2, 3, 4, 5, 6 and 7 respectively. Thus, claims 11-16 of the '483 patent are anticipated by Drager for same reasons as those discussed above in the analyses of claim 8 and claims 2-7 of the '483 patent.

### B.    CLAIMS 1-9 AND 11-16 OF THE '483 PATENT ARE OBVIOUS OVER DRAGER

### 1.   Claim 1 of the '483 Patent is Obvious Over Drager

167.    Claim 1 of the '483 patent recites a ready to use liquid formulation comprising about 10 mg/mL to about 100 mg/mL bendamustine, polyethylene glycol, and a stabilizing amount

of an antioxidant, wherein the composition has less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃.

168.    As discussed in detail above in the anticipation analysis of claim 1, it is my opinion that Drager discloses a formulation comprising bendamustine, PEG, and a stabilizing amount of an antioxidant. To the extent any limitation of claim 1 of the '483 patent is not found to be disclosed in Drager, which I do not believe is the case, it is also my opinion that after reviewing Drager, a POSA would have been motivated to prepare liquid bendamustine formulations recited in claim 1 of the '483 patent with a reasonable expectation of success. Thus, independent claim 1 of the '483 patent is obvious over Drager.

169.    First, prior art taught that the previously known lyophilized formulations of bendamustine required reconstitution prior to administration.

> In light of its instability in aqueous solution, **bendamustine is currently supplied as a lyophilized powder for injection**. Just prior to its infusion, the medical practitioner reconstitutes the powder with Sterile Water for Injection. Reconstitution should yield a clear, colorless to pale yellow solution and the powder should completely dissolve in about 5 minutes. If particulate matter is observed, the reconstituted product should not be used and should be discarded. The reconstituted product is then transferred to a 0.9% Sodium Chloride Injection infusion bag within 30 minutes of reconstitution. This admixture should be a clear and colorless to slightly yellow solution. If the admixture comprises particulate matter or is discolored, it should be discarded and a fresh sample prepared.
>
> **The reconstitution of the bendamustine lyophilized powder is time consuming and cumbersome**. Moreover, lyophilization of solids on a commercial scale requires specialized equipment and incurs significant expense. As such, formulations of bendamustine that do not require lyophilization and/or reconstitution are needed.

Drager at 1:22-2:9 (emphasis added).

170.    Because Drager specifically taught that reconstitution of lyophilized bendamustine compositions is cumbersome, a POSA would have been motivated to develop liquid formulations of bendamustine. Furthermore, Drager clearly states that a POSA would be motivated to develop liquid formulations, "[a]s such, formulations of bendamustine that do not require lyophilization and/or reconstitution are needed." *Id.* at 2:8-9.

171.    Indeed, Drager discloses "ready to use" liquid formulations comprising bendamustine. In the "Summary of the Invention" section, Drager disclosed that the "[t]he present invention is directed to liquid pharmaceutical formulations comprising bendamustine . . . ." Drager at 2:18-20. Drager further disclosed:

> **The liquid formulations of bendamustine described herein are intended to be administered *via* injection**, for example, they may be administered subcutaneously, intracutaneously, **intravenously**, intramuscularly, intra-articularly, intrasynovially, intrasternally, intrathecally, intralesionally, intracranially or via infusion. In a typical preparation, the volume of the liquid formulation of the present invention needed for the required dose can be aseptically withdrawn and transferred to an infusion bag of 0.9% Sodium Chloride (or other pharmaceutically acceptable intravenous solution) for injection. After transfer, the contents of the infusion bag are thoroughly mixed. Administration by intravenous infusion is typically provided over a time period of from about 30 to about 60 minutes. **Previously described lyophilized formulations of bendamustine required reconstitution of the lyophilized bendamustine prior to mixture with the acceptable intravenous solution before infusion**.

Drager at 8:18-29 (emphasis added).

172.    Moreover, specific Examples taught in Drager teach multiple "ready to use" liquid formulations comprising bendamustine. *Id.* at 10, Table II.

173.    Second, Drager discloses liquid formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine. Regarding the concentration of bendamustine in the disclosed liquid formulations, Drager discloses:

> Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL. Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about 5 mg/mL to about 120 mg/mL. Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof. As used herein, the term "about" is defined as ± 10%, preferably ± 5%.

Drager at 7:14-25.

174.   Thus, POSA would have known that Drager taught liquid bendamustine solutions comprising about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL bendamustine, *i.e.*, the concentrations encompassed by "about 10 mg/mL to about 100 mg/mL," recited in claim 1 of the '483 patent.

175.   Third, Drager discloses liquid bendamustine compositions comprising PEG.

> It has also been discovered that **stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent** or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable **nonaqueous polar protic solvents** are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-β-cyclodextrin), polyalkylene glycols, such as **<u>polyethylene glycol</u>**, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

Drager at 4:1-8 (emphasis added).

176.   Thus, a POSA would have known that Drager explicitly taught liquid bendamustine compositions comprising PEG. Drager provides a very concise list of nonaqueous polar protic solvents, but the POSA would immediately understand that a smaller subset of nonaqueous polar

protic solvents would be even more preferable. For example, as discussed above, polyethylene glycol was known to be widely used and they are regarded as nontoxic and nonirritant materials.

177.    Indeed, Drager specifically claims bendamustine formulations comprising polyalkylene glycols. *See* Drager at claim 5, 14:11-12; *see also id.* at claim 54, 18:18-19; *id.* at claim 61, 19:14-15. Drager only provides three specific examples of polyalkylene glycols: PEG (*i.e.*, polyethylene glycol), polypropylene glycol, and polybutylene glycol. *Id.* at 4:4-8. Thus, in effect, a POSA would have understood that Drager specifically points out a solution comprising bendamustine and PEG.

178.    Drager further discloses that "formulations of the present invention may further comprise other pharmaceutically acceptable excipients [including] . . . hydrophilic polymers *(e.g.*, **polyethylene glycols (PEG 300, PEG 400)** . . . ." *Id.* at 7:27-8:2 (emphasis added).

179.    Thus, a POSA would have prepared bendamustine liquid formulations containing PEG with a reasonable expectation of success.

180.    Fourth, Drager taught that previously known solutions of bendamustine were prepared under an inert atmosphere. *See* Drager at 2:10-11 ("Solutions of bendamustine hydrochloride in anhydrous propylene glycol, prepared under an inert gas atmosphere, have been reported  . . . ."). As discussed above, a POSA would have known that an inert atmosphere is used to prevent oxidative degradation. A POSA would have known that including an antioxidant in the formulation is widely-used method of preventing oxidative degradation of the drug. *See generally* Wayne Bequette 2008 at 170; Waterman 2002 at 20-27.

181.    Indeed, Drager also discloses the use of an antioxidant in the liquid bendamustine formulations. *See* Drager at 7:29-31 ("Pharmaceutically acceptable excipients are known in the art

and include, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate). . . ."). Drager further explicitly included the formulations comprising antioxidants in the claims. Drager at 15:11-12, claim 18 ("The formulation of claim 1, further comprising a pharmaceutically acceptable antioxidant."); *see also id.* at 17:5-7, claim 38 ("The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.").

182.    Moreover, Drager further discloses examples of liquid bendamustine formulations comprising an antioxidant. In particular, Drager discloses liquid bendamustine formulations comprising 25 mg/mL niacinamide. Drager at 9:10-11. As discussed above, a POSA would have known that niacinamide is an antioxidant. *See supra*, ¶ 77. Thus, in effect, Drager discloses examples of liquid bendamustine formulations comprising an antioxidant. In addition, Drager also teaches that bendamustine formulations comprising an antioxidant is more stable as compared to the corresponding bendamustine formulations lacking bendamustine. *See supra*, ¶ 105 (disclosing that bendamustine formulations comprising DMA and niacinamide (an antioxidant) are more stable under storage conditions as compared to bendamustine formulations comprising only DMA).

183.    Thus, a POSA would have been motivated to include antioxidants in liquid bendamustine formulations with a reasonable expectation of success.

184.    The liquid bendamustine formulations disclosed in Drager are stable under the conditions of commercial storage. *See* Drager at 21, Fig. 2. Because Drager teaches that the liquid bendamustine formulation comprising niacinamide has good commercial stability, a POSA would know that this formulation includes a stabilizing amount of an antioxidant.

185.    Thus, a POSA would have been motivated to use a stabilizing amount of an antioxidant to prevent oxidative degradation in the liquid bendamustine formulations in the course of routine experimentation and optimization with a reasonable expectation of success.

186.    Accordingly, in my opinion, a POSA would have prepared liquid bendamustine formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine, PEG, and a stabilizing amount of an antioxidant in the course of routine experimentation and optimization with a reasonable expectation of success.

187.    Finally, the remaining limitation recited in claim 1 of the '483 patent requiring the liquid bendamustine formulation to "have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C to about 25°C" is an inherent property of an otherwise obvious formulation.

188.    I have been informed by counsel that recitation of an inherent property does not add anything patentable to an otherwise obvious formulation. Here, as discussed below, it is my opinion that liquid bendamustine formulations comprising bendamustine, PEG, and an antioxidant, which are obvious, would have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5°C to about 25°C.

189.    Indeed, the specification of the '483 patent discloses that the formulations disclosed in Drager, *i.e.*, formulations comprising about 10 mg/mL to about 100 mg/mL bendamustine, PEG, and a stabilizing amount of an antioxidant, have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC at a

wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃. *See* '483 Patent at 4:36-40 ("Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5℃ to about 25℃."); *see also id.* at 6:48-7:28 (Table 1); *id.* at 8:10-43 (Example 3, Table 3).

190.    Because the stability profile recited in claim 1 of the '483 patent is an inherent property of an obvious liquid bendamustine formulation, the mere recitation of the stability profile will not make an otherwise obvious formulation patentable. Thus, in my opinion, this limitation does not add anything patentable to the remainder of claim 1 of the '483 patent.

191.    Moreover, the technique used to measure the impurity of formulations disclosed in Drager, *i.e.*, measuring impurities using HPLC with a 223 nm wavelength for detection, does not add anything patentable to formulation recited in claim 1 of the '483 patent. Indeed, Drager discloses the use of HPLC analysis to determine the levels of impurities. Drager at 6, 7, 10, 12. ("[P]urity was determined over time at room temperature for up to 8 hours using HPLC."). Thus, this limitation reciting the stability profile of liquid bendamustine formulations does not add anything patentable to the remainder of claim 1 of the '483 patent.

192.    Moreover, for the same reasons as those discussed above in the anticipation analysis of claim 1 of the '483 patent above, it is also my opinion that based on the data provided in Drager, a POSA would have known that the formulations disclosed in Drager would have less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃. Furthermore, to the extent the formulations disclosed in Drager do not have the stability profile recited in claim 1 of the '483 patent, it is also my opinion that a POSA

would have prepared the claimed liquid bendamustine formulations in the course of routine experimentation and optimization with a reasonable expectation of success.

193.    In addition, I have been informed by counsel that recitation of a disclosed value can render a claimed invention with a similar, but not identical value obvious where the disclosed value or property is "close enough" to the claimed invention that, based on the disclosure, a POSA would consider the claimed invention to also have been disclosed.  Here, as discussed above, the stability of the formulations is repeatedly characterized as "typical commercial storage conditions" and includes conditions that by application of the defined "about" recited before the timing of "about 365 days" equates to a disclosed range of up to 13.2 months which is "close enough" to the claimed invention of 15 months such that the POSA understanding "typical storage conditions" can even include up to 18 months, would have understood the disclosure of Drager to teach the claimed inventions stability timing of 15 months.

194.    As if that were not enough, separately and independently of all of the above, the text of Claims 32 and 33 of Drager states:

> 32. The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions.
>
> 33. The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for about 30 days to about 365 days.

Drager at 16:16-20.

195.    I have been informed that a dependent claim is narrower in scope of then its associated prior claim.  In this case, claim 33 states that storage conditions are "about 365 days", or, as explained above, use of the word "about" means that "about 365 days" equates to 13.4

months.[9]   Claim 33 depends from Claim 32, and Claim 32 makes a recitation to "storage conditions."  Therefore, the POSA would have known that "storage conditions" as taught in Claim 32 is broader than 13.4 months.  Therefore the disclosure of Drager is not limited to an outer bound of 13.4 months (*i.e.*, "about 365 days") but is more than 13.4 months.  As explained above, the POSA would consider 15 months (and more) to be typical storage conditions.  This would only be confirmed by the analysis of Drager for the reasons explained in this paragraph and this Report generally.  Indeed, the stability data disclosed by Drager for several formulations indicated that the formulations would be stable for in excess of 15 months. *See supra*, ¶¶ 112-13. Therefore, even if Drager does not expressly use the word "15 months" in its disclosure, Drager still teaches it.

196.   Accordingly, at least for the reasons discussed above, the limitation requiring less than about 5% peak area response to total impurities resulting from the degradation of the bendamustine as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5℃ to about 25℃ does not add anything patentable to the remainder of claim 1 of the '483 patent.

197.   Thus, for all the reasons discussed above, it is my opinion that independent claim 1 of the '483 patent would be obvious over Drager.

## 2.   Claim 2 of the '483 Patent is Obvious Over Drager

198.   Claim 2 of the '483 patent depends from claim 1 and further recites that the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof. Drager specifically discloses the use

---

[9] 365 days X 110% = 402 days, and 402 days / 30 (days per month) = 13.4 months.

of propyl gallate as an antioxidant for liquid bendamustine formulations. *See* Drager at 7:26-31 ("Pharmaceutically acceptable excipients are known in the art and include, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methylparaben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and **propyl gallate**) . . . .") (emphasis added). In addition, tocopherol, butylhydroxyanisole and butylhydroxytolune are phenol-containing aliphatic compounds, which are covered by claim 2 of the '483 patent. Thus, the limitations recited in claim 2 of the '483 patent are explicitly disclosed by Drager.

199.    Thus, the additional limitation recited in claim 2 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in the obviousness analysis of claim 1 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 2 of the '483 patent is also obvious over Drager.

### 3.    Claim 3 of the '483 Patent is Obvious Over Drager

200.    Claim 3 of the '483 patent depends from independent claim 1 and further recites that the liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5℃. The additional limitation recited in claim 3 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 3 of the '483 patent is that claim 1 of the '483 patent recited that the composition is stable at "a temperature of from about 5℃ to about 25℃" and claim 3 of the '483 patent recited that the composition is stable "at a temperature of about 5℃."

201.    Thus, claim 3 of the '483 patent is obvious for the same reasons as those discussed above in the obviousness analysis of claim 1 above.  Indeed, Drager discloses stability data for at

least one formulation at 5°C that indicates it would be stable for in excess of 15 months.  *See supra*, ¶¶ 112.  Accordingly, it is my opinion that dependent claim 3 of the '483 patent is also obvious over Drager.

### 4.   Claim 4 of the '483 Patent is Obvious Over Drager

202.    Claim 4 of the '483 patent depends from independent claim 1 and further recites that liquid bendamustine composition of claim 1 has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of about 25°C. The additional limitation recited in claim 4 of the '483 patent is similar to the stability profile recited in independent claim 1 of the '483 patent. The only difference between the limitation recited in claim 1 of the '483 patent and claim 4 of the '483 patent is that in claim 1 of the '483 patent it recited that the composition is stable at "a temperature of from about 5°C to about 25°C" and claim 4 of the '483 patent recited that the composition is stable at "at a temperature of about 25°C."

203.    The specification of the '483 patent discloses that a solution comprising bendamustine, PEG, and an antioxidant, *i.e.¸* a formulation disclosed in Drager, has a "shelf life of at least about 15 months at 5°C and 25°C." '483 patent at 8:10-46 (Example 3). In other words, the data provided in the specification of the '483 patent demonstrates that the formulation disclosed in Drager would have the stability profile recited in claim 4 of the '483 patent. Moreover, a POSA would have a prepared liquid bendamustine formulations with less than 5% peak area response in the course of routine experimentation and optimization with a reasonable expectation of success.

204.    Thus, at least for these reasons, it is my opinion that claim 4 of the '483 patent is obvious over Drager.

### 5.   Claim 5 of the '483 Patent is Obvious Over Drager

205.    Claim 5 of the '483 patent depends from claim 1 and further requires that bendamustine concentration is from about 20 mg/mL to about 60 mg/mL. Drager discloses liquid bendamustine formulations comprising, among others, "about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL" bendamustine. Drager at 7:17-20. Thus, Drager discloses liquid bendamustine formulations comprising bendamustine concentration encompassed by the range recited in dependent claim 5 of the '483 patent.

206.    Thus, the additional limitation recited in claim 5 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in obviousness analysis of claim 1 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 5 of the '483 patent is also obvious over Drager.

### 6.   Claim 6 of the '483 Patent is Obvious Over Drager

207.    Claim 6 of the '483 patent depends from independent claim 1 and further requires that the bendamustine concentration is about 25 mg/mL. As discussed above, Drager discloses liquid bendamustine formulations comprising "about 20 mg/mL, about 30 mg/mL" bendamustine. Drager at 7:17-20. Drager defines the term "about" as follows: "As used herein, the term 'about' is defined as ± 10%, preferably ± 5%." *See id.* at 7:25. Thus, Drager discloses concentration ranges of 18 mg/mL – 22 mg/mL bendamustine (about 20 mg/mL) and 27 mg/mL – 33 mg/mL (about 30 mg/mL).  Furthermore, Drager's disclosure of the encompassing range (i.e., about 5 to about 120 mg/mL), and then the explicit disclosure of several concentrations across that range using the term "about" (i.e., sub-ranges), indicates that Drager's liquid bendamustine formulations would function no differently at intermediate concentrations between the exemplified sub-ranges that are within the outer encompassing range.

82

208.     It is my opinion that a POSA would have prepared solutions comprising about 25 mg/mL bendamustine in the course of routine experimentation and optimization with a reasonable expectation of success. The '483 patent does not provide any evidence that there is any criticality in the concentration of about 25 mg/mL. Indeed, none of the specific examples within the Examples disclosed by the '483 has a concentration of 25 mg/mL. Indeed, of the examples that disclose formulations comprising polyethylene glycol, the concentrations of bendamustine disclosed are 20 mg/mL in the case of Example 3 and 50 mg/mL in the case of Examples 4-8.

209.     Accordingly, it is my opinion that for the reasons discussed above in the obviousness analysis of claim 1 and the additional reasons discussed herein, claim 6 of the '483 patent is obvious over Drager.

### 7.   Claim 7 of the '483 Patent is Obvious Over Drager

210.     Claim 7 of the '483 patent depends from independent claim 1 and further requires that the composition comprises bendamustine hydrochloride. Drager discloses bendamustine hydrochloride. *See generally* Drager at 9; *see also id.* at 3:14-16 ("It has been determined that pharmaceutically acceptable liquid formulations of bendamustine, and the pharmaceutically acceptable salts thereof, in particular the **hydrochloride salt** . . . ."). Thus, the additional limitation recited in dependent claim 7 of the '483 patent is disclosed in Drager.

211.     Thus, the additional limitation recited in claim 7 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in the obviousness analysis of claim 1 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 7 of the '483 patent is also obvious over Drager.

### 8.   Claim 8 of the '483 Patent is Obvious Over Drager

212.    Claim 8 of the '483 patent is directed to a method of treating cancer in a mammal by administering effective amount of ready to use formulation recited in claim 1 of the '483 patent. Drager discloses the use of therapeutically effective amount of bendamustine compositions for the treatment of cancer.

> Also within the scope of the invention are methods of treating diseases, such as, for example, **chronic lymphocytic leukemia, Hodgkin's disease**, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention. These methods **comprise administering to the patient a therapeutically effective amount of a preparation prepared from a pharmaceutical formulation of the present invention**.

Drager at 8:4-8; *see also id.* at 18:22-26, claim 56.

213.    Thus, the additional limitation recited in claim 8 of the '483 patent is disclosed in Drager. Indeed, the "Background of the Invention" section in the specification of the '483 patent discloses that bendamustine is used for treatment of cancers. *See* '483 Patent at 1:39-41 ("**Bendamustine is used in the treatment of a number of cancers** including leukemias, Hodgkins disease and multiple myelomas.") (emphasis added). Thus, in effect, the patentee admits that a POSA would have known that bendamustine was used for treatment of cancer.

214.    Thus, the additional limitation recited in claim 8 of the '483 patent does not add anything patentable to claim 1 of the '483 patent. Accordingly, for the reasons discussed above in obviousness analysis of claim 1 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 8 of the '483 patent is also obvious over Drager.

### 9.   Claim 9 of the '483 Patent is Obvious Over Drager

215.    Claim 9 of the '483 patent depends from claim 8 and further requires that the cancer is leukemia. Here, a POSA would have known that Drager teaches the use of liquid bendamustine

formulations for the treatment of leukemia. Drager at 8:4-7 ("Also within the scope of the invention are methods of treating diseases, such as, for example, **chronic lymphocytic leukemia,** Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention.") (emphasis added). Thus, the additional limitations recited in claim 9 of the '483 patent are taught by Drager. Indeed, the "Background of the Invention" section in the specification of the '483 patent discloses that bendamustine is used for treatment of cancers. *See* '483 Patent at 1:39-41 ("Bendamustine is used in the treatment of a number of cancers including **leukemias,** Hodgkins disease and multiple myelomas.") (emphasis added). Thus, in effect, the patentee admits that a POSA would have known that bendamustine was used for treatment of, *inter alia*, leukemia and Hodgkin's disease.

216.    Thus, the additional limitation recited in claim 9 of the '483 patent does not add anything patentable to claim 8 of the '483 patent. Accordingly, for the reasons discussed above in obviousness analysis of claim 8 of the '483 patent and the additional reasons discussed herein, it is my opinion that dependent claim 9 of the '483 patent is also obvious over Drager.

### 10. Claims 11-16 of the '483 Patent Are Obvious Over Drager

217.    Claims 11-16 of the '483 patent depend from claim 8, and the additional limitations recited in claims 11-16 of the '483 patent are identical to the limitations recited in claims 2-7 of the '483 patent respectively. Thus, claims 11-16 of the '483 patent are obvious over Drager for same reasons as those discussed above in the obviousness analyses of claims 8 and 2-7 of the '483 patent.

218.    Accordingly, for all the reasons discussed above, it is my opinion that claims 11-16 of the '483 patent are also invalid as obvious over Drager.

C.      NO SECONDARY CONSIDERATIONS OVERCOME THE PRIMA FACIE OBVIOUSNESS OF CLAIMS 1-16 OF THE '483 PATENT

219.    Here, during the prosecution of the '483 patent, the patentee asserted that the claimed invention has purported unexpected results. In particular, the patentee asserted that the claimed composition is surprisingly and unexpectedly stable in storage. *See* Prosecution History of the '483 patent, Nov. 25, 2020 Amendment at 9. The patentee also asserted:

> Despite the **poor stability of bendamustine/PEG, <u>surprisingly</u>, adding an antioxidant substantially eliminated the formation of degradation products.** As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).
>
> The claimed liquid bendamustine/PEG **compositions exhibit <u>surprising</u> storage stability if an antioxidant is added**. Such an <u>**unexpected result could not have been predicted**</u>. The claims are patentable for at least this reason.

*Id.* at p. 10 (emphasis added).

220.    In short, the patentee asserted purported unexpected results for the claimed formulations as a result of the addition of antioxidants to the compositions comprising bendamustine and PEG.

221.    I have been informed by counsel that unexpected results of an invention are always compared against the closest prior art. Here, as discussed above, prior art (Drager) explicitly teaches a liquid bendamustine formulation comprising bendamustine, PEG, and a stabilizing amount of an antioxidant. Moreover, Drager also teaches that formulations comprising an antioxidant are stable. *See* Drager at 21, Fig. 2 (disclosing stability of liquid bendamustine compositions comprising niacinamide – an antioxidant); *see also supra*, ¶ 105. In other words, the liquid bendamustine compositions taught by prior art specifically teach the purported "surprising" and "unexpected" stability of bendamustine formulations including an antioxidant. Because the

86

prior art teaches that liquid bendamustine compositions comprising bendamustine, PEG, and an antioxidant and that bendamustine compositions comprising an antioxidant have good stability, a POSA would have known that there is nothing unexpected about the purported enhanced stability of the claimed liquid bendamustine formulations.

222.    To the extent that the closest prior art does not teach that bendamustine is subject to oxidation and addition of an antioxidant provides surprising stability, it has been known for over 75 years that related nitrogen mustard anticancer drugs, *e.g.*, mechlorethamine, are subject to oxidative degradation, and clinical liquid formulations incorporate an antioxidant for shelf stability. *See supra*, ¶ 63. To the extent that it is surprising that an antioxidant can provide stability to a formulation containing PEG, it has long been known that formulations containing PEG can be subject to oxidation, and that addition of an antioxidant can provide stability. Indeed, shelf-stable drug formulations containing PEG and an antioxidant were commercially available at the time of the invention. *See supra*, ¶ 67.

223.    Accordingly, it is my opinion that there are no secondary considerations in support of non-obviousness of the claimed invention.

224.    Because Plaintiff has not yet made its position known on any secondary considerations, I reserve the right to address any secondary considerations put forth by Plaintiff.

**D.    CLAIMS 1-9 AND 11-16 OF THE '483 PATENT ARE INVALID AS INDEFINITE UNDER 35 U.S.C. § 112(b)**

225.    I understand that the parties have stipulated that the term "ready to use" means "able to be dispensed with minimal if any effort or preparation; prepackaged." It is my understanding that Plaintiff maintains that "ready to use" includes "ready for further dilution." The '483 patent states that "[t]he inventive formulations are advantageously ready to use **or** ready for further

dilution." '483 Patent at 2:18-20. During prosecution of the '483 patent, Plaintiff expressly distinguished its claimed "ready to use" compositions from prior art reconstituted solutions because they "avoid the multi-step reconstitution and preparation for administration required[.]" 05/20/2021 Response to Office Action, p. 5. In response to that amendment.

226.    The Examiner rejected the pending claims on the ground that "it appears the term 'ready for use' appears indefinite because there are two or more ways of interpreting it." '920 Application, 06/02/2021 Advisory Action. The Examiner ultimately concluded that "ready to use" "is a term of the art that does give meaning and life to the claim." 07/26/2021 Notice of Allowance, p. 3.

227.    As discussed above, it is my opinion that the claimed compositions of the '483 patent are invalid as anticipated and/or obvious. It is further my opinion that the claims of the '483 patent are invalid as indefinite because the '483 patent fails to provide objective boundaries such that a POSA would be informed, with reasonable certainty, about the scope of the claims. For example, the definition applied by the Examiner, as stipulated by the parties, recites "minimal if any effort or preparation." Yet, there is no disclosure in the '483 patent or its file history that provides sufficient guidance or objective boundaries that would allow a POSA to discern how the level of "effort or preparation" should be measured, let alone do so with reasonable certainty. Absent such guidance or other objective boundaries, this determination would necessarily depend on the subjective assessment of any one person.

228.    Accordingly, without the ability to provide reasonable certainty on the scope of the claims, it is further my opinion that they are invalid as indefinite.

Date: June 3, 2022

Laird Forrest, Ph.D.

# EXHIBIT A

# Laird Forrest, Ph.D.

Professor

| | |
|---|---|
| Department of Pharmaceutical Chemistry, School of Pharmacy | Cell: (785) 813-1331 |
| University of Kansas, Lawrence, KS 66047 | Email: lforrest@ku.edu |

## Education

| | |
|---|---:|
| Post-doctoral fellow, Pharmaceutical Sciences, University of Wisconsin, Madison, WI | 2006 |
| Ph.D.   Chemical and Biomolecular Engineering, University of Illinois, Urbana, IL | 2003 |
| M.S.   Chemical Engineering, University of Illinois, Urbana, IL | 2001 |
| B.S.   Chemical Engineering, Auburn University, Auburn, AL (*Summa Cum Laude*) | 1998 |

## Academic Professional Experience

Full Professor, Department of Pharmaceutical Chemistry, University of Kansas, 3/2017-present (primary appointment)
    *Adjunct/Courtesy Appointments:*
    Bioengineering Center, University of Kansas, 6/2011-present
    Department of Medicinal Chemistry (courtesy), University of Kansas, 12/2015-3/2018
    Department of Chemistry (courtesy), University of Kansas, 11/2013-11/2016
Associate Professor, Department of Pharmaceutical Chemistry, University of Kansas, 8/2013-2/2017
Research Associate Professor (volunteer), Department of Internal Medicine, Division of Dermatology, University of Kansas
    Medical Center, 6/2011-6/2015 (listed appointments were at Asst. Prof. level prior to 8/2013)
Assistant Professor, Department of Pharmaceutical Chemistry, University of Kansas, 1/2007-8/2013
Adjunct Assistant Professor, Dept. of Pharmaceutical Sciences, Washington State University, Pullman, 11/2006-11/2013
Postdoctoral Fellow, Division of Pharmaceutical Sciences, University of Wisconsin, Madison, 2004-2006
Graduate Research Assistant, Department of Chemical Engineering, UIUC, 1998-2003

## Other Professional Experience

Hylapharm LLC, co-founder, 2011-present
    *HylaPharm is developing injected and locally administered anti-cancer therapeutics.*
Aerobyx LLC, co-founder, Chief Operating Officer, 2017-present
    *Aerobyx is developing bioenergetic medicines for neurodegenerative diseases.*
Vesarex LLC, co-founder, Chief Operating Officer, 2018-present
    *Veserax is developing devices and treatments for vascular disease.*
Exogenesis Corporation, Member of Scientific and Medical Advisory Board, 2009-present
    *Exogenesis is developing and commercializing nanoscale surface modification for improving the safety and efficacy of*
    *implantable medical devices*
Patent Writer, Beem Patent Law Firm, Chicago, IL, 2003-2004
    *Drafted and assisted in prosecution of patent applications, provided in-house scientific expert support.*
Software Engineer/Consultant, Packaging Corporation of America (multiple sites), 1994-present
    *Developed and managed custom software for analysis of real-time manufacturing quality control systems and*
    *integration with product tracking in business data systems.*
Expert witness (prior 6 years)

1. Medac Pharma, Inc., et. al.  v. Antares Pharma Inc., et al., Civ. No. 1:14-cv-01498-JBB (D. NJ) (2014) (engaged by Antares, did not testify)
2. Par Pharmaceutical, Inc., et al. v. Breckenridge Pharmaceutical, Inc., et al., Civ. No. 1:15-cv-00486-SLR (D. DE) (2015) (engaged by Par, did not testify)
3. Merck Sharp & Dohme Corp. v. Savior Lifetec Corp., Civ. No. 5:15-cv-415 (E.D.N.C) (2016) (engaged by Savior, testified)
4. Mylan Pharmaceuticals Inc. v. Astrazeneca AB; PTAB IPR2016-01326; PTAB  IPR2016-01325; PTAB IPR2016-01324; PTAB  IPR2016-01316 (Inter Partes Review filed before the Patent Trial and Appeal Board, 2016) (engaged by Mylan, did not testify)
5. Horizon Pharma, Inc., Horizon Pharma USA, Inc. and Pozen Inc. v. Mylan Pharmaceuticals Inc., Mylan Laboratories Limited, and Mylan Inc; Civ. No. 3:15-cv-03327-MLC-DEA, 3:16-cv-04921 (D. NJ); *joint* Horizon Pharm, Inc., Horizon Pharma USA, Inc., and Pozen Inc. v. Dr. Reddy's Laboratories, Inc. and Dr. Reddy's Laboratories; Civ. No. 3:15-cv-03324 (D. NJ), 3:16-cv-04918 (D. NJ), 3:16-cv-09035 (D.NJ); *joint* Horizon Pharm, Inc., Horizon Pharma USA, Inc., and Pozen Inc. v. Lupin Ltd. and Lupin Pharmaceuticals Inc.; Civ. No. 3:15-cv-03326 (D. NJ), 3:16-cv-04920 (D.NJ) (2017) (engaged by Mylan, DRL and Lupin, testified)
6. Halozyme, Inc. v. Joseph Matal (on behalf of USPTO). Civ. No. 1:16-cv-1580 (E.D. Va) (2017) (engaged by USPTO, testified).

7.  Bracco Diagnostics Inc. v. Maia Pharmaceuticals, Inc. Civ. No. 3:17-cv-13151 (D. NJ) (2018) (engaged by Bracco, testified).

## Awards and Honors

Baxendale Innovation Award, 2016
University of Kansas Leading Light award, 2014
Japan Society for Promotion of Science (JSPS) Visiting Scholar Fellow, 2010
American Cancer Society Research Scholar, 2008-2012
American Association of Colleges of Pharmacy, New Investigators Award, 2007
PhRMA Foundation Postdoctoral Fellow, 2006
Controlled Release Society Annual Meeting, Glasgow, Scotland.
    Student poster abstract award (unable to attend), 2003
American Institute of Chemical Engineers Annual Conference, Reno, NV
    Pharmaceutical and Biotechnology Program Student Paper Award, 2001
    Carriers in Gene Therapy Session Speaker Award, 2001
Auburn P&P Foundation Scholarship; Tenneco Engineering Scholarship, 1994-1998

## Teaching

*Full courses*
Biopharmaceutics and Drug Delivery (PharmD professional course), PHCH626, yearly Spring 2011-present, *Course coordinator and instructor*
Drug Delivery (graduate course), PHCH715, CP&E 715; yearly Spring 2016-present, *Course instructor*
Introduction of Clinical Chemistry (PharmD professional course) PHCH667; Spring 2007-2010, *Course coordinator and instructor*
Pharmaceutical Equilibria (graduate course), PHCH862/3; yearly Fall 2008-Fall 2017, *Course coordinator and instructor*
Physical Chemistry of Pharmaceutical Solutions, Solids and Surfaces (graduate course), PHCH862/3, yearly Fall 2018-present, *Course instructor*

*Short courses*
Short course on Drug Delivery (15 lectures / 1 credit hr), *Course developer and instructor*
    Shandong University, China (July 2009)
    Tsukuba University, Japan (July 2009)
Short course on Drug Formulation and Basic Pharmacokinetics (15 lecture hours/1 credit hr), *Couse developer and instructor*
    Tsukuba University, Japan (August 2010)

*Partial courses and invited course lectures*
Drug Delivery PHCH 715; Fall 2007, 2009, 2011, 2013, 2015 (became instructor in full course Spring 2016)
Emerging Trends in Pharmaceutical Chemistry PHCH 511; Fall 2007, Fall 2008 – present, every even year
Introduction to Nanotechnology, C&PE 656; Spring/Fall 2009-2014 (guest lecturer)
Sigma Xi Continuing Education series, KUMC Fall 2007 (guest lecturer).

## Patents and Applications

1.  Rowe PSN, Martin A, David NV, Forrest ML, Moulder KR, Cai S, DJ Aires. "Compounds and methods for increasing hair growth." US Patent 10,350,263 (granted 7/16/2019)
2.  Forrest ML Hunt J, Aires DH, Cai S, Lu R, Groer C, Moulder R, Kleindl P. "Investigations of the phenyl ring of imidazoquinolines." US Provisional 62/835,408 (filed 4/17/2019).
3.  Swerdlow R, Forrest ML, Michaelis E, Hunt J, Wilkins H. "Bioenergetically active esters for health and disease." US Nonprovisional Application (international app. PCT/US19/53901) (filed 9/30/2019).
4.  Buchman SR, Cohen M, Donneys A, Nelson N, Forrest ML, Zhang T, Yang Q. "Devices, compositions and related Methods for accelerating and enhancing bone repair." (filed, 12/17/2015), WO2017/106744, PCT/US2016/067320
5.  Forrest ML, Cai S, Zhang T, Senadheera SPSN, Groer C, Aires D, "Drug delivery compositions and methods." US Pat. Prov. Application 62/274,508 (filed 1/4/2016), non-provisional patent filed 1/3/2017, CIP 16/067,630 filed 7/2/2018
6.  Forrest ML, Kleindl P, Senadheera SPSN, "Immunosuppressive compositions" US Pat. Prov. Application (filed 3/3/2016).
7.  Forrest ML, Cai S, Zhang T, Senadheera SPSN, Duan S, Groer C, Aires D, Zhao Y, "Targeted mTOR Inhibitor." US Pat. Non-provisional Application 15/052,302 (filed 2/24/2016) (priority to Prov. Application 62/120,215, 2/24/2015).
8.  Kwon, G.S. and M.L. Forrest, "Micelle composition of polymer and passenger drug." US Pat 9,107,814 (granted 8/18/2015).

9. Forrest ML, Cai S, Duan S, Zhang T, Yang Q, "Drug and imaging agent delivery compositions and methods" US Pat. 8,802,235. (granted 4/4/2014)
10. Rowe P, Forrest ML, Moulder R, Cai S, Martin A, Aires D. "Preparations for enhancement of hair growth" US Pat. 10,213,479 (granted 2/26/2019).
11. Rowe P, Forrest ML, Moulder R, Cai S, Martin A, Aires D. "Preparations for enhancement of hair growth" US Divisional application (filed 2/13/2019) (priority to PCT/US2015/012691, filed 1/23/2015 16/275,069)
12. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" US Pat. 8,088,412 (granted 1/3/2012) (International filings 1/30/2009)
13. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" Korean Patent 10-1224711 (granted 2/18/2013)
14. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" Japanese Patent 5,302,340 (granted 6/28/2013)
15. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" Chinese Patent 101965201 B  (granted 10/23/2013)
16. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" Canada Application 2,713,813
17. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" CIP 13/341,282 (filed 1/3/2012)
18. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" France Brevet No. 2242514  (granted 9/30/2015)
19. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" Germany DBP No. 60 2009 033 907 (granted 9/30/2015)
20. Forrest ML, Cohen MS, Cai S, "Intralymphatic chemotherapy drug carriers" U.K. Patent No. 2242514 (granted 9/30/2015)
21. Kwon, G.S, and M.L. Forrest, "Micelle composition of polymer and passenger drug." US Pat. 8,173,167 (granted 5/11/12)
22. Kwon, G.S., M.L. Forrest, and N.M. Davies. "Micelle encapsulation of therapeutic agents." US App 20100203114


## Peer Reviewed Publications (chronological order)

List also available as:
http://www.ncbi.nlm.nih.gov/myncbi/browse/collection/41384976/?sort=date&direction=ascending

1. Forrest, M.L., D.W. Pack. "On the Kinetics of Polyplex Endocytic Trafficking:  Implications for Gene Delivery Vector Design." *Mol. Ther.* 6: 57-66 (2002).  PMID: 12095304
2. Forrest, M.L., J.T. Koerber, and D.W. Pack.  "A Degradable Polyethylenimine Derivative with Low Toxicity for Highly Efficient Gene Delivery."  *Bioconjug. Chem.* 14: 934-940 (2003).  PMID: 13129396
3. Forrest, M.L., G.E. Meister, J.T. Koerber, D.W. Pack.  "Polyethylenimine Derivatives with Reduced Buffering Capacity and Enhanced Transfection Efficiency."  *Pharm. Res.* 21: 365-371 (2004).  PMID: 15032320
4. Forrest, M.L., N. Gabrielson, D.W. Pack.  "Cyclodextrin-polyethylenimine conjugates for targeted in vitro gene delivery." *Biotechnol. Bioeng.* 89: 416-423 (2005).  PMID: 15627256
5. Kwon, G.S. and M.L. Forrest.  "Amphiphilic Block Copolymer Micelles for Nanoscale Drug Delivery." *Drug Dev. Res.* 67: 15-22 (2006).
6. Forrest, M.L., C.-Y. Won, A.W. Waseem, G.S. Kwon.  "In vitro Release of the mTOR Inhibitor Rapamycin from Poly(ethylene glycol)-b-Poly(ε-caprolactone) Micelles." *J. Control. Release* 110:370-377 (2006).  PMID: 16298448 *Highest cited paper in this journal for 2006.*
7. Forrest, M.L., A. Zhao, C.-Y. Won, A.W. Waseem, G.S. Kwon.  "Lipophilic prodrugs of Hsp90 inhibitor geldanamycin for nanoencapsulation in poly(ethylene glycol)-beta-poly(sigma-caprolactone) micelles." *J. Control. Release* 116:139-149 (2006).  PMID: 16926059
8. Xiong, M.P., M.L. Forrest, A.L. Karls, G.S. Kwon. "Biotin-triggered release of PEG-avidin from biotinylated-PEI enhances in vitro gene expression." *Bioconjug. Chem.*18:746-753 (2007).  PMID: 17375897
9. Yáñez, J.A., M.L. Forrest, Y. Ohgami, G.S. Kwon, N.M. Davies.  "Pharmacometrics and Delivery of Novel Nanoformulated PEG-b-Poly(ε-caprolactone) Micelles of Rapamycin."  *Cancer Chemo. Pharmacol.* 2007 61(1):133-144 (2008).  PMID: 17393166 PMCID: PMC2259393
10. Xiong, M.P., Y. Bae, S. Fukushima, M.L. Forrest, N. Nishiyama, K. Kataoka, G.S. Kwon. "pH-Responsive Multi-PEGylated Dual Cationic Nanoparticles Enable Charge Modulations for Safe Gene Delivery." *ChemMedChem* 2(9): 1321-1327 (2007).  PMID: 17579918
11. Xiong, M.P., M.L. Forrest, N.M. Davies, G.S. Kwon. "Poly(Aspartate-g-PEI800), a polyethylenimine analogue of low toxicity and high transfection efficiency for gene delivery." *Biomaterials* 28:4889-4900 (2007). PMID: 17692910.
12. Forrest, M.L., J.A. Yáñez, C.M. Remsberg, Y. Ohgami, G.S. Kwon, N.M. Davies. "Paclitaxel prodrugs with sustained release and high solubility in poly(ethylene glycol)-b-poly(ε-caprolactone) micelle nanocarriers: pharmacokinetic disposition, tolerability and cytotoxicity." *Pharm. Res.* 25:194-206 (2008). PMID:17912488.

13. M.L. Forrest, G.S. Kwon. "Clinical developments in drug delivery nanotechnology." *Adv. Drug Deliv. Rev.* 60(8): 861-862 (2008). PMID: 18358557.

14. S. Cai, Y. Xie, T. Bagby, M.S. Cohen, M.L. Forrest. "Intralymphatic chemotherapy using a hyaluronan-cisplatin conjugate." *J. Surg. Res.* 147(2): 247-252 (2008). PMID: 18498877. **Featured on issue cover.** PMCID: PMC2430723.

15. M.P. Xiong, J.A. Yáñez, C.M. Remsberg, Y. Ohgami, G.S. Kwon, N.M. Davies, M.L. Forrest. "Formulation of a geldanamycin prodrug in mPEG-b-PCL micelles greatly enhances tolerability and pharmacokinetics in rats." *J. Control. Rel.* 129(1):33-40 (2008). PMID: 18456363 PMCID: PMC2492396

16. K.R. Vega-Villa, J.A. Yáñez, C.M. Remsberg, M.L. Forrest, N.M. Davies. "Clinical Toxicities of Nanocarrier Systems." *Adv. Drug Deliv. Rev.* 60(8):929-938 (2008). PMID: 18313790

17. K.L. Aillon, Y. Xie, N. El-Gendy, C.J. Berkland, M.L. Forrest. "Effects of nanomaterial physicochemical properties on in vivo toxicity." *Adv. Drug. Deliv. Rev.*, 61(6):457-66 (2009). PMID 19386275. PMCID: PMC2743376

18. M.P. Xiong, J.A. Yáñez, G.S. Kwon, N.M. Davies, M.L. Forrest. "A cremophor-free formulation for tanespirmycin (17-AAG) using PEO-b-PDLLA micelles: characterization and pharmacokinetics in rats." *J. Pharm. Sci.* 98(4):1577-86 (2009). PMID 18752263 PMCID: PMC2649998

19. Xie, Y, M.S. Cohen, M.L. Forrest. "Drug Delivery to the Lymphatic System: Importance in Future Cancer Diagnosis and Therapies." *Expert Opin. Drug Deliv.*, 6:785-92 (2009). PMID: 19563270. PMCID: PMC3102644.

20. S.K. Nune, P. Gunda, P.K. Thallapally, Y.Y. Lin, M.L. Forrest, C.J. Berkland. "Nanoparticles for biomedical imaging." *Expert Opin. Drug Deliv.* 6(11):1175-94 (2009). PMID: 19743894. PMCID: PMC3097035.

21. M.S. Cohen, S. Cai, M.L. Forrest. "A Novel Intralymphatic Nanocarrier-Delivery System for Cisplatin Therapy in Breast Cancer with Improved Tumor Efficacy and Lower Systemic Toxicity In Vivo." *Am. J. Surg.*, 198(6):781-6 (2009). PMID 19969129. PMCID: PMC2791715.

22. S. Cai, Y. Xie, N.M. Davies, M.S. Cohen, M.L. Forrest. "Pharmacokinetics and disposition of a localized lymphatic polymeric hyaluronan conjugate of cisplatin in rats." *J. Pharm. Sci.*, 99(6):2664-71 (2010). PMID: 19960530

23. R. Ndolo, M.L. Forrest, J.P. Krise. "The role of lysosomes in limiting drug toxicity in mice." *J. Pharmacol. Exp. Ther.* 333(1):120-8 (2010). PMID: 20056778 PMCID: PMC2846018

24. D.A. Rao, M.L. Forrest, A.W. Alani, G.S. Kwon, J.R. Robinson. "Biodegradable PLGA based nanoparticles for sustained regional lymphatic drug delivery." *J. Pharm. Sci.*, 99(4):2018-31 (2010). PMID: 19902520

25. Y. Xie, K.L Aillon, S. Cai, J.M. Christian, N.M. Davies, C.J. Berkland, M.L. Forrest. "Pulmonary delivery of cisplatin-hyaluronan conjugates via endotracheal instillation for the treatment of lung cancer." *Intl. J. Pharm.* 392(1-2):156-63 (2010). PMID: 20363303 PMCID: PMC2873163

26. S. Cai, S. Thati, T.R. Bagby, H-M. Diab, N.M. Davies, M.S. Cohen, M.L. Forrest. "Localized doxorubicin chemotherapy with a biopolymeric nanocarrier improves survival and reduces toxicity in xenografts of human breast cancer." *J. Control. Rel.* 146(2):212-218 (2010). PMID: 20403395 PMCID: PMC2918704

27. Y. Xie, S. Duan, M.L. Forrest. "Alkyne- and 1,6-elimination- succinimidyl carbonate- terminated heterobifunctional poly(ethylene glycol) for reversible "click" PEGylation." *Drug Discov. Ther.* 4(4):240-245 (2010). PMID: 21949558 PMCID: PMC3178183

28. S. Cai, N.M. Davies, M.S. Cohen, M.L. Forrest. "Carried-based intralymphatic cisplatin chemotherapy for the treatment of metastatic squamous cell carcinoma of the head & neck." *Ther. Deliv.* 1(2):237-245 (2010). PMID 21339844 PMCID: PMC3039877

29. R. A. Ndolo, D.T. Jacobs, M.L. Forrest, J.P. Krise. "Intracellular distribution-based anticancer drug targeting: exploiting a lysosomal acidification defect associated with cancer cells." *Mol. Cell Pharmacol.* 2(4):131-126 (2010). PMID: 21274418 PMCID: PMC3026327

30. J.A. Yáñez, C.M. Remsberg, C.L. Sayre, M.L. Forrest, N.M. Davies. "Flip-flop pharmacokinetics – reversal of disposition. Challenges and opportunities during drug development." *Ther. Deliv.* 2(5):643-672 (2011). PMID: 21837267 PMCID: PMC3152312

31. S.K. Nune, P. Gunda, B.K. Majeti, P.K. Thallapally, M.L. Forrest. "Advances in lymphatic imaging and drug delivery." *Adv. Drug. Deliv. Rev.* 63(10-11):867-85 (2011). PMID: 21718728. PMCID: 3164439.

32. S. Cai, Q. Yang, M.L. Forrest. "Lymphatic drug delivery using engineered liposomes and solid lipid nanoparticles." *Adv. Drug. Deliv. Rev.* 63(10-11):901-908 (2011). PMID: 21712055. PMCID PMC3164476.

33. M.S. Cohen, M.L. Forrest. "Lymphatic drug delivery: Therapy, Imaging and Nanotechnology." *Adv. Drug. Deliv. Rev.* 63(10-11):865-866 (2011). PMID: 21669240

34. S.M. Cohen, R. Mukerji, S. Cai, I. Damjanov, M.L Forrest*, M.S. Cohen*. "Subcutaneous delivery of nanoconjugated doxorubicin and cisplatin for locally advanced breast cancer demonstrate improved efficacy and decreased toxicity at lower doses than standard systemic combination therapy in vivo." *Am. J. Surg.* 202(6):646-653 (2011) *\* co-corresponding authors* PMID: 21982998.

35. V. Shum, N. Gabrielson, M.L. Forrest, D.W. Pack. "The effects of PVP(Fe(III)) Catalyst on polymer molecular weight and gene delivery via biodegradable cross-linked polyethylenimine." *Pharm. Res.* 29(2):500-10 (2011). PMID: 21892707 PMCID: PMC3465843

36. S. Cai, T. Bagby, M.L.Forrest. "Development of regional chemotherapies: feasibility, safety and efficacy in clinical use and preclinical studies." *Ther. Deliv.* 2(11):1467-1484 (2011). PMID: 22229080 PMCID: PMC3249754

37. Q. Yang, H. Cui, S. Cai, X. Yang, <u>M.L. Forrest</u>. "In vivo photoacoustic imaging of chemotherapy-induced apoptosis in squamous cell carcinoma using a near-infrared caspase-9 probe" *J. Biomed. Optics.* 16(11)116026 (2011) PMID: 22112131 PMCID: PMC3221716
    Included in: Virtual Journal of Biological Physics, 22(9) (2011).

38. Y. Luan, Q. Yang, Y. Xie, S. Duan, S. Cai, <u>M.L. Forrest</u>. "A Sensitive Near-Infrared Fluorescent Probe for Caspase: Synthesis and Application in Cell Imaging." *Drug Discov. Ther.* 5(5):220-226 (2011). PMID: 22282719 PMCID: PMC3265084

39. S. Sharifi, S. Behzadi, S. Laurent, <u>M.L. Forrest</u>, P. Stroeve, M. Mahmoudi. "Toxicity of Nanomaterials." *Chem. Soc. Rev.* 41: 2323-2343 (2012). PMID: 22170510   **Featured as most read article in Dec11 and Jan12.**

40. S. Duan, S. Cai, Q. Yang, <u>M. L. Forrest</u>. "Multi-arm polymeric nanocarrier as a nitric oxide delivery platform for chemotherapy of head and neck squamous cell carcinoma" *Biomaterials* 33(11):3243-3253 (2012). PMID: 22281420 PMCID: PMC3572206

41. S. Duan, S. Cai, Y. Xie, T.R. Bagby, <u>M.L. Forrest</u>. "Synthesis and characterization of a multi-arm poly(acrylic acid) star polymer for application in delivery of cisplatin and a nitric oxide." *J. Polym. Sci. A Polym. Chem.*. 50(13): 2715-24 (2012).

42. Y. Zhao, S. Duan, X. Zeng, C. Liu, B. Li, <u>M.L. Forrest</u>. "Prodrug strategy for PSMA-targeted delivery of TGX-221 to prostate cancer cells" *Mol. Pharm.* 9(6):1705-16 (2012). PMID: 22494444 PMCID: PMC3601665

43. T. R. Bagby, S. Cai, S. Thati, S. Duan, D.J. Aires, <u>M.L. Forrest</u>. "Impact of Molecular Weight on Lymphatic Drainage of a Biopolymer-Based Imaging Agent." *Pharmaceutics* 4, 276-295 (2012). PMID: 24300232 PMCID: PMC3834911

44. E.A. Mohamed, M. M. Meshali, C.M. Remsberg, Yunqi Zhao, T.M. Borg, A. Monem, M. Foda, N.M. Davies, <u>M.L. Forrest</u>. "Vorinostat with Sustained Release and High Solubility in Poly(ethylene glycol)-b-poly(DL-lactic acid) Micelle Nanocarriers: Characterization and Effects on Pharmacokinetics in Rat Serum and Urine" *J. Pharm. Sci.* 101(10):3787-98 (2012). PMID: 22806441

45. R. Ndolo, Y. Luan, S. Duan, <u>M.L. Forrest</u>, J. Krise. "Lysosomotropic Properties of Weakly Basic Anticancer Agents Promote Cancer Cell Selectivity" *PLoS One* 7(11):e49366 (2012). PMID 23145164 PMCID: PMC3492287

46. C. Remsberg, Y. Zhao, J. Takemoto, R. Bertram, N. Davies, <u>M.L. Forrest</u>. "Pharmacokinetic Evaluation of a DSPE-PEG2000 Micellar Formulation of Ridaforolimus in Rat." *Pharmaceutics* 5(1):81-91 (2012)

47. R. Venable, D. Worley, D. Gustafson, R. Hansen, E.J. Ehrhart, D. Aires, S. Cai, M. Cohen, <u>M.L. Forrest</u>. "Hyaluronan cisplatin conjugate in five dogs with soft tissue sarcomas." *Am. J. Vet. Res.* 73(12):1969-76 (2012). PMID: 23176425 PMCID: PMC3778682

48. T.R. Bagby, S. Duan, S. Cai, S. Thati, C. Berkland, D. Aires, <u>M.L. Forrest</u>. "Lymphatic trafficking kinetics and near-infrared imaging using star polymer architectures with controlled anionic character". *Eur. J. Pharm. Sci.* 47(1):287-94 (2013). PMID 22546180 PMCID: PMC4301975

49. A.J. Mellot, <u>M.L. Forrest</u>, M.S. Detamore. "Physical non-viral gene delivery methods for tissue engineering." *Ann. Biomed. Eng.* 41(3):446-68 (2013) PMID: 23099792

50. K. Devarajan, <u>M.L. Forrest</u>, M.S. Detamore, H. Staecker. "Adenovector Mediated  Delivery to Human Umbilical Cord Mesenchymal Stromal Cells Induces Inner Ear Cell Phenotype." *Cellular Reprogramming* 15(1):43-54 (2013). PMID: 23379581 PMCID: PMC4298749

51. S. Cohen, N. Rockefeller, R. Makerji, D. Durham, <u>M. Forrest</u>, S. Cai, M. Cohen, Y. Shnayder. "Efficacy and Toxicity of Peritumoral Delivery of Nanoconjugated Cisplatin in an In Vivo Murine Model of Head and Neck Squamous Cell Carcinoma." *JAMA Otolaryngology-Head & Neck Surgery* 139(4):382-7 (2013). PMID: 23599074 PMCID: PMC4306558

52. T. Zhang, H. Cui, H-C. Chang, X. Yang, M.L. Forrest. "Photoacoustic imaging of biological tissues with radiation damaged nanodiamonds as a near infrared optical contrast agent." *Journal of Biomedical Optics*. 18(2):26018 (2013). PMID: 23400417 PMCID: PMC3569583

53. J. Sestak, M. Mullins, L. Northrup, S. Thati, M.L. Forrest, T. Siahaan, C. Berkland. "Single-step grafting of aminooxy-peptides to hyaluronan: A simple approach to multifunctional therapeutics for experimental autoimmune encephalomyelitis." *Journal of Controlled Release.* 168(3)334-40 (2013). PMID: 23541930 PMCID: PMC3672265

54. Q. Yang, D.J. Aires, S. Cai, G.R. Fraga, D. Zhang, C.Z. Li, M.L. Forrest. "In vivo efficacy of nano hyaluronan-conjugated cisplatin for treatment of murine melanoma." *J. Drugs Dermatol.* 13(3):283-7 (2014). PMID: 24595572 PMCID: PMC4344317

55. Mellott AJ, Godsey ME, Shinogle HE, Moore DS, Forrest ML, Detamore MS, "Improving viability and transfection efficiency with human umbilical cord Wharton's jelly cells through use of a ROCK inhibitor," *Cellular Reprogramming* 16(2):91-7 (2014). PMID: 24552552 PMCID: PMC3967373

56. C. Louizos, J.A. Yanez, M.L. Forrest, N.M. Davies. "Deconvoluting the Hysteresis Loop Conundrum in Pharmacokinetic / Pharmacodynamic Relationships" *J. Pharm. Pharm. Sci.* 17(1):34-91 (2014). PMID: 24735761 PMCID: PMC4332569

57. Y. Zhao, T. Zhang, S. Duan, N.M. Davies, M.L.Forrest. "CD44-Tropic Polymeric Nanocarrier for Breast Cancer Targeted Rapamycin Chemotherapy". *Nanomedicine: NBM* 10(6):1221-30 (2014). PMID: 24637218 PMCID: PMC4119834

58. T. Zhang, H. Cui, C-Y Fang, K. Cheng, X. Yang, H-C Chang, M.L. Forrest. "Targeted nanodiamonds as phenotype specific photoacoustic contrast agents for breast cancer." *Nanomedicine (London)* 10(6):1221-30 (2014). PMID: 25723091 PMCID: PMC4703108

59. S. Cai, A. Alhowyan, Q. Yang, W.C.M. Forrest, Y. Shnayder, M.L. Forrest. "Cellular Uptake and Internalization of Hyaluronan-based Doxorubicin and Cisplatin Conjugates." *J. Drug Targeting*, 22(7):648-57 (2014). PMID: 24892741

60. S. Thati, C. Kruel, B. Hartwell, J. Sestak, T. Siahaan, M.L. Forrest, C. Berkland. "Routes of Administration and Dose Optimization of Soluble Antigen Arrays in Mice with Experimental Autoimmune Encephalomyelitis." *J. Pharm. Sci.* 104(2):714-21 (2015). PMID: 25447242 PMCID: PMC4312227

61. R. Chen, Y. Zhao, Y. Huang, W. Jiang, JB. Thrasher, P. Terranova, M.L. Forrest, B. Li. "Nanomicellar TGX221 blocks xenografts tumor growth of prostate cancer in nude mice." *Prostate* doi:10.1002/pros.22941 (2015). PMID: 25620467 PMCID: PMC4376584

62. Q. Yang, K.R. Moulder, M.S. Cohen, S. Cai, M.L. Forrest. "Cabozantinib Loaded DSPE-PEG2000 Micelles as Delivery System: Formulation, Characterization and Cytotoxicity Evaluation." *BAOJ Pharm. Sci.* 1.pii:001 (2015). PMID: 25688382 PMCID: PMC4327881

63. T. Zhang, Q. Yang. W.C. Forrest, S. Cai, D. Aires, M.L. Forrest. "A Lanthanum-Tagged Chemotherapeutic Agent HA-Pt to Track the *In Vivo* Distribution of Hyaluronic Acid Complexes." *BAOJ Pharm. Sci. 1.pii:002* (2015). PMID: 26756040 PMCID: PMC4706177.

64. Mellott AJ, Devarajan K, Shinogle HE, Moore DS, Talata Z, Laurence JS, Forrest ML, Noji S, Tanaka E, Staecker H, Detamore MS, "Non-viral reprogramming of human Wharton's jelly cells reveals differences between ATOH1 homologues," *Tissue Engineering Part A*, 1(11-12):1795-809 (2015). PMID: 25760435 PMCID: PMC4449705

65. Chakraborty, Aishik; Mucci, Nicolas; Tan, Ming; Steckley, Ashleigh; Zhang, Ti; Forrest, M. Laird; Dhar, Prajnaparamita. "Phospholipid Composition Modulates Carbon Nanodiamond Induced Alterations in Phospholipid Domain Formation." *Langmuir*, 31(18):5093-104 (2015) PMID: 25876023 PMCID: PMC4702515

66. Q Yang, M. Gong, S. Cai, T. Zhang, J.T. Douglas, V. Chikan, N.M. Davies, P. Lee, I.- Y. Choi, S. Ren, M.L. Forrest. "Combining hard and soft magnetism into a single core-shell nanoparticle to achieve both hyperthermia and image contrast." *Therapeutic Delivery,* 6(10):1195-1210 (2015) PMID: 26606855 PMCID: PMC4702516

67. S. Cai, T. Zhang, W.C. Forrest, Y. Qiuhong, C. Groer, E. Mohr, D.J. Aires, M. S.M. Axiak-Bechtel, B.K. Flesner, C.J. Henry, K.A. Selting, D. Tate, J.A. Swarz, J.N. Bryan, M.L. Forrest. "Phase I/II Clinical Trial of Hyaluronan-Cisplatin Nanoconjugate for the Treatment of Spontaneous Canine Cancers." *Am. J. Vet. Res.*, 77(9):1005-16 (2016). *PMID 27580113.*

68. M.W. Sim, P.T. Grogan, C. Subramanian, C.R. Bradford, T.E. Carey, M.L. Forrest, M.E. Prince, M.S. Cohen. "Effects of Peritumoral Nanoconjugated Cisplatin on Laryngeal Cancer Stem Cells." *The Laryngoscope.* 126(5):E184-90 (*2016*). PMID: 26690734.

69. C. Kuehl, J.Z. Hildebrandt. L.M. Kaminskas, C.J.H. Porter, N.M. Davies, M.L. Forrest, C. Berkland. Hylauronic acid molecular weight determines lung clearance and biodistribution after instillation. *Molec. Ther.* 13(6):1904-14 (2016). *PMID 27157508.*

70. T. Zhang, S. Cai, C. Groer, W.C. Forrest, Q. Yang, E. Mohr, J. Douglas, D. Aires, S.M. Axiak-Bechtel, K.A. Selting, J.A. Swarz, D.J. Tate, J.N. Bryan, M.L. Forrest. "Hyaluronan-lysine cisplatin drug carrier for treatment of localized cancers: pharmacokinetics, tolerability, and efficacy in rodents and canines." *J. Pharm. Sci. 105(6):1891-900 (2016). PMID: 27155765.*

71. Ti Zhang, Shuang Cai, W.C. Forrest, Eva Mohr, Qiuhong Yang, and M. Laird Forrest. "Development and Validation of an Inductively Coupled Plasma Mass Spectrometry Method for Quantitative Analysis of Platinum in Plasma, Urine, and Tissues." *Appl. Spectrosc.*, 70(9):1529-36 (2016). *PMID 27527103*

72. P. Isedeh, M.L. Forrest, D. Liu, D. Aires. "Ensuring that injectable bicarbonate-buffered lidocaine-epinephrine complies with 2015 United States Pharmacopeia (USP) compounding provisions." *J. Am. Acad. Dermatol. 75(2):454-5 (2016). PMID 27444082.*

73. S. Ishiguro, S. Cai, D. Uppalapati, K. Turner, T. Zhang, W.C. Forrest, M.L. Forrest, M. Tamura. "Intratracheal administration of hyaluronan-cisplatin conjugate nanoparticles significantly attenuates lung cancer growth in mice." *Pharm. Res., 33(10):2517-29 (2016). PMID 27335023.*

74. S. Alrushaid, C.L. Sayre, Z.H. Maayah, Y. Zhao, M.L. Forrest, S.N. Senadheera, K. Chaboyer, H.D. Anderson, A. El-Kadi and N. M. Davies. "Mechanistically Elucidating the *In-Vitro* Safety and Efficacy of a Novel Doxorubicin Derivative" *Drug Dev. Transl. Res. 7(4):582-597. PMID 28462502*

75. Benyi Li, Chenchen He, Shaofeng Duan, Yi-Fen Wang, Qingting Hu, M. Laird Forrest, and Suxia Han. Characterization of a novel p110β-specific inhibitor BL140 that eliminates MDV3100-resistance in castration-resistant "prostate cancer cells." *Prostate*. 2017 *77(11):1187-1198. PMID: 28631436*

76. Senadheera SN, Zhang T, Groer CE, Forrest ML. "Formation of platinum (II) as a six member ring for sustained polymeric delivery." *Eur J Med Chem. 2017.136:452-456. PMID 28525843.*

77. Peter A. Kleindl, Jian Xiong, Asha Hewarathna, Olivier Mozzicconacci, Maulik K. Nariya, Adam C. Fisher, Eric J. Deeds, Sangeeta B. Joshi, C. Russell Middaugh, Christian Schöneich, David B. Volkin, M. Laird Forrest. The botanical drug

substance crofelemer as a model system for comparative characterization of complex mixture drugs. *J Pharm Sci. 2017 106(11):3242-3256. PMID: 28743606*

78. Asha Hewarathna, Olivier Mozziconacci, Maulik K. Nariya, Peter A. Kleindl, Jian Xiong, Adam C. Fisher, Sangeeta B. Joshi, C. Russell Middaugh, M. Laird Forrest, David B. Volkin, Eric J. Deeds, Christian Schöneich. Chemical stability of the botanical drug substance Crofelemer: a model system for comparative characterization of complex mixture drugs. *J Pharm Sci. 2017 106(11):3257-3269. PMID: 28688843*

79. Maulik K. Nariya, Jae Hyun Kim, Jian Xiong, Peter A. Kleindl, Asha Hewarathna, Adam C. Fisher, Sangeeta B. Joshi, Christian Schöneich, M. Laird Forrest, C. Russell Middaugh, David B. Volkin, Eric J. Deeds. "Comparative characterization of crofelemer samples using data mining and machine learning approaches with analytical stability data sets." *J Pharm Sci. 2017 106(11):3270-3279. PMID: 28743607*

80. O. Mozziconacci, J.T. Stobaugh, R. Bommana, J. Woods, E. Franklin, J.W. Jorgenson, M.L. Forrest, C. Schöneich, J.F. Stobaugh. "Profiling the photochemical induced degradation of rat growth hormone with extreme ultra pressure chromatography – mass spectrometry utilizing meter-long microcapillary columns packed with sub 2-μm particles." *Chromatographia 2017 80(9):1299-1318. PMID pending*

81. Samaa Alrushaid, Casey L. Sayre, Jaime A. Yanez, M. Laird Forrest, Sanjeewa N. Senadheera, Frank J. Burczynski, Raimar Lobenberg, Neal M. Davies. "Pharmacokinetic and toxicodynamic characterization of a novel doxorubicin derivative." *Pharmaceutics 2017 9(3). pii:E3. PMID 28902176*

82. Pingping Fang, Jill A. Madden, Lisa Neums, Ryan K. Moulder, Laird M. Forrest, Jeremy Chien "Olaparib-induced Adaptive Response Is Disrupted by FOXM1 Targeting that Enhances Sensitivity to PARP Inhibition.." *Mol. Cancer Res. 2018 16(6):961-73. PMID 29545475*

83. Ninad Varkhede, Nital Patel, William Chang, Kenneth Ruterbories, M. Laird Forrest. "A semi-physiologically based pharmacokinetic model describing the altered metabolism of midazolam due to inflammation in mice" *Pharm. Res. 2018 35(8):162-174. PMID: 29931580*

84. N. Varkhede, M.L. Forrest. "Understanding the monoclonal antibody disposition after subcutaneous administration using a minimal physiologically based pharmacokinetic model" *J. Pharm. Pharm. Sci. 2018  21(1s), 130s – 148s. PMID: 30011390*

85. S. Cai, T. Zhang, C. Groer, M. Forrest, D. Aires, V. Otte, S. Barchman, A. Faerber, M.L. Forrest. "Injectable chemotherapy downstaged oral squamous cell carcinoma from non-resectable to resectable in a rescue dog: diagnosis, treatment and outcome." *Case Reports Vet. Med. 2018:9078537. PMID: 30402324*

86. Z. Maayah, T. Zhang, M.L. Forrest, S. Alrushaid, M.R. Doschak, N. Davies, A. El-Kadi. "DOX-Vit D, a novel doxorubicin delivery approach, inhibits human osteosarcoma cell proliferation by inducing apoptosis while inhibiting Akt and mTOR signaling pathways." *Pharmaceutics. 2018 10(3) pii:E144. PMID: 30181466*

87. P. Kasturi, A. Artigues, M.L. Forrest, B. Li. "Alternol eliminates excessive ATP production by disturbing Krebs cycle in prostate cancer" *Prostate. 2019 79(6):628-639. PMID: 30663084*

88. J.Y. Song, N.R. Larson, S. Thati, I. Torres-Vazquez, N. Martinez-Rivera, N.J. Subelzu, M.A. Leon, E. Rosa-Molinar, C. Schoeneich, M.L. Forrest, C.R. Middaugh, C.J. Berkland. "Glatiramer acetate persists at the injection site and draining lymph nodes via electrostatically-induced aggregation. *J. Control. Rel. 2019, 293:36-47. PMID: 30414463.*

89. Donneys A, Yang Q, Forrest ML, Nelson NS, Zhang T, Ettinger R, Ranganathan K, Snider A, Deshpande SS, Cohen MS, Buchman SR. "Implantable hyaluronic acid-deferoxamine conjugate prevents nonunions through stimulation of neovascularization." *npj Regenerative Medicine, 2019  4:11. PMID: 31123600.*

90. R. Lu, C. Groer, P.A. Kleindl, K.R. Moulder, A. Huang, J.R. Hunt, S. Cai, D.J. Aires, C. Berkland, L. Forrest. "Formulation and preclinical evaluation of a toll-like receptor 7/8 agonist as an anti-tumoral immunomodulator." *J. Control. Rel. 2019. Pii:S0168-3659(10)30313-x. PMID: 31173789.*

91. N. Varkhede, B.H. Peters, Y. Wei, C.R. Middaugh, C.S. Schöneich, L. Forrest. "Effect of iron oxide nanoparticles on the oxidation and secondary structure of growth hormone." *J. Pharm. Sci. (in press).*

92. N. Varkhede, R. Bommana, C.S. Schöneich, L. Forrest. Proteolysis and oxidation of therapeutic proteins after intradermal or subcutaneous administration." *J. Pharm. Sci. (in press)*

93. J.R. Hunt, P.A. Kleindl, K.R. Moulder, T.E. Prisinzano, M.L. Forrest. "Further Exploration of the Structure-Activity Relationship of Imidazoquinolines; Identification of Potent C7 Substituted Imidazoquinolines" *Bioorganic & Medicinal Chemistry Letters (in press)*

### Books/Special Journal Issues as Editor

1. M.L. Forrest and G.S. Kwon (co-editors) "Clinical developments in drug delivery nanotechnology." *Advanced Drug Delivery Reviews,* Elsevier (Philadelphia, PA USA), 2008.

2. M.L. Forrest and M.S. Cohen (co-editors) "The Lymphatic System: Therapy, Imaging and Nanotechnology." *Advanced Drug Delivery Reviews,* Elsevier (Philadelphia, PA USA), 2011.

3. M.L Forrest and J. Ramsey (co-editors). "Nanoparticles for Delivery of Biotherapeutics." Future Science Ltd. (London), 2015.

***Book chapters (peer reviewed)***

1. Liu, R.L., <u>M.L. Forrest</u>, and G.S. Kwon. "Micellization and Drug Solubility Enhancement" in *Water Insoluble Drug Formulation*, 2nd ed. Editor R. Liu. CRC Press (Boca Raton, FL) (2008).

2. Hart, D.S., Yunqi Zhao, <u>M.L. Forrest</u>. "Polyethylene glycol polyester block copolymers: Biocompatible carriers for nanoparticulate drug delivery" in *Handbook of Harnessing Biomaterials in Nanomedicine*, Ed. Dan Peer. Taylor & Francis publishing, (Oxford, UK)(2011).

3. J.A. Yáñez, D.R. Brooks, <u>M.L. Forrest</u>, N.M. Davies. "Pharmacokinetic Behavior of Orally Administered Drugs" in *Oral Bioavailability: Basics Principles, Advanced Concepts and Applications*, Eds. M. Hu and X. Li. Wiley Press (Hoboken, NJ) (2011).

4. T. Zhang, M.L. Forrest. "Biotherapeutic applications of metallic nanoparticles." *Nanoparticles for Delivery of Biotherapeutics*, Future Science Ltd. (London) (2015).

5. Q. Yang, M.L. Forrest. "Drug delivery to the lymphatic system." In *Drug Delivery: Principles and Applications, Second Edition,* Eds. B. Wang, T. Siahaan. Wiley Press (Hoboken, NJ) (2016).

## Conference Abstracts, Papers, Proceedings and Posters

1. Forrest, M.L, D. W. Pack. "Quantitation of endolysosomal trafficking of polyplex gene delivery vehicles." *Proceedings of the International Symposium on Controlled Release of Bioactive Materials* 28, 607 (2001).

2. Forrest, M.L, J.T. Koerber, D.W. Pack. "Highly Efficient, Biodegradable Polyethylenimine Gene Delivery Vehicles." *Proceedings of the International Symposium on Controlled Release of Bioactive Materials* 30, 588 (2003).

3. Balija, A.M., M. L. Forrest, D.W. Pack, and S.C. Zimmerman. "Dendritic Trojan horse." *Abstracts of Papers (American Chemical Society Meeting)* 228: U63 267-ORGN Part 2, Aug. 22 (2004).

4. Forrest, M.L., N. Gabrielson, D.W. Pack. "Reduction of polyethylenimine bufferings capacity enhances in-vitro gene delivery activity." *Molecular Therapy* 9:S138 (2004).

5. Forrest, M.L., S. Tu, C.-Y. Won, W. Malick, G.S. Kwon. "Nanoencapsulation of Hydrophobic Paclitaxel Prodrugs in Poly(ethylene glycol)-block-poly(ε-caprolactone) Micelles." *Proceedings of the International Symposium on Controlled Release of Bioactive Materials* 30 (2006).

6. Yáñez, J. C. Remsberg, G. Kwon, N. Davies, <u>M.L. Forrest</u>. "Pharmacokinetics, Delivery, and Tolerability of Novel Nanoencapsulated PEG-b-Poly(ε -caprolactone) Micelles of Geldanamycin Prodrugs in Rats." *AAPS J* 9:W4427 (2007).

7. <u>Forrest, M.L.</u>, J. Yáñez, M. Xiong, G.S. Kwon, N. Davies. "Pharmacokinetics and Characterization of 17-AAG Geldanamycin Analogue (Tanespimycin) in a Poly(ethylene oxide)-b-Poly(D-lactic acid) Micelle Nanocarrier." *AAPS J* 9:W4405 (2007).

8. C. Remsberg, C., J. Yáñez, G. Kwon, N. Davies, <u>M.L. Forrest</u>. "To encapsulate a synthesized paclitaxel prodrug in amphiphilic block co-polymer micelles of PEG-b-PCL and to determine the pharmacokinetics and tissue distribution of paclitaxel prodrug (PAX7'C6) solubilized in PEG-b-PCL compared to Taxol." *AAPS J* 9:W4406 (2007).

9. Forrest, M.L. and D.W. Pack.  "DNA-Polymer Complexes for Gene Therapy:  Discovering the Barriers to Efficient Delivery."  Poster presentation at the University of Illinois Biotechnology Symposium, Urbana, IL, November 1999.

10. Forrest, M.L. and D.W. Pack. "Quantitation of Polyplex pH Microenvironment as a Tool for Elucidating Gene Delivery Mechanism." Paper at Pharmaceutical and Biotechnology Program, American Institute of Chemical Engineering National Meeting, Reno, NV, November 2001.

11. Forrest, M.L. and D.W. Pack.  "Nano-Complexes of Polymer and DNA: 'Artificial Viruses'."  Poster at the Nanotechnology Industrial Symposium, University of Illinois, Urbana, IL, May 2003.

12. Forrest, M.L. and D.W. Pack.  "Non-Viral Gene Delivery Vectors Based on Modified Polyethylenimine" and "Highly Efficient, Biodegradable Polyethylenimine Gene Delivery Vehicles."  Posters at the 30th Annual Meeting & Exposition of the Controlled Release Society, Glasgow, Scotland, July 2003.

13. Forrest, M.L. and G.S. Kwon.  "Hydrolysable Prodrugs of Geldanamycin for Efficient Nanoencapsulation and Sustained Release." Poster at the American Association of Pharmaceutical Scientists Annual Meeting and Exposition, Nashville, TN, November 2005.

14. Forrest, M.L. and G.S. Kwon.  "Hydrolysable Prodrugs of Geldanamycin for Efficient Nanoencapsulation and Sustained Release."  and "Nanocarriers for Controlled Delivery of Therapeutic Agents."  Poster at American Institute of Chemical Engineers Annual Conference, Cleveland, OH, November 2005.

15. Yáñez, J.A., M.L. Forrest, Y. Ohgami, G.S. Kwon, N.M. Davies. "Pharmacometrics and Delivery of Novel Nanoformulated PEG-b-Poly($\varepsilon$-caprolactone) Micelles of Rapamycin." Poster at American Association of Pharmaceutical Scientists Annual Meeting, San Antonio, TX, October 2006.

16. Forrest, M.L., J.A. Yáñez, C.M. Remsberg, G.S. Kwon, N.M. Davies. "Nanocarrier Formulation of a Geldanamycin Prodrug in ABC Micelles: Pharmacokinetics and Tolerability in Rats." Poster at Utah 13th Drug Delivery Symposium, Salt Lake City, UT, February 2007.

17. Forrest, M.L., J.A. Yáñez, C.M. Remsberg, G.S. Kwon, N.M. Davies. "Pharmacokinetics of Nanoencapsulated Paclitaxel Hexonate Prodrug in Poly(ethylene glycol)-block-poly(epsilon-caprolactone) Micelles." Poster at 34th Annual Meeting of the Controlled Release Society, Long Beach, CA, July 2007.

18. Xiong, M.P., J.A. Yáñez, G.S. Kwon, N.M. Davies, M.L. Forrest. "A Cremophor-free Formulation for 17-AAG (tanespimycin) using PEO-b-PDLA Micelles: Characterization and Pharmacokinetics in Rats." Poster at 34th Annual Meeting of the Controlled Release Society, Long Beach, CA, July 2007.

19. Forrest, M.L., J.A. Yáñez, C.M. Remsberg, G.S. Kwon, N.M. Davies. "Pharmacokinetics of Nanoencapsulated Paclitaxel Hexonate Prodrug in Poly(ethylene glycol)-block-poly(epsilon-caprolactone) Micelles." Poster at 34th Annual Meeting of the Controlled Release Society, Long Beach, CA, July 2007.

20. M.S. Cohen, H. Diab, S. Cai, Y. Xie, M.L. Forrest, "Intralymphatic delivery system for treatment of breast cancer." Presented at American Society of Clinical Oncology – 2007 Breast Cancer Symposium, San Francisco, CA, September 7-8, 2007.

21. Yáñez, J.A., C.M. Remsberg, G.S. Kwon, N.M. Davies, M.L. Forrest. "Pharmacokinetics, Delivery, and Tolerability of Novel Nanoencapsulated PEG-b-Poly(epsilon-caprolactone) Micelles of Geldanamycin Prodrugs in Rats." Presented at American Association of Pharmaceutical Scientists Annual Meeting, San Diego, CA, November, 2007.

22. Remsberg, C.M., J.A. Yáñez, G.S. Kwon, N.M. Davies, M.L. Forrest. "Pharmacokinetic and Tissue Distribution Analysis of a Paclitaxel Prodrug Nanoencapsulated in PEG-b-Poly(epsilon-caprolactone) Micelles." Presented at American Association of Pharmaceutical Scientists Annual Meeting, San Diego, CA, November, 2007.

23. Forrest, M.L., J.A. Yáñez, M.P. Xiong, G.S. Kwon, N.M. Davies. "Pharmacokinetics and Characterization of 17-AAG Geldanamycin Analogue (Tanespimycin) in a Poly(ethylene oxide)-b-Poly(D-lactic acid) Micelle Nanocarrier." Presented at American Association of Pharmaceutical Scientists Annual Meeting, San Diego, CA, November, 2007.

24. Cai, S., Y. Xie, H. Diab, M.S. Cohen, M.L. Forrest. "Nanocarrier delivery of cisplatin to the lymphatics: In vitro and in vivo evaluation in rodents." Presented at KUMC Masonic Cancer Center Annual Meeting, December 1, 2007.

25. Cai, S., Y. Xie, T. Bagby, M.S. Cohen, M.L. Forrest. "A Hyaluronan nanocarrier for intralymphatic drug delivery: synthesis, characterization, and pharmacokinetics in rats." Presented at American Association for Cancer Research Annual Meeting, San Diego, April 14, 2008.

26. Cai, S., M.S. Cohen, M.L. Forrest. "Intralymphatic treatment of breast cancer: synthesis, characterization and pharmacokinetics in rodents." Presented at Abbott Labs, Abbott Park, IL, June 13, 2008.

27. M.S. Cohen, S. Cai, M.L. Forrest. "Intralymphatic nanocarrier chemotherapy for breast cancer: Improved delivery to locoregional lymph nodes." Presented at AACR Translational Cancer Medicine: Cancer Clinical Trials and Personalized Medicine conference, Monterey, CA, July 21, 2008.

28. T. Bagby, M.L. Forrest. "Development of Stable Melphalan Formulations for Melanoma." Presented at KU Cancer Center Research Symposium, Kansas City, November 7, 2008.

29. Y. Xie, K.L. Aillon,C.J. Berkland, M.L.Forrest. "Pulmonary Delivery of Cisplatin-Hyaluronan Conjugates for the Treatment of Lung Cancer: Synthesis, Pharmacokinetics, and Tissue Distribution in Rats." Presented at 2008 Cancer Center Research Symposium, Kansas City, November 7, 2008.

30. S. Cai, Y. Xie, T.R. Bagby, M.S. Cohen, M.L. Forrest. "Intralymphatic drug delivery for treatment of breast cancer and head and neck cancer" Presented at The University of Kansas Cancer Center Symposium at the University of Kansas Medical Center, Kansas City, November 7, 2008.

31. S. Thati, S. Cai, T.R. Bagby, M.S. Cohen, M.L. Forrest. "Intralymphatic drug delivery for treatment of breast cancer: Synthesis, characterization, pharmacokinetics and anti-cancer activity in rodents" Presented at The University of Kansas Cancer Center Symposium at the University of Kansas Medical Center, Kansas City, November 7, 2008.

32. S. Cai, Y. Xie, T.R. Bagby, M.S. Cohen, M.L. Forrest. "Intralymphatic drug delivery for treatment of breast cancer: Synthesis, characterization, and pharmacokinetics in rodents." Presented at Higuchi Bioscience Talks 2008 at University of Kansas, Lawrence, December 5, 2008.

33. T.R. Bagby, Y. Xie, M.L. Forrest. "Reversible Shielding of Viruses for Cancer Gene Therapy." Presented at the 14th International Symposium on Recent Advances in Drug Delivery Systems: Drug Carriers-Progress Beyond Delivery, Salt Lake City, UT, February 16, 2009.

34. Y. Xie, K.L. Aillon, C. Berkland, M.L. Forrest. "Nanocarrier delivery system for chemotherapeutic treatment of lung cancer." ." Presented at the 14th International Symposium on Recent Advances in Drug Delivery Systems: Drug Carriers-Progress Beyond Delivery, Salt Lake City, UT, February 16, 2009.

35. S. Cai, Y. Xie, T.R. Bagby, S. Thati, B.J. Johnston, M.S. Cohen , M.L. Forrest. "Intralymphatic drug delivery for treatment of breast cancer and head and neck cancer: synthesis, characterization, pharmacokinetics and anti-cancer activity in rodents." Presented at 14th international symposium on recent advances in drug delivery systems, Salt Lake City, UT, February 16, 2009.

36. Forrest, M.L. "Drug nanocarriers for intralymphatic chemotherapy of breast cancer." Presented at INBRE Conference, Oklahoma City, OK, May 28, 2009.

37. T.R. Bagby and M.L. Forrest. "Lymphatic Imaging of Mice." Presented at The University of Kansas Department of Pharmaceutical Chemistry Fall Retreat, Lawrence, KS, October 15, 2009.

38. T.R. Bagby, S. Cai, S. Thati, Y. Xie, N.M. Davies, M.S. Cohen and M.L. Forrest. "Localized Doxorubicin Chemotherapy with a Biopolymeric Nanocarrier Improves Survival and Reduces Toxicity in Xenografts of Human Breast Cancer." Presented at the Faculty Research Day at the University of Kansas Medical Center, Kansas City, KS, November 3, 2009.

39. Remsberg, C.M., J.K. Takemoto, R.M. Bertram, M.L. Forrest, N.M. Davies. "Development of a novel micelle formulation and pharmacometrics of the mTOR inhibitor, deforolimus." Presented at Canadian Society for Pharmaceutical Sciences in Richmond, British Columbia, June 2-5, 2010.

40. Remsberg, C.M., J.K. Takemoto, R.M. Bertram, M.L. Forrest, N.M. Davies. "Nanoformulation development and pharmacometrics of the histone deacetylase inhibitor vorinostat." Presented at Canadian Society for Pharmaceutical Sciences in Richmond, BC, June 2-5, 2010.

41. S. Cai, S. Duan, Q. Yang, M.L. Forrest. "Lymphatic Delivery of Cisplatin and Nitric Oxide Prodrug JS-K for the Treatment of Metastatic Head and Neck Squamous Cell Cancer." Presented at Department of Pharmaceutical Chemistry Fall Retreat Symposium, University of Kansas, Baldwin City, Kansas, October 14, 2010

42. S. Cai, M.L. Forrest. "Lymphatic Drug Delivery for the Treatment of Metastatic Cancers." Presented at School of Pharmacy Graduate Honors Symposium, University of Kansas, Lawrence, Kansas, April 15, 2010

43. T.R. Bagby, S. Thati, S. Cai, and M.L. Forrest. "Effect of Molecular Weight on Lymphatic Drainage Patterns and Kinetics of Localized Drug Carriers." Presented at Pharmaceutics Graduate Student Research Meeting, Columbus, Ohio, June 18, 2010.

44. Q. Yang, S. Cai, T.R. Bagby, S. Duan, M.L. Forrest. "Encapsulation of anticancer drugs and imaging agents in nanoparticles for lymphatic cancer treatment." Presented at Department of Pharmaceutical Chemistry Fall Retreat Symposium, Baldwin city, KS, October 14, 2010

45. T.R. Bagby, S. Thati, S. Duan, S. Cai, and M.L. Forrest. "Effect of Molecular Weight and Charge on Lymphatic Drainage Patterns and Kinetics of Localized Drug Carriers Using Whole Body Fluorescent Imaging." Presented at the Fourth Annual University of Kansas Department of Pharmaceutical Chemistry Fall Retreat, Lawrence, KS, October 15, 2010.

46. Y. Zhao, S. Duan, M.L. Forrest. "PSMA-targeted Nanocarriers for Delivery of TGX-221 to Prostate Cancer Cells." Presented at Department of Pharmaceutical Chemistry Fall Retreat Symposium, Baldwin city, KS, October 14, 2010

47. Duan, S.; S. Cai; T.R. Bagby; M.L. Forrest. "Synthesis of sugar and carbonate star polymers for localized chemotheraphy". Presented at the 45th Midwest Regional Meeting of the American Chemical Society, Wichita, KS, October 27-30, 2010.

48. Takemoto, J.K., C.M. Remsberg, M.L. Forrest, N.M. Davies. "Nanomicellar delivery pharmacokinetics and pharmacodynamics of the histone deacetylase inhibitor suberoylanilide hydroxamic acid." Presented at the American Association of Pharmaceutical Scientists Annual Meeting and Exposition, New Orleans, LA, November 13-14, 2010.

49. Remsberg, C.M., M.L. Forrest, N.M. Davies. "Quantitative determination of ridaforolimus, a mTOR inhibitor, in rat plasma using LC/ESI/MS." Presented at the FIP Pharmaceutical Sciences 2010 World Congress, American Association of Pharmaceutical Scientists Annual Meeting and Exposition, New Orleans, LA, November 13-14, 2010.

50. Cai, S., Y. Xie, S. Thati, T.R. Bagby, M.S. Cohen, M.L. Forrest. "Lymphatic delivery of cisplatin for the treatment of metastatic head and neck squamous cell cancer." Presented at Globalization of Pharmaceutics Education Network (GPEN), University of North Carolina, Chapel Hill, NC, November 10-12, 2010.

51. Bagby, T.R., S. Thati, S. Duan, S. Cai, M.L. Forrest. "Effect of Molecular Weight and Charge on Lymphatic Drainage Patterns and Kinetics of Localized Drug Carriers." Presented at Globalization of Pharmaceutics Education Network (GPEN), University of North Carolina, Chapel Hill, NC, November 10-12, 2010.

52. S. Cai, S. Duan, Q. Yang, M.L. Forrest. "Targeted Drug Platform for Combination Nitric Oxide and Platinum Chemotherapy of Head and Neck Cancer." Presented at Chemical Biology NIH Training Grant Symposium, University of Kansas, Lawrence, Kansas, December 7, 2010

53. S. Cai, S. Duan, M.S. Cohen, M.L. Forrest. "Targeted Drug Platform for Combination Nitric Oxide and Platinum Chemotherapy of Head and Neck Cancer." Presented at Kansas IDeA Network of Biomedical Research Excellence Symposium, Kansas City, Kansas, January 15, 2011

54. S. Cai, M.L. Forrest. "Development of Drug Delivery Platforms for Locoregional Treatment of Carcinomas." Presented at Kansas IDeA Network of Biomedical Research Excellence Symposium, Kansas City, Kansas, January 15, 2011.

55. S. Cohen, M. Cohen, R. Mukerji, S. Cai, I. Damjanov, M.L. Forrest. "Subcutaneous Delivery of Nanoconjugated Doxorubicin/Cisplatin for Locally Advanced Breast Cancer Demonstrates Improved Efficacy and Decreased Toxicity Over Standard Systemic." Resident, Postdoc, Fellows Research Day, Kansas City, Kansas, May 5, 2011.

56. M.L. Forrest, S. Cai, S. Duan, M.S. Cohen, Q. Yang. "Nitric oxide-releasing nanoparticle combination therapy to overcome drug resistance in platinum-resistant breast cancers." Presented at American Society of Clinical Oncology Breast Symposium, San Francisco, CA, September 9, 2011.

57. S. M. Cohen, R. Mukerji, S. Cai, I. Damjanov, M.L. Forrest (presenter), M.S. Cohen. "Evaluation of complete pathologic response and histologic toxicity using a subcutaneous delivery system with combination nanoconjugated doxorubicin and cisplatin for locally advanced breast cancer in vivo." Presented at American Society of Clinical Oncology Breast Symposium, San Francisco, CA, September 9, 2011.

58. K. Devarajan, M.L. Forrest, H. Staecker, M.S. Detamore. "Adenoviral mediated gene delivery to human umbilical cord mesenchymal stem cells for inner ear hair cell differentiation." Biomedical Engineering Society, Hartford, CT, October, 2011.

59. C.L. Sayre, S.E. Martinez, E.A. Mohamed, M.M. Meshali, C.M. Remsberg, Y. Zhao, T. M. Borg. A.M.M. Foda, J.K. Takemoto, M.L. Forrest, N.M. Davies. "Vorinostat with sustained released and high solubility in poly(ethylene glycol)-b-poly(DL-lactic acid) micelle nanocarriers: characterization and effects on pharmacokinetics in rat serum and urine." Canadian Society for Pharmaceutical Sciences Annual Symposium, Toronto, June 2012.

60.  S. Cai, Q. Yang, S. Siller, D. Worley, L. Schneider, D. Aires, M. Cohen, M.L. Forrest. "A safe and efficacious approach to cisplatin chemotherapy: loco-regional injection of HylaPlat in canines." American Association of Pharmaceutical Scientists Annual Meeting, Chicago, IL, October, 2012.

61. Forrest, M.L. "Formulation development and pharmacokinetics of subcutaneously injected HylaPlat in spontaneous canine cancers" International Society for Hyalurnan Sciences. Oklahoma City, OK. June 3, 2013.

62. T. Zhang, Forrest, M.L. "Nanodiamond-based contrast agents for photoacoustic imaging." SPIE International Society for optics and photonics. San Diego, CA. August 25, 2013.

63. S. Cai, D. Vartia, M. Forrest, J. Bryan, D. Aires, M.L. Forrest. "A safe and efficacious approach to cisplatin chemotherapy: loco-regional injection of HylaPlat in canines." American Association of Cancer Research Annual Meeting, San Diego, CA, April 2014.

64. S. Cai, W.C. Forrest, J. Bryan, D. Aires, M.L. Forrest. "Development of Locoregional Polymeric Cisplatin Chemotherapy: Clinical Trials in Canines with Spontaneous Cancers" Controlled Release Society Annual Meeting, Chicago, IL, June 2014.

65. M. L. Forrest, S. Cai, W.C. Forrest, T. Zhang, M. Cohen, J. Bryan, D. Aires. "Development of Locoregional Polymeric Cisplatin Chemotherapy: Clinical Trials in Canines with Spontaneous Cancers," American Association for Pharmaceutical Sciences (AAPS) Annual Conference, San Diego, CA, November 2014

66. P.T. White, C. Subramanian, P.T. Grogan, S. Cai, M.L. Forrest, M.S. Cohen. "Nanoparticle-targeting of breast cancer stem cells improves efficacy and durability of chemotherapy." Association for Academic Surgery Congress, Las Vegas, NV, February 2015.

67. S. Ishiguro, D. Uppalapati, S. Cai, J. Hodge, L. Forrest, M. Tamura. "A local chemotherapy with hyaluronan-cisplatin conjugate significantly attenuates growth of lung adenocarcinoma xenografts in mouse model," American Association for Cancer Research (AACR) Annual Conference, Philadelphia, PA, April 22, 2015.

68. Samaa Alrushaid, Casey L. Sayre, Zaid Al Maayh, Yunqi Zhao, M Laird Forrest, Sanjeewa Senadheera, Kevin Chaboyer, Hope D Anderson, Ayman El-Kadi and Neal M. Davies  "Mechanistically Elucidating the *In-Vitro* Safety and Efficacy of a Novel Doxorubicin Derivative." American Association for Pharmaceutical Sciences (AAPS) Annual Conference, Denver, CO, November 2016.

69. Peter Kleindl, S. P. Sanjeewa Nilendra Senadheera, Samantha Farb, M. Laird Forrest. "Development of novel immunosuppressant prodrugs for treatment of ulcerative colitis." Federation of American Societies for Experimental Biology (FASEB) Gastrointestinal Tract XVII: Current Biology of the GI Tract, Mucosa, Microbiota, and Beyond. Steamboat Springs. CO. July 30-Aug 4, 2017.

70. Ninad Varkhede, Christian Schoeneich, Laird Forrest. "Pre-systemic In Vitro Metabolism of Therapeutic Proteins After Subcutaneous Administration and Its Utility for a Semi-PBPK Model" American Association for Pharmaceutical Sciences (AAPS) Annual Conference, San Diego, CA, November 2017

71. K. R. Moulder, F. J. Martinez-Becerra, W. L. Picking, M. L. Forrest. "Enhancing immunological response towards Shigella spp. through a multivalent subunit vaccine" American Association for Pharmaceutical Sciences (AAPS) Annual Conference, San Diego, CA, November 2017

72. R. Lu, C. Groer, K.R. Moulder, P.A. Kleindl, M.L. Forrest. "An extended release formulation of toll like receptor 7 agonist analogs." KU Pharm Chem. Fall Retreat. Oct. 2018

73. Peter A. Kleindl, S. P. Sanjeewa Nilendra Senadheera, M. Laird Forrest. (October 2018) "Targeted delivery of potent immunosuppressants for treatment of ulcerative colitis." Department of Pharmaceutical Chemistry Annual Fall Retreat, Lawrence, Kansas.

74. Peter A. Kleindl, S. P. Sanjeewa Nilendra Senadheera, M. Laird Forrest. (September 2018) "Targeted delivery of potent immunosuppressants for treatment of ulcerative colitis." Globalization of Pharmaceutics Education Network (GPEN) 2018 Conference, Singapore.

75. Peter A. Kleindl, Jian Xiong, Asha Hewarathna, Maulik K. Nariya, Olivier Mozziconacci, Jae Hyun Kim, Sangeeta B. Joshi, C. Russell Middaugh, Christian Schöneich, Eric J. Deeds, David B. Volkin, M. Laird Forrest. (January 2018) "Physicochemical and biological characterization of crofelemer for identification of critical quality attributes using a machine learning approach", 33rd Graduate Honors Symposium, Lawrence, Kansas.

76. Moulder KR, Zhang T, Forrest ML, "Development and biophysical characterization of a sustained release formulation for Coversin, a C5 Complement Inhibitor." *Department of Pharmaceutical Chemistry Annual Fall Retreat, 2018*

77. Hunt, J; Kleindl, P; Forrest, L. "Further exploration of the SAR of imidazoquinolines; Identification of potent C7 substituted imidazoquinolines" *Department of Pharmaceutical Chemistry Annual Fall Retreat, 2018*

78. Brachtenbach A, Moulder KR, Forrest ML, "Development and characterization of a novel nanoparticle for the sustained release of antigens following subcutaneous injection." *Undergraduate Research Symposium, University of Kansas, 2018*

79. Brachtenbach A, Moulder KR, Forrest ML, "Development of nanodiamonds as a vaccine delivery system." *Summer Undergraduate Research Poster Session, University of Kansas, 2018*

## Invited Lectures and Conference Podium Presentations (chronological order)

1. M.L. Forrest, D.W. Pack. "Quantitative assay for polyplex release from endolysosomes: implications for design of gene delivery vehicles." AIChE Annual Meeting, Los Angeles, CA, November 13, 2000.

2. M.L. Forrest, D.W. Pack. "Quantitation of endolysosomal trafficking of polyplex gene delivery vehicles." 28th International Symposium on Controlled Release of Bioactive Materials, San Diego, California, June 27, 2001.

3. Forrest, M.L. and D.W. Pack. "Intelligent Design of Gene Delivery Vehicles: Is Endosomal Buffering Necessary?" American Institute of Chemical Engineering National Meeting, Reno, NV, November 2001.

4. Forrest, M.L. and D.W. Pack. "A Degradable Derivative of Polyethylenimine that Provides Higher Gene Transfer Efficiency and Negligible Cytotoxicity." American Institute of Chemical Engineering Annual National Meeting, Indianapolis, IN, November 2002.

5. M.L. Forrest, J.T. Koerber, D.W. Pack. "Non-viral gene delivery vectors based on modified polyethylenimine." 30th International Symposium on Controlled Release of Bioactive Materials, Glasgow, Scotland, June 22, 2003.

6. M.L. Forrest, J.T. Koerber, D.W. Pack. "Highly efficient, biodegradable polyethylenimine gene delivery vehicles." 30th International Symposium on Controlled Release of Bioactive Materials, Glasgow, Scotland, June 22, 2003.

7. M.L. Forrest, J.T. Koerber, and D.W. Pack. "Enhancement of PEI-mediated gene delivery by acetylation of primary and secondary amines." AIChE Annual Meeting, San Francisco, CA, November 20, 2003.

8. N. Gabrielson, M.L. Forrest, and D.W. Pack. "Reduction of polyethylenimine buffering capacity enhances in-vitro gene delivery activity." American Society of Gene Therapy 7th Annual Meeting, Minneapolis, MN, June 4, 2004.

9. Forrest, M.L. and G.S. Kwon. "Phospholipid Micelles for Chemotherapeutic Drug Delivery." Invited lecture for Engineering Seminar Series, University of Kansas, Lawrence, KS, March 10, 2005.

10. Forrest, M.L. and G.S. Kwon. "Nanoencapsulation of Chemotherapeutics." Invited lecture for Pharmaceutical Sciences Seminar Series, Washington State University, Pullman, WA, September 9, 2005.

11. Forrest, M.L. and G.S. Kwon. "Development of Nanotechnologies for Drug and Gene Delivery." Invited lecture for Chemical Engineering, Florida State University, April 25, 2006.

12. Forrest, M.L. "Stability of Sirolimus in oxidative environments." Invited lecture for Exogenesis Inc., Cambridge, MA, April 25, 2007.

13. Forrest, M.L. "Emerging nanotherapeutics for cancer." Invited lecture for Sigma Xi Seminar Series, School of Medicine, University of Kansas Medical Center, Kansas City, KS, September 3, 2007.

14. Forrest, M.L. "Nanocarrier technologies for cancer imaging and treatment." Invited lecture for Engineering Seminar Series, University of Kansas, Lawrence, KS, October 19, 2007.

15. Forrest, M.L. "Nanocarrier technology in the treatment and diagnosis of cancer." Invited lecture for Department of Chemistry, Missouri State University, Springfield, MO, October 29, 2007.

16. Forrest, M.L. "New routes for chemotherapeutic intervention using nanotechnology." Invited lecture for Department of Molecular and integrative physiology, University of Kansas Medical Center, Kansas City, MO, February 4, 2008.

17. Forrest, M.L. "Trailblazing new pathways in cancer therapy", Invited lecture for Department of Chemical Engineering, Oklahoma State University, Stillwater, OK, October 7, 2008.

18. Forrest, M.L. "Lymphatic chemotherapy for localized cancers", Invited lecture for Department of Oral Biology, University of Missouri, Kansas City, KS, December 6, 2008.

19. Forrest, M.L. "Drug delivery technology and new treatments in cancer." Invited lecture for Department of Chemistry, University of Central Arkansas, Conway, AR, November 20, 2008.

20. Forrest, M.L. "Design of nanocarriers for novel routes of therapy." Invited lecture for Department of Bioengineering, University of Kansas, KS, April 10, 2009.

21. Forrest, M.L. "Drug nanocarriers for intralymphatic chemotherapy of breast cancer." INBRE Conference, Oklahoma City, OK, May 28, 2009.

22. Forrest, M.L. "Targeted Nanopharmaceuticals for Localized Carcinomas", Tsukuba University, Tsukuba City, Japan, July 15, 2009.

23. Forrest, M.L. "Nanotechnology Treatments for Cancer", Shandong University, Jinan, China, July 27, 2009.

24. Forrest, M.L. "Nanotechnology and Future Therapeutics in Cancer Treatment", Washington State University, Pullman, WA, August 3, 2009.

25. Forrest, M.L., "Development of Nanocarrier Platforms for Locally Advanced Carcinomas", Washington State University, Pullman, WA, August 7, 2009.

26. Forrest, M.L. "Localizing drug delivery to reduce toxicity and improve efficacy." NSF IUCRC, Atlanta, GA, November 20, 2009.

27. Forrest, M.L. "Nanoconjugate Formulation for Localized Chemotherapy." Invited speaker for NanoDDS, Indianapolis, IN, October 6, 2009.

28. Forrest, M.L. "Star Polymers for Lymphatic Delivery." Invited speaker for American Chemical Society Midwest Regional Annual Meeting, Iowa City, IA, October 23, 2009.

29. Forrest, M.L. "Engineered nanomaterials in drug delivery." Department of Materials Science Technology, Graduate School of Industrial Science and Technology, Tokyo University of Science, Tokyo, Japan, June 9, 2010.

30. Forrest, M.L. "Nanoconjugate formulation for treatment of locally advanced cancers." Department of Biomolecular Engineering, Graduate School of Bioscience and Biotechnology, Tokyo Institute of Technology, Tokyo, Japan, June 11, 2010.

31. Forrest, M.L. "Nanoconjugate formulation for treatment of locally advanced cancers." Bioengineering Laboratory, RIKEN Institute, Wako, Japan, June 15, 2010.

32. Forrest, M.L. "Engineered nanomaterials in drug delivery." Bioengineering Department, Tokyo University of Agriculture, Tokyo, Japan, June 22, 2010.

33. Forrest, M.L. "Star polymers for localized drug delivery." Graduate School of Medicine, University of Tokyo, Tokyo, Japan, June 23, 2010.

34. Forrest, M.L. "Lymphatic drug targeting systems." Biomaterials Engineering Research Institute, Tokyo Medical and Dental, Tokyo, Japan, June 28, 2010.

35. Forrest, M.L. "Localized chemotherapy using polymeric nanocarriers." Department of Translational Medicine, National Cancer Center, Tokyo, Japan, July 1, 2010.

36. Forrest, M.L. "Nanoparticle engineering for targeted drug delivery." School of Engineering, Tsukuba University, Tsukuba City, Japan, July 6, 2010.

37. Forrest, M.L. "Hyaluronan nanocarriers in drug delivery." Department of Biophysical Chemistry, Kyoto Pharmaceutical University, Kyoto, Japan, July 8, 2010.

38. Forrest, M.L. "Star polymers for localized drug delivery." Department of Drug Delivery Research and Institute for Innovative NanoBio Drug Delivery and Development, Graduate School of Pharmaceutical Sciences, Kyoto University, Kyoto, Japan, July 9, 2010.

39. Forrest, M.L. "Localized chemotherapy using polymeric nanocarriers." Department of Applied Chemistry, Graduate School of Engineering, Osaka University, Osaka, Japan, July 12, 2010.

40. Forrest, M.L. "Nanoparticle strategies for treatment of head and neck and breast cancers." Department of Biomedical Engineering, National Cerebral and Cardiovascular Center Research Institute, Osaka, Japan, July 13, 2010.

41. Forrest, M.L. "Star polymers for localized drug delivery." Department of Chemistry and Materials Engineering, Faculty of Chemistry, Materials and Bioengineering, Kansai University, Osaka, Japan, July 14, 2010.

42. Forrest, M.L. "Localized chemotherapy using polymeric nanocarriers." Osaka Prefecture University, Osaka, Japan, July 15, 2010.

43. Forrest, M.L. "Localized chemotherapy using polymeric nanocarriers." Department of Applied Chemistry and Bioengineering, Graduate School of Engineering, Osaka City University, Osaka, Japan, July 16, 2010.

44. Forrest, M.L. "Multi-branched polymer design for drug delivery." Department of Applied Chemistry, Hiroshima University, Hiroshima, Japan, July 17, 2010.

45. Forrest, M.L. "Localized nanoparticle chemotherapy." Institute for Materials Chemistry and Engineering." Kyushu University, Fukuoka, Japan, July 20, 2010.

46. Forrest, M.L. "Targeted chemotherapy in the lymphatic system." Hokkaido University, Sapporo, Japan, July 27, 2010.

47. S. Cai, M.L. Forrest. "Development of Drug Delivery Platforms for Locoregional Treatment of Carcinomas." Presented at Kansas IDeA Network of Biomedical Research Excellence Symposium, Kansas City, Kansas, January 15, 2011

48. Forrest, M.L. "Targeted drug delivery to the lymphatics and functional imaging of tumor response." Affiliated Hospital of Guangdong Medical College, Zhanjiang, China, June 3, 2011.

49. Forrest, M.L. "Targeted chemotherapy platform for veterinarian oncology." University of Missouri, Rolla, October 7, 2011.

50. Forrest, M.L. "Localized chemotherapy for anti-cancer treatment and rapid in vivo imaging of therapeutic response." University of Kentucky, Dept. Pharmaceutics Sciences, Lexington, KY, November 4, 2011.

51. Forrest, M.L. "Development of localized cancer treatments and measurement of therapeutic response." University of Manitoba, School of Pharmacy, Winnipeg, Canada, April 11, 2012.

52. Forrest, M.L. "Localized anti-cancer treatment via lymphatic targeting."  Midwest Regional Meeting of the American Chemical Society (MWMB), Omaha, Nebraska, October 25, 2012.

53. Forrest, M.L. "Localized anti-cancer treatment via lymphatic targeting." KINBRE External Advisory Committee, Kansas City, KS, April 17, 2013.

54. Forrest, M.L. "Localized anti-cancer chemotherapy." International Advanced Drug Delivery Symposium. Taipei, Taiwan, May 2, 2013.

55. Forrest, M.L. "Formulation development and pharmacokinetics of subcutaneously injected HylaPlat in spontaneous canine cancers" International Society for Hyalurnan Sciences. Oklahoma City, OK. June 3, 2013.

56. Forrest, M.L., T. Zhang. "Nanodiamond-based contrast agents for photoacoustic imaging." Invited speaker for International Society for Optics and Photonics (SPIE), San Diego, CA, August 27, 2013.

57. Forrest, M.L. "Locally targeted anti-cancer therapy." University of Missouri – Kansas City. Kansas City, MO. April 27, 2014.

58. Forrest, M.L. "Locally targeted platinum chemotherapy." Kansas State University, Manhattan, KS. October 5, 2015.

59. Forrest, M.L. "Particle-based Lymphatic targeted chemotherapy." University of Alberta, Edmonton, Alberta, Canada. October 12, 2016.

60. Forrest, M.L. "Particle Therapy in the Treatment of Lymphatic Cancers" Globalization of Pharmaceutics Education Network (GPEN) Conference, Lawrence, KS. November 12, 2016.

61. Forrest, M.L. "Particle based lymphatic cancer treatment: Preclinical and canine clinical studies" University of Kansas Cancer Center seminar series, Kansas City, KS. December 2, 2016.

62. Peter A. Kleindl, Jian Xiong, Asha N. Hewarathna, Maulik K. Nariya, Olivier Mozziconacci, Jae Hyun Kim, Sangeeta B. Joshi, C. Russell Middaugh, Christian Schöneich, Eric J. Deeds, David B. Volkin, M. Laird Forrest. *Characterization of the oligomeric proanthocyanidin crofelemer toward development of an integrated mathematical model for comparison of complex therapeutics*. Presented at 32nd Graduate Honors Symposium, Lawrence, KS. (January 11, 2017)

63. Forrest, M.L. "Targeting the lymphatics to improve cancer treatment." Tokyo, Japan. May 10, 2017.

64. Ninad Varkhede, C. Russell Middaugh, Christian Schöneich, M. Laird Forrest. *Effect of iron oxide nanoparticles on secondary structure and oxidation of rat growth hormone.* Presented at 33rd Graduate Honors Symposium, Lawrence, KS (January 17, 2018)

65. Forrest, M.L. "Development of localized drug delivery systems." University of Missouri, Columbia, MO, August 28, 2018.

66. Forrest, M.L. "Development and pre-clinical testing of localized drug delivery systems in canines with spontaneous cancers." Invited speaker, NanoDDS Annual Conference, Portland, OR, Sept. 23, 2018.

67. Forrest, M.L. "Development of localized therapies for cancer." University of Wisconsin, Madison, WI, October 12, 2018.

68. Forrest, M.L. "Development of localized immunochemotherapy in canines with spontaneous cancers", Controlled Release Society Annual Conference (Canadian Chapter) invited speaker, Vancouver, BC, May 22, 2019.


## Thesis Committees, Past Students

*Thesis committee chair:*
PhD: Taryn Bagby (Pharm Chem, 2012), Shuang Cai (Pharm Chem, 2011), Jordan Hunt (Medicinal Chemistry, expected 2019), Peter Kleide (Pharm Chem, expected 2020), Ryan Moulder (Pharm Chem, 2019), Ninad Varkhede (Pharm Chem, 2018), Qiuhong Yang (Pharm Chem, 2014), Ti Zhang (Pharm Chem, 2015), Yunqi Zhao (Pharm Chem, 2013)

MS: Adel Alhowyan (Pharm Chem, 2014), David Hart (Pharm Chem, 2007), Jordan Hunt (Med. Chem, 2018), Peter Kleindl (Bioengineering, 2016), Ryan Moulder (Bioengineering, 2016), Abby Petrulis (Pharm Chem, 2018), Alisha Simonian (Pharm Chem, expected 2019), Evelyn Yanez (Pharm Chem, 2018)

*Thesis committee member:*
PhD: Rosemary Ndolo (Pharm Chem, 2012), Julian Kissman (Pharm Chem, 2009), Chuda Chittasupho (Pharm Chem, 2012), Ryan Funk (Pharm Chem), Supang Kondee (Pharm Chem, 2011), Kwame Nti-Addae (Pharm Chem, 2008), Zahra Mohammadi (Chem Engr), Erik Vankampen (Chem Engr), Tiffany Suekama (Bioengineering, 2014), Jacob Staley (Bioengineering), Amir Fakhari (Bioengineering, 2011), Huizhong Cui (Bioengineering, 2012), Janggun Jo (Bioengineering, 2014), Lindsey Ott (Bioengineering, 2014), Anahita Khanlari (Chem Engr, 2014), Adam Mellott (Chem Engr, 2014), Saba Ghazvini (Bioegineering, tbd), Shara Thati (Pharm Chem, 2016), Thora Whitmore (Bioengineering 2016)

MS: Vivian Robertson (Pharm Chem, 2013), Mark Bailey (Bioengineering, 2010), Keerthana Devarajan (Bioengineering, 2011)

## Student advising (undergraduate researchers)
Pharmacy: Grace Ulrich, Lei Cheung, Abby Petrulis, Hollie Wickam, Kristen Fischer

Chemical Engineering: He Li, Shara Thatti, Connor Bybee, Jason Christian, Hanny Sawaf, Benjamin Johnston, Brian Kim, Francis Pamatmat, Carolynn Stone, Ryan Moulder, Sebastian Bohn, Vignish Raghumraman, John Gerber, Joe Rasmussen, Michael Choi, Eva Mohr (Mechanical), Hannah Leiker , Apexa Shah, Jacob Thompson

Chemistry: Zachary Nicolay, Reese Willis

Summer URP: Grace Ulrich, Yomna Badawi, Shih-Hsuan Huang, Rachel Seo

Highschool: Samantha Farb

## Postdoctoral Scientists (includes visiting scientists and research associates)
Shuang Cai, Padmaja Gunda, Yumei Xie, Yepeng Luan, Shaofeng Duan, Sanjeewa Senadheera, Jaden Jungho Jin, Ti Zhang, Chad Groer

## Employment of graduates (includes persons employed but have not yet completed all degree requirements):
Adel Alhowyan, MS (lecturer, King Saud University)
Taryn Bagby, PhD (Scientist II, Recro Gainesville)
Shuang Cai, PhD (Principal Scientist, HylaPharm)

Shaofeng Duan, PhD (Full Professor, Henan University, China)
Padmaja Gunda, PhD (Assistant Professor, Chemistry, Columbia Basin College)
David Hart, MS (Research & Development Manager, PhytoTechnology Laboratories)
Jaden Jungho Jin, PhD (Assistant Professor, University of Pittsburg)
Ryan Moulder, PhD (Research Scientist, Amgen)
Yepeng Luan, PhD (Instructor, Medicinal Chemistry, Qingdao University, Qingdao, China)
Abby Petrulis, MS (Pharmacy Resident at U. S. Public Health Service Phoenix Indian Medical Center)
Sanjeewa Senadheera, PhD (Research Scientist, Lancaster Laboratories / Eurofins)
Alisha Simonian, MS (Senior Product Development Scientist,  Nitto Avecia Pharma Services)
Ninad Varkhede, PhD (Senior Scientist, Merck Pharmaceuticals)
Yumei Xie, PhD (Research Associate, Pacific Northwest National Laboratory)
Evelyn Yanez, MS (Senior Research Associate, Genentech)
Qiuhong Yang, PhD (CMC consultant, Astex Pharmaceuticals)
Ti Zhang, PhD (Research Scientist, HylaPharm)
Yunqi Zhao, PhD (Associate Professor, Kunming Medical University, Kunming, China)

## Professional Activities

*Peer review (Funding Agencies, ad-hoc unless noted otherwise):*

American Cancer Society, Drug development study section *ad hoc reviewer (2012-2014), full member (2014-2019)*
National Institutes of Health (NIH), *NCI RC1 2009, NCI R43(SBIR) 2011, NIGMS(MBRS) 2010-2013, NIGMS(SCORE) 2016, NCI SBIR 2014, R15 2014, NCI SBIR 2015,NIH UH2/3 2015, NIH R01/R21Bioengineering Sciences and Technologies (BST) 2015, NIH R01/R21 Developmental Therapeutics (2017, 2018, 2019), NCI R03/R21 Clinical and Translational Review Panel (2019)*
National Science Centre (NARODOWE CENTRUM NAUKI), Poland, 2013
United Kingdom Association for International Cancer Research (AICR), *2010*
Canadian National Sciences and Engineering Research Council (NSERC), *2008*
Netherlands Technology Foundation (STW), *2009*
Hong Kong Innovation and Technology Support Programme (ITSP), *2008*
University of Houston Gear Program, *2007*

*Peer review (Publications):*

Ad hoc Editor for issue of Advanced Drug Delivery Reviews (2 issues, 2008 and 2011)

Ad hoc reviewer for: Advanced Drug Delivery Reviews, Biomacromolecules, Biomaterials, Biomedical Chromatography, Biopharmaceutics & Drug Disposition, Biophysical Chemistry, Clinical Pharmacokinetics, Drug Development and Industrial Pharmacy, European Journal of Pharmaceutics and Biopharmaceutics, International Journal of Pharmaceutics, Journal of Biomaterials Research, Journal of the American Chemical Society, Journal of Biomaterials Science: Polymer Edition, Journal of Biomedical Materials Research Part A, Journal of Controlled Release, Journal of Pharmaceutical Sciences, Journal of Pharmacy and Pharmaceutical Sciences, Phytotherapy Research

*Member:*  American Association of Pharmaceutical Scientists (active), American Association for Cancer Research (inactive), American Institute of Chemical Engineers (inactive)

## Service

### DEPARTMENT

Graduate student admissions committee, Spring 2007-present
Coordinator for Higuchi Awards to 6th year pharmacy students, Spring 2007-present
Coordinator for Enz Awards to 6th year pharmacy students, Spring 2007-present
Graduate student recruiting at Midwest American Chemical Society meeting, October 2009, 2010, 2012
Presenter in Atlanta NSF-industry meeting for I/UCRC CPMF (Industry/University Cooperative Research Center for Center for Pharmaceutical Manufacturing and Formulation), November 2009
Graduate student recruiting at Central Arkansas University, November 2008
Faculty retreat planning committee member, Spring 2007
Graduate student recruiting at Missouri State University, October 2007

### SCHOOL

PharmD admissions committee member, Spring 2010-present
PharmD and MBA dual degree admissions committee member, Spring 2008-present
Pharmaceutical Chemistry Chair 5-year review committee, November 2014 – February 2015

**UNIVERSITY**

University Conflict of Interest Committee, October 2019-present
University Senate Judicial Board, October 2017-present
BioEngineering Center Director Search Committee, June 2018
Animal Care Advisory Council, November 2013 - June 2017
Vice-Chair of Institutional Animal Care and Use Committee (IACUC) (October 2011 – August 2013)
Chair of IACUC protocol development subcommittee, July 2009 – August 2013
IACUC member January 2007-August 2013
Interviewer for University Assessment of General Education, Spring 2007 and 2008
Student recruiter for KU at Annual Biomedical Research Conference for Minority Students (ABRCMS), St. Louis, 2011; Nashville, TN, 2013
Japan Alumni Outreach Seminars, on behalf of KU Endowment Association and Department of Pharmaceutical Chemistry, Tokyo, Japan, May 2017

**LOCAL, STATE, REGIONAL**

Invited speaker at Kansas City Chapter of American Cancer Society fundraising dinner, August 2009 (unable to attend)
Judge at PSGRM Annual Conference, Kansas City, June 2007
Judge at Annual Biomedical Research Conference for Minority Students (ABRCMS), November 2011, 2013

**NATIONAL**

Reviewer and ad hoc study section member for American Cancer Society (ACS), Cancer Drug Development panel, 2012-2015
Reviewer and standing study section member for American Cancer Society (ACS), Cancer Drug Development panel, 2015-2018
Reviewer National Institutes of Health (NIH), R01 proposal review: Developmental Therapeutics, ad hoc, 2016-2019
Reviewer National Institutes of Health (NIH), R01/R21 proposal review: Bioengineering Sciences and Technologies (BST) study section, ad hoc, 2015.
Reviewer National Institutes of Health (NIH), NCI proposal review: cancer detection, diagnosis, and treatment technologies for global health (UH phase 2 and 3), ad hoc, 2015
Reviewer National Institutes of Health (NIH), SBIR contract review: cancer stem cell culture systems (Phase 1 and Phase 2), ad hoc, 2015
Reviewer National Institutes of Health (NIH), SBIR contract review: cancer stem cell treatments(Phase 1 and Phase 2), ad hoc, 2014
Reviewer for National Institutes of Health (NIH) R15, ad hoc, 2014
Reviewer for National Institutes of Health (NIH), SBIR contract review panel: anticancer antibodies, ad hoc 2011
Reviewer for National Institutes of Health (NIH), MBRS review panel, ad hoc 2010, 2012
Reviewer for National Institutes of Health (NIH), RC1 grants, ad hoc 2009
Member of Scientific and Medical Advisory Board, Exogenesis Corporation, Billerica, MA, 2009-present
Member and participant in national meetings – American Chemical Society, 2009-present
Member and participant in national meetings – American Association of Pharmaceutical Sciences, 2005-present
Member and participant in national and international meetings, abstract reviewer – Controlled Release Society, 2002-2014
Member and participant in national meetings – American Institute of Chemical Engineers, 2000-2005
Reviewer for Advanced Drug Delivery Reviews, Biomacromolecules, Biomaterials, Biomedical Chromatography, Biopharmaceutics & Drug Disposition, Biophysical Chemistry, Clinical Pharmacokinetics, Drug Development and Industrial Pharmacy, European Journal of Pharmaceutics and Biopharmaceutics, International Journal of Pharmaceutics, Journal of Biomaterials Research, Journal of Biomaterials Science: Polymer Edition, Journal of Biomedical Materials Research Part A, Journal of Chromatography B, Journal of Controlled Release, Journal of Pharmaceutical Sciences, Journal of Pharmacy and Pharmaceutical Sciences, Phytotherapy Research, Nanomaterials
Reviewer for University of Houston Gear Program, ad hoc 2007

**INTERNATIONAL**

Reviewer for National Science Centre (NARODOWE CENTRUM NAUKI), Poland, ad hoc 2013
Editorial Board member, Journal of Pharmaceutics, 2012-2013
Reviewer for Icelandic Research Fund, ad hoc 2012
Reviewer for Association for International Cancer Research (AICR), United Kingdom; ad hoc 2010
Developed, organized and taught short course (1 full credit hour) "Drug Delivery systems"
    Tsukuba University, Tsukuba, Japan (July 2009 and 2010)

Shandong University, Jinan, China (July 2009)
Reviewer for Hong Kong Innovation and Technology Support Programme (ITSP), ad hoc 2008
Theme issue editor for Advanced Drug Delivery Reviews, 2 theme issues, 2008 and 2009
Reviewer for Canadian National Sciences and Engineering Research Council (NSERC), ad hoc 2007
Reviewer for Netherlands Technology Foundation (STW), ad hoc 2007 and 2008

## Grants
### *Active*

1R01CA173292-01 (PI:Forrest)                                   03/01/13 – 2/28/19 (no cost)
National Institute of Health/National Cancer Institute
Title: Biomaterials for treatment of head and neck cancers
Role: PI

R01AI138970 (PI: W.L. Picking)                                 06/01/2018 – 05/31/2023         1.2
calendar
National Institutes of Health
Title: *Vaccines to counter emerging antibiotic resistance*
Pursue our hypothesis that Haf-Fusions from *Pseudomonas aeruginosa, Salmonella enterica* and *Shigella* spp. will provide
serotype-independent protection against all strains of these pathogen including MDR species/strains
Role: Co-Investigator

BioNEXUS KCALSI                                                12/1/2018-11/30/2019
Title: Development of cancer vaccines using dogs as a translational model
Role PI

IAMI Frontiers (PI: Swerdlow)                                  05/15/2018 – 06/30/2019        0.1
effort
KUMC
Title: Pharmacokinetic Analysis of a Novel Bioenergetic Medicine Esters
Goal: Synthesis and preliminary PK testing of new bioenergetic prodrugs.
Role: co-investigator

KUADC (PI: L Forrest)                                          07/01/2018 – 06/30/2019        0.24
calendar
KUMC
Title: *Bioenergetic prodrugs for treatment of Alzhelmer's*
Goal: To develop a pilot library of bioenergetic drugs
Role: PI

SBIR Phase 1  (PI: Michaelis)                                  09/01/2018 – 03/30/2019        0.1
effort
Aerobyx LLC/NIH flowthru
Title: Targeting Bioenergetic Flux for Alzheimer's Disease Management
Goal: Scale up and production of a bioenergetic prodrug, preliminary animal testing
Role: co-investigator

Industrial Contract (PI: Forrest)                              05/01/12- 02/28/19
HylaPharm LLC
Translation development of intralymphatic chemotherapy
Role: Principal investigator

### *Recently completed (last 3 years)*

National Institutes of Health (NIH) / National Institute for Allery and Infection Disease (PI:Cai)        7/1/2017-6/30/2018
Generating synergy between protein and non-protein macromolecular adjuvants
Role: co-investigator


Kansas State University – College of Veterinary Medicine & Veterinary Health Center        6/1/15-12/31/17
Proof-of-concept study locoregionally administering a nanotherapeutic formulation of hyaluronan conjugated cisplatin to
dogs with naturally-occurring metastatic apocrine gland anal sac adenocarcinoma
Role: co-investigator


1U01FD005285 (lead PI: Volkin, Co-PI:Forrest)        10/1/14-9/30/17
FDA (Food and Drug Administration)
Title: Development of an Integrated Mathematical Model for Comparative Characterization of Complex Molecules


Industrial Contract (PI: Forrest)
Akari Pharmaceutics
Formulation of Coversin for subcutaneous sustained release        8/15/2016-1/15/2018
Role: Principal Investigator


National Institutes of Health (NIH) / National Cancer Institute (PI: Groer)        2/1/2017-1/31/2018
SBIR 1R43CA203142-01A1
Aerosolized platinum nanoparticle chemotherapy for lung cancer
Role: co-investigator


National Institutes of Health (NIH) / National Cancer Institute (NCI)        9/10/2015-10/1/2016
Contract Number: HHSN261201500047C (NCI control # N43-CO-2015-0047)
Targeted nanoparticle treatment for breast cancer stem cells
Role: co-investigator/PI subaward


KINBRE: Local immunosuppressive treatment of ulcerative colitis        05/01/2016 – 04/30/2017
NIH P20GM103418 (PI P20: Wright)
Kansas IDeA Network of Biomedical Research Excellence (K-INBRE), Translational Partnership Award
Role: PI (project)


Proof of Concept Award (PI: Forrest)        5/1/2015-6/30/2016
University of Kansas Commercialization and Technology Center
Development of therapy for triple negative breast cancer
Role: PI


Proof of Concept Jay Award (PI: Forrest)        7/1/2015-6/30/2016
Higuchi Biosciences Center
Mechanistic understanding of oxidation of therapeutic proteins after subcutaneous administration
Role: PI


Proof of Concept Award (PI: Rowe)        4/1/2014-6/30/2015
University of Kansas Commercialization and Technology Center
Formulation for enhanced hair growth
Role: Co-PI


1R56AI091996 (PI: Berkland)        08/15/12 – 07/31/15
Targeted nanoscale antigen arrays for treating autoimmune diseases
NIH

**Exhibit B**

**Materials Considered for the Opening Expert Report of Laird Forrest, Ph.D.**

| Description | Short Cite |
|---|---|
| U.S. Patent No. 11,103,483, titled "Formulations of Bendamustine," (filed July 12, 2019) (issued Aug. 31, 2021) | "The '483 patent" |
| U.S. Provisional Appl. No. 61/299,100 (filed on January 28, 2010) | "The '100 provisional application" |
| Prosecution History of the '483 Patent | |
| Agalloco, J., and James Akers. "Sterile Product Manufacturing." Section 2.1, In *Pharmaceutical Manufacturing Handbook: Production and Processes,* Gad, S. C., Ed., Wiley-Interscience, Hoboken, NJ, 2008, pp. 99–134. | "Agallocco 2008" |
| Akers, Michael J. "Excipient–Drug Interactions in Parenteral Formulations." *Journal of Pharmaceutical Sciences*, vol. 91, no. 11, Nov. 2002, pp. 2283–2300. | "Akers 2002" |
| United States Patent Application Publication No. 2006/0159713 (filed January 12, 2006) (published July 20, 2006). | "Brittain 2006" or "the '713 publication" |
| Broadhead, Joanne. "Parenteral Dosage Forms." *Pharmaceutical Preformulation and Formulation: A Practical Guide from Candidate Drug Selection to Commercial Dosage Form*, edited by Mark Gibson, Interpharm/CRC Press, Boca Raton, Florida, 2001, pp. 331–354. | "Broadhead 2001" |
| Carstensen J.T. and Nelson E., Terminology Regarding Labeled and Contained Amounts in Dosage Forms, *J. Pharm. Sci.*, **1976**, 65(2), 311-312 | "Carstensen 1976" |
| WO 2010/036702 (filed September 23, 2009) (published April 1, 2010) | "Drager" or "WO '702" |
| Etherington, W.G., et al. "Reproductive Performance of Dairy Cows Following Treatment with Fenprostalene, Dinoprost, or Cloprostenol between 24 and 31 Days Post Partum: A Field Trial." *Theriogenology*, vol. 42, no. 5, 1994, pp. 739–752. | "Etherington 1994" |
| European Medicine Agency, Scientific Discussion in Approval of Onsior, published Dec. 2008 (available at | "EMA 2008" |

| Description | Short Cite |
|---|---|
| https://www.ema.europa.eu/en/documents/scientific-discussion/onsior-epar-scientific-discussion_en.pdf). | |
| FDA GFI Q1A(R2) Stability Testing of New Drug Substances and Products, FDA GFI Q1A(R2) Stability Testing of New Drug Substances and Products, November 2003 | "FDA Guidance" |
| Guidance for Industry Q1E Evaluation of Stability Data, U.S. Department of Health and Human Services, Food and Drug Administration, June 2004 | "FDA Guidance 2004" |
| Harmon, Paul A., et al. "A Novel Peroxy Radical Based Oxidative Stressing System for Ranking the Oxidizability of Drug Substances." *Journal of Pharmaceutical Sciences*, vol. 95, no. 9, 2006, pp. 2014–2028. | "Harmon 2006" |
| Hovorka, Susan W., and Christian Schöneich. "Oxidative Degradation of Pharmaceuticals: Theory, Mechanisms and Inhibition." *Journal of Pharmaceutical Sciences*, vol. 90, no. 3, 2001, pp. 253–269. | "Hovorka 2001" |
| Johnson, David M., and William F. Taylor. "Degradation of Fenprostalene in Polyethylene Glycol 400 Solution." *Journal of Pharmaceutical Sciences,* vol. 73, no. 10, 1984, pp. 1414–1417. | "Johnson 1984" |
| Kamat, J.P., and T.P.A. Devasagayam. "Nicotinamide (Vitamin B3) as an Effective Antioxidant against Oxidative Damage in Rat Brain Mitochondria." *Redox Report*, vol. 4, no. 4, 1999, pp. 179–184. | "Kamat 1999" |
| Maurin, Michael B., et al. "Physicochemical Properties of a Nonpeptide Cyclic Urea HIV Protease Inhibitor (DMP 323)." *International Journal of Pharmaceutics*, vol. 144, no. 1, 1996, pp. 99–106. | "Maurin 1996" |
| Moini et al., Antioxidant and Prooxidant Activities of α-Lipoic Acid and Dihydrolipoic Acid, *Toxicol. Appl. Pharmacol.*, **2002**, 182, 84-90 | "Moini 2002" |
| Nema, Sandeep, et al. "Excipients and Their Use in Injectable Products." *Journal of Pharmaceutical Science & Technology*, vol. 51, no. 4, 1997, pp. 166–171. | "Nema 1997" |
| Ogata, Shin, et al. "Radical Scavenging Activities of Niacin-Related Compounds." Bioscience, Biotechnology, and Biochemistry, vol. 66, no. 3, 2002, pp. 641–645. | "Ogata 2002" |
| German Democratic Republic Patent No. 159289 (filed June 1, 1981) (issued March 2, 1983) (with translation from German to English). | "Olthoff" or "DD 159289" |

| Description | Short Cite |
|---|---|
| Rasmussen, H. T., et al. "HPLC Method Development." Chapter 6, In *Handbook of Pharmaceutical Analysis by HPLC,* Ahuja, S., and Michael Dong, Eds., vol. 6, Elsevier, London, UK, 2005, pp. 145–190. | "Rasmussen 2005" |
| Bailey L. C., "Chromatography," Chapter 33, In *Remington, The Science and Practice of Pharmacy*, Gennaro, A.R., Ed., Lippincott Williams & Wilkins, Baltimore, MD 2000. | "Remington 2000 Chapter 33" |
| Nairn J. G., "Solutions, Emulsions, Suspensions, and Extracts," Chapter 39, In *Remington, The Science and Practice of Pharmacy*, Gennaro, A.R., Ed., Lippincott Williams & Wilkins, Baltimore, MD 2000. | "Remington 2000 Chapter 39" |
| Vadas, E. B., "Stability of Pharmaceutical Products," Chapter 52, In *Remington, The Science and Practice of Pharmacy*, Gennaro, A.R., Ed., Lippincott Williams & Wilkins, Baltimore, MD 2000. | "Remington 2000 Chapter 52" |
| Wallick, D., "Polyethylene Glycol." *Handbook of Pharmaceutical Excipients*, edited by Richard C. Rowe, Paul J. Sheskey, and Marian E. Quinn, Pharmaceutical Press, Grayslake, Illinois, 2009, pp. 517–522. | "Rowe 2009" |
| Santoro, Maria I. R. M., and Anil Kumst Singh. "Packaging and Labeling." Section 3.2, In *Pharmaceutical Manufacturing Handbook: Production and Processes,* Gad, S. C., Ed., Wiley-Interscience, Hoboken, NJ, 2008, pp. 159–232. | "Santoro 2008" |
| Stahmann, Mark A., and Max Bergmann. "Chemical Reactions of the Nitrogen Mustard Gases.1 VIII. the Oxidation of the Nitrogen Mustard Gases by Peracids." *The Journal of Organic Chemistry*, vol. 11, no. 5, 1946, pp. 586–591. | "Stahmann 1946" |
| Steele, G., "Preformulation as an Aid to Product Design in Early Drug Development," Chapter 6, In *Pharmaceutical Preformulation and Formulation*, Gibson, M., Ed., CRC Press, Boca Raton, FL 2001. | "Steele 2001" |
| TREANDA® (bendamustine hydrochloride) for Injection, for intravenous infusion, Prescribing Information, Revised 03/2008. | "2008 TREANDA® Label" |
| United States Patent Application Publication No. 2006/0205694 (filed March 7, 2006) (published September 14, 2006). | "The '694 Publication" |
| United States Patent No. 4,879,286 (filed April 4, 1988) (issued November 7, 1989). | "The '286 Patent" |

| Description | Short Cite |
|---|---|
| United States Patent No. 4,997,823 (filed July 20, 1987) (issued March 5, 1991). | "The '823 Patent" |
| United States Patent No. 8,344,006 (filed January 31, 2012) (issued January 1, 2013). | "The '006 Patent" |
| "Polyethylene Glycol." *United States Pharmacopea and the National Formulary, USP 32/NF 27*, The United States Pharmacopeial Convention, Rockville, Maryland, 2009, pp. 1308–1310. | "2009 USP Monograph for Polyethylene Glycol" |
| Van Scott, Eugene J., and Jacob D. Kalmanson. "Complete Remissions of Mycosis Fungoides Lymphoma Induced by Topical Nitrogen Mustard (HN2). Control of Delayed Hypersensitivity to HN2 by Desensitization and by Induction of Specific Immunologic Tolerance." *Cancer*, vol. 32, no. 1, 1973, pp. 18–30. | "Van Scott 1973" |
| Varia, Sailesh A., et al. "Optimization of Cosolvent Concentration and Excipient Composition in a Topical Corticosteroid Solution." *Journal of Pharmaceutical Sciences*, vol. 80, no. 9, 1991, pp. 872–875. | "Varia 1991" |
| Wayne Bequette, B., From Pilot Plant to Manufacturing: Effect of Scale-Up on Operation of Jacketed Reactors, Chapter 3, In Pharmaceutical Manufacturing Handbook, Production and Processes, **2008**, Wiley-Interscience, | "Wayne Bequette 2008" |
| Wasylaschuk, Walter R., et al. "Evaluation of Hydroperoxides in Common Pharmaceutical Excipients." *Journal of Pharmaceutical Sciences*, vol. 96, no. 1, 2007, pp. 106–116. | "Wasylaschuk 2007" |
| Waterman, Kenneth C., et al. "Stabilization of Pharmaceuticals to Oxidative Degradation." *Pharmaceutical Development and Technology*, vol. 7, no. 1, 2002, pp. 1–32. | "Waterman 2002" |
| Waterman, Kenneth C., et al. "N-Methylation and n-Formylation of a Secondary Amine Drug (Varenicline) in an Osmotic Tablet." *Journal of Pharmaceutical Sciences*, vol. 97, no. 4, 2008, pp. 1499–1507. | "Waterman 2008" |

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EAGLE PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1256-CFC |
| | ) | |
| SLAYBACK PHARMA LLC, APOTEX, | ) | |
| INC., AND APOTEX CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**RESPONSIVE EXPERT REPORT OF BERNHARDT TROUT, Ph.D.**

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

II.   Materials Considered ............................................................................................ 3

III.  Summary of Opinions ........................................................................................... 4

IV.   Person of Ordinary Skill in the Art ...................................................................... 5

V.    Legal Standard ...................................................................................................... 7

    A.    Anticipation ...................................................................................................... 7

    B.    Non-Obviousness .............................................................................................. 7

VI.   The '483 Patent ................................................................................................... 11

VII.  Scope and Content of the Prior Art .................................................................... 12

    A.    Formulation Guidelines ................................................................................. 12

        1.    Dosage Form Design ................................................................................ 12

        2.    Parenteral Dosage Forms ......................................................................... 14

    B.    Drager ............................................................................................................. 14

VIII. The Asserted Claims of the '483 Patent Are Valid ............................................ 20

    A.    Drager Does Not Anticipate the '483 Patent Because It Does Not Teach Each and Every
          Limitation of the Asserted Claims, as Arranged in the Claims ................................. 20

        1.    Drager Does Not Teach a Formulation Comprising Bendamustine and PEG nor Does It
              Allow A POSA To Immediately Envisage One ................................................. 20

        2.    Drager Does Not Teach a Formulation Comprising Bendamustine and a Stabilizing
              Amount of an Antioxidant nor Does It Allow A POSA To Immediately Envisage One ..... 26

        3.    Drager Does not Teach Any Particular Formulation Comprising PEG and an
              Antioxidant and Having the Claimed Stability ................................................. 32

        4.    Based on the Foregoing, Drager Does Not Anticipate The '483 Patent ...................... 38

    B.    Drager Does Not Render the Asserted Claims Obvious ................................................. 42

        1.    A POSA Would Not Be Motivated to Select PEG as an Excipient ............................ 44

        2.    A POSA Would Not Be Motivated to Use A Stabilizing Amount of An Antioxidant. 47

3.   A POSA Would Not Have Had A Reasonable Expectation of Successfully Achieving the Claimed Stability Profile ................................................................................. 50

IX.  Objective Indicia Further Demonstrate The Non-Obviousness of the '483 Patent .............. 52

A.   Nexus ................................................................................................................. 52

B.   Unexpected Results ............................................................................................ 52

C.   Long-Felt Need .................................................................................................. 54

D.   Failure of Others ............................................................................................... 54

E.   Teaching Away ................................................................................................... 56

## I.     Introduction

1.      I am the Raymond F. Baddour Professor of Chemical Engineering at the Massachusetts' Institute of Technology ("MIT").   My research focuses generally on pharmaceutical development and manufacturing research.  I have held various teaching positions at MIT since January of 1998.  The following is a summary of my qualifications, which are more fully described in my curriculum vitae, attached as Exhibit A.

2.      In 1998, I became an Assistant Professor of Chemical Engineering at MIT.  In 2003, I became an Associate Professor of Chemical Engineering at MIT, and in 2008, I became a full Professor of Chemical Engineering at MIT.  From 2006-2014, I was the Co-Chair of Chemical and Pharmaceutical Engineering Singapore-MIT Alliance Program.   In 2007, I co-founded the Novartis-MIT Center for Continuous Manufacturing with several colleagues and served as Director of the Center from 2007-2019.

3.      I have taught more than 1,000 students in undergraduate and graduate university chemical engineering courses, including courses in Thermodynamics, Chemical Reactor Engineering, Kinetics of Biological and Chemical Systems, Chemical Kinetics and Reactor Design, Process Engineering Laboratory, Molecular Computational Methods in Chemical Engineering, and Chemical Engineering Design Module.  I have also taught and supervised graduate students (at both the Masters and Ph.D. level), post-doctoral researchers, and research scientists with a primary emphasis on pharmaceutical development and manufacturing research. The research of these supervisees often encompasses parenteral formulation (in particular intravenous and subcutaneous) with an emphasis on stabilization approaches for these formulations.

1

4.      I am also familiar with the principles behind and interpretation of high performance liquid chromatography ("HPLC") and have frequently relied on this analytical technique over the course of my career, as well as others reflected in the patent, including stability and solubility testing.

5.      I have consulted widely for industry, particularly in the fields of pharmaceutical development and manufacturing, including stabilization of pharmaceuticals and delivery.  I also work closely with the United States Food and Drug Administration ("FDA") and was a consultant for the FDA Advisory Committee for Pharmaceutical Science and Clinical Pharmacology.  In addition, I work with other regulatory agencies, in particular the European Medicines Agency and Japan's Pharmaceutical and Medical Devices Agency.  I also work with the United States Pharmacopeia and was recently a member of their Expert Panel on Quality Standards for Pharmaceutical Continuous Manufacturing.  In addition, I am Co-Chair of the International Symposium on Continuous Manufacturing of Pharmaceuticals, a group which promotes integrated continuous manufacturing and works with industry and regulatory authorities across the globe, hosting meetings and writing white papers.

6.      I am a member of various professional societies, including the American Institute of Chemical Engineers, the American Chemical Society, and the American Association of Pharmaceutical Scientists.

7.      I have published over 200 papers in peer reviewed journals in the field of pharmaceutical formulation and stabilization, physical chemistry, chemical engineering, and pharmaceutical development and manufacturing in addition to 19 patents issued or pending.  I regularly give invited lectures, including keynote and plenary lectures to academics, professional organizations, regulatory bodies, including the FDA, and industry.

8.      I received the National Science Foundation Graduate Research Fellowship from 1991 through 1994.   From 1996-1997, I received the Max-Planck Institute Fellowship for Biophysical Chemistry.  In 2000-2004, I received the National Science Foundation Faculty Early Career Development ("CAREER") Award.   I received the Ford Motor Company Young Investigator Award in 2001.   In 2011, I received the Impact Award from the Computational Molecular Science and Engineering Forum of the American Institute of Chemical Engineers.  In 2012, my continuous manufacturing technology led to the Manufacturing Technology Runner-Up for the Wall Street Journal Technology Innovation Award.  In 2014, I received the Counsel for Chemical Research Collaboration Award.  I received the Medicine Maker "Power List" award in 2015, 2016, 2017, and 2019.  In 2015, I received the American Institute of Chemical Engineers Division 15 Plenary Speaking Award.  For a complete list of my awards and honors, please see my curriculum vitae attached hereto as Exhibit A.

9.      I have been retained by Latham & Watkins LLP on behalf of Eagle Pharmaceuticals, Inc. ("Eagle") to respond to Dr. Forrest's opinions regarding the validity of U.S. Patent No. 11,103,483 (the "'483 patent").  I am being paid at my customary consulting rate of $950 per hour for my time on this matter.  My compensation is not contingent upon the outcome of this case.  During the previous four years, I have testified as an expert by deposition and at trial in the cases identified in Exhibit B of my report.

10.      Based on my experience and qualifications, I consider myself to be an expert in pharmaceutical technology, including the formulation of liquid injectable drug products.

## II.    Materials Considered

11.      This report contains a statement of my present opinions and includes the bases and reasons therefore, and the data and other information which I have considered in forming these opinions.

3

12.     If called as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below.  Additionally, I anticipate that I may comment on materials relating to these topics that may later become available, such as expert reports or deposition testimony.  I reserve the right to supplement or amend this report.  In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

13.     This report is based on information currently available to me.  I reserve the right to continue my investigation and study, which may include a review of documents and information that may be produced subsequent to this report, as well as deposition testimony from depositions for which transcripts are not yet available or that may yet be taken in this case.  Therefore, I expressly reserve the right to expand or modify my opinions as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me, any matters raised by Defendants and/or opinions provided by Defendants' expert(s), or in light of any relevant orders from the Court.

14.     In preparing my opinions in this matter and preparing this report, I have reviewed and considered the materials referenced in the body of this report, in addition to my own knowledge, education, and experience.

## III.    Summary of Opinions

15.     It is my opinion that Dr. Forrest failed to provide clear and convincing evidence that the asserted claims of U.S. Patent No. 11,103,483 (the "'483 patent") are invalid.  In my opinion, the asserted claims of the '483 patent are not invalid.

16.     In particular, it is my opinion that the asserted claims are not invalid as anticipated by Drager.  The asserted claims require PEG, "a stabilizing amount of an antioxidant," and that the formulation have no more than 5% total impurities after 15 months under certain storage

conditions.  Drager does not disclose any such formulation, nor does Drager allow a POSA to immediately envisage such a formulation.

17.     Further, in my opinion, Drager does not render the asserted claims obvious for many of the same reasons that it does not anticipate the asserted claims.  Drager provides no motivation to use PEG or an antioxidant in a bendamustine-containing formulation on their own and certainly provides no motivation to use both in the same bendamustine-containing formulation. Additionally, the asserted claims require no more than 5% total impurities after 15 months under certain storage conditions.  Drager does not provide any reasonable expectation of successfully achieving such stability in a formulation meeting the other elements of the claims.  Drager does not show any data for any formulation actually meeting that stability limitation at 15 months and concedes that many of the disclosed formulations will not meet such a limitation.

## IV.     Person of Ordinary Skill in the Art

18.     I understand that the person of ordinary skill in the art ("POSA") is a hypothetical person who may possess the combined skills of more than one actual person.  I understand that in a prior litigation regarding patents related to the '483 patent, the Court adopted the following definition of a POSA: the person of ordinary skill in the art would have had the skills, education, and expertise of a team of individuals working together to formulate a liquid injectable drug product.  Such a team would have included individuals with doctoral degrees in chemistry, biochemistry, pharmaceutics, pharmaceutical sciences, chemical engineering, biochemical engineering or related fields, with at least two years of post-graduate experience in developing liquid injectable drug products, or master's or bachelor's degrees in similar fields of study, with a commensurate increase in their years of postgraduate experience.  Such a team also would have been familiar with a variety of issues relevant to developing liquid injectable drug formulations, including, among other things, solubility, stability, pharmacokinetics, pharmacodynamics, and

5

other pharmaceutical characteristics.  Such a team also would have included persons with expertise in analytical chemistry, including the detection and measurement of chemical degradants.  The team also would have had access to an individual with a medical degree with experience in treating patients with CLL and NHL.  *Cephalon, Inc. v. Slayback Pharma LLC*, 17-cv-1154, Slip Op. ("*Cephalon*") at 10-11.

19.     I agree with this definition and have adopted this same definition in forming my opinions described in this report.

20.     I note that I would have qualified as a member of this team as of the earliest priority date of the asserted claims, which I understand from counsel is January 28, 2010.

21.     Dr. Forrest proposes an alternative definition of a POSA: a POSA with respect to the '483 patent would be a formulator of drugs with a Ph.D. or equivalent degree in pharmaceutics, chemistry, chemical engineering, or a related field.  The POSA would have had several (at least two) years of experience in formulating parenteral drugs, including drugs designed for intravenous administration.  The POSA would have collaborated, as needed, with other skilled persons such as: a clinical scientist with a medical degree and several years of experience in the clinical development of drugs, including those that are administered intravenously and the medical preparation and administration of the same; oncologists; pharmacologists; toxicologists; clinical oncology pharmacists; specialty pharmacists; oncology nurses; and the like.

22.     Dr. Forrest does not explain why he disagrees with the POSA definition the Court adopted in the prior litigation on related patents involving Slayback and Apotex.  Regardless, I note that I received my Ph.D. in chemical engineering in 1996 and would have qualified as a POSA under Dr. Forrest's definition as of the earliest priority date of the asserted claims, which I understand from counsel is January 28, 2010.

6

23.     If the Court were to adopt Dr. Forrest's definition, my opinions would not change.

## V.     Legal Standard

### A.     Anticipation

24.     I understand from counsel that a patent may be invalid if it is anticipated by the prior art.  I further understand that in order to be anticipatory, a prior art reference must disclose each element of the claims within the document and further that those elements must be arranged as in the claims.  I further understand that it is not enough that the prior art reference discloses multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention.   I also understand that even where a reference discloses each of the elements of a claim, to anticipate, the prior art reference must contain a discussion linking the claim elements so as to arrange them as in the claim at issue.  While I understand that a reference can anticipate a claim even if it does not expressly spell out all the limitations as arranged or combined in the claim, that can occur only if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination.  Further, even if a skilled artisan could at once envisage the claimed arrangement or combination, I understand that a reference is not anticipatory if it the number of  is so large that the combination would not be immediately apparent to one of ordinary skill in the art.  I also have been informed that to anticipate, a reference must direct those skilled in the art to the invention without any need for picking, choosing, and combining various disclosures.

### B.     Non-Obviousness

25.     I understand from counsel that a patent claim would have been "obvious," and thus invalid, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to the POSA to which said subject matter pertains.  I understand that analysis of whether a

claim would have been obvious depends on (a) the scope and content of the prior art, (b) the differences between the claimed invention and the prior art, (c) the level of ordinary skill in the art, and (d) any objective considerations of non-obviousness.  I understand that the use of hindsight must be avoided because the obviousness of an invention is evaluated from the perspective of the POSA at the time the invention was made.  Thus, in conducting an obviousness inquiry, one must be aware of the distortion caused by hindsight bias and must be cautious to avoid reading into the prior art the teachings of the claimed invention at issue.

26.      I understand from counsel that to be relevant to obviousness, a prior-art reference should be analogous.  Under that standard, a prior-art reference is relevant only if (a) it comes from the same field of the inventor's endeavor, or (b) it is reasonably pertinent to the particular problem with which the inventor is involved.  I understand that a reference is reasonably pertinent if it is one that, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering her or his problem.  I define the boundaries of the corpus of knowledge, or "the art," pertinent to the subject matter of the patents, accordingly.

27.      I understand from counsel that, when a party challenging a patent relies on multiple references to demonstrate that an invention would have been obvious to the POSA, the challenger must prove not only that the prior art taught or suggested the invention, but also that the POSA would have had a reason to combine the teachings of the prior art references to achieve the claimed invention.  In other words, there needs to be a reason to combine the known elements in the way claimed by the patent at issue. I further understand that whether a skilled artisan would be motivated to make a combination includes whether he or she would select particular references from the available prior art in order to combine their elements.  I also understand that references that "teach away" from the invention—in other words, references that would lead the POSA in a

different direction from that taken by the patentee and that would lead the POSA to believe that the direction taken by the patentee was unsuitable—must be considered.  In determining whether the invention would have been obvious, one must consider the prior art as a whole.

28.     I understand that, in addition to having a reason to combine the teachings of the prior art references, the POSA must have a reasonable expectation of success.  I understand that to have a reasonable expectation of success, one must be motivated to do more than merely vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.

29.     I understand that in evaluating the issue of obviousness, one factor to be evaluated is the passage of time from the publication of the allegedly invalidating references, as advances that are purportedly routine and relatively easy should prompt the development of the subject matter at issue in a relatively short period of time (as opposed to the passage of years).  I understand that a prior art reference that recites success in achieving a particular result may itself indicate a lack of motivation to modify the reference in the manner required to achieve the claimed subject matter.

30.     I understand that, in certain circumstances, a patent may be non-obvious where the inventors recognized and solved a problem that the prior art did not recognize.  I understand that without knowledge of the problem, it would not have been obvious to undertake efforts to solve that problem.  I understand that even an obvious solution does not render an invention obvious if the problem solved was previously unknown.

31.     I understand that, in certain circumstances, a prior-art reference may "inherently" disclose a particular claim limitation if the limitation in question is necessarily present in, or is the

natural result of the combination of elements expressly disclosed by, that reference.  I understand that inherency cannot be established by probabilities or possibilities.  If a result may or may not result from practice of that reference or teaching, inherency is not established.  I further understand that a party must meet a high standard in order to rely on inherency to establish the existence of a claim limitation in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art.  I understand that inherency requires an analysis of what would have been expected in light of disclosures in the prior art.  Thus, when considering whether a particular claim limitation would have been inherently disclosed for the purposes of an obviousness analysis, the person conducting the inquiry must consider unpredictability and unexpectedness.

32.     I understand that, in certain circumstances, a combination of elements may have been "obvious to try."  Accordingly, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, the POSA has good reason to pursue the known options within her or his technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.  Conversely, where the prior art at best gives only general guidance as to the particular form of the claimed invention or how to achieve it, the combination would not have been obvious to try.  I further understand that where the options do not behave predictably, this principle of obvious to try does not apply.

33.     Counsel has also informed me that, in the case of certain claimed ranges, a claim may have been obvious if the prior art disclosed the general conditions of the claim and the differences between the prior art and the claimed invention are such that a POSA would have achieved the invention through routine experimentation.  However, I understand that even where

the prior art discloses a range that overlaps with the claimed parameter, the parameter might not have been obvious if, among other things, (a) the prior art taught away from the claimed range; (b) the prior art did not recognize that the parameter was result-effective (i.e., the prior art did not recognize that the parameter affected the relevant property or result of the invention); or (c) the prior art discloses very broad ranges.

## VI.   The '483 Patent

34.     The '483 patent is entitled "Formulations of Bendamustine."  Claim 1 of the '483 patent is the sole independent claim and reads as follows:

A ready to use liquid bendamustine-containing composition comprising:

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;

polyethylene glycol; and

a stabilizing amount of an antioxidant;

the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.

35.     I have been informed by counsel that the following claims have been asserted in this matter: 1-9 and 11-16 (the "Asserted Claims").

36.     I understand that the Court has construed the term "ready to use" based on an agreement by the parties to mean "[a]ble to be dispensed with minimal if any effort or preparation; prepackaged."  D.I. 41 at 2.

11

## VII.   Scope and Content of the Prior Art

### A.   Formulation Guidelines

#### 1.   Dosage Form Design

37.   Designing a dosage form requires choosing the manner in which a drug is administered to a patient.  *See* Leon Shargel, APPLIED BIOPHARMACEUTICS & PHARMACOKINETICS, (Leon Shargel et al. eds., 2005) ("Shargel 2005") at 51.  A drug can be administered to a patient through various means, including orally or intravenously.   Choosing the form of drug administration is a complex process that involves balancing the safety and efficacy of the drug with patient experience as well as drug potency and stability.  *See id.* at 372; Joanne Broadhead and Mark Gibson, *Parenteral Dosage Forms*, in PHARMACEUTICAL PREFORMULATION AND FORMULATION, (Mark Gibson ed., 2009) ("Gibson") at 325.

38.   Drugs are rarely administered to patients as pure chemical substances, and are almost always given to patients as formulated preparations with several ingredients.  *See* Raymond C. Rowe et al., HANDBOOK OF PHARMACEUTICAL EXCIPIENTS, (Raymond C. Rowe ed., 2009) ("Rowe 2009") at x ("Pharmaceutical dosage forms contain both pharmacologically active compounds and excipients added to aid the formulation and manufacture of the subsequent dosage form for administration to patients.").  Pharmaceutical formulators must consider several factors when designing formulations, including "drug solubility, product stability . . . drug delivery . . . and manufacturability."  Gibson at 325.  As a result, drug products typically include excipients in their formulations to maintain not just product quality, but also predictability.  *See* Rowe 2009 at x; *see also* J.G. Nairn, *Solutions, Emulsions, Suspensions, and Extracts,* in REMINGTON: THE SCIENCE AND PRACTICE OF PHARMACY, (Daniel Limmer, ed., 2000) ("Remington 2000"); Gibson at 327-28, 334.

12

39.     Excipients are inactive formulation ingredients that serve as a vehicle or medium for an active substance or drug.  Excipients are useful "in preventing chemical and physical instability" of drug products, and improving product quality by reducing side effects, or increasing bulk.  *See* Gibson at 327-28, 334.  While there are certain excipients that may be used commonly for certain purposes, each formulation is inherently unpredictable and can come with its own series of complications.  *See* Rowe 2009 at x ("the properties of the final dosage form (i.e. its bioavailability and stability) are, for the most part, highly dependent on the excipients chosen, their concentration and interaction with both the active compound and each other.").  Certain excipients can react negatively with other excipients, or even the active ingredient in a drug product, resulting in negative side effects for a patient.  *See* Gibson at 328 ("An excipient, which may be acceptable as a last resort in a treatment for a life-threatening condition, should not be considered for a product to be administered chronically or for a less serious condition."); Rowe 2009 at x ("No longer can excipients be regarded simply as inert or inactive ingredients, and a detailed knowledge not only of the physical and chemical properties but also of the safety, handling and regulatory status of these materials is essential for formulators throughout the world.").

40.     As a result, each type of dosage form requires careful study of the chemical and physical properties of the drug product.  The interactions between the various ingredients in any given drug product, including the drug-excipient interaction, can greatly impact the overall stability of the drug.  *See* Gibson at 325; Rowe 2009 at x.  Indeed, the frequency of unpredictable interactions means that pharmaceutical formulators generally attempt to limit the number of excipients utilized, and only use an excipient with a specific purpose in mind.  *See* Rowe 2009 at x; Gibson at 328 ("As with all pharmaceutical products, the most important 'rule' to bear in mind when formulating parenterals is the 'keep it simple' principle.").

13

## 2. Parenteral Dosage Forms

41.     One type of dosage form design is a parenteral dosage form, which refers to medicines administered by means of other than through the gastrointestinal system (e.g., by injection).  Some of the most common routes of parenteral administration are:  (1) intravenous (IV); (2) subcutaneous (SC); and (3) intramuscular (IM).  Gibson at 325.  Parenteral dosage forms offer quicker absorption times as compared to oral medications, and are preferable in cases where patients are unable to swallow tablets or capsules.  *See* Remington 2000 at 721.  Indeed, the parenteral route is the most popular and viable approach in many diagnostic cases, and is the preferred choice for the administration of peptide and protein drugs.  Gibson at 325.

42.     Parenteral preparations are usually sterile solutions or suspensions of the active ingredient of a drug in an appropriation medium.  Gibson at 325; *see also* Remington 2000 at 721.  Regardless of the formulation of the parenteral preparation, the product must be sterile, setting it apart from most other dosage forms.  Gibson at 325.  Substances are frequently added to parenteral formulations in order to ensure sterility, as well as product stability, drug solubility, and drug delivery.  *Id.*  However, any addition to the formulation must have an established function.  *Id.* at 328 ("As with all pharmaceutical products, the most important 'rule' to bear in mind when formulating parenterals is the 'keep it simple' principle.").

## B. Drager

43.     WO 2010/036702 ("Drager") is an international patent application publication titled Liquid formulations of Bendamustine that published on April 1, 2010.  The named inventors are Anthony Drager, Rachel, Labell, and Piyush Patel.  I have been asked to assume that Drager is prior art to the '483 patent for purposes of my analysis.

44.     Drager begins by providing a "Background of the Invention" in which it explains that "bendamustine is currently supplied as a lyophilized powder for injection" because of its

"instability in aqueous solution."  Drager at 1:22-23.  Drager goes on to explain that "[t]he reconstitution of bendamustine lyophilized powder is time consuming and cumbersome . . . . As such, formulations of bendamustine that do not require lyophilization and/or reconstitution are needed."  *Id*. at 2:6-9.

45.     In summarizing the invention, Drager explains that "[t]he present invention is directed to liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent."  *Id*. at 2:18-20.  While "[c]ertain preferred embodiments" also include a polar protic solvent, such a solvent is not required.  In fact, Drager begins by attempting to reproduce an earlier publication, GDC Patent 159289 ("Olthoff"), that described efforts to make bendamustine formulations that used only polar protic solvents.  Those formulations used pure propylene glycol ("PG") as a vehicle, and reportedly "did not suggest any decomposition" in the original publication. *Id*. at 2:13-14.  However, after performing experiments with those same formulations, Drager concluded that "the results described in [Olthoff] were not reproducible.  Solutions of bendamustine in 99% propylene glycol degraded to non-bendamustine products over a time equivalent to commercial storage.  Two of the impurities were identified as propylene glycol esters of bendamustine.  As such, a 100% propylene glycol commercial formulation of bendamustine is not feasible for pharmaceutical purposes."  *Id*. at 3:9-13.

46.     Drager then continues, explaining that "pharmaceutically acceptable liquid formulations of bendamustine, and the pharmaceutically acceptable salts thereof, in particular the hydrochloride salt, can be prepared by combining bendamustine, or the pharmaceutically acceptable salt thereof, with a polar aprotic solvent or mixture of polar aprotic solvents."  *Id*. at 3:14-17.  Drager opines that such formulations were successful because "polar, aprotic solvents

are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions." *Id*. at 3:25-28.

47.     Drager then goes on to note that one could optionally add a non-aqueous polar protic solvent, providing a list of them: "Pharmaceutically acceptable nonaqueous polar protic solvents are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-b-cyclodextrin), polyalkylene glycols, such as polyethylene glycol, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide." *Id*. at 4:3-8.  With the exception of an exemplary formulation comprising PG, Drager provides no guidance on the selection of any particular polar protic solvent, nor does it provide any reason to include such a polar protic solvent in the first place.

48.     Drager then goes on to discuss bendamustine's degradation pathways.  That discussion is reproduced below.  Notably, Drager does not mention oxidation as a potential route for bendamustine degradation.

Bendamustine converts to non-bendamustine products (i.e., "degrades") upon exposure to certain nucleophiles, for example, water and alkyene glycols such as propylene glycol. Exposure of bendamustine to water can produce "HP1," which is undesirable.



(HP1)

Another undesirable compound that bendamustine can convert to over time is "BM1 dimer."



(BM1 dimer)

Still another undesirable compound that bendamustine can convert to over time is "DCE."



(DCE)

Upon exposure to an alkylene glycol, for example, propylene glycol, esters of bendamustine can form, e.g., PG-I and PG-2.



PG-I                               PG-2

In preferred embodiments of the present invention, analysis of formulations of the present invention will exhibit 1.50% or less of DCE, as determined by HPLC analysis, after

*Id*. at 5.

49.     Drager then goes on to explain that "the formulations of the present invention may further comprise other pharmaceutically acceptable excipients."  *Id*. at 7:27-28.  Drager then provides the following examples:

17

> Pharmaceutically acceptable excipients are known in the art and include, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate), surfactants, (e.g., polysorbates (TWEEN 20, TWEEN 40, TWEEN 80)), lipids (e.g., dimyristoylphophatidylcholine (DMPC), Dimyristoylphosphatidylglycerol (DMPG), distearoylphophatidylglycerol (DSPG), fillers (e.g., mannitol), organic acids (e.g., citric acid, lactic acid, benzoic acid), hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400), complexing agents (e.g., niacinamide, nicotinic acid, creatine, cyclodextrins), and preservatives (e.g., benzyl alcohol). *Id*. at 7:29-8:3.

50.    As with the list of polar protic solvents, Drager provides no guidance as to the selection of these excipients nor reasons to include them in a formulation.

51.    Drager then goes on to test solubility and stability of various formulations comprising polar aprotic solvents.  *Id*. at 9:5-10:21.   No exemplary formulation contains polyethylene glycol ("PEG"), nor does any exemplary formulation contain an antioxidant. Notably, with the exception of a single formulation comprising 34% PG, none of the formulations in Table I of Drager contains any polar protic solvent.  In Table I, Drager provides solubility testing for certain exemplary formulations.

Table I

| Sample* | % Purity | Assay (mg/mL) |
|---|---|---|
| NMP | 99.1 | 104.0 |
| DMI | 98.5 | 75.8 |
| DMSO | 99.5 | 311.7 |
| DMF | 99.6 | 71.8 |
| 66% DMA/34%PG | 99.5 | 110.1 |
| DMA | 99.4 | 56.2 |
| PC | 98.7 | 7.7 |
| Niacinamide/DMA | 99.2 | 61.3 |

\* acetone and THF have no measurable solubility of bendamustine.

52.    In Table II, Drager then provides impurity data for certain impurities in certain formulations after 12 months at 5 °C.

18

10

Table II

*Impurity profile of certain liquid formulations of Bendamustine HCl after storage at 5 ⁰C for about 12 months*

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66%DMA/34%PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

15   *ND = not detected*

53.     Notably, similar data is presented in Figure 2 for 5 °C and Figure 1 for 25 °C.  There are significant discrepancies between the data in Tables 1 and 2 and Figures 1 and 2.  For instance, Table I and II and Figures 1 and 2 do not report the same set of tested formulations.  Moreover, because Table II and Figure 2 do not report the same impurities, there are meaningful inconsistencies in the results.  In Table II, Drager reports the following impurity data (in decreasing order):    66%DMA/34%PG  (1.62%);  Niacinamide/DMA  (1.54%);  DMA  (1.23%);  DMSO (1.12%); NMP (1.00%); and DMF (0.25%).  Figure 2 shows the following order of total impurities from greatest to least: DMI, DMA, NMP, Niacinamide/DMA, 66%DMA/34%PG, and DMSO and DMF approximately even for lowest level of degradants.  This is a completely different order.  Most notably in Table II, the Niacinamide/DMA formulation and the 66%DMA/34%PG perform worse than the pure DMA formulation.  In Figure 2 they appear flipped, which would cause a POSA to question the completeness, accuracy, consistency, and ultimately the usefulness of the data.  Additionally, Table II reports 12 month stability data for the 34% PG formulation, but that same formulation appears to stop at approximately 200 days in Figure 2 without explanation.

19

## VIII.   The Asserted Claims of the '483 Patent Are Not Invalid

### A.   Drager Does Not Anticipate the Claims of the '483 Patent

54.     Drager does not anticipate the '483 patent because it fails to disclose multiple limitations, and fails to disclose all of the limitations arranged as they are arranged in the claims. First, the asserted claims require PEG, but Drager does not disclose any actual formulations containing PEG, nor does it provide any reason to use PEG in a bendamustine formulation. Second, the claims require a "stabilizing amount of an antioxidant," but Drager does not disclose any actual formulations containing an antioxidant, nor a stabilizing amount of one.  I understand Dr. Forrest opines that niacinamide is an antioxidant.  I disagree.  Niacinamide is a complexing agent, as Drager itself acknowledges.  Drager at 8:2-3.  Moreover, even if niacinamide were an antioxidant as Dr. Forrest alleges, Drager's data demonstrate that it has the potential to decrease formulation stability.  *Id*. at Table II.  Third, the asserted claims require no more than 5% total impurities after 15 months under certain storage conditions.  Drager provides no data or other information indicating that any of its formulations would meet that limitation, let alone that that stability profile would be an inherent characteristic of any formulation that would fall within the scope of the asserted claims.

#### 1.     Drager Does Not Disclose Formulation Comprising Bendamustine and PEG nor Does It Allow A POSA To Immediately Envisage One

55.     Drager does not anticipate the '483 patent claims because it does not disclose a formulation comprising PEG with the elements arranged as in the claims.  Indeed, Dr. Forrest identifies only two references to PEG in the entire Drager reference.  Both are found in extensive lists of possible categories of excipients that Drager states could be added to a bendamustine formulation, either as a polar, protic solvent or a hydrophilic polymer.  Forrest Rep. at ¶¶ 128-30. Neither disclosure is sufficient to anticipate the '483 patent.  In my opinion, by arbitrarily selecting

PEG from one of dozens of potential options, Dr. Forrest improperly picks and chooses from among the various disclosures of Drager.

56.     With respect to the disclosure of PEG within the group of polar protic solvents, a POSA would understand that the invention disclosed and claimed in Drager was the use of polar aprotic solvents.  Indeed, Drager described polar protic solvents as an optional addition to the polar aprotic solvent required for Drager's invention.  Drager at 2:18-22.  In fact, while Drager allows for the use of polar protic solvents in combination with aprotic ones, it specifically criticizes the use of prior art that contains only polar protic solvents.  *Id*. at 3:9 (criticizing Olthoff's pure PG formulation).  I have reviewed the Court's opinion from the Bendeka Litigation and note also that the Court previously described aprotic solvents as Drager's "solution to the degradation problem" of bendamustine, a characterization I agree with.  *Cephalon* at 15.

57.     Even if a POSA did choose to include a polar protic solvent in a bendamustine formulation, Dr. Forrest provides no reason why a POSA would immediately envisage a formulation with PEG in particular.  Drager provides an extensive list of potential polar protic solvents, explaining that:

> Pharmaceutically acceptable nonaqueous polar protic solvents [] known in the art include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl-3-cyclodextrin), polyalkylene glycols, such as polyethylene glycol, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide." Drager at p. 4:3-8.

58.     This already extensive list includes large categories like alkyl alcohols and polyalkylene glycols, meaning that the number of potential polar protic solvents could be in the dozens.

59.     Dr. Forrest opines that Drager specifically claims bendamustine formulations comprising polyalkylene glycols, citing claims 5, 54, and 61 of Drager, and that "a POSA would have envisaged that Drager specifically points out a solution comprising bendamustine and PEG" because Drager provides only three examples of polyalkylene glycols, which are not even referenced in those claims.  Forrest Rep. at ¶ 128.  That is a mischaracterization of these claims. While all three claims include polyalkylene glycols as a potential excipient, they allow the use of alcohols or primary amides instead.  *See id*.  Thus, there are myriad formulations encompassed by those claims that do not include any polyaklyene glycols at all, let alone PEG in particular.  *See id.*  Notably, there are dependent claims that do specify single categories of solvent, such as claim 6, which specifically claims glycols.  Moreover, there are claims that specify particular protic solvents, including propylene glycol, ethylene glycol or butylene glycol (claim 7); hydroxypropyl-β-cyclodextrin (claim 10).  In essence, Dr. Forrest begs the question, arriving at a group of three potential polyalkylene glycols to choose from by assuming that (1) a POSA reviewing the patent would focus only on claims 5, 54, and 61, instead of any of the exemplary formulations with stability data in the patent or even other claims that have more specific guidance with respect to excipients; (2) that a POSA would focus only on the polyalkylene glycols recited in those claims, not primary amides or the much larger class of "alcohols;" and (3) that a POSA would focus only on the polyalkylene glycols specifically listed in Drager.  Drager provides no guidance that would direct a POSA specifically to any of claims 5, 54, and 61, nor does Dr. Forrest suggest any.  Instead, a POSA would be left with an extensive list of claims and excipients and no ability to immediately envisage a formulation comprising PEG.

60.     As to Drager's second disclosure that PEG could be used as a hydrophilic polymer, Dr. Forrest merely cites an excerpt from a list of possible other types of excipients that includes various types of PEG.  The full list is reproduced below.

> In addition to comprising a polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a nonaqueous polar protic solvent, or mixture of solvents, formulations of the present invention may further comprise other pharmaceutically acceptable excipients. Drager disclosed that pharmaceutically acceptable excipients known in the art included, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole (BHA), butylhydroxy toluene (BHT), and propyl gallate), surfactants, (e.g., polysorbates (TWEEN 20, TWEEN 40, TWEEN 80)), lipids (e.g., dimyristoylphophatidylcholine (DMPC), Dimyris toylphosphatidylglycerol (DMPG), distearoylphophatidylglycerol (DSPG), fillers (e.g., mannitol), organic acids (e.g., citric acid, lactic acid, benzoic acid), hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400), complexing agents (e.g., niacinamide, nicotinic acid, creatine, cyclodextrins), and preservatives (e.g., benzyl alcohol)." Drager at 7:26-8:3.

61.     In full, this list is merely a catalog of common categories of pharmaceutical excipients a formulator could experiment with.  A review of the *Handbook of Pharmaceutical Excipients*, a commonly used text, demonstrates that there are hundreds of pharmaceutically acceptable excipients that would be included in the categories on this list.  *See generally* Rowe 2009.  Dr. Forrest undertakes no analysis of why a POSA would envisage a formulation comprising PEG based on that extensive list.  And there is no reason why a POSA would pluck PEG in particular from that list.  Drager provides no guidance or indication of why a POSA would use a hydrophilic polymer in a bendamustine formulation.  Indeed, Drager provides no reason why any of these excipients or even broad categories would be used, let alone how any of these components would affect the stability of a bendamustine formulation.

62.     To convey the enormity of the task a POSA reviewing Drager would be faced with, consider the fact that the only category of excipient Drager requires is at least one polar aprotic

solvent.  Drager at claim 1.  Drager provides a list of 10 possible polar aprotic solvents that a POSA would have to start with, as well as mixtures.  *Id*. at claim 2.  A POSA would therefore be presented with 10 single-solvent systems, 45 double-solvent systems, and hundreds more if a POSA considered ternary or quaternary solvents, and all of these in any possible number of combinations and permutations.  On top of that, Drager discloses 13 specific protic solvents, in addition to large categories like alkyl alcohols, as well as dozens more possible excipients.  The number of potential combinations is essentially uncountable.

63.      Dr. Forrest further opines that a POSA would select PEG because "Drager also discloses formulations that do not require any certain amount of aprotic solvent: '[a]lternatively, formulations of the present invention will comprise 10 moles per liter, or less, of the nonaqueous polar protic solvent.  Preferably, formulations of the present invention will comprise between about 4 moles per liter to about 9.5 moles per liter, of the nonaqueous polar protic solvent.'"  Forrest Rep. at ¶ 100 (*quoting* Drager at 4:16-19).  Based on this, Dr. Forrest opines that "no certain or minimum amount of apolar [sic] solvent is required."  *Id*. at ¶ 101.  I understand Dr. Forrest here to be referring in this paragraph to polar, aprotic solvents, rather than apolar solvents and respond accordingly, though my overall opinions are not impacted if Dr. Forrest did intend to refer to "apolar" solvents.

64.      As an initial matter, that is a gross misreading of that disclosure, which is in a passage that begins "[i]t has also been discovered that stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent or a mixture of non-aqueous polar protic solvents."  Drager at 4:1-3.  Indeed, it is immediately preceded by a paragraph expressing various ratios of percentages of polar protic solvents, ranging from 30% to 90%.  From that, a POSA would understand that when Drager

24

goes on to then "[a]lternatively" express the amount of polar protic solvents in molar concentrations, it does not mean that the formulations can be comprise only a de minimis or trivial amount of polar aprotic solvent.  A POSA would understand that polar aprotic solvents were central to the invention of Drager.  The summary of the invention itself begins "[t]he present invention is directed to liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent." *Id*. at 2:18-20. Further, the polar aprotic solvents Drager suggests are relatively uncommon or disfavored for use in pharmaceutical formulations, particularly compared to more common polar protic solvents such as water, ethanol, or propylene glycol.  Thus, a POSA would understand from Drager's use of such solvents that they were a necessary part of the invention.  Based on this, a POSA would not envisage of formulation without such solvents or with only a negligible amount of them.

65.    Based on his flawed reading of Drager's disclosure, Dr. Forrest opines that "a POSA would know that several liquid PEGs had been used as excipients in FDA-approved injectable products as of at least December 2009, namely PEG 200, PEG 300, PEG 400 and PEG 600, and hence would be preferable solvents in a formulation intended for regulatory approval. All of these PEGs have densities and molecular weights such that a solution of the PEG, without additional solvents, can produce a solution of 10 moles per liter or less."  Forrest Rep. at ¶ 100. However, even if a POSA understood Drager to recite that a substantially pure polar protic formulation was viable, the mere fact that PEG was an approved excipient with a molar concentration of less than 10 would not be sufficient guidance to a POSA to envisage a PEG formulation for bendamustine, as opposed to the many other available excipients and solvents, including PG and ethanol, both of which are encompassed as potential solvents and were in wide use as of the priority date. *See* Rowe 2009 at 17-19, 592-94; Sandeep Nema et al., *Excipients and*

25

*Their Use in Injectable Products,* PDA Journal of Pharmaceutical Science & Technology, Vol 51, No. 3 (1997) ("Nema 1997") at 167.

> **2.    Drager Does Not Disclose a Formulation Comprising Bendamustine and a Stabilizing Amount of an Antioxidant nor Does It Allow A POSA To Immediately Envisage One**

66.    Drager independently fails to anticipate the '483 patent because it neither discloses a formulation comprising a stable amount of an antioxidant nor does it allow a POSA to immediately envisage one.

67.    Dr. Forrest first opines that because the same extensive list of excipients that disclosed hydrophilic polymers above also discloses antioxidants as a general category that Drager meets this limitation as arranged in the claims.  *See supra* at VIII.A.1.  This analysis falls short for the same reasons addressed above.  Drager provides no guidance as to why a POSA would envision including an excipient in a bendamustine formulation or how to select one.  Indeed, Drager has an extensive discussion of various degradation pathways, but does not disclose or suggest that oxidation was a possible pathway or otherwise indicate that an antioxidant could promote bendamustine stability.  Drager at 5:1-15 (disclosing hydrolysis, dimerization, degradation to DCE, and esterization as the potential degradation pathways).

68.    Dr. Forrest next opines that "Drager also discloses specific examples of liquid bendamustine formulations comprising an antioxidant," citing "bendamustine solutions comprising 25 mg/mL niacinamide."  Forrest Rep at ¶ 105.  I disagree with Dr. Forrest's opinion that a POSA reviewing Drager would consider niacinamide, also known as vitamin B3, to be an antioxidant.  *Id*. at ¶ 132.  As an initial matter, while niacinamide had been used in pharmaceuticals primarily as a vitamin, it was not commonly used as a pharmaceutical excipient.  *See generally* Rowe 2009.  In fact, as of the priority date, niacinamide was rarely used in injectable drug formulations, and never as an excipient.  Instead, a review of the Physicians' Desk Reference

demonstrates that a POSA would have understood that niacinamide was primarily used in multivitamin, oral supplements.  *See, e.g.,* PHYSICIANS' DESK REFERENCE (58th ed. 2004) ("PDR") at 596, 1264, 1282, 1289, 1730, 1874, 2124, 2125-26, 2347, 2993, 3228-29, 3237, 3249-50, 3286. In recent years, niacinamide has widely been used as an active ingredient in topical treatments of dermatological disorders, such as acne.  *See* Niacinamide, DRUGS.COM, https://www.drugs.com/ingredient/niacinamide.html (last visited June 28, 2022).  However, its use in such treatments was not recognized as of the priority date.  *See, e.g.,* Desoximetasone 0.05% / Niacinamide 4% cream, for topical application, active ingredients, Revised May 2019; Label: Niacinamide 4% / Tretinoin 0.025% cream, for topical application, active ingredients, Revised May 2019.

69.     Drager classifies niacinamide as a "complexing agent," not an antioxidant.  Drager at 8:2-3.  Complexing agents are a different class of excipient than antioxidants and serve a different purpose.  As Gibson explains, "[c]omplexing agents, in this context, are molecules that have the ability to form soluble complexes with insoluble drugs."  Gibson at 331.  Gibson goes on to explain that the "most well-known examples are the cyclodextrins," another exemplary complexing agent in Drager's list.  *Id.*  Thus, a POSA reviewing Drager's exemplary formulation containing niacinamide would understand that it was included primarily for solubility, rather than improved stability.  Moreover, Gibson notes that at least some complexing agents, such as cyclodextrins, also function as "stabilizing excipients."  Gibson at 332.  However, stabilizing an API via complexing to sequester it from reactants with the potential to induce degradation is a completely different mechanism than an antioxidant's scavenging oxidizing free radicals.  Thus, a POSA would not understand the niacinamide-containing formulation to present any evidence of the need for or benefit from an antioxidant.

70.     While Dr. Forrest opines that niacinamide can function as a chelating agent and thereby potentially reduce oxidation, he provides no meaningful citation to support that.  Forrest Rep. ¶ 77 n.5 (citing Waterman 2002 at 20, 23-26).  Unlike antioxidants that interact directly with oxidative species, chelating agents remove metals from solution, which can impact their ability to catalyze oxidative reactions.   Waterman discusses a variety of methods of stabilizing pharmaceutical formulations against oxidation.  However, the portions Dr. Forrest cites do not relate to niacinamide at all or provide any evidence that niacinamide can chelate metals, let alone that it is an antioxidant.  Page 20 relates to the ability of EDTA, a well-known chelator, to complex metals, irrelevant to the question of whether niacinamide has that capability or is classified as an antioxidant.   Pages 23-26 discuss cyclodextrins as a potential option for inhibiting oxidation.  Notably, this section makes clear that while cyclodextrins may inhibit oxidation, inhibiting oxidation is not sufficient to classify an excipient as an antioxidant.  The section immediately preceding cyclodextrins is titled "Antioxidants."  Waterman 2002 at 21-23.  Then, the antioxidant section ends and the next section "Cyclodextrins" begins.[1]  *Id*. at 23.  Waterman 2002 then goes on to provide a table of 23 "Additives for Reducing Oxidation in Pharmaceutical Dosage Forms." *Id*. at Table 12.  It does not mention niacinamide.  Thus, a POSA would not understand niacinamide to be an antioxidant or a chelator and would not understand Drager's niacinamide-containing formulation to disclose a bendamustine formulation containing an antioxidant.

71.     Dr. Forrest also cites two papers for the proposition that "[a] POSA would have known that niacins such as niacinamide and nicotinic acid are antioxidants."  Forrest Rep. at ¶ 77

---

[1] The section breaks in Waterman can be identified by the different font styles.  "Antioxidants" is styled in ordinary Roman text, with the different subsections italicized beneath it.  "Cyclodextrins" is similarly styled in Roman text.

(citing Kamat 1999 and Ogata 2002).  I have reviewed both of these references and disagree with Dr. Forrest as to whether they demonstrate that niacinamide is a true antioxidant that scavenges free radicals.  While I understand that Kamat refers to niacinamide as an "antioxidant" and Ogata asserts that niacinamide "had scavenging abilities," neither study actually performs any experiment or provides any data sufficient to understand niacinamide's mechanism of action.  At best, the studies show that niacinamide may be worth investigation as a possible method for inhibiting oxidation, but these studies give no reason to employ niacinamide in pharmaceutical formulations as an antioxidant, particularly where other, already-common antioxidants exist for use in pharmaceuticals.  For instance, Drager identifies "tocopherol (Vitamin E), ascorbic acid, [and] methyl paraben" as antioxidants, but notably describes niacinamide as a complexing agent instead.  Drager at 7:5-9, 16-18.

72.     Even accepting Dr. Forrest's premise that niacinamide is an antioxidant, Drager does not disclose a stabilizing amount of antioxidant or even that antioxidants stabilize Drager's formulations at all.  While Dr. Forrest points to Figure 2, which appears to show a combination of DMA and niacinamide degrading slower than DMA alone, Table II shows data for the same formulations and makes clear that for every impurity measured, the niacinamide containing formulation performed worse than the formulations without niacinamide, as shown below.  *See* Forrest Rep at ¶ 134.

Table II

*Impurity profile of certain liquid formulations of Bendamustine HCl after storage at 5 $^0$C for about 12 months*

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66%DMA/34%PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

*ND = not detected*

73.     Thus, Drager's data regarding the impact of an antioxidant on stability is, at best, ambiguous, inconsistent, and inconclusive.  Drager neither discloses nor allows a POSA to envision a bendamustine-containing formulation comprising and antioxidant, let alone a stabilizing amount of one.

74.     Further, Drager does not disclose a formulation comprising bendamustine, PEG, and a stabilizing amount of an antioxidant, nor does it allow a POSA to immediately envisage one As discussed above, Drager does not disclose a bendamustine-containing formulation using either PEG nor a formulation containing an antioxidant individually, nor does it provide any guidance that would allow a POSA to envisage either.  *See supra* at VIII.A.1.  Even if it did provide guidance on those excipients individually or otherwise disclose formulations containing them, Drager does not disclose or allow a POSA to immediately envisage a bendamustine formulation containing both PEG and a stabilizing amount of an antioxidant.  Drager does not disclose any actual formulation containing both PEG and an antioxidant.  Nor does Drager provide any guidance as to why a POSA would include both PEG and an antioxidant in a bendamustine containing formulation.  Drager gives no indication that a PEG-containing bendamustine formulation would be susceptible to oxidation or otherwise require an antioxidant.  In fact, none of Drager's dependent

claims upon which Dr. Forrest relies (5, 38, 54, and 61) require the use of antioxidants or PEG.

Drager at claims 5, 38, 54, and 61.  Indeed, none of them mention PEG at all, and the only one that

mentions an antioxidant is claim 38, which claims "[t]he formulation of any one of claims 1 and

4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic

polymer, a complexing agent, a preservative, or a combination thereof."   That is a mere

reproduction of the general list of excipients at Drager 7:29-8:3 discussed above and it provides

no more guidance than that list.  If anything, it provides less for having stripped out the exemplary

excipients.  Claim 38 adds nothing substantive to Drager's disclosure from the perspective of a

POSA seeking to develop a bendamustine formulation.

75.     Dr. Forrest also appears to opine that a POSA would have added an antioxidant to

a PEG-containing formulation because "[o]xidation reactions can also occur due to other peroxides

that are in the formulation" and "[m]any grades and molecular weights of PEGs, e.g., PEG 400,

from varying manufactures are well known to contain substantial quantities of these peroxides."

Forrest Rep. at ¶ 62.  Dr. Forrest goes on to identify three formulations comprising both PEG and

an antioxidant, none of which were commercially marketed for the treatment of humans.  *Id.* at ¶

67.  I disagree that this would allow a POSA to envisage a bendamustine-containing formulation

comprising PEG and an antioxidant.  If anything, it suggests the opposite.  If a POSA were

concerned that the use of PEG would lead to oxidation, that would suggest to a POSA that one of

the dozens of other solvents disclosed by Drager would be suitable.  To the extent oxidation was

a known concern for potentially using PEG in a bendamustine formulation, which Dr. Forrest

provides no evidence of, a POSA would not use PEG, rather than seeking to introduce and then

solve an oxidation problem.  Conversely, a POSA would have known as of the priority date that

there was not only a PEG-containing formulation marketed for treating humans, but it contained

DMA as a co-solvent without an antioxidant, further suggesting that the use of PEG and a polar aprotic co-solvent would not require an antioxidant.  *See* Busulfex™ Label at 1.  Thus, the use of PEG would not allow a POSA to immediately envisage the use of an antioxidant and, if it did, would indicate to a POSA that PEG was not an appropriate solvent choice given Drager's data demonstrating the availability of other options that did not require an antioxidant.

### 3.     Drager Does not Disclose Any Particular Formulation Comprising PEG and an Antioxidant and Having the Claimed Stability

76.     Drager further fails to anticipate the '483 patent because it neither discloses nor allows a POSA to immediately envisage a composition comprising PEG and a stabilizing amount of an antioxidant, and further having the requisite stability of the claims.  The asserted claims require that the composition have "less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5° C. to about 25° C."[2]  Dr. Forrest argues that "this limitation is an inherent property of the formulations disclosed by Drager." Forrest Rep. at ¶ 135.  I understand from counsel that for something to be an inherent property for purposes of anticipation it must be necessarily and inevitably present when the prior art is practiced.

77.     Dr. Forrest uses a combination of general statements in the Drager specification asserting the stability of the disclosed formulations and specific data for formulations that do not meet the other claim limitations to support his inherency position.  *Id*. at ¶¶ 141-145.  For instance, Dr. Forrest relies on a general statement that "[l]iquid formulations of the present invention are

---

[2] I understand that certain dependent claims limit this temperature range specifically to either about 5° C. or about 25° C.

stable over the course of a typical commercial storage period," and that "[p]referably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5° C and time periods of about 30 days (about 1 month) to about 365 days (about 1 year)." *Id.* at ¶ 141.  Even if a POSA were to take these broad assertions unsupported by data as true for some formulations, they are fatal to Dr. Forrest's inherency opinion.  These quotes disclose that while it is preferable to limit degradation to 5% over a period of about a year, Drager defines "stable" as "no more than about 10% loss of bendamustine under typical commercial storage conditions," which Dr. Forrest equates to one year. *See id*. at ¶¶ 141-42.  Thus, a maximum of 5% total impurities after 15 months at about 5° C is not an inherent property of Drager's formulations because some may experience 10% degradation after as little as one year.  The fact that Drager itself identifies various possible stability outcomes therefore undermines Dr. Forrest's inherency opinion.

78.    Dr. Forrest also opines that "Drager discloses that liquid bendamustine formulations comprising 34% propylene glycol, stored at 5°C have a purity of approximately 98.8% at 200 days." *Id*. at ¶ 143 (citing Fig. 2).  From this, Dr. Forrest makes a generalized conclusion that a "POSA would know that this stability data indicates that based on this data, the stability of liquid bendamustine compositions comprising 34% propylene glycol at 15 months would be greater than 97%." *Id*. at ¶ 143.  This is a profoundly flawed analysis based on inaccurate premises.

79.    Drager does not disclose that each and every formulation comprising 34% PG stored at 5°C will have a purity of approximately 98.8% at 200 days.  Drager discloses stability data for a specific, exemplary formulation containing 66% DMA and 34% PG.  One cannot draw conclusions about how other solvent systems will behave based on Drager's limited disclosure,

even more so for time periods beyond the measured data.  *See* Loyd V. Allen Jr., THE ART, SCIENCE, AND TECHNOLOGY OF PHARMACEUTICAL COMPOUNDING (Loyd V. Allen Jr. ed., 2012) ("Allen") at 347 ("The effect of these cosolvent systems can be complicated and difficult to predict.").  Indeed, Drager's own data shows this.  Drager tested a pure PG solvent system (i.e. a system with 34% PG where the remaining DMA was exchanged for additional PG).  Figure 3 shows that bendamustine stability drops precipitously after 180 days, and Drager acknowledges that "[a]fter storage at 5°C for about 365 days, the purity of the bendamustine is about 80% or less."  Drager at 10:20-21.  Accordingly, Dr. Forrest's inherency opinion is incorrect, because the Drager patent itself makes clear that formulations having the disclosed combination of excipients may have far less stability than is required by the instant claims.

80.    Dr. Forrest uses this flawed analysis as the basis of his opinion that a POSA would select PEG for a bendamustine formulation.  As an initial matter, Dr. Forrest's opinion is based on an extensive analysis of degradation pathways to substitute excipients, which suggests that a POSA would not immediately envisage a formulation comprising PEG.[3]  Dr. Forrest bases this opinion on the alleged fact that "a POSA would have known that liquid bendamustine formulations comprising PEG would have lower degradation as compared to liquid bendamustine compositions comprising PG" because a "POSA would have known that the rate of degradation of bendamustine goes up with increasing amount of –OH groups in the solvents."  Forrest Rep. at ¶ 144.  This is also inaccurate.  Dr. Forrest's only basis for the idea that the degradation of bendamustine increases as hydroxyl groups increase is Drager's statement that "the esterification reaction involves the –

---

[3] I understand this analysis may be more appropriate to whether a POSA would be motivated to substitute PEG for PG in Drager's exemplary formulation as part of the obviousness analysis below.  Nevertheless, Dr. Forrest chose to address this issue in his anticipation section and I do the same, incorporating these same opinions into my obviousness analysis.

OH group of the solvent, 'if the concentration of the polar protic solvent is kept' sufficiently low such that the esters 'will not form during typical commercial storage.'" *Id.* at ¶ 87.  Dr. Forrest explains that "[t]he significance of Drager's teaching was that the concentration of –OH groups (borne by the protic solvent) was what needed to be kept low, in order to reduce ester formation of bendamustine." *Id.*  This analysis is flawed for two reasons.

81.     First, at most, Drager's disclosure indicates that hydroxyl groups are directly correlated with increased esterification.   However, Drager identifies multiple degradation pathways and Dr. Forrest offers no evidence or opinion that reducing the concentration of hydroxyl groups would reduce those degradation pathways or even that PEG and PG would behave similarly for purposes of those degradation pathways.   In particular, different hydroxyl groups exhibit different levels of reactivity based on a variety of factors, such as the size and conformation of the particular molecule bearing those groups. *See* Henry Zimmerman & Isaak Zimmerman, ELEMENTS OF ORGANIC CHEMISTRY (1977) at 430-31 ("Zimmerman").   PEG and PG are significantly different molecules in both size and conformation and a POSA would not expect the hydroxyl groups on each molecule to behave in the same way.

82.     Second, if a POSA were concerned with reducing the hydroxyl group load as much as possible, they would simply omit the optional polar protic solvent altogether.   As Dr. Forrest acknowledges " Drager uses the commonly used terms of 'protic' and 'aprotic' to refer to organic solvents that either contain or lack hydroxyl (–OH) groups in their molecular structure."  Forrest Rep. at ¶ 87.  Thus, a POSA could reduce the hydroxyl concentration to zero by using only a polar, aprotic solvent.   In my opinion, particularly given the disclosure of Drager that polar, protic solvents are optional, a POSA seeking to reduce hydroxyl concentration would simply omit PG, PEG or any other protic solvent entirely.

35

83.     I note also that Dr. Forrest attempts to stretch the maximum length of "typical storage conditions," as Drager uses the term, from one year to 13.4 months, then to 15 months, and then even to 18 or 24 months.  *Id*. at ¶¶ 112, 195.  I see no basis for this.  First, Dr. Forrest asserts that "A POSA would be familiar with 'typical commercial storage conditions' as representing time frames up to about 12 months to 18 months, even 24 months."  *Id.* at ¶ 112.  While I agree as a general matter that many marketed formulations are stored for 18 or 24 months, Drager provides a specific definition of what the term means, explaining that "[t]ypical commercial storage conditions include time periods of, for example, about 30 days, about 90 days, about 180 days, and about 365 days (about 1 month, about 3 months, about 6 months, and about 1 year)."  Drager at 3:28-30.  Dr. Forrest appears to opine that "include" means that typical commercial storage conditions can be longer than 365 days.  That is not necessarily the case, as include could refer instead to unmentioned time periods between 30 and 365 days, for example 60 days.  Dr. Forrest also opines that "the POSA would have known that 'storage conditions' as taught in Claim 32 is broader than 13.4 months" because "Claim 33 depends from Claim 32, and Claim 32 makes a recitation to 'storage conditions.'"  Forrest Rep. at ¶ 195.  While I understand that dependent claims may not be broader than the claim it depends from, it does not necessarily follow that each individual term in the independent claim is broader than each corresponding term in the dependent claim.  At most, the independent claim is, as a whole, not narrower than the dependent claim.  Regardless, even if typical storage conditions do include periods of up to 15 months or longer, a POSA would not understand Drager to disclose stability out beyond 12 months without any data to support it and, indeed, with data and statements in the patent indicating that degradation of Drager's formulations can reach 10 % or more within 12 months under the claimed conditions.  Thus, in light of Drager's statements about its formulations reaching 10 % degradants before 15

months under the claimed storage conditions and the data in Drager showing the same, the claimed stability limitations do not follow as a necessary or natural characteristic of either the claimed formulation or the formulations Drager discloses.

84.     Further, a POSA would have no need to take Drager's stability assertions on faith. Even a cursory review of Drager's actual stability data shows that not even all of the tested formulations would exhibit fewer than 5% total impurities after 15 months at about 5° C.  For instance, Figure 2 shows that DMI is already at almost 10% total impurities by one year and Dr. Forrest himself calculates that "DMA without an antioxidant had about 6% total impurities after about 12 months, and would be expected to have about 7% impurities (93% purity) after 15 months."  Forrest Rep. at ¶ 105.  This data further demonstrates that the stability limitation is not an inherent property of all formulations encompassed by Drager.

85.     If we assume Dr. Forrest's opinion that there is no minimum amount of polar aprotic solvent necessary to meet the limitations of Drager's claims, then even the pure PG or PG with a miniscule amount of aprotic solvent, shown degrading to approximately 80% after a year at about 5° C in Figure 3, would be sufficient to show that Drager's formulations do not inherently possess less than 5% total impurities after 15 months at about 5° C.

86.     Moreover, A POSA would not understand Drager to disclose a formulation comprising PEG and an antioxidant that inherently meets the stability limitation because the data in Drager is inconsistent, as discussed above.  *See supra* at VIII.A.2.  Beyond the fact that Figure 2 and Table II show different stability results for DMA with and without niacinamide, it also appears to be missing the complete 365 day data for the 66% DMA formulation that, according to Table II, should have existed.  Further, despite being shown in Figure 2, DMI does not appear in

37

Table II. These inconsistencies would cast doubt on Drager's stability data, which already does not meet the stability limitation of the '483 patent.

87.     These differences between formulations also highlight a more fundamental flaw in Dr. Forrest's anticipation analysis.  Dr. Forrest has attempted to identify where each individual element is recited in Drager, such as whether a POSA would immediately envisage a formulation comprising bendamustine and PEG or bendamustine and an antioxidant.  But Dr. Forrest makes no attempt to show the elements arranged as they are in the claims.  He cites a hypothetical pure PEG formulation to support his opinion that the PEG limitation is met, but then relies on a formulation of niacinamide and DMA to support his opinion that the antioxidant limitation is met. But he offers no analysis as to why or how or even whether a POSA would combine those two disparate formulations into a single formulation meeting both the PEG and antioxidant limitations and also having the requisite stability.  Dr. Forrest attempts to fill that gap in his analysis by citing to claim 38 (Forrest Rep. at ¶¶ 97, 104-05), which claims "[t]he formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof."  Drager at claim 38.  Claim 38 provides no more guidance than the general list of excipients at Drager 7:29-8:3 discussed above.  If anything, it provides less guidance since it does not even include examples of the different types of excipients and does not require PEG.  Thus, claim 38 adds nothing to the analysis and does not allow a POSA to immediately envisage a formulation comprising bendamustine, PEG, and an antioxidant, let alone one that meets the claimed stability limitations.

### 4.     Based on the Foregoing, Drager Does Not Anticipate The '483 Patent

88.     Based on the foregoing explanation, it is my opinion that Drager does not anticipate the asserted claims of the '483 patent for the following reasons:  (1) Drager does not disclose each element of the asserted claims arranged as they are in the claims; (2) Drager does not contain a

discussion linking the claim elements so as to arrange them as in the asserted claims; (3) Drager does not allow a POSA to immediately envisage the claimed invention; (4) Drager only discloses PEG and antioxidants in extensive lists of possible, optional excipients, leading to countless possible combinations; (5) Dr. Forrest must pick, choose, and combine various disclosures to purportedly arrive at the claimed invention; and (6) inherency cannot supply the claimed stability limitation.

**a.**   *Drager Does Not Disclose Each Element Of The Asserted Claims Arranged As They Are In The Claims*

89.     I understand that in order to be anticipatory, a prior art reference must disclose each element of the claims within the document and further that those elements must be arranged as in the claims.  Based on the foregoing, Drager does not anticipate the asserted claims of the '483 patent.  *See supra* at VIII.A.1-3.  Drager does not disclose any bendamustine formulation containing PEG or an antioxidant, let alone one containing both that also meets the other elements of the claims, including the claimed stability.

**b.**   *Drager Does Not Contain A Discussion Linking The Claim Elements So As To Arrange Them As In The Asserted Claims*

90.     I also understand that even where a reference discloses each of the elements of a claim, to anticipate, the prior art reference must contain a discussion linking the claim elements so as to arrange them as in the claim at issue.  Based on the foregoing, Drager does not provide such a discussion linking the claim elements.  *See supra* at VIII.A.1-3.  In particular, the '483 patent explains that "[t]here is a need for ready to use [] bendamustine formulations having enhanced stability" and that "[o]ne of the advantages of the inventive liquid compositions is that they have substantially improved long term stability."  '483 patent at 1:61-62, 2:13-15.  Drager similarly focuses on the importance of stability.  Indeed, the first sentence of Drager's Detailed Description

39

of the Invention is "[s]table, liquid formulations of bendamustine have been discovered and are reported herein."  Drager at 3:6-7.

91.     Despite this focus on stability in a liquid formulation, Drager provides no discussion linking either PEG or antioxidants to achieving a stable, liquid formulation.  In fact, there is no indication in Drager that either PEG or an antioxidant can improve bendamustine stability in a liquid formulation, let alone a discussion linking them together with the claimed stability such that they are arranged in the claims.  Thus, Drager does not anticipate the asserted claims of the '483 patent.

92.     This is even more true for dependent claims 2 and 11, both of which present an independent basis for patentability insofar as they require specific antioxidants.  While Dr. Forrest opines that these claims are satisfied by the disclosure of propyl gallate, tocopherol, BHA, and BHT as exemplary antioxidants. However, Drager does not discuss these excipients at all or describe their use in any formulations and certainly provides no link between them and the other claim elements such that the elements are arranged as in the claims.

c.     *Drager Does Not Allow A POSA To Immediately Envisage The Claimed Invention*

93.     I also understand that a reference can anticipate a claim, if a person of skill in the art, reading the reference, would at once envisage the claimed arrangement or combination.  Based on the foregoing, Drager does not anticipate the asserted claims of the '483 patent because a POSA reviewing Drager would not envisage a bendamustine formulation containing PEG and an antioxidant and meeting the claimed stability limitation.  *See supra* at VIII.A.1-3.  Drager merely discloses the individual excipients among an extensive list with countless combinations.  Such lists do not allow a POSA to envisage any particular formulation without further guidance.

40

        **d.**     *Drager Discloses Countless Possible Combinations Of Excipients*

94.     I also understand even if a skilled artisan could at once envisage the claimed arrangement or combination, I understand that a reference is not anticipatory if it the number of  is so large that the combination would not be immediately apparent to one of ordinary skill in the art. Based on the foregoing, Drager does not anticipate the asserted claims of the '483 patent.  *See supra* at VIII.A.1-3.  Drager provides two extensive lists of dozens, if not hundreds of potential excipients to be combined with little to no guidance, leading to countless potential formulations. Moreover, to the extent Drager does provide guidance in the form of exemplary formulations and experimental data, it would not allow a POSA to envisage the use of from protic solvents.  Drager criticized protic solvents by criticizing Olthoff and PEG in particular by not including it in any disclosed formulations.

        **e.**     *Dr. Forrest Improperly Picks, Chooses, And Combines Various Disclosures Of Drager*

95.     I further understand that to anticipate, a reference must direct those skilled in the art to the invention without any need for picking, choosing, and combining various disclosures. Based on the foregoing, Drager does not anticipate the asserted claims of the '483 patent.  *See supra* at VIII.A.1-3.  Picking, choosing, and combining various disclosures is just how Dr. Forrest arrives at the purportedly anticipatory disclosures.  For instance, he arbitrarily selects specific excipients (PEG and antioxidants) from extensive lists with no guidance.  Further, he arbitrarily identifies claims 5, 38, 54, and 61 as providing anticipatory disclosures and then goes on to further pick and choose specific excipients from the claimed options.  In another instance, Dr. Forrest asserts that "claims 19-27, 31-33, 37-38, 56 and 60 of Drager disclose the concentration of bendamustine, the use of a non-aqueous protic solvent, the use of an antioxidant, and the use of a hydrophilic polymer."  Forrest Rep. at ¶¶ 114-115.  That is not the case.  For instance, claim 38

41

does not include any bendamustine concentration at all. Other claims in that set specifically claim concentrations outside the range claimed by the '483 patent. Claim 21 specifically claims a concentration of "about 5 mg/mL" of bendamustine and claim 26 claims "about 200 mg/mL." Dr. Forrest picks and chooses limitations from among these claims improperly.

### f. *Inherency Cannot Supply The Claimed Stability Limitation*

96.    I understand that, in certain circumstances, a prior-art reference may "inherently" disclose a particular claim limitation if the limitation in question is necessarily present in, or is the natural result of the combination of elements expressly disclosed by, that reference. I understand that inherency cannot be established by probabilities or possibilities. If a result may or may not result from practice of that reference or teaching, inherency is not established. Based on the foregoing, Drager does not anticipate the asserted claims of the '483 patent. *See supra* at VIII.A.1-3. In addition to the issues discussed above with respect to the fact that Drager does not disclose the elements of the asserted claims arranged as they are in the claims, Drager also does not disclose the claimed stability. Indeed, Drager reports that many formulations disclosed do not achieve the claimed stability, and Dr. Forrest provides no evidence that the claimed stability limitation is necessarily present in either the elements Drager discloses or a formulation containing the claimed excipients, along with bendamustine at the claimed concentrations.

### B.    Drager Does Not Render the Asserted Claims Obvious

97.    In my opinion, Drager does not render the asserted claims obvious for many of the same reasons that it does not anticipate the asserted claims, as well as others that I understand from

counsel are relevant to the obviousness analysis.[4]  First, the asserted claims require PEG.  In addition to failing to disclose actual formulations comprising PEG as discussed above, Drager provides no motivation to use PEG.  Indeed, insofar as Drager presents numerous actual formulations with stability and solubility data, a POSA would be more likely to use one of those as the starting point for future development.  Second, the claims require a "stabilizing amount of an antioxidant."  Again, in addition to not disclosing any formulations actually comprising an antioxidant, Drager fails to provide any motivation to use one.  To the extent niacinamide qualifies as an antioxidant, which, again, Drager does not classify it as, Drager's data demonstrates that it potentially decreases formulation stability.  Drager at Table II.  Third, the asserted claims require no more than 5% total impurities after 15 months under certain storage conditions.  Drager does not show any data for any formulation actually meeting that limitation at 15 months and concedes that many of the disclosed formulations will not meet such a limitation.

98.     As a preliminary matter, counsel has informed me that obviousness considers the prior art as a whole and that whether the POSA would have selected specific prior art references to combine from the sea of available prior art and the POSA's motivation for doing so is part of the obviousness analysis.  In my opinion, Dr. Forrest provides no rationale for why the POSA would start with Drager over any of the other available bendamustine formulations, such as Treanda or Ribomustin.  Instead, Dr. Forrest merely starts from the assumption that a POSA would

---

[4] While I understand that, as discussed in Section V, anticipation and obviousness are separate legal analyses with separate requirements, many of my opinions regarding Drager, including its disclosures and how a POSA would understand them are relevant to both analyses.  I have attempted to organize this report to respond to Dr. Forrest's anticipation and obviousness opinions as set forth in his opening report.  Nevertheless, I reserve the right to rely my disclosures in Section VIII.A in supporting my opinion that the '483 patent is not obvious and the disclosures in Section VIII.B to support my opinion that the '483 patent is not anticipated.

select Drager's liquid formulation, despite the apparent difficulties of successfully achieving such a formulation, an opinion that requires picking and choosing from among the different disclosures of Drager.

### 1.    A POSA Would Not Be Motivated to Select PEG as an Excipient

99.    A POSA reviewing the Drager reference would not be motivated to select PEG as an excipient in a bendamustine formulation. Dr. Forrest's obvious analysis relies on the same three portions of the specification cited above for anticipation, the two extensive lists of polar protic solvents and other excipients, and claims 5, 54, and 61. Forrest Rep. at ¶¶ 175-79 (citing Drager at 4:1-8, 7:27-8:2). These disclosures would not motivate a POSA to select PEG for a bendamustine formulation for many of the same reasons addressed above. In particular, PEG is disclosed only in extensive lists that give a POSA no guidance or motivation to select it and the claims Dr. Forrest cites to provide no specific direction or motivation to use PEG and encompass myriad formulations that do not include PEG. *See supra* at VIII.A.1-2.

100.    Further, Drager's mention of PEG in the list of potential polar protic solvents would not motivate a POSA to select PEG for a bendamustine formulation. As discussed, Drager teaches that polar *aprotic* solvents are the necessary part of its invention. Drager characterizes the disclosed invention as "liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent." Drager at 2:18-20. Drager provides no motivation to select a polar protic solvent at all, particularly since the one formulation tested containing a polar, protic solvent showed worse stability than some formulations containing just aprotic solvents. Drager at Table II (showing a formulation

44

containing 66% DMA and 34% PG exhibited worse stability data than DMF, NMP, or DMSO).[5] Further, the polar aprotic solvents Drager suggests are relatively uncommon or disfavored for use in pharmaceutical formulations, particularly compared to more common polar protic solvents such as water, ethanol, or propylene glycol.  Thus, a POSA would understand from Drager's use of such solvents that they were a necessary part of the invention.  Based on this understanding of the importance of aprotic solvents, a POSA would not be motivated to pursue a PEG-containing formulation.

101.    Even if a POSA did choose to include a polar protic solvent, Dr. Forrest provides no explanation why a POSA would not pursue a formulation comprising PG instead of PEG, as tested by Drager.  Drager provides stability and solubility data for a bendamustine formulation comprising PG.  *See id.* at Tables I-II and Fig. 2.  While such data is inferior to certain tested formulations that do not contain polar protic solvents, nothing about the data disclosed for the PG formulation suggests that it would be unsuitable for use in comparison to the other formulations disclosed.  Drager even selected the DMA/PG formulation as one of two formulations to test from a pharmacokinetic perspective (along with pure DMA), which a POSA would understand indicates that Drager viewed it as a relatively promising formulation to pursue.  Indeed, the DMA/PG formulation Drager discloses was ultimately commercialized as liquid Treanda.[6]  EAGLEBEN-

---

5 I note that a full 365 days of stability data does not appear to be reported for the 66% DMA formulation in Figure 2.  The stability data reported appears worse than both DMSO and DMF.  Further, the 66% DMA formulation does not appear to have been tested in Figure 1 at all.  This lack of data would further dissuade a POSA from pursuing polar protic solvents in a bendamustine formulation.

6 I understand that the commercial liquid Treanda product is not prior art to the '483 patent.  Nevertheless, the fact that the Drager formulation ultimately selected for commercialization was one of the specific formulations tested and contains neither PEG nor an antioxidant as required by

SLAYBACK-00157933.  Thus, a POSA who did choose to include a polar protic solvent would be motivated to use the solvent Drager provided actual data on.  Dr. Forrest provides no analysis or reason as to why a POSA would be motivated to select PEG from the list of dozens of potential polar, protic solvents.  In my opinion, there is no reason that a POSA would do so.  Not only does Drager provide no guidance or motivation towards selecting PEG, it actually teaches away from its use, showing data and exemplary formulations containing only polar aprotic solvents or, in one instance, a different polar protic solvent than PEG.

102.    The three claims Dr. Forrest cites, 5, 54, and 61, similarly do not provide a motivation to use PEG in a bendamustine-containing formulation.  As discussed above, none of these claims disclose any specific formulations, provide any data to demonstrate that their formulations work, or even specifically mention PEG as an excipient for inclusion in the formulations.  Indeed, there are many formulations encompassed by the claims that do not require PEG at all.  These claims would not have motivated a POSA to include PEG in a bendamustine formulation, particularly where other claims disclosed specific, alternative excipients, such as claim's 7 suggestion of specific glycols, including propylene glycol or claim 10's suggestion of hydroxypropyl-β-cyclodextrin.  *See supra* at VIII.A.1.

103.    Finally, in support of his obviousness opinion, Dr. Forrest cites to the same disclosure of PEG as an exemplary hydrophilic polymer, again in an extensive list.  Forrest Rep. at ¶ 178.  Dr. Forrest provides no discussion or analysis of this cite in the context of obviousness or why it would motivate a POSA to select PEG in particular.  Nevertheless, I note that a POSA

---

the asserted claims corroborates my opinion that a POSA would not have been motivated to include those excipients based on a review of Drager and instead would have pursued one of the specific formulations Drager disclosed and tested.

would not be motivated to select PEG in particular from the list for the same reasons discussed above with respect to anticipation. *See supra* at VIII.A.4. Moreover, as Drager provides exemplary data for other formulations, including solubility and stability data which are critical for intravenous infusion drug products, a POSA would not be motivated to select PEG from this list any more than from the list of polar protic solvents.

104. Beyond Dr. Forrest's opinions, I understand that Plaintiff's chemistry expert, Dr. Dean Toste, is offering the opinion that a POSA would not be motivated to use PEG in a bendamustine formulation because it would have been expected to have high nucleophilic reactivity, similar to water, and thus cause degradation.

105. In sum, Drager would not motivate a POSA to use PEG in a bendamustine formulation because Drager provides only two offhand mentions of PEG in its entire disclosure, both as a possible excipient for inclusion among much broader lists. Drager provides no exemplary formulations comprising PEG nor do any of its claims even require the use of PEG. It provides no data supporting the use of PEG and, indeed, teaches away from the use of PEG by providing exemplary formulations, solubility, and stability data for other viable formulation approaches.

## 2. A POSA Would Not Be Motivated to Use A Stabilizing Amount of An Antioxidant

106. Drager would also not motivate a POSA to use a stabilizing amount of antioxidant in a bendamustine formulation. First, Dr. Forrest appears to opine that a POSA would have understood bendamustine to be subject to oxidative degradation based on the statement that the Olthoff reference included liquid bendamustine formulations "prepared under an inert gas atmosphere." Forrest Rep. at ¶ 180. I disagree that this statement would have motivated a POSA to include an antioxidant in a bendamustine formulation for two reasons. First, Drager goes on to discredit Olthoff's data, noting on the very next page that its results "were not reproducible."

47

Drager at 3:9.  A POSA would not rely on information in a discredited, East German reference from decades before the priority date to determine the potential degradation pathways of bendamustine.  Even beyond that, Drager includes an extensive discussion of bendamustine's degradation pathways and does not include oxidation as a possibility.  Drager at 5:1-15.  Second, even if a POSA did choose to credit Olthoff, the inclusion of an inert gas atmosphere teaches away from the inclusion of an antioxidant.  As Drager notes, Olthoff's results "did not suggest any decomposition."  *Id.* at 2:13-14.  Thus, if a POSA did rely on Olthoff's disclosures, it would teach that an inert gas atmosphere is sufficient to ensure stability without an antioxidant.  It was known at the time that the prior art taught away from the use of antioxidants if there were other techniques available.  *See, e.g.*, Eur. Agency for the Evaluation of Med. Prods., *Note for Guidance on Excipients, Antioxidants, and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of a Medicinal Product* at 2 (Feb. 20, 2003).  The Court previously reached this conclusion, with which I agree.  *Cephalon* at 26 ("Other prior art references [] teach away from the use of antioxidants.").  Thus, if anything, the use of an inert gas atmosphere in Drager would teach away from the inclusion of a stabilizing amount of antioxidant.

107.    Dr. Forrest then cites the same niacinamide formulations discussed above to argue that they would have motivated a POSA to include an antioxidant.  These provide no motivation for the same reasons discussed above: niacinamide is a complexing agent, not an antioxidant and Drager's data is inconclusive at best about the impact of niacinamide on stability and does not provide any guidance on what a "stabilizing amount" would be.  *See supra* at VIII.A.2.  In contrast to the complete absence of any guidance in Drager, the '483 patent provides a specific discussion of the use of antioxidants, and describes how to determine a stabilizing amount.  '483 patent at 3:61-4:22.  The '483 inventors were able to make this disclosure because they discovered the actual

48

degradation that could be inhibited by an antioxidant, measured that degradation, both with and without an antioxidant, and showed skilled artisans how to determine a stabilizing amount. *Id.* at Table 3. Additionally, claims 2 and 11 require the use of one or more specific antioxidants. *Id*. at Claims 2, 11. Niacinamide is not among the compounds listed as antioxidants in claims 2 and 11. Dr. Forrest opines that Drager's disclosure of propyl gallate, tocopherol, BHA, and BHT among its undifferentiated list of excipients is sufficient to motivate a POSA to select one of those antioxidants. Forrest Rep. at ¶ 148. Dr. Forrest offers no support for this opinion. In my opinion, a POSA who did view Drager as suggesting the inclusion of an antioxidant—and I stress they would not—would naturally select the tested compound for which there is data, niacinamide. Dr. Forrest provides no reason or analysis to suggest why a POSA would reject niacinamide or why they would select propyl gallate in particular to replace. In my opinion, a POSA would not be motivated to do so.

108.   Further, even if Drager did motivate a POSA to use an antioxidant in a bendamustine containing formulation, it provides no motivation to use both PEG and a stabilizing amount of an antioxidant in the same formulation. This is true for the same reasons that it does not teach a formulation comprising bendamustine, PEG, and an antioxidant, nor does it allow a POSA to immediately envisage one, as discussed above. *See supra* at VIII.A.1-3. In short, it provides no guidance for why a POSA would select PEG and a stabilizing amount of an antioxidant for use in a bendamustine formulation. It does not discuss their benefits or provide any indication of why or when a POSA would use PEG and a stabilizing amount of an antioxidant in the same bendamustine formulation.

### 3. A POSA Would Not Have Had A Reasonable Expectation of Successfully Achieving the Claimed Stability Profile

109. Finally, Drager would not have given a POSA a reasonable expectation of successfully achieving the claimed stability profile. Dr. Forrest appears to start from the premise that the stability limitation "is an inherent property of an otherwise obvious formulation." Forrest Rep. at ¶ 187. However, Dr. Forrest provides no support for this statement. He goes on to assert that "the specification of the '483 patent discloses that the formulations disclosed in Drager, *i.e.*, formulations comprising about 10 mg/ mL to about 100 mg/mL bendamustine, PEG, and a stabilizing amount of antioxidant" meet the stability limitation. *Id*. at ¶ 189. As an initial matter, I disagree with that statement in that the Drager does not disclose any specific formulation comprising about 10 mg/ mL to about 100 mg/mL bendamustine, PEG, and a stabilizing amount of antioxidant. Beyond that, the portion of the specification Dr. Forrest cites for that proposition that the claimed stability profile is inherent in Drager's formulations has nothing to do with Drager whatsoever. Instead, it refers specifically to bendamustine formulations described in the '483 patent containing PEG, PG, and thioglycerol. No such formulation is recited in Drager and, indeed, that formulation would not even meet Drager's requirement for a polar aprotic solvent.

110. Dr. Forrest then goes on to incorporate his discussion of the stability data in his anticipation section, which I disagree with for the same reasons. *Id*. at ¶ 192. The data in Drager is incomplete and internally inconsistent and would not give a POSA a reasonable expectation of successfully achieving the claimed stability. *See supra* at VIII.A.2-3. Moreover, even if a POSA did rely on the data or descriptions of stability in Drager, those descriptions of formulations allow for greater than 10% total impurities after 12 months and, indeed, Drager's data shows that not all formulations covered by its claims meet the stability limitation. *See supra* at VIII.A.3.

50

111.    Dr. Forrest also appears to rely on the same, incorrect definition of "typical storage conditions" discussed above.  *See id.*  Beyond that, Dr. Forrest also appears to offer an opinion that "about" 365 days is 13.4 months because "about" creates a margin of 10%.  Forrest Rep. at ¶ 195.  While I understand that Drager generally defines "about" as a 10% margin (Drager at 7:25), a POSA would not understand that margin to apply to time on the scale of 365 months or years, as such times can be set with sufficient precision.  Indeed, Drager notes that "about" would "preferably" encompass a margin of only 5%, which Dr. Forrest does not address.  Even if it is correct to assume a margin of 10%, that margin can also reduce the stability Drager claims to have achieved.  Drager defines "stable" as "no more than about 10% loss of bendamustine under typical commercial storage conditions," but with a 10% margin, that means that Drager's formulations can experience twice the claimed level of degradation after just 329 days (i.e. 90% of 365).  Further, even if an unsupported statement in Drager that each and every claimed formulation is stable up to 13.4 months were accurate and even if stable did limit degradation to 5% total impurities instead of Drager's clearly defined 10%, 13.4 months is still not 15 months and Drager's formulations still would not meet the stability limitation of the asserted claims.  Dr. Forrest opines that "13.2 [sic] months" is "close enough" to the claimed invention of 15 months.  In my opinion, 13.2 or 13.4 months is not 15 months, particularly since the actual disclosure of the patent is only 12 months.  In essence, Dr. Forrest opines that 12 months, stretched to the limit of about would be stability of 13.4 months, which is "close enough" to teach 15 months stability.  That is not how a POSA would understand Drager's disclosure, but is, instead, a litigation-driven analysis trying to extend an unsupported stability claim as far as possible to reach the claimed limitation.  Moreover it still falls short, and is contradicted by Drager's actual data, which shows claimed formulations with degradation in excess of 5% total impurities after less than 15 months at 5 ℃.

112.    I also note that this portion of Dr. Forrest's analysis is subject to the same failure to analyze why a POSA would be motivated include each excipient in a single formulation having the claimed stability or whether the formulation would be reasonably expected to successfully achieve that claimed stability, as discussed above.  *See supra* at VIII.A.3.  Indeed, under Dr. Forrest's approach, one could arbitrarily select a solvent system comprising 0.1% of a polar aprotic solvent and 99.9% PG, substantially the same formulation Drager tests and demonstrates is insufficient is Figure 3.

## IX.    Objective Indicia Further Demonstrate The Non-Obviousness of the '483 Patent

### A.    Nexus

113.    I understand from counsel that where a product embodies an asserted claims, there is presumed to be a nexus between the objective indicia pertaining to the product and the asserted claims.  I have reviewed the opening expert report of Plaintiffs' Expert Dr. Edmund Elder, who offers the opinion "[t]hat Belrapzo® and Bendeka® are compositions that fall within the scope of the '483 patent" and that "Belrapzo® and Bendeka® are embodiments of the claimed "ready to use" liquid bendamustine-containing composition."  Elder Rpt. at ¶¶ 63-68.  I agree with Dr. Elder's conclusion that both Belrapzo and Bendeka embody the asserted claims of the '483 patent.

### B.    Unexpected Results

114.    I understand from counsel that  where a claimed invention yields more that predictable results, such an unexpected improvement is evidence of non-obviousness.  The claimed inventions of the '483 patent exhibits such results.  In particular, the use of both PEG and an antioxidant results in unexpected stability both at room temperature and under refrigeration, even over the use of PEG alone.  As the below data in the '483 patent shows, the use of PEG in combination with an antioxidant reduces total impurities by a factor of 10 when stored at 25 °C for 15 and by a factor of 80 when stored at 40 °C for 15.  '483 patent at 8:11-43.

TABLE 3

| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants

<LD = Below Level of Detection

115.    Such a result was unexpected because the prior art did not indicate that bendamustine was susceptible to oxidative degradation.  Notably, Drager recites four different degradation pathways for bendamustine, none of which are oxidative.  Drager at 5:1-15.  Indeed, as discussed above, the prior art did not provide any motivation to include an antioxidant.  *See supra* at VIII.B.2.

116.    Moreover, that same table shows a similar reduction in an impurity that elutes at RRT 0.58.  That impurity is the monohydroxy impurity, also referred to as hydrolysis product 1 or HP1, resulting from the hydrolytic degradation pathway.  '483 patent at 1:49-53 (explaining that HP1 has an RRT of 0.6), *and* Tables 4 and 5 (labeling impurities with RRT 0.59 and 0.58 as HP1).  It is also unexpected that an antioxidant would reduce non-oxidative degradation.

117.    As a result, the claimed compositions of the '483 patent exhibit unexpected stability, even providing superior stability to Drager's purported stability of no more than 10% total impurities under the longest disclosed typical commercial storage conditions (i.e. 12 months of refrigerated storage).  This is an unexpected result and further demonstrates that the asserted claims of the '483 patent would not have been obvious to one of ordinary skill in the art.

## C.     Long-Felt Need

118.    I understand from counsel that where a claimed invention satisfies a long-felt but unmet need in a technology area, that is evidence of non-obviousness because it is reasonable to infer that the need would not have persisted if the solution had been obvious.  Here, there was a long felt need for a stable, tolerable liquid bendamustine drug product that was commercially viable.  As of the priority date, the only commercially available formulations of bendamustine were lyophilized, as both Drager and the '483 patent state.  Drager at 1:22-23 ("In light of its instability in aqueous solution, bendamustine is currently supplied as a lyophilized powder for injection."); '483 patent at 1:39:62.

119.    Lyophilized formulations have disadvantages. As Drager explains:

> The reconstitution of the bendamustine lyophilized powder is time consuming and cumbersome. Moreover, lyophilization of solids on a commercial scale requires specialized equipment and incurs significant expense. As such, formulations of bendamustine that do not require lyophilization and/or reconstitution are needed.

120.    The '483 patent similarly acknowledges the limitations of lyophilization:

> The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

121.    The claimed inventions of the '483 patent, as embodied in Belrapzo® and Bendeka®, satisfy that long-felt need, providing liquid compositions that does not require reconstitution.

## D.     Failure of Others

122.    I understand that evidence others tried to develop the claimed invention, but failed, may provide evidence of non-obviousness because actual reports of failure weigh against a

reasonable expectation of success.  Here, the history of bendamustine and, in particular Olthoff, provides evidence of such a failure.

123.     Bendamustine was first synthesized in 1963 and was originally marketed as a lyophilized formulation.   Drager at 1:40-13, 1:66-67.   Olthoff attempted to develop stable, injectable, liquid bendamustine compositions in the 1980s using pure PG.  Olthoff at 1:9-17; *see* Drager at 2:61-64.  While Olthoff reported that bendamustine hydrochloride "is chemically stable over long periods in the group of solvents mentioned and does not form mono- and dihydroxy and alkoxy derivatives, known from aqueous solutions," that was not true.  Olthoff at 4:18-21.  Drager later attempted to reproduce Olthoff's work and found that "the results described in GDR Patent 159289 were not reproducible" as the "[s]olutions of bendamustine in 99% propylene glycol degraded to nonbendamustine products over a time equivalent to commercial storage."  Drager at 3:8-13.  Moreover, as of the priority date, no liquid formulation was commercialized, providing further evidence of Olthoff's failure.

124.     Notably, Drager's response to Olthoff's failure provides further evidence that the claimed inventions' in the '483 patent were not obvious.  Drager, faced with Olthoff's failure, did not choose to pursue a PEG-containing formulation at all, but rather moved away from protic solvents, using polar, aprotic solvents to stabilize bendamustine.  To the extent Drager used polar protic solvents at all, they were an optional addition, and Drager ultimately tested and commercialized a PG-containing product, not a PEG-containing one.  EAGLEBEN-SLAYBACK-00157933.  Notably, that product, liquid Treanda, was later discontinued.  Thus, despite being synthesized in 1963, no one successfully developed a stable, liquid, commercially viable formulation for almost 50 years, until the '483 patent.

### E.      Teaching Away

125.    Finally, I understand from counsel that whether a reference or the prior art teaches away from a claimed invention may be considered as objective indicia of non-obviousness, in addition to rebutting a reasonable expectation of success or motivation to combine.  Thus, to the extent I address teaching away above, I incorporate it here.  In particular, Drager teaches away from the use of polar, protic solvents by presenting them as optional and, in cases, inferior to formulations containing only polar aprotic solvents from a stability standpoint.  *See supra* at VIII.B.1.  Further, Drager teaches away from the use of PEG, using PG instead to the extent any exemplary formulations use a protic solvent at all.  *See id*.  Finally, the prior art teaches away from the use of an antioxidant in a variety of ways including Drager's inconclusive data regarding the purported antioxidant niacinamide (*supra* at VIII.B.2), Olthoff's use of an inert gas atmosphere instead of an antioxidant (*supra* at ¶ 106), and the prior art's general admonition against the use of antioxidants where other options are available.  *See supra* at VIII.A.2.

7/1/22
_____
Date

_____
Bernhardt Trout, Ph.D.

57

# EXHIBIT A

# Bernhardt L. Trout

Department of Chemical Engineering
Massachusetts Institute of Technology
77 Massachusetts Avenue, E19-502B
Cambridge, MA 02139

Tel: (617) 258-5021
Fax: (617) 253-2272
trout@mit.edu

**Research Interests**:

Pharmaceutical manufacturing and development research, Biopharmaceutical (protein and antibody) processes and stabilization, Pharmaceutical crystallization and separations, Multi-scale modeling, Electronic-structure calculations, Rare events simulations.

**Positions**:

*Massachusetts Institute of Technology, Cambridge, MA*
Raymond F. Baddour, ScD, (1949) Professor of Chemical Engineering, October 2014 – present
Director, SEE: Society, Engineering and Ethics, Jan., 2009 - present
Director, Novartis-MIT Center for Continuous Manufacturing, June 2007 – May 2019
Co-Chair, Chemical and Pharmaceutical Engineering Singapore-MIT Alliance Program, July 2006 – October 2014
Professor of Chemical Engineering, January 2008 – October 2014
Director, Concourse Freshman Educational Program, July 2009 – June 2012
Associate Professor of Chemical Engineering, July 2003 – December 2007
Assistant Professor of Chemical Engineering, January 1998 – July 2003

*Max-Planck-Institut für Festköperforschung, Stuttgart, Germany*
Post-Doctoral Researcher, 1996 – 1997
Director: Michele Parrinello

**Teaching**:

10.01 Ethics for Engineers, 10.02 Foundations of Principled Entrepreneurship for Engineers , 10.213: Undergraduate Thermodynamics, 10.40: Graduate Thermodynamics, 10.65: Chemical Reactor Engineering, 10.541: Kinetics of Biological and Chemical Systems, 10.37: Chemical Kinetics and Reactor Design, 10.27: Process Engineering Laboratory, 10.675: Molecular Computational Methods in Chemical Engineering, 10.491: Chemical Engineering Design Module, 10A16: Freshman Advising Seminar, 10.04J Philosophical History of Energy,

**Education**:

*University of California, Berkeley*
    Ph.D. in Chemical Engineering, 1996
        Thesis: Reaction Processes in ZSM-5 Zeolites Elucidated by Quantum Density Functional Theory and by Dynamic Monte Carlo
        Advisors: Arup K. Chakraborty and Alexis T. Bell

*Université de Paris IV*
    Certificat de Langue et de Civilisation Françaises, 1991

*Massachusetts Institute of Technology*
    M.S. in Chemical Engineering Practice, 1990

*Massachusetts Institute of Technology*
    B.S. in Chemical Engineering, 1990

**Awards and Honors**:

AIChE Pharmaceutical Discovery, Development and Manufacturing Forum (PD2M) 2021 Drug Product QbD Award
The Medicine Maker "Power List", 2019
ISCMP Co-Chair, 2018
The Medicine Maker "Power List", 2017
ISCMP Co-Chair, 2016
The Medicine Maker "Power List", 2016
AIChE Division 15 (FPBE) Plenary Speaking Award, 2015
Armenian Academy of Engineering, Foreign Member, elected 2015
The Medicine Maker "Power List", 2015
AIChE Excellence in Process Development Research Award, 2014
ISCMP Co-Chair, 2014
ISCMP Downstream Pharmaceutical Panel Chair, 2014
CCR Research Collaboration Award, 2014
Manufacturing Technology Runner-up for the Wall Street Journal Technology Innovation Award, 2012
Impact Award from the Computational Molecular Science and Engineering Forum of the AIChE (CoMSEF), 2011
ACS Plenary Lecture, 2011
AIChE Area 1A Program Chair, 2006
National Academy of Engineering participant in "Frontiers in Engineering," 2001
Henry L. and Grace Doherty Professorship, 2001 – 2003
Ford Motor Company Young Investigator Award, 2001
NSF CAREER Award, 2000 – 2004
Joseph R. Mares Junior Faculty Chair, 1998 – 2001
Max-Planck Institute Fellowship, 1996 – 1997
NSF Graduate Fellowship, 1991 – 1994

**Committees/Memberships:**

MIT Advisory Board for Social and Ethical Responsibilities of Computing (SERC), 2019-present
MIT Schwarzman College of Computing Committee on Social Implications, 2019
MIT Task Force on Open Access, 2017 – 2019
Task Force on Open Access, Contracts subteam, 2017-2019
Molecular Systems Design & Engineering (MSDE), Royal Society of Chemistry Journal, Editorial Board Member, 2016 – present
United States Pharmacopeia Expert Panel: Quality Standards for Pharmaceutical Continuous Manufacturing, 2016 – 2019
FDA Advisory Committee for Pharmaceutical Science and Clinical Pharmacology, Consultant, 2015 – 2018
MIT Chemical Engineering Department Head Search Advisory Committee, 2015
FDA Coordination Group at MIT, 2014 – 2016
MIT Committee on Intellectual Property, 2011 – 2016
ISPE Subcommittee on Pharmaceutical Manufacturing, 2010 – 2011
ISPE Subcommittee on Continuous Production, 2008
MIT Graduate Committee, 2006 – 2009
MIT Committee on the Undergraduate Program, 2006 – 2009
MIT Faculty Search Committee, 2006 – 2009
DuPont-MIT Advisory Committee, 2005 – 2007
MIT Practice School Steering Committee, 2004 – 2015
Hottel Lecture Committee, 2004 – 2007
SMA Annual Report Committee, 2003 – 2012
Department Computer Committee, 2002 – 2007

**Editorial Boards:**

Molecular Systems Design & Engineering (MSDE), Royal Society of Chemistry Journal, 2016 – present
AI and Ethics, 2020 – present
The AI Ethics Journal, 2020 - present

**Conferences Organization:**

Co-Chair, International Symposium on Continuous Manufacturing Biologics Summit, September 2020
Co-Chair, International Symposium on Continuous Manufacturing, October 2018
Co-Chair, International Symposium on Continuous Manufacturing, September 2016
Chair, MIT Mastery of Nature Conference, May 2016
Organizing Committee, AIChE/FDA P2DM Workshop on Continuous Manufacturing, March 2016
Co-Chair, International Symposium on Continuous Manufacturing, May 2014

**Scientific Publications:**

212.   Hagras, M., Marek, R., Feras, H., and Trout, B. L., "Computational Modeling for the Oxidation Reactions of the Cysteine Residues with the Superoxide and the Organic Radical Species," *J. Phys. Chem. B*, submitted.

211.   Lai, P., Gallegos, A., Mody, N., Sathish, H.A., and Trout, B.L., "Machine learning prediction of antibody aggregation and viscosity for high concentration formulation development of protein therapeutics," *mAbs*, **14**, Article Number: 2026208 (2022). https://doi-org.libproxy.mit.edu/10.1080/19420862.2022.2026208.

210.   Lai, P., Fernando, A., Cloutier, T., Kingsbury, J.S., Gokarn, Y., Halloran, K.T., Calero-Rubio, C., Trout, B.L., "Machine learning feature selection for predicting high concentration therapeutic antibody aggregation", *J. Pharm. Sci.*, **110**, 1583 (2021). DOI: 10.1016/j.xphs.2020.12.014.

209.   Lai, P., Fernando, A., Cloutier, T., Gokarn, Y., Zhang, J., Schwengerb, W., Charib, R., Calero-Rubio, C., Trout, B.L., "Machine learning applied to determine the molecular descriptors responsible for the viscosity behavior of concentrated therapeutic antibodies," *Mol. Pharm.*, **18**, 1167 (2021). DOI: 10.1021/acs.molpharmaceut.0c01073.

208.   Lai, P., Ghagb, G., Yu, Y., Juan, V., Fayadat-Dilman, L. and Trout, B. L., "Differences in human IgG1 and IgG4 S228P monoclonal antibodies viscosity and self-interactions: Experimental assessment and computational predictions of domain interactions," *mAbs*, **13**, Article Number: 1991256 (2021). https://doi.org/10.1080/19420862.2021.1991256.

207.   Lai, P., Swan, J., and Trout, B. L., "Calculation of Therapeutic Antibody Viscosity with Coarse-Grained Models, Hydrodynamic Calculations and Machine Learning-Based Parameters," *mAbs,* **13**, Article Number: 1907882 (2021)*.* DOI: 10.1080/19420862.2021.1907882.

206.   Hagras, M., Bellucci, M., Gobbo, G., Ryan, M., Trout, B.L., "Computational Modelling of the Disulfide Cross-Linking Reaction", *J. Phys. Chem. B*, **124**, 9840 (2020). DOI: 10.1021/acs.jpcb.0c07510.

205.   Cloutier, T., Sudrik, C., Mody, N., Sathish, H., and Trout, B. L., "Machine learning models of antibody-excipient preferential interactions for use in computational formulation design," *Mol. Pharm.*, **17**, 3589 (2020). DOI: 10.1021/acs.molpharmaceut.0c00629.

204.   Mehrabian, H., and Trout, B.L., "In Silico Engineering of Hydrate Antiagglomerant Molecules using Bias-Exchange Metadynamics Simulations", *J. Phys. Chem. B*, **124**, 18983 (2020)*.* DOI 10.1021/acs.jpcc.0c03251.

203.   Cloutier, T., Sudrik, C., Mody, N., Sathish, H., and Trout, B. L., "Molecular computations of preferential interactions of L-proline, L-arginine.HCl, and NaCl with

IgG1 antibodies and their impact on aggregation and viscosity mAbs," *mAbs*, **12**, article number 1816312 (2020). DOI: 10.1080/19420862.2020.1816312.

202. Badman, C., Cooney, C. L., Florence, A., Konstantinov, K., Krumme, M., Nasr, M. N., Mascia, S., Trout, B.L., "Why We Need Continuous Pharmaceutical Manufacturing and How to Make it Happen," *J. Pharm. Sci.,* **108**, 3521 (2019). **Featured Article**

201. Pisano, R., Arsiccio, A., Capozzi, L.C., Trout, B.L., "Achieving Continuous Manufacturing in Lyophilization: Technologies and Approaches," *EJPB,* **142**, 265 (2019).

200. Cloutier, T., Sudrik, C., Mody, N., Sathish, H., and Trout, B. L., "Molecular Computations of Preferential Interaction Coefficients of IgG1 Monoclonal Antibodies with Sorbitol, Sucrose, and Trehalose and the Impact of These Excipients on Aggregation and Viscosity," *Molecular Pharmaceutics,* **16**, 3657 (2019).

199. Sudrik, C., Cloutier, T., Mody, N., Hasige, S. A., and Trout, B. L., "Understanding the role of preferential exclusion of sugars and polyols from native state IgG1 monoclonal antibodies and its effect on aggregation and reversible self-association," *Pharm. Res.,* **36**, UNSP 109 (2019). DOI: 10.1007/s11095-019-2642-3.

198. Mehrabian, H., Bellucci, M., Walsh, M., and Trout, B.L., "In Silico Analysis of the Effect of Alkyl Tail Length on Anti-Agglomerant Adsorption to Natural Gas Hydrates in Brine," *J. Phys. Chem. C,* **123**, 17239 (2019). DOI: 10.1021/acs.jpcc.9b01952.

197. Gobbo, G., Ciccotti, G., and Trout, B. L., "On computing the solubility of molecular systems subject to constraints using the extended Einstein crystal method," *J. Chem. Phys*., **150**, 201104 (2019). DOI: 10.1063/1.5099378. **Editor's Pick.**

196. Chadwick, K., Chen, J., Santiso, E. and Trout, B.L. "Molecular Modeling Applications in Crystallization," Ch. 5 of <u>Handbook of Industrial Crystallization</u>. *Cambridge University Press, ed.* Myerson, A. S, Erdemir, D., and Lee, A., p. 136 (2019).

195. Wijethunga, T., Chen, X., Myerson, A. S., Trout, B. L., "The use of functional crystalline substrates for heterogeneous nucleation and polymorphic selection of indomethacin," *Cryst. Eng. Comm.,* **21**, 2193 (2019). DOI: 10.1039/c8ce01517a

194. Bellucci, M., Gobbo, G., Wijethunga, T., Ciccotti, G., and Trout, B. L., "Solubility of Paracetamol in Ethanol by Molecular Dynamics Using the Extended Einstein Crystal Method and Experiments", *J. Chem. Phys.,* **150**, article number 094107 (2019). DOI: 10.1063/1.5086706

193. Capozzil, L. C., Trout, B. L. Pisano, R., "From batch to continuous: freeze-drying of suspended vials for pharmaceuticals in unit-doses," *I&EC,* **58**, 1635 (2019). DOI: 10.1021/acs.iecr.8b02886

5

192. Cloutier, T., Sudrik, C., Sathish, H., and Trout, B. L., "Kirkwood-Buff Derived Alcohol Parameters for Aqueous Carbohydrates and their Application to Preferential Interaction Coefficient Calculations of Proteins," *J. Phys. Chem. B,* **122**, 9350 (2018). DOI 10.1021/acs.jpcb.8b07623

191. Wijethunga, T., Stojakovic, J., Bellucci, M., Chen, X., Myerson, A. S., Trout, B. L., "A general method for the identification of crystal faces using Raman spectroscopy combined with machine learning and application to the epitaxial growth of acetaminophen," *Langmuir*, **34**, 9836 (2018). DOI 10.1021/acs.langmuir.8b01791.

190. Mehrabian, H., Bellucci, M., Walsh, M., and Trout, B.L., "Effect of Salt on Anti-Agglomerant Surface Adsorption in Natural Gas Hydrates," *J. Phys. Chem. C,* **122**, 12839 (2018). DOI: 10.1021/acs.jpcc.8b03154.

189. Bellucci, M., Walsh, M., and Trout, B.L., "Molecular Dynamics Analysis of Anti-Agglomerate Surface Adsorption in Natural Gas Hydrates," *J. Phys. Chem. C,* **122**, 2673 (2018). DOI: 10.1021/acs.jpcc.7b09573

188. Gobbo, G., Bellucci, M., Tribello, G., Ciccotti, G., and Trout, B. L., "Nucleation of molecular crystals driven by relative information entropy," *J. Chem. Theory Comput.,* **14**, 959 (2018). DOI: 10.1021/acs.jctc.7b01027

187. Puri, V., Brancazio, D., Harinith, E., Martinez, A., Desai, P. M., Jensen, K. D., Chun, J., Braatz, R. D., Myerson, A. S., Trout, B. L., " Demonstration of Pharmaceutical Tablet Coating Process by Injection Molding Technology," *Int. J. Pharm.,* **535**, 106 (2018).

186. Desai, P. M., Puria, V., Brancazio, Halkudea, B. S., Jeremy E. Hartman, Wahanea, A. V., Martinez, A. R., Jensen, K.D., Harinatha, E., Braatz, R. D., Chun, J.-H., Trout, B. L., "Tablet coating by injection molding technology – optimization of coating formulation attributes and coating process parameters," *Eur. J. Pharm. Biopharm.,* **122**, 25 (2018).

185. Nasr, M. N., Krumme, M., Matsuda, Y., Trout, B. L., Badman, C., Mascia, S., Cooney, C. L., Jensen, K. D., Florence, A., Johnston, C., Konstantinov, K., Lee, S. L., "Regulatory Perspectives on Continuous Pharmaceutical Manufacturing: Moving from Theory to Practice," *J. Pharm. Sci.,* **106**, 3199 (2017).

184. Puri, V., Desai, P. M., Jensen, K. D., Chun, J., Myerson, A. S., Trout, B. L., "Development of Maltodextrin Based Immediate Release Tablets using an Integrated Twin-Screw Hot Melt Extrusion and Injection Molding Continuous Manufacturing Process," *J Pharm Sci.,* **106**, 3328 (2017).

183. Desai, P. M., Hogan, R. C., Brancazio, D., Puri, V., Jensen, K. D., Chun, J., Myerson, A. S., Trout, B. L., " Integrated hot-melt extrusion - injection molding continuous tablet manufacturing platform: Effects of critical process parameters and formulation attributes on product robustness and dimensional stability," *Int. J. Pharm.*, **531**, 332 (2017).

182. Widanalage Dona, T. K., Baftizadeh, F., Stojakovic, J., Myerson, A. S., Trout, B. L., "Experimental and mechanistic study of the heterogeneous nucleation and epitaxy of acetaminophen with biocompatible crystalline substrates," *Cryst. Growth Des.,* **17**, 3783 (2017).

181. Stojakovic, J., Baftizadeh, F., Bellucci, M., Myerson, A. S., Trout, B. L. "Angle-Directed Nucleation of Paracetamol on Biocompatible Nano-Imprinted Polymers," *Crystal Growth & Design*, **17**, 2955, DOI: http://dx.doi.org/10.1021/acs.cgd.6b01093 (2017).

180. Yazdanpanah, N., Testa, C., Perala, S. R. K., Jensen, K., Braatz, R., Myerson, A. S., Trout, B. L.,  "Continuous Heterogeneous Crystallization on Excipient Surfaces," *Crystal Growth & Design,* **17**, 3321, DOI: http://dx.doi.org/10.1021/acs.cgd.7b00297 (2017).

179. Lakerveld, R., Heider, P.L., Jensen, K.D., Braatz, R.D., Jensen, K.F., Myerson, A.S., Trout, B.L., "End-to-End Continuous Manufacturing: Integration of Unit Operations," in *Continuous Manufacturing of Pharmaceuticals*, edited by P. Kleinebudde, J. Khinnast, and J. Rantanen, Wiley Inc., New York, Chapter 13, pages 447-483 (2017).

178. Padhye, N., Parks, D., Trout, B.L., and Slocum A., "A New Phenomenon: Sub-$T_g$, Solid-State, Plasticity-Induced Bonding in Polymers," *Sci. Rep.* **7**, Article number: 46405, doi:10.1038/srep46405 (2017).

177. Li, J., Tsai-ta, C. L., Trout, B. L., Myerson, A. "Continuous Crystallization of Cyclosporine: The Effect of Operating Conditions on Yield and Purity," *Crystal Growth & Design,* **17**, 1000, DOI: 10.1021/acs.cgd.6gd.6b01212 (2017).

176. Sudrik, C., Cloutier, T., Pham, P., Samra, H, and Trout, B. L., "Preferential interactions of trehalose, L-arginine and sodium chloride with therapeutically relevant IgG1 monoclonal antibodies," *mAbs*, **9**, 1155 http://dx.doi.org/10.1080/19420862.2017.1358328 (2017).

175. Reslan, M., Demir, Y. K., Trout, B. L., Chan, H. K., and Kayser, V., "Lack of Synergistic Effect of Arginine-Glutamic Acid on the Physical Stability of Spray-Dried Bovine Serum Albumin," *Pharmaceutical Development and Technology*, **22**, 785, DOI: 10.1080/10837450.2016.1185116 (2017).

174. Kayser, V., Francon, A., Pinton, H., Saluzzo, J. F., Trout, B. L., "Rational Design of Rabies Vaccine Formulation for Enhanced Stability," *Turkish Journal of Medical Sciences* **47**, 987. doi:10.3906/sag-1610-82 (2017).

173. Badruddoza, A. Z. M., Godfrin, D., Myerson, A., Trout, B. L., Doyle, P. "Core-shell Composite Hydrogels for Controlled Nanocrystal Formation and Release of Hydrophobic Active Pharmaceutical Ingredients," *Advanced Healthcare Materials,* **5**, 15, 1960, DOI: 10.1002/adhm.201600266 (2016).

172.   Padhye, N., Parks, D., Slocum, A., Trout, B. L. "Enhancing the Performance of the T-Peel Test for Thin and Flexible Adhered Laminates," *Review of Scientific Instruments,* **87**, 085111; DOI: 10.1063/1.4960172 (2016).

171.   Lee, K.K.H., Sahin, Y.Z., Neeleman, R., Trout, B.L. and Kayser, V., "Quantitative Determination of the Surfactant-Induced Split Ratio for Influenza Virus by Fluorescence Spectroscopy," *Human Vaccines & Immunotherapies,* **12**, 1757, DOI: 10.1080/21645515.2016.1141846 (2016).

170.   Lauer, T., Wood, G., Farkas, D., Sathish, H., Samra, H., Trout, B. L. "Molecular Investigation into the Mechanism of Non-Enzymatic Hydrolysis of Proteins and Predictive Algorithm for Susceptibility," *Biochemistry,* **55**, 23, 3315-3328, DOI: 10.1021/acs.biochem.5b01376 (2016).

169.   Zhou, L., Ferguson, S., Youn, Y., Trout, B.L., Myerson, A., Braatz, R. "Mathematical Modeling and Design of Falling Film Solution Crystallization," *Crystal Growth & Design*, **55**, 5019-5029, DOI: 10.21/acs.iecr.6b0057 (2016).

168.   Wood, G., Alavattam, S., Moore, J., Wang, Y. J., Trout, B. L. "Mechanistic Insights Into Radical-Mediated Oxidation of Tryptophan from ab initio Quantum Chemistry Calculations and QM/MM Molecular Dynamics Simulations," *J. Phys. Chem. A,* **120**, 18, 2926-2939, DIO: 10.1021/acs.jpca.6b02429 (2016).

167.   Yu, L., Akseli, I., Allen, B, et al. "Advancing Pharmaceutical Quality: a Summary of the Second FDA/PQRI Conference," AAPS Journal, **18**, 528 (2016).

166.   Yazdanpanah, N., Myerson, A., Trout, B. L. "Mathematical Modeling of Layer Crystallization on a Cold Column with Recirculation," *Industrial & Engineering Chemistry Research*, **55**, 1, 5019-5029, DOI: 10.102/acs.iecr.6b00057 (2016)

165.   Li, J., Trout, B. L., Myerson, A. "Multistage Continuous Mixed-Suspension, Mixed-Product Removal (MSMPR) Crystallization with Solids Recycle," *Organic Process Research & Development*, **20**, 2, 510–516, DOI: 10.1021/acs.oprd.5b00306 (2016).

164.   Agrawal, N.J., Helk, B., Kumar, S., Mody, N., Sathish, H., Samra, H., Buck, P., Li, L., Trout, B.L. "Computational Tool for the Early Screening of IgG1 Monoclonal Antibodies for their Viscosities," *mAbs,* **8**, 1, 43-48, DOI: 10.1080/19420862.2015.1099773 (2016).

163.   Courtois, F., Agrawal, N., Lauer, T. M., Trout, B. L. "Rational Design of Therapeutic mAbs Against Aggregation through Protein Engineering and Incorporation of Glycosylation Motifs Applied to Bevacizumab," *mAbs,* **8**, 1, 99-112, DOI: 10.1080/1942086.2015.1112477 (2016).

162.   Yazdanpanah N., Ferguson, S. T., Myerson, A., Trout, B. L., "A Novel Technique for Filtration Avoidance in Continuous Crystallization," *Crystal Growth & Design,* **16**, 1, 285–296, DOI: 10.1021/acs.cgd.5b01231 (2016).

8

161.    Chopade, P., Sarma, B., Santiso, E., Simpson, J., Fry, J., Yurttas, N., Biermann, K., Chen, J., Trout, B.L., Myerson, A. S. "On the Connection between Nonmonotonic Taste Behavior and Molecular Conformation in Solution: The Case of Rebaudioside-A," *J. Chem. Phys.*, **143**, 24, DOI: 10.1063/1.4937946 (2016). *Editors' Choice Article*

160.    Trout, B.L., Foreword to <u>Developability of Biotherapeutics: Computational Approaches</u>, Edited by Sandeep Kumar and Satish Kumar Singh, CRC Press (2015).

159.    Santiso, E., Trout, B. L. "A General Method for Molecular Modeling of Nucleation from the Melt," *J Chem. Phys.,* **143**, 174109, DOI: 10.1063/1.4934356 (2015).

158.    O'Mahony, M., Leung, A., Ferguson, S., Trout, B.L.; Myerson, A.S. "A Process for the Formation of Nanocrystals of Active Pharmaceutical Ingredients with Poor Aqueous Solubility in a Nanoporous Substrate," *Org. Process Res. Dev.,* **19**, 9, 1109-1118, DOI: 10.1021/op500262q (2015).

157.    Courtois, F., Schneider, C., Agrawal, N.J., Trout, B.L. "Rational Design of Biobetters with Enhanced Stability", *J. Pharm. Sci.,* **104**, 8, 2433-2440, DOI: 10.002/jps.24520 (2015).

156.    Tsai-Ta, C.L., Cornevin, J., Ferguson, S., Li, N., Trout, B.L., Myerson, A. "Control of Polymorphism in Continuous Crystallization via MSMPR Cascade Design," *Crystal Growth and Design*, **15**, 7, 3374–3382, DOI: 10.1021/acs.cgd.5gd.5b00466 (2015).

155.    Sharma, M., Trout, B.L. "Effect of Pore Size and Interactions on Paracetamol Aggregation in Porous Polyethylene Glycol Diacrylate Polymers," *J. Phys Chem. B*, **119**, 25, 8135–8145, DOI: 10.1021/jp512788a (2015).

154.    Yu, L. X., Akseli, I., Allen, B., Amidon, G., Bizjak, T. G., Boam, A., Caulk, M., Doleski, D., Famulare, J., Fisher, A., Furness, S., Hasselbalch, B., Havel, H., Hoag, S. W., Iser, R., Johnson, B. D., Ju, R., Katz, P., Lacana, E., Lee, S. L., Lostritto, R., McNally, G., Mehta, M., Mohan, G., Nasr, M., Nosal, R., Oates, M., O'Connor, T., Polli, J., Raju, G. K., Randazzo, G., Schwendeman, A., Selen, A., Seo, P., Shah, V., Sood, R., Thien, M. P., Tong, T., Trout, B. L., Tyner, K., Vaithiyalingam, S., VanTrieste, M., Wesdyk, R., Woodcock, J., Wu, G., Wu, L., Yu, L., Zezza, D. "Advancing Product Quality: A Summary of the Second FDA/PQRI Conference," *The AAPS Journal*, **17**, 4, 1011-1018, DOI: 10.1208/s12248-015-9754-4  (2015).

153.    Tan, L., Davis, R., Myerson, A., Trout, B.L., "Control of heterogeneous nucleation via rationally designed biocompatible polymer surfaces with nanoscale features," *Crystal Growth & Design,* **15**, 5, 2176-2186, DOI: 10.1021/cg501823w (2015).

152.    Yageta, S., Lauer, T., Trout, B.L., Honda, S. "Conformational and Colloidal Stabilities of Isolated Constant Domains of Human Immunoglobulin G and Their Impact on Antibody

Aggregation under Acidic Conditions," *Molecular Pharmaceutics*, **12**, 5, 1443-1455, DOI:10.1021/mp500759p (2015).

151.  Badman, C., Trout, B.L., "Achieving Continuous Manufacturing," *J. Pharm. Sci.,* **104**, 3, 779-780, DOI: 10.1002/jps.24246 (2014).

150.  Byrn, S., Futran, M., Thomas, H., Jayjock, E., Maron, N., Meyer, R.F., Myerson, A., Thien, M.P., Trout, B.L., "Achieving Continuous Manufacturing for Final Dosage Formation Challenges and How to Meet Them," *J. Pharm. Sci.,* **104**, 3, 792-802, DOI:10.1002/jps.24247 (2014).

149.  Eral, H.B., O'Mahony, M., Shaw, R., Trout, B.L., Myerson, A.M., Doyle, P., "Composite Hydrogels Laden with Crystalline Active Pharmaceutical Ingredients of Controlled Size and Loading," *Chem. Mat.,* **26**, 21, 6213-6220, DOI: 10.1021/cm502834h (2014).

148.  Tsai-ta, C.L., Ferguson, S.T., Palmer, L., Trout, B.L., Myerson, A.S., "Continuous Crystallization and Polymorph Dynamics in the L-glutamic Acid System," *Org. Process Res. Dev.,* **18**, 11, 1382-1390, DOI: 10.1021/op500171n (2014).

147.  Bellucci, M.A., Trout, B.L., "Bezier Curve String Method for the Study of Rare Events in Complex Chemical Systems," *J. Phys. Chem.,* **141**, 074110 DOI: 10.1063/1.4893216 (2014).

146.  Zen, A., Trout, B.L., and Guidoni, L., "Properties of Reactive Oxygen Species by Quantum Monte Carlo," *J. Chem. Phys.*, **141**, 014305 DOI: 10.1063/1.4885144 (2014).

145.  Weber, C., Wood, G. P. F., Kunov-Kruse, A. J., Nmagu, D.E., Trout, B.L., Myerson, A.S. "Quantitative Solution Measurement for the Selection of Complexing Agents to Enable Purification by Impurity Complexation," *J. Am. Chem. Soc.,* 2014, **14**, 7, 3649–3657 DOI: 10.1021/cg500709h (2014).

144.  Zhang, H., Lakerveld, R., Heider, P., Tao, M., Su, M., Testa, C., D'Antonio, A., Barton, P., Braatz, R., Trout, B.L., Myerson, A.S., Jensen, K.F., Evans, J., "Application of continuous crystallization in an integrated continuous pharmaceutical pilot plant," *Crys. Grow. Des.,* **14**  5, 2148-2157, DOI: 10.1021/cg401571h (2014).

143.  Bellucci, M. and Trout B.L., "Note: On the evaporation coefficient of water," *J. Chem. Phys.*, **140**, 15, Article Number: 156101 DOI: 10.1063/1.4871989 (2014).

142.  Wood, G., Sreedhara, A., Moore, J., Trout, B.L. "Reactions of Benzene and 3-Methyl Pyrrole with the •OH and •OOH Radicals: An Assessment of Contemporary Density Functional Theory Methods," *J. Phys. Chem. A,* **118**, 14, 2667-2682 DOI: 10.1021/jp5009708 (2014).

141.  Ferguson, S., Ortner, F., Quon, J., Peeva, L., Livingston, A., Trout, B.L., and Myerson, A.S. "Use of Continuous MSMPR Crystallization with Integrated Nanofiltration

Membrane Recycle for Enhanced Yield and Purity in API Crystallization," *Crys. Grow. Des.* **14**, 2, 617-627, DOI: 10.1021/cg401491y (2014).

140.  Curcio, E., López-Mejías, V., Di Profio, G., Fontananova, E.; Drioli, E.,Trout, B.L., and Myerson, A. "Regulating Nucleation Kinetics Through Molecular Interactions at the Polymer-Solute Interface," *Crys. Grow. Des.,***14**, 2, 678-686, DOI: 10.1021/cg4015543 (2014).

139.  Agrawal, N.J., Helk, B., and Trout, B.L. "A computational tool to predict the protein-protein interaction hot-spot residues from the structure of the unbound protein," *FEBS Letters,* **58**, 2, 326–333, DOI: 10.1016/j.febslet.2013.11.004 (2014).

138.  Eral, H., López-Mejías, V., O'Mahony, M., Trout, B.L., Myerson, A., Doyle, P. "Biocompatible Alginate Microgel Particles as Heteronucleants and EncapsulatingVehicles for Hydrophilic and Hydrophobic Drugs," *Crys. Grow. Des.,* **14**, 4, 2073–2082, DOI: 10.1021/cg500250e (2014).

137.  Mascia, S., Heider, P.L., Zhang, H., Lakerveld, R., Benyahia, B., Barton, P.I., Braatz, R.D., Cooney, C. L., Evans, J.M.B., Jamison, T.F., Jensen, K.F., Myerson, A.S., Trout, B.L. "End-to-End Continuous Manufacturing of Pharmaceuticals: Integrated Synthesis, Purification, and Final Dosage Formation," **52**, 12359 (2013). "Hot Paper" in *Nature,* **502**, 274, (2013). http://www.nature.com/nature/journal/v502/n7471/full/502274d.html

136.  Smejkal, B., Agrawal, N.J., Mechelke, M., Ortner, F., Heckmeier, P., Helk, B., Schulz, H., Giffard, M., Trout, B.L., Hekmat, D.  "Fast and scalable purification of a therapeutic full-length antibody based on process crystallization," *J. Biotech. Bioeng.*, **110**, 9, 2452-2461,  DOI: 10.1002/bit.24908 **(**2013).

135.  Myerson A.S. and Trout, B.L. "Nucleation from Solution," Science, **341**, 6148, 855-856, DOI: 10.1126/science.1243022 (2013).

134.  López-Mejías, V., Myerson, A.S., Trout, B.L.  "Geometric Design of Heterogeneous Nucleation Sites on Biocompatible Surfaces," *Cryst. Growth Des.*, **13**, 8, 3835-3841, DOI: 10.1021/cg400975b (2013).

133.  Santiso, E., Musolino, N., and Trout, B.L.  "Design of linear ligands for selective separation using a genetic algorithm applied to molecular architecture," *J. Chem. Inf. Model.*, **5**, 7, 1638-1660, DOI: 10.1021/ci400043q (2013).

132.  Musolino, N. and Trout, B.L. "Insight into the molecular mechanism of water evaporation via the finite temperature string method," *J. Chem. Phys.*, **138**, 13 Article Number: 134707 DOI: 10.1063/1.4798458 (2013).

131.  Quon, J., Chadwick, K., Wood, G., Sheu, I., Brettmann, B., Myerson, A.S., Trout, B.L., "Templated Nucleation of Acetaminophen on Spherical Excipient Agglomerates," *Langmuir,* **29**, 10, 3292-3300   DOI: 10.1021/la3041083 (2013).

11

130. Xi, L., Shah, M., Trout, B.L. "Hopping of water in a glassy polymer studied via transition path sampling and likelihood maximization," *J. Phys. Chem.,* **117**, 13, 3634-3647, DOI: 10.1021/jp3099973 (2013).

129. Zhou, L., Su, M., Benyahia, B., Singh, A., Barton, P.I., Trout, B.L., Myerson, A.S. and Braatz, R.D. "Mathematical modeling and design of layer crystallization in a concentric annulus with and without recirculation," *AIChE Journal*, **59**, 4, 1308-1321, DOI: 10.1002/aic.14049 (2013).

128. Shukla, D. and Trout, B.L. Book editors: Kantardjieff, A., Asuri, P., Coffman, JL., et al. Source: Developments In Biotechnology and Bioprocessing  "Understanding the Role of Arginine and Citrate as Eluents in Affinity Chromatography," *ACS Symposium Series* **1125**, 67-86 (2013).

127. Vagenende, V., Han, A.X., Mueller, M., and Trout, B.L. "Protein-associated cation-clusters in aqueous arginine solutions and their effect on protein stability and size," *ACS Chem. Biol.,* **8,** 2, 416-422, DOI: 10.1021/cb300440x (2013).

126. Brettmann, B.K., Cheng, K., Myerson, A.S., and Trout, B.L."Electrospun Formulations Containing Crystalline Active Pharmaceutical Ingredients," *Pharm. Res.*, **30**, 1, 238-246, DOI: 10.1007/s11095-012-0868-4 (2013).

125. Wong, S.Y., Tatusko, A., Trout, B. L., Myerson, A. S. "Development of Continuous Crystallization Processes Using a Single-Stage Mixed-Suspension, Mixed-Product Removal Crystallizer with Recycle," *Cryst. Growth Des.*, **12**, 11, 5701-5707, DOI: 10.1021/cg301221q (2012).

124. Vagenende, V. and Trout, B. L., "Quantitative characterization of local protein solvation to predict solvent effects on protein structure," *Biophys. J.*, **103**, 6, 1354-1362, DOI: 10.1016/j.bpj.2012.08.011 (2012).

123. Wang, M., Rutledge, G. C., Myerson, A. S., Trout, B. L. "Production and characterization of carbamazepine nanocrystals by electrospraying for continuous pharmaceutical manufacturing", *J. Pharm. Sci.*, **101,** 3, 1178-1188, DOI: 10.1002/jps.23024 (2012).

122. Lauer, T., Agrawal, N. J., Chennamsetty, N., Egodage, K., Helk B., Trout B. L., "Developability Index: A rapid in silico tool for the screening of antibody aggregation propensity," *J. Pharm. Sci*.**, 101**, 1, 102-115, DOI: 10.1002/jps.22758 (2012).

121. Chadwick, K., Chen, J., Myerson, A. S., and Trout, B.  L., "Towards the Rational Design of Crystalline Surfaces for Heteroepitaxy: The Role of Molecular Functionality," *Cryst. Growth Des.,* **12**, 3, 1159–1166 DOI: 10.1021/cg2010858 (2012).

120.   Brettmann, B. K., Myerson, A. S., and Trout, B. L. "Solid-state nuclear magnetic resonance study of the physical stability of electrospun drug and polymer solid solutions," *J. Pharm Sci.,* **101**, 6, 2185–2193, DOI: 10.1002/jps.23107 (2012).

119.   Quon, J., Zhang, H., Alvarez, A., Evans, J., Myerson, A. S., and Trout, B. L., "Continuous Crystallization of Aliskiren Hemifumarate," *Cryst. Growth Des.*, **12**, 6, 3036-3044 DOI: 10.1021/cg300253a (2012).

118.   Zhang, H., Quon, J., Alvarez, A., Evans, J., Myerson, A.S, and Trout, B. L., "Development of Continuous Anti-solvent-cooling Crystallization Process using Cascaded Crystallizers," *Org. Pro. Res. Dev.,* **16**, 915–924 DOI: 10.1021/op2002886 (2012).

117.   Brettmann, B. K., Bell, E., Myerson, A. S., and Trout, B. L., "Solid-State NMR characterization of high-loading solid solutions of API and excipients formed by electrospinning," *J. Pharm. Sci.,* **101**, 4, 1538-1545 DOI: 10.1002/jps.23107 (2012).

116.   Kayser, V., Chennamsetty, N., Voynov, V., Helk, B., Forrer, K., and Trout, B. L. "A Screening Tool for Therapeutic Monoclonal Antibodies: Identifying the Most Stable Protein and Its Best Formulation Based on Thioflavin T Binding," *Biotechnol. J.*, 7, 1, 127–132, DOI: 10.1002/biot.201100366 (2012).

115.   Brettmann, B. K., Tsang, S., Forward, K., Rutledge, G., Myerson, A. S., and Trout, B. L., "Free Surface Electrospinning of Microparticles," *Langmuir,* **28**, 25, 9714-9721 (2012).

114.   Diao, Y., Helgeson, M., Siam, Z., Doyle, P., Myerson, A. S., Hatton, T. A., and Trout, B.L., "Gel-Induced Selective Crystallization of Polymorphs," *J. Am. Chem. Soc.,* **134**,1, 673–684 DOI: 10.1021/ja210006t (2012).

113.   Diao, Y., Helgeson, M.E., Siam, Z. A., Doyle, P. S., Myerson, A. S., Hatton, T. A., and Trout, B. L., "Nucleation under Soft Confinement: Role of Polymer-Solute Interactions," *Cryst. Growth Des.,* **12**, 1, 508–517 DOI: 10.1021/cg201434r (2012).

112.   Schneider, C., Shukla, D., and Trout, B. L., "Effects of Solute-Solute Interactions on Protein Stability Studied Using Various Counterions and Dendrimers," *PLoS One,* **6**, 11, e27665, DOI: 10.1371/journal.pone.0027665 (2011).

111.   Shukla, D., Schneider C., and Trout, B. L., "Complex Interactions between Molecular Ions in Solution and Their Effect on Protein Stability," *J. Am. Chem. Soc.*, **133**, 46, 18713-18718, DOI: 10.1021/ja205215t (2011).

110.   Chadwick, K., Myerson, A. S., and Trout, B. L., "Polymorphic Control by Heterogeneous Nucleation – A New Method for Selecting Crystalline Substrates," *Cryst. Eng. Comm.,* **13**; 6625-6627, DOI:10.1039/C1CE05871A (2011).

13

109. Shukla, D., Schneider, C., and Trout, B. L., "Effect of PAMAM Dendrimer Salts on Protein Stability," *J. Phys. Chem. Lett*., **2**, 14, 1782-1788, DOI: 10.1021/jz200758m (2011).

108. Diao, Y., Harada, T., Myerson, A. S., Hatton, T. A., and Trout, B. L., "The Role of Nanopore Shape in Surface-Induced Crystallization," *Nat. Mater.*, **10**, 11, 867-871, DOI: 10.1038/NMAT3117 (2011).

107. Chunsrivirot, S., Santiso, E. E., and Trout, B. L., "Binding Affinity of a Small Molecule to an Amorphous Polymer in a Solvent. Part 2: Preferential Binding to a Surface," *Langmuir*, **27,** 20, 12396-12404, DOI: 10.1021/la202593u (2011).

106. Chunsrivirot, S., Diao, Y., and Trout, B. L., "Binding Affinity of a Small Molecule to an Amorphous Polymer in a Solvent. Part 1: Free Energy of Binding to a Binding Site," *Langmuir*, **27,** 20, 12396-12404, DOI: 10.1021/la201508m (2011).

105. Shukla, D., and Trout, B. L., "Understanding the Synergistic Effect of Arginine and Glutamic Acid Mixtures on Protein Solubility," *J. Phys. Chem. B*, **115,** 41, 11831-11839, DOI: 10/1021/jp204462t (2011).

104. Shah, M., Santiso E. E., and Trout, B. L., "Computer Simulations of Homogeneous Nucleation of Benzene from the Melt," *J. Phys. Chem. B*, **115**, 35, 10400-10412, DOI: 10.1021/jp203550t (2011).

103. Agrawal, N. J., Kumar, S., Wang, X., Helk, B., Singh, S. K., Trout, B. L., "Aggregation in protein-based biotherapeutics: computational studies and tools to identify aggregation prone regions," *J. Pharm. Sci*., **100**, 12, 5081-5095, DOI: 10.1002/jps.22705 (2011).

102. Shukla, D., Schneider C., and Trout, B. L., "Molecular Level Insight Into Intra-Solvent Interaction Effects on Protein Stability and Aggregation," *Adv. Drug. Dev. Rev.*, **63**, 13, SI, 1074-1085, DOI: 10.1016/j.addr.2011.06.014 (2011).

101. Kayser, V., Chennamsetty, N., Voynov, V., Helk, B., Forrer, K., and Trout, B. L. "Conformational Stability and Aggregation of Therapeutic Monoclonal Antibodies Studied with ANS and Thioflavin T Binding," *mAbs*, **3**, 4, 408-411, DOI: 10.4161/mabs.3.4.15677 (2011).

100. Schaber, S. D., Gerogiorgis, D. I., Ramachandran, R., Evans, J. M. B. Barton, P.I., and Trout, B. L., "Economic Analysis of Integrated Continuous and Batch Pharmaceutical Manufacturing: A Case Study," *I&EC*, **50**, 17, 10083-10092, DOI: 10.1021/ie2006752 (2011).

99. Schneider C., Shukla, D., and Trout, B. L., "Arginine and the Hofmeister Series: The Role of Ion-Ion Interactions In Protein Aggregation Suppression," *J. Phys. Chem. B*, **115**, 22, 7447-7458, DOI: 10.1021/jp111920y (2011).

14

98.  Chunsrivirot, S., and Trout, B. L., "Free Energy of Binding of a Small Molecule to an Amorphous Polymer in a Solvent," *Langmuir*, **27,** 11, 6910-6919, DOI: 10.1021/la201011q (2011).

97.  Pan, B., Ricci, M., and Trout, B.L., "A Molecular Mechanism of Hydrolysis of Peptide Bonds at Neutral pH Using a Model Compound," *J. Phys. Chem. B*, **115**, 19, 5958-5970, DOI: 10.1021/jp1076802 (2011).

96.  Diao, Y., Myerson, A. S., Hatton, T. A., and Trout, B. L., "Surface Design for Controlled Crystallization: The Role of Surface Chemistry and Nanoscale Pores in Heterogeneous Nucleation," *Langmuir*, **27**, 9, 5324-5334, DOI: 10.1021/la104351k (2011).

95.  Kayser, V., Chennamsetty, N., Voynov, V., Helk, B., Forrer, K., and Trout, B. L., "Evaluation of a non-Arrhenius Model for Therapeutic Monoclonal Antibody Aggregation," *J. Pharm. Sci.,* **100**, 7, 2526-2542, DOI: 10.1002/jps.22493 (2011).

94.  Diao, Y., Helgeson, M. E., Myerson, A.S., Hatton, T.A., Doyle, P. S., and Trout, B. L., "Controlled Nucleation from Solution Using Polymer Microgels," *J.A.C.S.,* **133**, 11, 3756-3759, DOI: 10.1021/ja110801g (2011).

93.  Shukla, D., Zamolo, L., Cavallotti, C., and Trout, B. L., "Understanding the Role of Arginine as an Effluence in Affinity Chromatography via Molecular Computations," *J. Phys. Chem. B*, **115**, 11, 2645-2654 DOI: 10.1021/jp111156z (2011).

92.  Santiso, E. and Trout, B. L., "A General Set of Order Parameters for Molecular Crystals," *J. Phys. Chem. B,* **134**, 6, 064109, DOI: 10.1063/1.3548889 (2011).

91.  Chennamsetty, N., Voynov, V., Kayser, V., Helk, B., and Trout, B. L "Prediction of Protein Binding Regions," *Proteins: Structure, Function, and Bioinformatics,* **79**, 3, 888-897, DOI: 10.1002/prot.22926 (2011).

90.  Shukla, D. and Trout, B. L., "Preferential Interaction Coefficients of Proteins in Aqueous Arginine Solutions and its Molecular Origins," *J. Phys. Chem. B*, **115**, 5, 1243-1253, DOI: 10.1021/jp108586b (2011).

89.  Kayser, V., Chennamsetty, N., Voynov, V., Helk, B., and Trout, B. L., "Tryptophan Tryptophan energy transfer and classification of tryptophan residues in proteins: Therapeutic monoclonal antibody as a model," *J. Fluores.,* **21**, 1, 275-288, DOI:10.1007/s10895-010-0715-0 (2011).

88.  Kayser, V., Chennamsetty, N., Voynov, V., Forrer, K., Helk, B., and Trout, B. L., "Glycosylation Influences on the Aggregation Propensity of Therapeutic Monoclonal Antibodies," *Biotechno. J.,* **6**, 1, 38-44 DOI: 10.1002/biot.201000091 (2011). *"Identified by journal as one of the most cited articles in 2011"*

15

87.   Chen, J., and Trout, B. L, "A Computational Study of the Mechanism of the Selective Crystallization of α and β Glycine from Water and Methanol-Water Mixtures," *J. Phys. Chem. B*, **114**, 43, 13764-13772 DOI: 10.1021/jp1039496 (2010).  (Comment in **115**, 6810 (2011))

86.   Chen, J., and Trout, B. L, "Computer-aided Solvent Selection for Improving the Morphology of Needle-like Crystals," *Growth & Design*, **10**, 4379-4388 (2010).

85.   Shukla, D. and Trout, B. L., "Interaction of Arginine with Proteins and the Mechanism by which It Hinders Aggregation," *J. Phys. Chem. B,* **114**, 13426-13438 (2010).

84.   Chennamsetty, N., Voynov, V., Kayser, V., Helk, B., and Trout, B. L., "Prediction of Protein Aggregation Prone Regions," *J. Phys. Chem. B.*, **114**, 6614-6624 (2010).

83.   Pan, B., Ricci, M., and Trout, B. L., "A Molecular Mechanism of Acid-catalyzed Hydrolysis of Peptide Bonds Using a Model Compound," *J. Phys. Chem. B*, **114**, 4389-4399 (2010).

82.   Voynov, V., Kayser, V., Chennamsetty, N., Wallny, H.J., Helk, B., and Trout, B.L., "Design and Application of Antibody Cysteine Variants," *Bioconj Chem.*, **21**, 385-392 (2010).

81.   Ovchinnikov, V., Trout, B. L., and Karplus, M., "Mechanical Coupling in Myosin V: A Simulation Study," *J.M.B.*, **395**, 815-833 (2010).

80.   Voynov, V.,Chennamsetty, N., Kayser, V., Helk, B., Forrer, K., Zhang, H., Fritsch, C., Heine, H., Trout, B. L., "Dynamic fluctuations of protein-carbohydrate interactions promote protein aggregation," *PLOS One*, **4**, Article Number**:** e8425 (2009)**.**

79.   Voynov, V., Chennamsetty, N., Kayser, V., Helk, B., and Trout, B.L., "Predictive tools for stabilization of therapeutic proteins," *mAbs*, **1**, 580-581 (2009).

78.   Vagenende, V., Yap, M., and Trout, B.L., "Mechanisms of Protein Stabilization and the Prevention of Protein Aggregation by Glycerol," *Biochemistry*, **48**, 11084-11096 (2009).

77.   Shukla, D., Shinde, C., and Trout, B. L., "Molecular Computations of Preferential Interaction Coefficients of Proteins," *J. Phys. Chem. B*, **113**, 12546-12554 (2009).

76.   Vagenende, V., Yap, M.G.S., and Trout, B.L., "Molecular Anatomy of Preferential Interaction Coefficients by Elucidating Protein Solvation in Mixed Solvents: Methodology and Application for Lysozyme in Aqueous Glycerol," *J. Phys. Chem. B*, **113**, 11743-11753 (2009).

75.   Chennamsetty, N., Helk, B., Voynov, V., Kayser, V., and Trout, B.L., "Aggregation Prone Motifs in Human Immunoglobulin G," *J. Mol. Bio.*, **391**, 404-413 (2009).

74.    Chennamsetty, N., Voynov, V., Kayser, V., Helk, B., and Trout, B.L., "Design of Therapeutic Proteins with Enhanced Stability," *Proc. Natl. Acad. Sci.*, **106** 11937-11942 (2009). (highlighted in *Nature*, **406**, 155 (2009).

73.    Schneider, C. and Trout, B.L., "Investigation of Cosolute-Protein Preferential Interaction Coefficients: A New Insight into the Mechanism by Which Arginine Inhibits Aggregation," *J. Phys. Chem. B*, **113**, 2050 (2009).

72.    Peters, B., Nils E.R. Zimmermann, N.E.R, Beckham, G.T., Tester, J.W., Trout, B.L., "Path Sampling Calculation of Methane Diffusivity in Natural Gas Hydrates from a Water-Vacancy Assisted Mechanism," *J.A.C.S.,* **130**, 17342 (2008).

71.    Trout, B.L., "Why Philosophical History is Essential to Teaching the Second Law of Thermodynamics," International Thermodynamics Symposium held in Honor and Memory of Joseph H Keenan, OCT 04-05, 2007 Cambridge, MA, *Meeting the Entropy Challenge*, AIP Conference Proceedings, 1033, 288 (2008).

70.    Chen, J. and Trout, B. L., "Computational study of the solvent effects on the molecular self-assembly of tetrolic acid in solution and consequent polymorph formed from crystallization," *J. Phys. Chem. B*, **112**, 7794 (2008).

69.    Beckham, G. T., Peters, B., and Trout, B. L., "Evidence for a size dependent mechanism in solid state polymorph transformations," *J. Phys. Chem. B*, **112**, 7460 (2008).

68.    Pong, B.-K., Trout, B. L., and Lee, J. Y., "Modified Ligand-exchange for Efficient Solubilisation of CdSe/ZnS Quantum Dots in Water: A Procedure Guided by Computational Studies," *Langmuir*, **24**, 5270 (2008*).*

67.    Chong, G., Lustig, S., Jackson, C. and Trout, B. L.," Surface adsorption behavior of soluble peptide molecules at the air/water interface," *J. Phys. Chem. B*, **112**, 2970 (2008).

66.    Maresh, J., Giddings, L.A., Friedrich, A., Loris, E., Panjikar, S., Trout, B.L., Stockigt, J., Peters, B., O'Connor, S.,"Strictosidine synthase: mechanism of a Pictet-Spengler catalyzing enzyme," *J.A.C.S.*, **130**, 710 (2008).

65.    Peters, B., Beckham, G. T., and Trout, B. L.," Extensions to the likelihood maximization approach for finding reaction coordinates," *J. Chem. Phys*., **127**, 34109 (2007).

64.    McNeill, V. F., Geiger, F. M., Loerting, T., Trout, B. L., and Molina, M. J., "The interaction of hydrogen chloride with ice surfaces: The effects of grain size, surface roughness, and surface disorder," *J. Phys. Chem. A*, **111**, 6274 (2007).

63.    Pong, B.-K., Elim, H. I., Chong, J.-X., Ji, W., Trout, B. L., and Lee, J.-Y., "New insights on the nanopartical growth mechanism in the citrate reduction of gold (III) salt: formation of the Au nanowire intermediate and its non-linear optical properties," *J. Phys. Chem. C*, **111**, 6281 (2007).

17

62.   Beckham, G. T., Peters, B., Starbuck, C., Variankaval, N., and Trout, B. L., "Surface-mediated nucleation in the solid-state polymorph transformation of terephthalic acid," *J.A.C.S.*, **129**, 4714 (2007).

61.   Anderson, B. J., Radhakrishnan, R., Peters, B., Borghi, G. P., Tester, J. W., and Trout, B. L., "Molecular simulations of gas hydrate nucleation," in *Physics and Chemisty of Ice*, Royal Society, Cambridge (2007).

60.   Pan, B., Abel, J, Ricci, M. S., Brems, D. N., Wang, D. I.C. and Trout, B. L. "Comparative oxidation studies of methionine residues reflect the structural effect on chemical kinetics," *Biochemistry*, **45**, 15430 (2006).

59.   Peters, B. and Trout, B.L., "Obtaining reaction coordinates by likelihood maximization," *J. Chem. Phys,* **125**, 54108 (2006).

58.   Rempel, J.Y., Trout, B.L., Bawendi, M.G., Jensen, K.F. "Density functional theory study of ligand binding on CdSe (0001), (0001), and (1120) single crystal relaxed and reconstructed surfaces: implications for nanocrystalline growth," *J.P.C.B*, **110**, 18007 (2006).

57.   Tang, H. and Trout, B. L., "Rational design of selective, sulfur-resistant, oxidation emissions catalysts," *J. Phys. Chem. B*, **110**, 6856 (2006).

56.   McNeill, V.F., Loerting, T., Geiger, F.M., et al. "Hydrogen chloride-induced surface disordering on ice," *PNAS,* **103**, 9422 (2006).

55.   Peters, B. and Trout, B. L. "Asparagine deamidation: pH dependent mechanism from density functional theory," *Biochemistry*, **45**, 5384 (2006).

54.   Gu, C., Lustig, S., and Trout, B.L., "Solvation model based on order parameters and a fast sampling method for the calculation of solvation free energies of peptides," *J. Phys. Chem. B*, **110**, 1476 (2006).

53.   Anderson, B.J., Tester, J.W., Borghi, G.P. and Trout, B.L., "Properties of inhibitors of methane hydrate formation via molecular dynamics simulations," *J.A.C.S.*, **127**, 17852 (2005).

52.   Pong, B.K., Lee, J.Y., and Trout, B.L., "First principles computational study for understanding the interactions between ssDNA and gold nanoparticles: Adsorption of methylamine on gold nanoparticulate surfaces," *Langmuir*, **21**, 11599 (2005).

51.   Tang, H.R. and Trout, B.L., "NO chemisorption on Pt(111), Rh/Pt(111), and Pd/Pt(111)," *J. Phys. Chem. B*, **109**, 17630 (2005).

50.    Rempel, J.Y., Trout, B.L., Bawendi, M.G., and Jensen, K.F., "Properties of the CdSe(0001), (0001), and (1120) single crystal surfaces: relaxation, reconstruction, and ad-atom and ad-molecule adsorption," *J. Phys. Chem. B*, **109**, 19320 (2005).

49.    Lo, C.S., Radhakrishnan, R., and Trout, B.L., "Application of transition path sampling methods in catalysis: a new mechanism for C-C bond formation in the methanol coupling reaction in Chabazite," *Catalysis Today*, **105**, 93 (2005).

48.    Anderson, B.J., Bazant, M.Z., Tester, J.W., and Trout, B.L., "Application of the cell potential method to predict phase equilibria of multi-component gas hydrate systems," *J. Phys., Chem. B*, **109**, 8153 (2005).

47.    Tang, H. and Trout, B.L., "Electronic composition-property relationship applied to $SO_2$ chemisorption on Pt(111) surfaces, alloys, and overlayers," *J. Phys. Chem.*, **109**, 6948 (2005).

46.    Baynes, B.M., Wang, D.I.C., and Trout, B.L., "The role of arginine in the stabilization of proteins against aggregation," *Biochemistry*, **44**, 4919 (2005).

45.    Radhakrishnan, R. and Trout, B.L. "Order parameter approach to understanding and quantifying the physico-chemical behavior of complex systems," in *Handbook of Materials Modeling*, Part B, Chapter 5: Rate Processes, Section 5.5, Dordrecht, The Netherlands: *Springer*, 2005.

44.    Yin, J., Chu, J.W., Speed Ricci, M., Brems, D.N., Wang, D.I.C. and Trout, B.L., "Effects of excipients on the hydrogen perioxide induced oxidation of methionine residues in granulocyte colony-stimulating factor (G-CSF)," *Pharm. Res.,* **22**, 140 (2005)

43.    Chu, J.W., Brooks, B.R. and Trout, B.L, "Oxidation of methionine residues in aqueous solutions, free methionine and methionine in G-CSF," *J.A.C.S.,* **126**, 16601 (2004).

42.    Anderson, B., Tester, J. W., and Trout, B. L., "Accurate potentials for argon - water and methane - water interactions via ab initio methods and their application to clathrate hydrates," *J. Phys. Chem. B*., **108**, 18705 (2004).

41.    Yin, J., Chu, J.W., Speed Ricci, M., Brems, D.N., Wang, D.I.C. and Trout, B.L., "Effects of antioxidants on the non-site-specific oxidation of methionine residues in granulocyte colony-stimulating factor (G-CSF) and human parathyroid hormone (hPTH) fragment 13-34," Pharm. Res., 21, 2378 (2004).

40.    Chu, J.W., Yin, J., Brooks, B.R., Wang, D.I.C., Speed Ricci, M., Brems, D.N. and Trout, B.L., "A comprehensive picture of 'non-site-specific' oxidation of methionine residues by peroxides in protein pharmaceuticals," *J. Pharm. Sci.*, **93**, 3096 (2004).

39.   Chu, J.W., Yin, J., Wang, D.I.C. and Trout, B.L., "A structural and mechanistic study of the oxidation of methionine residues in hPTH(1-34) via experiment and simulations," *Biochemistry*, **43**,14139 (2004).

38.   Lin, X., Schneider, W.F. and Trout, B.L., "Chemistry of sulfur oxide on transition metals III: oxidation of $SO_2$ and self-diffusion of O, $SO_2$, and $SO_3$ on Pt," *J. Phys. Chem. B.*, **108**, 13329 (2004).

37.   Lo, C. and Trout, B.L., "Density functional theory characterization of acid sites in chabazite," *J. Catal.*, **227**, 77 (2004).

36.   Baynes, B.M. and Trout, B.L. "Rational design of solution additives for the prevention of protein aggregation," *Biophys. J.*, **87**, 1631 (2004).

35.   Tang, H., van der Ven, A.F. and Trout, B.L., "Phase diagram of oxygen atoms adsorbed on platinum(111) by first principles investigation," *Phys. Rev. B*, **70**, 045420 (2004).

34.   Lo, C., Giurumescu, C.A., Radhakrishnan, R. and Trout, B.L., "Methanol coupling in the zeolite chabazite studied via Car-Parrinello molecular dynamics," *Mol. Phys.*, **102**, 281 (2004).

33.   Tang, H., van der Ven, A.F. and Trout, B.L., "Lateral interactions between oxygen atoms adsorbed on platinum(111) by first principles," *Mol. Phys.*, **102**, 273 (2004).

32.   Chu, J.W., Yin, J., Wang, D.I.C. and Trout, B.L., "Molecular dynamic simulations and experimental oxidation rates of methionine residues of granulocyte colony-stimulating factor (G-CSF) at different pH values," *Biochemistry*, **43**, 1019 (2004).

31.   Chu, J.W. and Trout, B.L., "On the mechanisms of peroxide oxidation in aqueous solutions: ab initio studies of hydrogen transfer of hydrogen peroxide and dimethyl sulfide oxidation by $H_2O_2$," *J.A.C.S.*, **126**, 900 (2004).

30.   Lin, X., Schneider, W.F. and Trout, B.L., "Chemistry of sulfur oxides on transition metals II: thermodynamics of sulfur oxides on Pt (111)," *J. Phys. Chem. B*, **108**, 250 (2004).

29.   Chu, J.W., Trout, B.L. and Brooks, B.R., "A super-linear minimization scheme for the nudged elastic band method," *J. Chem. Phys.*, **119**, 12708 (2003).

28.   Baynes, B.M., and Trout, B.L., "Proteins in mixed solvents: a molecular-level perspective," *J. Phys. Chem. B*, **107**, 14058 (2003).

27.   Radhakrishnan, R. and Trout, B.L., "Nucleation of hexagonal ($I_h$) ice in liquid water," *J.A.C.S.*, **125**, 7743 (2003).

26.    Radhakrishnan, R. and Trout, B.L., "Nucleation of crystalline phases of water in homogeneous and inhomogeneous environments," *Phys. Rev. Lett.*, **90**, 158301 (2003).

25.    Radhakrishnan, R., Demurov, A., Herzog, H. and Trout, B.L., "A consistent and verifiable macroscopic model for the dissolution of liquid $CO_2$ in water under hydrate forming conditions," *Energ. Convers. Manag.*, **44**, 771 (2003).

24.    Lin, X., Hass, K.C., Schneider, W.F. and Trout, B.L., "Chemistry of sulfur oxides on transition metals I: configurations, energetics, orbital analyses, and surface coverage effects of $SO_2$ on Pt(111)," *J. Phys. Chem. B*, **106**, 12575 (2002).

23.    Mantz, Y.A., Geiger, F.M., Molina, L.T., Molina, M.J. and Trout, B.L., "A theoretical study of the interaction of HCl with crystalline NAT," *J. Phys. Chem. A*, **106**, 6972 (2002).

22.    Lin, X. and Trout, B.L., "Chemistry of sulfur oxides on transition metal surfaces," in Interfacial Applications in Environmental Engineering, ed. Keane, M., *ACS Symposium Proceedings,* (2002), pp. 55-68.

21.    Cao, Z., Tester, J.W. and Trout, B.L., "Sensitivity analysis of hydrate thermodynamic reference properties using experimental data and *ab initio* methods," *J. Phys. Chem. B*, **106**, 7681 (2002).

20.    Radhakrishnan, R. and Trout, B.L., "A new approach for studying nucleation phenomena using molecular simulations: application to $CO_2$ hydrate clathrates," *J. Chem. Phys.*, **117**, 1786 (2002).

19.    Cao, Z., Anderson, B.J., Tester, J.W. and Trout, B.L., "Development and application of an *ab initio* methane-water potential for the study of phase equilibria of methane hydrates," in Accurate Description of Low-lying Electronic States and Potential Energy Surfaces, eds. Hoffmann, M.R. and Dyall, K.G., *ACS Symposium Series 828*, 2002, pp. 418-444.

18.    Demurov, A., Radhakrishnan, R. and Trout, B.L., "Computations of Diffusivities in Ice and $CO_2$ Clathrate Hydrates via Molecular Dynamics and Monte Carlo Simulations," *J. Chem. Phys.*, **116**, 702 (2002).

17.    Cao, Z., Tester, J.W., Sparks, K.A. and Trout, B.L., "Molecular Computations Using Robust Hydrocarbon-Water Potentials for Describing Hydrate Phase Equilibria," *J. Phys. Chem. B*, **105**, 10950 (2001).

16.    Mantz, Y.A., Geiger, F.M., Molina, L.T., Molina, M.J. and Trout, B.L., "The Interaction of HCl with the (0001) Face of Hexagonal Ice Studied Theoretically via Car-Parrinello Molecular Dynamics," *Chem. Phys. Lett.,* **348**, 285 (2001).

15.   Bazant, M. and Trout, B.L., "A method to extract potentials from the temperature dependence of Langmuir constants for clathrate-hydrates," *Physica A*, **300**, 139 (2001).

14.   Lin, X., Ramer, N.J., Rappe, A.M., Hass, K.C., Schneider, W.F. and Trout, B.L., "Effect of Particle Size on the Adsorption of O and S Atoms on Pt: A Density-Functional Theory Study," *J. Phys. Chem. B*, **105**, 7739 (2001).

13.   Girumescu, C.A. and Trout, B.L., "Quantum Calculations and Car-Parrinello Simulations of Processes in the Zeolite Chabazite," in *Foundations of Molecular Modeling and Simulation*, eds. Cummings, P.T., Westmoreland, P.R. and Carnahan, B., *AIChE Symposium Series*, **97** (2001).

12.   Mantz, Y.A., Geiger, F.M., Molina, L.T., Molina, M.J. and Trout, B.L., "First-Principles Theoretical Study of Molecular HCl Adsorption on a Hexagonal Ice (001) Surface," *J. Phys. Chem. A.*, **105**, 7037 (2001).

11.   Cao, Z., Tester, J.W. and Trout, B.L., "Computation of the Methane–Water Potential Energy Hypersurface via *ab initio* Methods," *J. Chem. Phys.*, **115**, 2550 (2001).

10.   Trout, B.L., "Car-Parrinello Methods in Chemical Engineering: Their Scope and Potential," *Adv. Chem. Eng.*, Academic Press: San Diego, **28**, 353, (2001).

9.   Trout, B.L., White, D., Suits, B.H. and Gorte, R.J., "Molecular motions of hydrogen bonded $CH_3CN$ in CHA: Comparison of first-principles molecular dynamics simulations with results from $^1H$, $^2H$, and $^{13}C$ NMR," *J. Phys. Chem B*, **104**, 11734 (2000).

8.   Mantz, Y.A., Geiger, F.M., Molina, L.T., Molina, M.J. and Trout, B.L., "First-principles molecular dynamics study of surface disordering of the (0001) face of hexagonal ice," *J. Chem. Phys.*, **113**, 10733 (2000).

7.   Lau, K.K.S., Gleason, K.K. and Trout, B.L., "Thermochemistry of gas phase $CF_2$ reactions: a density functional theory study," *J. Chem. Phys.*, **113**, 4103 (2000).

6.   Trout, B.L. and Parrinello, M., "Analysis of the dissociation of $H_2O$ in water using first principles molecular dynamics," *J. Phys. Chem. B*, **103**, 7340 (1999).

5.   Sparks, K.A., Tester, J.W., Cao, Z. and Trout, B.L., "Configurational properties of water clathrates: Monte Carlo and multidimensional integration versus the Lennard-Jones and Devonshire approximation," *J. Phys. Chem. B*, **103**, 6300 (1999).

4.   Trout, B.L. and Parrinello, M., "The dissociation mechanism of $H_2O$ in water studied by first-principles molecular dynamics," *Chem. Phys. Lett.*, **288**, 343 (1998).

3.   Trout, B.L., Chakraborty, A.K. and Bell, A.T., "Diffusion and reaction in ZSM-5 studied by dynamic Monte Carlo," *Chem. Eng. Sci.*, **52**, 2276 (1997).

2.   Trout, B.L., Chakraborty, A.K. and Bell, A.T., "Analysis of the thermochemistry of $NO_x$ decomposition over CuZSM-5 based on quantum chemical and statistical mechanical calculations," *J. Phys. Chem.*, **100**, 17582 (1996).

1.   Trout, B.L., Chakraborty, A.K. and Bell, A.T., "Local spin density functional theory study of copper ion-exchanged ZSM-5," *J. Phys. Chem.*, **100**, 4173 (1996).

**Philosophical Publications:**

2.   Trout, B.L., "Quantum Mechanics and Political Philosophy" Minkov, S. Y. and Trout, Bernhardt L. (Eds.), *Mastery of Nature: Promises and Prospects* (pp. 220-232) Philadelphia, PA: University of Pennsylvania Press (2018).

1.   Minkov, S. Y. and Trout, Bernhardt L. (Eds.), *Mastery of Nature: Promises and Prospects*, Philadelphia, PA: University of Pennsylvania Press (2018).

**Non-Peer Reviewed Publications:**

3.   Livingston, A., et al. "Challenges and Directions for Green Chemical Engineering-- Role of Nanoscale Materials" in *Sustainable Nanoscale Engineering*, Elsevier, Amsterdam 2020.

2.   Trout, B.L., "Foreword." *Developability of Biotherapeutics: Computational Approaches,* CRC Press, 2015.

1.   Mascia, S., Trout, B.L., "Integrated Continuous Manufacturing," *Pharmaceutical Manufacturing,* December 2014, pp. 26-29.

**Conference Publications:**

6.   Buck, P.M., Kumar, S., Wang, X., Agrawal, N.J., Trout, B.L., and Singh, S.K., "Computational Methods to Predict Biotherapeutic Protein Aggregation", *Therapeutic Proteins: Methods and Protocols, Second Edition*, Springer, Humana Press. pp. 425-451 (2012).

5.   Agrawal, N.J., Lauer, T.M, Hernandez-Guzman, H., Helk, B. and Trout, B.L., "Novel computational tools could mitigate antibody aggregation", *Pharmaceutical Formulation and Quality*, (2012).

4.   Radhakrishnan, R., Demurov, A., Herzog, H.J. and Trout, B.L., "Modeling the dissolution of liquid $CO_2$ in water under hydrate forming conditions," Proceedings of the Fourth International Conference on Gas Hydrates, Yokohama, Japan, May 2002, pp. 262- 266.

3. Cao, Z., Anderson, B., Tester, J.W. and Trout, B.L., "Computations of the thermodynamics of methane hydrates using *ab initio* data," Proceedings of the Fourth International Conference on Gas Hydrates, Yokohama, Japan, May 2002, pp. 315- 320.

2. Anderson, B., Bazant, M.Z. and Trout, B.L. "Application of an analytical method to extract molecular potentials from Langmuir curve data," Proceedings of the Fourth International Conference on Gas Hydrates, Yokohama, Japan, May 2002, pp. 418-423.

1. Radhakrishnan, R. and Trout, B.L., "Mechanism for the nucleation of $CO_2$ hydrate clathrates studied using a Monte Carlo based approach," Proceedings of the Fourth International Conference on Gas Hydrates, Yokohama, Japan, May 2002, pp. 494-497.

**Patents:**

19. "Lyophilization Systems and Methods." US Provisional Application No.: 63/072,633, Filing Date: August 31, 2020

18. "Continuous Freeze-drying Methods and Related Products." US 62/500,466, Filing Date: May 2, 2017, US Patent No. 11340014, issued May 24, 2022.

17. "Continuous Crystallization on Excipient Surface and Tablet Making." US 62/477253, Filing Date: 27.03.2017

16. "Core-Shell Particles for Controlled Release of Organic Material." US 62/348371, Filing Date: 23.09.2016

15. "Biocompatible Polymeric Hydrogels for Controlling Nucleation from Solution and Loading of Hydrophobic and Hydrophilic Pharmaceuticals." U.S. Patent Application: 14/575069, Filing Date: 18.12.2014

14. "Computer-Implemented Methods of Determining Protein Viscosity," U.S. Patent Application: 61/824680, PCT/US2014/038368, International Filing Date: May 16, 2014.

13. "Plasticity Induced Bonding," U.S. Patent No.: 10,213,960, Date of Patent: Feb. 26, 2019, PCT/US2015/031666, International Filing Date: May 20, 2015.

12. "Methods and Systems for Manufacturing a Tablet." U.S. Patent No.: 10,053,798, Date of Patent: Aug. 21, 2018, Filed: Apr. 30, 2015.

11. "Layer Processing for Pharmaceuticals." U.S. Patent No.: 9,205,089, Date of Patent: Dec. 8, 2015, Filed Apr. 27, 2012.

10. "Compositions, Methods, and Systems Relating to Controlled Crystallization and/or Nucleation of Molecular Species." U.S. Patent No.: 9,138,659, Date of Patent: Sept. 22, 2015, Filed: Aug. 23, 2011.

9.      "Immunoglobulins with Reduced Aggregation.", U.S. Patent No.: 9,676,841, Date of Patent: Jun. 13, 2017, PCT/US2009/047948, International Filing Date: June 19, 2009.

8.      "Immunoglobulins with Reduced Aggregation.", U.S. Patent No.: 8,747,848, Date of Patent: Jun. 10, 2014, PCT/US2009/047948, International Filing Date: June 19, 2009.

7.      "HER2 and VEGF-A-binding Proteins with Enhanced Stability." U.S. Patent No.: 9,777,067, Date of Patent: Oct. 3, 2017, PCT/US2013/062108, International Filing Date: Sept. 27, 2013

6.      "Methods to Identify Amino Acid Residues Involved in Macromolecular Binding and Uses Therefor." U.S Patent No.: 10,431,325, Date of Patent: Oct. 1, 2019, PCT/US2013/053499, International Filing Date: Aug. 2, 2013.

5.      "Methods and Systems Relating to the Selection of Substrates Comprising Crystalline Templates for the Controlled Crystallization of Molecular Species," U.S. Patent No.: 9,822,467, Date of Patent: Nov. 21, 2017, Filing Date:  Nov. 15, 2012.

4.      "Dendrimer-Based Excipients for the Attenuation of Protein Aggregation," U.S. Patent No.: 9,410,142, Date of Patent: Aug. 9, 2016, PCT/US2011/060400, International Filing Date: Nov. 11, 2011.

3.      "Methods for Identification of Sites for IgG Conjugation.", U.S. Patent No. 9,629,925, Date of Patent: Apr. 25, 2017, PCT/US2010/037517, International Filing Date: June 4, 2010.

2.      "Methods for Identification of Sites for IgG Conjugation.", U.S. Patent No. 8,834,885, Date of Patent: Sept. 16, 2014, PCT/US2010/037517, International Filing Date: June 4, 2010.

1.      "Methods to Identify Macromolecule Binding and Aggregation Prone Regions in Proteins and Uses Therefor,", U.S. Patent No.: 9,922,164, Date of Patent: Mar. 20, 2018, PCT/US2009/047954, International Filing Date: June 19, 2009.


**Invited Talks and Plenary Lectures**:

167.    September 30, 2021, "Machine Learning Techniques Applied to Developability: Aggregation and Viscosity," RM1 Symposium at the Laufer Center, Stoneybrook.

166.    September 15, 2021, "Machine Learning for Antibody Selection," Biovia User meeting, Life Sciences Modeling and AI.

165.    September 10, 2021, "Machine Learning Applied to High Concentration Formulation Development," HiSubQ Biologics Symposium, Merck.

164.    February 5, 2021, "Thermodynamics, Atoms, and Citizenship," University of Colorado Boulder: Technology and Politics lecture series.

163.    December 10, 2020, "Ethics of AI in Healthcare," MIT ILP Series for Humana.

162.    September 23, 2020, "Machine Learning for Therapeutic Protein Developability and Formulation Design", Biovia Users Meeting, Virtual.

161.    February 25, 2020, "Leading the Change to Continuous Manufacturing Of Small Molecules," Panel Discussion at MassBio Forum, Cambridge, MA.

160.    November 20, 2019, "Machine Learning for Developability and Formulation Design," CDD for Biologics, Boston, MA.

159.    October 30, 2019, "Ethical Issues in AI and Implications for the Law," Artificial Intelligence Driving Life Sciences, Cambridge, MA.

158.    October 23, 2019, "Continuous Lyophilization of Unit Doses," Lyophilization USA, Boston, MA.

157.    September 26, 2019, "Continuous Manufacturing: State of the Art, Challenges, and Future Prospect," IMA conference "Can't Stop the Future: Spotlight on Continuous Manufacturing," Bologna, Italy.

156.    June 11, 2019, "Formulation Starts in Discovery," Gordon Research Conference on Preclinical Form and Formulation, Waterville Valley, NH.

155.    May 14, 2019, "Developability and Machine Learning for Formulation Design," Biovia Community Day, Dusseldorf, Germany (via webcast).

154.    February 27, 2019, "Living a Life of Leisure While Teaching Science in a Classical Secondary School Education," Great Heats Academies, Sandra Day O'Connor College of Law, Phoenix, Arizona.

153.    December 1, 2018, "Truths About Quantum Mechanics," St. John's College, Santa Fe, NM.

152.    November 7, 2018, "Product and Process Development Start in Discovery," Takeda Pharmaceutical Company, Cambridge, MA.

151.    October 25, 2018, "Product and Process Development Start in Discovery," Biovia Community Day, Boston, MA.

150.    September 10, 2018, "Developability for Biologics and Approaches to Formulation Design," BioMan Process Intensification Conference, Cambridge, MA.

149.    August 3, 2018, "Biomolecular Computational Methods for Protein Engineering Against Aggregation and Other Molecular Liabilities," Acceleron Pharma, Cambridge, MA.

148.    May 30, 2018, "Continuous Lyophilization of Pharmaceutical Products in Unit Doses," Hudson Valley LyoMac Webinair.

147.    December 7, 2017, "Enabling Developability via Molecular Modeling," CDD for Biologics, Boston, MA.

146.    December 1, 2017, "The Significance of Quantum Mechanics," St. John's College, Annapolis, MD.

145.    October 17, 2017, "Biomolecular Computational Methods for Protein Engineering Against Aggregation and Other Molecular Liabilities", Biovia Community Day, Cambridge, MA.

144.    September 21, 2017, "Developability for Biologics and Approaches to Formulation Design," Biologics, Modeling, and Informatics (BMI) Discussion Group, Cambridge, MA.

143.    July 19, 2017, "Biopharmaceuticals and Continuous Manufacturing," Senate Competitive Caucus, U.S. Senate, Washington D.C.

142.    May 10, 2017, "New Continuous Crystallization Technologies for Small Molecule Pharmaceutical Manufacturing," Vertex Pharmaceuticals, Boston, MA.

141.    April 13, 2017, "Ethics and Engineering: How to Think About the Ethics of AI," MIT Course 6 Super UROP, Cambridge, MA.

140.    February 10, 2017, "New Technologies for Holistic Pharmaceutical Creation," United States Pharmacopeia, Rockville, MD.

139.    February 1, 2017, "New Technologies for Holistic Pharmaceutical Creation: Focus on 3D Printing," Takeda, Zurich, Switzerland.

138.    January 31, 2017, "Developability and Manufacturability in Pharmaceutical Creation," Roche, Basel, Switzerland.

137.    January 31, 2017, "Developability and Manufacturability in Pharmaceutical Creation," Lonza, Basel, Switzerland.

136.    December 15, 2016, "Enabling Developability Via Molecular Modeling," IBC Antibody Engineering & Therapeutics, San Diego, CA.

135.    October 26, 2016, "Integrating Discovery, Development and Manufacturing in Pharmaceutical Creation," University of Pennsylvania Department of Chemical and Biomolecular Engineering, Philadelphia, PA.

134.    May 13, 2016, "Quantum Mechanics and Political Philosophy," MIT Conference on Mastery of Nature, Cambridge, MA.

133.    March 17, 2016, "Ethics in Engineering," MIT Course 6 Super-UROP, Cambridge, MA.

132.    October 5, 2015, "New Technologies for Enabling Continuous Manufacturing," PQRI Meeting, Bethesda, MD (plenary lecture)

131.    September 16, 2015, "Rational Approaches for the Developability of Biotherapeutics" Boston University Department of Physical Chemistry, Boston, MA

130.    September 7, 2015, "MIT's Success at Teaching and Research," National Polytechnic University, Yerevan, Armenia

129.    June 4, 2015 "Continuous Processing in (Bio)Pharmaceutical Manufacturing," Ipsen Corporation, Paris, FR

128.    May 15, 2015 "Advanced Formulation, Stabilization, and Manufacturing of Therapeutic Antibodies" MassBiologics, Boston, MA

127.    April 29, 2015 "Continuous Pharmaceutical Manufacture and Advances in Biopharmaceuticals Formulation" The Pall Corporation Technology Symposium, Cambridge, MA. (Keynote Address)

126.    April 14, 2015 "Rational Approaches for the Development of Biotherapeutics,"4th International Symposium on Higher Order Structure of Protein Therapeutics, Boston, MA

125.    March 27, 2015 "Molecular and Macroscopic Engineering of Small Molecular Crystallization," Department of Mechanical and Chemical Engineering, ETH, Zurich, Switzerland

124.    March 24, 2015 "Holistic Pharmaceutical Process Development," Department of Mechanical and Chemical Engineering, ETH, Zurich, Switzerland

123.    Sept. 16, 2014 "Enabling Technologies for the Continuous Manufacturing of APIs: Continuous Crystallization" at FDA/PQRI Conference, Silver Spring, MD

122.    June 10, 2014 "How 'Continuous' Manufacturing will Transform Biotherapeutic Manufacturing" The Annual Bio Manufacturing & Process Innovation Leaders Summit USA 2014 (MANU-BIO), Boston, MA (Keynote Address)

121.   June 6, 2014 "Strategic Approaches for Understanding and Hindering Aggregation" IBC's Protein Aggregation, Stability & Solubility Conference, San Francisco, CA (Keynote Address)

120.   March 26, 2014 "Rational Approaches to Developability and Manufacturability" Accelyrs, Cambridge, MA

119.   March 21, 2014 "Rational Approaches to Developability and Manufacturability" Bayer, Wuppertal, Germany

118.   January 21, 2014 "Rational Approaches for Biologics and Small Molecule Pharmaceutical Development and Manufacturing" Columbia University, New York, NY

117.   January 8, 2014 "Rational Approaches to Developability and Manufacturability" Pfizer, Cambridge, MA

116.   December 16, 2013 "Rational Approaches to Developability and Manufacturability"BMS, Devens, MA

115.   November 7, 2013, "Recent Updates at the Novartis-MIT Center for Continuous Manufacturing", FDA, Silver Spring, MD

114.   November 5, 2013 "Transforming Manufacturing to "Continuous": Flexible API and Final Dosage Form" ISPE Meeting, Washington, DC

113.   October 21, 2013 "Transforming Small Molecule Pharmaceutical Manufacturing to Continuous and the Potential for Continuous Biologics Manufacturing," Integrated Continuous Biomanufacturing, an ECI Conference, Barcelona, Spain (Keynote Address)

112.   September 11, 2013 "Rational Approaches to Developability and Manufacturability," Biogen Idec, Cambridge, MA

111.   September 10, 2013 "Rational Approaches to Developability and Manufacturability," Pfizer, Andover, MA

110.   July 10, 2013 "What Molecular Modeling in Pharmaceutical Development Can Do for You," BMS Symposium on Modeling, New Brunswick, NJ (Keynote Address)

109.   June 27, 2013 "Capitalizing on Continuous Manufacturing," 8th Global Pharma Manufacturing Summit, Boston, MA (Plenary Lecture)

108.   June 12, 2013, "Transforming Small Molecule Pharmaceutical Manufacturing to Continuous and the Potential for Continuous Biologics Manufacturing," Biomanufacturing Leaders Summit, Boston, MA (Keynote Address)

107. April 24, 2013 "From Molecular Computations to Continuous Manufacturing and Their Role in Shaping a Sustainable Future," 9th European Congress of Chemical Engineering, The Hague, Netherlands (Plenary Lecture)

106. April 19, 2013 "Transforming Pharmaceutical Manufacturing Continuous: The Ultra Lean Way of Manufacturing," Pharmintech, Bologna, Italy (Keynote Address)

105. March 26, 2013, "Rational Approaches to Developability for Stabilization Against Aggregation and Other Routes," 6th Annual Proteins Conference, London, UK.

104. November 15, 2012, "Rational Approaches to Developability, Formulation, and Design of Biobetters," MIT Center for Biomedical Innovation: Biomanufacturing Summit, Cambridge, MA

103. November 14, 2012, "Advanced manufacturing for pharmaceuticals and the Novartis-MIT center for continuous manufacturing," MIT ILP R&D Conference, Cambridge, MA

102. August 21, 2012, "Technical Update for the FDA on the Downstream Continuous Manufacturing Toolbox," FDA, Cambridge, MA

101. May 5, 2012, "Rational Approaches to the Stabilization of Biologics:  Incorporating Developability and Manufacturability," Ispen, Milford, MA.

100. November 18, 2011, "Protein Aggregation Modeling and Novel Excipients for Downstream Processing: Incorporating Rational Approaches to Developability and Manufacturability for Biotherapeutics," BioMan, Cambridge, MA.

99. November 9, 2011, "Predication of Aggregation Prone Regions in Proteins: Incorporating Rational Approaches to Developability and Manufacturability for Biotherapeutics," CASSS Symposium on Immunogenicity, Gaithersburg, MD

98. October 20, 2011, "Heterogeneous Crystallization of API's on Excipients for "Continuous" Process and Product Design," Peck Symposium at Purdue University, West Lafayette, IN

97. October 19, 2011, "Transforming Pharmaceutical Development and Manufacturing with Molecular Computations ," AIChE Annual Symposium, CoMSEF Award, Minneapolis, MN

96. September 15, 2011, "Transforming Pharmaceutical Manufacturing, Continuous: The Ultra Lean Way of Manufacturing," President Obama's Advanced Manufacturing Partnership, Cambridge, MA

95. August 4, 2011 "Rational Approaches to Stabilization: Incorporating Developability in Discovery through Development Phases," GSK, King of Prussia, PA

94.   July 28, 2011 "Rational Approaches to Stabilization: Incorporating Developability in Discovery through Development Phases," Pfizer Research, Cambridge, MA

93.   July 21, 2011, "Molecular Modeling Approaches for Predicting The Stability of Biotherapeutics, Antibodies in Particular," Colorado Protein Stability Conference , Breckenridge, CO

92.   May 19, 2011, "Computational Approaches for Identifying Degradation "Hotspots": Spatial Aggregation Propensity and Implementation in Pipeline Pilot,"Accelrys North America-UGM Conference, Newark, NJ

91.   March 29, 2011, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization," ACS, Anaheim, CA (Plenary Lecture)

90.   March 15, 2011, "Transforming Pharmaceutical Manufacturing Continuous: The Ultra Lean Way of Manufacturing," ISPE-NJ

89.   November, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," AAPS Annual Meeting, New Orleans, LA

88.   October, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," PEGS Biotechnology conference, Hannover, Germany

87.   September, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Ipsen Corporation, Milford, MA

86.   September, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," IBC Protein Formulation Conference, Providence, RI

85.   August, 2010, "Molecular Modeling for the Rational Control of Polymorphism and Morphology," Sepracor Corporation, Marlborough, MA

84.   July, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," MedImmune Corporation, Gaithersburg, MD

83.   July, 2010, "Continuous Manufacturing: The Ultimate in Quality by Design," Sepracor Corporation, Marlborough, MA

82.   May, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Accelrys Annual International Conference, Boston, MA

81.     April, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," ISPE Biotech Meeting, Cambridge, MA

80.     April, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Merck, West Point, PA

79.     March, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Genzyme, MA

78.     March, 2010, "Molecular Modeling for the Rational Control of Polymorphism and Morphology," Gilead Corporation, Foster City, CA

77.     March, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Genentech, South San Francisco, CA

76.     March, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Amgen, Thousand Oaks, CA

75.     March, 2010, "Modeling Protein Degradation Processes and the Development of Rational Approaches to Stabilization and Protein-Cosolute Interactions: A New Strategy of Molecular QbD," Biogen-Idec, Cambridge, MA

74.     December, 2009, "Continuous Manufacturing of Small Molecule Pharmaceuticals," Leaders for Global Manufacturing, MIT, Cambridge, MA

73.     November, 2009, "Order parameter methods for reactions in complex systems," Princeton Center for Theoretical Sciences, Department of Physics, Princeton, NJ

72.     October, 2009, "Rational approaches to protein and antibody stabilization," Schering-Plough, Elizabeth, NJ

71.     September, 2009, "Rational approaches to protein and antibody stabilization," Merck & Co., West Point, PA.

70.     September, 2009, "Modeling of crystallization processes," Merck Research Laboratories, Rahway, NJ.

69.     September, 2009, "Rational approaches to pharmaceutical manufacturing," Merck Research Laboratories, Rahway, NJ.

68.     July, 2009, "Continuous manufacturing:  the ultra lean way of manufacturing," Biochemical Engineering XVI, Burlington, VT.

67.     June, 2009, "Rational approaches to protein and antibody stabilization," Bristol-Meyers Squibb, New Brunswick, NJ.

66.     April, 2009, "Reactivity in complex systems," University of Washington.

65.     March, 2009, "Reactivity in complex systems," North Carolina Theory Seminar.

64.     February, 2009, "Reactivity in complex systems," UCLA.

63.     September, 2008, "Continuous manufacturing of pharmaceuticals: the ultra lean way of manufacturing," Global Pharmaceutical Manufacturing Summit, Chicago.

62.     June, 2008, "Rational design of solvent formulations via molecular computations," American Association of Pharmaceutical Science National Biotechnology Conference, Toronto, Canada.

61.     March, 2008, "Frontiers in chemical reactivity and pharmaceutical manufacturing," Department of Chemical Engineering, University of Puerto-Rico.

60.     March, 2008, "Frontiers in chemical reactivity and pharmaceutical manufacturing," Department of Chemical and Biomolecular Engineering, University of Illinois, Urbana-Champaign.

59.     Oct., 2007, "Formulation approaches for the future," IBC Life Sciences on Formulation Strategies for Protein Therapeutics, Hynes Convention Center, Boston, Keynote Address.

58.     July, 2007, "Understanding reaction processes in complex media such as liquids," Gordon Conference on the Chemistry of Liquids, Holderness School, New Hampshire

57.     June, 2007, "Molecular Design of New Excipients for Large Molecule Stabilization," AAP National Biotechnology Conference, San Diego, CA.

56.     March, 2007, "Finding reactions coordinates for complex processes via likelihood maximization," ACS Spring Meeting, Chicago, IL.

55.     November, 2006, "Understanding complex reaction processes," Department of Chemical Engineering, University of Buffalo, Buffalo, New York.

54.     July, 2006, "Molecular simulations of ice and gas hydrate nucleation," Physics and Chemistry of Ice Conference, Bremerhaven, Germany, Keynote Address.

53.     June, 2006, "Reaction coordinates from likelihood maximization," U.S.-Poland Workshop on Nanoscience and Nanostructured Materials, Poznan, Poland.

52.   June, 2006, "Understanding complex reaction processes with applications to pharmaceuticals and heterogeneous catalysis," Department of Chemistry, University of Western Ontario, London, Ontario, Canada.

51.   February, 2006, "Statistical physics applied to the development of biopharmaceuticals," Department of Physics, University of Rome "La Sapienza," Rome, Italy.

50.   February, 2006, "Statistical physics applied to the development of biopharmaceuticals," SISSA, International School for Advanced Studies, Trieste, Italy.

49.   September, 2005, "Molecular engineering of chemical systems," Department of Chemical Engineering, Drexel University, Philadelphia, Pennsylvania.

48.   September, 2005, "Molecular engineering of chemical systems," Department of Chemical Engineering, Texas A&M, College Station, Texas.

47.   September, 2005, "Reactivity in complex systems," Meeting in honor of Michele Parrinello's 60th Birthday, Agno, Switzerland.

46.   July, 2005, "Molecular computational engineering: mechanism of methionine oxidation and rational design of additives for hindering aggregation," Protein Stability Conference, Breckenridge, Colorado.

45.   May, 2005, "Transition Path Sampling Calculations in Complex Systems or How Can We Find the Reaction Coordinate?" 2005 International Conference on Scientific Computation and Differential Equations (SciCADE), Nagoya, Japan.

44.   March, 2005, "Molecular computations for predictions of clathrate-hydrate nucleation and phase-behavior of multi-component hydrates," Hydrate Symposium at the American Chemical Society Spring Meeting, San Diego, California.

43.   March, 2005, "Water structuring in phase transitions and in chemical reactions at sulfur sites in proteins," Water: Structure, Dynamics and Reactions Across the Phase Diagram at the American Chemical Society Spring Meeting, San Diego, California.

42.   July, 2004, "A unified approach for the nucleation of ice and ice-like systems in homogeneous and inhomogeneous environments," Telluride Workshop on Studies of ice, icy particles, ice surfaces, and ice-adsorbate interactions: a molecular view," Telluride, Colorado.

41.   April, 2004, "Molecular analyses and design for the stabilization of therapeutic proteins," Department of Chemical Engineering, Tufts University, Medford, Massachusetts.

40.   April 2004, "Molecular analyses and design for the stabilization of therapeutic proteins," Department of Chemistry, Boston University, Boston, Massachusetts.

39.   March, 2004, "Molecular analyses and design for the stabilization of therapeutic proteins," Department of Chemical Engineering, Cornell University, Ithaca, New York.

38.   March, 2004, "Reactivity for phase transitions, zeolites, and biological systems," Department of Chemical Engineering, University of Rochester, Rochester, New York.

37.   February, 2004, "Molecular analyses and design for the stabilization of therapeutic proteins," Department of Chemical Engineering, Tsinghua University, Beijing, China.

36.   February, 2004, "Reactivity for phase transitions, zeolites, and biological systems," Department of Chemistry, Fudan University, Shanghai, China.

35.   February, 2004, "Reactivity for phase transitions, zeolites, and biological systems," Center for Atomic-Scale Materials Physics (CAMP) and Department of Physics, Technical University of Copenhagen, Copenhagen, Denmark.

34.   November, 2003, "Ordering of water in phase transitions and biological systems," Department of Chemistry, Washington University, St. Louis, MO.

33.   November, 2003, "Ordering of water in phase transitions and biological systems," Department of Physics, University of Missouri, Columbus, MO.

32.   October, 2003, "Nucleation and growth of clathrate-hydrates and ice and a new theoretical framework to address those," Dartmouth University, Thayer School of Engineering, Dartmouth, NH.

31.   September, 2003, "Finding reaction pathways for industrial chemical problems," Statistical Mechanics of Rare Events, Paris, France.

30.   September, 2003, "Analyses of reactions in acid zeolites and of proteins via nudged elastic band calculations and Car-Parrinello simulations," CECAM Workshop on Reactivity, Lyon, France.

29.   May, 2003, "Reactivity of acidic zeolites via quantum chemical and Car-Parrinello molecular dynamical methods," Advances in the Understanding and Application of Catalysis, Moscow, Russia, *Plenary Lecture*.

28.   April, 2003, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, Princeton University, Princeton, NJ.

27.   April, 2003, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, University of Pittsburgh, Pittsburgh, PA.

26.   March, 2003, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, University of Texas, Austin, TX.

25.    March, 2003, "Reactivity of acidic zeolites via quantum chemical and Car-Parrinello molecular dynamical methods," invited talk in "Mechanistic Surface Chemistry," Spring Meeting of the American Chemical Society, New Orleans, LA.

24.    March, 2003, "Effects of solvation on biological processes," invited talk in "Symposium in Honor of Professor Clayton J. Radke, recipient of the American Chemical Society Award in Colloid Chemistry," Spring Meeting of the American Chemical Society, New Orleans, LA.

23.    March, 2003, February, 2003, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, Stanford University, Palo Alto, CA.

22.    February, 2003, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, Tsinghua Univeristy, Beijing, China.

21.    February, 2003, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, North Carolina State University, Raleigh, NC.

20.    November, 2002, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, University of California, Berkeley, CA.

19.    November, 2002, "Solvation effects in clathrate-hydrates and biological systems," Department of Chemical Engineering, California Institute of Technology, Pasadena, CA.

18.    July, 2002, "Nucleation of and transport in clathrate-hydrates and ice," Physics and Chemistry of Ice Conference, New Foundland, Canada.

17.    June 2002, "Quantum mechanical calculations applied to engineering problems," Steacie Institute of Molecular Sciences, National Research Council, Ottawa, Ontario, Canada.

16.    April, 2002, "Molecular simulations for the stabilization of therapeutic proteins and the quantification of nucleation of clathrate-hydrates," Rensselaer Polytechnic Institute, Troy, NY.

15.    April, 2002, "Quantification of reactive sites in zeolitic and transition metal catalysts via first-principles," ACS Meeting, Orlando, Fl.

14.    February, 2002, "The identification and study of sites of varying activity in zeolites and transition metal catalysts," First-Principles Catalysis, Vienna, Austria.

13.    February, 2002, "Order-disorder transitions on the surface of ice and in bulk ice and clathrate-hydrates," Swiss Center for Computational Sciences, Manno, Switzerland.

12.  February, 2002, "Molecular simulations for the stabilization of therapeutic proteins and the quantification of nucleation of clathrate-hydrates," Colorado School of Mines, Golden, CO.

11.  August, 2001, "Car-Parrinello simulations of the disordering of ice and dissociation of HCl, relevant to stratospheric chemistry," ACS Meeting, Chicago, IL.

10.  July, 2001, "Insight into the stabilization of therapeutic proteins via molecular simulations," National University of Singapore, Singapore.

9.  June, 2001, "Insight into the stabilization of therapeutic proteins via molecular simulations," Hong Kong University of Science and Technology, Hong Kong.

8.  April, 2001, "Multi-scale modeling of hydrate-clathrates from first-principles to macroscopic thermodynamics," University of Connecticut, Storrs, CT.

7.  February, 2001, "Multi-scale modeling of hydrate-clathrates from first-principles to macroscopic thermodynamics," Georgia Institute of Technology, Atlanta, GA.

6.  January, 2001, "Multi-scale modeling of hydrate-clathrates from first-principles to macroscopic thermodynamics," National University of Singapore, Singapore.

5.  November 1999, "Sustainable development," ТВП Leonardo Lecture, MIT.

4.  June, 1999, "Application of molecular modeling to automotive catalysis," Workshop held at Ford Motor Company, Dearborn.

3.  March, 1999, "Defect structure and its relation to methanol activation", ACS Annual Conference, Annaheim, CA.

2.  April, 1998, "Quantum mechanical methods in catalysis: a primer", New England Catalysis Society, Worchester, MA.

1.  September, 1996, "Dynamic Monte Carlo study of reaction and diffusion sites in ZSM-5 Zeolites", Technical University of Athens, Athens, Greece.

**Professional Affiliations**:

AIChE, ACS, ASEE, AAPS

**Languages**:

French, German, Ancient Greek

# EXHIBIT B

- Janssen Ortho LLC v. United States, US Customs Court No. 1:13-cv-00296
- Wyeth LLC, et al. v. Alembic Pharm., Ltd., et al., No. 16-1305-RGA Amgen Inc. v. Alexion Pharmaceuticals, Inc., IPR2019-00739 and IPR2019-00740
- Shire Viropharma Inc. v. CSL Behring LLC, Civil Action No. 17-00414-MSG
- Mitsubishi Tanabe Pharma Corporation v. Zydus Pharmaceuticals (USA) Inc., Case No. 1:17-cv-5005 (RMB)(JS) (D.N.J.) (consolidated)
- Allergan Sales, LLC, and Allergan, Inc. v. Sandoz, Inc. and Alcon Laboratories, Inc., Case No. 2:17-cv-10129-WHW (D.N.J.)
- Astellas US LLC, Astellas Pharma US, Inc., and Gilead Sciences, Inc. v. Apotex, etc., Case No. 1:18-cv-1675-CFC (D. Del.)
- Gilead Sciences Inc. v. Apotex, etc., Case No. 20-00189 (MN) (D. Del)
- Eagle Pharmaceuticals, Inc., Teva Pharmaceuticals International, and Cephalon, Inc. v. Hospira, Inc., Case No. 18-1074-CFC-CJB (D. Del)
- Exelixis, Inc. v. MSN Laboratories Private Limited and MSN Pharmaceuticals, Inc., C.A. No. 1:19-cv-02017-RGA (D. Del)
- Chiesi USA, Inc., and Chiesi Farmaceutici S.P.A. v. MSN Pharmaceuticals, Inc., et al., C.A. No. 2:19-cv-18564 (MCA-MAH) (consolidated)
- Gilead Sciences v. Apotex et al. C.A. No. 20-cv-00189 (MN)
- Novartis Pharmaceutical Corporation v. Alkem Laboratories LTD et al. C.A. No. 20-2930-LPS (D. Del.)

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 21-1256-CFC |
| SLAYBACK PHARMA LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**REPLY EXPERT REPORT OF LAIRD FORREST, PH.D. REGARDING
U.S. PATENT NO. 11,103,483**

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ....................................................................................................3

II.   LEGAL STANDARDS .............................................................................................4

    A.  Secondary Considerations of Nonobviousness ..................................................... 4

III.  PERSON OF ORDINARY SKILL IN THE ART ("posa") ...................................5

IV.   SCIENTIFIC AND TECHNICAL BACKGROUND ...............................................6

V.    THE ASSERTED CLAIMS ARE ANTICIPATED BY DRAGER ........................6

    A.  Claim 1 Of The '483 Patent Is Anticipated By Drager ......................................... 6

        1.  Drager claim 5 discloses a "ready to use" liquid bendamustine composition ............. 9

        2.  Drager claim 5 discloses the same concentrations of bendamustine ........................... 9

        3.  Drager claim 5 discloses liquid formulations of bendamustine comprising PEG ...... 10

        4.  Drager claim 5 discloses liquid bendamustine compositions comprising a stabilizing amount of an antioxidant ................................................................................... 11

        5.  Drager claim 5 discloses liquid formulations of bendamustine having less than 5% peak area response of total impurities resulting from the degradation of the bendamustine ................................................................................ 13

        6.  Drager claim 5 discloses the bendamustine compositions of Claim 1 and are arranged in the same way.................................................................................... 15

    B.  Claims 2-9 and 11-16 are Anticipated By Drager ............................................ 16

VI.   THE ASSERTED CLAIMS ARE OBVIOUS OVER DRAGER .......................16

    A.  A POSA would be motivated to use PEG in stable liquid bendamustine formulations ... 17

    B.  A POSA would be motivated to use a stabilizing amount of antioxidant in stable liquid bendamustine formulations ........................................................................... 21

    C.  A POSA would have had a reasonable expectation of success in arriving at the liquid bendamustine formulations of the asserted claims .......................................... 27

    D.  Claims 2-9 and 11-16 are Obvious over Drager ............................................. 31

    E.  Secondary considerations are insufficient to overcome the strong case of obviousness .. 31

VII.  CLAIMS 1-9 AND 11-16 ARE INVALID AS INDEFINITE UNDER 35 U.S.C. § 112 ...35

## I.   INTRODUCTION

1.     At the request of counsel for Defendants Slayback Pharma LLC ("Slayback"), Apotex Inc. and Apotex Corp. (collectively "Apotex") (Slayback and Apotex collectively "Defendants"), I hereby submit this Reply Expert Report pursuant to Fed. R. Civ. P. 26(a)(2)(B) ("Reply Report") in response to the following reports: (i) Expert Report of F. Dean Toste, Ph.D. ("Toste Report"); (ii) Responsive Expert Report of Edmund J. Elder, Ph.D. ("Elder Responsive Report"); (iii) Responsive Expert Report of Graham James Sewell, Ph.D. ("Sewell Responsive Report"); and (iv) Responsive Expert Report of Bernhardt Trout, Ph.D. ("Trout Responsive Report").

2.     I am the same Dr. Laird Forrest who submitted the "Expert Report of Laird Forrest, Ph.D., Regarding U.S. Patent No. 11,103,483" on June 3, 2022 ("Opening Report"), which is incorporated herein by reference.

3.     In my Opening Report, I reserved the right to address any additional statements, opinions, or conclusions, including any rebuttal or reply reports provided by Plaintiff.  *See* Opening Report, ¶ 3.  I do so here in this Reply Report, which contains my opinions regarding the invalidity of U.S. Patent No. 11,103,483 ("the '483 patent") and, in particular claims 1-9 and 11-16 (the "Asserted Claims"), as anticipated, obvious, and/or indefinite based on the information currently available to me.  In preparing my Reply Report, I have relied on: the materials considered in Exhibit 1 to this report, as well as the materials identified in my Opening Report, my decades of knowledge, training and experience in pharmaceutical chemistry, drug discovery and pharmacokinetics/pharmacology, and my experience in all aspects of parenteral, topical, and oral drug formulation and biopharmaceutics, including formulation of anti-cancer chemotherapeutics. I have also relied on the materials cited in the Toste Report, Elder Responsive Report, Sewell

Responsive Report, and Trout Responsive Report.  Throughout this report, I cite to portions of certain documents.  These citations are intended only as examples, and I reserve the right to rely additionally on other portions of these documents.

4.      Details concerning my compensation, prior testimony, and qualifications are set forth in my Opening Report.

5.      In addition to the subject matter described in my Opening Report, if called upon to testify, I expect to testify concerning the opinions expressed herein.  In such testimony, I may rely on additional documents that are either publicly available or produced in this litigation.  If any further developments occur in this litigation that may bear upon the opinions I have expressed in this Reply Report, I also reserve the right to supplement or amend this report to take those developments into account.

## II. LEGAL STANDARDS

6.      As stated in my Opening Report, I have been informed of the legal standards governing an invalidity determination based on anticipation, obviousness, and indefiniteness.  *See* Opening Report, ¶¶ 21-33.  My additional understanding of the legal standards relating to objective evidence of non-obviousness is set forth below.

### A.  Secondary Considerations of Nonobviousness

7.      I understand that in determining the obviousness of the subject matter of an alleged invention, a court must consider objective indicia of nonobviousness, before reaching a final determination of obviousness.  These secondary considerations of non-obviousness may include: (1) whether the claimed invention achieved unexpected results; (2) whether there was a failure of others in trying to achieve the claimed invention; (3) whether the prior art taught away from the

claimed invention; or (4) whether the claimed invention satisfied a long-felt but unmet need (collectively "secondary considerations").

8.      I have been further informed that a patentee is not required to present evidence of secondary considerations.  However, if they choose to do so, a given secondary consideration must be demonstrated by a preponderance of the evidence.

9.      I also have been advised by counsel that for any asserted secondary consideration to have relevance and weight in an invalidity analysis, the patentee must show that there is a "nexus" between the consideration and the novel features of the claimed invention.  A "nexus" means "a causal connection" between the alleged secondary consideration and the novel features of the claimed invention.  If the secondary consideration is tied to either an unclaimed feature of the invention or a claimed feature in the prior art (*i.e.*, the feature is not novel), then there is no nexus to the claimed invention.  Further, the evidence of secondary considerations must be reasonably commensurate in scope with the asserted claims.

10.     I have been advised by counsel that the existence of secondary considerations does not necessarily mean that an invention is not obvious.  When, to the person of ordinary skill in the art ("POSA"), there is motivation and reasonable expectation of success from the teachings of prior art, a claim may be invalid despite evidence of secondary considerations of non-obviousness.

## III. PERSON OF ORDINARY SKILL IN THE ART ("POSA")

11.     I understand that the Court adopted a definition for a POSA with respect to different, but related, bendamustine patents in a different case, *Cephalon, Inc. v. Slayback Pharma LLC*, 456 F. Supp. 594, 603 (D. Del. 2020).  *See* Toste Report, ¶ 22; Trout Responsive Report, ¶ 18.  The definition of a POSA provided in my Opening Report is consistent with the Court's

definition in the *Cephalon* case.  Dr. Toste has mischaracterized my definition of a POSA by suggesting that I indicated that a POSA "would not have collaborated with other skilled persons, such as a chemist."  Toste Report, ¶ 24.  This is not the case.  My definition of a POSA includes "a formulator of drugs with a Ph.D. or equivalent degree in pharmaceutics, chemistry, chemical engineering, or a related field."  Opening Report, ¶ 36; *see id.*, ¶¶ 35-38.  I also made clear that the POSA "would have collaborated, as needed, with other skilled persons."  *Id.*, ¶ 36.  My opinions regarding the invalidity of the Asserted Claims do not change under the Court's prior definition of a POSA in the *Cephalon* case, which I understand that Dr. Toste and Dr. Trout have adopted in providing their opinions in this case.

## IV. SCIENTIFIC AND TECHNICAL BACKGROUND

12.     Details concerning relevant Technical Background as it pertains to, *inter alia* (1) formulations for parenteral administration, (2) excipient selection for parenteral formulations, (3) background on bendamustine, and (4) physical and chemical properties of bendamustine are set forth in my Opening Report.  *See* Opening Report, ¶¶ 44-88.

## V. THE ASSERTED CLAIMS ARE ANTICIPATED BY DRAGER

13.     The opinions expressed in the Toste Responsive Report and the Trout Responsive Report do not change my opinion that the Asserted Claims are anticipated by International Patent Publication No. WO 2010/036702 A1 (filed Sept. 23, 2009) to Drager et al ("Drager").[1]

### A.  Claim 1 Of The '483 Patent Is Anticipated By Drager

14.     Dr. Toste and Dr. Trout contend that the Claim 1 of the '483 patent is not anticipated because Drager does not teach or disclose bendamustine compositions as they are arranged in that

---

[1] As with my Opening Report, my opinions expressed herein are based on Drager and the related patents and applications that claim priority to Drager and share the same specification, such as U.S. Patent No. 8,344,006 (Drager '006 patent).

claim. *See, e.g.*, Toste Report, ¶¶ 58-86; Trout Responsive Report, ¶¶ 88-96.  I disagree.  As set forth below, and explained in my Opening Report, not only is each and every element of Claim 1 taught and disclosed in Drager, but the elements are also disclosed in the same manner as arranged in Claim 1.

15.     For example, claim 5 of U.S. Patent No. 8,344,006 ("Drager '006 patent") discloses all of the elements of the bendamustine compositions recited in Claim 1.  *See* Opening Report, ¶ 122.  An annotated version of claim 5 of the Drager '006 patent ("Drager claim 5") is reproduced below with key elements in bold:

> 5. A **stable**, non-aqueous **liquid**, pharmaceutical **formulation comprising** from **about 5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof**, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, wherein said formulation, **following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization**, further comprising **an antioxidant**, a surfactant, a lipid, a filler, an organic acid, **a hydrophilic polymer**, a complexing agent, a preservative, or a combination thereof.

Drager claim 5 (emphasis added).

16.     As set out in the table below, a POSA would understand that Drager claim 5 discloses each and every element of Claim 1 of the '483 patent, arranged in the same manner as it appears in the Asserted Claims:

| Claim 1, '483 Patent | Drager Claim 5[2] |
|---|---|
| 1. A ready to use liquid bendamustine-containing composition comprising bendamustine, or a pharmaceutically acceptable salt thereof … | 5. A stable, **non-aqueous liquid, pharmaceutical formulation comprising** from about 5 mg/ml to about 120 mg/mL of **bendamustine, or a pharmaceutically acceptable salt thereof**, solubilized in about 66% (v/v) of dimethylacetamide and about 34% (v/v) of propylene glycol, **wherein said formulation, following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization**, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof. |
| . . .wherein the <u>bendamustine</u> concentration in the composition is from **about 10 mg/mL to about 100 mg/mL;** | "… comprising from about **5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof,…**" |
| **polyethylene glycol**; and | ". . . further compris[ing] … **a hydrophilic polymer** …"<br><br>", … **hydrophilic polymers (*e.g.*, polyethylene glycols (PEG 300, PEG 400)** …"<br>Drager at 7:26-8:3 (emphasis added). |
| a **stabilizing amount** of an **antioxidant**; | "A **stable**, non-aqueous liquid, pharmaceutical formulation. . . further comprising … an **antioxidant**…" |
| the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least 15 months at a temperature of from about 5ºC. to about 25ºC.<br>'483 patent at claim 1 (emphasis added). | "A **stable**, non-aqueous **liquid**, pharmaceutical formulation …"<br><br>"As used herein, 'stable' is defined as . . . more preferably, no more than about a 5% loss of bendamustine under typical commercial storage conditions."<br>Drager at 4:28-32 (emphasis added). |

17.    I address each of these limitations in further detail below.

### 1. Drager claim 5 discloses a "ready to use" liquid bendamustine composition

18.     I understand that the term "ready to use" has been construed in this case to mean "able to be dispensed with minimal if any effort or preparation; prepackaged."  Opening Report, ¶ 225.  Dr. Sewell and Dr. Elder contend that a POSA the claimed compositions do "not require additional reconstitution," and thus, are able to be dispensed with "minimal if any effort or preparation.  *See* Elder Responsive Report ¶ 9; *see also* Sewell Responsive Report ¶ 11.  It is my opinion that under Plaintiff's effort to construe the term, it renders the Asserted Claims indefinite. *See infra*, ¶ 81-86. If however, the term "ready to use" is found not to be indefinite, then Drager expressly teaches "ready to use" liquid bendamustine compositions.

19.     Under this interpretation, Drager claim 5 discloses a "ready to use" composition.

20.     As set forth above, Drager claim 5 recites a composition that "following dilution with a pharmaceutically acceptable diluent, is suitable for injection into a patient without lyophilization." A POSA would understand that this claim element meets the "ready to use" limitation under the interpretation offered by Dr. Sewell and Dr. Elder.  Neither Dr. Toste nor Dr. Trout contend that Drager claim 5 fails to teach or disclose "ready to use" bendamustine compositions.

### 2. Drager claim 5 discloses the same concentrations of bendamustine

21.     Drager claim 5 recites a formulation comprising "**about 5 mg/ml to about 120 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof.**"  A POSA would understand that a range of "about 5 mg/ml to about 120 mg/mL" (where "about is defined as ±10%, preferably ±5%" (Drager at 7:25)), discloses the "about 10 mg/mL to about 100 mg/mL" concentrations ranges recited in claim 1 of the '483 patent.  Moreover, as I explained in my

Opening Report, it is my opinion that Drager specifically describes additional concentrations of bendamustine within the range of Drager claim 5, such that a POSA would understand the range to further disclose discrete concentrations within that range, including for example "about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine." *See* Opening Report, ¶ 95 (citing Drager at 7:14-25). Neither Dr. Trout nor Dr. Toste contend that Drager claim 5 fails to teach or disclose any of the concentrations of bendamustine recited in the Asserted Claims. Nor do they present any evidence that would suggest the claimed concentrations are critical to the Asserted Claims, let alone novel.

22.     In view of the above, and for the reasons set forth in my opening report, a POSA would have understood that Drager claim 5 teaches and discloses the claimed concentrations of bendamustine as arranged in Claim 1 of the '483 patent. *See, e.g.*, Opening Report, ¶ 122.

### 3. Drager claim 5 discloses liquid formulations of bendamustine comprising PEG

23.     Drager claim 5 expressly recites a formulation which includes a "**hydrophilic polymer.**" The *only* example of a hydrophilic polymer disclosed in Drager is polyethylene glycol ("PEG"). *See* Drager at 7:29-8:3 (emphasis added) ("Pharmaceutically acceptable excipients are known in the art and include, for example, . . . **hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400) . . . .**"); *see also, e.g.*, Opening Report, ¶¶ 97-99, 128. Dr. Trout and Dr. Toste concede this teaching of PEG. *See* Trout Responsive Report, ¶¶ 49, 60; Toste Report, ¶¶ 54,

65.  Accordingly, a POSA would have understood that Drager claim 5 discloses a bendamustine composition comprising PEG.

24.     The opinions offered by Dr. Toste and Dr. Trout regarding Drager's disclosure of PEG do not alter my opinions on anticipation. Drager claim 5 explicitly discloses a liquid bendamustine composition comprising PEG. Thus, it is my understanding that whether Drager describes "innumerable possible combinations" of solvents, as Dr. Toste contends, this is irrelevant to an anticipation analysis.  *See* Toste Report, ¶ 67.  As set forth above, Drager claim 5 expressly requires the inclusion of a "hydrophilic polymer" which is identified as PEG.

25.     Similarly, Dr. Toste argues that a POSA would not choose PEG from the disclosure of Drager.  *See, e.g.*, Toste Report, ¶ 64.   Again, it is my understanding that the purported "motivation" to select PEG from the disclosure of Drager is irrelevant in an anticipation analysis. Rather, the sole issue to be decided is whether what Drager teaches anticipates the claim; Drager claim 5 discloses a composition comprising PEG. As set forth above, Drager claim 5 meets this requirements by explicitly disclosing a bendamustine composition comprising PEG.

### 4. Drager claim 5 discloses liquid bendamustine compositions comprising a stabilizing amount of an antioxidant

26.     Drager claim 5 also expressly recites "stable" liquid bendamustine compositions comprising "an **antioxidant**."  Drager claim 5.  *See also, e.g.*, Opening Report, ¶¶ 104, 122.  A POSA would understand Drager claim 5 discloses a bendamustine composition comprising "a stabilizing amount of antioxidant" as recited in Claim 1 of the '483 patent. Neither Dr. Toste nor Dr. Trout contest this reading of Drager claim 5.

27.     A POSA would have known at the time of the claimed invention that antioxidants were used in many liquid pharmaceutical formulations to enhance stability and, thus, would have

performed the same function in a liquid bendamustine formulation based on the disclosures of Drager. Opening Report, ¶¶ 70-71, 105.

28.    Additionally, the '483 patent states: "'stabilizing amount' shall be understood to include those amounts which increase or enhance the stability of the Bendamustine compositions described herein." '483 patent, 3:63-67. I understand that Eagle has agreed in a separate litigation involving the '483 patent that a "stabilizing amount of an antioxidant" is "any amount of an antioxidant that decreases the amount of bendamustine degradation after any time period and at any temperature." *See Eagle Pharms., Inc. v. Celerity Pharms., LLC*, No. 22-cv-42-CFC, D.I. 64, Joint Claim Construction Chart, at 5; *accord* Toste Report, ¶ 80. Under Eagle's proposed definition, a POSA would understand that the disclosure of a "stable" bendamustine composition comprising "an antioxidant" in Drager claim 5 means that the composition contains a "stabilizing amount of an antioxidant." Notably, neither Dr. Toste nor Dr. Trout suggest that Drager claim 5 fails to disclose a "stabilizing amount of antioxidant."

29.    Dr. Toste and Dr. Trout instead offer opinions on the degradative pathways of bendamustine. *See* Toste Report, ¶¶ 49-51, 106-11; Trout Responsive Report, ¶¶ 106, 115. For example, Dr. Toste and Dr. Trout opine that Claim 1 is not anticipated because Drager does not "identif[y] any mechanism of oxidation as a degradation pathway," "disclose[] of the need to reduce bendamustine degradation by adding an antioxidant," "[make a] suggestion as to why an antioxidant should be added," or "[provide a] teaching linking any amount of any antioxidant specifically to any impact on stability of the formulation." Toste Report, ¶¶ 69, 70; *see also* Trout Responsive Report, ¶¶ 69, 71. Whether or not niacinamide's mechanism of action was known, is not the point, rather its effect as an antioxidant was known, and a POSA does not have to know the exact mechanism of action to know the properties of a compound. Dr. Toste and Dr. Trout's

opinions above are not relevant to the issue of whether Drager claim 5 discloses a "stabilizing amount of antioxidant" because  as I understand, an anticipation analysis does not require a particular "motivation" or "suggestion" to include a claimed feature that is expressly disclosed in the prior art.

30.     I also disagree with Dr. Toste's mischaracterization of my opinion that Drager discloses a bendamustine formulation comprising an antioxidant.  *See* Toste Report, ¶¶ 74-75.  As set forth in my Opening Report, at the time of the '483 patent, niacinamide was a known antioxidant.  *See, e.g.*, Opening Report, ¶¶ 76-77. Moreover, Drager teaches that the addition of niacinamide improved the stability of certain bendamustine compositions disclosed in Drager.  *Id.*, ¶ 105.

31.     Accordingly, in view of the above, and as set forth in my Opening Report, a POSA would readily understand that Drager claim 5 discloses bendamustine compositions comprising a "stabilizing amount of antioxidant" as recited in Claim 1 of the '483 patent.  *See* Opening Report, ¶¶ 117, 159.

### 5. Drager claim 5 discloses liquid formulations of bendamustine having less than 5% peak area response of total impurities resulting from the degradation of the bendamustine

32.     As set forth above, Drager claim 5 recites a "**stable**, non-aqueous, **liquid**" bendamustine formulation. Drager defines "stable" as "more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions." Drager at 4:28-32; *see also* Opening Report, ¶ 109.  A POSA would readily understand that this definition of "stable" includes compositions "having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC as a wavelength of 223 nm after at least

13

15 months at a temperature of from about 5° C to about 25° C" as recited in claim 1 of the '483 patent.

33.     Dr. Trout's opinions on Drager's teaching of "typical storage conditions" do not change my opinions that this claim element is anticipated by Drager. As Dr. Trout readily concedes, "many marketed formulations are stored for 18 or 24 months." Trout Responsive Report, ¶ 83. This comports with Drager's reference to 'typical storage conditions,' which would be understood by a POSA to be a period of time that is routinely used to store commercial products. *See* Opening Report, ¶ 112.  Dr. Trout appears to contend that a POSA's understanding of the phrase "typical storage conditions" is limited only to the express time periods recited by Drager. Trout Responsive Report, ¶ 83.  I disagree.

34.     A POSA would not limit their understanding of "typical storage conditions" to exclude any time periods not expressly listed in Drager. Drager does not provide an exhaustive list, but rather, discloses exemplary time periods that could be included.  There is no basis in Drager that would support Dr. Trout's limited view.  Thus, it is my opinion that Drager's disclosure of "typical storage conditions" includes periods of up to 12, 18, and even 24 months, but definitely includes 15 months.  *See* Opening Report, ¶ 112.

35.     Moreover, the disclosed stability data translates to longer time periods of 15 months based on the knowledge of the POSA and based on modeling studies that extrapolate stability data disclosed by Drager.  Neither Dr. Toste nor Dr. Trout contend that the modeling studies in my Opening Report are inappropriate methods to analyze stability data. As set out in my Opening Report, the stability data provided in Drager demonstrates about 97.6% of the bendamustine would remain intact after 15 months.  *Id.*, ¶ 112.  A POSA would understand that such extrapolation of stability data is acceptable and routine.  Indeed, the inventors of the '483 patent appear to have

engaged in the same type of analysis to support their 15-month stability limitation.   For example, the '483 patent contends that its bendamustine compositions "are substantially free of impurities after at least about 15 months . . . ."  *See, e.g.*, '483 patent, 2:13-21.  Yet, the '483 patent fails to provide any stability data for its compositions at 15 months. The inventors supported the long-term stability of their claimed compositions by extrapolating from stability studies for much shorter periods (*e.g.*, 12 months).  *See* '483 patent, Table 6, 11:35-38 ("The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.").  Accordingly, a POSA would understand the disclosure of 12-month stability data presented in Drager to include at least 15 months.

### 6.   Drager claim 5 discloses the bendamustine compositions of Claim 1 and are arranged in the same way

36.    As set forth above, and as previously discussed in my Opening Report, each and every element of Claim 1 is taught and disclosed in Drager.  Moreover, at least Drager claim 5 arranges these claim elements in the same way they appear in Claim 1.

37.    None of the opinions offered by Dr. Toste or Dr. Trout change my opinion nor do they conflict with the disclosures relied upon in my analysis.  For example, Dr. Toste contends that I "improperly pick[] and choose[] from various disclosures within Drager to arrive at the claimed composition."  Toste Report, ¶ 13; *see also id.*, ¶¶ 59, 86.  Dr. Trout posits the same, stating "[p]icking, choosing, and combining various disclosures is just how Dr. Forrest arrives at the purportedly anticipatory disclosures."  Trout Responsive Report, ¶ 95; *see also id.*, ¶¶ 55, 57, 59.  These characterizations of my opinions ignore Drager's explicit disclosure in a single claim of each and every element arranged as in Claim 1 of Asserted Claims.

38.     Accordingly, it remains my opinion that Claim 1 of the '483 patent is anticipated by Drager.

**B.  Claims 2-9 and 11-16 are Anticipated By Drager**

39.     As explained in my Opening Report, Asserted Claims 2-9 and 11-16 are anticipated by Drager.  Opening Report, ¶¶ 148-66. It remains my opinion that none of these claims impart any patentable subject matter and are therefore also anticipated by Drager for the same reasons discussed above with respect to claim 1, and as set forth in my Opening Report.  Dr. Trout and Dr. Toste focus their opinions on the "Asserted Claims," generally, and fail to identify or address any specific limitation in Asserted Claims 2-9 and 11-16 that would change the anticipation analysis set forth above or in my Opening Report.  I reserve the right to offer additional opinions regarding the specific limitations of Asserted Claims 2-9 and 11-16.

**VI. THE ASSERTED CLAIMS ARE OBVIOUS OVER DRAGER**

40.     As discussed above, it is my opinion that Drager discloses the same liquid bendamustine formulations recited in the Asserted Claims.  To the extent that any limitation of claim 1 of the '483 patent is not found to be expressly or inherently disclosed in Drager, which I do not believe in the case, it is also my opinion that in view of the teachings of Drager, the Asserted Claims would have been obvious.  *See, e.g.*, Opening Report, ¶¶ 72-77; 167-218.  In particular, contrary to the opinions of Dr. Trout and Dr. Toste, Drager provides a POSA with (i) motivation to select PEG, (ii) motivation to use a stabilizing amount of antioxidant, and (iii) a reasonable expectation of success in obtaining a stable liquid bendamustine formulation that contains both PEG and antioxidant as recited in the Asserted Claims.

**A. A POSA would be motivated to use PEG in stable liquid bendamustine formulations**

41.    Dr. Toste and Dr. Trout contend that a POSA would not have been motivated to select PEG in view of Drager.  *See, e.g.*, Toste Report, ¶ 14; Trout Responsive Report, ¶ 55.  I disagree.  Drager provides at least two separate motivations for a POSA to use PEG in a liquid bendamustine composition. First, as discussed in my Opening Report and above, Drager claim 5 discloses stable liquid bendamustine compositions comprising a hydrophilic polymer. *See* Opening Report, ¶ 99; Drager claim 5; Drager at claim 38.  The only example of a hydrophilic polymer disclosed by Drager is PEG.  *See* Drager at 8:2-3.  This alone is sufficient to provide motivation to a POSA to include PEG in stable liquid bendamustine formulations.

42.    Dr. Trout and Dr. Toste attempt to avoid this clear disclosure in Drager by contending that Drager fails to provide any guidance to select PEG.  *See* Toste Report, ¶ 63; Trout Responsive Report ¶ 49.  I disagree.  The incorporation of PEG as a hydrophilic polymer comes from multiple disclosures within Drager, including at least Drager claim 5 (as discussed above), Drager at claim 38, and the specification's description for hydrophilic polymers.  As such, Drager's suggestion for PEG as a hydrophilic polymer alone is enough to render its inclusion in the Asserted Claims obvious in view of the prior art.

43.    Second, Drager also teaches "stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent . . . with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents."  Drager at 4:1-3.  Drager expressly identifies PEG as an example of a suitable polar protic solvent. *See id.* at 4:3-8. Dr. Trout and Dr. Toste readily concede this fact.  *See* Trout Responsive Report, ¶¶ 47, 57 (citing Drager at 4:3-8) (reciting the list of potential polar protic solvents disclosed in Drager as including "polyalkylene glycols, such as polyethylene glycol"); Toste Report, ¶ 62 (citing Drager at 4:1-8) (reciting same).  Indeed, similar

to the focused disclosure of PEG as a hydrophilic polymer, PEG is disclosed as the first of only three examples of a polyalkylene glycol as a polar protic solvent.  For these reasons, a POSA would be further motivated by Drager's disclosure to use PEG as a suitable solvent in stable liquid bendamustine formulations.

44.      Dr. Trout contends that the POSA would not have been motivated to use PEG as a polar protic solvent based on Drager's disclosure of an exemplary formulation with a polar protic solvent that does not contain PEG.  *See* Trout Responsive Report, ¶ 47.  I disagree.  Dr. Trout concedes that Drager discloses an exemplary formulation containing a polar protic solvent, but contends a POSA would not select PEG.  *See* Trout Responsive Report, ¶ 80; *id.*, fn.3.  I disagree. Drager's disclosure of a formulation containing PG would not have discouraged a POSA from using other well-known polar protic solvents in liquid bendamustine formulations.  This is particularly true here because Drager explicitly identifies PEG as a pharmaceutically acceptable polar protic solvent that is suitable for formulation with bendamustine, rendering it an equivalent choice with PG.  *See* Drager at 4:3-8.  Moreover, as referenced in my Opening Report, PG and PEG were both routinely used by pharmaceutical formulators developing parenteral solutions prior to the critical date of the '483 patent.  *See* Opening Report, ¶ 56-57.  The use of these particular co-solvents was well known to a POSA because, *inter alia*, of their known ability to increase the solubility of nonpolar drugs by several orders of magnitude.  *See id.,* ¶ 51.  Therefore, it would have been obvious for a POSA at the time of the invention to select and use PEG, a well-known solvent that was also directly taught by Drager for use in a stable liquid bendamustine formulation.

45.      In another attempt to diminish the clear disclosures of Drager, Dr. Toste asserts that "Drager disclosed numerous polar protic solvents and hydrophilic polymers that were known in the art that could potentially be added, with no particular preference for PEG among the many

disclosed excipients and combinations of excipients." *See* Toste Report, ¶ 89.  Dr. Toste goes on to state that Drager "merely pointed" a POSA toward "all of the polar protic solvents and hydrophilic polymers and other optional listed excipients" and that the POSA would have no reason to single out PEG. *See id.*  I disagree.[3]  As described in my Opening Report (¶¶ 175-179) and discussed above, Drager's disclosure of PEG in two separate instances is clear and Dr. Toste's mischaracterization of these teachings does not erase them from Drager.

46.     Furthermore, Dr. Toste mischaracterizes the role of oxidation and hydrolysis in the degradation of bendamustine-containing formulations, especially those containing PEG. *See, e.g.*, Toste Report, ¶¶ 91-98. Dr. Toste fails to consider the full teachings of Drager which contemplate these potential issues and provides a solution to avoid them.  For example, Drager expressly teaches that the potential degradation of bendamustine associated with polar protic solvents can be avoided by adjusting the concentration of those solvents. Drager at 4:22-26. A POSA would understand that keeping the polar protic solvent concentration low would reduce and/or eliminate any concerns associated with degradation via nucleophilic attack. *Id.*  To put in another way, regardless of whether the formulation solvent affects the reactivity of bendamustine to nucleophiles, if the nucleophile concentration is low enough, degradation cannot occur due to a lack of reactant. Dr. Toste does not account for this solution provided by Drager.

47.     Dr. Toste further contends that a POSA would not be motivated to select PEG due to its water content. Toste Report, ¶ 101.  This does not change my opinion that Drager provides a POSA with sufficient motivation to use PEG.  As an initial matter, Drager expressly teaches exposing bendamustine to water results in undesirable byproducts.  Drager at 5:1-2. However, as

---

[3] Dr. Trout effectively asserts the same argument relying on the same premise.  For the same reasons, I disagree. *See* Trout Responsive Report, ¶ 80 n.3.

discussed herein, Drager also expressly teaches that the potential degradation of bendamustine associated with polar protic solvents can be avoided by adjusting the concentration of those solvents.  Drager at 4:22-26.   In addition, the POSA would have been aware of the fact that PEG as disclosed in Drager as a hydrophilic polymer provides for various molecular weights, *e.g.*, PEGs 300, 400 and PEG 600 that, which a POSA would readily recognize as options for selecting higher molecular weight liquid PEGs, which have fewer nucleophilic terminal hydroxyl groups and thus limit the availability of reactant groups, either for nucleophilic attack or esterification.

48.    I also disagree with Dr. Toste's hypothetical analysis and prediction of PEG stability based on $\pi^*$ values.  Toste Report, ¶¶ 92-98. DMSO has a high $\pi^*$ similar to PEG.  Yet Drager demonstrates that DMSO based formulations had <5% impurities after at least 1 year at 25˚C (Fig. 1), and < 0.5% impurities after storage at 5˚C (Fig. 2) – contrary to Dr. Toste's predicted instability.  '006 patent at Figs. 1 and 2.  Thus, the mere fact that PEG has a particular $\pi^*$ value is insufficient to overcome the strong teachings of Drager that motivate its use with bendamustine.

49.    Finally, Dr. Toste contends that PEG was an uncommon excipient, and the formation of peroxides would discourage its use in parenteral formulations.  Toste Report, ¶ 103. I disagree.  As recognized by Rowe 2009, "[p]olyethylene glycols (PEGs) are widely used in a variety of pharmaceutical formulations, including parenteral."   *See* Rowe 2009 at 517 (JDG_BENDA_00006564); *see also id.* at 518 (JDG_BENDA_00006565) stating "[i]n concentrations up to approximately 30% v/v, PEG 300 and PEG 400 have been used as the vehicle for parenteral dosage forms."   As to the formation of peroxides, it was well understood how to stabilize PEGs; as recognized by Rowe 2009, "[o]xidation of polyethylene glycols may also be inhibited by the inclusion of a suitable antioxidant." *See* Rowe 2009 at 520 (JDG_BENDA_00006567.  Thus, the use of PEG was hardly uncommon in parenteral formulation.

20

A POSA would have significant experience and understanding of PEG and its suitability for parenteral formulations, further motivating its selection by a POSA in view of Drager.

50.     As set forth above, the teachings of Drager, as viewed with the knowledge and experiences of a POSA at the time of the '483 patent, provide sufficient motivation to select PEG.

**B.  A POSA would be motivated to use a stabilizing amount of antioxidant in stable liquid bendamustine formulations**

51.     Dr. Toste and Dr. Trout contend that the Asserted Claims are not obvious because a POSA would not have been motivated to use a "stabilizing amount" of an antioxidant in a liquid bendamustine formulation. *See* Trout Responsive Report, ¶¶ 106-08; Toste Report, ¶¶ 105-11.  I disagree.

52.     First, as provided in my Opening Report and above, Drager claim 5 explicitly discloses the use of an antioxidant in stable liquid bendamustine formulations.   *See* Opening Report, ¶ 122; *supra*, ¶¶ 26-31.  Moreover, at the time of the '483 patent, a POSA would have also known that an antioxidant can enhance the stability of a formulation and that when used with certain excipients, like PEG, its use was beneficial to reduce the presence of peroxyacids and free radicals that could reduce overall stability of the composition.  *See* Opening Report, ¶¶ 50, 63-64. These understandings are further confirmed by Drager's disclosure of stable liquid bendamustine formulations containing a known antioxidant, niacinamide.  *See id.*, ¶ 182.  Thus, Drager would have motivated a POSA to include antioxidant in a liquid bendamustine formulation, and would have done so in combination with PEG.  Moreover, determining the particular antioxidant and amounts would have been a matter of routine experimentation, and a mere recitation of a "stabilizing amount" of antioxidant represents the normal process when developing a formulation. *See id.*, ¶ 76. Put another way, a POSA would not develop a formulation that was unstable, rather

they would change the amount of antioxidant to arrive at a "stabilizing amount."  The recitation of "stabilizing amount" reflects nothing more than the direction a POSA would have gone in every formulation.  As if this were not enough, the POSA would have also been motivated to use a stabilizing amount of antioxidant from the recitation of "stable" in Drager claim 5.

53.     Dr. Trout and Dr. Toste both contend that a POSA would not be motivated to use an antioxidant in a liquid bendamustine formulation because at the time of the '483 patent bendamustine was not known to degrade via an oxidative pathway.  *See* Trout Responsive Report, ¶ 106; Toste Report, ¶¶ 106-107.  I disagree.  Drager expressly teaches including an antioxidant in "stable" liquid bendamustine formulations.  *See* Drager at claim 5; *see also, e.g.*, Opening Report, ¶¶ 104, 122.  Moreover, Drager discloses the very same antioxidants described in the '483 patent (*e.g.*, propyl gallate).  Drager at 7:30-31. Thus, the use of an antioxidant as suggested by Drager is apparent.   These clear teachings would not be ignored by a POSA based on the known understanding of the degradative pathways of bendamustine, as alleged in the Responsive Reports. *See* Toste Report, ¶¶ 49-51, 106-11; Trout Responsive Report, ¶¶ 106, 115.

54.     Indeed, the Asserted Claims make no direct connection between the claimed antioxidant and the oxidative degradants of bendamustine.  Rather, like Drager, the Asserted Claims include a "stabilizing amount of antioxidant."

55.     Nor does Drager teach away from the inclusion of a stabilizing amount of antioxidant, as Dr. Trout contends.  *See* Trout Responsive Report, ¶¶ 106, 125.  There is no disclosure in Drager that discourages the use of antioxidants.  Dr. Trout and Dr. Toste simply ignore the clear teachings of Drager to form their opinion that a POSA would not be motivated to select an antioxidant.

56.     Moreover, as discussed in my Opening Report, a POSA was well aware of the use of antioxidants in parenteral compositions to help reduce the presence of peroxyacids and free radicals that could reduce overall stability of the composition.  *See* Opening Report, ¶¶ 50, 63-64; 133-134.  Dr. Toste does not disagree that antioxidants can act as reducing agents or may serve as free radical scavengers.  *See* Toste ¶ 72 (citing Nema 1997) ) nor does he disagree that polyether groups—like those in PEG—are highly susceptible to oxidative degradation in a chain process analogous to autooxidation (*see* Toste Report, ¶ 109 (citing Waterman 2002)).   This aspect of antioxidant activity—namely free radical scavenging—was known to be particularly relevant for formulations containing PEG, like those of the Asserted Claims and disclosed in Drager.  There is clear motivation for a POSA to use an antioxidant, because of its known function in scavenging free radicals, the nitrogen mustard compound structure of bendamustine, and because of PEG's known susceptibility to oxidative degradation of PEG.  *See, e.g.*, Opening Report, ¶¶ 62, 65-69, 82, 84-88.

57.     In addition, Drager disclosed exemplary liquid bendamustine formulations containing a known antioxidant, niacinamide.  *See* Opening Report, ¶ 77.  Dr. Toste and Dr. Trout do not dispute the teachings of Kamat and Ogata as references demonstrating the knowledge of a POSA.  *See* Trout Responsive Report, ¶ 71; Toste; ¶ 76.  Indeed, Dr. Trout recognizes that these references disclose niacinamide as an "antioxidant" with "scavenging abilities," but then tries to discount them due to the fact that they did not "actually perform[] any experiment or provide any data sufficient to understand niacinamide's mechanism of action."  *See* Trout Responsive Report, ¶ 71.  Similarly, Dr. Toste does not dispute the teachings of Kamat or Ogata, but simply asserts that the references did not "show how niacinamide would interact with bendamustine, DMA, or PEG."  *See* Toste Report, ¶ 76.

58.     Dr. Trout and Dr. Toste cannot avoid the fact that niacinamide was a known antioxidant.  By disclosing the use of niacinamide, Drager necessarily teaches all of the known properties of niacinamide, including its utility as an antioxidant.

59.     Dr. Trout and Dr. Toste further contend that Drager's data supporting the disclosure of the Niacinamide/DMA and the DMA-only formulation is either contradictory, "difficult to draw any conclusions from" or of "at best, ambiguous, inconsistent, and inconclusive."  *See* Toste Report, ¶¶ 81-84; Trout Responsive Report, ¶¶ 72-73.  I disagree.  Dr. Trout and Dr. Toste fail to appreciate the utility of the data as presented by Drager in Figure 2 and Table II regarding the antioxidant-containing exemplary formulation as compared to its corollary formulation without antioxidant.   Dr. Toste's criticisms of these data lack any basis.  As explained in Drager, the samples tested were the result of combining three replicates (*see* Drager at 9:25-26) which were stored at 5ºC and 25ºC over the disclosed periods of time and then extracted for measurement of stability as demonstrated by "bendamustine purity" and certain levels of bendamustine adducts, with the resulting analysis of the stability samples being presented graphically in Figure 2 and numerically in Table II.  The graphical analysis of Figure 2 shows that the Niacinamide/DMA formulation (represented as "Niacinamide," the filled black circle line of Figure 2) exhibited "bendamustine purity" stability of ~97% (corresponding to ~3% total impurities) after 365 days of storage under the defined conditions leaving it in "third place" in the stacked comparison of solvent systems of Figure 2.  *See* Drager at Fig. 2.  In comparison, the same data show the stability results for the DMA formulation (without antioxidant-Niacinamide) (represented as "DMA," the filled black diamond line of Figure 2) exhibited "bendamustine purity" stability closer to ~94-95% (corresponding to ~5-6% total impurities) after 365 days of storage under the defined conditions, leaving it in "fifth place" in the stacked comparison of solvent systems.  *See id.*   These data

demonstrate to the POSA that when compared to the use of DMA (without antioxidant), the use of niacinamide with DMA in the liquid bendamustine formulation *increased* the overall stability of bendamustine (as represented by the % bendamustine purity) after storage of the formulations at 5°C over the course of one year.  *See id.*

60.     Contrary to Dr. Toste's assertions (Toste Report, ¶¶ 81-84), the results in Table II do not contradict these conclusions, rather they represent the impurity profile of only five selected impurities (DCE, HP1, BM1 dimer, PG-1 and PG-2) measured in the formulations.  *See* Drager at Table II; *see also* Toste Report, ¶ 82 (recognizing that Figure 2 does not specify the measured impurities) and Trout Responsive Report, ¶ 72 (recognizing that Table II shows data for the same formulations and for "every impurity measured").   This understanding is supported by the mathematical totals of the degradant impurities for the two comparative formulations in Figure 2 as greater in absolute value than the total of the measured degradant impurities for the same formulations in Table II.  Indeed, the description of Figure 2 indicates analysis of "% bendamustine purity" whereas Table II shows an "impurity profile" for five measured bendamustine degradants.  More specifically, with regard to the antioxidant-containing formulation of Niacinamide/DMA, the mathematical total of impurities represented in Table II is ~1.54% [calculated as the sum of 1.40% (DCE) + 0.08% (HP1) + 0.06% (BM1 dimer)].  This value is *less than* the total impurities of ~3% as shown for this formulation in Figure 2.    Similarly, with regard to the DMA-only formulation, the mathematical total of impurities represented in Table II is ~1.23% [calculated as the sum of 1.10% (DCE) + 0.08% (HP1) + 0.05% (BM1 dimer)].  This value is also *less than* the total impurities of ~5-6% as shown for this formulation in Figure 2.  In other words, the POSA reading Drager would understand that there are very likely other degradants that are represented in the impurity results of Figure 2, but these are not identified nor are they quantified in Table II.

A POSA would not find it difficult to draw conclusions from Drager, nor would it be contradictory or ambiguous that Drager did not fully characterize every single impurity in an exemplary formulation, but instead quantified only a few selected ones. In fact, the '483 patent does the same. For example, in Table 5 of the '483 patent, the "BDM – 50 mg/ml Lipoic acid – 5 mg/mL" formulation at 40˚C and 1M, has 0.11% HP1, 0.43% PG ester(1.10) and 0.13% PG ester(1.13) impurities. These impurities sum to $(0.11 + 0.43 + 0.13)=0.67\%$ impurities but the total impurities is listed as 1.03%. *See* '483 patent, Table 5.  And furthermore, the POSA would conclude that based on the disclosures of Figure 2 of Drager, the antioxidant-containing Niacinamide/DMA formulation achieved higher bendamustine purity (~97%) as compared to the DMA-only formulation without antioxidant (~94-95%).  As such, Drager's data are not inconsistent or unreliable, rather it demonstrates to a POSA that the use of a known antioxidant can enhance the bendamustine stability of a liquid formulation.

61.     Therefore, my opinion does not change.  Drager discloses exemplary formulations of bendamustine that include an antioxidant and that demonstrate enhanced stability when compared to the same formulations without antioxidant.  *See supra*, ¶¶ 59-60; Opening Report, ¶¶ 105, 133. As such, a POSA would be motivated to include an antioxidant in stable formulations of liquid bendamustine based on the teachings of Drager.

62.     For all of the reasons provided above in addition to those provided in my Opening Report, it remains my opinion that Drager provides clear teachings that would motivate a POSA to include a "stabilizing amount of an antioxidant" in a liquid bendamustine formulations.

### C. A POSA would have had a reasonable expectation of success in arriving at the liquid bendamustine formulations of the asserted claims

63.     As I explained in my Opening Report, Drager would have provided a POSA with a reasonable expectation of success in obtaining a stable liquid bendamustine formulation comprising PEG and a stabilizing amount of antioxidant.  *See, e.g.*, Opening Report, ¶¶ 72-77, 167-218.  Nothing in Dr. Trout's Responsive Report or Dr. Toste's Responsive Report alters my opinions.

64.     Dr. Trout and Dr. Toste contend that a POSA would not have a reasonable expectation of success in arriving at the Asserted Claims in view of Drager.  *See, e.g.*, Trout Responsive Report, ¶¶ 109-12; Toste Report, ¶¶ 115-16.  I disagree. As set out above, Drager provides sufficient motivation to a POSA to prepare a stable, liquid bendamustine composition comprising PEG and a stabilizing amount of antioxidant.  *See supra*, ¶ 56; *see also supra*, ¶¶ 41-62.  It is further my opinion that a POSA would have had a reasonable expectation of success in preparing such compositions.

65.     As discussed above, at least Drager claim 5 discloses stable liquid bendamustine compositions comprising the exact same elements of the Asserted Claims arranged in the same way.  A POSA, in view of Drager, would be immediately aware of Drager's formulations—like those disclosed in Drager claim 5 containing PEG and a stabilizing amount of antioxidant—and would have a reasonable expectation of success in arriving at the Asserted Claims because in the same compositions are expressly disclosed in Drager.[4]  Nothing that Dr. Trout or Dr. Toste put

---

[4] It is my understanding that Drager '006 patent is listed in connection with a product approved for use by the FDA and listed by Cephalon in the FDA's publication Approved Drug Products with Therapeutic Equivalents (known as the "Orange Book") as a patent under the "Patent and Exclusivity Information" for a—now discontinued—liquid formulation product of Bendamustine Hydrochloride (Treanda) Solution 45 mg/0.5ml (90 mg/ml) and for

forward regarding the alleged stability of the formulations of the Asserted Claims changes my opinion.

66.     Dr. Toste contends that a POSA would not have had a reasonable expectation of success "because of the possibility that PEG could introduce additional degradation via other pathways."  Toste Report ¶ 104.  I disagree. As discussed above, there are several motivating factors to use PEG, and those same motivations would have provided a reasonable expectation of success. First, PEG is disclosed as a hydrophilic polymer to be used in the stable liquid bendamustine formulations of Drager.  Second, PEG is taught as a pharmaceutically acceptable polar protic solvent. Furthermore, Drager also discloses a stable composition with PG (a polar protic solvent) and DMA could be achieved and teaches how to reduce potential for degradation in compositions containing polar protic solvent (*supra*, ¶ 46).  As such, a POSA would have a reasonable expectation of success using PEG in the formulations of the Asserted Claims.

67.     Dr. Trout contends that "Drager would not have given a POSA a reasonable expectation of successfully achieving the claimed stability profile."  Trout Responsive Report, ¶ 109.  I disagree.  Stability is central to the teachings of Drager as stated in the abstract "Stable liquid formulations of bendamustine."  Drager at abstract.  Drager goes on to discuss the need for liquid formulations "[i]n light of its instability in aqueous solution."  Drager at 1:22.  In its "Brief Description of the Drawings," Drager provides a number of figures of "stability analysis of

---

Bendamustine Hydrochloride (Treanda) Solution 180 mg/2ml (90 mg/ml).  *See* FDA Orange Book, Product and Exclusivity for Product 003
BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 45MG/0.5ML (90MG/ML) (available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=003&Appl_No=022249&Appl_type=N); FDA Orange Book, Product and Exclusivity for Product 004
BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 180MG/2ML (90MG/ML) (available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=004&Appl_No=022249&Appl_type=N).  This further supports my opinion that Drager would have provided a reasonable expectation of success to make the disclosed compositions, as it taught and disclosed products that were ultimately approved for use by the FDA.

bendamustine in various solvents" at temperatures of 5ºC and 25ºC.  Drager at Figs. 1, 2.  The "Detailed Description of the Invention" states "[s]table, liquid formulations of bendamustine have been discovered and are reported herein."  Drager at 3:6-7.

68.    "Stable" is defined by Drager as "no more than about a 10% loss of bendamustine under typical commercial storage conditions. Preferably, formulations of the present inventions will have no more than about a 10% loss of bendamustine, more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions."  Drager at 4:28-32.  The POSA would understand this disclosure to directly include less than 5% as recited in the Asserted Claims.

69.    Dr. Trout contends that "Drager does not disclose any specific formulation comprising about 10 mg/ mL to about 100 mg/mL bendamustine, PEG, and a stabilizing amount of antioxidant."  Trout Responsive Report, ¶ 109.  I disagree.  The same compositions as recited in the Asserted Claims are found, specifically, in at least Drager claim 5.  *See supra*, ¶ 16; *see also supra* ¶¶ 21-38.  Dr. Trout simply ignores this disclosure.

70.    To the extent that Dr. Trout and Dr. Toste contend that the stability limitation of the Asserted Claims is not expressly or inherently disclosed in Drager, I disagree.  It is further, however, my opinion that the claimed stability limitations would have been obvious in view of Drager.

71.    For example, Dr. Trout contends that "Drager does not show any data for any formulation actually meeting that limitation at 15 months and concedes that many of the disclosed formulations will not meet such a limitation."  Trout Responsive Report, ¶ 97.  I disagree.  As discussed above, Drager discloses formulations describing them as stable under typical

29

commercial storage conditions, which the POSA would understand to include (and exceed) 15 months. *See supra*, ¶¶ 33-35. This understanding of the timeframe for typical commercial storage conditions is also shared by Dr. Trout. *See* Trout Responsive Report, ¶ 83 (agreeing that commercial storage conditions can be 18 to 24 months). Moreover, Drager provides exemplary formulations that meet the required stability limitations at 15 months. *See supra*, ¶ 35.

72.     As discussed above, the 12-month stability data provided in Drager is sufficient to demonstrate stability of those same compositions at 15 months and beyond. *See supra*, ¶¶ 33-35, 71. Like Drager, the inventors of the '483 patent present stability data of twelve months and in many cases, as little as 1 month or even 1 week, to demonstrate longer term stability of 15 months and up to 2 years. *See id*. Some of these examples are identified below:

- Example 1, stability data from "48 hrs" and "7 day" … "translates to a bendamustine containing compositions … having a shelf life of at least about 15 months";[5]

- Example 2, stability data from "48 hrs" or "1 week" … "translates to bendamustine-containing compositions … expected to have a long term stability for periods beyond 15 months, i.e. up to 2 years or greater";[5]

- Example 3, stability data from "15 days" … "translates to bendamustine-containing compositions … having a shelf life of at least about 15 months":

- Example 4, stability data from … "supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years";[5]

- Example 5, stability data from "1 week, 15 days, or one month" … "translates to bendamustine-containing compositions having a shelf life of at least about 2 years";

- Example 6, stability data from "3 months" and "6-12 months" … "corresponds to bendamustine solutions being stable … well in excess of 2 years, and thus long term stable";

- Example 7, stability data from "3 months" and "6 months" … "supports the conclusion that these bendamustine solutions are stable … for about 2 years"

---

[5] These examples are conducted at a single temperature of 40°C and then draw conclusions about shelf life at 5° or 25°C.

- Example 8, stability data from "three months" … "supports the conclusion that these bendamustine solutions are stable … for at least about 2 years if not longer"

'483 patent at 6:31–13:20.

73.     A POSA would further understand that demonstrated stability over a shorter time period is sufficient to demonstrate stability over a longer time period. For at least these reasons, Drager would provide a POSA with a reasonable expectation of success[6] in achieving stable liquid bendamustine compositions having the recited stability for at least 15 months.

### D.  Claims 2-9 and 11-16 are Obvious over Drager

74.     As explained in my Opening Report, Asserted Claims 2-9 and 11-16 are obvious over Drager. Opening Report, ¶¶ 198-218. It remains my opinion that none of these claims impart any patentable subject matter and are therefore also obvious over Drager for the same reasons discussed above with respect to claim 1, and as set forth in my Opening Report. Dr. Trout and Dr. Toste focus their opinions on the "Asserted Claims," generally, and fail to identify or address any specific limitation in Asserted Claims 2-9 and 11-16 that would change the obviousness analysis set forth above or in my Opening Report. I reserve the right to offer additional opinions regarding the specific limitations of Asserted Claims 2-9 and 11-16.

### E.  Secondary considerations are insufficient to overcome the strong case of obviousness

75.     Dr. Toste and Dr. Trout contend that certain "secondary considerations" establish the Asserted Claims are not obvious in view of Drager.  *See* Toste Report ¶¶ 117-120 (surprising results); Trout Responsive Report ¶ 113 (nexus), ¶¶ 114-117 (unexpected results), ¶¶ 118-121

---

[6] Dr. Toste's assertion that there is no "reasonable expectation of success in using an antioxidant to address alleged acid catalyzed bendamustine esterification" (¶ 116) is nothing more than a red herring.  Simply put, the Asserted Claims do not require, nor does the specification reference, the use of antioxidant for addressing specific degradation products of bendamustine. To allege such restraints on the obviousness inquiry reads limitations into the analysis that are not included in the Asserted Claims.

(long-felt need), ¶¶ 122-124 (failure of others), ¶ 125 (teaching away).  For the reasons stated below, the factual basis for each of these assertions is insufficient to show that the alleged secondary indicia actually exists.  Accordingly, it remains my opinion that the Asserted Claims are obvious.

76.     It is my understanding that in order for the Court to give substantial weight to evidence of objective indicia of nonobviousness, the evidence must have a "nexus" to the claimed invention.  Dr. Trout contends that a nexus exists because the Asserted Claims include commercial embodiments such as Belrapzo® and Bendeka®.  Trout Responsive Report, ¶ 113.  I understand that Dr. Michael Brandt has offered an opinion in this case that neither Belrapzo nor Bendeka are embodiments of the Asserted Claims.  *See* Brandt Rebuttal Report, ¶¶ 174-175.  I rely upon Dr. Brandt's opinions and for those reasons find that no nexus exists between the Asserted Claims and Eagle's bendamustine liquid formulation products.

77.     With regard to alleged unexpected results, Dr. Trout opines that the use of PEG with antioxidant resulted in unexpected stability as compared to PEG alone.  *See* Trout Responsive Report, ¶ 114.  As discussed in my Opening Report and above (*see supra*, ¶ 52), the POSA was well aware that the use of an antioxidant with PEG would reduce degradation due to peroxyacid formation and thereby increase stability.  This alone eliminates any alleged surprise or unexpected result.  Dr. Trout's assertion that this is unexpected because the POSA did not know bendamustine was susceptible to oxidative degradation is irrelevant because the claims are not bound by any particular mechanism of reducing stability.  A POSA would know that less oxidative reactivity would occur with the use of an antioxidant and PEG, thereby increasing stability.  Dr. Trout does not quantify or calculate any projected stability difference that would be expected given the POSA's knowledge of these excipients.  Dr. Trout simply calls the results unexpected based on

his view that oxidative degradation of bendamustine was unknown.  Moreover, I understand that any unexpected results must be compared to the closest prior art compositions.  As discussed herein, Drager discloses the same compositions as the Asserted Claims, and thus, would achieve the same results relied upon by Dr. Trout.  For these same reasons I also disagree with Dr. Toste's assertion of surprising results.  Toste Report, ¶¶ 117-120.  Accordingly, it is my opinion that this evidence is insufficient to rise to the level required for unexpected or surprising results.

78.      With regard to long-felt need, I understand that the objective evidence must show that an art-recognized problem existed for a long period of time without solution.  I do not agree that Dr. Trout's cursory opinion establishes such a scenario with regard to liquid bendamustine formulations.   In particular, Dr. Trout essentially asserts that because there were no other "commercially viable" liquid bendamustine formulations available on the market that did not require lyophilization, there was allegedly a long-felt, unmet need.  This is not only inadequate as I understand the objective indicia under this test to require, but it is inaccurate.  In particular, the disclosures of Drager alone show that stable liquid bendamustine formulations were readily achieved.  As discussed in my Opening Report and herein, neither Dr. Trout nor Dr. Toste disagree that the formulations disclosed by Drager are indeed stable liquid bendamustine formulations.  The claims do not recite any "commercially viable" limitation, nor is that term readily defined in the specification or by Dr. Trout.  As conceded by Dr. Trout, any alleged "long-felt need" was expressly recognized by Drager.  *See* Trout Responsive Report, ¶ 44.  As set forth above, this need was satisfied by Drager's disclosure of stable liquid bendamustine formulations.  *See, e.g.*, *supra*, n.4.  For all these reasons, I disagree with Dr. Trout's opinion that there was a long-felt met by the formulations of the Asserted Claims.

79.     With regard to failure of others, Dr. Trout again refers to a "commercially viable formulation" as the goal to achieve.  However, in that same assertion, he explicitly recognizes that another company—Cephalon—did in fact achieve that goal.  Trout Responsive Report, ¶ 124.  He devotes a single sentence to attempt to dismiss the power of that fact by simply stating that the product "was later discontinued".  A discontinued product does not connote any "failure" as Dr. Trout contends.  Rather, it suggests that the teachings of Drager were sufficient to achieve a successful result—earning FDA approval of a stable liquid bendamustine formulation.   As such, I disagree with Dr. Trout's opinion regarding failure of others as it relies on insufficient evidence.

80.     Finally, with regard to teaching away, as I understand a reference in the prior art may be found to teach away if it criticizes an element of the invention.  Dr. Trout provides a single paragraph referring to his characterization of Drager and its disclosures of PEG.  Trout Responsive Report, ¶ 125.  Dr. Trout contends that "Drager teaches away from the use of PEG, using PG instead to the extent any exemplary formulations use a protic solvent at all." *Id.*  I disagree that Drager teaches away from PEG.  Drager contains no language that in any way diminishes or reduces the value of PEG as an option for hydrophilic polymer or polar protic solvent in the Asserted Claims.  Indeed, it does the very opposite—it expressly includes PEG as a suitable solvent and/or hydrophilic polymer that can be used in formulating stable, liquid bendamustine compositions.  Moreover, as discussed above, Drager specifically addresses how polar protic solvents, like PEG, can be used to avoid any potential drawbacks. *See supra*, ¶ 46.  Accordingly, it is my opinion that Drager would not "teach away" from the use of PEG as Dr. Trout contends.

## VII.  CLAIMS 1-9 AND 11-16 ARE INVALID AS INDEFINITE UNDER 35 U.S.C. § 112

81.     I understand that Dr. Elder and Dr. Sewell have provided a response to my opinion that Claims 1-9 and 11-16 of the '483 patent are indefinite. I have reviewed each of their reports. Nothing contained in those reports change my opinions on indefiniteness.

82.     It is my opinion that the phrase "able to be dispensed with minimal if any effort or preparation" is highly subjective and, on its face, provides little guidance to one of skill in the art. Whether a formulation can be dispensed with "minimal if any effort" depends on the preferences of the particular individual charged with the dispensing that product and the circumstances under which the product is dispensed. It is my understanding that if a term of degree (*e.g.*, "minimal if any") depends on the unpredictable vagaries of any one person's opinion, that term fails to provide sufficient notice of its scope when that scope.

83.     Neither Dr. Sewell nor Dr. Elder point to any objective boundaries (*e.g.*, time to dispense) in the patent specification or its associated file history that define the limits of "minimal if any," or "ready to use." None of the examples describe the compositions therein as "ready to use" or otherwise describe the level of effort necessary to use them.

84.     At most, Dr. Sewell and Dr. Elder appear to suggest that a POSA would readily understand the scope of "ready to use" with reasonable certainty because the claimed compositions do "not require additional reconstitution." Elder Responsive Report ¶ 9; *see also* Sewell Responsive Report ¶ 11. I disagree. As an initial matter, the proposed construction of "ready to use" adopted by the parties makes no reference to "reconstitution" or "lyophilized" products. Thus, there is nothing in the plain language of the construction that would allow a POSA to exclude from its scope solutions that "do not require additional reconstitution" as Dr. Elder and Dr. Sewell contend. Indeed, the '483 patent suggests that such compositions are "ready for use." For example,

the '483 patent describes an embodiment comprising "kits containing lyophilized bendamustine" and a "fluid . . . [that] allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use." '483 patent at 6:10-26.   This characterization directly contradicts the not only the opinions of Dr. Elder and Dr. Sewell, but also the statement made by Applicants during prosecution to the same effect. *See* May 20, 2021 Response to Office Action at 5.

85.     In view of the lack of a relationship between the phrase "ready to use" and "reconstitution" it is my opinion that the '483 patent and its file history fails to provide the clarity that the subjective phrase "minimal if any effort or preparation" needs.

86.     Accordingly, without the ability to provide reasonable certainty on the scope of the claims, it remains my opinion that they are invalid as indefinite.

Date: July 22, 2022

_____

Laird Forrest, Ph.D.

## EXHIBIT 1 – MATERIALS CONSIDERED

**Documents considered include the following materials, listed below. To the extent not listed below, documents considered include all documents cited in my Reply Report,**

| DOCUMENT |
| --- |
| Expert Report of Laird Forrest, Ph.D., Regarding U.S. Patent No. 11,103,483, and all exhibits and materials cited referenced therein ("Opening Report"). |
| Expert Report of F. Dean Toste, Ph.D., and all exhibits and materials cited referenced therein ("Toste Report"). |
| Responsive Expert Report of Edmund J. Elder, Ph.D., and all exhibits and materials cited referenced therein ("Elder Responsive Report"). |
| Responsive Expert Report of Graham James Sewell, Ph.D., and all exhibits and materials cited referenced therein ("Sewell Responsive Report"). |
| Responsive Expert Report of Bernhardt Trout, Ph.D., and all exhibits and materials cited referenced therein ("Trout Responsive Report"). |
| Rebuttal Expert Report of Dr. Michael L. Brandt, B.S., PharmD, FASHP, and all exhibits and materials cited referenced therein ("Brandt Rebuttal Report"). |
| FDA Orange Book, Product and Exclusivity for Product 003 BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 45MG/0.5ML (90MG/ML) (available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=003&Appl_No=022249&Appl_type=N). |
| FDA Orange Book, Product and Exclusivity for Product 004 BENDAMUSTINE HYDROCHLORIDE (TREANDA) SOLUTION 180MG/2ML (90MG/ML) (available at: https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=004&Appl_No=022249&Appl_type=N). |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

    Plaintiff,

    v.

SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,

    Defendants.

C.A. No. 21-1256-CFC-JLH

**CONFIDENTIAL – FILED UNDER SEAL**

# DEFENDANTS' OPPOSITION TO EAGLE'S MOTION *IN LIMINE* # 2

Eagle seeks to bar Defendants' expert from offering invalidity opinions on the dependent claims of the '483 patent beyond those disclosed in his expert reports.  At trial, Defendants' expert, Dr. Laird Forrest, intends to offer opinions on the invalidity of Claims 1-9 and 11-16 of the '483 patent (the "Asserted Claims"). The entirety of his opinions are set out in detail across two expert reports. *See* Ex. A; Ex. C. Despite cross-examining Dr. Forrest on these opinions, and offering three rebuttal reports from its own experts in response thereto, Eagle fails to identify any specific opinion from Dr. Forrest that it seeks to exclude at trial. Rather, Eagle's motion is merely a pretext to bar Dr. Forrest from offering invalidity opinions on any dependent claim of the '483 patent and should be denied.

Eagle contends "the totality of Dr. Forrest's invalidity opinions for certain of the dependent claims was to state that his analysis for independent claim 1 applied equally to the dependent claims," and that he "failed to offer any specific analysis of the unique aspects of the dependent claims." *See* Motion, at 2. This is patently false. Dr. Forrest directly addressed the invalidity of each dependent claim in his reports, noting the large areas of overlap with Claim 1. *See e.g.,* Ex. A, ¶¶ 118-147 and 167-197 (claim 1); 148-166 and 199-218 (dependent claims); Ex. C, ¶¶ 13-39, 40-74. Any negligible differences between Claim 1 and the dependent claims (*e.g.*, selecting temperature endpoints from claimed ranges, selecting concentration

1

within ranges, specifying types of antioxidants, *etc.*), were expressly addressed by Dr. Forrest. *See id.* Eagle ignores the redundancies in its claims, despite its own expert concessions regarding the same. *See e.g.,* Ex. B, 76, fn. 2 (conceding dependent claims recite endpoint temperatures of claim 1).

That many of Dr. Forrest's opinions on invalidity are focused on "Claim 1" is of no moment. Dr. Forrest incorporated those opinions into his analysis of the dependent claims – all of which depend directly or indirectly from Claim 1.  It necessarily follows that Dr. Forrest's opinions regarding Claim 1 provide factual evidence directly relevant to the invalidity of the dependent claims, particularly those claims that include limitations similar to Claim 1 (*e.g.*, "from about 5°C to about 25°C" (claim 1) vs. "about 5°C" (claim 3) or "about 25°C" (claim 4). *See*, *e.g.*, *Rockwell Automation, Inc. v. WAGO Corp.*, No. 10-CV-718-WMC, 2013 WL 12234523, at *2 (W.D. Wis. June 18, 2013) (citation omitted) (finding expert testimony regarding independent claims leaves "an open question to be addressed as a matter of fact by the jury" as to whether that same fact invalidates dependent claims).

In the absence of identifying any offending testimony from Dr. Forrest, Defendants should have the opportunity to prepare and present their invalidity case

on all Asserted Claims.[1] If Eagle believes Dr. Forrest's testimony at trial exceeds the scope of his reports, its counsel is free to lodge an objection and the Court will issue a ruling. Indeed, the cases cited by Eagle support such a framework. In *Liqwd Inc. v. L'oreal USA Inc.*, the court stated it "will *allow defendants to develop the record at trial*, and the plaintiffs may object to any evidence or testimony that exceeds the scope, and the Court will rule on the specifics *at that time*." No. 17-14, 2019 WL 10252611, at *2 (D. Del. June 25, 2019) (emphasis added).[2]

Eagle's attempt to prevent Dr. Forrest from testifying at trial should be rejected, as it seeks to bar admissible and relevant evidence. Dr. Forrest's opinions address the invalidity of each of the Asserted Claims, highlighting the lack of meaningful distinctions across these claims. The motion should be denied.

---

[1] In view of the redundancies amongst the claims of the '483 patent, Defendants have attempted to achieve efficiencies in the issues to be tried by repeatedly urging Eagle to reduce the number of asserted claims. While the parties' negotiations are ongoing, no agreement has been reached.

[2] *See also Stored Value Solutions, Inc. v. Card Activation Techs., Inc.,* No. 09-495, 2010 WL 3834457, at *2 n.1 (D.Del. Sep 27, 2010) (denying motion to strike rebuttal expert report because "the Court will, as it must, limit the expert testimony at trial to that disclosed in the expert reports) (emphasis added).

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

              Plaintiff,

        v.

SLAYBACK PHARMA LLC,
APOTEX INC., and APOTEX CORP.,

             Defendants.

C.A. No. 21-1256-CFC-JLH

**<u>CONFIDENTIAL –
FILED UNDER SEAL</u>**

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION *IN LIMINE* # 2

ME1 42230064v.1

Defendants argue that because Eagle "fails to identify any specific opinion from Dr. Forrest that it seeks to exclude," Eagle's Motion should be denied.[1] Opp. at 1, 3. That is not the law. Defendants do not—and cannot—dispute that an expert may not offer opinions beyond those disclosed in his expert reports. Instead, Defendants attempt to skirt this black letter law by arguing that Eagle may "lodge an objection" at trial regarding Dr. Forrest's testimony. *Id*. at 3. But Defendants ignore that the case it relies on for this proposition *granted* the moving party's motion *in limine*. *Liqwd, Inc. v. L'Oréal USA, Inc*., C.A. No. CV 17-14-JFB-SRF, 2019 WL 10252611, at \*2 (D. Del. June 25, 2019). And Defendants' other cited authorities did not involve any pre-trial disputes, let alone motions *in limine*.[2] *Rockwell Automation, Inc. v. WAGO Corp*., No. 10-CV-718-WMC, 2013 WL 12234523, at \*2 (W.D. Wis. June 18, 2013) (deciding motion to strike expert report in context of plaintiff's bad faith failure to disclose prior art); *Stored Value Sols., Inc. v. Card Activation Techs., Inc*., C.A. No. 09-495-LPS, 2010 WL 3834457, at \*3 (D. Del. Sept. 27, 2010) (deciding motion to strike expert report scheduling order was silent on). For the reasons set forth, the Court should grant Eagle's Motion.

---

[1] Defendants also argue that Dr. Forrest's invalidity opinions on the dependent claims of the '483 patent are adequately addressed in his expert reports. Eagle disagrees for the reasons already set forth in its Motion. Mot. at 1-2.

[2] Defendants appear to confuse Eagle's Motion with a motion to strike. For the sake of clarity, Eagle is not moving to "prevent Dr. Forrest from testifying at trial" on the dependent claims; Eagle is moving to *limit* the scope of his trial testimony.

1

McCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Attorneys for Plaintiff Eagle Pharmaceuticals, Inc.*

Dated:  September 8, 2022

2