# EXHIBIT 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**CONFIDENTIAL – FILED UNDER SEAL** |

## DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE ON CLAIM CONSTRUCTION

In February 2022, the parties stipulated to an agreed-upon construction for the term "ready to use," which was adopted by the Court. D.I. 42. The stipulated construction came directly from the prosecution history of the '483 patent. In order to overcome a series of rejections in view of known prior art liquid bendamustine compositions, the Examiner suggested amending the claims to recite "for administration." Eagle declined that suggestion, opting instead to insert "ready to use." The Examiner initially concluded that "ready to use" was indefinite because "there are two ways of interpreting" that phrase, including "ready to be administered without any further dilution/preparation" and "ready for further dilution." That ambiguity was resolved by the Examiner when he subsequently found a dictionary definition of "ready to use" that defined the term as "able to be dispensed with minimal if any effort or preparation; prepackaged." Eagle accepted this definition and the Examiner allowed the claims.

Now, unhappy with the way the facts are playing out, Eagle is attempting through expert testimony to alter the stipulated construction (which was offered to and accepted by Eagle during prosecution) to the point where it has effectively become a new and different construction that defendants would have opposed had Eagle properly advanced it. Specifically, Eagle's experts have opined that "ready to use" encompasses both products that are ready to administer as well as products that require further dilution before they can be administered. This is precisely the

result the Examiner sought to avoid when he adopted the stipulated construction (without challenge or clarification from Eagle) during prosecution. The Court should not allow Eagle to upend the record through expert testimony.

Less than four months after stipulating to the construction of "ready to use" suggested by the Examiner, Eagle served the Opening Expert Report of Graham James Sewell, Ph.D. At paragraph 86, Dr. Sewell argues as follows, with the actual claim construction italicized and Eagle's spin in bold face:

> "In my experience, based on my experiences and expertise, an oncology pharmacist…would consider [Apotex's and Slayback's] concentrated liquid bendamustine formulations as *able to be dispensed with minimal if any effort or preparation*, **especially as compared to the lyophilized bendamustine products previously on the market."**

Ex. B at ¶ 86.[1]  *See also* Ex. C (Elder Tr.) at 17:21-18:16, 19:9-24, 20:16-24, 25:2-19, 31:3-20, 32:6-13, 84:15-85:9; Ex. D (Sewell Tr.) at 81:2-15.

The phrase "minimal if any" means constituting a minimum; the term "minimum" means the least quantity or amount possible, not merely "less than" other products that may require more effort and preparation. This is why the Examiner distinguished between "ready to use" products requiring essentially no preparation before administration and "ready to dilute" products requiring additional preparation.

---

[1] "Ex. _" refers to exhibits to the Declaration of Christopher B. Ferenc in Support of Defendants' Motion *in Limine* No. 1 to Exclude Evidence on Claim Construction.

Eagle's failure to raise such arguments during the claim construction phase results in waiver. *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 641 (Fed. Cir. 2011) ("[T]he district court did not abuse its discretion in holding that Bunzl could not add new claim construction theories on the eve of trial."); accord *Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347 (Fed. Cir. 2007). Moreover, Eagle cannot seek to introduce expert testimony that fails to follow the Court's adopted construction. *See, e.g.*, *Quest Worldwide, LLC v. Liown Elecs. Co., Ltd.*, No. 14-561, 2017 U.S. Dist. LEXIS 7200, at *3 (D. Del. Jan. 19, 2017). Allowing the "altered" construction advanced by Eagle would also sanction its experts to violate the maxim of any infringement analysis, which prohibits comparing the accused products to the prior art. *See*, *e.g.*, *Contentguard Holdings, Inc. v. Google, Inc.*, No. 2:14-CV-61-JRG, 2016 WL 3655603, at *5 (E.D. Tex. July 8, 2016), *aff'd*, 701 F. App'x 963 (Fed. Cir. 2017) (instructing jury to "never to compare the accused products to the prior art" when answering the question of infringement).

Accordingly, the Court should prohibit Eagle and its experts from introducing argument and evidence at trial seeking to alter the stipulated construction of "ready to use" to include a comparison to prior art lyophilized products.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff, | |
| v. | C.A. No. 21-1256-CFC-JLH |
| SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP., | **CONFIDENTIAL – FILED UNDER SEAL** |
| Defendants. | |

## DECLARATION OF CHRISTOPHER B. FERENC IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE ON CLAIM CONSTRUCTION

I, Christopher B. Ferenc, declare as follows:

1.  I am a member in good standing of the bars of District of Columbia, New Jersey, and Virginia. I am also a partner at the law firm Katten Muchin Rosenman LLP, counsel for Defendants Apotex Inc. and Apotex Corp. in the above-captioned matter.  As such, I have personal knowledge of the facts set forth herein.

2.  This Declaration is submitted in support of Defendants' Motion *in Limine* No. 1 to Exclude Evidence on Claim Construction.

3.  Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the prosecution history of U.S. Patent No. 11,103,483.

4.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts of the Opening Expert Report of Graham James Sewell, Ph.D., dated June 2, 2022, which has been marked Highly Confidential under the Protective Order in this case.

5.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts of the deposition transcript of Edmund J. Elder, Jr., Ph.D., dated August 11, 2022, which has been marked Highly Confidential under the Protective Order in this case.

6.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts of the deposition transcript of Dr. Graham Sewell, dated August 17, 2022, which has been marked Highly Confidential under the Protective Order in this case.

I declare under penalty of perjury that the foregoing statements made by me are true and correct to the best of my knowledge and belief.


Dated: August 29, 2022

_s/ Christopher B. Ferenc_
Christopher B. Ferenc

# EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311        7590        03/16/2021
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/16/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | Applicant(s) Palepu et al. | | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney | |
| Michael Mercanti | Attorney of Record | |

**Date of Interview:** 11 March 2021

**Issues Discussed:**

**35 U.S.C. 103**

Applicant sent a detailed agenda. The reference of Brittain US 20060159713 was discussed in detail with focus on Brittain teaching two different compositions: one for making a lyophilized cake and the other for administration and where the artisan would not add PEG to be lyophilized. Applicant also noted litigation of related patent where the question of PEG and antioxidants was thoroughly hashed with the judge holding the patent valid which the instant Examiner had issued. Applicant asked if it would be helpful to have all or parts of that decision on record here. The Examiner thought that such evidence would carry strong weight and would be considered thoughtfully. The Examiner suggested filing any claim amendments, evidence and arguments in the AFCP2.0 program for the Examiner to consider.

**Proposed Amendment(s)**

The Examiner suggested amending the claim preamble to a "for administration" to differentiate the composition from other compositions which are not for administration.

**Non-statutory Double Patenting**

The Examiner asked if allowable subject matter could be determined after FINAL would terminal disclaimers be filed in order to let the application issue. Applicant's thought that would be no problem.

**Other**

The Examiner suggested the AFCP2.0 program for consideration of their response.

| | /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**

Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

| *Applicant-Initiated Interview Summary* | Application No.<br>16/509,920 | | Applicant(s)<br>Palepu et al. | |
|---|---|---|---|---|
| | Examiner<br>ERNST V ARNOLD | Art Unit<br>1613 | AIA (First Inventor to File) Status<br>No | Page<br>2 of 2 |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

DOCKET NO.:  820-1041-US-CON7

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Examiner:  Ernst V. Arnold   Art Unit:  1613

Re:   Application of:            Nagesh R. Palepu

Serial No.:                16/509,920

Filed:                   July 12, 2019

For:                    **FORMULATIONS OF BENDAMUSTINE**

Confirmation No.:          7527

## AMENDMENT

Mail Stop Amendment                                May 20, 2021
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sirs:

In response to the Final Office Action of December 21, 2020, please amend the above-identified patent application as follows:

**Amendments to the Claims** begin on page **2** of this paper.

**Remarks/Arguments** begin on page **5** of this paper.

CERTIFICATE OF ELECTRONIC TRANSMISSION
I hereby certify that this document is being electronically
transmitted to the Commissioner for Patents via EFS-
Web on May 20, 2021.

LUCAS & MERCANTI, LLP

BY: /Carla Curado /
     Carla Curado

{00592392 }

DOCKET NO.: 820-1041-US-CON7

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1. (Currently Amended) A <u>ready to use </u>liquid bendamustine-containing composition comprising

   bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;

   polyethylene glycol; and

   a stabilizing amount of an antioxidant;

   the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.

2. (Currently Amended) The <u>ready to use </u>liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

3. (Currently Amended) The <u>ready to use </u>liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

4. Currently Amended)   The <u>ready to use </u>liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

{00592392 }

DOCKET NO.:  820-1041-US-CON7

5. (Currently Amended)  The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

6. (Currently Amended)  The ready to use liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

7. (Currently Amended)  The ready to use liquid bendamustine-containing composition of claim 1, comprising bendamustine hydrochloride.

8. (Currently Amended)  A method of treating cancer in a mammal, comprising administering an effective amount of the ready to use liquid bendamustine-containing composition of claim 1 to the mammal.

9. (Original)     The method of claim 8, wherein the cancer is leukemia.

10. (Original)     The method of claim 8, wherein the cancer is Hodgkin's disease.

11. (Original)     The method of claim 8, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

12. (Currently Amended)  The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

13. (Currently Amended)  The method of claim 8, wherein the ready to use liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

DOCKET NO.: 820-1041-US-CON7

14. (Currently Amended) The method of claim 8, wherein the bendamustine concentration <u>in the ready to use liquid bendamustine-containing composition</u> is from about 20 mg/mL to about 60 mg/mL.

15. (Currently Amended) The method of claim 8, wherein the bendamustine concentration <u>in the ready to use liquid bendamustine-containing composition</u> is about 25 mg/mL.

16. (Currently Amended) The method of claim 8, wherein the <u>ready to use</u> liquid bendamustine-containing composition comprises bendamustine hydrochloride.

{00592392 }

DOCKET NO.: 820-1041-US-CON7

## REMARKS

A Certification and Request for Consideration Under the After Final Consideration Pilot Program 2.0 accompanies this response.

The undersigned thanks Examiner Arnold for the courtesy of the telephonic interview conducted on March 11, 2021, with the undersigned and Stephanie Lodise (Reg. No. 51,430). The pending claims and Brittain[1] were discussed, as well as District of Delaware Civil Action No. 17-1154-CFC regarding U.S. Patent Nos. 9,265,831 and 9,572,797.[2]  Examiner Arnold suggested that amending the claims to recite that the liquid bendamustine-containing compositions are "ready to use" would distinguish the claimed compositions over Brittain's compositions.  This response and AFCP are filed in response to that interview.

Claims 1-16 are pending.  The claims have been amended to recite that the compositions are "ready to use."  The amendments are supported by the specification at, for example, pages 2 and 9.  No new matter has been added.

**Brief Description of the Claimed Inventions**

The pending claims are directed to, among other things, "ready to use," liquid bendamustine-containing compositions having from about 10 mg/mL to about 100 mg/mL of bendamustine, polyethylene glycol, and an antioxidant.  The claimed compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent.  (*See, e.g.,* Specification at page 2). This avoids the multi-step reconstitution and preparation for administration required for the Brittain products, including TREANDA®.  These ready to use, liquid compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

---

[1] U.S. Published Application No. 2006/0159713
[2] A copy of the District Court's decision is attached hereto as Exhibit A.  U.S. Patent Nos. 9,265,831 and 9,572,797 are parents of the present application.

{00592392 }

DOCKET NO.:  820-1041-US-CON7

**35 U.S.C. § 103**

The Examiner alleges that claims 1-16 would have been obvious over Brittain,[3] Treanda,[4] Von Stetten,[5] and Miekka.[6]  At the time of the invention, one of ordinary skill in the art would not have been motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed.  Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art.  Applicant requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Ready to Use, Bendamustine-Containing Liquid Having a Concentration of 10 mg/ml to about 100 mg/mL**

Brittain in combination with Treanda fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 10 mg/mL to about 100 mg/mL, or any amount within that range.

The Prescribing Information for Treanda instructs that lyophilized bendamustine should be reconstituted with water to a concentration of no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient administration:

**2.3  Reconstitution/Preparation for Intravenous Administration**
Aseptically reconstitute each TREANDA vial as follows:
o   25 mg TREANDA vial: Add 5 mL of only Sterile Water for Injection, USP.
o   100 mg TREANDA vial: Add 20 mL of only Sterile Water for Injection, USP.

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline).  As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution. After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution.

-----------------------------------------------------

[3] U.S. Published Application No. 2006/0159713
[4] TREANDA, Highlights of prescribing information, 2008
[5] U.S. 4,711,906.  Von Stetten is cited merely for a disclosure of diclofenac in PEG and propylene glycol.  (Action at 8).  Diclofenac and bendamustine are chemically distinct compounds and there is no evidence of record that those of ordinary skill in the art would have considered a diclofenac formulation to be informative in preparing a storage-stable liquid bendamustine composition.
[6] U.S. 7,252,799.  Miekka is merely cited for its purported disclosure that lipoic acid, methionine, cysteine, thiols, propyl gallate, dihydrolipoic acid, BHA, BHT, and sodium formaldehyde sulfoxylate are antioxidant stabilizers.

{00592392 }

DOCKET NO.: 820-1041-US-CON7

(Treanda at Section 2.3; *see also,* Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted with, *e.g.,* saline)). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda.

While Treanda refers to a "concentrated solution of bendamustine which is subsequently further diluted for administration" (Action at 5), it is clear that Treanda refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed. Treanda then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.,* 10 mg/mL to 100 mg/mL. Nor would they have had any expectation that those more concentrated liquids would have had the claimed stability characteristics. The rejection should be withdrawn for at least these reasons.

**Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition**

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition. In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[7,8] Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation. The claims are patentable for at least these reasons.

***Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition***

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant. (Action at 6). Brittain provides no such disclosure. None of Brittain's exemplified compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner

---

[7] *See, e.g.,* Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report"). A redacted version of the entirety of the Siepmann Report is attached hereto as Exhibit C.

[8] *See also,* Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 6). This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply. The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the art that an antioxidant should be included in a ready to use bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

***The art does not teach that bendamustine can degrade via an oxidative mechanism***

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[9] Studies and Results, Scheme; U.S. 8,344,066 (Drager)[10] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[9] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.

[10] Drager is of record in this application.

DOCKET NO.:  820-1041-US-CON7



(Brittain at paragraph [0027]; Drager at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds.  Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; Drager at col. 5, lines 13-44).

DOCKET NO.:  820-1041-US-CON7

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product."  (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record))  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[11]  The claims are non-obvious for at least this reason.

***Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations***

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant.  Instead, industry guidance encouraged addressing oxidation by ***other*** means.  For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen."  (Broadhead at 334)[12].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[13] industry guidance discouraged adding antioxidants and recommended other means for preventing

---

[11] Noteworthy is that the TREANDA lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda at Section 11).

[12]

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[13] As discussed *supra*, Applicant does not concede this point.

DOCKET NO.:  820-1041-US-CON7

oxidation.[14]  Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be withdrawn for at least this reason.

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
|  | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
|  | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶ 359, 469-71)

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products.  As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is

---

[14] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

DOCKET NO.: 820-1041-US-CON7

particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway.  The claims are patentable for at least this reason.

**Obviousness-type double patenting**

The Examiner alleges that claim 1-16 are not patentable on the ground of nonstatutory double patenting over:

claims 1-6 of U.S. 9,265,831;

claims 1-27 of U.S. 9,572,797;

claims 1-26 of U.S. 9,572,796;

claims 1-22 of U.S. 8,609,707;

claims 1-23 of U.S. 9,579,384;

claims 1-24 of U.S. 9,034,908;

claims 1-17 of U.S. 9,597,399;

claims 1-23 of U.S. 9,144,568;

claims 1-29 of U.S. 9,572,887;

claims 1-7 of U.S. 9,597,397; and

claims 1-26 of U.S. 10,010,533.

Applicant will consider filing terminal disclaimers once otherwise allowable subject matter has been acknowledged.

\* \* \*

Claims 1-16 are non-obvious over the combination of cited art.  An early notice to that effect is earnestly solicited.

**Fees**

This response is being filed with a two-month extension of time and the requisite fee.  No further fees are believed to be due.  If, on the other hand, it is determined that any further fees are due or any overpayment has been made, the Assistant Commissioner is hereby authorized to debit or credit such sum to Deposit Account No. 02-2275.

Pursuant to 37 C.F.R. 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as

{00592392 }

DOCKET NO.:  820-1041-US-CON7

incorporating a petition for extension of time for the appropriate length of time.  The fee associated therewith is to be charged to Deposit Account No. 02-2275.

**Conclusion**

In view of the amendments and remarks contained above, it is respectfully submitted that each of the matters raised by the Examiner has been addressed by the present amendment and that the present application is now in condition for allowance.

If for any reason the present application is not deemed in condition for allowance, the Examiner is respectfully requested to contact the undersigned attorney.

Respectfully submitted,

LUCAS & MERCANTI, LLP

By:    /Michael N. Mercanti/
       Michael N. Mercanti
       Registration No. 33,966

LUCAS & MERCANTI, LLP
30 Broad Street, 21st Floor
New York, New York 10004
Phone: 212-661-8000

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311          7590          06/02/2021
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 06/02/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

| | Application No. 16/509,920 | Applicant(s) Palepu et al. |
|---|---|---|
| ***Advisory Action*** *Before the Filing of an Appeal Brief* | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

THE REPLY FILED <u>20 May 2021</u> FAILS TO PLACE THIS APPLICATION IN CONDITION FOR ALLOWANCE.

<u>NO NOTICE OF APPEAL FILED</u>

1. ☑ The reply was filed after a final rejection. No Notice of Appeal has been filed. To avoid abandonment of this application, applicant must timely file one of the following replies: (1) an amendment, affidavit, or other evidence, which places the application in condition for allowance; (2) a Notice of Appeal (with appeal fee) in compliance with 37 CFR 41.31; or (3) a Request for Continued Examination (RCE) in compliance with 37 CFR 1.114 if this is a utility or plant application. Note that RCEs are not permitted in design applications. The reply must be filed within one of the following time periods:

   a) ☑ The period for reply expires <u>5</u> months from the mailing date of the final rejection.

   b) ☐ The period for reply expires on: (1) the mailing date of this Advisory Action; or (2) the date set forth in the final rejection, whichever is later. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of the final rejection.

   c) ☐ A prior Advisory Action was mailed more than 3 months after the mailing date of the final rejection in response to a first after-final reply filed within 2 months of the mailing date of the final rejection.The current period for reply expires _____ months from the mailing date of *the prior Advisory Action* or SIX MONTHS from the mailing date of the final rejection, whichever is earlier.

      *Examiner Note:* If box 1 is checked, check either box (a), (b) or (c). ONLY CHECK BOX (b) WHEN THIS ADVISORY ACTION IS THE <u>FIRST</u> RESPONSE TO APPLICANTS <u>FIRST</u> AFTER-FINAL REPLY WHICH WAS FILED WITHIN TWO MONTHS OF THE FINAL REJECTION. ONLY CHECK BOX (c) IN THE LIMITED SITUATION SET FORTH UNDER BOX (c). See MPEP 706.07(f).

Extensions of time may be obtained under 37 CFR 1.136(a). The date on which the petition under 37 CFR 1.136(a) and the appropriate extension fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The appropriate extension fee under 37 CFR 1.17(a) is calculated from: (1) the expiration date of the shortened statutory period for reply originally set in the final Office action; or (2) as set forth in (b) or (c) above, if checked. Any reply received by the Office later than three months after the mailing date of the final rejection, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

<u>NOTICE OF APPEAL</u>

2. ☐ The Notice of Appeal was filed on _____. A brief in compliance with 37 CFR 41.37 must be filed within two months of the date of filing the Notice of Appeal (37 CFR 41.37(a)), or any extension thereof (37 CFR 41.37(e)), to avoid dismissal of the appeal. Since a Notice of Appeal has been filed, any reply must be filed within the time period set forth in 37CFR 41.37(a).

<u>AMENDMENTS</u>

3. ☑ The proposed amendments filed after a final rejection, but prior to the date of filing a brief, will <u>not</u> be entered because

   a) ☑ They raise new issues that would require further consideration and/or search (see NOTE below);

   b) ☐ They raise the issue of new matter (see NOTE below);

   c) ☑ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal; and/or

   d) ☐ They present additional claims without canceling a corresponding number of finally rejected claims.
      NOTE: See <u>Continuation Sheet</u> (See 37CFR 1.116 and 41.33(a)).

4. ☐ The amendments are not in compliance with 37CFR 1.121. See attached Notice of Non-Compliant Amendment (PTOL-324).

5. ☐ Applicants reply has overcome the following rejection(s): _____.

6. ☐ Newly proposed or amended claim(s) _____ would be allowable if submitted in a separate, timely filed amendment canceling the non-allowable claim(s).

7. ☐ For purposes of appeal, the proposed amendment(s):(a)☐ will not be entered, or (b)☐ will be entered, and an explanation of how the new or amended claims would be rejected is provided below or appended.

<u>AFFIDAVIT OR OTHER EVIDENCE</u>

8. ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

9. ☐ The affidavit or other evidence filed after final action, but before or on the date of filing a Notice of Appeal will <u>not</u> be entered because applicant failed to provide a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented. See 37 CFR 1.116(e).

10. ☐ The affidavit or other evidence filed after the date of filing a Notice of Appeal, but prior to the date of filing a brief, will <u>not</u> be entered because the affidavit or other evidence failed to overcome <u>all</u> rejections under appeal and/or appellant fails to provide a showing of good and sufficient reasons why it is necessary and was not earlier presented. See 37 CFR 41.33(d)(1).

11. ☐ The affidavit or other evidence is entered. An explanation of the status of the claims after entry is below or attached.

<u>REQUEST FOR RECONSIDERATION/OTHER</u>

12. ☑ The request for reconsideration has been considered but does NOT place the application in condition for allowance because: <u>See Continuation Sheet</u>.

13. ☐ Note the attached Information *Disclosure Statement*(s). (PTO/SB/08) Paper No(s). _____.

14. ☑ Other: <u>2323</u>.

<u>STATUS OF CLAIMS</u>

15. The status of the claim(s) is (or will be) as follows:
   Claim(s) allowed:_____.
   Claim(s) objected to:_____.
   Claim(s) rejected:<u>1-16</u>.
   Claim(s) withdrawn from consideration:_____.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

Continuation of 3. NOTE: The limitation of "ready to use" has not been searched and requires further search and consideration. The AFCP2.0 program does not provide enough time to also skim through the 600+ pages filed. Applicant's results appear unexpected but the claimed subject matter is not necessarily commensurate in scope with the data. The double patenting rejections remain because such results are implicit in those patents.

Continuation of REQUEST FOR RECONSIDERATION/OTHER 12. The request for reconsideration has been considered but does NOT place the application in condition for allowance because: While the instant specification has support for "ready to use" (page 2, second to last line) this term raises issues. First of all, the Examiner did not suggest this term at all during the interview of 3/16/21. Rather the Examiner suggested "for administration" to differentiate the composition from other compositions that are not for administration. Second of all, the instant specification does not define "ready to use". It is reasonable to presume that "ready for use" could mean ready to be administered without any further dilution/preparation but the instant claim does not define the use such as ready for use without further dilution. And the instant specification read as a whole suggests that the doses of bendamustine administered to treat cancer in a mammal is similar to those employed any treatment regimen designed for bendamustine as marketed under the trade name TREANDA (instant specification, bottom of page 7 bridging page 8). Since the package insert of TREANDA teaches dilution to 5 mg/ml and then further dilution to 500 ml to a final concentration of 0.2-0.6 mg/mL, the "ready to use" appears to infer "ready for further dilution", which is also disclosed in the instant specification (page 2, second to last line), in order to administer the proper dosage amount of bendamustine as taught by TREANDA. Consequently, it appears the term "ready for use" appears indefinite because there are two or more ways of interpreting it. "When a claim is amenable to two or more plausible constructions, applicant is required to amend the claim to more precisely define the metes and bounds of the claimed invention, or the claim remains indefinite under § 112. Ex parte Miyazaki, 89 USPQ2d 1207 (BPAI 2008). Instant claim 8 does not clarify the issue because the ready to use liquid composition is not necessarily the about 10 mg/ml to about 100 mg/ml concentration but rather some diluted concentration. In light of these issues as well as the claims not being commensurate in scope with the data where only sulfur containing antioxidant lipoic is shown (table 3), (tables 4-8 require the addition of propylene glycol) the application is not in immediate condition for allowance.

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | Applicant(s) Palepu et al. | | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 1 of 2 |

| All Participants (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney | |

**Date of Interview:** 12 July 2021

**Issues Discussed:**

**35 U.S.C. 103**

The art of Brittain 20050159713 was discussed. See below.

**Proposed Amendment(s)**

See attached. The Examiner noted that the instant claims are directed to liquid bendamustine compositions and the proposed amendment is "ready for further dilution". In contrast, Brittain US 20060159713 teaches liquid compositions ready for further concentration via lyophilization ( pre-lyophilization). See claim 77 of Brittain. The Examiner also researched the term "ready for use" which in the medical arts has a specific meaning that is not ambiguous. See attached Medical Dictionary definition for example. The pre-lyophilized solution of Britttain is not "ready for use" in this context because it is ready for lyophilization. The Examiner noted that while only sulfur based antioxidants were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention. Also the Examiner noted that t-butyl alcohol used by Brittain has a high vapor pressure and is thus an excellent freeze-drying medium (Abstract of: Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) whereas PEG does not sublime under practical and common lyophilization conditions (left column page 2245 of: Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). As a result, in view of the prosecution history and art of record, the Examiner left it to Applicants to decide whether "ready to use" or "ready for further dilution" in the claim preamble was appropriate because either would work in terms of patentable subject matter. Applicant thought "ready to use" as per the claims filed 5/20/21 would be best and would file terminal disclaimers.

**Non-statutory Double Patenting**

Applicant would file terminal disclaimers.

| | /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | | Applicant(s) Palepu et al. | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 2 of 2 |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 107071.000299 | 7527 |

23377        7590        08/04/2021
BakerHostetler
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104-2891

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/04/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

eofficemonitor@bakerlaw.com

| *Notice of Allowability* | Application No. 16/509,920 | Applicant(s) Palepu et al. | |
|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to 7/27/21.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 1-16. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All    b) ☐ Some    *c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail No. _____.
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

Application/Control Number: 16/509,920                                          Page 2
Art Unit: 1613

### Notice of Pre-AIA or AIA Status

The present application is being examined under the pre-AIA first to invent

provisions.

This corrected notice of allowance is in response to the PRINTER RUSH filed

7/27/21 which indicated a missing IDS filed 8/30/19 which is unusual because the IDS

flag needs to be cleared prior to posting and the allowance should never have made it

to the printer until that was fixed. In looking to the Application, the IDS in question was

not grouped with the other four IDS but stuck in with the non-patent literature.

| | | |
|---|---|---|
| | Non Patent Literature | 08/30/20 |
| | EFS Acknowledgmen... | 08/30/20 |
| ✕ | Information Disclosu...  ✓ | 08/30/20 |
| | Non Patent Literature | 08/30/20 |
| | Non Patent Literature | 08/30/20 v |

And when the Examiner attempted to upload the document, this error code appeared:



An Error Occured with the Exported IDS Document

IDS Flag in PALM has not cleared for the exported IDS document

Contact a PALM troubleshooter

Ok

### Information Disclosure Statement

The information disclosure statement (IDS) submitted on 8/30/19 is in

compliance with the provisions of 37 CFR 1.97. Accordingly, the information disclosure

statement is being considered by the examiner.

Application/Control Number: 16/509,920                                    Page 3
Art Unit: 1613

### *REASONS FOR ALLOWANCE*

The following is an examiner's statement of reasons for allowance:

Claims 1-16 are allowed for the reasons articulated in the notice of allowance

(NOA) mailed on 7/26/21, which are incorporated herein by reference. Applicants' IDS

submitted on 8/30/19 did not change the previous determination of patentability.


### *Conclusion*


Any inquiry concerning this communication or earlier communications from the

examiner should be directed to ERNST V ARNOLD whose telephone number is

(571)272-8509.  The examiner can normally be reached on M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a

USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Brian Y Kwon can be reached on 571-272-0581.  The fax phone number for

the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see https://ppair-

Application/Control Number: 16/509,920                                           Page 4
Art Unit: 1613

my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

If you would like assistance from a USPTO Customer Service Representative or access

to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

Plaintiff,

v.

SLAYBACK PHARMA LLC, APOTEX
INC., and APOTEX CORP.,

Defendants.

C.A. No. 21-1256-CFC

CONTAINS HIGHLY
CONFIDENTIAL INFORMATION

**OPENING EXPERT REPORT OF GRAHAM JAMES SEWELL, Ph.D.**

reconstituting a lyophilised cytotoxic drug powder increase the opportunity for inadvertent occupational exposure to the cytotoxic compound.  First, the extra steps naturally increase the opportunities for mistakes, breaks, spills, and other accidents that can release aerosols of the cytotoxic formulation into the environment.  Second, the lyophilised powders themselves present greater exposure risks than liquid formulations, in the event of vial breakage.  This is because the powders can become airborne and extremely challenging to contain and to clean once released.  In my experience, vial breakage is a rare occurrence, but when it does occur the consequences can be severe, including the need to temporarily shut down an aseptic facility or even cancel treatment clinics.

**B.    Eagle's Belrapzo® and Bendeka® Liquid Bendamustine Products are "Ready to Use"**

85.    Based on my experience as an oncology pharmacist and my review of the FDA submissions, prescribing information, and other development materials and submissions, Eagle's Belrapzo® and Bendeka® products are "ready to use" per the '483 patent because they are able to be dispensed with minimal if any effort, or minimal if any preparation.

86.    In my opinion, based on my experiences and expertise, an oncology pharmacist a would consider these concentrated liquid bendamustine formulations as able to be dispensed with minimal if any effort or preparation, especially as compared to the lyophilised bendamustine products previously on the market.  ███████████████████████████████████ ██ ████████ ████████████████████████████████████

87.    Specifically, the act of dispensing Belrapzo® or Bendeka® requires at most the four discrete steps I described for ready to use liquid formulations of cytotoxic drugs.  Based on my expertise and experiences, an oncology pharmacist would not find any of the steps taken to dispense Belrapzo® or Bendeka®, alone or in combination, to involve more than minimal effort or

# EXHIBIT C

Page 1

HIGHLY CONFIDENTIAL

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
2

3

4    EAGLE PHARMACEUTICALS, INC.,        )
                                         )
5              Plaintiff,                )
                                         )
6         vs.                            ) No. 21-1256-CFC
                                         )
7    SLAYBACK PHARMA, LLC, APOTEX,       )
     INC., and APOTEX CORP.,             )
8                                        )
               Defendants.               )
9

10

11                  HIGHLY CONFIDENTIAL

12

13            Videotaped deposition of EDMUND J. ELDER, JR.,
14    Ph.D., R.Ph., taken before NADINE J. WATTS, CSR, RPR,
15    and Notary Public, pursuant to the Federal Rules of
16    Civil Procedure for the United States District Courts
17    pertaining to the taking of depositions, at Suite 2900,
18    330 North Wabash Street, in the City of Chicago, Cook
19    County, Illinois, commencing at 9:08 a.m. on the 11th
20    day of August, A.D., 2022.
21

22

23

24

HIGHLY CONFIDENTIAL

**Page 2**

1   There were present at the taking of this
2   deposition the following counsel:
3       (Appeared via videoconference)
        LATHAM & WATKINS, LLP by
4       MR ALEX GRABOWSKI
        330 North Wabash Street, Suite 2800
5       Chicago, Illinois  60611
        (312) 876-7700
6       alex.grabowski@lw.com
7        on behalf of the Plaintiff;
8       (Appeared via videoconference)
        WINDELS MARX LANE & MITTENDORF by
9       MS BETH C FINKELSTEIN
        One Giralda Farms
10      Madison, New Jersey  07940
        (973) 966-3246
11      bfinkelstein@windelsmarx.com
12       on behalf of Defendant Slayback Pharma,
        LLC;
13
        (Appeared via videoconference)
14      KATTEN MUCHIN ROSENMAN by
        MR CHRISTOPHER B FERENC
15      2900 K Street, N W , Suite 200
        Washington, D C  20007
16      (202) 625-3500
        christopher.ferenc@katten.com
17           -and-
18
        (Appeared via videoconference)
19      KATTEN MUCHIN ROSENMAN by
        MS RACHEL SCHWEERS
20      525 West Monroe Street
        Chicago, Illinois  60661
21      (312) 902-5200
        rachel.schweers@katten.com
22
         on behalf of Defendant Apotex, Inc  and
23       Apotex Corp ;
24  ALSO PRESENT: Mr Milo Savich, Veritext videographer

**Page 3**

1   VIDEOTAPED DEPOSITION OF EDMUND J  ELDER, JR , Ph D ,
2            TAKEN AUGUST 11, 2022
3
4   EXAMINATION BY                          PAGE
5   Mr Christopher B  Ferenc                 6
6   Ms Beth C  Finkelstein                  88
7
8                    EXHIBITS
9                                           PAGE
10  ELDER EXHIBIT 1            8
        Curriculum vitae
11
        ELDER EXHIBIT 2            12
12       U S  Patent No  11,103,483
13  ELDER EXHIBIT 3            22
        Expert Report of Edmund J  Elder, Ph D
14
        ELDER EXHIBIT 4            22
15      Responsive Expert Report of Edmund J
        Elder, Ph D
16
        ELDER EXHIBIT 5            22
17      Reply Expert Report of Edmund J
        Elder, Ph D
18
        ELDER EXHIBIT 6            33
19      EAGLEBEN-SLAYBACK-00271044 - 00271075
        5-27-2020 Office Action
20
        ELDER EXHIBIT 7            41
21      EAGLEBEN-SLAYBACK-00271708 - 00271718
        Amendment, filed 7-12-19
22
        ELDER EXHIBIT 8            43
23      EAGLEBEN-SLAYBACK-00271719 - 00271754
        12-21-20 Office Action
24

**Page 4**

1          EXHIBITS (Continued)
2                    PAGE
3   ELDER EXHIBIT 9            51
        EAGLEBEN-SLAYBACK-00271815 - 00271817
4       3-16-21 Office Action
5   ELDER EXHIBIT 10           52
        EAGLEBEN-SLAYBACK-00271857 - 00271869
6       Amendment, filed 7-12-19
7   ELDER EXHIBIT 11           55
        EAGLEBEN-SLAYBACK-00272475 - 00272478
8       6-2-21 Office Action
9   ELDER EXHIBIT 12           66
        Rebuttal Expert Report of Dr. Michael L.
10      Brandt, B.S., PharmD, FASHP
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 5**

1       THE VIDEOGRAPHER:  Good morning.  We are going on
2   the record at 9:08 a.m. on August 11th, 2022.
3       Please note that the microphones are sensitive
4   and may pick up whispering, private conversations, and
5   cellular interference.  Please turn off all cellphones
6   or place them away from the microphones, as they may
7   interfere with the deposition audio.  Audio and video
8   recording will continue to take place unless all parties
9   agree to go off the record.
10      This is media unit 1 of the video-recorded
11  deposition of Edmund J. Elder taken by counsel for the
12  Plaintiff in the matter of Eagle Pharmaceuticals, Inc.
13  versus Slayback Pharma, LLC, et al.  This case is filed
14  in the United States District Court, District of
15  Delaware.
16      This deposition is being held at Latham &
17  Watkins, LLP located at 330 North Wabash Street, Suite
18  2800, Chicago, Illinois.
19      My name is Milo Savich from the firm Veritext,
20  and I am the videographer.  The court reporter is Nadine
21  Watts, also from Veritext.  I am not authorized to
22  administer an oath, I'm not related to any party in this
23  action, nor am I financially interested in the outcome.
24      Counsel and all present in the room, and

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1 everyone attending remotely, will now please state their
2 appearances and affiliations for the record.  If there
3 are any objections to the proceeding, please state them
4 at the time of your appearance, beginning with the
5 noticing attorney.
6    MR. FERENC:  Christopher Ferenc from Katten Muchin
7 Rosenman on behalf of the Apotex defendants.  With me
8 today is my colleague, Rachel Schweers, also with Katten
9 Muchin Rosenman.
10    MS. FINKELSTEIN:  Beth Finkelstein from Windels
11 Marx, Lane & Mittendorf on behalf of defendant Slayback.
12    MR. GRABOWSKI:  Alex Grabowski, Latham & Watkins, on
13 behalf of Eagle and the witness.
14    THE VIDEOGRAPHER:  Will the court reporter please
15 swear in the witness, and we may then proceed.
16       EDMUND J. ELDER, JR., Ph.D., R.Ph.,
17 called as a witness herein, having been first duly
18 sworn, was examined upon oral interrogatories and
19 testified as follows:
20       EXAMINATION
21    by Mr. Ferenc:
22    Q  Good morning, Dr. Elder.  How are
23 you?
24    A  Good.  Good morning.

Page 7

1    Q  I just wanted to go over a few ground rules
2 given the remote setup and some of the printing and
3 exhibit issues that we're likely going to face.
4       Have you ever been deposed before?
5    A  Yes, I have.
6    Q  Approximately how many times?
7    A  About 35 or 36 I think.
8    Q  Do you know how many of those cases involved
9 patent litigation?
10    A  They -- Pretty much all of them did.
11    Q  When's the last time you were deposed for a
12 deposition, or deposed remotely, I'll say that?
13    A  I believe it was in January maybe.  Earlier this
14 year.  I don't remember the exact date or month.
15    Q  So I'm going to bring up some exhibits
16 throughout the day and ask you some questions about the
17 various exhibits.  I know some printouts have -- are in
18 the room with you, but I would just request that we stay
19 on the documents that I specifically address so we have
20 clarity in the record as to which documents we're
21 discussing.  Do you agree to do that?
22    A  Yes, that's fine.
23    MR. GRABOWSKI:  Hold on.  Sorry.  I just want to be
24 clear, if it's not -- if it's not an exhibit, that's

Page 8

1 fine, but he's entitled to refer back to old marked
2 exhibits, right?
3    MR. FERENC:  Q  I'm going to mark various exhibits
4 throughout the deposition.  You'll know that because it
5 will be marked by the court reporter.
6       To make sure that we have a clear record of
7 what documents are being discussed, if you're going to
8 reference a document, just like if I'm going to
9 reference a document, I will try to identify that
10 document by the exhibit number so there is a clarity in
11 the record about the document you're speaking about.
12 Does that make sense?
13    A  Yes.
14    Q  Okay.  And you agree to do that to the best of
15 your ability?
16    A  I will try my best to identify the documents
17 appropriately.
18    Q  Perfect, thank you.  I'll try to do the same.
19       So if you could -- I'm going to pull up a copy
20 of your CV that is attached to one of your expert
21 reports submitted in this case.  It's Exhibit A.  I'll
22 share my screen so you can see it.
23       (Document marked as Elder Deposition
24       Exhibit 1 for identification.)

Page 9

1    A  I have it here.
2    Q  Great.  At the time -- So I notice, if you look
3 at the first actual page of your CV, at the bottom left
4 it says April 2022.  Do you see that?
5    A  Yes, I do.
6    Q  I assume that indicates the date on which the CV
7 was prepared; is that fair?
8    A  That is correct, yes.
9    Q  Do you have any updates or edits to make to this
10 version of the CV?
11    A  I believe -- I mean, it was certainly up to date
12 as of that date, and I don't believe there's anything of
13 significance to add at this point.
14    Q  So in looking at your CV, you know, I did not
15 see anything in that document that indicated one way or
16 the other whether you had experience with dispensing
17 bendamustine products.  Do you have any experience in
18 dispensing bendamustine products?
19    A  Not specifically.  You know, my role is -- as a
20 pharmacist is in the industrial setting with formulating
21 and testing products.  I do that for the hospital system
22 at UW.  And so I interact with those folks who dispense
23 a lot of the drugs that we test.
24    Q  Okay.  I want to make sure my question's very

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 14

1 composition of claim 1? Do you see that?
2     A  Yes, I do.
3     Q  Okay.  You would agree with me that the phrase
4 ready to use appears in each of the claims listed here
5 either expressly or via a dependency, correct?
6     A  I see that it's written here, certainly.
7     Q  In each of the claims, correct?
8     A  I didn't read every single claim at the moment,
9 but I see it as I scan through at least written in 1
10 through 8 I believe.
11     Q  And what about 9 through 16?
12     A  Some of those have it, but I don't see it
13 written in every single one of them that I can see.
14     Q  Do you recall any claims that do not include the
15 term ready to use?
16     A  I don't recall if I --
17     MR. GRABOWSKI:  Objection, vague.
18     THE WITNESS:  I -- It's not written specifically in
19 claim 9. I see that.  It's not written specifically in
20 claim 10.
21     MR. FERENC:  Q  Do you understand that claim 9,
22 where it says the method of claim 8, do you understand
23 that the method of claim 9 includes everything from
24 claim 8?

Page 15

1     A  In general, yes.
2     Q  Do you see in claim 8 it says, a method of
3 treating cancer in a mammal comprising administering an
4 effective amount of the ready to use liquid
5 bendamustine-containing composition of claim 1?
6     A  I see that written there, yes.
7     Q  So is it fair to characterize each and every
8 claim of the '483 patent requires in some capacity a
9 ready to use liquid bendamustine-containing composition?
10     A  I didn't specifically evaluate that, but I think
11 in general terms when the claim refers to a prior claim,
12 that it includes the contents of that prior claim.
13     Q  Yes, I'm just a little bit confused because in
14 your opinion in your reports you talk about the claims
15 being -- describing a ready to use liquid
16 bendamustine-containing composition.  Is that not the
17 case?
18     A  Well, you were asking me if I saw it here.  I
19 don't see it written in those claims.  It may refer to
20 the other claims in which it's written.  I'm answering
21 the question you asked --
22     Q  Okay.
23     A  -- to the best of my ability.
24     Q  I appreciate that.  Maybe I'll try asking it a

Page 16

1 different way.
2     I'm just trying to understand and get
3 confirmation from you that all of the claims of the '483
4 patent recite a ready to use liquid bendamustine
5 composition.
6     A  If that's what I wrote in my report, then
7 that's -- I would have to look at my report to see the
8 exact language that I used.
9     Q  And looking at the claims right, now you're
10 unable to tell me that?
11     A  I said in general terms I believe it is
12 included, but I would want to verify what I wrote in
13 my -- You're now asking about my report.  So I would
14 like to review what I said in my report as well just to
15 verify that I wrote it that way.
16     Q  Does the '483 patent provide a definition of the
17 term ready to use?
18     MR. GRABOWSKI:  Objection, vague.
19     THE WITNESS:  I understand that there was a claim
20 construction around that term that is based on review of
21 the overall patent and specification that provided an
22 agreed-upon construction.  Or it was stipulated.  I
23 don't recall which.  There is an agreed-upon
24 construction for that term.

Page 17

1     MR. FERENC:  Q  And do you know if that agreed-upon
2 construction is recited in the specification of the '483
3 patent?
4     MR. GRABOWSKI:  Objection.  The document speaks for
5 itself.
6     THE WITNESS:  I understand that that's the
7 agreed-upon term.  I don't recall if it's specifically
8 laid out word for word in the patent, but it would be
9 supported by the assessment of the contents of the
10 patent as a whole, including the prosecution history.
11     MR. FERENC:  Q  If you could turn to column 2 of
12 the '483 patent, I'm looking specifically at the
13 sentence beginning on line 16 -- or, sorry, line --
14 where it states the invented formulations are
15 advantageously ready to use or ready for further
16 dilution.  Do you see that?
17     A  Beginning on line 18 I believe it is; is that
18 where you're referring to?
19     Q  Yes, column 2, line 18 going through line 20.
20     A  Yes, I see that there.
21     Q  What is your understanding of the phrase ready
22 for further dilution?
23     A  Well, you have to read this in the context of
24 the overall patent, and they indicate that the product

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1 that's the subject of the patent is either ready to use
2 or ready for further dilution, and that it does not
3 require powders that are lyophilized, or the
4 reconstitution of powders that are lyophilized.
5    Q  Do you interpret the phrase ready to use to be
6 the same as ready for further dilution?
7    A  They are overlapping terms certainly.  They're
8 alternative language to represent aspects of the
9 invention.
10    Q  You stated that they are overlapping terms.
11 What did you mean by that?
12    A  Well, there can be things that are ready to use
13 that also are ready for further dilution certainly.  I
14 mean, the patent differentiates that ready to use -- or
15 the formulation from a reconstituted lyo - or a
16 lyophilized product that requires reconstitution.
17    Q  I'm trying to understand what the differences
18 are in your view between ready to use and ready for
19 further dilution.  You said that there's overlap.  Are
20 they the same?
21    MR. GRABOWSKI:  Objection, asked and answered.
22    THE WITNESS:  As I said, there's overlap.  They're
23 alternate phrases to describe aspects of the patent, the
24 patented products that was -- I mean, that the examiner

Page 19

1 for the patent indicated that they were alternative
2 terms.
3    MR. FERENC:  Q  Right.  I'm trying to understand,
4 you know, whether you're aware of any differences
5 between ready to use and ready for further dilution
6 formulation.
7    A  In the context of reviewing the patent, they're
8 overlapping terms that describe the product.
9    Q  That's not really answering my question.  I'm
10 trying to understand where the two definitions do not
11 overlap.  Are you aware of any areas where those two
12 definitions do not overlap?
13    MR. GRABOWSKI:  Objection, asked and answered.
14    THE WITNESS:  I'm trying to describe my
15 understanding of the terms in the context of the patent,
16 and that's my understanding, is they can overlap and
17 they are differentiating the product from lyophilized
18 powder that would not be ready to use.
19    MR. FERENC:  Q  So is it your opinion that ready to
20 use excludes reconstituted products?
21    A  I'm indicating that in the context of the
22 patent, that it's differentiated from -- for this
23 particular product, it's differentiated from a
24 reconstituted product.

Page 20

1    Q  So a reconstituted lyophilized powder would not
2 be ready to use according to the '483 patent?
3    MR. GRABOWSKI:  Objection, mischaracterizes prior
4 testimony.
5    THE WITNESS:  A reconstituted bendamustine --
6 lyophilized powder that requires reconstitution --
7 Sorry, let me make this clear.  A reconstituted powder
8 of bendamustine, which is the subject of the patent,
9 would not be ready to use under the context of this
10 definition.
11    MR. FERENC:  Q  Why not?
12    A  Because it requires an additional step of
13 reconstitution before it would be ready for -- for --
14 ready for use by the pharmacist to dilute it for
15 administration.
16    Q  So it's your opinion that products
17 reconstituted -- bendamustine products reconstituted
18 from a lyophilized powder would not be ready to use?
19    MR. GRABOWSKI:  Objection, mischaracterizes prior
20 testimony.
21    THE WITNESS:  In the context of this -- the
22 definitions in this patent, that's my understanding,
23 that the lyophilized product is differentiated from a
24 ready to use product.

Page 21

1    MR. FERENC:  Q  Would a reconstituted bendamustine
2 lyophilized powder be a product that is ready for
3 further dilution?
4    A  It may be.
5    MR. GRABOWSKI:  Objection, vague.
6    MR. FERENC:  Q  What are -- What is an example of
7 how it would not be?
8    MR. GRABOWSKI:  Objection, incomplete hypothetical.
9    THE WITNESS:  I think you would have to know to what
10 extent has it been diluted in the reconstitution.  I
11 mean, I didn't consider that in my assessment.  I looked
12 at the definition of the patent and evaluated the
13 products involved in the case.
14    MR. FERENC:  Q  So it's your opinion that the
15 phrase ready for further dilution does not include
16 products that were reconstituted from a lyophilized
17 powder; is that correct?
18    MR. GRABOWSKI:  Objection, mischaracterizes prior
19 testimony.
20    THE WITNESS:  I don't believe I said that.  I
21 indicated my opinion based on my interpretation of the
22 patent.
23    MR. FERENC:  Q  If you could please -- If the court
24 reporter can mark as Elder Exhibit No. 3 -- There's

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

1 three different exhibits.  We'll just do them together.
2         It will be Exhibits No. 3, 4, and 5.  It is
3 Dr. Elder's June 3rd opening report, Dr. Elder's
4 July 1st rebuttal report, and Dr. Elder's July 22nd
5 reply report.
6         MR. GRABOWSKI:  And just for clarity, I want to make
7 sure, 3 is the opening report, 4 is the response, and 5
8 is the reply, correct?
9         MR. FERENC:  Correct.
10         (Documents marked as Elder Deposition
11         Exhibit 3, Exhibit 4, and Exhibit 5
12         for identification.)
13         MR. FERENC:  Q   Dr. Elder, if you could pull up a
14 copy of -- it's Exhibit No. 3, your opening report.
15 I've got it pulled up on the shared screen as well.
16     A   Yes, I have it here.
17     Q   I just want to make sure that the copy that you
18 have in front of you is a complete copy of the opening
19 report you submitted on June 3rd, 2022 with this case.
20     A   It is a copy with no exhibits attached.
21     Q   Okay.  Thank you.  And could you please confirm
22 that the copy that is in front of you has no annotations
23 or notes or markings provided by you in the original
24 report.

Page 23

1     A   It does not have any markings or annotations or
2 other information added.
3     Q   Thank you.  If you could please turn to
4 paragraph 38 of your report.
5     A   I'm there.
6     Q   In paragraph 38 you state, I have been informed
7 that the parties have stipulated to the following
8 construction of the claim term ready to use and the
9 stipulated construction is provided in the table below
10 that.  Do you see that?
11     A   Yes, I do.
12     Q   Do you agree that the definition of able to be
13 dispensed with minimal, if any, effort or preparation,
14 semicolon, prepackaged, is a fair and accurate
15 representation of the meaning of the phrase ready to
16 use?
17         MR. GRABOWSKI:  Objection, vague, calls for a legal
18 conclusion.
19         THE WITNESS:  That's the claim construction that I
20 was provided as part of this case, and so that's the
21 terminology that I utilized.
22         MR. FERENC:  Q   Does the agreed-upon construction
23 reference any comparisons to other products?
24     A   It does not specifically address other products,

Page 24

1 but in the context of the use of that term in the
2 patent, which is the basis for analyzing infringement
3 and other aspects of the patent, you have to take into
4 consideration its context.  A person of -- That's how a
5 person of ordinary skill in the art does the analysis.
6     Q   But the actual construction included any such
7 comparisons, correct?
8         MR. GRABOWSKI:  Objection, asked and answered, legal
9 conclusion, vague.
10         THE WITNESS:  It does not have those words in the
11 construction, but, again, the use of the term has to be
12 taken in the context of the overall patent.
13         MR. FERENC:  Q   The phrase reconstitution does not
14 appear in the agreed-upon construction, correct?
15     A   That word is not specifically listed there.
16     Q   Thank you.  So are you aware of any arguments or
17 claim construction briefs that were submitted in this
18 case?
19     A   No, I've not seen any of that information.
20     Q   And you were not asked to provide your opinion
21 regarding how the term ready to use should be construed;
22 rather, you were asked to accept the stipulated
23 construction; is that correct?
24     A   I was informed that was the stipulated

Page 25

1 construction, yes.
2     Q   In your opinion, how would a person of ordinary
3 skill in the art ascertain what is meant in the
4 construction by minimal, if any, effort or preparation?
5     A   Well, again, the person of ordinary skill would
6 look at the context of the use of this term in the
7 patent.  And in this particular patent it refers to the
8 differentiation between a ready to use product and a
9 lyophilized product requiring reconstitution as I
10 discussed previously.
11     Q   Does the definition of ready to use include
12 products that are ready to inject?
13         MR. GRABOWSKI:  Objection, vague.
14         THE WITNESS:  In the context of this patent, it --
15 again, it's a differentiation from the lyophilized
16 product.  Bendamustine does not have any products that
17 are ready to inject.  All of the products, like the
18 majority of chemotherapeutic agents, require dilution
19 prior to administration.
20         MR. FERENC:  Q   That's not really my question.  I'm
21 trying to understand the scope of the phrase ready to
22 use.  Does that include bendamustine products that would
23 be ready to inject?
24         MR. GRABOWSKI:  Objection, asked and answered.

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 30

1 the '483 patent that describes bendamustine products
2 that can be dispensed with no effort, correct?
3    MR. GRABOWSKI:  Objection, calls for a legal
4 conclusion.
5    THE WITNESS:  I don't know that I've assessed it in
6 that context.  I know that the examples that are cited
7 are all products that require further dilution
8 certainly, which would be minimal effort to prepare
9 them.
10   MR. FERENC:  Q  Okay.  Let's turn to the examples.
11 Could you pull up the '483 patent again please.  This is
12 Elder Exhibit 2.
13   A  I have it here.
14   Q  So if you turn to column 6 of the '483 patent,
15 that's where the examples begin.
16   A  Yes, I'm there.
17   Q  Are these the examples you were referring to?
18   A  These are the examples listed in the patent that
19 continue on through column 13 I believe.
20   Q  And it's your opinion that these examples
21 disclose bendamustine compositions that are ready for
22 further dilution, correct?
23   MR. GRABOWSKI:  Objection, mischaracterizes prior
24 testimony.

Page 31

1    THE WITNESS:  These are formulations that are ready
2 to use and require further dilution.
3    MR. FERENC:  Q  Which are they, ready to use or
4 require -- or ready for further dilution?
5    A  They are ready to use and require further
6 dilution.  That's -- They are differentiated from the
7 lyophilized formulations.  They meet those requirements.
8    Q  Are you aware of anywhere in the '483 patent
9 where the terms ready to use are differentiated from
10 ready for further dilution?
11   A  They're alternative terms that we talked about
12 in paragraph -- or in column 2 earlier and they
13 differentiate those terms from lyophilized products in
14 those statements.
15   Q  So they don't differentiate the terms from each
16 other; is that correct?
17   A  They're alternative terms that are part of the
18 specification and also the patent -- the prosecution
19 history.  The examiner addresses them as alternative
20 terms.
21   Q  I understand that you are characterizing them as
22 alternative terms.  My question's more specific.  It's
23 whether you're aware of any instance in the '483 patent
24 where the terms are distinguished from one another?

Page 32

1    MR. GRABOWSKI:  Objection, vague, and the document
2 speaks for itself.
3    THE WITNESS:  I did my assessment based on my
4 understanding of how a person of ordinary skill in the
5 art would interpret the patent.
6    MR. FERENC:  Q  Sitting here today, you're not
7 aware of any -- where the '483 patent distinguishes
8 ready to use from ready for further dilution, correct?
9    A  My understanding is they're alternative phrases
10 that are overlapping and differentiated from the
11 lyophilized products requiring reconstitution.  That's
12 how a person of ordinary skill would assess the patent
13 language.
14   MR. FERENC:  Can we take a 10-minute break.
15   THE VIDEOGRAPHER:  Okay.  The time is 9:55 a.m., and
16 we're going off the video record.
17        (Recess was taken.)
18   THE VIDEOGRAPHER:  The time is 10:18 a.m., and we're
19 back on the video record.
20   MR. FERENC:  Q  I'll have the court reporter mark
21 as Elder Exhibit No. 6 a document -- It's a May 27th,
22 2020 document.  I have that up on my shared screen.  It
23 has the Bates Nos. beginning at the bottom
24 EAGLEBEN-SLAYBACK-00271044.

Page 33

1        (Document marked as Elder Deposition
2        Exhibit 6 for identification.)
3    A  Okay.  I have that.
4    Q  Dr. Elder, in providing your opinions in
5 connection with this case did you review the prosecution
6 history of the '483 patent?
7    A  Yes, I did.
8    Q  What has been handed to you as Elder Exhibit
9 No. 6 is a May 27th, 2020 office action issued by the
10 U.S. Patent and Trademark Office.  Do you see that?
11   A  I'm just trying to find the right dates here.
12   Q  Sure.  So --
13   A  Oh, yes, I see it now.  Yes.
14   Q  Okay.  And the copy that you have, if you look
15 at the bottom right, it has the production numbers
16 bearing EAGLEBEN-SLAYBACK-00271044, and that goes
17 through 271075, correct?
18   A  Yes, that's correct.
19   Q  Okay.  Do you recognize this document as the
20 office action that was issued on May 27th, 2020?
21   A  That's what I understand it is, yes.
22   Q  And you understand that as part of the office
23 action the examiner rejected all of the claims in the
24 pending application, correct?

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 82

1 differentiated from a reconstituted lyophilized product,
2 as is the Slayback product, as are both of the
3 commercial products that I discussed.
4       So this is all consistent with differentiation
5 from a reconstituted lyophilized product of
6 bendamustine.  And based on the definition of ready to
7 use, all of these products meet that definition.
8    MR. FERENC:  Q  Where in this response cited on
9 page 43 of your report does Apotex reference
10 lyophilization or reconstitution?
11    MR. GRABOWSKI:  Objection, vague, mischaracterizes
12 the document that he doesn't have in front of him.
13    THE WITNESS:  Well, as of -- I mean, I have made
14 this statement numerous times, and I will repeat it.
15 This response is specifically addressing the testing of
16 osmolality.  That's what this statement is relevant to,
17 period.
18    MR. FERENC:  Q  Doesn't Apotex describe its drug
19 product by saying applicant wishes to emphasize that the
20 drug product is ready to dilute?  Isn't that a
21 description of its drug product?
22    A  In the context of justifying the osmolality
23 testing on the diluted material as opposed to the
24 concentrate.  That's what this whole response is about,

Page 83

1 period.
2    Q  The context of the response doesn't change the
3 characterization of Apotex's drug product, correct?
4    MR. GRABOWSKI:  Objection, vague, argumentative.
5    THE WITNESS:  The context is what are they trying to
6 tell the FDA.  They're trying to justify testing the
7 osmolality of the diluted product.
8       You have to look at it not as a single
9 sentence, but in the context of what are they trying to
10 tell the agency.  They're trying to justify why they
11 tested osmolality.  That's what they do in these
12 regulatory filings, is they have to justify their
13 testing and their specifications, and that's the context
14 in which this statement is made.
15    MR. FERENC:  Q  Can you please pull up Exhibit
16 No. 5.  This is your reply report.
17    A  I have it here.
18    Q  So in paragraph 24 you say, consequently,
19 minimal, if any, effort or preparation; prepackaged
20 cannot make ready to inject in the context of the ready
21 to use liquid bendamustine formulations of the asserted
22 claims.  Do you see that?
23    A  Yes, I do.
24    Q  Is it fair to say that a ready to use liquid

Page 84

1 injection would not be covered by the asserted claims?
2    MR. GRABOWSKI:  Objection, asked and answered.
3    THE WITNESS:  Well, first of all, there are no ready
4 to inject bendamustine products to make an assessment
5 on.  But within -- I mean, minimal, if any, is different
6 than no preparation.  And so -- I mean, if there were a
7 product, we would assess it within the context of the --
8 within the context of the patent and the language here.
9    MR. FERENC:  Q  So is it your opinion that the
10 asserted claims do not contemplate a ready to use liquid
11 injection of bendamustine?
12    MR. GRABOWSKI:  Objection, asked and answered
13 several times, incomplete hypothetical, mischaracterizes
14 prior testimony.
15    THE WITNESS:  Not at all.  Ready to use is
16 differentiated from the lyophilized product that
17 requires reconstitution.  So that's the assessment that
18 a person of ordinary skill would do in looking at the
19 definition in the patent.
20       I can only assess the products that actually
21 exist to be assessed.  The hypotheticals would need to
22 be assessed in the same context.  But all
23 chemotherapeutic agents need to be diluted before
24 administration if they're in a concentrated form.

Page 85

1    MR. FERENC:  Q  Does that mean they would be ready
2 for further dilution?
3    A  It would depend --
4    MR. GRABOWSKI:  Objection, incomplete hypothetical.
5    THE WITNESS:  It would depend on the specific
6 product and how it's provided.  And this patent only
7 applies to bendamustine and differentiates ready to use
8 from the lyophilized products that need to be
9 reconstituted first.
10    MR. FERENC:  Q  Does the patent differentiate ready
11 to use from ready for further dilution?
12    MR. GRABOWSKI:  Objection, asked and answered.
13    THE WITNESS:  Again, those are alternate phrases
14 that are included in the patent that overlap.
15    MR. FERENC:  Q  I'll ask it again.  I'm asking if
16 the patent differentiates the two?
17    A  The same answer.
18    MR. GRABOWSKI:  Objection, asked and answered.  The
19 patent speaks for itself.
20    MR. FERENC:  Q  So it's your opinion that the
21 patent does not differentiate ready to use from ready
22 for further dilution?
23    MR. GRABOWSKI:  Objection, asked and answered
24 several times, mischaracterizes prior testimony.  The

22 (Pages 82 - 85)

# EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF DELAWARE
3
   --------------------------------------
4
   EAGLE PHARMACEUTICALS, INC.,
5
                            Plaintiff,
6
                   v.
7
8  SLAYBACK PHARMA LLC, APOTEX INC.,
   and APOTEX CORP.,
9
                            Defendants.
10
11 --------------------------------------
12
                 C.A. No: 21-1256-CFC
13
                 -----------------------
14
              Videotaped deposition of:
15
                  DR GRAHAM SEWELL
16
17
                taken at the offices of:
18
                    Latham & Watkins
19                   99 Bishopsgate
                    London EC2M 3XF
20                      England
21          on Wednesday, August 17th, 2022
             commencing at 10.06 am (BST)
22
23
24
25

Page 2

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | For Eagle Pharmaceuticals, Inc. and the witness: |
| 4 | |
| 5 | MR KENNETH G. SCHULER |
| 6 | Attorney at Law |
| 7 | Latham & Watkins LLP |
| 8 | 330 North Wabash Avenue |
| 9 | Suite 2800 |
| 10 | Chicago, Illinois 60611 |
| 11 | USA |
| 12 | Telephone:  +1 312 876 7700 |
| 13 | E-mail:  kenneth.schuler@lw.com |
| 14 | |
| 15 | MS REBECCA NEUBAUER |
| 16 | Attorney at Law |
| 17 | Latham & Watkins LLP |
| 18 | 555 Eleventh Street, NW |
| 19 | Suite 1000 |
| 20 | Washington, DC 20004-1304 |
| 21 | USA |
| 22 | Telephone: +1 202 654 7105 |
| 23 | E-mail:  rebecca.neubauer@lw.com |
| 24 | |
| 25 | |

Page 4

| | |
|---|---|
| 1 | For the defendant Slayback Pharma LLC: |
| 2 | |
| 3 | MS BETH C. FINKELSTEIN |
| 4 | Windels, Marx, Lane & Mittendorf |
| 5 | One Giralda Farms |
| 6 | Madison, NJ 07940 |
| 7 | USA |
| 8 | Telephone:  +1 973 966 3246 |
| 9 | E-mail:  bfinkelstein@windelsmarx.com |
| 10 | |
| 11 | Court reporter: |
| 12 | |
| 13 | MS MELANIE BALL |
| 14 | Veritext Legal Solutions |
| 15 | |
| 16 | Videographer: |
| 17 | |
| 18 | MS EMMANUELLE ROSSI |
| 19 | Veritext Legal Solutions |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 3

| | |
|---|---|
| 1 | For Apotex Inc. and Apotex Corp.: |
| 2 | |
| 3 | MR CHRISTOPHER B. FERENC |
| 4 | Attorney at Law |
| 5 | Katten Muchin Rosenman LLP |
| 6 | 2900 K Street NW |
| 7 | North Tower - Suite 200 |
| 8 | Washington, DC 20007-5118 |
| 9 | USA |
| 10 | Telephone:  +1 202 625 3647 |
| 11 | E-mail: christopher.ferenc@katten.com |
| 12 | |
| 13 | MS RACHEL SCHWEERS |
| 14 | Attorney at Law |
| 15 | Katten Muchin Rosenman LLP |
| 16 | 525 West Monroe Street |
| 17 | Chicago, Illinois 60661-3693 |
| 18 | USA |
| 19 | Telephone:  +1 312 902 5413 |
| 20 | E-mail:  rachel.schweers@katten.net |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 5

| | | |
|---|---|---|
| 1 | I N D E X | |
| 2 | Contents | Page |
| 3 | | |
| 4 | INTRODUCTIONS | 8 |
| 5 | | |
| 6 | DR GRAHAM SEWELL: | |
| 7 | | |
| 8 | Cross-examination by Mr Ferenc | 9 |
| 9 | | |
| 10 | Cross-examination by Ms Finkelstein | 79 |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

2 (Pages 2 - 5)

Page 6

## LIST OF EXHIBITS

The following exhibits were marked:

Exhibit number      Description                Page

Exhibit 1     Curriculum Vitae            11

Exhibit 2     Opening Expert Report of      19
              Graham James Sewell, Ph.D.

Exhibit 3     Highlights of Prescribing     33
              Information - Treanda
              [EAGLEBEN-SLAYBACK-000281047
              - 000281065]

Exhibit 4     Reply Expert Report of       43
              Graham James Sewell, Ph.D.

Exhibit 5     Rebuttal Expert Report of     45
              Dr Michael L. Brandt, B.S.,
              PharmD, FASHP

Page 7

Exhibit 6     Highlights of Prescribing     62
              Information - Bendeka
              [EAGLEBEN-SLAYBACK-00052446
              - 00052473]

Exhibit 7     Highlights of Prescribing     64
              Information - Bendamustine
              Hydrochloride Injection
              [APO-BENDA_0006629 - 0006650]

Exhibit 8     Highlights of Prescribing     74
              Information - Belrapzo
              [EAGLEBEN-SLAYBACK-00050294
              - 00050315]

Page 8

1    Wednesday, 17th August 2022
2         INTRODUCTIONS
3         VIDEOGRAPHER:  We are now on the
4  record.  My name is Emmanuelle Rossi, representing
5  Veritext.  The date today is August 17, 2022 and the
6  time is 10.06 am.  This deposition is being held at
7  Latham Watkins LLP located at 99 Bishopsgate,
8  London, United Kingdom.
9         The caption of this case is Eagle
10  Pharmaceuticals Inc versus Slayback Pharma LLP,
11  Apotex Inc and Apotex Corp.  This case is being held
12  in the United States District Court for the District
13  of Delaware.  The case number is 21-1256-CFC.  The
14  name of the witness is Graham James Sewell.
15         At this time the attorneys present in
16  the room and everyone attending remotely will
17  identify themselves and the parties they represent.
18         MR FERENC:  Morning.  This is
19  Christopher Ferenc of Katten Muchin Rosenman along
20  with my colleague Rachel Schweers.  We represent the
21  Apotex defendants.
22    A.  Good morning.
23    Q.  Ken Schuler, Latham & Watkins, along with
24  my colleague Rebecca Neubauer.  We represent the
25  witness and Eagle Pharmaceuticals.

Page 9

1         VIDEOGRAPHER:  Our court reporter,
2  Melanie Ball, representing Veritext, will swear in
3  the witness and we can proceed.
4         DR GRAHAM SEWELL,
5         having been duly sworn,
6         testified as follows.
7         COURT REPORTER:  Could you keep your
8  voice up as well, please?
9    A.  Yes.  Uh-huh.
10         Cross-examination by MR FERENC
11         MR FERENC:  Good morning, Dr Sewell.
12  How are you?
13    A.  I'm fine.  Thank you.
14    Q.  Can you hear me okay?
15    A.  I can.  Can you hear me?
16    Q.  I can.  Thank you.
17    A.  Excellent.
18    Q.  I'm just going to go over some of the
19  opinions that you are intending to offer in this
20  case at trial.  I've reviewed your expert reports
21  and the documents cited therein.  So we'll go
22  through that today, but before we do that I wanted
23  to just get an understanding of your experience with
24  respect to being deposed.
25         Have you ever been deposed in a patent

3 (Pages 6 - 9)

Page 78

1    A.  Correct, and I didn't claim that they
2  would.
3    Q.  Is it accurate to say that the entirety of
4  your opinions that you would offer at trial in this
5  case are recited in any one of the three reports
6  that you've submitted in this case?
7    A.  Yes, they are.  I believe they cover all
8  of the main aspects of what I have to say, yes.
9    Q.  You have not been asked to supplement any
10 of your reports in this case?
11   A.  No, I haven't.
12   Q.  And you have no intention to supplement
13 them before trial.  Is that true?
14   A.  I have no intention.  I would have to
15 defer to counsel to ask if that probability could
16 arise, but at this time I've not been asked to
17 produce any supplement.
18   Q.  Okay.  That answers my question.  Thank
19 you.  I'd like to go back off the record.
20        VIDEOGRAPHER:  Going off the record
21 at 13.22.
22        (Off the record)
23        VIDEOGRAPHER:  We are back on the
24 record at 13.30.
25        MR FERENC:  Dr Sewell, thank you very

Page 79

1  much.  I have no further questions on behalf of
2  Apotex and I'm going to turn it over to my
3  colleague.
4      Cross-examination by MS FINKELSTEIN
5        MS FINKELSTEIN:  Good afternoon,
6  Dr Sewell.  I am Beth Finkelstein.  I'm counsel for
7  Slayback.  I just have some additional questions for
8  you --
9    A.  Okay.
10   Q.  -- which shouldn't take too long.
11   A.  Good afternoon.
12   Q.  Good afternoon to you.  Hopefully this
13 shouldn't take too long and we can get you out of
14 here relatively early.
15     Do you have any reason to dispute that
16 Bendeka and Belrapzo are prepared in the same way?
17        MR SCHULER:  I'm sorry.  I didn't
18 hear that question.  You cut out.
19   A.  Yes.
20        MS FINKELSTEIN:  Sorry.
21   Q.  Do you have any reason to dispute
22 that Bendeka and Belrapzo are prepared in the same
23 way?
24   A.  I have no --
25        MR SCHULER:  Object to the form.

Page 80

1    A.  Okay.  I think I know what you mean.
2  I have no -- I don't know how they're prepared.  The
3  preparation, manufacture of -- are you -- are you
4  talking about the medicinal product or the way in
5  which a pharmacy would handle them?  I'm sorry.
6  That -- that was the part of the question I didn't
7  understand.
8        MS FINKELSTEIN:  The way in which
9  a pharmacy would handle them to administer them to
10 a patient.
11   A.  Right.  Yes.  So the way in which
12 a pharmacy would handle them.  Well, knowing
13 obviously one is for short infusion, one is --
14 Belrapzo is for the longer infusion, the preparation
15 requirements would be the same for -- for both
16 presentations.
17   Q.  Are you aware whether Bendeka was ever
18 described as "ready to use"?
19   A.  I would have to go back to my opening
20 report and check that, if I may.
21   Q.  Go ahead.
22   A.  Is -- is that okay?  Sorry.
23   Q.  Go ahead.
24        MR SCHULER:  Can I have the question
25 back while he's looking?

Page 81

1      (Question read back by court reporter)
2    A.  Okay.  Happy to answer your question now.
3  No.  The information I have says Bendeka is ready to
4  dilute.  The reason that I needed to check is that,
5  as I explained to your colleague earlier, the two
6  terms "ready to dilute" and "ready to use" are used
7  synonymously.  They've been used synonymously in
8  various aspects of this case and I've documented
9  those in the report, and I regard "ready to dilute"
10 as a subset of "ready to use".  So it's something
11 I will -- the exact wording is something I would
12 always have to check, because from my -- you know,
13 in my experience they essentially mean the same
14 thing, ie, not lyophilised I suppose would be the
15 way I would describe it.
16   Q.  Are you -- and I apologise if you already
17 went over this -- are you familiar with liquid
18 Treanda?
19   A.  Not really.  I've heard that a liquid
20 Treanda did exist at some point.  It's not something
21 I have been asked to look at or study, and I've got
22 no real opinion on it other than that it -- I don't
23 even know if it still exists, whether it's actively
24 marketed.  So I can't really comment on that.  I'm
25 sorry.

21 (Pages 78 - 81)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

     Plaintiff,

     v.

SLAYBACK PHARMA LLC,
APOTEX INC., and APOTEX CORP.,

     Defendants.

C.A. No. 21-1256-CFC-JLH

**CONFIDENTIAL –
FILED UNDER SEAL**

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE ON CLAIM CONSTRUCTION

Defendants' motion—which ostensibly requests the Court preclude Eagle from introducing evidence that allegedly alters the stipulated construction of "ready to use" by comparing the products to prior art lyophilized products—is a red herring. Defendants' real aim is to walk back their binding stipulation as to the meaning of "ready to use."  The parties in this case agreed to a definition of "ready to use" taken directly from the prosecution history:  "able to be dispensed with minimal if any effort or preparation; prepackaged."[1]  Eagle's oncology pharmacy expert Dr. Sewell provides straightforward opinions faithful to that construction addressing the fact question of whether Defendants' products infringe.  Dr. Sewell explains that the Apotex and Slayback proposed NDA formulations are "ready to use" because they can be dispensed in four steps that a POSA would consider to involve "minimal if any effort or preparation," exactly as in the stipulated construction.  Ex. A, ¶¶ 98-103, 110-115.  Those opinions in no way transgress the agreed construction – they wholly embrace it.

Defendants cite to a single paragraph where Dr. Sewell (like the '483 patent) distinguished "ready to use" products from prior art lyophilized products that required *more* than "minimal effort" to dispense.  That is hardly the stuff of a motion *in limine* and, in any event, that opinion is fully consistent with the stipulated claim

---

[1] As the Examiner recognized, the term "has a specific meaning" in the medical arts, as reflected in the dictionary definition to which the parties stipulated.  Ex. B, EAGLEBEN-SLAYBACK-00272500, 272529.

1

construction.  It provides straightforward context for how a pharmacy oncologist tasked with *dispensing* a bendamustine product would evaluate what is or is not considered minimal effort in the field.[2]  *E.g.*, *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1289-90 (Fed. Cir. 2021) (considering additional intrinsic record arguments supporting the original claim construction position). Defendants' argument that Eagle is attempting to "add new claim construction theories on the eve of trial" is meritless.  Eagle made clear its position in its complaint and initial infringement contentions, served well before Defendants' stipulated to the construction of "ready to use."  ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Defendants' Motion appears to spring from their remorse at stipulating to a claim construction under which their infringement is apparent.  With no citations to the prosecution history, Defendants incorrectly contend that Eagle's experts now apply the "ready to use" stipulated construction differently from what was

---

[2] The deposition testimony Defendants cite was in fact directed to how a POSA would apply the stipulated "ready to use" construction to a lyophilized formulation.  Mot. at 2 (citing Elder and Sewell transcripts).

"accepted by Eagle during prosecution."  Mot. at 1-2.  Eagle explicitly told the Examiner its "claimed compositions are not reconstituted lyophilized powders, they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent."  Ex. E, (5/20/2021 Response to Office Action) EAGLEBEN-SLAYBACK-00271857 at 271861.  The Examiner's citation to the dictionary definition reflecting the "specific meaning" and allowance of the claims did not alter the scope of the claimed compositions to exclude formulations ready for dilution as Defendants suggest.  Mot. at 1; Ex. B, EAGLEBEN-SLAYBACK-00272500, 272529; Ex. F, EAGLEBEN-SLAYBACK-00272535 at 272537.  Having stipulated to that construction, Defendants' motion attempts to repackage the claim construction arguments made in the co-pending litigation between Eagle and Celerity Pharmaceuticals, C.A. No. 22-00042-CFC.  But remorse does not afford Defendants grounds to now baselessly accuse and to request such non-specific relief from the Court.  *See Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1311 (Fed. Cir. 2015) (agreed construction "controls in this case"); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015) (appellant "bound by" stipulated construction).

Defendants are welcome to challenge Dr. Sewell's opinions at trial and offer their own expert testimony disputing those opinions.  But the die has been cast on the claim construction, and Defendants' motion should be denied.

McCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com

Daniel G. Brown
Rebecca L. Neubauer
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 654-7136

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Jennifer Koh
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Attorneys for Plaintiff Eagle*
*Pharmaceuticals, Inc.*

Dated:  September 6, 2022

4

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC<br><br>CONTAINS HIGHLY CONFIDENTIAL INFORMATION |

**OPENING EXPERT REPORT OF GRAHAM JAMES SEWELL, Ph.D.**

## Table of Contents

I.      Introduction...................................................................................................1

II.     Materials Considered ......................................................................................3

III.    Summary of Opinions .....................................................................................4

IV.     The '483 Patent ...............................................................................................5

        A.      Asserted Claims .................................................................................5
        B.      Prosecution History...........................................................................6

V.      Legal Standards...............................................................................................7

        A.      Infringement......................................................................................7
        B.      Person of Ordinary Skill in the Art ..................................................8
        C.      Claim Construction............................................................................9

VI.     Eagle's Bendamustine Products....................................................................10

VII.    ██████████████████████████████████████████████████████████ 14

VIII.   ██████████████████████████████████████████████████████████ 20

IX.     Statement of Opinions...................................................................................24

        A.      Oncology Formulations for Intravenous Infusion..........................24
                1.      Pharmacists  "Dispense" Drug Products.............................24
                2.      Categories of Oncology IV Infusion Drug Products.............24
        B.      Eagle's Belrapzo® and Bendeka® Liquid Bendamustine Products are
                "Ready to Use" ..............................................................................30
        C.      Apotex's NDA Product Meets the "Ready to Use" Limitation of the
                Asserted Claims .............................................................................32
                █.      ██████████████████████████████████████████
                        ██████████████████████████████████
                █.      ██████████████████████████████████████████
                        ████████████████████████████████████████ 34
        D.      Slayback's NDA Product Meets the "Ready to Use" Limitation of the
                Asserted Claims .............................................................................35
                █.      ████████████████████████████████████████████
                █.      ████████████████████████████████████████████
                        ████████████████████████████████████████████

## I.       INTRODUCTION

1.       I am an academic pharmacist with considerable hospital pharmacy experience, including oncology pharmacy.   My hospital pharmacy work has focused on aseptic dispensing/manufacture and oncology pharmacy, with over 27 years' experience to 2009, and a continuing contribution to oncology pharmacy thereafter.

2.       Currently I am an honorary Professor of Pharmacy Practice at DeMontfort University in Leicester, UK and an honorary Professor of Clinical Pharmaceutics at University of Plymouth, Plymouth, UK.   I currently supervise and direct graduate and postgraduate student research projects and continue to contribute to published pharmaceutical research, particularly in the area of oncology pharmacy.

3.       My core research focuses on cancer chemotherapy formulation, dispensing and administration.  My research interests are mainly focused around oncology pharmacy and include therapeutic optimisation, clinical pharmacokinetics, drug formulation and stability, environmental hazards of cytotoxic drugs and non-medical prescribing.   I have authored or co-authored more than 140 peer-reviewed research publications, abstracts, book chapters and review articles.   I have given over 80 invited keynote/plenary presentations to national and international conferences.   I also have directed over 20 PhD/MPhil projects to completion.   In 2008, the International Society of Oncology Pharmacy Practitioners presented me with the Helen McKinnon Award, its highest accolade, in recognition of my research in oncology pharmacy.

4.       I am one of the founding members of the International Society of Oncology Pharmacy Practitioners (ISOPP). ISOPP has developed international guidelines (preparation, safe practice, research topics), created international networks, and organised a series of conferences around the world. ISOPP was formed because of a lack of knowledge and uniformity in oncology



**2.**

98. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ based on my own expertise and experiences, it is my opinion that an oncology pharmacist dispensing the Apotex NDA product would not view any of the four steps taken to dispense the Apotex NDA product, alone or in combination, as involving more than minimal effort or more than minimal or routine preparation.

99. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

100. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

101. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

102. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

103. In my opinion, these dispensing steps are minimal both from a quantitative and

qualitative perspective.  Therefore, it is my opinion that Apotex's NDA product meets "ready to use" claim limitation because it is "able to be dispensed with minimal if any, effort or preparation" per the parties stipulated construction and my independent opinion that a ready to use liquid bendamustine-containing formulation is one that is able to be dispensed in steps involving minimal effort or preparation.

**D.    Slayback's NDA Product Meets the "Ready to Use" Limitation of the Asserted Claims**

       **1.**    ██████████████████████████████████████

104.    ███████████████████████████████████████████████

██████████████    █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    ███████████████████████

105.    Second, I have reviewed those characterizations and independently agree with them. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

106.    Third, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



107. Fourth,

108. Fifth,

109. Again,

**2.**   ███████████████████████████████

110.    Based on my expertise and experiences, it is my opinion that an oncology pharmacist dispensing the Slayback NDA product would not view any of the four steps taken to dispense the Slayback NDA product, alone or in combination, as involving more than minimal effort or more than minimal or routine preparation.

111.   ███████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████

112.   ███████████████████████████████
███████████████████████████   ████████████
██████████████████████████

113.   ███████████████████████████████
███████████████████████████████████
███████████████████████████████████
██████████████████

114.   ███████████████████████████████
███████████████████████████████████
██████████████████████████

115.    In my opinion, these dispensing steps are minimal both from a quantitative and

qualitative perspective.  Therefore, it is my opinion that Slayback's NDA product meets "ready to use" claim limitation because it is "able to be dispensed with minimal if any, effort or preparation" per the parties stipulated construction and my independent opinion that a ready to use liquid bendamustine-containing formulation is one that is able to be dispensed in steps involving minimal effort or preparation.

2nd of June 2022

Graham James Sewell, Ph.D.

# EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/509,920 | 07/12/2019 | Nagesh R. Palepu | 820-1041-US-CON7 | 7527 |

20311        7590        07/16/2021
LUCAS & MERCANTI, LLP
30 BROAD STREET
21st FLOOR
NEW YORK, NY 10004

| EXAMINER |
|---|
| ARNOLD, ERNST V |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1613 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 07/16/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

info@lmiplaw.com

PTOL-90A (Rev. 04/07)

EAGLEBEN-SLAYBACK-00272500

| ***Applicant-Initiated Interview Summary*** | Application No. 16/509,920 | Applicant(s) Palepu et al. | | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 1 of 2 |

| **All Participants** (applicant, applicants representative, PTO personnel) | Title | Type |
|---|---|---|
| ERNST V ARNOLD | Primary Examiner | Telephonic |
| Stephanie Lodise | Attorney | |

**Date of Interview:** 12 July 2021

**Issues Discussed:**

**35 U.S.C. 103**

The art of Brittain 20050159713 was discussed. See below.

**Proposed Amendment(s)**

See attached. The Examiner noted that the instant claims are directed to liquid bendamustine compositions and the proposed amendment is "ready for further dilution". In contrast, Brittain US 20060159713 teaches liquid compositions ready for further concentration via lyophilization ( pre-lyophilization). See claim 77 of Brittain. The Examiner also researched the term "ready for use" which in the medical arts has a specific meaning that is not ambiguous. See attached Medical Dictionary definition for example. The pre-lyophilized solution of Britttain is not "ready for use" in this context because it is ready for lyophilization. The Examiner noted that while only sulfur based antioxidants were used as the antioxidant, the Examiner does not have any evidence that other antioxidants would not also work in the invention. Also the Examiner noted that t-butyl alcohol used by Brittain has a high vapor pressure and is thus an excellent freeze-drying medium (Abstract of: Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) whereas PEG does not sublime under practical and common lyophilization conditions (left column page 2245 of: Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). As a result, in view of the prosecution history and art of record, the Examiner left it to Applicants to decide whether "ready to use" or "ready for further dilution" in the claim preamble was appropriate because either would work in terms of patentable subject matter. Applicant thought "ready to use" as per the claims filed 5/20/21 would be best and would file terminal disclaimers.

**Non-statutory Double Patenting**

Applicant would file terminal disclaimers.

| | /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 |
|---|---|

**Applicant is reminded that a complete written statement as to the substance of the interview must be made of record in the application file. It is the applicants responsibility to provide the written statement, unless the interview was initiated by the Examiner and the Examiner has indicated that a written summary will be provided. See MPEP 713.04**
Please further see:
MPEP 713.04
Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews, paragraph (b)
37 CFR § 1.2 Business to be transacted in writing

EAGLEBEN-SLAYBACK-00272501

| *Applicant-Initiated Interview Summary* | Application No. 16/509,920 | | Applicant(s) Palepu et al. | |
|---|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (First Inventor to File) Status No | Page 2 of 2 |

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview.

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

EAGLEBEN-SLAYBACK-00272502

| | | | | | | |
|---|---|---|---|---|---|---|
| **Notice of References Cited** | | Application/Control No. 16/509,920 | | Applicant(s)/Patent Under Reexamination Palepu et al. | | |
| | | Examiner ERNST V ARNOLD | | Art Unit 1613 | | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | CPC Classification | US Classification |
|---|---|---|---|---|---|---|
| | A | | | | | |
| | B | | | | | |
| | C | | | | | |
| | D | | | | | |
| | E | | | | | |
| | F | | | | | |
| | G | | | | | |
| | H | | | | | |
| | I | | | | | |
| | J | | | | | |
| | K | | | | | |
| | L | | | | | |
| | M | | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | CPC Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | Amin et al. (Journal of Pharmaceutical Sciences 2004;93(9):2244-2249). (Year: 2004) |
| | V | Ni et al. (international Journal of Pharmaceutics 2001;226:39-46) (Year: 2001) |
| | W | "ready-to-use" [online] retrieved on 5/27/21 from: https://medical-dictionary.thefreedictionary.com/ready-to-use; 1 page). (Year: 2021) |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20210712

EAGLEBEN-SLAYBACK-00272503



ELSEVIER

International Journal of Pharmaceutics 226 (2001) 39–46

international
journal of
pharmaceutics

www.elsevier.com/locate/ijpharm

# Use of pure *t*-butanol as a solvent for freeze-drying: a case study

Nina Ni [a,\*], Marc Tesconi [b], S. Esmail Tabibi [c], Shanker Gupta [c], Samuel H. Yalkowsky [a]

[a] *College of Pharmacy, University of Arizona, Tucson, AZ 85721, USA*
[b] *Chiron Corporation, Emeryville, CA 94608, USA*
[c] *Pharmaceutical Resources Branch, DTP, DCTD, NCI, NIH, Bethesda, MD 20892-7446, USA*

Received 23 January 2001; received in revised form 24 May 2001; accepted 24 May 2001

## Abstract

1-(2-Chloroethyl)-3-sarcosinamide-1-nitrosourea, (SarCNU) (NSC-364432) is a new antitumor drug that is of interest to the National Cancer Institute. It is intended for use as an intravenous injection. Although SarCNU is sufficiently soluble in water to obtain the desired dosage, it is highly unstable. Its $T_{90}$ in aqueous solution at room temperature is less than 6 h. Neat tertiary butyl alcohol (TBA), a low toxicity, high vapor pressure and low melting solvent, was determined to be an excellent freeze-drying medium. Lyophilization of SarCNU from pure TBA produces a uniform cake composed of needle-shaped crystals. Thermal analysis and gas chromatography indicate that the cake contains less than 0.001% residual solvent. The SarCNU cake can be readily reconstituted with either water or an aqueous solution of 40% propylene glycol and 10% ethanol. The reconstituted solutions are stable for 4 and 13 h, respectively. © 2001 Elsevier Science B.V. All rights reserved.

*Keywords:* 1-(2-Chloroethyl)-3-sarcosinamide-1-nitrosourea; Lyophilization; Tertiary butyl alcohol

## 1. Introduction

1-(2-Chloroethyl)-3-sarcosinamide-1-nitrosourea (SarCNU) (Fig. 1) was selected for formulation by the National Cancer Institute because of its therapeutic advantage in the treatment of malignant glioma. Most nitrosoureas are stable in acidic media at pH 3–5, and in nonaqueous sol-

vents such as methanol, ethanol (EtOH), and tertiary butyl alcohol (TBA), but they are very labile in neutral aqueous media (Bosanquet, 1985). SarCNU is a chloroethylnitrosourea that is methylated in the *N*-3 position to make it more stable. In spite of its being more stable than other nitrosoureas, we have found that it still degrades rapidly in aqueous media, especially in the presence of light and at high temperatures. Although it is soluble in aqueous media, the instability of SarCNU prevents the formulation of the drug in an aqueous or a semi-aqueous vehicle.

\* Corresponding author. Tel.: + 1-520-626-4308; fax: + 1-520-626-4063.
*E-mail address:* na@pharmacy.arizona.edu (N. Ni).

0378-5173/01/$ - see front matter © 2001 Elsevier Science B.V. All rights reserved.
PII: S 0 3 7 8 - 5 1 7 3 ( 0 1 ) 0 0 7 5 7 - 8

EAGLEBEN-SLAYBACK-00272504

Case 1:21-cv-01256-CFC-JLH Document 107-3 Filed 09/23/22 Page 74 of 154 PageID #: 3621

Fig. 1. Structure of SarCNU.

Generally a product is freeze-dried, if it is not stable in aqueous media. Although inherently expensive in terms of manufacturing costs, freeze-drying is often the processing method of choice for the production of an unstable parenteral product. Generally a reconstitutable freeze-dried product has improved stability, dosing accuracy, and rapid reconstitution. However, freeze-drying is commonly restricted to drugs that are soluble and stable in an aqueous medium for at least the time required for dissolution, filtration, filling, and freezing of the product.

The ideal freeze-drying medium has a high vapor pressure, a melting point either below or slightly above room temperature, a high viscosity, and a low toxicity. It must provide a stable environment for freeze-drying and be rapidly and completely removed to produce a readily reconstitutable cake. In this report, we will show that neat TBA is an excellent nonaqueous solvent for freeze-drying highly water unstable drugs, such as SarCNU.

## 2. Experimental

### 2.1. Materials

SarCNU (NSC-364432) was provided by the Pharmaceutical Resources Branch, Developmen-

Table 2
Vapor pressure of TBA and water

| Temperature (°C) | TBA[a] | Water[b] |
|---|---|---|
| | Vapor pressure (mmHg) | Vapor pressure (mmHg) |
| −20.5 | 1 | 0.74 |
| −3.0 | 5 | 3.57 |
| 5.5 | 10 | 6.77 |
| 14.5 | 20 | 12.38 |
| 24.4 | 40 | 22.92 |
| 31.0 | 60 | 33.69 |
| 39.8 | 100 | 54.74 |
| 52.5 | 200 | 104.65 |
| 68.0 | 400 | 214.17 |
| 83.0 | 760 | 400.60 |

[a] All data were obtained from reference (Chemical Engineer's Handbook, 1973).

[b] All data were obtained from reference (Lange's Handbook of Chemistry, 1992).



Fig. 2. Sublimation of TBA and $H_2O$ during the primary drying ($-20$ °C and 60 mTorr).

Table 1
The physical properties of the solvents

| Name | Molecular weight | Melting point (°C) | Boiling point (°C) | Density (g/ml) 25 °C | Vapor pressure (mmHg) 25 °C | Viscosity (mPa·s) 20 °C |
|---|---|---|---|---|---|---|
| $H_2O$ | 18.02 | 0 | 100 | 0.9970 | 23.78 | 1.00 |
| HAc | 60.05 | 17 | 118 | 1.0429 | 15.75 | 1.31 |
| TBA | 74.12 | 25 | 82 | 0.7812 | 41.25 | 3.62 |
| DMSO | 78.14 | 19 | 189 | 1.0955 | 0.60 | 2.20 |

All data were obtained from reference (Handbook of Chemistry and Physics, 1991–1992), except for the viscosity of TBA that was experimentally determined.

EAGLEBEN-SLAYBACK-00272505

tal Therapeutics Program, Division of Cancer Treatment, National Cancer Institute (Bethesda, MD). 'Baker Analyzed' *tert*-butyl alcohol was at least 99.9% pure. All other chemicals were analytical or high pressure liquid chromatographic assay (HPLC) grade.

Table 3
Degradation of SarCNU in different solvents at 25 °C

| Solvent | Degradation rate constants (per day) | $T_{90}$ (days) |
|---|---|---|
| HAc | 1.8324 | 0.06 |
| DMSO | 0.0912 | 1.16 |
| MeOH | 0.0216 | 4.88 |
| $H_2O$ | 0.4128 | 0.26 |
| 20% TBA/$H_2O$ | 0.2880 | 0.36 |
| 50% TBA/$H_2O$ | 0.1032 | 1.02 |
| 80% TBA/$H_2O$ | 0.0336 | 3.14 |
| TBA | 0.0072 | 14.93 |



Fig. 3. Degradation of SarCNU in different solvents at 25 °C.



Fig. 4. Degradation of SarCNU in TBA/water mixture at 25 °C.



Fig. 5. Crystallinity of the cake.

## 2.2. Freeze-drying process

A laboratory freeze-drier (Virtis 15 SRC-X, The Virtis Co., Inc. Gardiner, NY) was used. The freeze-drying process was as follows: (1) freezing at −20 °C for 24 h; (2) primary drying at −20 °C for 10 h; and (3) secondary drying at 10 °C for 10 h and then 20 °C for 5 h. The cooling and heating rate was not controlled during freezing. The chamber pressure was maintained at 60 mTorr throughout the drying process. Solutions of SarCNU were prepared at a concentration of 5.0 mg/ml in TBA. The amber freeze-drying vials (Serum vials, Borosilicate Glass, Kimble) were 10.0 ml with a fill volume of 1.0 ml and were covered using rubber stoppers (Gray Buty Rubber Stoppers, Kimble).

## 2.3. Thermal Analysis

Differential scanning calorimetry (DSC) was conducted on 3–5 mg samples. The samples were placed in sealed aluminum pans and an empty sealed aluminum pan was used as a reference. They were heated at 10 °C/min using a TA Instruments DSC 910 (TA, Instruments, Inc., New Castle, DE).

Thermogravimetric analysis (TGA) was conducted on 3–5 mg samples in open aluminum pans at a heating rate of 10 °C/min using a TA Instruments TGA 951 (TA, Instruments, Inc.).

EAGLEBEN-SLAYBACK-00272506

Case 1:21-cv-01256-CFC-JLH   Document 107-3   Filed 09/23/22   Page 76 of 154 PageID #: 3623

### 2.4. Analysis of sublimation of TBA and water during primary drying

Preweighed 10 ml freeze-drying vials were filled with 1 ml of TBA or water, reweighed and transferred to the freeze-dryer. The solutions were cooled at − 20 °C over night to allow for complete solidification. Sublimation of the solutions was undertaken at a shelf temperature of − 20 °C and a chamber pressure of 60 mTorr. Samples that were removed at various stage of drying were weighed and the weight loss was recorded.

### 2.5. Polarizing microscope and camera

Photomicrographs of the freeze-dried cakes ∈were taken using a SPOT camera and a Leica DMLP polarizing microscope (E. Licht Co., Denver, CO).

### 2.6. Gas chromatographic assay

A gas chromatographic assay (GC) with flame ionization detection (Hewlett Packard 5890, series II, Hewlett Packard Inc., Wilmington, DE) was used to measure the amount of residual TBA. The column used was a Supelco Simplicity-Wax Fused Silica Capillary Column, 30 m, 0.25 mm ID, 0.25 μm film (Lot no. 12130-08A) (Supelco Inc., Bellefonte, PA). Three aqueous solutions: TBA/SarCNU, pure drug, and the cake were prepared. A PIERCE Reacti-Therm™ Stirring/heating module (Pierce Inc., Rockford, IL) was used to heat the sample solution at 85 °C for 1 h, until a saturated vapor was obtained. The injection volume was 100 μl.



Fig. 6. DSC thermograph of SarCNU.

EAGLEBEN-SLAYBACK-00272507

*N. Ni et al. / International Journal of Pharmaceutics 226 (2001) 59–90*

# TGA



Fig. 7. TGA thermograph of SarCNU.

## 2.7. High pressure liquid chromatographic assay

The gradient high pressure liquid chromatography assay of Peninsula Laboratories has been modified for SarCNU as described below: A Beckman System Gold (Beckman Instruments Inc., Fullerton, CA) equipped with a model no. 167 detector at 254 nm was used for HPLC analysis. The injection volume was 20 µl. Separations were achieved on a Restek Pinnacle ODS Amine column (5 U, 4.6 × 250 mm²) (Restek Inc., Bellefonte, PA) at room temperature with a flow rate of 1.0 ml/min. The initial composition of the mobile phases was 9 parts of 1% acetic acid and 1 part acetonitrile. This was changed over a period of 20 min to the final composition of 1 part of 1% acetic acid and 9 parts of acetonitrile. Samples were dissolved in methanol and filtered through a 0.45 µm nylon filter membrane (Alltech Associates Inc. Deerfield, IL) before injection. The observed relative retention time of SarCNU was 9 min.

## 3. Results and discussion

### 3.1. Selection of a freeze-drying medium

Water and three possible alternate freeze-drying vehicles: glacial acetic acid, TBA, and dimethyl sulfoxide (DMSO) were chosen for evaluation. Table 1 shows the physical properties of water and the three nonaqueous vehicles considered. Each of these relatively nontoxic solvents has a low molecular weight, a melting point that is only slightly lower than room temperature, and the

EAGLEBEN-SLAYBACK-00272508

Case 1:21-cv-01256-CFC-JLH Document 107-3 Filed 09/23/22 Page 78 of 154 PageID #: 3625

ability to readily sublime. Solvents with high vapor pressures sublime rapidly and thus accelerate the freeze-drying process. The cooling produced by rapid sublimation also helps to prevent the collapse of the cake by helping to keep the temperature of the cake below the collapse temperature. Solvents with a high viscosity are likely to reduce collapse or crystallization of amorphous drugs by inhibiting viscous flow during the formation of the cake. Table 1 shows that TBA has the highest viscosity as well as the highest vapor



Fig. 8. GC of aqueous solution containing 0.7 g/100 ml SarCNU and 0.1 ml/100 ml TBA.



Fig. 9. GC of the cake aqueous solution containing 0.7 g/100 ml SarCNU cake.



Fig. 10. GC of the pure drug aqueous solution containing 0.7 g/100 ml SarCNU.

pressure. In addition, it was observed that TBA forms small loosely packed needle-shaped crystals. This further decreases the resistance of the partially dried solids to further drying, because the needle-shaped crystals sublime to leave a highly porous matrix. Since this matrix has a low resistance to vapor transfer and a large surface area, both primary and secondary drying are efficient and rapid. Thus, as a result of its high vapor pressure (Table 2) and its crystal morphology the sublimation rate of TBA is more than 2.5 times greater than that of water as shown in Fig. 2. Although TBA has been used as an aqueous cosolvent in freeze-drying (Kasraian and DeLuca, 1994; Wittaya-Areekul and Nail, 1998), it is rarely used as a neat vehicle. This may be due to the fact that it is solid at most ambient temperatures. However, Tesconi and Yalkowsky (Tesconi et al., 1999) have shown that solid vehicles can be successfully used for freeze-drying.

### 3.2. Freeze-drying cake

No cake was formed when water was used to freeze-dry SarCNU. It was found that higher concentrations of TBA in TBA–water mixtures improve cake quality and the most uniform cake is produced from pure TBA. It is believed that the poor quality of cake formed in the presence of water is due to the lower vapor pressure and the

EAGLEBEN-SLAYBACK-00272509

N. Ni et al. / International Journal of Pharmaceutics 226 (2001) 39–46

lower viscosity of water even though the primary drying temperature was maintained below the collapse temperature. The stronger interaction of water with SarCNU may also contribute to the reduction of cake quality. The rapid sublimation of TBA helps to keep the product temperature below the collapse temperature. (For a crystalline drug, the collapse temperature is the eutectic temperature and for an amorphous drug, the collapse temperature is the glass transition temperature.) The high viscosity of TBA is also believed to help to prevent collapse by reducing viscous flow during the formation of the cake. Table 3 and Figs. 3 and 4 show that SarCNU is more stable in pure TBA than in any of the other pure solvents or in any of the TBA–water mixtures.

Fig. 5 shows that needle-shaped crystals of SarCNU were obtained after freeze-drying with TBA. The DSC scans in Fig. 6 show that there is no significant difference between the crystals of the cake and those of the pure bulk drug. The high surface area of the crystals in the cake ensures rapid reconstitution. The drug can be stored at 4 °C over 6 months without any measurable physical or chemical change and at 25 °C with some cake collapse but without any chemical degradation. The drug also can be stored at 4 °C over 12 months with some cake collapse but without any chemical degradation. A possible reason for the collapse of the cake is that small amounts of SarCNU (which melts at 93 °C) slowly sublime and recrystallize in a process similar to caking or sintering. This process is faster at room temperature than in the refrigerator. The cake is readily reconstituted with water. However, the resultant SarCNU solution has a $T_{90}$ of only 4 h. The cake can also be reconstituted with an aqueous solution of 40% propylene glycol (PG) and 10% EtOH. This solvent, which is less polar and has less water, was chosen to minimize hydrolysis. It gives a $T_{90}$ of 13 h for SarCNU. In either case, both the 4 and 25 °C products can be reconstituted within 30 s with only gently shaking.

### 3.3. Residual solvent

The TGA scans in Fig. 7 show no detectable TBA in the SarCNU cake. The gas chro-matograms of Figs. 8–10 confirm that there is less than 0.001% TBA in the cake. The absence of TBA in the cake results from its ability to form high surface area crystals and from the fact that the intermolecular forces among TBA molecules and between TBA and SarCNU are not as strong as those of water. This allows TBA to sublime more completely and easily than water. The detrimental effects of TBA on health are minimal (Faulkner et al., 1989). The 0.001% TBA (0.05 µg TBA per cake) that is left in the cake is much lower than the toxic level. It has also been reported that a volatile organic solvent such as TBA can significantly reduce microbial contamination during filling or drying (Olson, 1997).

### 3.4. Recovery

Samples were assayed by the HPLC method described above before freeze-drying and after reconstitution. Only about 4% of the drug was lost during the lyophilization process. The same recovery ratio was obtained by repeating the freeze-drying process. Most of the drug loss is believed to be due to sublimation as evidenced by the fact that the chromatograms show no evidence of degradation of SarCNU and that it can be detected on the condenser after the TBA is removed.

### 4. Conclusion

TBA can improve the solubility and stability of hydrophobic and/or water sensitive drugs that must be freeze-dried. The needle-shaped crystals of TBA allow it to freeze and dry quickly and completely. There is less than 0.001% residual solvent left in the cake after secondary drying. The rapid sublimation of TBA prevents the collapse of the cake. The high crystallinity of the drug formed after freeze-drying from TBA increases its stability and shelf life. The SarCNU cake is readily reconstituted with water or an aqueous solution containing 40% PG and 10% EtOH. Thus, based upon its high volatility, high viscosity, crystal morphology and low reactivity, TBA is determined to be a suitable freeze-drying

EAGLEBEN-SLAYBACK-00272510

Case 1:21-cv-01256-CFC-JLH Document 107-3 Filed 09/23/22 Page 80 of 154 PageID #: 3627

medium for SarCNU, and perhaps for other poorly water stable and poorly water-soluble drugs.

## Acknowledgements

This work was performed under contract CM-77 109 from the National Cancer Institute.

## References

Bosanquet, A.G., 1985. Stability of solutions of antineoplastic agents during preparation and storage for in vitro assays. Cancer Chem. Pharm. 14, 83–95.

Chemical Engineer's Handbook, fifth ed., 1973. R.C. Weast (Ed.) McGraw-Hill, New York, pp. 3–50.

Faulkner, T.P., Wiechart, J.D., Hartman, D.M., 1989. The effects of prenatal tertiary butanol administration in CBA/ J and CS7BI/6J mice. Life Sci. 45, 1989–1995.

Handbook of Chemistry and Physics, 72nd ed., 1991–1992. Chemical Rubber Publishing Company.

Kasraian, K., DeLuca, P.P., 1994. The effect of tertiary butyl alcohol on the resistance of the dry product layer during primary drying. Pharm. Res. 12 (4), 491–495.

Lange's Handbook of Chemistry, 14th Ed., 1992. J.A. Dean (Ed.) McGraw-Hill, New York, pp. 5.26–5.29.

Olson, W.P., 1997. Volatile solvents for drying and microbial kill in the final container: a proposal and a review, with emphasis on tert-butyl alcohol. Pharm. Eng. July/August, 112–117.

Tesconi, M.S., Sepassi, K., Yalkowsky, S.H., 1999. Freeze-drying above room temperature. J. Pharm. Sci. 88 (5), 501–506.

Wittaya-Areekul, S., Nail, S.L., 1998. Freeze-drying of tert-butyl alcohol/water cosolvent systems: effects of formulation and process variables on residual solvents. J. Pharm. Sci. 87 (4), 491–495.

EAGLEBEN-SLAYBACK-00272511

*For Discussion Purposes Only*
U.S. Application 16/509,920

U.S. Application 16/509,920
Telephonic Interview Agenda
March 11, 2021, 10.00
Examiner Arnold
Michael Mercanti (for Applicant)
Stephanie Lodise (for licensee)

### *Brief Summary of Claimed Subject Matter*

1.  A **liquid bendamustine-containing composition** comprising
    bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about **10 mg/mL to about 100 mg/mL**;
    **polyethylene glycol**; and
    a stabilizing amount of an **antioxidant**;
    the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.

8.  A method of treating cancer in a mammal, comprising administering an effective amount of the liquid bendamustine-containing composition of claim 1 to the mammal.

### *Art for Discussion:  Brittain[1] in view of TREANDA®*

| Brittain |
| --- |
| [0008]  Currently bendamustine is formulated as a lyophilized powder for injection with 100 mg of drug per 50 mL vial or 25 mg of drug per 20 mL vial. The vials are opened and reconstituted as close to the time of patient administration as possible. The product is reconstituted with 40 mL (for the 100 mg presentation) or 10 mL (for the 25 mg presentation) of Sterile Water for Injection. The reconstituted product is further diluted into 500 mL, q.s., 0.9% Sodium Chloride for Injection. The route of administration is by intravenous infusion over 30 to 60 minutes. |

---

[1] US 2006/0159713

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272512

*For Discussion Purposes Only*
U.S. Application 16/509,920

| Brittain | |
|---|---|
| [0088] A pharmaceutically acceptable lyophilization excipient can be dissolved in the aqueous phase. Examples of excipients useful for the present invention include, without limitation, sodium or potassium phosphate, citric acid, tartaric acid, gelatin, glycine, and carbohydrates such as lactose, sucrose, maltose, glycerin, dextrose, dextran, trehalose and hetastarch. Mannitol is a preferred excipient. Other excipients that may be used if desired include antioxidants, such as, without limitation, ascorbic acid, acetylcysteine, cysteine, sodium hydrogen sulfite, butyl-hydroxyanisole, butyl-hydroxytoluene or alpha-tocopherol acetate, or chelators. | [0087] As described herein, a lyophilized formulation of bendamustine is achieved following removal of an organic solvent in water. The most typical example of the solvent used to prepare this formulation is tertiary butanol (TBA). Other organic solvents can be used including ethanol, n-propanol, n-butanol, isopropanol, ethyl acetate, dimethyl carbonate, acetonitrile, dichloromethane, methyl ethyl ketone, methyl isobutyl ketone, acetone, 1-pentanol, methyl acetate, methanol, carbon tetrachloride, dimethyl sulfoxide, hexafluoroacetone, chlorobutanol, dimethyl sulfone, acetic acid, cyclohexane. These preceding solvents may be used individually or in combination. Useful solvents must form stable solutions with bendamustine and must not appreciably degrade or deactivate the API. The solubility of bendamustine in the selected solvent must be high enough to form commercially useful concentrations of the drug in solvent. Additionally, the solvent should be capable of being removed easily from an aqueous dispersion or solution of the drug product, e.g., through lyophilization or vacuum drying. Preferably, a solution having a concentration of about 2-80 mg/mL, preferably about 5 to 40 mg/mL, more preferably 5-20 mg/mL and even more preferably 12 to 17 mg/mL bendamustine is used. |
| [0099] After lyophilization, the bendamustine lyophilization powder may be filled into containers, such as vials, or alternatively the pre-lyophilization solution can be filled into such vials and lyophilized therein, resulting in vials which directly contain the lyophilized bendamustine formulation. Such vials are, after filling or lyophilization of the solution therein, sealed, as with a stopper, to provide a sealed, sterile, pharmaceutical dosage form. Typically, a vial will contain a lyophilized powder including about 10-500 mg/vial, preferably about 100 mg/vial, bendamustine and about 5 mg-2 g/vial, preferably about 170 mg/vial, mannitol. | [0057] By "stable pharmaceutical composition" is meant any pharmaceutical composition having sufficient stability to have utility as a pharmaceutical product. Preferably, a stable pharmaceutical composition has sufficient stability to allow storage at a convenient temperature, preferably between −20° C. and 40° C., more preferably about 2° C. to about 30° C., for a reasonable period of time, e.g., the shelf-life of the product which can be as short as one month but is typically six months or longer, more preferably one year or longer even more preferably twenty-four months or longer, and even more preferably thirty-six months or longer. The shelf-life or expiration can be that amount of time where the active ingredient degrades to a point below 90% purity. For purposes of the present invention stable pharmaceutical composition includes reference to pharmaceutical compositions with specific ranges of impurities as described herein. Preferably, a stable pharmaceutical composition is one which has minimal degradation of the active ingredient, e.g., it retains at least about 85% of un-degraded active, preferably at least about 90%, and more preferably at least about 95%, after storage at 2-30° C. for a 2-3 year period of time. |
| | [0108] Preferably, a lyophilized preparation of the invention is stable with respect to HP1, i.e., the amount of HP1 does not increase appreciably (does not exceed the shelf-life specifications), for 6 months, more preferably 12 months, and even more preferably greater than 24 months, e.g., 36 months, when stored at about 2° C. to about 30° C., preferably 5° C. |

EAGLEBEN-SLAYBACK-00272513

*For Discussion Purposes Only*
U.S. Application 16/509,920

| Brittain |  |
| --- | --- |
| [0067]  A "pharmaceutical dosage form" as used herein means the pharmaceutical compositions disclosed herein being in a container and in an amount suitable for reconstitution and administration of one or more doses, typically about 1-2, 1-3, 1-4, 1-5, 1-6, 1-10, or about 1-20 doses. Preferably, a "pharmaceutical dosage form" as used herein means a lyophilized pharmaceutical composition disclosed herein in a container and in an amount suitable for reconstitution and delivery of one or more doses, typically about 1-2, 1-3, 1-4, 1-5, 1-6, 1-10, or about 1-20 doses. The pharmaceutical dosage form can comprise a vial or syringe or other suitable pharmaceutically acceptable container. The pharmaceutical dosage form suitable for injection or infusion use can include sterile aqueous solutions or dispersions or sterile powders comprising an active ingredient which are adapted for the extemporaneous preparation of sterile injectable or infusible solutions or dispersions. In all cases, the ultimate dosage form should be sterile, fluid and stable under the conditions of manufacture and storage. The liquid carrier or vehicle can be a solvent or liquid dispersion medium comprising, for example, water, ethanol, a polyol such as glycerol, propylene glycol, or liquid polyethylene glycols and the like, vegetable oils, nontoxic glyceryl esters, and suitable mixtures thereof. The prevention of the growth of microorganisms can be accomplished by various antibacterial and antifungal agents, for example, parabens, chlorobutanol, phenol, sorbic acid, thimerosal, and the like. |  |

| TREANDA |
| --- |
| **2.3   Reconstitution/Preparation for Intravenous Administration** <br> Aseptically reconstitute each TREANDA vial as follows: <br> o   25 mg TREANDA vial: Add 5 mL of only **Sterile Water for Injection, USP**. <br> o   100 mg TREANDA vial: Add 20 mL of only **Sterile Water for Injection, USP**. <br><br> Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used. <br><br> Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline).  As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500 mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution.  After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution. <br><br> Use Sterile Water for Injection, USP, for reconstitution and then either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, for dilution, as outlined above. No other diluents have been shown to be compatible. <br> Parenteral drug products should be inspected visually for particulate matter and discoloration prior to administration whenever solution and container permit. Any unused solution should be discarded according to institutional procedures for antineoplastics. <br><br>     **2.4   Admixture Stability** <br>     TREANDA contains no antimicrobial preservative.  The admixture should be prepared as close as possible to the time of patient administration. Once diluted with either 0.9% Sodium Chloride Injection, USP, or 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, the final admixture is stable for 24 hours when stored refrigerated (2-8°C or 36-47°F) or for 3 hours when stored at room temperature (15-30°C or 59-86°F) and room light. Administration of TREANDA must be completed within this period. |

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272514

*For Discussion Purposes Only*
U.S. Application 16/509,920

### *Examiner-Cited "Hydrogen Peroxide" Art*

| Waterman (2002) p 18 | |
|---|---|
| Peroxide impurities, commonly found in polysorbates such as Tween 80 and Tween 20, as well as commercial polyethylene glycol (PEG), are typically at sufficient levels to cause appreciable degradation, especially at elevated temperatures (see "Peroxides and Other Oxidizing Agents" and "Detecting and Controlling Impurities"). Peroxides can prevent an excipient's use in protein formulations or lead to the use of specially processed excipients in cases where the excipient is an essential formulation component. This illustrates an important point in protein formulation: the variety of routes by which proteins degrade often leads to situations where a particular excipient or formulation/storage condition is optimal to prevent one route of degradation (e.g., aggregation or adsorption) but accelerates another route of degradation (e.g., oxidation or microbial growth). Unfortunately, there is no general means to address these situations and they must be treated on a case-by-case basis, factoring in | not only the physico-chemical properties of the protein, but also the desired product profile and the storage and shipping restrictions. |

**Jones (1999) p 39**

Undissociated hydrogen peroxide behaves, to some extent, as a nucleophile, being about $10^4$ times more nucleophilic than water. For example, hydrogen peroxide readily adds to carbonyl bonds giving rise to hydroxyhydroperoxides (peracetals and perketals). Such compounds are often used as polymerization initiators on account of their radical decomposition at moderate temperatures (O–O bond homolysis). Neutral hydrogen peroxide can also react with activated acyl compounds such as anhydrides to give peroxyacids.

**Hsu (2002) p 7**

Hydrogen peroxide is one of oxidizing reagents commonly used in the oxidation of a tertiary amine to its N-oxide.[6] Accordingly, a homogeneous solution of HN-1 (1) and 30% hydrogen peroxide in methanol or acetonitrile at room temperature produced white precipitate in less than an hour, with a more profound effect in methanol. The white solid was soluble in water, aqueous acidic or basic solution indicating a charged species might be formed. After an extremely careful examination of the $^1H$ and $^{13}C$ NMR spectra and comparison with known piperazine compounds, the chemical structure of the white solid was identified as the bispiperazine quaternary ammonium salt 10 as shown in Scheme 3. Under identical reaction conditions, the bis-quaternary ammonium salt 11 was produced from HN-2 (2) in the same manner. It was surprising that HN-1 and HN-2 were not oxidized by 30% hydrogen peroxide under these conditions. The cyclized dimeric bisquaternary ammonium salts 10 and 11 were also formed rapidly in acetonitrile alone at ambient temperature. These results suggest that HN-1 and HN-2 proceed *via* a bimolecular nucleophilic substitution at a rapid rate in polar solvents which lead to the formation of bis-quaternary ammonium salts and thus, completely blocks the oxidation reaction at the nitrogen.

Under the same conditions, a mixture of HN-3 (3) and 30% hydrogen peroxide in methanol at room temperature yielded a new compound 12 in which a methanol molecule was incorporated into the product. When acetonitrile, a weaker nucleophile, was used to replace methanol as the solvent, a bi-molecular nucleophilic substitution took place as in the case of HN-1 and HN-2, but at a much slower rate. The cyclized bis-quaternary ammonium salt 13 was isolated in only three percent yield, and the remaining was

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272515

*For Discussion Purposes Only*
U.S. Application 16/509,920

the starting material, HN-3 (Scheme 4). This slow reaction was also observed in the acetonitrile-only media. The solution of HN-3 in acetonitrile did not form any cyclized quaternary salt after 14 days. Addition of a small amount of water into the mixture did enhance the formation of 13, but in very low yield. These results suggest that HN-3 is less reactive than HN-1 and HN-2 and water is the favored solvent for formation of bisquaternary salts.



1  R = $CH_2CH_3$ (HN-1)
2  R = $CH_3$ (HN-2)
3  R = $CH_2CH_2Cl$ (HN-3)



4

5

Scheme 3



1  R = $CH_3CH_2$
2  R = $CH_3$

10  R = $CH_3CH_2$
11  R = $CH_3$

Scheme 4



3

12

13

**Qin (2009) Introduction, Scheme 1**

The observation that oligo(ethylene glycol) (OEG)-terminated monolayers remained highly protein-resistant for a month at 37 °C in PBS buffer while they degraded faster in air can be rationalized by a proposed mechanism formulated from a model study using the first internal hydroperoxide of OEG.

EAGLEBEN-SLAYBACK-00272516

*For Discussion Purposes Only*
U.S. Application 16/509,920



Scheme 1

## *Non-Obviousness of Invention*

### December 21, 2020, Office Action

Applicant asserts that: "Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition." Respectfully, the Examiner cannot agree because in [0088] in the same paragraph that Brittain discusses adding excipient antioxidants, Brittain states: "A pharmaceutically acceptable lyophilization excipient can be dissolved in the aqueous phase." The Examiner properly interprets "dissolved in the aqueous phase" to mean that the antioxidant is added to the liquid bendamustine/PEG composition.

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272517

*For Discussion Purposes Only*
U.S. Application 16/509,920

pages. Accordingly, it is obvious to the ordinary artisan in this art to add antioxidants to pharmaceutical compositions containing PEG due to the presence of hydrogen peroxide impurity which can readily degrade bendamustine via reaction with the chloroethylamine functional group. A further motivation to add antioxidants to PEG compositions is to prevent the autoxidation of PEG as taught by Qin et al. (Introduction and Scheme 1 of: Chem Commun. 2009;5112-5114).

storage-stable composition." Respectfully, the Examiner cannot agree. The ordinary artisan in the pharmaceutical arts would have recognized that an antioxidant is required to prevent PEG autoxidation and/or to counteract any hydrogen peroxide impurities in the PEG that would serve to degrade the bendamustine. Thus it would appear that these are expected results. It is noted that Brittain et al. does not specifically name lipoic acid but Applicant did not compare lipoic acid against any of the disclosed antioxidant species of Brittain including acetylcysteine, ascorbic acid and cysteine. Furthermore, even if Applicant can show that lipoic acid is superior compared to the species taught by Brittain, the instantly claimed subject matter is not commensurate in scope. "The evidence presented to rebut a prima facie case of obviousness must be commensurate in scope with the claims to which it pertains." *In re Dill*, 604 F.2d 1356, 1361 (CCPA 1979).

In summary with the instant case, Applicant fails to provide any comparison showing an unexpected result compared with the closest prior art. See *In re Baxter*

### November 25, 2020, Applicant Remarks

***Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations***

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant. Instead, industry guidance encouraged addressing oxidation by ***other*** means. For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that "Antioxidants should only be included in a formulation if it has been proven [t]hat their use cannot be avoided." (EMEA Guidance at 8 of 9). Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead at 334).

EAGLEBEN-SLAYBACK-00272518

*For Discussion Purposes Only*
U.S. Application 16/509,920

Even if oxidation of a liquid bendamustine composition was for some reason a concern, industry guidance discouraged adding antioxidants and recommended other means for preventing oxidation.* Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be withdrawn for at least this reason.

*There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant. (Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C. (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | T$^o$C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition. A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition. (Siepmann Report at ¶¶ 359, 469-71)

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products. As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C. (Specification at Example 3, page 13, Table 3).

EAGLEBEN-SLAYBACK-00272519

*For Discussion Purposes Only*
U.S. Application 16/509,920

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CEPHALON, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   C.A. No. 17-01154-CFC |
| | )   (Consolidated) |
| SLAYBACK PHARMA LIMITED | ) |
| LIABILITY CO., *et al.*, | )   Highly Confidential |
| | ) |
| Defendants. | ) |
| | ) |

RESPONSIVE EXPERT REPORT OF JUERGEN SIEPMANN, PH.D.

**Siepmann Report at ¶¶355-358**

355.   A review of the marketed parenteral formulations available in the United States as of the priority date that contained PEG indicates that those formulations do not have antioxidants:

- Ativan® (lorazepam) contains "0.18 mL polyethylene glycol 400 in propylene glycol with 2.0% benzyl alcohol as preservative." Ativan® Label at 1 (2006). JDG_BENDA_00005945 at 5948.

- Busulfex™ (busulfan) contains "N-N-dimethylacetamide (DMA) 33% wt/wt and polyethylene glycol 400, 67% wt/wt." Busulfex™ Label at 1 (1999). JDG_BENDA_00005643 at 5643.

- Robaxin® (methocarbamol) contains "polyethylene glycol 300, NF 0.5 mL, Water for Injection, USP q.s." Robaxin® Label at 1 (2003). JDG_BENDA_00005854 at 5854.

- VePesid® (etoposide) contains 60% PEG 300, 30% ethanol, 8.0% Tween 80, 3% benzyl alcohol, and 2 mg/mL citric acid. Strickley 2004 at 219. JDG_BENDA_00003290 at 3308.

356.   Of the four formulations listed above containing PEG, none of them contain excipients that are listed in Nema 1997's list of Antioxidants/Reducing Agents (Table IV). Nema 1997 at 167, JDG_BENDA_00002272 at 2273. This state of the art refutes clearly Dr. Pinal's opinion that the POSA would have used PEG and then added an antioxidant to avoid the oxidation of PEG.

EAGLEBEN-SLAYBACK-00272520

*For Discussion Purposes Only*
U.S. Application 16/509,920

357.   I understand that citric acid (which is in VePesid®) may potentially act synergistically in conjunction with other antioxidants. *See, e.g.*, Akers 1982 at 227, JDG_BENDA_00006113 at 6119 (listing citric acid as an "antioxidant synergist," which is a compound that has "no capability of protecting oxygen-sensitive drugs, but, when combined with antioxidants, do serve to increase the maintenance of oxidative stability of the drug" either by "complexing trace amounts of metal," "lowering the solution pH," or "decreasing the oxygen stability in the solution"); Rowe 2009 at 181 ("Citric acid monohydrate is used as a sequestering agent and antioxidant synergist."). However, citric acid is principally a pH adjustor. *See* Rowe 2009 at 181. A publication discussing the VePesid® formulation states that the citric acid in that formulation is for pH adjustment. *See* Jonkman-de Vries at 479, JDG_BENDA_00002062 at 2066 ("The commercial formulation of etoposide (Vepesid®) contains . . . 2 mg citric acid (for pH adjustment) . . . .").

358.   From the above information, the POSA would have understood that, as of the priority date, none of the four commercially available parenteral formulations that contained PEG 300 or PEG 400 also contained an antioxidant. This would have taught the POSA that antioxidants were not routinely added to parenteral formulations containing PEG. REDACTED

## Siepmann Report at ¶¶ 359, 469-71

359.   The POSA likewise would have understood that Dr. Pinal's suggested formulation approach—to add PEG to the formulation and also to add an antioxidant to fix the degradation caused by the PEG—was not conventional. Rather, in view of the small number of marketed parenteral drugs containing PEG, and the fact that none of those drugs contained an antioxidant, the POSA would have inferred that formulators simply did not use PEG with drugs that might be susceptible to degradation via PEG's oxidation products. In my opinion, and based on my experience as a formulator, the POSA would not have been motivated or had reason to add PEG to a formulation if she or he believed that doing so would have necessitated also adding an antioxidant.

EAGLEBEN-SLAYBACK-00272521

*For Discussion Purposes Only*
U.S. Application 16/509,920

469. I further agree with Dr. Pinal that it was known that PEG could form various degradation products. As I explain above, the POSA would have viewed the degradation products of PEG as a disadvantage that would have discouraged the use of that solvent. *See, e.g.,* ¶¶ 339–360.

470. I disagree, however, with Dr. Pinal that PEG's known sensitivity to oxidation would have motivated or provided reason for the POSA to use an antioxidant with PEG. I likewise disagree that the POSA would have been motivated or had reason to use an antioxidant in conjunction with PG and bendamustine.

471. As I explain in detail above, the POSA would have been strongly motivated to avoid using an antioxidant in the formulation. *See* ¶¶ 344–360. The POSA would have preferred to keep the formulation as simple as possible; adding an antioxidant would have introduced substantial complexity into the formulation, including increasing the risk of unwanted interactions between the excipients and bendamustine. *See* ¶¶ 344–345. The POSA would have understood that antioxidants are particularly reactive and likely to cause unwanted interactions in the formulation. *See* ¶ 346. Adding an antioxidant would also have been undesirable because the concentration of the antioxidant would have to be maintained throughout the shelf life of the product—in effect, the stability of the product would become dependent on the antioxidant. *See* ¶ 347. The POSA also would have understood that an antioxidant might not completely solve any potential oxidation problem and that finding an appropriate antioxidant would, in the first instance, be an unpredictable research effort. *See* ¶¶ 349–352.

4842-9996-8992.1

EAGLEBEN-SLAYBACK-00272522

# Lyophilization of Polyethylene Glycol Mixtures

KETAN AMIN, ROSE-MARIE DANNENFELSER, JOSEPH ZIELINSKI, BARBARA WANG

Novartis Pharmaceuticals Corporation, Pharmaceutical Development, One Health Plaza, East Hanover, New Jersey 07936

*Received 3 December 2003; revised 29 March 2004; accepted 1 April 2004*

*Published online in Wiley InterScience (www.interscience.wiley.com). DOI 10.1002/jps.20135*

**ABSTRACT:**   Lyophilization of cosolvent systems may be a beneficial way of enhancing both physical and chemical stability of a drug product. The objective of this research is to establish whether cosolvent systems commonly used in the formulation of poorly water-soluble drugs can be successfully lyophilized. Polyethylene glycol (PEG) 400 was selected because it is widely used and can be easily frozen. The addition of PEG 400 to commonly used bulking agents, such as mannitol, sucrose, or polyvinylpyrrolidone, caused a significant change in the thermal properties of the bulking agents as observed by modulated differential scanning calorimetry. In addition, PEG 8000 was evaluated as a bulking agent because it also can function as a cosolvent in solution and forms an acceptable cake after lyophilization. Addition of PEG 400 to PEG 8000 caused negligible changes in the thermogram of this bulking agent. Surprisingly, the combination of PEG 8000 and PEG 400 forms a solid lyophilized cake. The current system can be best described as the lyophilization of a miscible solution of PEG 8000 and PEG 400 resulting in a lyophile that has a crystalline structure of PEG 8000 which is able to support PEG 400.
© 2004 Wiley-Liss, Inc. and the American Pharmacists Association J Pharm Sci 93:2244–2249, 2004
**Keywords:**   freeze drying/lyophilization; solubility; calorimetry (DSC); excipients; formulation; formulation vehicle; injectables; microscopy; glass transition; thermal analysis

## INTRODUCTION

Many new active pharmaceutical ingredients exhibit poor aqueous solubility necessitating additional solubilizing excipients to develop parenteral drug products. Often these poorly water-soluble drugs are incorporated into systems that contain organic solvents (i.e., cosolvent systems).[1,2] Although these liquid cosolvent systems increase solubility, they may do little to augment drug substance stability. As a result, lyophilization of these cosolvent systems may be a beneficial way of enhancing both physical and chemical stability of the drug product. Typically, the ideal lyophilization medium has a high vapor pressure, a melting point either below or slightly above room temperature, low toxicity, and should be rapidly and completely removed to produce a stable and readily reconstitutable cake.[3] Currently there is little guidance in the literature for the development of an unstable and highly insoluble drug that requires a lyophilized cosolvent system.

Organic solvents, solubility enhancers, typically used in cosolvent systems include propylene glycol, polyethylene glycols (PEGs), polysorbate 80, and Cremophor. However, previous attempts to lyophilize cosolvent systems have focused primarily on excipients with relatively high vapor pressures, such as ethanol, isopropanol, or *tert*-butanol, to ensure removal of the solvent from the drug product. Selection of an appropriate cosolvent system involves an understanding of the numerous problems that may arise. A list of some potential disadvantages includes toxicity, operator safety due to the high degree of flammability

Barbara Wang's present address is HGB International Ltd., Summit, NJ 07901.
*Correspondence to:* Ketan Amin (Telephone: 862-778-7372; Fax: 973-781-4556;
E-mail: ketan.amin@pharma.novartis.com)
Journal of Pharmaceutical Sciences, Vol. 93, 2244–2249 (2004)
© 2004 Wiley-Liss, Inc. and the American Pharmacists Association

EAGLEBEN-SLAYBACK-00272523

or explosivity, lack of compendial grades or monographs, requirement of special manufacturing facilities/equipment and/or storage areas, difficult handling properties, requirements of high-purity solvents with low impurities, minimal residual solvent levels in the final product, high usage cost, potential for splash/spattering of product in vial neck, and lack of regulatory familiarity.[4]

The properties of PEG mixtures have been examined here because PEGs are commonly used and well tolerated, both orally and parenterally. Lyophilization of these cosolvents does not remove PEGs from the final product because they do not sublime under practical and common lyophilization conditions. PEG 400 was selected because it can be easily frozen and is widely accepted. PEG 8000 (solid at room temperature and a solubility enhancer) was evaluated and used as a bulking agent because it also has been reported to have an acceptable lyophilized product appearance.[5] The objective of this study is to identify a nonvolatile system consisting of commonly used cosolvents that is capable of undergoing lyophilization for poorly water-soluble drugs. Assessment of the physical properties of the lyophilized cakes will assist in understanding the implications on drug product stability due to the lyophilized system. Characterization of key physical properties of materials intended for lyophilization should be performed because identification of the thermal events provides information that is predictive in terms of determining whether a particular solvent system can be successfully lyophilized.

## MATERIALS AND METHODS

### Materials

PEGs of various molecular weights were obtained from Union Carbide Corp. (Danbury, CT). Polyvinylpyrrolidone (PVP) (Povidone K-90) was obtained from ISP Technologies, Inc. (Wayne, NJ). Mannitol, sucrose, glycine, dextran (45,000 MW), and Ficoll (Type 400) were obtained from Sigma Chemical Co. (St. Louis, MO). Excipients were dissolved in Millipore water at the concentration indicated in the figure legends on a weight-per-volume basis. The vials were purchased from Schott Pharmaceutical Packaging (Cleona, PA), stoppers from Daikyo Seiko, Ltd. (Tokyo, Japan), and seals from West Pharmaceutical Services (Lionville, PA).

### Methods

#### Thermal Analysis

Thermal analysis was performed using modulated differential scanning calorimetry (MDSC) with indium being used for temperature calibration. Samples were analyzed in hermetically sealed aluminum pans using a TA Instruments model 2920 DSC (TA Instruments, Newcastle, DE) equipped with an automated liquid nitrogen cooling accessory. An empty hermetically sealed aluminum pan was used as reference. MDSC thermograms were recorded at a heating rate of $1°C/min$ with a modulation of $1°C$ every 100 s. For rapid freezing, samples were quenched in liquid nitrogen externally and loaded into the precooled MDSC cell at $-150°C$.

#### Lyophilization

Solutions were filled into 10-mL serum vials with a 2-mL fill volume and transferred to a freeze dryer (Usifroid Model SMH 90, Maurepas, France) equipped with an MKS Instruments Residual Gas Analyzer (MKS Instruments, Methuen, MA) which uses a mass spectrometer to monitor the drying process. The lyophilization cycle consisted of cooling the solutions down to a shelf temperature of $-50°C$ at $1°C/min$, establishing vacuum, and primary drying at temperatures below the collapse temperature ($T_c$) with secondary drying taking place at $25°C$. Figure legends indicate composition of lyophilized cakes as a weight/weight ratio. The water content of freeze-dried samples was determined to be $<1.5\%$ using the Karl Fisher titrimetry method (EM Science, Cherry Hill, NJ). Reconstitution time for all lyophilized samples was 1–2 min.

#### Freeze-Drying Microscopy

Freeze-drying microscopy was used to observe the $T_c$ of solutions using a procedure described by Hsu et al.[6] and Nail et al.[7] Briefly, a Linkam freeze-drying microscope stage, model FDCS 196, with LinkSys software and real-time video measurement was used. A small volume of sample (3 μL) was placed in a quartz holder. $T_c$ was determined while samples were maintained under vacuum. Direct thermal contact between the quartz sample holder and the stage was achieved with a suitable thermal fluid, which is capable of temperatures to $-90°C$. Composition of the samples was the same as that used for thermal analysis.

EAGLEBEN-SLAYBACK-00272524

### Scanning Electron Microscopy (SEM)

The surface structure of the lyophilized samples was studied by SEM (JEOL 6301FXV X-vision field emission SEM, Peabody, MA). Samples were lyophilized on aluminum specimen stubs and coated with gold palladium (coating thickness approximately 15 nm) in an argon atmosphere by a sputter coater (Denton Desktop cold sputter coater, Cherry Hill, NJ) before a photograph was taken.

### X-ray Powder Diffraction

A Rigaku RINT (D/Max+) 2200 diffractometer equipped with an Ultima+ goniometer was used with Cu Kα radiation at a voltage of 40 kV and a current of 40 mA. Alignment was verified with a Corundum standard using reflections at 25.578, 35.153, and 37.777° 2θ. Samples were prepared by front loading powders into a 0.5-mm deep glass well slide and scanning from 2 to 40° 2θ at a rate of 2°/min.

## RESULTS AND DISCUSSION

PEGs have been extensively discussed elsewhere as being primarily a crystalline polymer with high water solubility, melting point ∼60°C, and <10% amorphous content.[8] Identification of $T'_g$, the glass transition temperature for the maximally freeze-concentrated solution, is critical to the development of lyophilization cycles because this represents the highest temperature that is safe for the product during primary drying. In fact, $T'_g$ can be considered to be closely related to $T_c$ for amorphous systems just as the eutectic temperature ($T_e$) is related to $T_c$ for crystalline systems. $T'_g$ for common bulking agents alone and in the presence of varying concentrations of PEG 400 is shown in Table 1. The addition of up to 20% PEG 400 causes a negligible shift in the $T'_g$ for an

**Table 1.** $T'_g$ for Common Bulking Agents Alone and in the Presence of PEG 400

|  | $T'_g$ (°C) | | |
|---|---|---|---|
| % PEG 400 | 0% | 10% | 20% |
| PEG 8000 5% | −67 | −77 | −79 |
| Mannitol 5% | −29 | −81 | −80 |
| Sucrose 10% | −33 | −71 | −75 |
| PVP K90 5% | −21 | −82 | NT |

NT, not tested.





**Figure 1.** MDSC profiles of frozen solutions containing PEG 8000 and PEG 400. Samples were cooled to −150°C followed by a heating rate of 1°C/min with a modulation of 1°C every 100 s. MDSC provides the sum of the reversing and nonreversing heat flow signals whereby $T'_g$ will be found in the reversing heat flow signal. Panel A illustrates $T'_g$ of −67°C, −77°C, and −79°C for 5% PEG 8000, 5% PEG 8000 with 10% PEG 400, 5% PEG 8000 with 20% PEG 400, respectively. Panel B illustrates an endotherm at −11°C, −17°C, and −18°C for 5% PEG 8000, 5% PEG 8000 with 10% PEG 400, 5% PEG 8000 with 20% PEG 400, respectively.

aqueous solution of 5% PEG 8000 (Fig. 1A). Conversely, addition of PEG 400 to solutions of mannitol, sucrose, or PVP results in a significant decrease in $T'_g$. Model crystalline bulking materials, mannitol and PEG 8000, and model amorphous bulking materials, sucrose and PVP, were evaluated with PEG 400, a plasticizer, for their interactions in aqueous solutions.

To examine the lyophilization process of various solutions, approximately 3 µL of solution was placed onto the cooling stage of a freeze-drying microscope, covered with a quartz slide, and cooled from room temperature to −70°C at 10°C/min. Figure 2 shows the freeze-drying microscopy image for an aqueous solution containing 5% PEG 8000 and 10% PEG 400. After a 3-min hold, the sample was reheated to −30°C at 5°C/min and then to −18°C at 1°C/min. After a 5-min hold, the

EAGLEBEN-SLAYBACK-00272525

Case 1:21-cv-01256-CFC-JLH   Document 107-3   Filed 09/23/22   Page 95 of 154 PageID #: 3642

**Figure 2.** Freeze-drying micrograph of solution containing 5% PEG 8000 and 10% PEG 400. Micrograph depicts drying along the freeze-drying front advancing from right to left with drying occurring at $-35^\circ$C and collapse occurring at $-18^\circ$C. Bands of dried and collapsed material are evident by repeated oscillation between the drying and collapse temperatures.



**Figure 3.** MDSC profile of frozen solutions containing PEG 8000, PEG 400, and their mixture. Samples were cooled to $-150^\circ$C followed by a heating rate of $1^\circ$C/min with a modulation of $1^\circ$C every 100 s. MDSC provides the sum of the reversing and nonreversing heat flow signals whereby $T'_g$ will be found in the reversing heat flow signal. Frozen solutions containing PEG 8000 and PEG 400 show a single $T'_g$ ($-75.79^\circ$C), in the reversing heat flow, between the $T'_g$ of the individual components ($-83.74^\circ$C and $-66.99^\circ$C for PEG 400 and PEG 8000 solution, respectively).

sample was then recooled to $-35^\circ$C at $10^\circ$C/min and then reheated to $-18^\circ$C at $1^\circ$C/min followed by a return to $-35^\circ$C to allow for additional lyophilization along the freeze-drying front. Freeze-drying microscopy observations of 5% PEG 8000 with 10% PEG 400 indicates a $T_c$ of $-18^\circ$C which corresponds to the endothermic events observed in MDSC thermograms (Fig. 1B). Similar observations were made by freeze-drying microscopy for 5% PEG 8000 with 20% PEG 400. However, freeze-drying microscopy studies indicated that lyophilization of PEG 400 with mannitol, sucrose, or PVP are not feasible at temperatures above $-50^\circ$C because of structure collapse or lack thereof within the lyophilized sample.

MDSC profiles of frozen solutions containing PEG 8000, PEG 400, and their mixtures (Fig. 3) were evaluated to determine phase behavior during freezing. Frozen aqueous solutions containing PEG 8000, and PEG 400 show a single $T'_g$ region between their individual $T'_g$s, indicating that a single phase is formed when frozen. Similarly, Izutsu et al.[9] observed a single $T'_g$ region between the individual components of the sucrose and PVP or sucrose and Ficoll solutions indicating miscibility of the two components. However, frozen solutions that contained both dextran and Ficoll, or both dextran and PVP, showed two $T'_g$ regions that were close to those of their respective

individual $T'_g$s,[9] indicating phase separation in the frozen state.[10]

Thermal analysis of a 5% PEG 8000 aqueous solution yields an endothermic event at $-11.18^\circ$C which corresponds to the $T_c$ noted by MacKenzie[5] (Fig. 1B). Upon addition of 10% or 20% PEG 400, this endotherm shifts from $-11^\circ$C to $-17^\circ$C or $-18^\circ$C, respectively. Observations of $T_c$'s obtained from freeze-drying microscopy correspond to the endothermic events observed in MDSC thermograms for 5% PEG 8000 with 10% or 20% PEG 400. Similarly, thermal analysis of 5% PEG 8000 with 10% or 20% PEG 600 yields endothermic events at $-15^\circ$C or $-16^\circ$C, respectively. The physical state of the solutes in frozen solutions is typically evaluated by MDSC which, in addition, provides an estimate of the maximum allowable product temperature for primary drying which also corresponds to $T_c$.[11]

A $T_g$ was not detected by MDSC upon lyophilization of PEG 8000. Thermally stimulated current spectrometry studies, beneficial for materials with low amorphous content, were performed based on methods described elsewhere.[12,13] Thermally stimulated current analysis indicated that lyophilized PEG 8000 has a $T_g$ at $-16.16^\circ$C. Lyophilization of PEG 8000 with increasing concentrations of PEG 400 resulted in a $T_g$ close to the $T_g$ of neat PEG 400. Thermal analysis of lyophilized mixtures of

EAGLEBEN-SLAYBACK-00272526

**2248** AMIN ET AL.



**Figure 4.** Thermal analysis of lyophilized mixtures of PEG 8000 and PEG 400. Samples were cooled to $-150°C$ followed by a heating rate of $1°C/min$ with a modulation of $1°C$ every 100 s. MDSC provides the sum of the reversing and nonreversing heat flow signals whereby $T_g$ will be found in the reversing heat flow signal. MDSC was unable to detect a $T_g$ for PEG 8000, whereas the $T_g$ for the tested ratios of PEG 8000/PEG 400 are in close proximity to the $T_g$ for neat PEG 400 ($-79°C$).



**Figure 5.** SEM micrograph illustrating the extensive porous nature on the surface of the lyophilized PEG 8000/PEG 400 (1:4) mixture suitable for the efficient passage of escaping water vapor.

PEG 8000 and PEG 400 are illustrated in Figure 4. The lack of a $T_g$ between the $T_g$ values of the pure components indicates that lyophilization of PEG 8000 with PEG 400 results in a phase-separated system analogous to immiscible amorphous systems previously described.[14]

An SEM micrograph of the surface structure of a lyophilized sample consisting of PEG 8000 and PEG 400 (5% and 20%, respectively, in the initial aqueous solution) is shown in Figure 5. Evident in the micrograph is the extensive porous nature of the freeze-dried cake or lyophile surface suitable for the efficient passage of escaping water vapor. Typically, lyophiles consist of contiguous systems of channels or pores created by the sublimation of ice as water vapor travels from the ice to the outer surface of the cake. The porous nature of lyophiles aids in the reconstitution time and therefore is another property necessary for the acceptance of a good lyophilized product. The resultant PEG 8000 and PEG 400 lyophile, because of its porous nature, reconstitutes in <2 min, indicative of a good lyophile.

## CONCLUSIONS

Nonaqueous cosolvent systems have been previously used in the development of lyophilized pharmaceutical drug products with one such product, Caverject® Sterile Powder, currently on the market.[15,16] Most attempts to lyophilize non-aqueous cosolvent systems have involved combinations of *tert*-butyl alcohol due to the ease with which it freezes and sublimes.[17,18] Nevertheless, the use of such volatile solvents has inherent disadvantages in terms of explosivity and residual solvent levels.

An alternative approach for the development of highly insoluble and unstable drugs requiring cosolvent systems was discussed. The proposed system uses an aqueous solution of PEG 8000 with PEG 400 to enhance the solubility of poorly water-soluble drugs. During lyophilization, both PEG 8000 and PEG 400 are not removed from the resultant lyophile. The lyophile is crystalline in structure (Fig. 6) due to 5% PEG 8000 and is able to support up to 20% PEG 400. Optimization of the proposed system would require the selection of an ideal molecular-weight PEG as the bulking agent. Higher-molecular-weight PEGs, >8000, may be better suited to support larger quantities of low-molecular-weight PEGs. The ideal ratio of high- to low-molecular-weight PEGs will also need to be ascertained along with the properties of the active pharmaceutical ingredient. Attention to any possible toxicities associated with the parenteral delivery of high-molecular-weight PEGs is

EAGLEBEN-SLAYBACK-00272527



**Figure 6.** X-ray powder diffractograms depicting crystallinity of (A) colyophilized PEG 8000/PEG 400 (1:6), (B) colyophilized PEG 8000/PEG 400 (1:2), (C) lyophilized PEG 8000, and (D) PEG 400.

required. The proposed system allows for the lyophilization of a nonaqueous cosolvent system void of explosivity, toxicity, and special handling issues related to the more commonly used volatile cosolvent systems that incorporate ethanol, isopropanol, or *tert*-butanol.

## ACKNOWLEDGMENTS

The authors thank Paul Grosenstein for assistance with SEM studies and Marilyn Alvine for assistance with X-ray powder diffraction studies.

## REFERENCES

1. Ni N, Sanghvi T, Yalkowsky SH. 2002. Stabilization and preformulation of anticancer drug SarCNU. Int J Pharm 249:257–264.
2. Sweetana S, Akers MJ. 1996. Solubility principles and practices for parenteral dosage form development. PDA J Pharm Sci Technol 50:330–342.
3. Ni N, Tesconi M, Tabibi E, Gupta S, Yalkowsky SH. 2001. Use of pure *t*-butanol as a solvent for freeze drying: A case study. Int J Pharm 226:39–46.
4. Teagarden DL, Baker DS. 2002. Practical aspects of lyophilization using non-aqueous co-solvent systems. Eur J Pharm Sci 15:115–133.
5. MacKenzie AP. 1976. The physico-chemical basis for the freeze-drying process. Dev Biol Stand 36: 51–67.
6. Hsu CC, Walsh AJ, Nguyen HM, Overchasier DE, Koning-Bastiaan H, Bailey RC, Nail SL. 1996. Design and application of a low-temperature peltier-cooling microscope stage. J Pharm Sci 85: 70–74.
7. Nail SL, Her LM, Proffitt C, Nail L. 1994. An improved microscope stage for direct observation of freezing and freeze-drying. Pharm Res 11:1098–1100.
8. Buckley CP, Kovacs AJ. 1976. Melting behavior of low molecular weight poly(ethylene-oxide) fractions. 2. Folded chain crystals. Colloid Polym Sci 254:695–715.
9. Izutsu K, Yoshioka S, Kojima S, Randolph TW, Carpenter JF. 1996. Effects of sugars and polymers on crystallization of poly(ethylene glycol) in frozen solutions: Phase separation between incompatible polymers. Pharm Res 13:1393–1400.
10. Her LM, Deras M, Nail SL. 1995. Electrolyte-induced changes in glass transition temperatures of freeze-concentrated solutes. Pharm Res 12:768–772.
11. Jiang S, Nail SL. 1998. Effect of process conditions on recovery of protein activity after freezing and freeze drying. Eur J Pharm Biopharm 45:249–257.
12. Venkatesh GM, Barnett ME, Owusu-Fordjour C, Galop M. 2001. Detection of low levels of the amorphous phase in crystalline pharmaceutical materials by thermally stimulated current spectrometry. Pharm Res 18:98–103.
13. Boutonnet-Fagegaltier N, Menegotto J, Lamure A, Duplaa H, Caron A, Lacabanne C, Bauer M. 2002. Molecular mobility study of amorphous and crystalline phases of a pharmaceutical product by thermally stimulated current spectrometry. J Pharm Sci 91:1548–1560.
14. Shamblin SL, Taylor LS, Zografi G. 1998. Mixing behavior of colyophilized binary systems. J Pharm Sci 87:694–701.
15. Teagarden DL, Petre WJ, Gold PM. April 21, 1998. Stabilized Prostaglandin E$_1$. United States Patent 5,741,523.
16. Teagarden DL, Petre WJ, Gold PM. June 23, 1998. Method for preparing stabilized prostaglandin E$_1$. US patent 5,770,230.
17. Baldi G, Gasco M, Pattarino F. 1994. Statistical procedures for optimizing the freeze-drying of a model drug in *tert*-butyl alcohol water mixtures. Eur J Pharm Biopharm 40:138–141.
18. Kasraian K, DeLuca PP. 1995. Thermal analysis of the tertiary butyl alcohol-water system and its implications on freeze-drying. Pharm Res 12:484–490.

EAGLEBEN-SLAYBACK-00272528

Case 1:21-cv-01256-CFC-JLH   Document 107-3   Filed 09/23/22   Page 98 of 154 PageID #: 3645

# Ready-to-use | definition of ready-to-use by Medical dictionary

https://medical-dictionary.thefreedictionary.com/ready-to-use

**SAMSUNG** Galaxy Tab S7 | S7+ ⊙

# ready-to-use

## ready-to-use

Able to be dispensed with minimal if any effort or preparation; prepackaged.

Medical Dictionary, © 2009 Farlex and Partners

Advertisement. Bad banner? Please let us know Remove Ads



EAGLEBEN-SLAYBACK-00272529

# EXHIBIT C

# EXHIBIT D



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000013



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only

APO-BENDA_0000018



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only



Highly Confidential – Attorney's Eyes Only

# EXHIBIT E

DOCKET NO.: 820-1041-US-CON7

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Examiner: Ernst V. Arnold   Art Unit: 1613

Re:  Application of:        Nagesh R. Palepu

Serial No.:                 16/509,920

Filed:                      July 12, 2019

For:                        **FORMULATIONS OF BENDAMUSTINE**

Confirmation No.:           7527

## AMENDMENT

Mail Stop Amendment                               May 20, 2021
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sirs:

In response to the Final Office Action of December 21, 2020, please amend the above-identified patent application as follows:

**Amendments to the Claims** begin on page **2** of this paper.

**Remarks/Arguments** begin on page **5** of this paper.

CERTIFICATE OF ELECTRONIC TRANSMISSION
I hereby certify that this document is being electronically
transmitted to the Commissioner for Patents via EFS-
Web on May 20, 2021.

LUCAS & MERCANTI, LLP

BY: /Carla Curado /
    Carla Curado

{00592392 }

EAGLEBEN-SLAYBACK-00271857

DOCKET NO.: 820-1041-US-CON7

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1. (Currently Amended) A <u>ready to use</u> liquid bendamustine-containing composition comprising

   bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 10 mg/mL to about 100 mg/mL;

   polyethylene glycol; and

   a stabilizing amount of an antioxidant;

   the composition having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.

2. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

3. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

4. Currently Amended)  The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, having less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

{00592392 }

Page 2 of 13

EAGLEBEN-SLAYBACK-00271858

DOCKET NO.: 820-1041-US-CON7

5. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is from about 20 mg/mL to about 60 mg/mL.

6. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, wherein the bendamustine concentration is about 25 mg/mL.

7. (Currently Amended) The <u>ready to use</u> liquid bendamustine-containing composition of claim 1, comprising bendamustine hydrochloride.

8. (Currently Amended) A method of treating cancer in a mammal, comprising administering an effective amount of the <u>ready to use</u> liquid bendamustine-containing composition of claim 1 to the mammal.

9. (Original)     The method of claim 8, wherein the cancer is leukemia.

10. (Original)     The method of claim 8, wherein the cancer is Hodgkin's disease.

11. (Original)     The method of claim 8, wherein the antioxidant is lipoic acid, thioglycerol, propyl gallate, methionine, cysteine, a metabisulfite, sodium formaldehyde sulfoxylate, a phenol-containing aromatic compound, a phenol-containing aliphatic compound, dihydrolipoic acid, or a mixture thereof.

12. (Currently Amended) The method of claim 8, wherein the <u>ready to use</u> liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 5 °C.

13. (Currently Amended) The method of claim 8, wherein the <u>ready to use</u> liquid bendamustine-containing composition has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of about 25 °C.

EAGLEBEN-SLAYBACK-00271859

DOCKET NO.: 820-1041-US-CON7

14. (Currently Amended) The method of claim 8, wherein the bendamustine concentration <u>in the ready to use liquid bendamustine-containing composition</u> is from about 20 mg/mL to about 60 mg/mL.

15. (Currently Amended) The method of claim 8, wherein the bendamustine concentration <u>in the ready to use liquid bendamustine-containing composition</u> is about 25 mg/mL.

16. (Currently Amended) The method of claim 8, wherein the <u>ready to use </u>liquid bendamustine-containing composition comprises bendamustine hydrochloride.

EAGLEBEN-SLAYBACK-00271860

DOCKET NO.: 820-1041-US-CON7

## REMARKS

A Certification and Request for Consideration Under the After Final Consideration Pilot Program 2.0 accompanies this response.

The undersigned thanks Examiner Arnold for the courtesy of the telephonic interview conducted on March 11, 2021, with the undersigned and Stephanie Lodise (Reg. No. 51,430). The pending claims and Brittain[1] were discussed, as well as District of Delaware Civil Action No. 17-1154-CFC regarding U.S. Patent Nos. 9,265,831 and 9,572,797.[2] Examiner Arnold suggested that amending the claims to recite that the liquid bendamustine-containing compositions are "ready to use" would distinguish the claimed compositions over Brittain's compositions. This response and AFCP are filed in response to that interview.

Claims 1-16 are pending. The claims have been amended to recite that the compositions are "ready to use." The amendments are supported by the specification at, for example, pages 2 and 9. No new matter has been added.

### Brief Description of the Claimed Inventions

The pending claims are directed to, among other things, "ready to use," liquid bendamustine-containing compositions having from about 10 mg/mL to about 100 mg/mL of bendamustine, polyethylene glycol, and an antioxidant. The claimed compositions are not reconstituted lyophilized powders; they are concentrated, bendamustine-containing liquids for administration through infusion with an appropriate diluent. (*See, e.g.,* Specification at page 2). This avoids the multi-step reconstitution and preparation for administration required for the Brittain products, including TREANDA®. These ready to use, liquid compositions are surprisingly stable and do not exhibit significant bendamustine degradation after storage for at least 15 months at refrigerated or room temperature conditions.

---

[1] U.S. Published Application No. 2006/0159713
[2] A copy of the District Court's decision is attached hereto as Exhibit A. U.S. Patent Nos. 9,265,831 and 9,572,797 are parents of the present application.

{00592392 }

EAGLEBEN-SLAYBACK-00271861

DOCKET NO.: 820-1041-US-CON7

**35 U.S.C. § 103**

The Examiner alleges that claims 1-16 would have been obvious over Brittain,[3] Treanda,[4] Von Stetten,[5] and Miekka.[6]  At the time of the invention, one of ordinary skill in the art would not have been motivated to make a liquid bendamustine-containing composition incorporating polyethylene glycol (PEG) and an antioxidant, as claimed.  Moreover, the stability achieved by the claimed compositions would have been unexpected in view of the cited art.  Applicant requests reconsideration and withdrawal of the rejection.

**Those of Ordinary Skill in the Art Would Not Have Had Any Reason to Prepare a Ready to Use, Bendamustine-Containing Liquid Having a Concentration of 10 mg/ml to about 100 mg/mL**

Brittain in combination with Treanda fails to motivate anyone of skill in the art to prepare a liquid composition having a bendamustine concentration of 10 mg/mL to about 100 mg/mL, or any amount within that range.

The Prescribing Information for Treanda instructs that lyophilized bendamustine should be reconstituted with water to a concentration of no more than 5 mg/mL, before being added to a 500 mL infusion bag of aqueous dextrose/sodium chloride to achieve further dilution to 0.2 – 0.6 mg/mL for patient administration:

2.3  Reconstitution/Preparation for Intravenous Administration
Aseptically reconstitute each TREANDA vial as follows:
o   25 mg TREANDA vial: Add 5 mL of only **Sterile Water for Injection, USP.**
o   100 mg TREANDA vial: Add 20 mL of only **Sterile Water for Injection, USP.**

Shake well to yield a clear, colorless to a pale yellow solution with a bendamustine HCl concentration of 5 mg/mL.  The lyophilized powder should completely dissolve in 5 minutes.  If particulate matter is observed, the reconstituted product should not be used.

Aseptically withdraw the volume needed for the required dose (based on 5 mg/mL concentration) and immediately transfer to a 500 mL infusion bag of 0.9% Sodium Chloride Injection, USP (normal saline). As an alternative to 0.9% Sodium Chloride Injection, USP (normal saline), a 500

mL infusion bag of 2.5% Dextrose/0.45% Sodium Chloride Injection, USP, may be considered.  The resulting final concentration of bendamustine HCl in the infusion bag should be within 0.2 – 0.6 mg/mL.  The reconstituted solution must be transferred to the infusion bag within 30 minutes of reconstitution.  After transferring, thoroughly mix the contents of the infusion bag.  The admixture should be a clear and colorless to slightly yellow solution.

---

[3] U.S. Published Application No. 2006/0159713

[4] TREANDA, Highlights of prescribing information, 2008

[5] U.S. 4,711,906.  Von Stetten is cited merely for a disclosure of diclofenac in PEG and propylene glycol.  (Action at 8).  Diclofenac and bendamustine are chemically distinct compounds and there is no evidence of record that those of ordinary skill in the art would have considered a diclofenac formulation to be informative in preparing a storage-stable liquid bendamustine composition.

[6] U.S. 7,252,799.  Miekka is merely cited for its purported disclosure that lipoic acid, methionine, cysteine, thiols, propyl gallate, dihydrolipoic acid, BHA, BHT, and sodium formaldehyde sulfoxylate are antioxidant stabilizers.

{00592392 }

Page 6 of 13

EAGLEBEN-SLAYBACK-00271862

DOCKET NO.: 820-1041-US-CON7

(Treanda at Section 2.3; *see also*, Brittain at paragraph [0100] (stating that Brittain's lyophilized formulations are reconstituted with water and then further diluted with, *e.g.*, saline)). Brittain refers to polyethylene glycol as an example of a "liquid carrier or vehicle" for preparing the ultimate dosage form. (Brittain at paragraph [0067]). Brittain does not suggest, however, that the skilled person should deviate from the concentrations specified by Treanda.

While Treanda refers to a "concentrated solution of bendamustine which is subsequently further diluted for administration" (Action at 5), it is clear that Treanda refers to 5 mg/mL (bendamustine in water), which is much more dilute than presently claimed. Treanda then instructs that this concentration should be "immediately" transferred to an infusion bag to provide the 0.2-0.6 mg/mL concentration for administration. Without Applicant's disclosure, those skilled in the art would have had no reason to prepare more concentrated bendamustine liquids, *e.g.*, 10 mg/mL to 100 mg/mL. Nor would they have had any expectation that those more concentrated liquids would have had the claimed stability characteristics. The rejection should be withdrawn for at least these reasons.

### Those of Ordinary Skill in the Art Would Not Have Included an Antioxidant in Any Liquid Bendamustine Composition

Despite the Examiner's assertions, Brittain does not suggest that an antioxidant should be added to a liquid bendamustine/PEG composition. In fact, those of ordinary skill in the art would not have expected the addition of an antioxidant to be beneficial to bendamustine's storage stability because no reference had suggested that bendamustine degraded *via* an oxidative mechanism.[7,8] Moreover, industry guidance discouraged the use of antioxidants, recommending other methods for reducing oxidation. The claims are patentable for at least these reasons.

#### *Brittain does not teach that an antioxidant should be added to a liquid bendamustine composition*

The Examiner alleges that Brittain teaches lyophilizing bendamustine with an antioxidant. (Action at 6). Brittain provides no such disclosure. None of Brittain's exemplified compositions includes an antioxidant. Moreover, the paragraph relied upon by the Examiner

---

[7] *See, e.g.*, Exhibit B, Excerpts from the *Responsive Expert Report of Juergen Siepmann, Ph.D.* ("Siepmann Report"). A redacted version of the entirety of the Siepmann Report is attached hereto as Exhibit C.
[8] *See also*, Exhibit A, pages 25-26 (finding that "Defendants did not establish by clear and convincing evidence that [the prior art] would have motivated a POSITA to use an antioxidant" to curb PEG oxidation).

{00592392 }

Page 7 of 13

EAGLEBEN-SLAYBACK-00271863

merely states that an antioxidant could be used as a lyophilization excipient only "if desired." (Brittain at paragraph [0088]; Action at 6). This statement hardly provides the "clear and unambiguous" instruction to include an antioxidant, as the Examiner appears to imply. The Examiner has not articulated how Brittain would have suggested to one of ordinary skill in the art that an antioxidant should be included in a ready to use bendamustine/PEG composition and the rejection should be withdrawn for at least this reason.

### *The art does not teach that bendamustine can degrade via an oxidative mechanism*

Bendamustine rapidly degrades in water *via* several pathways, none of which are oxidative. (*See, e.g.,* Specification at page 2). One pathway by which bendamustine degrades is *via* aziridinium ring hydrolysis, which produces HP1 and HP2:



(Brittain at paragraph [0022]; Maas,[9] Studies and Results, Scheme; U.S. 8,344,066 (Drager)[10] at col. 1, lines 50-65; col. 4, lines 33-45).

Bendamustine also degrades *via* dimer formation, which occurs when a molecule of bendamustine attacks the aziridinium ring:

---

[9] Maas is of record in this application. A copy of Maas, along with an English translation, accompanies this response.

[10] Drager is of record in this application.

EAGLEBEN-SLAYBACK-00271864

(Brittain at paragraph [0027]; Drager at col. 4, lines 50-67).

Another pathway for bendamustine degradation is esterification of the -COOH with mono- and poly-hydroxy-containing compounds.  Various bendamustine ester degradation products have been reported in the art:



(Brittain at paragraph [0111]; Drager at col. 5, lines 13-44).

EAGLEBEN-SLAYBACK-00271865

DOCKET NO.: 820-1041-US-CON7

While many bendamustine degradation mechanisms have been reported, the art did *not* teach that bendamustine degrades *via* any oxidative pathway.

"Antioxidants are used to reduce the oxidation of active substances and excipients in the finished product." (Note for Guidance, European Agency for the Evaluation of Medicinal Products, page 8 of 9 (of record))  Since bendamustine was not known to degrade *via* an oxidative process, those of ordinary skill in the art would not have tried to reduce degradation by adding an antioxidant to a bendamustine composition.[11]  The claims are non-obvious for at least this reason.

### Industry Guidance Discouraged Using Antioxidants in Parenteral Formulations

Even if those skilled in the art sought to discourage oxidation in a particular bendamustine composition, the guidance to the industry at the time of the invention was to ***not*** include an antioxidant.  Instead, industry guidance encouraged addressing oxidation by ***other*** means.  For example, the European Agency for the Evaluation of Medicinal Products (EMEA) stated that:

> Antioxidants should only be included in a formulation if it has been proven hat their use cannot be avoided. This applies to cases where the manufacturing process is optimised to minimise the potential for oxidation.

(EMEA Guidance at 8 of 9).  Indeed, it had been suggested at the time of the invention that the use of antioxidants in parenteral formulations was "now in decline" and that a "preferred method of preventing oxidation is simply to exclude oxygen." (Broadhead at 334)[12].

Even if oxidation of a liquid bendamustine composition was for some reason a concern,[13] industry guidance discouraged adding antioxidants and recommended other means for preventing

---

[11] Noteworthy is that the TREANDA lyophilized product does not include any antioxidant – it contains only bendamustine HCl and mannitol. (Treanda at Section 11).

[12]

**Use of Excipients**

Excipients may be useful in preventing chemical and physical instability. Antioxidants are included in parenteral formulations, although their use is now in decline, and EU guidelines discourage their use unless no other alternative exists (see sect. "Parenteral Products and the

[13] As discussed *supra*, Applicant does not concede this point.

{00592392 }

EAGLEBEN-SLAYBACK-00271866

oxidation.[14]  Those of ordinary skill in the art, therefore, would have been dissuaded from including antioxidants in any liquid bendamustine composition and the rejection should be withdrawn for at least this reason.

**The Claimed Compositions Are Surprisingly and Unexpectedly Stable During Storage**

As reported in the specification, a composition including bendamustine in PEG exhibited 2.28% of impurities after storage at room temperature for 15 days and 41.9% impurities after storage for 15 days at 40 °C.  (Specification at Example 3, page 13, Table 3, reproduced below).

| Antioxidant | T°C | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
|---|---|---|---|---|---|
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid 5 mg/ml | 25 | 15 | 98.5 | <LD | 0.23 |
| | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

Based on these poor stability results, a person would have forsaken development of a liquid bendamustine/PEG composition.  A composition presenting such a poor initial stability profile would have been deemed unsuitable as a starting point to create a storage-stable composition.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶ 359, 469-71)

Despite the poor stability of bendamustine/PEG, surprisingly, adding an antioxidant substantially eliminated the formation of degradation products.  As shown in the specification, and the Table above, a bendamustine/PEG composition including antioxidant exhibited no substantial increase in degradants after storage for 15 days at either room temperature or 40 °C.  (Specification at Example 3, page 13, Table 3).

The claimed liquid bendamustine/PEG compositions exhibit surprising storage stability if an antioxidant is added.  Such an unexpected result could not have been predicted.  This result is

---

[14] There were four marketed PEG-containing parenteral formulations available in the United States as of this application's priority date and none of them contained an antioxidant.  (*See* Appendix A, attached hereto, Siepmann Report at ¶¶355-358 (discussing Ativan®, Busulfex®, Robaxin®, and VePesid®))

EAGLEBEN-SLAYBACK-00271867

DOCKET NO.: 820-1041-US-CON7

particularly unexpected given the absence of any report in the literature of an oxidative degradation pathway. The claims are patentable for at least this reason.

**Obviousness-type double patenting**

The Examiner alleges that claim 1-16 are not patentable on the ground of nonstatutory double patenting over:

claims 1-6 of U.S. 9,265,831;

claims 1-27 of U.S. 9,572,797;

claims 1-26 of U.S. 9,572,796;

claims 1-22 of U.S. 8,609,707;

claims 1-23 of U.S. 9,579,384;

claims 1-24 of U.S. 9,034,908;

claims 1-17 of U.S. 9,597,399;

claims 1-23 of U.S. 9,144,568;

claims 1-29 of U.S. 9,572,887;

claims 1-7 of U.S. 9,597,397; and

claims 1-26 of U.S. 10,010,533.

Applicant will consider filing terminal disclaimers once otherwise allowable subject matter has been acknowledged.

\* \* \*

Claims 1-16 are non-obvious over the combination of cited art. An early notice to that effect is earnestly solicited.

<u>Fees</u>

This response is being filed with a two-month extension of time and the requisite fee. No further fees are believed to be due. If, on the other hand, it is determined that any further fees are due or any overpayment has been made, the Assistant Commissioner is hereby authorized to debit or credit such sum to Deposit Account No. 02-2275.

Pursuant to 37 C.F.R. 1.136(a)(3), please treat this and any concurrent or future reply in this application that requires a petition for an extension of time for its timely submission as

{00592392 }

Page 12 of 13

EAGLEBEN-SLAYBACK-00271868

DOCKET NO.: 820-1041-US-CON7

incorporating a petition for extension of time for the appropriate length of time. The fee associated therewith is to be charged to Deposit Account No. 02-2275.

**Conclusion**

In view of the amendments and remarks contained above, it is respectfully submitted that each of the matters raised by the Examiner has been addressed by the present amendment and that the present application is now in condition for allowance.

If for any reason the present application is not deemed in condition for allowance, the Examiner is respectfully requested to contact the undersigned attorney.

Respectfully submitted,

LUCAS & MERCANTI, LLP

By:   /Michael N. Mercanti/
       Michael N. Mercanti
       Registration No. 33,966

LUCAS & MERCANTI, LLP
30 Broad Street, 21st Floor
New York, New York 10004
Phone: 212-661-8000

EAGLEBEN-SLAYBACK-00271869

# EXHIBIT F

| *Notice of Allowability* | Application No. 16/509,920 | Applicant(s) Palepu et al. | |
|---|---|---|---|
| | Examiner ERNST V ARNOLD | Art Unit 1613 | AIA (FITF) Status No |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>6/11/21</u>.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>1-16</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

    a) ☐ All      b) ☐ Some      *c) ☐ None of the:

       1. ☐ Certified copies of the priority documents have been received.

       2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

       3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☐ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date _____ .
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| | /ERNST V ARNOLD/ Primary Examiner, Art Unit 1613 |
|---|---|

EAGLEBEN-SLAYBACK-00272535

### *Notice of Pre-AIA or AIA Status*

The present application is being examined under the pre-AIA first to invent provisions.

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this application is eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on 6/11/21 has been entered.

### Claims Status:

Claims 1-16 are pending.

### *Terminal Disclaimer*

The terminal disclaimer filed on 7/12/21 disclaiming the terminal portion of any patent granted on this application which would extend beyond the expiration date of **US Patents:**

9572887
9572797
9572796
8609707
9579384
10010533

9597399

9144568

9265831

9597397

9034908

has been reviewed and is accepted.  The terminal disclaimer has been recorded.

## Withdrawn rejections and Reasons for Allowance

Applicant's amendments and arguments filed 5/20/21 and 6/11/21 are acknowledged and have been fully considered.  The Examiner has re-weighed all the evidence of record. Any rejection and/or objection not specifically addressed below is herein withdrawn. Specifically, claims 1-16 were rejected under 35 U.S.C. 103(a) as being unpatentable over Brittain et al. (US 20060159713) and TREANDA (Highlights of prescribing information 2008) and Von Stetten et al. (US 4711906) and Miekka et al. (US 7252799). As discussed in the interview held 7/12/21, the term "ready to use" is a term of the art that does give meaning and life to the claim. Brittain et al. do not teach or suggest a ready to use liquid formulation as instantly claimed. Accordingly, it would then only be through hindsight using the instant inventor's disclosure as a blueprint that the ordinary artisan would modify the art of record to derive the instantly claimed subject matter.

EAGLEBEN-SLAYBACK-00272537

### *Conclusion*

Claims 1-16 are allowed.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to ERNST V ARNOLD whose telephone number is (571)272-8509.  The examiner can normally be reached on M-F 7-3:30.

Examiner interviews are available via telephone and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Brian Y Kwon can be reached on 571-272-0581.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see https://ppair-my.uspto.gov/pair/PrivatePair. Should you have questions on access to the Private

Application/Control Number: 16/509,920                                           Page 5
Art Unit: 1613

PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

If you would like assistance from a USPTO Customer Service Representative or access

to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-

272-1000.

/ERNST V ARNOLD/
Primary Examiner, Art Unit 1613

EAGLEBEN-SLAYBACK-00272539

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC, APOTEX INC., and APOTEX CORP.,<br><br>Defendants. | C.A. No. 21-1256-CFC-JLH<br><br>**CONFIDENTIAL – FILED UNDER SEAL** |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE ON CLAIM CONSTRUCTION

Eagle's opposition accuses Defendants of trying to walk away from the stipulated construction, but nowhere reveals exactly what "new" construction Defendants are supposedly advocating. Eagle's post-hoc revision of the stipulated construction "ready to use" seeks to require a comparison with lyophilized powder. This argument, however, should have been made long ago during prosecution or at the very least in the *Markman* phase of this case. Eagle chose to do neither, opting instead to accept, without challenge, that "ready to use" means "able to be dispensed with minimal if any effort or preparation; prepackaged." Defendants intend to apply the exact construction Eagle failed to challenge. Eagle should be precluded from making arguments it has waived.

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F. 4th 1285 (Fed. Cir. 2021) is unhelpful to Eagle as it was an appeal of the claim construction ruling itself. The sole piece of intrinsic evidence cited by Eagle in this case was immediately rejected by the Examiner. (Ex. A, 06/02/2021 Advisory Action) ("'ready to use' . . . raises issues."). The Examiner resolved those issues by offering a different construction, which Eagle accepted and which has now been adopted by the Court. Eagle cannot rewrite the record now as it admits, the "die has been cast." Finally, Granting this motion will also prevent Eagle's experts from engaging in the impermissible comparison of the accused products to the prior art – a concern that Eagle's response fails to address.